UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PALMER GARDENS, LLC, RACHEL GERSTEIN,
JOYCE GERSTEIN, HERBERT GERSTEIN, ALAN
MALTZ, JANET MALTZ, HUBERT TSAI,
CHRISTINE SINGH, XUE FENG, RANDALL A.
MECKEL, HENRY GROSS, BEAVER METAL, LLC,
ACACIO RODRIGUEZ, CREDIBOX UNIVERSAL,
SL, and FELISA HERNANDEZ

*Plaintiffs*

-against-

BAYROCK/SAPIR ORGANIZATION LLC, DONALD
J. TRUMP, ALEX SAPIR, TEVFIK ARIF, 246
SPRING STREET HOLDINGS II, LLC,
BAYROCK/SAPIR REALTY LLC, BAYROCK
SPRING STREET, LLC, BAYROCK GROUP, LLC,
JULIUS SCHWARZ, TRUMP INTERNATIONAL
HOTELS MANAGEMENT LLC, TRUMP MARKS
SOHO LLC, DONALD TRUMP JR., IVANKA
TRUMP, ERIC TRUMP, PRODIGY
INTERNATIONAL NYC, LLC, RODRIGO NINO,
CORE GROUP MARKETING LLC, SHAUN OSHER,
THOMAS POSTILIO and AKERMAN SENTERFITT
LLP, as ESCROW AGENT,

*Defendants.*

**JUDGE WOOD**

Case No.

**10 CIV 5830**

RECEIVED
AUG 0 2 2010
U.S.D.C. S.D. N.Y.
CASHIERS

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs, through their attorneys, Adam Leitman Bailey, P.C., for their Complaint

against the Defendants allege as follows:

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 5

THE PLAINTIFFS ........................................................................................................ 9

    The Palmer Garden Plaintiffs ................................................................................. 10

    The Maltz Plaintiffs ............................................................................................... 12

    The Tsai-Singh Plaintiffs ........................................................................................ 13

    The Feng-Meckel-Gross Plaintiffs ......................................................................... 14

    The Beaver Metal Plaintiffs .................................................................................... 16

    The Credibox Plaintiffs ........................................................................................... 17

    Purchasing and Investing Plaintiffs ........................................................................ 19

THE DEFENDANTS ..................................................................................................... 19

    The Sponsor Defendants ......................................................................................... 19

    The Trump Defendants ............................................................................................ 23

    The Prodigy Defendants .......................................................................................... 25

    The Core Defendants ............................................................................................... 26

    The Escrow Agent ................................................................................................... 28

    Misrepresenting and Control Defendants ............................................................... 28

    Other Non-Party Trump Soho Representatives ....................................................... 32

JURISDICTION AND VENUE ...................................................................................... 36

THE TRUMP SOHO DEVELOPMENT ......................................................................... 37

    The Marketing of the Trump Soho .......................................................................... 37

    The Offering Plan and Documents .......................................................................... 38

    The Restrictive Declaration .................................................................................... 40

The Condominium Declaration ................................................................ 43

The Condominium By-Laws ................................................................... 44

The Unit Management Agreement ........................................................... 45

FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS ..................... 46

Actual Unit Sales by Date ..................................................................... 46

False Statements Made to the Palmer Gardens Plaintiffs ........................... 48

False Statements Made to the Maltz Plaintiffs ........................................ 52

False Statements Made to the Tsai-Singh Plaintiffs .................................. 53

False Statements Made to the Feng-Meckel-Gross Plaintiffs ..................... 55

False Statements Made to the Beaver Metal Plaintiffs ............................... 58

False Statements Made to the Credibox Plaintiffs .................................... 61

Additional False Statements Made to the Press and Reliance by Plaintiffs ........... 65

Reliance on Defendants' False Statements by Additional Purchasers ................ 70

THE MAY 5, 2010 FILING REVEALING THE FRAUD ................................... 72

The Minimum Sales Percentage Required Under the Martin Act Regulations and

the Plan ............................................................................................ 72

The Effectiveness Amendment and the Sapir Affidavit .............................. 76

The Drastic Staff Cuts Revealed by the Tenth Amendment ....................... 77

THE DEFENDANTS' FRAUD AND THE MOTIVATION BEHIND IT .......................... 81

The Need to Project Success Through False Statements ............................. 81

False Statements of the Prodigy Defendants ........................................... 85

False Statements of the Core Defendants ............................................... 92

False Statements of the Trump Defendants ............................................. 96

False Statements of the Sponsor Defendants and their Agents ................................. 102

The Control Defendants' Responsibility for the False Statements .......................... 111

The Defendants' Regular Monitoring and Correction of News Reports.................. 112

THE TRUMP SOHO OFFERING AS A SECURITY ......................................... 115

NON-EXEMPTION AND NON-COMPLIANCE WITH ILSA ......................................... 122

No Full Exemption from ILSA under 15 U.S.C. §1702(a) Applies.......................... 123

No Other Statutory or Regulatory ILSA Exemption Applies .................................. 124

The Right to Revoke Under 15 U.S.C. §1503(d) ...................................................... 127

The ILSA Property Report's Failure to Disclose the Revocation Option ................ 127

CLAIM I – ILSA DECEPTIVE SALES PRACTICES, 15 U.S.C. § 1703(a)(2) ................ 134

CLAIM II – COMMON LAW FRAUD .............................................................................. 140

CLAIM III – SECURITIES FRAUD – 1934 ACT § 10(b) & RULE 10b-5 ....................... 142

CLAIM IV – SECURITIES CONTROL PERSONS – 1934 ACT § 20(a) .......................... 147

CLAIM V – SECURITIES FRAUD – 1933 ACT § 12(a)(2)............................................... 149

CLAIM VI – SECURITIES CONTROL PERSONS – 1933 ACT § 15............................... 153

CLAIM VII – DECEPTIVE BUSINESS PRACTICES, GBL §§ 349 et seq. ...................... 154

CLAIM VIII – BREACH OF CONTRACT ........................................................................ 158

CLAIM IX – ILSA PROPERTY REPORT OMISSION, 15 U.S.C. § 1702(a)(1) .............. 161

CLAIM X – ILSA REVOCATION, 15 U.S.C. § 1703(d).................................................... 164

CLAIM XI – INJUNCTION TO HOLD AND REFUND ESCROW ................................. 165

REQUEST FOR RELIEF.................................................................................................... 167

## PRELIMINARY STATEMENT

1.    This action seeks to redress the substantial and ongoing pattern of fraudulent
      misrepresentations and deceptive sales practices that the Defendants undertook
      against the Plaintiffs, inducing them to enter into agreements to buy hotel-
      condominium Units at the Trump Soho Hotel Condominium New York (the
      "Condominium"), then under construction at 246 Spring Street, New York, New
      York 10013.

2.    The hotel-condominium development  (the "Trump Soho") was announced with
      great fanfare by celebrity real estate mogul Donald J. Trump on the 2006 finale of
      the fifth season of his television show *The Apprentice*, and has been a signature
      project of Trump's three children, Donald Trump Jr., Ivanka Trump and Eric
      Trump, who have both an equity interest in the project and have publicly used the
      project to try to establish some independent credibility in the real estate business
      beyond their mere status as Trump's children.

3.    The Condominium sponsor, Bayrock/Sapir Organization LLP (the "Sponsor") is
      jointly owned by Donald Trump, Alex Sapir and Tevfik Aviv, each of whom had
      and has a significant personal, financial, and reputational interest in having the
      project succeed by selling condominium Units.

4.    The Sponsor and its affiliates and sales agents – the Defendants – stood to make
      substantial profits if large numbers of the Condominium Units could be sold, but
      could face disaster if they went unsold.

5.    As a result, from the very beginning of their marketing of the Units in September
      2007, the Defendants (other than Akerman Senterfitt LLP (the "Escrow Agent"),

sued only in its role as escrow agent holding the Plaintiffs' contract deposits)
engaged in a coordinated pattern of falsely overstating the number and percentage
of Trump Soho Units sold, and other indicators of market interest, to encourage
the Plaintiffs and other potential purchasers to buy Units in what they claimed to
be a highly successful sales effort.

6.      Over the first year and a half of marketing the Units (the period that the Plaintiffs
signed contracts to buy their Units and then made additional deposits to preserve
their contract rights), and despite badly lagging sales, the Defendants made
increasing representations about the percentages of Units sold – stating that the
Trump Soho was 30, 40, 50, 60 percent or more sold – both to worldwide media
sources and to individual purchasers and potential purchasers, including the
Plaintiffs.

7.      The Defendants' claims of high percentages of Units sales were very important to
the Plaintiffs and other purchasers hearing them because robust sales are a strong
indication of the development's value and that the Units are well priced in the
marketplace.

8.      More significantly, since a substantial part of the Unit's value was in the ability to
resell it at some later time in the secondary market, and if the Sponsor did not sell
out the Units, the buyer would be competing with the Sponsor on resale, a high
sales percentage reported by the Sponsor was vital to the buyer's belief in his or
her ability to eventually resell his or her investment.

9.      Indeed the federally-required property disclosure report distributed to Trump
Soho purchasers expressly cautions: "Resale of your Hotel Suite Unit may be

difficult or impossible until our projected sell-out of the condominium, since you may face the competition of our own sales program and local real estate brokers may not be interested in listing your Hotel Suite Unit."

10.    Further, the higher the percentage of Sponsor ownership in a condominium development, the riskier the investment because of the greater chance and consequences of Sponsor default.

11.    Indeed, many banks will not lend on condominium Units where the Sponsor ownership is more than 30 or 50 percent.

12.    Despite the extravagant claims of the percentage of Units sold made by Trump Soho representatives, when construction was complete the Sponsor was forced to reveal in a filing required under New York's Martin Act, New York General Business Law ("GBL") §§ 352 *et seq.*, that it had only entered into contracts to sell 62 out of the 413 Units originally offered (later reduced to 391 Units), or just over 15%.

13.    The 15% number is highly significant because under the Martin Act's regulations, the Sponsor would have been unable to declare the condominium offering effective and close on the sales of the Units unless it had secured contracts to sell 15% of the Units.  Similarly, in the Trump Soho's offering plan, the Sponsor represented that it would not declare the offering effective if fewer than 60 Units were under contract.

14.    What this means is that if the Sponsor had induced just three fewer purchasers to sign contracts (and possibly just one fewer), the project would have foundered,

and all purchasers could have rescinded their contracts and obtained full refunds under New York law.

15.     Thus, not only were the Plaintiffs individually misled into signing their contracts and submitting their additional deposits, the Defendants collective efforts to pump up sales through false and misleading statements caused all buyers to miss an option to revoke their contract that they all should have had in the absence of fraud.

16.     Moreover, although the Plaintiffs were promised a hotel fully staffed to provide high quality services, severe budget cutbacks by Trump Soho management mean that the services the Plaintiffs would receive do not match what was promised.

17.     A key aspect of the Trump Soho's sales pitch was that, because zoning restrictions prohibited buyers from staying in their Units for more than limited periods, each buyer's Unit would be rented to the public as a hotel room during the time they were not in occupancy, with the buyers receiving the rental revenue (less charges and expenses) as an investment return on their Unit purchases.

18.     As a result of these actions by the Defendants, the Plaintiffs are seeking rescission of their purchase agreements refund of all deposits they have made (a total of $1,749,861.00), compensatory and punitive damages, interest, costs and attorney's fees, and other relief under the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. §§ 1701 *et seq.*, common law fraud, breach of contract, the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78a *et seq.*, the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77a *et seq.*, and the New York Deceptive Business Practices Act, GBL §§ 349 *et seq.*

### THE PLAINTIFFS

19. Each of the Plaintiffs, either directly or indirectly through a business entity, is a contract vendee to purchase a Hotel Suite Unit (a "Unit") of the Condominium under a purchase agreement (a "Purchase Agreement") with the Sponsor.

20. Each of the Units was offered and sold pursuant to a Commercial Condominium Offering Plan for Trump Soho Condominium New York (the "Offering Plan" or "Plan"), as amended from time to time, issued by the Sponsor.

21. Each Purchase Agreement is on an identical form as provided in the Offering Plan, with provisions identical in substance other than business terms such as Unit number, purchase price, deposit amount, date and the like.

22. Each Purchase Agreement requires the purchaser to submit an initial deposit (an "Initial Deposit") of 10% of the purchase price of the Unit to be held in escrow by the Escrow Agent simultaneously with the submission of the Purchase Agreement to the Sponsor, except that in one instance detailed below, a purchaser was permitted to make an Initial Deposit of 5% of the purchase price, a First Additional Deposit of an additional 5% and then a Second Initial Deposit of 10%.

23. Each Purchase Agreement also requires the purchaser to submit an additional deposit (an "Additional Deposit") of 10% of the purchase price of the Unit to be held in escrow by the Escrow Agent on or before a date six months after the date of the Purchase Agreement (except as noted above and detailed below).

24. The Initial Deposit and the Additional Deposit (or First and Second Additional Deposit, as applicable) (collectively, the "Deposit"), totaling 20% of the purchase price, are to be held under an escrow agreement dated June 26, 2007 between the

Escrow Agent and the Sponsor (the "Escrow Agreement") until released with all accrued interest under the terms of the Escrow Agreement.

**The Palmer Garden Plaintiffs**

25.     Plaintiff Palmer Gardens LLC ("Palmer Gardens") is a California limited liability company with an address of 660 Sunset Blvd, #201, Los Angeles, California 90028.

26.     Under a Purchase Agreement dated January 28, 2008, Palmer Gardens contracted to purchase Hotel Suite Unit 2509 of the Condominium from the Sponsor for a purchase price of $2,136,000.00 under the terms and conditions thereof.

27.     Palmer Gardens submitted an Initial Deposit of $213,600.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

28.     Palmer Gardens submitted an Additional Deposit of $213,600.00 payable to the Escrow Agent on or about the day it was due, July 28, 2008.

29.     On information and belief, the Escrow Agent holds a total Deposit of $427,200.00, plus accrued interest, in escrow for the benefit of Palmer Gardens under the Escrow Agreement.

30.     Plaintiff Rachel Gerstein is a California resident with an address of 660 Sunset Blvd, #201, Los Angeles, California 90028.

31.     Plaintiff Rachel Gerstein is the managing member of Palmer Gardens and owns 50% of its equity membership interests.

32.     Plaintiff Joyce Gerstein is a Florida resident with an address of 660 Sunset Blvd, #201, Los Angeles, California 90028.

33.  Plaintiff Joyce Gerstein is a member of Palmer Gardens and owner of 49% of its
     equity membership interests.

34.  Plaintiff Herbert Gerstein is a Florida resident with an address of 660 Sunset
     Blvd, #201, Los Angeles, California 90028.

35.  Plaintiff Herbert Gerstein is a member of Palmer Gardens and owner of 1% of its
     equity membership interests.

36.  Rachel Gerstein conducted the investigation of the purchase of the Trump Soho
     Unit on behalf of Palmer Gardens, Joyce Gerstein and Herbert Gerstein.

37.  Rachel Gerstein communicated statements and representations made to her and
     reviewed by her regarding the Trump Soho, and her analyses and summaries
     thereof, to Palmer Gardens, Joyce Gerstein and Herbert Gerstein.

38.  In reliance on the representations made to Rachel Gerstein, Rachel Gerstein,
     Joyce Gerstein and Herbert Gerstein agreed to purchase a Unit of the Trump Soho
     through Palmer Gardens.

39.  In reliance on the representations made to Rachel Gerstein, Rachel Gerstein,
     Joyce Gerstein and Herbert Gerstein contributed the funds used to make the Initial
     Deposit and the Additional Deposit to Palmer Gardens in proportion to their
     membership interests in Palmer Gardens.

40.  In reliance on the representations made to Rachel Gerstein, Palmer Gardens
     agreed to purchase a Unit of the Trump Soho

41.  In reliance on the representations made to Rachel Gerstein, Palmer Gardens
     deposited the funds used to make the Initial Deposit and the Additional Deposit.

42.   In reliance on the representations made to Rachel Gerstein, Palmer Gardens entered into its Purchase Agreement.

### The Maltz Plaintiffs

43.   Plaintiffs Alan Maltz and Janet Maltz are Florida residents with an address of 220 Grand Pointe Drive, Palm Beach Gardens, Florida 33418.

44.   Under a Purchase Agreement dated October 27, 2007, Alan Maltz and Janet Maltz contracted to Purchase Hotel Suite Unit 2006 of the Condominium from the Sponsor for a purchase price of $1,244,000.00 under the terms and conditions thereof.

45.   Alan Maltz and Janet Maltz submitted an Initial Deposit of $124,400.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

46.   Alan Maltz and Janet Maltz submitted an Additional Deposit of $124,400.00 payable to the Escrow Agent on or about the day it was due, April 25, 2008.

47.   On information and belief, the Escrow Agent holds a total Deposit of $248,800.00, plus accrued interest, in escrow for the benefit of Alan Maltz and Janet Maltz under the Escrow Agreement.

48.   In reliance on the representations made to them, Alan Maltz and Janet Maltz agreed to purchase a Unit of the Trump Soho.

49.   In reliance on the representations made to them, Alan Maltz and Janet Maltz deposited the funds used to make the Initial Deposit and the Additional Deposit.

50.   In reliance on the representations made to them, Alan Maltz and Janet Maltz entered into their Purchase Agreement.

**The Tsai-Singh Plaintiffs**

51. Plaintiff Hubert Tsai is a California resident with an address of 3141 Michelson Drive, #1202, Irvine, California 96212.

52. Plaintiff Christine Singh is a New York resident with an address of 3274 Harbor Court, Baldwin Harbor, New York 11510.

53. Under a Purchase Agreement dated September 7, 2007, Hubert Tsai and non-party Anthony Tsai contracted to purchase Hotel Suite Unit 902 of the Condominium from the Sponsor for a purchase price of $1,062,000.00 under the terms and conditions thereof.

54. Hubert Tsai and Anthony Tsai submitted an Initial Deposit of $106,200.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

55. Hubert Tsai and Anthony Tsai submitted an Additional Deposit of $106,200.00 payable to the Escrow Agent on or about the day it was due, March 7, 2008.

56. Anthony Tsai assigned his rights and obligations under the Purchase Agreement to Plaintiff Christine Singh under an Assignment and Assumption of Agreement which was dated as of May 15, 2008, but which was signed by the parties in or about September 2008.

57. In connection with her assumption of Anthony Tsai's interest in the Purchase Agreement, Christine Singh paid Anthony Tsai $106,200.00 representing Anthony Tsai's interest in and contribution to the Initial Deposit and Additional Deposit, and thereby assumed Anthony Tsai's interest in the Initial Deposit and Additional Deposit.

58.     On information and belief, the Escrow Agent holds a total Deposit of $248,800.00, plus accrued interest, in escrow for the benefit of Hubert Tsai and Christine Singh under the Escrow Agreement.

59.     In reliance on the representations made to them, Hubert Tsai and Anthony Tsai agreed to purchase a Unit of the Trump Soho.

60.     In reliance on the representations made to them, Hubert Tsai and Anthony Tsai deposited the funds used to make the Initial Deposit and the Additional Deposit.

61.     In reliance on the representations made to them, Hubert Tsai and Anthony Tsai entered into their Purchase Agreement.

62.     In reliance on the representations made to Hubert Tsai, Anthony Tsai and her, Christine Singh agreed to purchase Anthony Tsai's interest in his Purchase Agreement.

63.     In reliance on the representations made to Hubert Tsai, Anthony Tsai and her, Christine Singh agreed to enter into Assignment and Assumption of Agreement and to assume Anthony Tsai's interest in his Purchase Agreement.

64.     In reliance on the representations made to Hubert Tsai, Anthony Tsai and her, Christine Singh paid to Anthony Tsai the funds representing her share of the Initial Deposit and Additional Deposit under the Purchase Agreement she assumed.

### The Feng-Meckel-Gross Plaintiffs

65.     Plaintiff Henry Gross is a New York resident with a business address of 444 Madison Avenue, 18th Floor, New York, New York 10022.

66. Plaintiff Randall A. Meckel is a New York resident with an address of 310 East 46th Street, #24A, New York, New York 10017.

67. Plaintiff Xue Feng is a New York resident with an address of 310 East 46th Street, #24A, New York, New York 10017.

68. Under a Purchase Agreement dated December 14, 2007, Xue Feng, Randall A. Meckel and Henry Gross contracted to Purchase Hotel Suite Unit 2202 of the Condominium from the Sponsor for a purchase price of $1,257,000.00 under the terms and conditions thereof.

69. Xue Feng, Randall A. Meckel and Henry Gross submitted an Initial Deposit of $125,700.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

70. Xue Feng, Randall A. Meckel and Henry Gross submitted an Additional Deposit of $125,700.00 payable to the Escrow Agent on or about the day it was due, June 14, 2008.

71. On information and belief, the Escrow Agent holds a total Deposit of $248,800.00, plus accrued interest, in escrow for the benefit of Xue Feng, Randall A. Meckel and Henry Gross under the Escrow Agreement.

72. In reliance on the representations made to them, Xue Feng, Randall A. Meckel and Henry Gross agreed to purchase a Unit of the Trump Soho.

73. In reliance on the representations made to them, Xue Feng, Randall A. Meckel and Henry Gross deposited the funds used to make the Initial Deposit and the Additional Deposit.

74.     In reliance on the representations made to them, Xue Feng, Randall A. Meckel
        and Henry Gross entered into the Purchase Agreement.

### The Beaver Metals Plaintiffs

75.     Plaintiff Beaver Metal, LLC ("Beaver Metal") is a Delaware limited liability
        company with an address of C/ Velazquez 60, 4°, 28001 Madrid, Spain.

76.     Under a Purchase Agreement dated July 2, 2008, Beaver Metal contracted to
        purchase Hotel Suite Unit 3203 from the Sponsor for a purchase price of
        $1,560,000.00 under the terms and conditions thereof.

77.     Beaver Metal submitted an Initial Deposit of $156,000.00 payable to the Escrow
        Agent with its submission of the Purchase Agreement to the Sponsor.

78.     Beaver Metal submitted an Additional Deposit of $156,000.00 payable to the
        Escrow Agent on or about the day it was due, January 2, 2009.

79.     On information and belief, the Escrow Agent holds a total Deposit of $312,000.00
        in escrow for the benefit of Beaver Metal under the Escrow Agreement.

80.     Plaintiff Acacio Rodriguez is a resident of Spain with an address of C/ Velazquez
        60, 4°, 28001 Madrid, Spain.

81.     Acacio Rodriguez is the principal of Beaver Metal and owns all of its equity
        membership interests.

82.     Non-party Javier Rodriguez is an authorized representative of Beaver Metal.

83.     Javier Rodriguez conducted the investigation of the purchase of the Trump Soho
        Unit on behalf of Beaver Metal and Acacio Rodriguez.

84.   Javier Rodriguez communicated statements and representations made to him and reviewed by him regarding the Trump Soho, and his analyses and summaries thereof, to Beaver Metal and Acacio Rodriguez.

85.   In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Acacio Rodriguez agreed to purchase a Unit of the Trump Soho through Beaver Metal

86.   In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Acacio Rodriguez contributed the funds used to make the Initial Deposit and the Additional Deposit to Beaver Metal.

87.   In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Beaver Metal agreed to purchase a Unit of the Trump Soho.

88.   In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Beaver Metal deposited the funds used to make the Initial Deposit and the Additional Deposit.

89.   In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Beaver Metal entered into its Purchase Agreement.

**The Credibox Plaintiffs**

90.   Plaintiff Credibox Universal, SL ("Credibox") is a Spanish company with an address of Calle Aurea Diaz Flores número 5 piso primero oficina número 8 Tenerife.código postal 38003, Spain.

91.   Under a Purchase Agreement dated August 2, 2008, Credibox contracted to purchase Hotel Suite Unit 3311 from the Sponsor for a purchase price of $1,490,305.00 under the terms and conditions thereof.

92. Credibox submitted an Initial Deposit of $74,515.25 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

93. Credibox submitted a First Additional Deposit of $74,515.25 on or about December 4, 2008, as provided in its Purchase Agreement.

94. Credibox submitted a Second Additional Deposit of $149,030.50 on or about February 15, 2009 as provided in its Purchase Agreement.

95. On information and belief, the Escrow Agent holds a total Deposit of $298,061.00 in escrow for the benefit of Credibox under the Escrow Agreement.

96. Plaintiff Felisa Hernandez is a resident of Spain with an address of Calle La Pirra14, Resid, Eisenhower, BQ C, 5°C, Madrid, 28022 Spain.

97. Felisa Hernandez is the sole owner and principal of Credibox.

98. Felisa Hernandez conducted the investigation of the purchase of the Trump Soho Unit on behalf of Credibox.

99. Felisa Hernandez communicated statements and representations made to her and reviewed by her regarding the Trump Soho, and her analyses and summaries thereof, to Credibox.

100. In reliance on the representations made to her, Felisa Hernandez agreed to purchase a Unit of the Trump Soho through Credibox.

101. In reliance on the representations made to her, Felisa Hernandez contributed the funds used to make the Initial Deposit, the First Additional Deposit and the Second Additional Deposit to Credibox.

102.    In reliance on the representations made to Felisa Hernandez, Credibox deposited

the funds used to make the Initial Deposit, the First Additional Deposit and the

Second Additional Deposit.

103.    In reliance on the representations made to Felisa Hernandez, Credibox entered

into its Purchase Agreement.

### Purchasing and Investing Plaintiffs

104.    As used herein, the term "Purchasing Plaintiffs" refers to all Plaintiffs who have

entered into Purchase Agreements (i.e. all Plaintiffs except Rachel Gerstein, Joyce

Gerstein, Herbert Gerstein, Acacio Rodriguez and Felisa Hernandez).

105.    As used herein, the term "Investing Plaintiffs" refers to all Plaintiffs who have

contributed funds to business entities for those entities to use to make deposits

required under those entities' Purchase Agreements (i.e. Rachel Gerstein, Joyce

Gerstein, Herbert Gerstein, Acacio Rodriguez and Felisa Hernandez).

### THE DEFENDANTS

### The Sponsor Defendants

106.    Defendant Bayrock/Sapir Organization LLC (the "Sponsor") is a Delaware

limited liability company having an address of 160 Varick Street, 2nd Floor, New

York, New York 10013.

107.    The Sponsor is the sponsor of the Trump Soho Hotel Condominium New York

(the "Condominium").

108.    On September 21, 2005, the Sponsor acquired an approximately 24,727 square

foot parcel of land located at 246 Spring Street, New York, New York (the

"Land") upon which the Condominium was later constructed by the Sponsor.

109.  Defendant Donald J. Trump ("Donald Trump") is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

110.  Defendant Alex Sapir is, on information and belief, an individual and resident of New York with an address of c/o The Sapir Organization, LLC, 384 Fifth Avenue, New York, New York 10018.

111.  Defendant Tevfik Arif is, on information and belief, an individual and resident of New York with an address of c/o Bayrock Group LLC, 160 Varick Street, 2nd Floor, New York, New York 10013.

112.  Donald Trump, Alex Sapir and Tevfik Arif are, on information and belief, the indirect owners of the Sponsor.   The basis for this allegation is a statement on page 170 of the Offering Plan.

113.  Defendant 246 Spring Street Holdings II, LLC ("246 Spring Holdings") is, on information and belief, a Delaware limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

114.  246 Spring Holdings is, on information and belief, the sole member of Sponsor.

115.  Defendant Bayrock/Sapir Realty LLC ("Bayrock/Sapir Realty") is, on information and belief, a Delaware limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

116.  Bayrock/Sapir Realty is, on information and belief, the managing member of 246 Holdings.

117.   Defendant Bayrock Spring Street LLC ("Bayrock Spring") is, on information and belief, a Delaware limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

118.   Bayrock Spring is on information and belief, the managing member of Bayrock/Sapir Realty.

119.   Defendant Bayrock Group LLC ("Bayrock Group") is, on information and belief, a New York limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

120.   Bayrock Group, on information and belief, is the sole member of Bayrock Spring.

121.   The basis for the allegations regarding the statuses of 246 Spring Holdings, Bayrock/Sapir Realty, Bayrock Spring and Bayrock Group as sole member or managing member of another company are statements in the Offering Plan and documents signed on behalf of those companies in those respective capacities, including a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan.

122.   Julius Schwarz is, on information and belief, an individual and resident of New York with an address of c/o Bayrock Group LLC, 160 Varick Street, 2nd Floor, New York, New York 10013.

123.   Julius Schwarz is, on information and belief, an Executive Vice President and Principal of Bayrock Group, and an authorized signatory of the Sponsor. The basis for this allegation is documents executed by Mr. Schwarz, including a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan.

124. Tevfik Arif is, on information and belief, the founder and Chairman of the Bayrock Group. The basis for this information is press reports regarding his title.

125. Donald Trump, Alex Sapir, Tevfik Arif and Julius Schwarz are, on information and belief, "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan." The basis for this allegation is statement to this effect on page 170 of the Plan and a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan.

126. Donald Trump, Alex Sapir, Tevfik Arif and Julius Schwarz have, in a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan, certified that they have read and investigated the facts in the Offering Plan, and that the Offering Plan (including any amendments to be submitted) is "complete, current and accurate," does not "omit any material fact," does not "contain any untrue statement of a material fact," and does "not contain any fraud, deception, concealment, suppression, [or] false pretence."

127. The By-Laws to the Condominium designate Donald Trump, Alex Sapir and Julius Schwarz as the initial board of directors of the Condominium, in full control and management of the Condominium, to serve as such until the Condominium's first annual meeting, which may be held as late as one year and 30 days after the first closing of a sale of a Unit.

128. The By-Laws of the Condominium provide that the Sponsor will have the absolute right to designate a majority of the members of the board of directors of the Condominium for a period ending the later of five years from the date of the

first closing of a sale of a Unit or when the Sponsor has sold an aggregate of 90% of common interests in Condominium Units.

129.  Even after the expiration of the period when the Sponsor has the absolute right to designate a majority of the members of the board of directors of the Condominium, the Sponsor may still continue to control the board of directors of the Condominium through voting its interests in any Units it owns.

**The Trump Defendants**

130.  Defendant Trump International Hotels Management LLC ("Trump Hotels") is, on information and belief, a Delaware limited liability company with an address of 725 Fifth Avenue, New York, New York 10022.

131.  Trump Hotels is designated in the Offering Plan (at 35) as the "Hotel Management Company" which will "act as the operator and manager of the hotel in the Condominium on behalf of the Board pursuant to a Hotel Management Agreement," with extensive responsibilities detailed in the Plan.

132.  Trump Hotels is also the "Hotel Manager" under a Unit Management Agreement (Exhibit 13 to the Plan) that each Unit buyer is required to sign upon purchase of the Unit, with extensive responsibilities detailed in the Plan.

133.  Defendant Trump Marks Soho LLC ("Trump Marks") is, on information and belief, a New York limited liability company with an address of 725 Fifth Avenue, New York, New York 10022.

134.  Trump Marks is the owner of certain trademarks, including "Trump Soho Hotel Condominium New York," "Trump Soho Hotel Condominium," "Trump Soho Hotel" and any other combination of "Trump" with "Soho", and the Licensor of

such trademarks to the Sponsor pursuant to a Sponsor License Agreement described on page 19 of the Plan, and to the Condominium under a Condominium License Agreement (Exhibit 16 to the Plan).

135.   Defendant Donald Trump Jr. is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

136.   Defendant Ivanka Trump is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

137.   Defendant Eric Trump is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

138.   On information and belief, Donald Trump, Donald Trump Jr., Ivanka Trump and Eric Trump have an 18% interest in the Trump Soho. The basis for this allegation is a *Wall Street Journal* article dated March 29, 2010 and a *Wall Street Journal* article dated July 30, 2010 that state that each have an 18% interest in the Trump Soho, and are each individual signatories to the exclusivity provisions of a license agreement for the use of Trump Trademarks, attached as Exhibit 16 to the Offering Plan.

139.   On information and belief, Donald Trump, Donald Trump Jr., Ivanka Trump and Eric Trump are officers, directors, shareholders, members, managers and/or principals of Trump Hotels, Trump Marks and the Sponsor. The basis for this

information and belief are press reports regarding their extensive involvement and control over multiple aspects of the Trump Soho project.

140. On information and belief, Trump Hotels has significant influence and control over the management and operations of the Sponsor and the Trump Soho. The basis of such information and belief is the common ownership, management and control between Trump Hotels and the Sponsor, because of its designation as Hotel Management Company and Hotel Manager in the Plan and the agreements referenced therein, and because of its extensive responsibilities for management and operation of the Trump Soho detailed in the Plan.

141. On information and belief, Trump Marks has significant influence and control over the management and operations of the Sponsor and the Trump Soho. The basis of such information and belief is the common ownership, management and control between Trump Marks and the Sponsor; and because of its ownership and licensing of trademarks critical to the operation and marketing of the Trump Soho under the Plan and in agreements referenced therein.

### The Prodigy Defendants

142. Defendant Prodigy International NYC, LLC ("Prodigy") is a Delaware limited liability company with an address of 72 Greene Street, 2nd Floor, New York, New York 10012.

143. Until approximately July 2008, Prodigy was designated by the Sponsor as the co-exclusive selling agent for the Trump Soho.

144. After approximately July 2008, Prodigy was the exclusive selling agent for the Trump Soho.

145.    At all relevant times, Prodigy was, on information and belief, responsible on an

exclusive or co-exclusive basis for selling Units of the Trump Soho on behalf of

the Sponsor and for marketing the Trump Soho's rental management program on

behalf of Trump Hotels.  The basis for this allegation is statements in the Offering

Plan, including on page 172 thereof.

146.    By reason of its status as exclusive and co-exclusive sales agent for the Trump

Soho, Prodigy has, on information and belief, a substantial financial stake in each

Unit of the Trump Soho sold.

147.    Defendant Rodrigo Nino is an individual and resident of New York with an

address of 1 Morton Square, #6FW, New York, New York 10014.

148.    Rodrigo Nino is, on information and belief, the founder and President of Prodigy,

as well as the principal officer of Prodigy responsible for the sales and marketing

of the Trump Soho.  The basis for this allegation in multiple statements reported

in the press and on the Trump Soho website.

149.    By reason of his status as founder, President and principal officer responsible for

the Trump Soho for Prodigy, Rodrigo Nino has, on information and belief, a

substantial personal financial stake in each Unit of the Trump Soho sold.

**The Core Defendants**

150.    Defendant Core Group Marketing, LLC ("Core") is a New York limited liability

company with an address of 417 Fifth Avenue, 9th Floor, New York, New York

10016.

151.    Until approximately July 2008, Core was designated by the Sponsor as the co-

exclusive selling agent for the Trump Soho.

152.   At all relevant times, Core was, on information and belief, responsible on a co-exclusive basis for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels.  The basis for this allegation is statements in the Offering Plan, including on page 172 thereof.

153.   By reason of its status as co-exclusive sales agent for the Trump Soho until approximately July 2008, Core had, on information and belief, a substantial financial stake in each Unit of the Trump Soho sold.

154.   On information and belief Defendant Shaun Osher is an individual and resident of New York with an address at 417 Fifth Avenue, 9th Floor, New York, New York 10016.

155.   Shaun Osher is, on information and belief, the founder and Chief Executive Officer of Core, as well as a principal officer of Core responsible for the sales and marketing of the Trump Soho.  The basis for this allegation in multiple statements reported in the press and on the Trump Soho website.

156.   By reason of his status as founder, Chief Executive Officer and principal officer responsible for the Trump Soho for Core, Shaun Osher has, on information and belief, a substantial personal financial stake in each Unit of the Trump Soho sold.

157.   On information and belief, Defendant Thomas Postilio is an individual and a resident of New York with an address of 417 Fifth Avenue, 9th Floor, New York, New York 10016.

158.   Thomas Postilio is, on information and belief, a founding member and Managing Director of Core, as well as a principal officer of Core responsible for the sales

and marketing of the Trump Soho.  The basis for this allegation is Thomas Postilio's position at Core.

159.   By reason of his status as a founding member, Managing Director and principal officer responsible for the Trump Soho for Core, Thomas Postilio has, on information and belief, a substantial personal financial stake in each Unit of the Trump Soho sold.

### The Escrow Agent

160.   Defendant Akerman Senterfitt, LLP (the "Escrow Agent") is a New York limited liability partnership with an address of 335 Madison Avenue, New York, New York 10017.

161.   The Escrow Agent is the escrow agent for purchasers of Units at the Trump Soho under a Escrow Agreement attached as Exhibit 9 to the Offering Plan.

162.   The Escrow Agent is being sued only in its capacity as Escrow Agent.

### Misrepresenting and Control Defendants

163.   As used herein, the term "Misrepresenting Defendants" refers to the Sponsor, Donald Trump, Julius Schwarz, Trump Hotels, Trump Marks, Donald Trump Jr., Ivanka Trump, Prodigy, Rodrigo Nino, Core, Shaun Osher and Thomas Postilio.

164.   As used herein, the term "Control Defendants" refers to all Defendants other than the Sponsor and the Escrow Agent.

165.   Each of the Control Defendants directly or indirectly had the power and influence, to control the decision-making of Sponsor, and did influence and control the decision-making of Sponsor, with respect to the acts and omissions and course of conduct alleged herein, including the dissemination of all false and misleading

statements described herein, and culpably participated in such acts and omissions and course of conduct, and had the opportunity to prevent, but failed to prevent, such acts and omissions and course of conduct by reason of the following:

a.   246 Spring Holdings, by reason of its being the sole member of Sponsor.

b.   Bayrock/Sapir Realty, by reason of its being the managing member of 246 Spring Holdings, the sole member of Sponsor.

c.   Bayrock Spring, by reason of its being the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

d.   Bayrock Group, by reason of its being the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

e.   Donald Trump, by reason of his being one of the three indirect owners of the Sponsor; his being one of the "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his having been designated a member of the initial Board of Directors of the Condominium; and his being an officer, director, shareholder, and/or principal of Trump Hotels, Trump Marks and the Sponsor.

f.   Alex Sapir, by reason of his being one of the three indirect owners of the Sponsor; his being one of the "officers, directors, shareholders and

principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his having been designated a member of the initial Board of Directors of the Condominium.

g. Tevfik Arif, by reason of his being one of the three indirect owners of the Sponsor; his being one of the "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his being founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

h. Julius Schwarz, by reason of his being one of the "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his being an authorized signatory of the Sponsor; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his being Executive Vice President and Principal of the Bayrock Group, the sole member of

Bayrock Spring, the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

i.   Trump Hotels, by reason of the common ownership, management and control between Trump Hotels and the Sponsor; its designation as Hotel Management Company and Hotel Manager in the Plan and the agreements referenced therein; and its extensive responsibilities for management and operation of the Trump Soho detailed in the Plan.

j.   Trump Marks, by reason of the common ownership, management and control between Trump Marks and the Sponsor; and its ownership and licensing of trademarks critical to the operation and marketing of the Trump Soho under the Plan and in agreements referenced therein.

k.   Donald Trump Jr., Ivanka Trump and Eric Trump, by reason of their ownership interest in the Trump Soho; and their being officers, directors, shareholders, members, managers and/or principals of Trump Hotels, Trump Marks and the Sponsor.

l.   Prodigy, by reason of its being responsible on an exclusive or co-exclusive basis for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels.

m.   Rodrigo Nino, by reason of his being the founder and President of Prodigy; and the principal officer of Prodigy responsible for the sales and marketing of the Trump Soho.

n.  Core, by reason of its being responsible on a co-exclusive basis for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels.

o.  Shaun Osher, by reason of his being the founder and Chief Executive Officer of Core, and a principal officer of Core responsible for the sales and marketing of the Trump Soho.

p.  Thomas Postilio, by reason of his being a founding member and Managing Director of Core, and a principal officer of Core responsible for the sales and marketing of the Trump Soho.

### Other Non-Party Trump Soho Representatives

166.  In addition to the Defendants named above, the following individuals and entities (the "Non-Party Trump Soho Representatives") have acted as representatives and agents of the Trump Soho in the capacities indicated.

167.  Sara Clephane was formerly Director of Sales for the Trump Soho.  On information and belief, she is a licensed real estate broker or salesperson and was an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

168.  Sandra Dominguez was formerly a sales associate for the Trump Soho.  On information and belief, she is a licensed real estate salesperson and was an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

169.  Amy Williamson is the Director of Rental Programs for the Trump Soho.  On information and belief, she is a licensed real estate salesperson and was an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

170. Marcella Carrillo is or was a sales associate for the Trump Soho. On information and belief, she is a licensed real estate broker or salesperson and is currently an employee or sales agent of Prodigy who is or was detailed to work on behalf of the Trump Soho.

171. Marcella Reyes formerly was a sales associate for the Trump Soho. On information and belief, she was is a licensed real estate broker or salesperson and an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

172. Ruedi Sieber is or was a sales associate for the Trump Soho. On information and belief, he is a licensed real estate broker or salesperson and is currently an employee or sales agent of Prodigy who is or was detailed to work on behalf of Trump Soho.

173. Baobab 3i ("Baobab") is a Spanish company with an address of C/Agustin De Foxa N°25 12°A, 28036 Madrid, Spain.

174. At all relevant times, Baobab was, on information and belief, an authorized selling agent of the Sponsor in Spain and responsible for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels in Spain. The basis for this allegation is that Baobab acted as a selling agent and was issued a Trump Soho business card and provided with a Trump Soho sales office address in New York.

175. Ferran Fontal is, on information and belief, Chairman and Chief Executive Officer of Baobab, as well as the principal officer of Baobab responsible for the sales and marketing of the Trump Soho. Defendant Ferran Fontal acted as a

selling agent of the Trump Soho and was issued a Trump Soho business card by the Sponsor and was provided with a Trump Soho sales office address in New York.

176.   Javier Cerro Diaz is or was the International Sales Manager for Baobab.  On information and belief, he is or was an employee or sales agent of Baobab detailed to work on behalf of the Trump Soho.

177.   Upon information and belief, each of the above-named Non-Party Trump Soho Representatives was privy to "inside" information of the Sponsor, provided to them either by the Sponsor and/or other Defendants, concerning (a) the number of actual potential buyers on the Trump Soho waiting list at any given time, (b) the number and percentage of Trump Soho Units that were actually sold or under a purchase agreement to purchasers at any given time, and (c) the overall progress of the marketing and sales of Trump Soho Units for purposes of the Sponsor being able declare the Plan effective and/or for purposes of the Sponsor being able to hold closings within the time specified in the Plan.

178.   Upon information and belief, each of the above-named Non-Party Trump Soho Representatives were authorized by the Sponsor and/or other Defendants to market Trump Soho Units to potential buyers by use of statements that referred to the number of buyers on the Trump Soho waiting list and/or to the number or percentage of sales already made overall or in specific hotel unit "lines."

179.   Upon information and belief, the statements made by each of the Non-Party Trump Soho Representatives to potential buyers, concerning the number of buyers on the Trump Soho waiting list and/or the number and percentage of sales

already made overall or in specific hotel unit "lines," were made either (a) at the express direction or agreement of, or (b) with the knowledge, approval, or acquiescence of the Sponsor and/or one or more of the other Defendants.

180.   Upon information and belief, neither the Sponsor nor any of the other Defendants ever advised any of the Non-Party Trump Soho Representatives that any statement made to a potential buyer, concerning the number of buyers on the Trump Soho waiting list and/or the number or percentage of sales already made overall or in specific hotel unit "lines," was either inaccurate or false; nor was any one of the Non-Party Trump Soho representatives ever directed to cease and desist from making inaccurate or false statements concerning the waiting list or the number of sales;  nor was any one of them ever reprimanded or his or her services terminated for doing so.

181.   Upon information and belief, each of the Non-Party Trump Soho Representatives had sufficient knowledge of the waiting list and/or the number of sales already made at any given time, through his or her own efforts, to know or determine the true facts concerning (a) the waiting list and sales numbers provided to them by either the Sponsor and/or by any of the other Defendants, (b) or the waiting list and sales numbers each of them represented in statements made to potential buyers.

182.   Upon information and belief, the compensation to be received by each of the Non-Party Trump Soho Representatives was directly related to the number of actual sales determined to be attributable to their individual services, and, therefore, each Non-Party Trump Soho Representative had a personal financial interest in

marketing and promoting the sale of Trump Soho hotel Units to potential buyers by making statements that inflated the numbers on the waiting list and the number of sales already made.

## JURISDICTION AND VENUE

183. Jurisdiction is proper in this Court under both 28 U.S.C. § 1331, the general federal question jurisdiction statute, and 15 U.S.C. § 1719, the provision of ILSA granting U.S. District Courts jurisdiction over actions to enforce ILSA's provisions.

184. Jurisdiction is proper in this Court as to the Claims not arising under federal law pursuant to this Court's supplemental jurisdiction under 28 USC. § 1367.

185. Venue is proper in this District under both 28 U.S.C. § 1391, the general venue statute, and 15 U.S.C. § 1719, ILSA's venue provision, in that many of the Defendants reside and may be found in this District, and the Condominium and the Units at issue are located in this District, the Units were offered for sale in this District, the Purchase Agreements at issue were entered into in this District, and a substantial part of the events, misrepresentations and omissions at issue here occurred in this District.

186. The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate and international commerce, the means and instruments of transportation and communication in interstate and international commerce, including the mails, the internet, electronic mails, interstate and international couriers and the telephones, in connection with the acts and practices, and courses of business set forth in this Complaint.

## THE TRUMP SOHO DEVELOPMENT

### The Marketing of the Trump Soho

187.  The Trump Soho was announced during the fifth season of Donald Trump's reality TV show "The Apprentice" in 2006.

188.  The Trump Soho was initially marketed as a 46-story glass tower, $3,000-a-square-foot condo-hotel that was scheduled to open in the Spring of 2009.

189.  The Trump Soho was going to be the first new five-star hotel downtown since the Ritz Carlton and the first one ever in Soho.

190.  The interior of the Trump Soho was designed by David Rockwell, and it features Fendi Casa furniture and custom-made bedding by Bellino.

191.  The advertisements for the Trump Soho have been described as featuring "Ivanka [Trump] elegantly falling out of a cocktail dress," and have the tagline "Possess Your Own Soho."

192.  While the Trump Soho was under construction, the Defendants conducted their marketing out of a sales office located at 102 Wooster Street, New York, New York, 10020.

193.  In conducting their marketing of the Trump Soho, the Defendants established a website, http://www.trumpsoho.com/, which was available to potential buyers worldwide.

194.  On information and belief, the Defendants marketed and promoted their http://www.trumpsoho.com website through paid, sponsored advertising links on Gmail and other Google websites.  The basis for this information and belief is a February 6, 2008 article in *Curbed NY*.

195.   In conducting their marketing of the Trump Soho, the Defendants published advertisements in magazines, newspapers and other publications of interstate and international distribution.

196.   In conducting their marketing of the Trump Soho, the Defendants sent sales agents on international trips to market the Trump Soho, including but not limited to trips to Spain and Korea.

197.   In conducting their marketing of the Trump Soho, the Defendants used the mails, the telephone, the internet, e-mails, interstate air courier service, and international air courier services, among other means of interstate and international communication.

198.   The Defendants marketed the Units to the general public in a public offering.

199.   The Plan states (at page 30) that: "There are no limitations on who may purchase the offered Units."

### The Offering Plan and Documents

200.   On August 3, 2007, the office of the New York Attorney General (the "Attorney General") accepted for filing an offering plan for the Trump Soho promulgated by the Sponsor.

201.   Under the Martin Act, the Attorney General's acceptance of the Plan for filing is a legal prerequisite to the offering of the Units for sale.

202.   The Offering Plan set forth the terms and conditions under which the Sponsor was to sell the Units.

203.   The Plan stated on its cover that 413 Hotel Suite Units of the Trump Soho were offered for sale.

204.   The cover of the Plan also noted that "The Condominium has 413 Hotel Suite Units and 7 Commercial Units.  The Commercial Units are not being offered for sale hereunder at this time."

205.   In the section of the Plan's Introduction entitled "Offering of Units for Sale", the Plan (at page 30) states:  "Sponsor hereby offers the 413 Hotel Suite Units for sale under the Plan."

206.   The "Offering of Units for Sale" section of the Plan goes on to state (at page 31): "Sponsor will endeavor in good faith to sell . . . the Hotel Suite Units offered hereunder."

207.   Nowhere in the Plan, or any of the other offering documents, does the Sponsor state – or even suggest – that any of the Units are excluded from or held back from the offering.

208.   Nowhere in the Plan, or any of the other offering documents, does the Sponsor state – or even suggest – that the offering of the Units is to be conducted in separate phases.

209.   Although amendments to the Offering Plan subsequently reduced the number of Units offered to 391, none of the amendments or any other offering documents state – or even suggest – that:  (i) the Sponsor has retreated from its pledge to "sell in good faith" all of the Units; (ii) the Sponsor has excluded from or held back from the offering any of the reduced number of Hotel Suite Units; (iii) the offering of the reduced number of Units is is to be conducted in separate phases.

210.   Under the Offering Plan, each purchaser is required to sign a Purchase Agreement in the form attached as Exhibit 1 to the Plan.

211. Each of the Purchasing Plaintiffs has signed a Purchase Agreement that is identical in substance to the form attached as Exhibit 1 to the Plan, other than business terms such as Unit number, purchase price, deposit amount, date and the like.

212. Under paragraph 11.2 of the Purchase Agreement: "The Plan is incorporated herein [into the Purchase Agreement] by reference and made a part hereof with the same force and effect as if set forth herein at length."

213. Under the Offering Plan, any purchaser of a Unit is required to be bound by at least four agreements that were then recorded or were to be recorded as binding encumbrances on the Unit with the Office of the New York City Register (the "City Register"):

   a. a Restrictive Declaration governing the use and occupancy of the Unit;

   b. the Condominium Declaration;

   c. the Condominium's By-Laws; and

   d. a Unit Management Agreement.

214. Copies of each of these four documents were included as exhibits to the Plan.

**The Restrictive Declaration**

215. In response to the Defendants' announcement of the Trump Soho, several community groups and governmental officials raised strong opposition to several aspects of the project.

216. One of the key grounds of opposition was a perceived risk that Trump Soho buyers would use their Units for their personal residences, rather than as transient hotel rooms.

217.    The Trump Soho is located in an area zoned M1-6 under the New York City
        Zoning Resolution.

218.    In an area zoned M1-6, use of property as a transient hotel is permitted, but use
        for residential purposes is prohibited.

219.    In order to prevent residential use of the Trump Soho and as a condition of issuing
        a building permit for its construction, the New York City Department of
        Buildings ("DOB") required the Sponsor to file a restrictive declaration placing
        limitations on the occupancy of Trump Soho Units.

220.    On May 4, 2007, the Sponsor recorded a restrictive declaration dated April 26,
        2007 (the "Restrictive Declaration") with the City Register under City Register
        File Number ("CRFN") 20077050100385001.

221.    The key feature of the Restrictive Declaration is that it prohibits each Unit from
        being occupied by its owner (or any other individual) for more than 120 days in a
        calendar year (and no more than 29 days in any 36 day period), and that when the
        Unit is not occupied by its owner, it must be offered for rental to the public by the
        Trump Hotels or another qualified broker as rental agent.

222.    Specifically, Sections 2.02(a), (b) & (c) of the Restrictive Declaration provide:

        (a)     No Unit may be occupied by its Unit Owner or by any other
        individual: (i) for a continuous period of more than 29 days in any 36 day
        period; or (ii) for a total of more than 120 days in any calendar year.

        (b)     At all times during which a Unit is not occupied by its Unit Owner,
        it shall be made available on a daily or weekly basis to non-Unit Owners
        pursuant to a rental program operated either (i) by or on behalf of the
        Management Company or (ii) through no more than five (5) (or such
        greater number as shall be mandated by applicable determination of the
        Securities and Exchange Commission) rental agents approved (which

approval shall not be unreasonably withheld) by the Board, at occupancy rates comparable to those at similar hotels in New York City.

(c)     All units shall be similarly furnished and decorated. The Condominium Documents shall prohibit each Unit Owner from decorating its Unit with any personal furnishings and/or decorations. All decisions as to the furnishing and decorations of individual Units shall be made by the declarant prior to the date on which the Condominium is established for the Subject Premises and by the Condominium thereafter, and no Unit Owner shall have any discretion as to the furnishings of the individual Unit(s) it owns.

223.    Under this restriction, the Unit owner is compelled to use the Unit as an investment property for a large majority of the time.

224.    Indeed, as detailed below, a significant portion of the marketing of the Units centered around the investment returns the Units could provide when not being used by their owners.

225.    The Restrictive Declaration provides for the enforcement of the occupancy restrictions in its section 2.02(a) through a requirement that, among other things, the Condominium report any violations to the DOB and charge any violating Unit owner a financial penalty.

226.    The first "Special Risk" in the Offering Plan, starting on page 1 of the Plan, summarizes the provisions of the Restrictive Declaration and what the Trump Soho will do to comply with its terms.

227.    This "Special Risk" specifies (at pages 1-2) that:

pursuant to the Restrictive Declaration, Hotel Suite Units when not occupied, will be required, to be made available for occupancy on a daily or weekly basis through either (i) the Hotel Management Company [Trump Hotels]; or (ii) a Qualified Broker (a hereinafter defined) and at occupancy rates comparable to those at hotels similar to the Condominium in New York City. The [Condominium] Board *will maintain a list of five*

*(5) real estate brokers* licensed in the state of New York that the Board determines satisfy certain minimum objective qualifications . . . [emphasis added].

228.   Although the Plan specifies that the Trump Soho will provide Unit owners with a list of five "Qualified Brokers" to act as rental agents in addition to Trump Hotels, in fact the Sponsor and Condominium Board have only been able to find a single company to serve as a Qualified Broker.

229.   Further, as detailed below, the marketing of the Trump Soho was exclusively focused on using Trump Hotels as the rental agent.

230.   More significantly, as discussed below, the Unit Management Agreement with Trump Hotels (which the By-Laws require all Unit purchasers to enter) provides significant financial disincentives to selecting a Qualified Broker other than Trump Hotels to act as rental agent.

### The Condominium Declaration

231.   The Condominium Declaration is the document that, when filed, establishes the Condominium and which, together with the By-Laws sets forth the mutual rights and responsibilities between the Condominium and its Unit owners.

232.   The Offering Plan contained a copy of the Condominium Declaration, which was filed with the City Register on May 6, 2010 under CRFN 2010000153443

233.   Under Section 8.1.1 of the Condominium Declaration, repeats the occupancy restrictions of the Restrictive Declaration, though the Condominium Declaration does not repeat the requirement that the Unit be in a rental program of the Management Company or a Qualified Broker.

## The Condominium By-Laws

234.    The Offering Plan also contained a copy of the Condominium's By-Laws, which were filed with the City Register on May 6, 2010 as annexed to the Condominium Declaration.

235.    In contrast to typical condominium By-Laws which provide for the prompt turn-over of control of the condominium's board of directors from the Sponsor to the Unit owners when 50% of the condominium is sold, Article 2 of the Trump Soho's By-Laws provide that Donald Trump, Alex Sapir and Julius Schwarz are designated as the initial board of directors of the Condominium until Condominium's first annual meeting, which may be held as late as one year and 30 days after the first closing of a sale of a Unit, and then the Sponsor has the absolute right to designate a majority of the board of directors of the Condominium until the Sponsor has sold *90%* of its interest in the Condominium Units, for up to a maximum of five years.

236.    Even after the expiration of the period when the Sponsor has the absolute right to designate a majority of the members of the board of directors of the Condominium, the Sponsor may still continue to control the board of directors of the Condominium through voting its interests in any Units it owns.

237.    Further, the Sponsor retains the absolute right to appoint one member of the board for so long as it owns at least two Units.

238.    The By-Laws also set forth many of the numerous fees, charges, and expenses that Unit owners at the Trump Soho are required to pay while they own and occupy their Units.

239.    Article 15 of the By-Laws sets forth that the use and occupancy of the Trump

Soho is subject to the restrictions contained in the Restrictive Declaration.

240.    Article 16 of the By-Laws requires that, at the closing of title to each Unit, the

purchaser execute a Unit Management Agreement with the Hotel Management

Company, Trump Hotels, in a specified form.

### The Unit Management Agreement

241.    The original Offering Plan contained a form of the Unit Management Agreement

that each purchaser would be required to execute upon the closing of title to the

purchaser's Unit.

242.    The Fifth Amendment to the Offering Plan dated July 23, 2008 contained an

amended form Unit Management Agreement.

243.    The amended form Unit Management Agreement was filed with the City Register

on May 6, 2010 as an exhibit to the By-Laws under the same filing as the

Condominium Declaration.

244.    Under Section 3(a) of the Unit Management Agreement, Trump Hotels is

responsible for certain "Mandatory Services", including "establishing room rental

rates."

245.    The Unit Management Agreement sets forth many more of the numerous fees,

charges, and expenses that Unit owners at the Trump Soho are required to pay

while they own and occupy their Units.

246.    Among the fees payable to Trump Hotels in the Unit Management Agreement is a

"Unit Management Fee" under Section 7(a) in the amount of the greater of

$1,000.00 per year or $15.00 per night the Unit is occupied (either by the Unit owner or a hotel guest), each of which is increased by 3% annually.

247. One significant aspect of this Unit Management Fee is that if Trump Hotels is designated by the Unit owner as the Unit's rental agent, this fee is rebated to the Unit owner, but if the Unit owner employs another "Qualified Broker" as rental agent, the Unit owner becomes fully subject to this fee.

## FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS

### Actual Unit Sales By Date

248. Almost immediately after the Defendants began to offer Trump Soho Units, they began making false and misleading statements regarding the development, and in particular the number and percentage of Units sold.

249. As discussed below many of the statements made by the Defendants are shown to be false by reason of an "Affidavit in Support of Declaring the Plan Effective" sworn to by Alex Sapir on March 30, 2010 (the "Sapir Affidavit") filed in connection with the Tenth Amendment to the Offering Plan (accepted for filing and publicly available May 5, 2010) which disclosed the actual number of bona fide Purchase Agreements that the Sponsor had entered into and listed the Unit number and date of each such Purchase Agreement.

250. The Sapir Affidavit certified that: "As of March 30, 2010, [Purchase] Agreements had been accepted for sixty-two (62) Hotel Suite Units . . . representing 15% of the three hundred ninety-one (391) Hotel Suite Units presently offered under the Plan."

251.    Exhibit A-1 to the Sapir Affidavit identified each of the 62 Unit Purchase

Agreements by Unit number and by the date the Agreement was signed. Sorting

this information by Agreement Date, the following table shows the number of

Units sold by date, as well as the percentage of Units sold of the total number

then-offered.

| Agreement Date | Unit No. | Units Sold | Total Offered | % Sold | Agreement Date | Unit No. | Units Sold | Total Offered | % Sold |
|---|---|---|---|---|---|---|---|---|---|
| 9/7/2007 | 902 | 1 | | | 10/28/2007 | 2611 | 31 | 413 | 7.51% |
| 9/7/2007 | 1703 | 2 | | | 11/9/2007 | 1004 | 32 | 413 | 7.75% |
| 9/7/2007 | 1803 | 3 | | | 11/13/2007 | 2508 | 33 | | |
| 9/7/2007 | 1805 | 4 | | | 11/13/2007 | 2610 | 34 | 413 | 8.23% |
| 9/7/2007 | 2303 | 5 | | | 11/16/2007 | 2108 | 35 | | |
| 9/7/2007 | 3009 | 6 | 413 | 1.45% | 11/16/2007 | 2805 | 36 | 413 | 8.72% |
| 9/14/2007 | 1402 | 7 | | | 11/28/2007 | 2111 | 37 | | |
| 9/14/2007 | 2003 | 8 | | | 11/28/2007 | 2905 | 38 | 413 | 9.20% |
| 9/14/2007 | 2606 | 9 | | | 12/10/2007 | 3406 | 39 | 413 | 9.44% |
| 9/14/2007 | 3208 | 10 | 413 | 2.42% | 12/14/2007 | 2202 | 40 | | |
| 9/20/2007 | 1102 | 11 | | | 12/14/2007 | 2304 | 41 | | |
| 9/20/2007 | 1903 | 12 | | | 12/14/2007 | 2511 | 42 | 413 | 10.17% |
| 9/20/2007 | 3010 | 13 | | | 12/20/2007 | 1002 | 43 | 413 | 10.41% |
| 9/20/2007 | 3410 | 14 | 413 | 3.39% | 12/27/2007 | 3109 | 44 | 413 | 10.65% |
| 10/4/2007 | 1202 | 15 | | | 1/8/2008 | 3108 | 45 | 413 | 10.90% |
| 10/4/2007 | 1802 | 16 | | | 1/11/2008 | 2411 | 46 | 413 | 11.14% |
| 10/4/2007 | 1811 | 17 | | | 1/28/2008 | 2509 | 47 | 400 | 11.75% |
| 10/4/2007 | 2902 | 18 | | | 2/13/2008 | 2811 | 48 | | |
| 10/4/2007 | 3810 | 19 | | | 2/13/2008 | 3005 | 49 | 400 | 12.25% |
| 10/4/2007 | 3910 | 20 | 413 | 4.84% | 3/22/2008 | 2106 | 50 | 400 | 12.50% |
| 10/9/2007 | 1502 | 21 | | | 4/16/2008 | 2506 | 51 | 400 | 12.75% |
| 10/9/2007 | 2603 | 22 | | | 5/1/2008 | 2505 | 52 | 400 | 13.00% |
| 10/9/2007 | 2702 | 23 | 413 | 5.57% | 5/9/2008 | 2711 | 53 | | |
| 10/16/2007 | 2704 | 24 | 413 | 5.81% | 5/9/2008 | 2705 & 4009* | 54 | 400 | 13.50% |
| 10/23/2007 | 1905 | 25 | | | 5/12/2008 | 3509 | 55 | 400 | 13.75% |
| 10/23/2007 | 2205 | 26 | | | 6/5/2008 | 2405 | 56 | | |
| 10/23/2007 | 2403 | 27 | | | 6/5/2008 | 2806 | 57 | | |
| 10/23/2007 | 3104 | 28 | 413 | 6.78% | 6/5/2008 | 3709 | 58 | 400 | 14.50% |
| 10/25/2007 | 2006 | 29 | | | 7/2/2008 | 3203 | 59 | | |
| 10/25/2007 | 2408 | 30 | 413 | 7.26% | 7/2/2008 | 3309 | 60 | 400 | 15.00% |

| Agreement Date | Unit No. | Units Sold | Total Offered | % Sold |
|---|---|---|---|---|
| 7/23/2008 | 3803 | 61 | 400 | 15.25% |
| 12/4/2008 | 2404 | 62 | 400 | 15.50% |
| 8/19/2009 | ** | 62 | 391 | 15.86% |

| Agreement Date | Unit No. | Units Sold | Total Offered | % Sold |
|---|---|---|---|---|

\* A note to the Sapir Affidavit explains: "These two units are subject to separate purchase agreements to the same purchaser; however, only one of them is included in the count of 62 units for effectiveness purposes."

\*\* In an August 19, 2009 Amendment to the Offering Plan, the number of units was reduced from 400 to 391. The number of units had been previously reduced from 413 to 400 in an January 2, 2008 Amendment to the Offering Plan.

### False Statements Made to the Palmer Gardens Plaintiffs

252.    On January 9, 2008, Rachel Gerstein visited the Trump Soho sales office and Sara

Clephane told her that 30-40% of the Units had been sold.

  a.    Rachel Gerstein justifiably relied on this statement in deciding to enter

  into the Purchase Agreement on behalf of Palmer Gardens.

  b.    This statement was false when it was made because, as sworn to in the

  Sapir Affidavit, on January 9, 2008 only 10.9% of the Units had been sold.

253.    In her January 9, 2008 visit to the Trump Soho sales office, Rachel Gerstein was

told by Sara Clephane that buyers were purchasing as many as three to five Units.

  a.    Rachel Gerstein justifiably relied on this statement in deciding to enter

  into the Purchase Agreement on behalf of Palmer Gardens.

  b.    This statement was false when it was made because, as sworn to in the

  Sapir Affidavit, only one out of the 62 buyers purchased multiple Units

  and that one buyer purchased just two Units.

254.    On January 15, 2008, an Associated Press wire service report, which described

the neighborhood opposition to the project, the death of a construction worker and

the violations the project received, stated that the developers boasted there were 3,200 purchase applications for the 400 Units.

   a.  The January 15, 2008 article was read and justifiably relied upon by Rachel Gerstein in deciding to enter into the Purchase Agreement on behalf of Palmer Gardens.

   b.  On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the number of purchase applications.

   c.  On information and belief, the information that there were 3,200 purchase applications for the 400 Units was provided to the Associated Press by the Sponsor or a representative or agent of the Sponsor.

   d.  On information and belief, the information regarding the number of purchase applications was false and misleading when it was made.  The basis for this belief is that on January 15, 2008, only 11.14% of the Units had been sold according to the Sapir Affidavit and, if there were such a waiting list, it is reasonable to believe that a much higher percentage of Units would have been sold at that time or shortly thereafter.

255.  On January 25, 2008, Sara Clephane told Rachel Gerstein that certain lines were almost sold out.

   a.  Rachel Gerstein justifiably relied on this statement in deciding to enter into the Purchase Agreement on behalf of Palmer Gardens.

      b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, none of the lines of Units was even close to being sold out.

256.  On or shortly before January 28, 2008, Rachel Gerstein signed the Purchase Agreement on behalf of Palmer Gardens, and she, Joyce Gerstein and Herbert Gerstein paid the Initial Deposit funds in reliance on the false statements that had been made to Rachel Gerstein.

257.  Had the false statements identified herein not been made to and justifiably relied upon by Rachel Gerstein, she, Joyce Gerstein and Herbert Gerstein would not have agreed to purchase the Unit and Palmer Gardens would not have entered into the Purchase Agreement.

258.  A March 30, 2008 *New York Magazine* article related to the history and problems with the Trump Soho development, described the Trump Soho sales process in detail, and stated that the author was told by a Trump Soho representative that the building was 60% sold.

      a.  This article was read and justifiably relied upon by Rachel Gerstein in deciding to pay the Additional Deposit on behalf of Palmer Gardens.

      b.  On information and belief, the Trump Soho sales agents, or other agents of the Sponsor, discussed in the article provided the author with the information that the building was 60% sold.

      c.  This statement was false when it was made, as sworn to in the Sapir Affidavit, on March 30, 2008 only 12.5% of the Units had been sold.

259.   A June 2, 2008 article in *The Real Deal* about international buyers at Trump Soho and William Beaver House, stated that Rodrigo Nino said 58% of the Trump Soho Units were under contract.

    a.   This article was read and justifiably relied upon by Rachel Gerstein in deciding to pay the Additional Deposit on behalf of Palmer Gardens.

    b.   On information and belief, Rodrigo Nino told the author of the article that 58% of the Trump Soho Units were under contract.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on June 2, 2008 only 13.75% of the Units were under contract.

260.   A June 27, 2008 a Reuters wire service article, which described how the weak dollar has attracted foreign buyers to Trump Soho, stated that Ivanka Trump said 60% of the Units were sold.

    a.   This article was read and justifiably relied upon by Rachel Gerstein in deciding to pay the Additional Deposit on behalf of Palmer Gardens.

    b.   On information and belief, Ivanka Trump told the author of the article the statement that 60% of the Units were sold.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, by June 27, 2008 only 14.5% of the Units had been sold.

261.   On July 17, 2008, Sara Clephane e-mailed Rachel Gerstein and told her that her Unit's line was "pretty much sold out."

    a.   Rachel Gerstein justifiably relied on this statement in deciding to pay her Additional Deposit.

      b.  This statement was false when it was made because, as sworn in the Sapir

Affidavit, on this date, only 7 of the 34 Units in the "09" line were sold.

262.    On or about July 28, 2008, Palmer Gardens paid its Additional Deposit in reliance

on the false statements made to Rachel Gerstein.

263.    Had the false statements identified herein not been made and justifiably relied

upon by to Rachel Gerstein, she, Joyce Gerstein, Herbert Gerstein and Palmer

Gardens would not have paid Palmer Gardens' Additional Deposit.

**False Statements Made to the Maltz Plaintiffs**

264.    On September 20, 2007, Sara Clephane, Director of Sales, e-mailed Alan Maltz

stating that "We open to the public today. The demand is overwhelming. We

have 1,400 people on a wait list."

      a.  Alan Maltz justifiably relied on this statement in deciding to enter into his

Purchase Agreement.

      b.  On information and belief, Sara Clephane's statement regarding the

waiting list was false and misleading when it was made. The basis for this

belief is that on September 20, 2007, as sworn to in the Sapir Affidavit,

only 3.39% of the Units had actually been sold and if there was such a

waiting list, it is reasonable to believe that a much higher percentage of

Units would have been sold at that time or shortly thereafter.

265.    In September of 2007, Sara Clephane orally told Alan Maltz that approximately

70% of the Units had been sold.

      a.  Alan Maltz justifiably relied on this statement in deciding to enter into his

Purchase Agreement.

b. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on September 20, 2007, contracts for only 3.39% of the Units had been signed.

266. On or shortly before October 25, 2007, Alan Maltz and Janet Maltz signed the Purchase Agreement in reliance on the false statements that had been made to Alan Maltz.

267. Had the false statements identified herein not been made to and justifiably relied upon by Alan Maltz, he and Janet Maltz would not have entered into the Purchase Agreement.

268. On or about April 25, 2008, Alan Maltz and Janet Maltz paid their Additional Deposit in reliance on the false statements made to Alan Maltz.

269. Had the false statements identified herein not been made to and justifiably relied upon by Alan Maltz, he and Janet Maltz would not have paid their Additional Deposit.

**False Statements Made to the Tsai -Singh Plaintiffs**

270. On or shortly before September 7, 2007, Hubert Tsai and Anthony Tsai signed the Purchase Agreement.

271. In early March of 2008, a Trump Soho sales representative told Hubert Tsai that the building was selling faster than expected and that approximately 50% of the Units have already been sold.

a. Hubert Tsai justifiably relied on this statement in deciding to pay his Additional Deposit.

      b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on March 22, 2008 only 12.5% of the Units had been sold.

272.    On or about March 7, 2008, Hubert Tsai and his brother Anthony Tsai paid their Additional Deposit in reliance on the false statements made to Hubert Tsai.

273.    Had the false statements identified herein not been made to and justifiably relied upon by Hubert Tsai, he would not have paid his additional deposit.

274.    On April 7, 2008, Prodigy emailed Hubert Tsai an excerpt from an article entitled "Trump Soho Condominium Outpacing Sales Predictions" in which Rodrigo Nino was quoted as saying that since sales commenced in September of 2007, global buyers had purchased nearly 53% of the building.

      a.  On information and belief, Rodrigo Nino told the author of the article excerpted that, since sales commenced in September of 2007, global buyers had purchased nearly 53% of the building.

      b.  Christine Sing justifiably relied upon this statement in deciding to purchase Anthony Tsai's rights and obligations under the Purchase Agreement.

      c.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on April 7, 2008 only 12.5% of the Units had been sold.

275.    Effective as of May 15, 2008 (by documents signed in September 2008), Tsai assigned his rights and obligations under the Purchase Agreement to Christine Singh, who agreed to assume those rights and obligations and to pay Anthony Tsai his share of the Deposit in reliance on the false statements made to Hubert Tsai.

276.   Had the false statements identified herein not been made, and not justifiably relied

upon by Christine Singh, she would not have assumed the rights and obligations

under the Purchase Agreement of Anthony Tsai and would not have paid Anthony

Tsai for his share of the Deposit.

### False Statements Made to the Feng-Meckel-Gross Plaintiffs

277.   In October and November 2007, prior to agreeing to purchase Unit 2202, Randall

A. Meckel orally and by e-mail inquired of Thomas Postilio about the availability

of at least 10 separate Units (Units 806, 808, 811, 1004, 1111, 1611, 1802, 2011,

2211 and 2611), and was advised by Thomas Postilio that each of these Units had

already been sold.

    a.   However, as sworn to in the Sapir Affidavit, all but one of these Units

       (Unit 1004) were in fact unsold at the time Thomas Postilio told Randall

       A. Meckell that the Units were already sold.

    b.   Randall A. Meckel justifiably relied on these statements of Thomas

       Postilio's regarding Units that had been sold and agreed to purchase Unit

       2202 at a price higher than those listed for other Units.

278.   In early November of 2007, Thomas Postilio of Trump Soho told Randall A.

Meckel, who was visiting the Trump Soho Sales Office, that over 30% of the

Units had been sold.

    a.   Randall A. Meckel justifiably relied on this statement in deciding to enter

       into a Purchase Agreement.

      b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on November 9, 2007, only 7.75% of the Units had been sold.

279.    Prior to signing their Purchase Agreement on or before December 14, 2007, a Trump Soho representative stated to Randall A. Meckel that over 50% of the Units had been sold.

      a.  Randall A. Meckel justifiably relied on this statement in deciding to enter into a Purchase Agreement.

      b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on December 14, 2007, only 10.17% of the Units had been sold.

280.    On or shortly before December 14, 2007, Xue Feng, Randall A. Meckel and Henry Gross signed their Purchase Agreement in reliance on the false statements made to Mr. Meckel.

281.    Had the false statements identified herein not been made to and justifiably relied upon by Randall A. Meckel, he, Xue Feng and Henry Gross would not have entered into the Purchase Agreement.

282.    A February 13, 2008 *Curbed NY* article about international and domestic purchasers stated that, according to Sales Director, Rodrigo Nino, 53% of the Units had been sold

      a.  This article was read and justifiably relied upon by Randall A. Meckel in deciding to pay the Additional Deposit for the Unit he purchased with Xue Feng and Henry Gross.

    b.  The *Curbed NY* article referenced a February 12, 2008 *New York Observer* article (discussed below) as the source of the information provided by Rodrigo Nino.

    c.  On information and belief, Rodrigo Nino told the author of the *New York Observer* article that 53% of the Units had been sold.

    d.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on February 13, 2008, only 12.25% of the Units had been sold.

283.  A March 5, 2008 article in *The Villager* about the hearing before the New York City Board of Standards and Appeals on the New York City Department of Building's decision to grant the project a building permit, stated that 53% of the 400 Units were sold.

    a.  This article was read and justifiably relied upon by Randall A. Meckel in deciding to submit the Additional Deposit for the Unit he purchased with Xue Feng and Henry Gross.

    b.  On information and belief, the Defendants (either directly or through statements to other publications) provided *The Villager* with the information that 53% of the 400 Units were sold.

    c.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on March 5, 2008 only 12.25% of the Units had been sold.

On or about June 14, 2008, Xue Feng, Randall A. Meckel and Henry Gross paid their Additional Deposit in reliance on the false statements made to Randall A. Meckel.

284.    Had the false statements identified herein not been made to and justifiably relied upon by Randall A. Meckel, he, Xue Feng and Henry Gross would not have paid their additional deposit.

### False Statements Made To The Beaver Metal Plaintiffs

285.    On or about April 8, 2008, Acacio Rodriguez and Javier Rodriguez attended the SIMA (Madrid Real Estate Exhibition International) where they met with Ferran Fontal of Baobab 3i.

286.    At the SIMA, Ferran Fontal provided Acacio Rodriguez and Javier Rodriguez with a brochure that contained, among other things, certain financial projections.

    a.   The financial projections stated that the project would have a Return on Investment of 76.83%, an Internal Return Rate of 19.3%, and other detailed financial information.

    b.   These statements were false when they were made because they were unrealistic, not based on reasonable and/or supportable assumptions, and were made without justification.

    c.   These statements were made without any disclaimers about relying on forward-looking information.

    d.   These statements were justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

287.    On April 15, 2008, Javier Cerro Diaz, International Sales Manager at Baobab 3i, emailed, among other things, financial projections to Acacio Rodriguez and Javier Rodriguez.

    a.  The financial projections stated that the project would have a Return on Investment of 153%, an Internal Return Rate of 80%, and other detailed financial information.

    b.  These statements were false and/or misleading when they were made because they were unrealistic, not based on reasonable and/or supportable assumptions, and were made without justification.

    c.  These statements were made without any disclaimers about relying on forward-looking information.

    d.  These statements were justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

288.    In April of 2008, Acacio Rodriguez contacted Marcela Carrillo, who informed him that more than 70% of the Units had been sold.

    a.  This statement was justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

    b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on April 16, 2008 only 12.75% of the Units had been sold.

289.    The April 2008 issue of *In the World Magazine*, a Spanish real estate promotion magazine, published an article that quoted Donald Trump as stating that Spanish purchasers had invested $250 million of the $800 million total offering, which implied that at least 31% of the Units had already been sold.

    a.   This statement was read and justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

    b.   On information and belief, Donald Trump told the author of the article that Spanish purchasers had invested $250 million of the $800 million total offering.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on April 16, 2008 only 12.75% of the Units had been sold.

    d.   This statement is also false in that, on information and belief, the total amount of money actually invested in the Trump Soho through the date of the Sapir Affidavit was less than $30 million.

290.    A June 29, 2008 article in *The London Times*, which described the Trump Soho project and the Trump children's involvement in the project, stated that Ivanka Trump said 60% of the Units were sold.

    a.   This article was read and justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

    b.   On information and belief, Ivanka Trump told the author of the article that 60% of the Units were sold.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on June 29, 2008 only 14.5% of the Units had been sold.

291.    On or shortly before July 2, 2008, Javier Rodriguez signed the Purchase Agreement on behalf of Beaver Metal, LLC in reliance on the false statements made to Javier Rodriguez and Acacio Rodriguez.

292.    Had the false statements identified herein not been made to and justifiably relied upon by Acacio Rodriguez, he would not have agreed to purchase the Unit and Beaver Metal would not have entered into the Purchase Agreement.

293.    On or about December 2, 2008, Beaver Metal, LLC submitted its Additional Deposit in reliance on the false statements made to non-party Javier Rodriguez and Acacio Rodriguez.

294.    Had the false statements identified herein not been made to and justifiably relied upon by Acacio Rodriguez, he and Beaver Metal would not have paid the Second Deposit.

**False Statements Made to the Credibox Plaintiffs**

295.    In November of 2007, an article in *Magnate Inmobiliario*, a Spanish publication discussing Spanish investment in Trump Soho, stated that 15% of the Units at Trump Soho had been purchased by Spanish individuals and companies, and that a total of 53% of the Units had been sold.

    a.    Felisa Hernandez read and justifiably relied on this statement in deciding to enter into the Purchase Agreement on behalf of Credibox.

    a.    On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information

regarding the percentage of Units purchased by Spanish individuals and companies and overall sales percentage.

b.  On information and belief, the Sponsor or the Sponsor's representatives or agents directly or indirectly provided *Magnate Inmobilario* with the information that 15% of the Units at Trump Soho had been purchased by Spanish individuals and companies, and that a total of 53% of the Units had been sold.

c.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, through November, 2007, only 9.2% of the Units had been sold.

296.  A March 18, 2008 article in *Calculadora de Hipotecas*, a Spanish publication, stated that Trump Soho had already attracted 98 million euros from Spain and that 15% of the Units had been purchased by Spanish individuals and companies.

a.  This article was read and justifiably relied upon by Felisa Hernandez in deciding to sign the Purchase Agreement on behalf of Credibox.

a.  On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the amount of investment from Spain and the percentage of Units purchased by Spanish individuals and companies.

b.  On information and belief, the Sponsor or the Sponsor's representatives or agents directly or indirectly provided *Calculadora de Hipotecas* with the information that 15% of the Units at Trump Soho had been purchased by Spanish individuals and companies.

      c.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on March 18, 2008, only 12.25% of the Units had been sold.

      d.  This statement was also false when it was made in that, on information and belief, the total amount of money actually invested in the Trump Soho through the date of the Sapir Affidavit was less than $30 million.

297.    On July 3, 2008, an article in *Periodista Digital*, a Spanish publication, stated Spanish investors had invested about 98.5 million Euros in Trump Soho, and that 15% of the Units had been purchased by Spanish buyers.

      a.  This article was read and justifiably relied upon by Felisa Hernandex in deciding to enter into the Purchase Agreement on behalf of Credibox.

      a.  On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the amount of investment from Spain and the percentage of Units purchased by Spanish individuals and companies.

      b.  On information and belief, the Sponsor or the Sponsor's representatives or agents directly or indirectly provided *Periodista Digital* with the information that Spanish investors had invested about 98.5 million Euros in Trump Soho and that 15% of the Units at Trump Soho had been purchased by Spanish buyers.

      c.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on July 3, 2008, only 15% of all the Units had been sold.

      d.  This statement was also false when it was made in that, on information and belief, the total amount of money invested actually invested in the Trump Soho through the date of the Sapir Affidavit was less than $30 million.

298.   Prior to entering into the Purchase Agreement on or shortly before August 2, 2008 on behalf of Credibox, Felisa Hernandez was told by Sandra Dominguez that 50% of the Units had been sold.

      a.  This statement was justifiably relied upon by Felisa Hernandez in deciding to enter into the Purchase Agreement on behalf of Credibox.

      b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, prior to August 2, 2008, only 15.25% of the Units had been sold.

299.   On or shortly before August 2, 2008, Felisa Hernandez signed the Purchase Agreement on behalf of Credibox in reliance on the false statements made to her.

300.   On October 30, 2008, an article in *Por Guillermo*, a Spanish publication, stated that 22% of the Units had been purchased by Spanish buyers.

      a.  This article was read and justifiably relied upon by Felisa Hernandez in deciding to submit the First Additional Deposit and Second Additional deposit on behalf of Credibox.

      a.  On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the percentage of Units purchased by Spanish individuals and companies.

b.  On information and belief, the Sponsor or the Sponsor's representatives or agents directly or indirectly provided *Por Guillermo* with the information that 22% of the Units had been purchased by Spanish buyers.

c.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on October 30, 2008, only 15.25% of the Units had been sold.

301.  On or about December 4, 2008, Credibox submitted its First Additional Deposit in reliance on the false statements made to Felisa Hernandez.

302.  Had the false statements identified herein not been made to and justifiably relied upon by Felisa Hernandez, she would not have agreed to purchase the Unit and Credibox would not have entered into the Purchase Agreement.

303.  On or about February 15, 2009, Credibox submitted its Second Additional Deposit in reliance on the false statements made to Felisa Hernandez.

304.  Had the false statements identified herein not been made to and justifiably relied upon by Felisa Hernandez, she and Credibox would not have paid its Additional Deposits.

**Additional False Statements to the Press and Reliance by Plaintiffs**

305.  On September 19, 2007, the Trump Soho held its sales kickoff gala, about which a September 27, 2007,  a *Daily News* article reporting on the event quoted Donald Trump as stating: "We already have a 3,200 person waiting list to see the Units."

a.  On information and belief, Donald Trump told the author of the article that there was a 3,200 person waiting list to see the Units.

    b.  On information and belief, the allegations regarding the waiting list were false and misleading when they were made.  The basis for this belief is that on that date, only 2.42% of the Units had been sold according to the Sapir Affidavit and if there was such a waiting list, a much higher percentage of Units would have been sold at that time or shortly thereafter.

306.  The same September 27, 2007 *Daily News* article covering the September 19, 2007 kickoff gala quoted Shaun Osher as stating that fifty contracts had been signed so far.

    a.  On information and belief, Shaun Osher told the author of the article that fifty contracts had been signed so far.

    b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on September 19, 2007, only 10 Unit contracts had been signed.

307.  An October 14, 2007 *New York Times* article describing the Trump Soho project reported Donald Trump had stated there were 3,200 purchase applications for the 400 Units.

    a.  On information and belief, Donald Trump told the author of the article that there were 3,200 purchase applications for the 400 Units to the author of the article.

    b.  On information and belief, the allegations regarding the waiting list were false and misleading when they were made.  The basis for this belief is that on October 14, 2007, only 5.57% of the Units had been sold according

to the Sapir Affidavit and if there was such a waiting list, a much higher
percentage of Units would have been sold at that time or shortly thereafter.

308.    A February 12, 2008 article in *The New York Observer* about foreign purchasers
and the purchase of a Unit by an internationally famous soccer player stated that
Rodrigo Nino said 53% of the Units were sold.

   a.   This article was excerpted and Rodrigo Nino's statement was reprinted in
        a February 13, 2008 *Huffington Post* article.

   b.   This article was excerpted and Rodrigo Nino's statement was reprinted in
        a February 13, 2008 *Curbed NY* article.

   c.   On information and belief, Rodrigo Nino told the author of the article that
        53% of the Units were sold.

   d.   This statement was false when it was made because, as sworn to in the
        Sapir Affidavit, on February 12, 2008, only 12.25% of the Units had been
        sold.

309.    An April 11, 2008 *Daily News* article about Rodrigo Nino and Prodigy
International's sales of New York condominiums units to foreign buyers, stated
that, according to Rodrigo Nino, 50% of the Trump Soho Units had been sold.

   a.   On information and belief, Rodrigo Nino told the author of the article that
        50% of the Units were sold.

   b.   This statement was false when it was made because, as sworn to in the
        Sapir Affidavit, on April 11, 2008 only 12.50% of the Units had been sold.

310.    A September 5, 2008 *Downtown Express* article reporting that construction had
resumed at Trump Soho after a partial stop-work order was lifted, stated that

Julius Schwarz, of the Bayrock Group, said the Condominium was more than half sold.

    a. On information and belief, Julius Schwarz provided the information in the article that the Condominium was more than half sold.

    b. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on September 5, 2008 only 15.25% of the Units had been sold.

311. A January 29, 2009 *New York Post* article quoted Rodrigo Nino as stating that 270 Units, or about 67% of the 400 total Units have been sold.

    a. On information and belief, Rodrigo Nino told the author of the article that 270 Units, or about 67% of the 400 total Units have been sold.

    b. This statement was false when it was made because, as sworn to in the Sapir Affidavit, by January 29, 2009, only 62 Units, 15.5% of the total Units, had been sold.

312. An April 30, 2009 *The Real Deal* article about condominium hotels quoted Donald Trump Jr. as stating that the building was more than 55% sold as of the middle of the prior month.

    a. This article was excerpted and Donald Trump Jr.'s statement was reprinted in a May 5, 2009 *Curbed NY* article.

    b. On information and belief, Donald Trump, Jr. told the author of *The Real Deal* article that the building was more than 55%.

    c. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on May 5, 2009, only 15.5% of the Units had been sold.

313.   In deciding to purchase their Units and submit their Additional Deposits, the Plaintiffs read and justifiably relied upon news stories and publications other than those they specifically recall at this time having read and relied upon.

314.   On information and belief, in deciding to purchase their Units and submit their Additional Deposits, the Plaintiffs read and justifiably relied upon news stories and publications identified above other than the news stories and publications they specifically identify herein as having been read and relied upon by them.

315.   On information and belief, in deciding to purchase their Units and submit their Additional Deposits, the Plaintiffs read and justifiably relied upon news stories and publications which are not identified in this Complaint but which contain false representations made by the Defendants regarding Unit sales levels which are similar in substance to the news stories and publications identified above.

316.   None of the Plaintiffs had any reason to believe that any of the statements told to them by any Trump Soho representatives were false, misleading or inaccurate.

317.   Each of the Plaintiffs was fully justified in relying on all statements made to them by Trump Soho representatives in deciding to enter into their respective Purchase Agreements and make their respective Additional Deposits.

318.   None of the Plaintiffs had any reason to believe that any of the statements in news stories and publications attributed to any of the Defendants or any other Trump Soho representatives were false, misleading or inaccurate.

319.   None of the Plaintiffs had any reason to believe that any of the statements in news stories and publications regarding the sales levels or percentages were false, misleading or inaccurate.

320.   As described in detail below, on information and belief, the Sponsor and other Defendants regularly monitored reports on the Trump Soho in news stories and publications, and demanded corrections of certain inaccurate information, but never sought any correction of any false statements regarding sales levels or percentages.

321.   Each of the Plaintiffs was fully justified in relying on all statements made in news stories and publications regarding sales levels or percentages made by or attributed to Defendants or Trump Soho representatives in deciding to enter into their respective Purchase Agreements and make their respective Additional Deposits.

**Reliance On Defendants False Statements by Additional Purchasers**

322.   The Plaintiffs herein have identified a consistent pattern of false representations regarding unit sales levels made by the Defendants and other Trump Soho sales representatives, both in personal statements and in reports in the press, to induce them to enter into Purchase Agreements and submit their Additional Deposits.

323.   Trump Soho Unit purchasers other than Plaintiffs have reported similar false representations regarding unit sales made to induce them to enter into Purchase Agreements and submit Additional Deposits.

324.   As such, on information and belief, Trump Soho sales representatives made false representations to purchasers of Units at the Trump Soho other than the Plaintiffs regarding Unit sales levels and unit availability similar in substance to the false sales representative statements identified above, and such purchasers justifiably relied upon such false statements.

325. On information and belief, in deciding to purchase Units and submit Additional Deposits, purchasers of Units at the Trump Soho other than the Plaintiffs read and justifiably relied upon news stories and publications identified above.

326. On information and belief, in deciding to purchase Units and submit Additional Deposits, purchasers of Units at the Trump Soho other than the Plaintiffs read and justifiably relied upon news stories and publications, which are not identified in this Complaint, but which contain false representations made by the Defendants regarding unit sales levels which are similar in substance to the news stories and publications identified above.

327. On information and belief, had the false statements identified herein and similar false statements of the Defendants not been made to and justifiably relied upon by numerous purchasers of Units at the Trump Soho other than the Plaintiffs, such purchasers would not have entered into Purchase Agreements.

328. On information and belief, had the false statements identified herein and similar false statements of the Defendants not been made to and justifiably relied upon by numerous purchasers of Units at the Trump Soho other than the Plaintiffs, such purchasers would not have paid Additional Deposits.

329. Had any of the purchasers of Units in the Trump Soho (whether Plaintiffs or non-Plaintiffs) not entered into their Purchase Agreements, such Purchase Agreements would not have been eligible to be counted among the 62 Units under contract that were identified in the Sapir Affidavit

330. Had any of the purchasers of Units in the Trump Soho (whether Plaintiffs or non-Plaintiffs) not paid their Additional Deposits, such purchasers' Purchase

Agreements would not have been eligible to be counted among the 62 Units under contract that were identified in the Sapir Affidavit

## THE MAY 5, 2010 FILING REVEALING THE FRAUD

### The Minimum Sales Percentage Under the Martin Act Regulations and the Plan

331.   Under the authority of the Martin Act, the Attorney General has promulgated binding regulations ("AG Regs.") for the offering of commercial condominium units such as those offered at the Trump Soho.  13 NYCRR Part 20.

332.   Under the AG Regs., "the offer to sell is contingent upon the [Offering] plan's being declared effective and upon compliance with the relevant conditions and time periods described in the offering plan."  13 NYCRR § 20.3(q).

333.   Thus, under the AG Regs., no Trump Soho Unit sale could close until its Offering Plan was declared effective pursuant to the AG Regs.

334.   Under the AG Regs., "the plan may not be declared effective unless bona fide purchasers, including investors, have signed purchase agreements for at least fifteen percent (15%) of the units offered under the plan."  13 NYCRR § 20.3(q)(3).

335.   Under the AG Regs., where a purchaser has signed a Purchase Agreement but defaulted in making a required payment of an Additional Deposit, such Purchase Agreement may not be counted toward the minimum 15% of units offered required for plan effectiveness.  13 NYCRR § 20.5(e)(5)(ii)(c).

336.   Under the AG Regs.: "For the purpose of computing the percentage of bona fide purchasers of units for which purchase agreements have been executed, a

fractional percentage shall be rounded off to the next lower whole number." 13 NYCRR § 20.5(e)(4).

337.    Thus, under the AG Regs., no Trump Soho Unit sale could close until the Sponsor had signed purchase agreements (not then in default) for at least 15% of the units offered under the Plan.

338.    Under the AG Regs., for a Plan to be declared effective, with exceptions inapplicable here, in addition to meeting the minimum 15% sales percentage, an Amendment to the Offering Plan must be submitted to and approved by the Attorney General, which Amendment shall "state the percentage of units being offered for which sponsor has accepted purchase agreements from bona fide purchasers", and include an affidavit from the Sponsor which has a "list of the units which are being counted to meet the minimum percentage that are needed under the terms of the plan to declare the plan effective."   13 NYCRR § 20.5(e).

339.    Thus, under the AG Regs., no Trump Soho Unit sale could close until an Offering Plan Amendment containing an affidavit disclosing the number and percentage of units with bona fide purchase agreements had been submitted to and approved by the Attorney General.

340.    Where the number of units has been reduced during the course of an offering, the AG Regs. do not specify whether 15% of the original number of units offered or 15% of the reduced number of units offered must have signed purchase agreements for the plan to be declared effective.

341.   The Trump Soho Plan originally offered 413 Units, if 15% of that number is required for the Plan to become effective, a minimum of 62 signed Purchase Agreements would be required to declare the Plan effective.

342.   Further, the Offering Plan states, on page 102 that:

> The Plan will not be declared effective, at Sponsor's option, when bona fide Agreements (including those executed by investors) have been executed and are in effect with respect to not less than 60 Hotel Suite Units.

343.   Although the Plan was amended on August 19, 2009 to reduce the number of Units offered to 391 (15% of which is 59 units), no Offering Plan amendment changed the minimum 60 units required to declare the Plan effective contained at page 102 of the original Plan.

344.   Thus, under the AG Regs. and the Plan, no Trump Soho Unit sale could close until the Sponsor had obtained signed Purchase Agreements (not then in default) from bona fide purchasers for at least 60 (and possibly 62) of the Units.

345.   Under the AG Regs. an offering plan is required to: "State when sponsor expects the first closing of a unit to occur which should correspond to the first year of operation projected in Schedule B. State that if such date is delayed twelve (12) months or more, purchasers will be offered rescission." 13 NYCRR § 20.3(o)(12).

346.   The Trump Soho Offering Plan specifies (on page 97) that:

> if . . . the First Closing does not occur within 12 months after June [1,] 2009, the date set forth in Schedule B as the commencement date for the projected First Year of Condominium Operations, then . . . the Sponsor will offer all Purchasers (other than Purchasers who are then in default under their Agreements, if the Plan has been declared effective) the right to rescind their Agreements . . . . Purchasers electing rescission pursuant to

such offer will have their Deposits and any interest accrued thereon returned."

347.  Thus, under the AG Regs. and the Offering Plan, if the Sponsor had not obtained signed Purchase Agreements from bona fide purchasers (not then in default) for at least 60 (and possibly 62) of the Units on or before May 31, 2010, the Sponsor would have been required to offer rescission and a full refund of all Deposits to each of the purchasers at the Trump Soho.

348.  Accordingly, under the AG Regs. and the Offering Plan, if just three (and possibly just one) of the 62 actual purchasers of Trump Soho units had either not signed their Purchase Agreements or defaulted in the payment of their Additional Deposits on or before May 31, 2010, the Sponsor would have been required to offer rescission and a full refund of all Deposits to each of the purchasers at the Trump Soho.

349.  As discussed in detail throughout this Complaint, the Purchasing Plaintiffs were induced by fraud and deceptive sales practices to enter into their Purchase Agreements and to submit their Additional Deposits.

350.  As also discussed throughout this Complaint, on information and belief additional purchasers in the Trump Soho (other than the Purchasing Plaintiffs) were induced by fraud and deceptive sales practices to enter into Purchase Agreements for Trump Soho Units and to make Additional Deposits required in such Purchase Agreements.

351.  Had the Purchasing Plaintiffs had not been fraudulently and deceptively induced to enter their Purchase Agreements and make their Additional Deposits, they would not have done so.

352.    On information and belief, had additional purchasers in the Trump Soho (other than the Purchasing Plaintiffs) not been fraudulently and deceptively induced to enter their Purchase Agreements and make their Additional Deposits, many or most of them would not have done so.

353.    Had the Defendants not engaged in their fraudulent and deceptive sales practices, by May 31, 2010, the Sponsor would have had fewer Units under Purchase Agreements (not then in default) than the minimum 15% of total units required by the AG Regs. and the 60 Units required under the Plan, and therefore would have been required to offer each purchaser of a Unit the opportunity to rescind their Purchase Agreement and obtain a full refund of their Deposits.

354.    Had the Purchasing Plaintiffs been offered the opportunity to rescind their Purchase Agreements, they each would have exercised such opportunity and obtained a full refund of their Deposits.

### The Effectiveness Amendment and the Sapir Affidavit

355.    On or about April 2, 2010, the Sponsor submitted the Tenth Amendment to the Offering Plan for the Trump Soho to the Attorney General.

356.    The Tenth Amendment stated that its purpose was "to declare the Plan to be effective and to extent the term of the offering under the Plan."

357.    The Attorney General accepted this Tenth Amendment for filing on May 5, 2010.

358.    On information and belief, on or shortly after May 5, 2010, the Sponsor distributed the Tenth Amendment to all unit purchasers, as required under the AG Regs.

Complaint Page 76

359. As required by the AG Regs., the Tenth Amendment included an affidavit stating the number of bona fide Purchase Agreements that were in effect and listing the unit numbers and date of each such Purchase Agreement.

360. Specifically, the Tenth Amendment included a copy of the Sapir Affidavit, which is described above and which disclosed that only 62 of the Trump Soho Units had been sold.

361. Prior to the public release of the Sapir Affidavit on or about May 5, 2010, neither the Sponsor nor any other Defendant had publicly disclosed the actual number of units sold.

362. Prior to the public release of the Sapir Affidavit on or about May 5, 2010, no Trump Soho purchaser would have been able to determine the actual number of units sold.

363. Prior to the public release of the Sapir Affidavit on or about May 5, 2010, no Trump Soho purchaser would have been able to discover the falsity of the Defendants' representations regarding the number and percentage of Trump Soho units sold described above.

### The Drastic Staff Cuts Revealed in the Tenth Amendment

364. Each Purchase Agreement expressly provides that the Plan (defined in ¶ 1 to include all amendments filed prior to the date of the Purchase Agreement) "is incorporated herein by reference and made a part hereof with the same force and effect as if set forth herein at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern." (¶ 11.2)

365.   Included in the Plan is a detailed budget for the Condominium, which specifies

not only the payroll budgets by department, but also, for each department, the

exact number of employees for each job title to be hired.  (Plan, pages 73-81)

366.   For example, the Plan showed that the Property Operation and Maintenance

department would have 29 employees as follows:   1 Manager, 1 Assistant

Manager, 1 Coordinator, 8 Lead Mechanics and 18 House Mechanics. (Page 74)

367.   In total, the Plan stated that the Condominium would employ a staff of 213

employees.

368.   The Plan explained the Condominium's staffing needs and costs as follows:

> The costs listed here are not anticipated to vary considerably due to
> changes from time to time in the levels of hotel occupancy as these costs
> are considered to be the core management and service staff necessary to
> operate a quality hotel of the size of the Condominium. (Page 72)

369.   Further, the Plan specified that: "The fitness center will initially be operated by

the Spa Unit Owner."  (Page 78)

370.   Although a slightly revised budget was published in the Third Amendment dated

January 25, 2008, it contained identical staffing levels and allocations as the

staffing specified in the original Plan.

371.   The Third Amendment also repeated the statement that: "The fitness center will

initially be operated by the Spa Unit Owner."

372.   Each of the Purchase Agreements at issue herein (and indeed all of the 62

Purchase Agreements listed in the Sapir Affidavit) were signed when the budgets

in the original Plan or the Third Amendment were current, and therefore the

(identical) staffing levels set out in the original Plan and the Third Amendment

were incorporated into the Purchase Agreements and became terms and covenants agreed to by the parties.

373.   In the May 5, 2010 Tenth Amendment, issued well after each Purchase Agreement had been signed, there was a budget that showed that the Condominium would have drastically slashed staffing levels.

374.   The staff according to the Plan and the Third Amendment of 213 was cut down by the Tenth Amendment to a total of 159 employees, a reduction of 25.4%.

375.   The Tenth Amendment radically reduced many departments.

376.   For instance, instead of having 29 employees in the Property Operation and Maintenance department, the Condominium would now hire only 12, 1 Manager, 1 Assistant Manager, and 10 House Mechanics, eliminating the positions of Coordinator and Lead Mechanic entirely.  (Tenth Amendment, Budget, Page 4)

377.   Similarly, the Rooms department staff dropped from 70 to 48, and the Security staff dropped from 25 to 18.  (Tenth Amendment, Budget, Pages 3 &9)

378.   The three persons Florist staff was eliminated entirely, leaving no internal floral services at the Trump Soho.  (Tenth Amendment, page 1)

379.   The Tenth Amendment also specifies that, rather than being operated by the Spa Unit Owner:  "The Fitness Center will be operated by the Condominium and the expenses for such are incorporated into the overall Condominium personnel and maintenance expense budget items."  (Tenth Amendment, Budget, page 7-8)

380.   Despite this change in responsibility for the operation of the Fitness Center, there are no jobs for Fitness Center staff listed in the Tenth Amendment budget.

381.   The change in staffing reflected in the Tenth Amendment, undertaking more responsibilities with less than three-quarters of the staff, reflects a material decrease in the level of services from what the Sponsor agreed to provide to the Plaintiffs in their Purchase Agreements.

382.   Such a reduction in staffing and services constitutes a material breach of each of the Plaintiffs' Purchase Agreements.

383.   The AG Regs. specify with regard to amendments to Offering Plans that:

> If there is a material amendment to the offering plan that adversely affects the purchasers, sponsor must grant purchasers a right of rescission and a reasonable period of time that is not less than fifteen (15) days after the date of presentation to exercise the right. Sponsor must return any deposit or down payment to purchasers who rescind. 13 NYCRR § 20.5(a)(5).

384.   The Plan provides (at page 177) with respect to amendments to the Plan that:

> All substantive or material revisions will be contained in a duly filed amendment to the Plan.  If there is a material change that adversely affects any Purchasers, Sponsor will grant such Purchasers a right to rescind their respective Agreements by written notice to Sponsor given within fifteen (15) days after the date of presentation of such amendment.  In such event, Sponsor will direct the Escrow Agent to return the Deposit of any Purchasers who duly rescind their Agreement.

385.   The Plan's provision requiring the Sponsor to grant purchasers a right to rescind their Purchase Agreements on a material adverse change was incorporated by reference into each Purchase Agreement.

386.   The decrease in Condominium staffing set forth  in the Tenth Amendment is "a material change that adversely affects . . . Purchasers."

387. Neither in the Tenth Amendment nor in any document provided to Plaintiffs at or after the time the Tenth Amendment was distributed did the Sponsor grant the Plaintiffs or other purchasers a right to rescind their Purchase Agreements.

388. The Sponsor's failure to grant a right to rescind the Plaintiffs' Purchase Agreements based on the material adverse change set forth in the Tenth Amendment constitutes a material breach of each Plaintiff's Purchase Agreement.

### THE DEFENDANTS' FRAUD AND THE MOTIVATION BEHIND IT

#### The Need to Project Success through False Statements

389. To effectively market units in a condominium development like the Trump Soho, it is necessary to generate initial enthusiasm for the project and create a continuing perception that the project is a success.

390. This was particularly true in the case of the Trump Soho, which was burdened by community opposition and its unique Restrictive Declaration limiting how Units could be occupied.

391. Donald Trump is well known in the real estate industry and throughout the world for marketing his projects with extensive hype and glitz.

392. The marketing of Trump Soho fit squarely in the Trump mode of marketing, having been introduced on the 2006 finale of Donald Trump's television show *The Apprentice*, and with its sales having been kicked off with an opulent gala celebration, as described in the September 27, 2007 *Daily News* article and other press reports.

393.  At the gala, as the *Daily News* reported, Donald Trump made the extravagant claim that there was a 3,200 person waiting list, and Shaun Osher boasted that 50 contracts had already been signed.

394.  Although the Defendants may have expected that Units would sell briskly, it must have quickly become apparent to them that sales would instead be sluggish in the extreme.

395.  In fact, though Shaun Osher claimed 50 contracts had been signed by the time of the September 19, 2007 gala, the Sapir Affidavit shows the Trump Soho did not achieve that number of signed contracts until more than six months later, on March 22, 2008.

396.  In a buyer's decision on whether to buy a condominium unit, the number or percentage of units already sold by the developer is an important consideration.

397.  This is particularly true in a hotel condominium where use as a personal residence is prohibited, and the unit is required to be held as an investment property for the bulk of every year.

398.  As an initial matter, buyers consider robust sales to be strong indication of the development's value and that the units are well priced in the marketplace.

399.  With an untested concept like the Trump Soho and its unique Restrictive Covenant, the fact that a substantial number of previous purchasers had evaluated and approved the development's particulars provides substantial comfort to later purchasers.

400.  More significantly, a substantial portion of the value of hotel condominium units like the ones at the Trump Soho is bound up in the ability of the purchaser to later resell the unit in the secondary market.

401.  Where the developer cannot sell a high number and percentage of units in its initial offering, it becomes unlikely that a viable secondary sales market will develop.

402.  On the other hand, a high number and percentage of initial unit sales is a good indication that demand for unit resales will develop.

403.  In fact, until the developer completes its initial offering and sells out all of its units, the developer remains in competition with unit purchasers for unit sales.

404.  Indeed the Property Report required by ILSA to be distributed to Trump Soho purchasers expressly cautions: "Resale of your Hotel Suite Unit may be difficult or impossible until our projected sell-out of the condominium, since you may face the competition of our own sales program and local real estate brokers may not be interested in listing your Hotel Suite Unit."

405.  In addition, the higher the percentage of developer ownership in a condominium development, the riskier the investment because of the greater chance and consequences of Sponsor default.

406.  Further, many banks will not lend on condominium units where the ownership is more than 30 or 50 percent.

407.  As a result, had the truth gotten out that the Trump Soho's sales were in fact anemic, selling any further units would have become nearly impossible.

408.   As detailed below, each of the Misrepresenting Defendants had a substantial personal, financial and reputational interest in generating sales of Units for the Trump Soho.

409.   Each of the individual and company sales agents, including Defendants Prodigy, Rodrigo Nino, Core, Shaun Osher, and Thomas Postilio, and non-parties Sara Clephane, Sandra Dominguez, Marcella Carrillo, Baobab 3i, Ferran Fontal and Javier Cerro Diaz, are compensated, on information and belief, wholly or in substantial part by commissions based on Unit sales. The basis for this information and belief is industry practice in the compensation of real estate sales persons.

410.   Each of the other Defendants has, upon information and belief, a personal financial or equity interest in the Trump Soho and will receive compensation or return on that interest based substantially on the level of Unit sales. The basis for this information and belief is information regarding each such Defendant set forth above and in the Offering Plan.

411.   By reason of their knowledge and experience in the real estate industry, each Defendant knew, on information and belief, that if the true levels of Unit sales had been revealed, that it would become difficult or impossible to make further Unit sales.

412.   Each Defendant also knew, on information and belief, that because the sales levels had been publicly overstated at the very beginning of the sales process, any statement showing a lower level of sales would reveal the prior falsehood.