413.  Indeed, it became necessary to rapidly increase the level of claimed sales told to the public and to prospective purchasers to give the impression that sales were progressing rapidly.

414.  Further, each Defendant was aware that if Trump Soho failed to sell 15% of the Units by May 31, 2010, the Plan would be declared ineffective under New York law, and if Trump Soho failed to sell 60 Units by that same date, the Plan would be declared ineffective under the terms of the Offering Plan. The Sponsor would then be required to refund the Deposits of each purchaser, thereby suffering substantial economic loss.

As a result, though the Defendants knew or should have known that they were stating falsehoods, on information and belief, they continued on their path of grossly overstating sales levels and numbers, and giving false impressions of limited Unit availability.

### False Statements of the Prodigy Defendants

415.  Rodrigo Nino made the following false statements described above:

a.  The statement in the March 12, 2008 *New York Observer* article that 53% of the Units had been sold, which statement was republished in February 13, 2008 articles in *Curbed NY* and *The Huffington Post* (whereas, according the Sapir Affidavit, on March 12, 2008, only 12.25% of the Units had been sold).

b.  The statement e-mailed to Hubert Tsai on April 7, 2009 by Prodigy stating that Trump Soho is outpacing sales predictions and that approximately 53% of the building had been purchased by global buyers as a result of the

weak dollar (according to the Sapir Affidavit, on April 7, 2008, only 12.50% of the Units had been sold).

c.  The statement in the April 11, 2008 *Daily News* article that 50% of the units have been sold (according to the Sapir Affidavit, on April 11, 2008, only 12.50% of the Units had been sold).

d.  The statement in the June 2, 2008 *The Real Deal* article 58% of the units were under contract (whereas, according to the Sapir Affidavit, on June 2, 2008, only 13.75% of the Units had been sold).

e.  The statements in the January 29, 2009 *New York Post* article that 270 Units, or about 67% of the 400 total units, have been sold (according to the Sapir Affidavit, on January 29, 2009, only 62 Units, or 15.5% of the Units, had been sold).

416.  Each of these statements by Rodrigo Nino was false when made.

417.  By reason of his being the founder and President of Prodigy, the exclusive or co-exclusive sales agent for the Trump Soho, and the principal officer of Prodigy responsible for the sales and marketing of the Trump Soho, Rodrigo Nino knew or should have known the true sales levels at the Trump Soho at the times he made these statements.

418.  By reason of his being the founder and President of Prodigy, the exclusive or co-exclusive sales agent for the Trump Soho, and the principal officer of Prodigy responsible for the sales and marketing of the Trump Soho, Rodrigo Nino knew or should have known these statements were false.

419. Had he made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Rodrigo Nino would have been severely reckless in making these statements.

420. On information and belief, as President of Prodigy (and possibly an owner), Rodrigo Nino would directly or indirectly receive a sales commission or similar compensation for each Trump Soho unit sold by him or by Prodigy. On information and belief, Rodrigo Nino made these false statements in order to induce sales of Trump Soho Units.

421. On information and belief, Rodrigo Nino made these false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Prodigy.

422. On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

423. On information and belief, Rodrigo Nino made these false statements to protect his personal reputation and the reputation of his company, Prodigy, as successful sales agents.

424. Sara Clephane made the following false statements described above:

    a. The statement emailed to Alan Maltz on September 20, 2007 that the demand for Units was overwhelming and that there was a 1,400 person waiting list (whereas, according to the Sapir Affidavit, on this date, only 2.42% of the Units had been sold, and if there was such a waiting list, a

much higher percentage of Units would have been sold at that time or shortly thereafter).

b. The statement made to Alan Maltz in September of 2007 that 70% of the Units had been sold (whereas, according to the Sapir Affidavit, on September 20, 2007, only 3.39% of the Units had been sold).

c. The statement made to Rachel Gerstein on January 9, 2008 that 30-40% of the Units had been sold (whereas, according to the Sapir Affidavit, on January 8, 2008, only 10.9% of the Units had been sold).

d. The statement made to Rachel Gerstein on January 9, 2008 that buyers were purchasing as many as three to five units (whereas, according to the Sapir Affidavit only one out of the 62 buyers purchased multiple units and that one buyer purchased just two units).

e. The statement made to Rachel Gerstein on January 25, 2008 that certain lines were almost sold out (whereas, according to the Sapir Affidavit, on January 8, 2008, none of the lines were nearly sold out.)

f. The statement made to Rachel Gerstein on July 17, 2008 that her Unit's line was "pretty much sold out" (whereas, according to the Sapir Affidavit, on this date, only 7 of the 34 units in the "09" line were sold).

425. Each of these statements by Sara Clephane was false when made.

426. By reason of her position as Director of Sales at the Trump Soho for Prodigy, Sara Clephane knew or should have known the true sales levels at the Trump Soho at the times she made these statements.

427. By reason of her position as Director of Sales at the Trump Soho for Prodigy, Sara Clephane knew or should have known these statements were false.

428. Had she made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Sara Clephane would have been severely reckless in making these statements.

429. On information and belief, as Director of Sales at the Trump Soho for Prodigy, Sara Clephane would directly or indirectly receive a sales commission or similar compensation for each Trump Soho unit sold by her.

430. On information and belief, Sara Clephane made these false statements in order to induce sales of Trump Soho Units.

431. On information and belief, Sara Clephane made these false statements because of the direct, personal, financial benefit she would receive by generating or increasing sales at the Trump Soho as a sales agent of Prodigy.

432. Sandra Dominguez made the following false statement described above:

   a. The statement made to Felisa Hernandez prior to August 2, 2008 that 50% of the Units had been sold (whereas, according to the Sapir Affidavit, on August 2, 2008, only 15.25% of the Units had been sold.

433. This statement made by Sandra Dominguez was false when made.

434. By reason of her position as Sales Associate for the Trump Soho with Prodigy, Sandra Dominguez knew or should have known the true sales levels at the Trump Soho at the time she made the statement.

435. By reason of her position as Sales Associate for the Trump Soho with Prodigy, Sandra Dominguez knew or should have known the statement was false.

436. Had she made the statement without knowing or ascertaining the true sales levels at the Trump Soho, Sandra Dominguez would have been severely reckless in making the statement.

437. On information and belief, as Sales Associate for the Trump Soho with Prodigy, Sandra Dominguez would directly or indirectly receive a sales commission or similar compensation for each Trump Soho unit sold by her.

438. On information and belief, Sandra Dominguez made the false statement in order to induce sales of Trump Soho Units.

439. On information and belief, Sandra Dominguez made the false statement because of the direct, personal, financial benefit she would receive by generating or increasing sales at the Trump Soho as a sales agent for the Trump Soho with Prodigy.

440. Marcella Carillo made the following false statements described above:

   a. The statement made to Acacio Rodriguez in April of 2008 that 70% of the Units had been sold (whereas, according to the Sapir Affidavit, in April of 2008, only 12.75% of the Units had been sold).

441. This statement made by Marcella Carrillo was false when made.

442. By reason of her position as International Director of Sales – New York at Prodigy and sales agent for the Trump Soho with Prodigy, Marcella Carrillo knew or should have known the true sales levels at the Trump Soho at the time she made the statement.

443. By reason of her position as International Director of Sales – New York at Prodigy and sales agent for the Trump Soho with Prodigy, Marcella Carrillo knew or should have known the statement was false.

444. Had she made the statement without knowing or ascertaining the true sales levels at the Trump Soho, Marcella Carrillo would have been severely reckless in making the statement.

445. On information and belief, as International Director of Sales – New York at Prodigy and and sales agent for the Trump Soho with Prodigy, Marcella Carrillo would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by her.

446. On information and belief, Marcella Carrillo made the false statement in order to induce sales of Trump Soho Units.

447. On information and belief, Marcella Carrillo made the false statement because of the direct, personal, financial benefit she would receive by generating or increasing sales at the Trump Soho as a sales agent for the Trump Soho with Prodigy.

448. At the time that Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Prodigy.

449. Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo made the false statements described herein in the course of their duties as employees, officers, directors, principals and/or sales agents for Prodigy and for the benefit of Prodigy.

450. As such, the false statements made by Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo described herein may be attributed to Prodigy.

451. Accordingly, Prodigy is legally responsible for the false statements made by Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo described herein.

452. At the time that the false statements made by Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo and attributed to Prodigy herein were made, Prodigy was acting as exclusive or co-exclusive sales agent for the Sponsor.

453. Prodigy made the false statements attributed to it herein in the course of its duties as exclusive or co-exclusive sales agent for the Sponsor and for the benefit of the Sponsor.

454. As such, the false statements attributed to Prodigy herein may be attributed to the Sponsor.

455. Accordingly, the Sponsor is legally responsible for the false statements attributed to Prodigy herein.

### False Statements of the Core Defendants

456. Shaun Osher made the following false statements described above:

   a. The statement in the September 27, 2007 *Daily News* article that fifty contracts had been signed so far (whereas, according the Sapir Affidavit, on September 27, 2007, only 14 Units were under contract).

457. This statement by Shaun Osher was false when made.

458. By reason of his being the founder and Chief Executive Officer of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Shaun Osher knew or should have known the true sales levels at the Trump Soho at the times he made the statement.

459. By reason of his being the founder and Chief Executive Officer of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Shaun Osher knew or should have known the statement was false.

460. Had he made the statement without knowing or ascertaining the true sales levels at the Trump Soho, Shaun Osher would have been severely reckless in making the statement.

461. On information and belief, as founder and Chief Executive Officer of Core, Shaun Osher would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Core.

462. On information and belief, Shaun Osher made the false statement in order to induce sales of Trump Soho Units.

463. On information and belief, Shaun Osher made the false statement because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Core.

464. On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

465. On information and belief, Shaun Osher made these false statements to protect his personal reputation and the reputation of his company, Core, as successful sales agents.

466. Thomas Postilio made the following false statements described above:

    a. The statements made to Randall A. Meckel in October and November of 2007 that Units 806, 808, 811, 1004, 1111, 1611, 1802, 2011, 2211, and 2611 (whereas, according the Sapir Affidavit, none of these Units were sold in October and November of 2007).

    b. The statement made to Randall A. Meckel in early November of 2007 that over 30% of the Units had been sold (whereas, according to the Sapir Affidavit, in early November of 2007, only 7.75% of the Units had been sold).

467. These statements by Thomas Postilio were false when made.

468. By reason of his being a founding member and Managing Director of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Thomas Postilio knew or should have known the true sales levels at the Trump Soho at the times he made the statements.

469. By reason of his being a founding member and Managing Director of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Thomas Postilio knew or should have known the statements were false.

470. Had he made the statements without knowing or ascertaining the true sales levels at the Trump Soho, Thomas Postilio would have been severely reckless in making these statements.

471. On information and belief, as founder and Chief Executive Officer of Core, Thomas Postilio would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Core.

472. On information and belief, Thomas Postilio made the false statements in order to induce sales of Trump Soho Units.

473. On information and belief, Thomas Postilio made the false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Core.

474. On information and belief, Thomas Postilio made these false statements to protect his personal reputation and the reputation of his company, Core, as successful sales agents.

475. At the time that Shaun Osher and Thomas Postilio made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Core.

476. Shaun Osher and Thomas Postilio made the false statements described herein in the course of their duties as employees, officers, directors, principals and/or sales agents for Core and for the benefit of Core.

477. As such, the false statements made by Shaun Osher and Thomas Postilio described herein may be attributed to Core.

478. Accordingly, Core is legally responsible for the false statements made by Shaun Osher and Thomas Postilio described herein.

479. At the time that the false statements made by Shaun Osher and Thomas Postilio and attributed to Core herein were made, Core was acting as co-exclusive sales agent for the Sponsor.

480. Core made the false statements attributed to it herein in the course of its duties as co-exclusive sales agent for the Sponsor and for the benefit of the Sponsor.

481. As such, the false statements attributed to Core herein may be attributed to the Sponsor.

482. Accordingly, the Sponsor is legally responsible for the false statements attributed to Core herein.

### False Statements of the Trump Defendants

483. Donald Trump made the following false statements described above:

    a. The statement in the September 27, 2007 *Daily News* article that there was already a 3,200 person waiting list to see the Units (whereas, according to the Sapir Affidavit, on this date, only 2.42% of the Units had been sold, and, if there was such a waiting list, a much higher percentage of Units would have been sold at that time or shortly thereafter).

    b. The statement in the October 14, 2007 *New York Times* article that there were 3,200 purchase applications for the 400 Units (whereas, according to the Sapir Affidavit, on this date, only 5.57% of the Units had been sold, and, if there were that many applications, a much higher percentage of Units would have been sold at that time or shortly thereafter).

c. The statement in the April 2008 issue of *In the World Magazine* that Spanish purchasers had invested $250 million of the $800 million total offering, which implied that at least 31% of the Units had been sold (whereas, according to the Sapir Affidavit, in April of 2008, only 12.5% of the Units had been sold).

484. Each of these statements by Donald Trump was false when made.

485. By reason of his being one of three indirect owners of the Sponsor, his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan, his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, his having been designated a member of the initial Board of Directors of the Condominium, and his being an officer, director, shareholder, and/or principal of Trump Hotels, Trump Marks and the Sponsor, Donald Trump knew or should have known the true sales levels at the Trump Soho at the times he made these statements.

486. By reason of his being one of three indirect owners of the Sponsor, his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan, his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, his having been designated a member of the initial Board of Directors of the Condominium, and his being an officer, director, shareholder, and/or principal of

Trump Hotels, Trump Marks and the Sponsor, Donald Trump knew or should have known these statements were false.

487. Had he made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Donald Trump would have been severely reckless in making these statements.

488. On information and belief, as one of three indirect owners of the Sponsor, his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan, his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, his having been designated a member of the initial Board of Directors of the Condominium, and as an officer, director, shareholder, and/or principal of Trump Hotels, Trump Marks and the Sponsor, Donald Trump would receive compensation for each Trump Soho Unit sold.

489. On information and belief, Donald Trump made these false statements in order to induce sales of Trump Soho Units.

490. On information and belief, Donald Trump made these false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho.

491. On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

492. On information and belief, Donald Trump made these false statements to protect his personal reputation and the reputation of his companies as successful developers.

493. Donald Trump Jr. made the following false statement described above:

    a. The statement in the May 5, 2009 Curbed.com article that the building was more than 55% sold (whereas, according to the Sapir Affidavit, on May 5, 2009, only 15.5% of the Units had been sold).

494. This statement made by Donald Trump Jr. was false when made.

495. By reason of his ownership interest in the Trump Soho and of his being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Donald Trump, Jr. knew or should have known the true sales levels at the Trump Soho at the times he made this statement.

496. By reason of his ownership interest in the Trump Soho and of his being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Donald Trump Jr. knew or should have known this statement was false.

497. Had he made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Donald Trump Jr. would have been severely reckless in making this statement.

498. On information and belief, by reason of his ownership interest in the Trump Soho and of his being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Donald Trump Jr. would receive compensation for each Trump Soho Unit sold.

499. On information and belief, Donald Trump Jr. made the false statement in order to induce sales of Trump Soho Units.

500. On information and belief, Donald Trump Jr. made the false statement because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho.

501. On information and belief, as one of the public faces of the Trump Soho project, it was important for his business and personal reputation that the project be seen as successful and as having robust sales, and in particular, because Donald Trump had given Donald Trump Jr. and his other children very public responsibility for the development and operation of the Trump Soho project, and Donald Trump Jr. and the other Trump children were using the project in an attempt to establish some independent credibility in the real estate business beyond their mere status as Trump's children, it would have been particularly devastating to Donald Trump Jr. to have the project seen as unsuccessful.

502. Ivanka Trump made the following false statements described above:

    a. The statement in the June 27, 2008 Reuters wire service article that 60% of the Units were sold (whereas, according to the Sapir Affidavit, on June 27, 2008, only 14.5% of the Units had been sold).

    b. The statement in the June 29, 2008 *London Times* article that 60% of the Units were sold (whereas according to the Sapir Affidavit, on June 27, 2008, only 14.5% of the Units had been sold).

503. These statements made by Ivanka Trump were false when made.

504.    By reason of her ownership interest in the Trump Soho and her being an officer,
        director, shareholder, member, manager and/or principal of Trump Hotels, Trump
        Marks, and the Sponsor, Ivanka Trump knew or should have known the true sales
        levels at the Trump Soho at the times she made these statements.

505.    By reason of her ownership interest in the Trump Soho and her being an officer,
        director, shareholder, member, manager and/or principal of Trump Hotels, Trump
        Marks, and the Sponsor, Ivanka Trump knew or should have known these
        statements was false.

506.    Had she made these statements without knowing or ascertaining the true sales
        levels at the Trump Soho, Ivanka Trump would have been severely reckless in
        making these statements.

507.    On information and belief, by reason of her ownership interest in the Trump Soho
        and her being an officer, director, shareholder, member, manager and/or principal
        of Trump Hotels, Trump Marks, and the Sponsor, Ivanka Trump would receive
        compensation for each Trump Soho Unit sold.

508.    On information and belief, Ivanka Trump made these false statements in order to
        induce sales of Trump Soho Units.

509.    On information and belief, Ivanka Trump made these false statements because of
        the direct, personal, financial benefit she would receive by generating or
        increasing sales at the Trump Soho.

510.    On information and belief, as one of the public faces of the Trump Soho project, it
        was important for her business and personal reputation that the project be seen as
        successful and as having robust sales, and in particular, because Donald Trump

had given Ivanka Trump and his other children very public responsibility for the development and operation of the Trump Soho project, and Ivanka Trump and the other Trump children were using the project in an attempt to establish some independent credibility in the real estate business beyond their mere status as Trump's children, it would have been particularly devastating to Ivanka Trump to have the project seen as unsuccessful.

511.  At the time that Donald Trump, Donald Trump, Jr. and Ivanka Trump made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Trump Hotels, Trump Marks, and the Sponsor.

512.  Donald Trump, Donald Trump, Jr. and Ivanka Trump made the false statements described herein in the course of their duties as employees, officers, directors, principals and/or sales agents for Trump Hotels, Trump Marks, and the Sponsor and for the benefit of Trump Hotels, Trump Marks, and the Sponsor.

513.  As such, the false statements made by Donald Trump, Donald Trump, Jr. and Ivanka Trump described herein may be attributed to Trump Hotels, Trump Marks, and the Sponsor.

514.  Accordingly, Trump Hotels, Trump Marks, and the Sponsor are legally responsible for the false statements made by Donald Trump, Donald Trump, Jr. and Ivanka Trump described herein.

### False Statements of the Sponsor Defendants and their Agents

515.  Julius Schwarz made the following false statement described above:

a. The statement in the September 5, 2008 *Downtown Express* article that the condominium was more than half sold (whereas according to the Sapir Affidavit, on September 5, 2008, only 15.25% of the Units had been sold).

516. This statement made by Julius Schwarz was false when made.

517. By reason of his being one of the "officers, directors, shareholders and principals of the Sonsor who are actively involved in the planning or the consummation of the offering contemplated by the Plan,", his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, and his being the founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, and the managing member of 246 Spring Holdings, the sole member of the Sponsor, Julius Schwarz knew or should have known the true sales levels at the Trump Soho at the times he made this statement.

518. By reason of his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or the consummation of the offering contemplated by the Plan," his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, and his being the founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, and the managing member of 246 Spring Holdings, the sole member of the Sponsor, Julius Schwarz knew or should have known this statement was false.

519.  Had he made the statement without knowing or ascertaining the true sales levels at the Trump Soho, Julius Schwarz would have been severely reckless in making this statement.

520.  On information and belief, by reason of his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or the consummation of the offering contemplated by the Plan," his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, and his being the founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, and the managing member of 246 Spring Holdings, the sole member of the Sponsor, Julius Schwarz would receive compensation for each Trump Soho Unit sold.

521.  On information and belief, Julius Schwarz made the false statement in order to induce sales of Trump Soho Units.

522.  On information and belief, Julius Schwarz made the false statement because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho.

523.  On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

524.  On information and belief, Julius Schwarz made these false statements to protect his personal reputation and the reputation of his company as successful developers.

525. At the time that Julius Schwarz made the false statement described herein, he was acting an employee, officer, director, principal and/or sales agent for the Sponsor.

526. Julius Schwarz made the false statements described herein in the course of his duties as an employee, officer, director, principal and/or sales agent for the Sponsor.

527. As such, the false statement made by Julius Schwarz described herein may be attributed to the Sponsor.

528. Accordingly, the Sponsor is legally responsible for the false statement made by Julius Schwarz described herein.

529. Ferran Fontal made the following false or misleading statements described above:

   a. Ferran Fontal provided a brochure to Acacio Rodriguez and Javier Rodriguez that contained, among other things, certain financial projections that stated the Return on Investment as 76.83% and the Internal Return Rate as 19.3% (these projections were false because they were unrealistic and unsupportable).

530. This statements contained in the brochure provided to Acacio Rodriguez and Javier Rodriguz by Ferran Fontal were false when made.

531. By reason of his being Chairman and Chief Executive Officer of Baobab, a sales agent for the Trump Soho in Spain, and a principal officer of Baobab responsible for the sales and marketing of the Trump Soho, Ferran Fontal knew or should have known that his statements regarding investment return at the Trump Soho were either false or unsupportable.

532. Had he made the statements without knowing that it was false or unsupportable, Ferran Fontal would have been severely reckless in making the statements.

533. On information and belief, as Chairman and Chief Executive Officer of Baobab, Ferran Fontal would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Baobab.

534. On information and belief, Ferran Fontal made the false statements in order to induce sales of Trump Soho Units.

535. On information and belief, Ferran Fontal made the false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Baobab.

536. Javier Cerro Diaz made the following false or unsupportable statements described above:

    a. The email to Acacio Rodriguez on April 15, 2008 that contained, among other things, certain financial projections that stated the Return on Investment as 153% and the Internal Return Rate as 80% (these projections were false because they were unrealistic and unsupportable).

537. These statements by Javier Cerro Diaz was false when made.

538. By reason of his being International Sales Manager of Baobab, the sales agent for the Trump Soho in Spain, and a principal officer of Baobab responsible for the sales and marketing of the Trump Soho, Javier Cerro Diaz knew or should have known that his statements regarding investment return at the Trump Soho were either false or unsupportable.

539. Had he made the statements without knowing it was false or unsupportable, Javier Cerro Diaz would have been severely reckless in making the statements.

540. On information and belief, as International Sales Manager of Baobab, Javier Cerro Diaz would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Baobab.

541. On information and belief, Javier Cerro Diaz made the false statements in order to induce sales of Trump Soho Units.

542. On information and belief, Javier Cerro Diaz made the false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Baobab.

543. At the time that Ferran Fontal and Javier Cerro Diaz made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Baobab.

544. Ferran Fontal and Javier Cerro Diaz made the false statements described herein in the course of their duties as employees, officers, directors, principals and/or sales agents for Baobab and for the benefit of Baobab.

545. As such, the false statements made by Ferran Fontal and Javier Cerro Diaz described herein may be attributed to Baobab.

546. Accordingly, Baobab is legally responsible for the false statements made by Ferran Fontal and Javier Cerro Diaz described herein

547. At the time that the false statements made by Ferran Fontal and Javier Cerro Diaz and attributed to Baobab herein were made, Baobab was acting as sales agent for the Sponsor in Spain.

548.  Baobab made the false statements attributed to it herein in the course of its duties as sales agent for the Sponsor in Spain and for the benefit of the Sponsor.

549.  As such, the false statements attributed to Baobab herein may be attributed to the Sponsor.

550.  Accordingly, the Sponsor is legally responsible for the false statements attributed to Baobab herein.

551.  The following false statements described above ("Unattributed False Statements") were, on information and belief made, directly or indirectly, by the Sponsor or a representative or agent of the Sponsor:

   a.  In November of 2007, an article in *Magnate Inmobiliario*, a Spanish publication discussing Spanish investment in Trump Soho, stated that 15% of the Units at Trump Soho had been purchased by Spanish individuals and companies, and that a total of 53% of the Units had been sold (whereas, according to the Sapir Affidavit, by the end of November of 2007, only 9.2% of the Units had been sold).

   b.  Prior to their signing the Purchase Agreement on or before December 14, 2007, Randall A. Meckel was told by a Trump Soho representative that over 50% of the Units had been sold (whereas, according to the Sapir Affidavit, on December 14, 2007, only 9.93% of the Units had been sold).

   c.  On January 15, 2008, an *Associated Press* article stated that the developers boasted there were 3,200 purchase applications for the 400 Units (whereas, according to the Sapir Affidavit, on January 15, 2008, only 11.14% of the Units had been sold, and if that many purchase applications

had been received, a much higher percentage of Units would have been sold at that time or shortly thereafter).

d. In early March of 2008, a Trump Soho sales representative told Hubert Tsai that the building is selling faster than expected and that approximately 50% of the Units have already been sold (whereas, according to the Sapir Affidavit, in early March of 2008, only 12.25% of the Units had been sold).

e. On March 5, 2008 an article in *The Villager* stated that 53% of the 400 Units were sold (whereas, according to the Sapir Affidavit, on March 5, 2008, only 12.25% of the Units had been sold).

f. On March 18, 2008, an article in *Calculadora de Hipotecas*, a Spanish publication, stated that Trump Soho had already attacted 98 million euros from Spain and that 15% of the Units have been purchased by Spanish individuals and companies (whereas, according to the Sapir Affidavit, on March 5, 2008, only 12.25% of the Units had been sold).

g. A March 30, 2008 *New York Magazine* article stated that the author was told by a Trump representative that the building was 60% sold (whereas, according to the Sapir Affidavit, on March 30, 2008, only 12.5% of the Units had been sold).

h. On July 3, 2008, an article in *Periodista Digital*, a Spanish publication, stated that Spanish investors had invested about 98.5 million Euros in Trump Soho, and 15% of the Units had been purchased by Spanish buyers

(whereas, according to the Sapir Affidavit, on March 5, 2008, only 15% of the total Units had been sold).

    i.  On October 30, 2008, an article in *Por Guillermo*, a Spanish publication, stated that 22% of the Units had been purchased by Spanish buyers (whereas, according to the Sapir Affidavit, on March 5, 2008, only 15.25% of the total Units had been sold).

552.    Each of the Unattributed False Statements were made, on information and belief, directly or indirectly, by the Sponsor or a representative or agent of the Sponsor, were false.

553.    By reason of being the Sponsor or a representative or agent of the Sponsor, each speaker of an Unattributed False Statement knew or should have known the true sales levels at the Trump Soho at the times the speaker made such statement.

554.    By reason of being the Sponsor or a representative or agent of the Sponsor, each speaker of an Unattributed False Statement knew or should have known that such statements were false.

555.    Had any speaker of an Unattributed False Statement made such a statements without knowing or ascertaining the true sales levels at the Trump Soho, the speaker would have been severely reckless in making this statement.

556.    On information and belief, as the Sponsor or a representative or agent of the Sponsor, each speaker of an Unattributed False Statement would receive compensation for each Trump Soho Unit sold.

557.    On information and belief, each speaker of an Unattributed False Statement made the false statement in order to induce sales of Trump Soho Units.

558. On information and belief, each speaker of an Unattributed False Statement made such false statement because of the direct, personal, financial benefit the speaker would receive by generating or increasing sales at the Trump Soho.

559. At the time that each speaker of an Unattributed False Statement made the false statements described herein, such speaker was acting an employee, officer, director, principal and/or sales agent for the Sponsor.

560. Each speaker of an Unattributed False Statement made the false statements described herein in the course of the speaker's duties as an employee, officer, director, principal and/or sales agent for the Sponsor.

561. As such, the false statements made by each speaker of an Unattributed False Statement described herein may be attributed to the Sponsor.

562. Accordingly, the Sponsor is legally responsible for each Unattributed False Statement described herein.

563. All of the false representations described herein as having been made by or attributed to Sponsor were made for the benefit of Sponsor and for the direct financial gain that Sponsor obtains when it sells Units.

**The Control Defendants' Responsibility for the False Statements**

564. Each of the Control Defendants was legally responsible for the making of each false statement described herein.

565. Each of the Control Defendants knew or should have known of the false statements described herein.

566. Each of the Control Defendants was reckless in not learning of the false statements described herein.

567. Each of the Control Defendants adopted the false statements described herein.

568. Each of the Control Defendants could have prevented the false statements described herein from being made.

569. Each of the Control Defendants failed to prevent the false statements described herein from being made.

**The Defendants' Regular Monitoring and Correction of News Reports**

570. On information and belief, the Sponsor and the other Defendants regularly monitored publications and the internet for statements and misstatements made regarding the Trump Soho.

571. On information and belief, the Sponsor and the other Defendants were aware of all or substantially all of the representations regarding Trump Soho occupancy made through newspapers, magazines, wire services and internet websites of general distribution.

572. On information and belief, the Sponsor and the other Defendants would regularly issue demands for correction or cease and desist letters when certain inaccurate information regarding the Trump Soho was published.

573. The basis for this information and belief includes:

    a. A letter dated December 19, 2006 from the Sponsor's outside counsel sent to the New York City Commissioner of Buildings, the Director of the New York City Department of City Planning, the Manhattan Borough President, the New York City Counsel Speaker, U.S. Representative Jerold Nadler, State Senator Tom Duane, and State Assembly Member Deborah Glick which represented that the "Sponsor has been and

continues to monitor the Internet" for improper representations regarding the Trump Soho.

b.   A letter dated December 27, 2006 from the Sponsor's outside counsel to the General Counsel of the New York City Department of Buildings stating that the Sponsor is continuing to monitor the Internet for improper representations regarding the Trump Soho.

c.   Numerous cease and desist letters attached to the December 19, 2006 and December 27, 2006 letters from the Sponsor's outside counsel described above requesting that inaccurate information regarding the Trump Soho cease being distributed.

d.   An e-mail dated February 28, 2007 from Julius Schwarz entitled "CORRECTION URGENTLY NEEDED – Trump Soho Real Estate Feature" sent to *New York* magazine requesting a correction of a feature describing the Trump Soho in the magazine.

e.   A correction letter dated February 14, 2008 from a Trump Soho lawyer to *Curbed NY* (published by *Curbed NY* on February 15, 2008) requesting a correction of a January 29, 2008 *Curbed NY* article regarding the scheduling of a hearing on the Trump Soho.

f.   A letter dated March 31, 2008 from the Sponsor's outside counsel to the chair of the New York City Board of Standards and Appeals which stated that: "Where the Sponsor has become aware of websites, brokers and/or publications that could mislead the public . . . the Sponsor has worked to clarify the matter."

g. The well-known propensity of Donald Trump and his organization to monitor, read and reply to press reports regarding him and his projects.

h. The fact that many organizations, including developers of major real estate developments, either internally or through contractors, monitor the press and publicity regarding their projects.

i. That, where an individual has been interviewed for a publication, the individual will often monitor that publication for any stories resulting from his or her interview, and that reporters will frequently notify interview subjects when such stories are published.

574. On information and belief, the Sponsor and other Defendants have not requested any correction of any statements in any newspaper, magazine, wire service or internet website article regarding Trump Soho sales percentages or number of Units sold.

575. The basis for such information and belief is that Plaintiffs' counsel has made a diligent search of publications and websites for corrections of statements regarding Trump Soho sales percentages or number of Units sold, and has been unable to locate any such corrections.

576. It is particularly noteworthy that on February 14, 2008, Trump Soho counsel requested a correction of a claimed misstatement regarding the scheduling of a hearing in a January 29, 2008 *Curbed NY* article (which correction request was published in *Curbed NY* on February 15, 2008), but apparently did not request any correction of a February 13, 2008 *Curbed NY* article in which Rodrigo Nino was reported to have said that 53% of the Trump Soho Units had been sold.

577. Accordingly, based on the foregoing, on information and belief, the Sponsor and the other Defendants had a policy of monitoring and reviewing published reports regarding the Trump Soho and engaged in the practice of requesting corrections of matters other than reports of sales, but not requesting any corrections of inaccurate statements of the percentages or number of Trump Soho Units sold.

578. As such, on information and belief, the Sponsor and the other Defendants accepted, adopted and endorsed each of the inaccurate statements regarding Trump Soho sales percentages and number of Units sold in the newspaper, magazine, wire service or internet website articles.

579. As such, on information and belief, the Sponsor and the other Defendants are legally responsible for all published inaccurate statements regarding Trump Soho sales percentages and number of Units sold in the newspaper, magazine, wire service or internet website articles.

580. At the very minimum, the Sponsor and the other Defendants are legally responsible for all inaccurate statements regarding Trump Soho sales percentages and number of Units sold in newspaper, magazine, wire service or internet website articles which were actually read, received or reviewed by such Defendants and for which such Defendants failed to request a correction or clarification.

## THE TRUMP SOHO OFFERING AS A SECURITY

581. In the marketing of the Trump Soho, purchasers were not only offered a Unit which they could personally use and occupy, they were also offered the

opportunity to earn investment income during the periods that they were not in occupancy.

582.	Indeed, the Restrictive Declaration requires in § 2.02(b) that: "At all times during which a Unit is not occupied by its Unit Owner, it shall be made available on a daily or weekly basis to non-Unit Owners pursuant to a rental program."

583.	That section further provides that each Unit is required to be rented "at rates comparable to those at similar hotels in New York City."

584.	Under the Trump Soho documents, including the Condominium Declaration, the By-Laws and the Unit Management Agreement, when a Unit is rented to the public, the Unit's owner receives the rental income attributable to that Unit, subject to numerous fees, charges, expenses and deductions.

585.	A significant portion of the Sponsor's efforts to market the Trump Soho to purchasers and their representatives, including the Plaintiffs, consisted of its sales representatives and agents touting the Trump Soho Rental Program and the investment returns which could be earned when the purchaser did not occupy the Unit.

586.	Although certain Trump Soho sales representatives appeared to focus on promoting the rental program while others focused on promoting Unit sales as a whole, the distinction between the two groups of representatives was not made apparent to purchasers and their representatives, including the Plaintiffs.

587.	Each of the Trump Soho sales representatives was an employee or agent of Prodigy or Core, and each had identical black business cards with the Trump Soho logo.

588. They each used e-mail addresses at "trumpsoho.com."

589. Although purchasers and their representatives, including the Plaintiffs, were sometimes referred back and forth between Trump Soho sales representatives to answer different types of questions, the sales organization was presented to them as an integrated whole selling Trump Soho Units, and not as two groups separately selling condominium Units and rental agent services.

590. Further, some sales agents who appeared to concentrate on Unit sales provided information and answered questions regarding the rental program and economic benefits of the Trump Soho, and vice versa.

591. Indeed, the Trump Soho sales process was presented as selling a cohesive package under which a buyer could have a guaranteed place to stay when he or she was in New York, but would be getting rental income from the property the remainder of the time under which one organization would manage the hotel, rent out the Units, and distribute the net rental income to the Unit owners.

592. In promoting the economic benefits available to Trump Soho purchasers, sales representatives would send prospective purchasers a computer spreadsheet that could calculate the investment return to the purchaser if he or she invested in a particular Unit.

593. This spreadsheet allowed the user to enter three variables, the average daily Unit rental rate, an occupancy rate representing the the percentage of nights the Unit would be occupied for rent, and the number nights that the purchaser was intending to use the Unit personally in a year.

594. From these variables, the spreadsheet would calculate and display the net annual rental income the Unit would provide, net of fees, charges, costs and expenses.

595. Although the sales representatives would generally not tell purchasers the exact numbers to fill into the spreadsheet (though sometimes they did), they often provided such clear and direct hints about what values to use that it was tantamount to directing them to use particular numbers.

596. For instance, with regard to average daily Unit rental rate to use, Trump Soho sales agents said and did the following:

    a. During a May 22, 2008 visit to the Trump Soho sales office, Javier Rodriguez was taken to the Mercer Hotel by Marcella Reyes, and directed to ask the desk clerk there what the room rental rates for that hotel were, whereupon he was told $500.00 to $700.00 per night from the Mercer desk clerk.

    b. On that same day, Marcella Reyes confirmed to Javier Rodriguez that $500.00 to $700.00 would be an appropriate rate to use.

    c. Similarly, in a January 9, 2007 meeting Sara Clephane told Rachel Gerstein that that the room rate to be used in calculating the return on investment was similar to that of The Mercer Hotel, and therefore she could charge at least $660.00 to $700.00 per night

    d. In a December 19, 2007 e-mail Amy Williamson told Rachel Gerstien that the Mandarin Oriental or Four Seasons were comparable hotels whose room rates could be used in the spreadsheet.

  e. A September 20, 2007 e-mail from Sara Clephane to Alan Maltz advised

   him that comparable hotels were the Mark, the Plaza, the St. Regis and the

   Mercer.

  f. Finally, in an April 18, 2008 e-mail, Reudi Sieber advised Felicia

   Hernandez that she could get $1000 per night.

597. With regard to the occupancy rate, Trump Soho sales agents said and did the

following:

  a. In a December 19, 2007 e-mail Amy Williamson told Rachel Gerstien

   that: "So far as occupancy rates are concerned, statistics for Manhattan

   hotel occupancy rates and highly credible studies indicating occupancy

   rate trends are available online."

  b. Other Plaintiffs were told orally to use New York City occupancy rates.

  c. Finally, during a May 22, 2008 visit to the Trump Soho sales office, Javier

   Rodriguez was told by Marcella Reyes that the appropriate occupancy rate

   to be used in calculating the return on investment was 84%.

598. Other of the Plaintiffs were given similar advice in filling out their spreadsheets.

599. Using these detailed hints or express instructions, purchasers, including the

Plaintiffs would be able to determine an exact investment return by using the

spreadsheet they were given.

600. Both the 1933 and 1944 Acts define "security" to include an "investment

contract", which has been held to include

601. As discussed above, Ferran Fontal and Javier Cerro Diaz of Baobab did even

more.

602. At the SIMA real estate conference in Madrid, Ferran Fontal provided Acacio Rodriguez and Javier Rodriguez, along with other conference attendees, with a brochure that contained, among other things, financial projections that stated that an investment in the Trump Soho would have a Return on Investment of 76.83% and an Internal Return Rate of 19.3%.

603. On April 15, 2008, Javier Cerro Diaz e-mailed a detailed financial projection to Acacio Rodriguez and Javier Rodriguez concluding that the Trump Soho project would have a Return on Investment of 153%, an Internal Return Rate of 80%.

604. Further, the Restrictive Declaration provides that the Unit Owner must hire as a rental agent either Trump Hotels or one of up to five Qualified Brokers.

605. Similarly, the very first page of the Offering Plan state that: "The Board will maintain a list of five (5) real estate brokers" qualified to act as Qualified Brokers.

606. However, the Trump Soho has designate only a single Qualified Broker to act as a rental agent (other than Trump Hotels), Jet Luxury Resorts ("Jet").

607. On information and belief, Jet is the only other company in the country able to act as an independent rental agent for a luxury property like the Trump Soho. The basis for this information and belief is a discussion between the president of Jet and Plaintiffs' counsel.

608. If a Unit purchaser were to select Jet, the purchaser would be required to pay Jet a full 35% of its gross room revenue for Jet's fee under its rental agency contract.

609. In addition, were a purchaser to select Jet, it would be subject to a Unit Management Fee in the amount of the greater of $1,000.00 per year or $15.00 per

night the Unit is occupied (either by the unit owner or a hotel guest), each of which is increased by 3% annually.

610. In contrast, if a purchaser selects Trump Hotels to act as rental agent, the purchaser will only be subject to a 3.75% rental agent fee, plus deductions for any credit card fees and travel agency and similar commissions, amounts which cannot total more than 14% of the gross room rental, leading to a maximum cost of less than 15% (and often a much lower cost).

611. Further, if Trump Hotels is selected, the Unit Management Fee will be rebated to the unit owner.

612. As such, though a purchaser technically has a choice of rental agent, such a choice is actually illusory in that Trump Hotels provides a significant financial advantage to the Purchaser.

613. A key part of this advantage is set forth in the Unit Management Agreement that Trump Hotels wrote and all purchasers are required to sign.

614. As such, the Trump Soho is set up so that all or virtually all Units will be managed for profit through the common efforts of Trump Hotels.

615. Under § 2(a)(1) of the 1933 Act and §3(a)(10) of the 1934 Act, 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10), the term "security" is defined to include an "investment contract."

616. Under the securities laws and precedent, an real estate investment providing financial returns to buyers may be considered an "investment contract" based on the facts and circumstances surrounding its terms and sales efforts.

617.  Factors that tend to establish that a real estate investment is a security include a requirement that they owner hold the unit available for rental for part of the year, a joint rental management or similar agreement, sales efforts that emphasize the economic benefits of the investment, and joint sales operations for both unit sales and rental management.

618.  Each of these factors is present in the Trump Soho offering.

619.  As such, and in consideration of all of the facts and circumstances of the Trump Soho sales offering, the Trump Soho offering must be considered a "security" under the federal securities laws.


## NON-EXEMPTION AND NON-COMPLIANCE WITH ILSA

620.  As ILSA is written, all real estate sales transactions are subject to ILSA unless they are found to be exempt under a particular statutory or regulatory exemption under ILSA (an "ILSA Exemption").

621.  Certain ILSA Exemptions, those listed under 15 U.S.C. § 1702(a), exempt transactions from all ILSA in its entirety, including ILSA's provisions prohibiting fraud and deceptive sales practices.

622.  Other ILSA Exemptions, those statutory exemptions listed under 15 U.S.C. § 1702(a) and the regulatory exemptions authorized by 15 U.S.C. § 1702(c), exempt transactions from the registration, reporting and contract revocation provisions of ILSA, but do not exempt transactions from its provisions prohibiting fraud and deceptive sales practices.

**No Full Exemption From ILSA under 15 U.S.C. § 1702(a) Applies**

623. Though a transaction is fully exempt from ILSA if one of the eight subsections of 15 U.S.C. § 1702(a) applies, no such subsection is applicable here.

624. Because the Trump Soho is a subdivision containing more than 25 lots, 15 U.S.C. § 1702(a)(1) does not apply.

625. Because each of the Purchasing Plaintiffs entered into their Purchase Agreements prior the construction of their Units being completed and such Units being habitable, and because none of the Purchase Agreements required that such Units be constructed and habitable within two years from the date such Purchasing Plaintiff signed its Purchase Agreement, 15 U.S.C. § 1702(a)(2) does not apply.

626. Because the transactions are not a sale of mortgage or deed of trust indebtedness, 15 U.S.C. § 1702(a)(3) does not apply.

627. Because the transaction is not a sale of securities of a real estate investment trust, 15 U.S.C. § 1702(a)(4) does not apply.

628. Because the transactions are not the sale or lease of real estate by a government or governmental agency, 15 U.S.C. § 1702(a)(5) does not apply.

629. Because the transactions are not the sale or lease of cemetery lots, 15 U.S.C. § 1702(a)(6) does not apply.

630. Because the transactions are for the sale of fully constructed Hotel Suite Units, and Unit purchasers are prohibited from altering or redecorating such Units, much using such Units for the purpose of constructing buildings thereon, 15 U.S.C. § 1702(a)(7) does not apply.

631. Because each of the Purchasing Plaintiffs except Palmer Gardens, Beaver Metal and Credibox are individuals and not business entities, 15 U.S.C. § 1702(a)(8) does not apply to such Purchasing Plaintiffs.

632. Although 15 U.S.C. § 1702(a)(8) may, under certain circumstances, apply to business entities purchasing real estate zoned for or restricted by covenant to commercial or industrial use, such ILSA Exemption does not apply to Palmer Gardens, Beaver Metal and Credibox because those entities are not (and cannot under the Restrictive Declaration) purchasing their Units substantially for their own use, and those entities do not have a binding commitment to sell, lease or sublease such Units to another business entity engaging in commercial or industrial business, but rather the Units are to be rented nightly as hotel rooms to individuals.

633. Further, Palmer Gardens, Beaver Metal and Credibox have not submitted to the Sponsor the affirmation in writing required under 15 U.S.C. § 1702(a)(8)(D) as a prerequisite for the 15 U.S.C. § 1702(a)(8) ILSA Exemption to apply.

634. As such, the transactions at issue herein are not fully exempt from ILSA under 15 U.S.C. § 1702(a).

635. Because the transactions are not fully exempt from ILSA, they are subject to ILSA's prohibition against fraudulent and deceptive sales practices contained in 15 U.S.C. § 1703(a)(2).

### No Other Statutory or Regulatory ILSA Exemption Applies

636. Though a transaction may be partially exempt from ILSA if one of the subsections of 15 U.S.C. § 1702(b) or a regulatory exemption adopted pursuant to

15 U.S.C. § 1702(c) applies, no such exemption applies to exempt the Defendants from the ISLA liability claimed herein.

637.    As to the regulatory exemptions set forth in 24 CFR § 1710.14, .15 & .16, they are each clearly inapplicable by their terms, except potentially for the "bona fide land sales business" exemption under 24 CFR § 1710.14(a)(3).

638.    With respect to regulatory exemptions, 24 CFR § 1710.4(d) requires that: "If a developer elects to take advantage of an exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met."

639.    As such, the Purchasing Plaintiffs cannot be subject to the "bona fide land sales business" exemption under 24 CFR § 1710.14(a)(3) because the Sponsor never obtained records from them regarding whether or not they met the requirements of the Exemption.

640.    Regardless of whether or not the Sponsor has records regarding applicability of the "bona fide land sales business" exemption under 24 CFR § 1710.14(a)(3), such exemption is inapplicable as each Purchasing Plaintiff is not in the "bona fide land sales business" in that (i) they are not persons who plan to subsequently sell their Unit in the ordinary course of their business; (ii) they are not in the business of land sales as an activity of some continuity, regularity and permanency, or means of livelihood; and (iii) they are buying the Units for their personal use and investment, to be sold at some unforeseeable time in the future. *See* HUD's Guidelines to the Interstate Land Sales Registration Program (the "ILSA Guidelines"), 61 FR 13596, 13609 (1996).

641. As to the statutory exemptions set forth in 15 U.S.C. § 1702(b), the exemptions in 15 U.S.C. § 1702(b)(2) through (8) are each clearly inapplicable by their terms.

642. 15 U.S.C. § 1702(b)(1) exempts: "the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section."

643. The regulation interpreting this section, 24 CFR § 1710.6 provides: "The sale of lots in a subdivision is exempt from the registration requirements of the Act if, since April 28, 1969, the subdivision has contained fewer than 100 lots, exclusive of lots which are exempt from jurisdiction under § 1710.5 [regarding 15 U.S.C. § 1702(a) full exemptions from ILSA]."

644. At the time that the Sponsor started marketing Trump Soho Units in August 2007, the Trump Soho had 413 Units, none of which was exempt under 15 U.S.C. § 1702(a).

645. Under the ILSA Guidelines, a Unit may only be considered complete and therefore eligible for the 15 U.S.C. 1702(a)(2) constructed building exemption where it is "physically habitable and usable for the purpose for which it was purchased." 61 FR at 13603.

646. At the Trump Soho, a Unit can be considered habitable and usable for its intended purpose when the DOB has issued a permanent or temporary certificate of occupancy for that Unit.

647. Until at least March 21, 2010, more than 100 Units of the Trump Soho were not covered by a temporary certificate of occupancy issued by the DOB.

648. As such, until at least March 21, 2010, the Trump Soho was not "a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of [15 U.S.C. § 1702]."

649. Accordingly, from the beginning of the marketing of the Trump Soho Units in August 2007 through at least March 21, 2010, the Trump Soho was not subject to any ILSA Exemption.

650. Therefore, from August 2007 through at least March 21, 2010 , the Trump Soho was required to comply with all provisions of ILSA, including ILSA's registration, reporting and revocation provisions.

## The ILSA Property Report

651. As the Trump Soho was not subject to any ILSA Exemption from the time its Units began to be offered through at least, at least March 21, 2010, the Sponsor registered the Trump Soho with HUD, effective July 3, 2007.

652. The Sponsor also prepared a property report purporting to comply with the requirements of ILSA (the "ILSA Property Report") dated July 3, 2007.

653. On information and belief, the Sponsor distributed the ILSA Property Report to each Unit purchaser prior to that purchaser's signing its Purchase Agreement.

654. However, the ILSA Property Report was severely deficient in at least one material respect, it neglected to disclose that each purchaser had the right to revoke its Purchase Agreement within two years of the date the purchaser signed it under 15 U.S.C. § 1703(d).

## The Right to Revoke Under 15 U.S.C. § 1703(d)

655. 15 U.S.C. § 1703(d) provides:

(d) Additional authority for revocation of nonexempt contract or agreement at option of purchaser or lessee; time limit; applicability

Any contract or agreement which is for the sale or lease of a lot not exempt under section 1702 of this title and which does not provide--

> (1) a description of the lot which makes such lot clearly identifiable and which is in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction in which the lot is located;

> (2) that, in the event of a default or breach of the contract or agreement by the purchaser or lessee, the seller or lessor (or successor thereof) will provide the purchaser or lessee with written notice of such default or breach and of the opportunity, which shall be given such purchaser or lessee, to remedy such default or breach within twenty days after the date of the receipt of such notice; and

> (3) that, if the purchaser or lessee loses rights and interest in the lot as a result of a default or breach of the contract or agreement which occurs after the purchaser or lessee has paid 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, the seller or lessor (or successor thereof) shall refund to such purchaser or lessee any amount which remains after subtracting (A) 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, or the amount of damages incurred by the seller or lessor (or successor thereof) as a result of such breach, whichever is greater, from (B) the amount paid by the purchaser or lessee with respect to the purchase price of the lot, excluding any interest paid under the contract or agreement,

may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement. This subsection shall not apply to the sale of a lot for which, within one hundred and eighty days after the signing of the sales contract, the purchaser receives a warranty deed (or, where such deed is not commonly used in the jurisdiction where the lot is located, a deed or grant that warrants at least that the grantor has not conveyed the lot to another person and that the lot

is free from encumbrances made by the grantor or any other person claiming by, through, or under him or her).

656. A regulation issued by HUD pursuant to ILSA, 24 CFR § 1715.4(b), interprets 15 U.S.C. § 1703(d)(3) and specifies that to avoid a revocation right under that subsection: "no damages may be specified in the contract or agreement, except a liquidated damages clause not exceeding 15% of the purchase price of the lot, excluding any interest owed."

657. Each Purchase Agreement provide that the purchaser will make an aggregate Deposit totaling 20% of the purchase price of the Unit.

658. Paragraph 12(b) of each Purchase Agreement specifies that upon the purchaser's uncured default, "Sponsor shall have the right to retain, as and for liquidated damages, the Deposit and any interest earned on the Deposit."

659. Paragraph 12(c) of each Purchase Agreement reinforces this, stating that:

> Sponsor and Purchaser each hereby agree and acknowledge that it would be impractical and/or extremely difficult to fix or establish the actual damage sustained by Sponor as a result of a default by a Purchaser hereunder, and that the Deposit (including all interest) shall constitute and be deemed to be the reasonable and agreed upon liquidated damages of Sponsor in respect of the possible loss of a timely closing, the possible fluctuation of values, additional carrying costs of the Unit and other expenses that may be incurred, including without limitation, attorney's fees, and shall be paid by Purchaser to Sponsor as Sponsor's sole and exclusive remedy. The payment of the deposit (including all interest) as liquidated damages is not intended to be a forfeiture or penalty, but is intended to constitute liquidated damages.

660. Paragraph 12(d) of each Purchase Agreement further reinforces this in the strongest possible terms, stating in all capital letters that:

> NEITHER SELLER NOR PURCHASER SHALL CHALLENGE THE VALIDITY OF THE PROVISIONS OF THIS AGREEMENT OF THE

PLAN WITH RESPECT TO LIQUIDATED DAMAGES OR ANY
RIGHT OF SPONSOR SET FORTH HEREIN OR THEREIN TO
RETAIN THE DEPOSIT IN THE EVENT OF A PURCHASER
DEFAULT. SUCH PROVISIONS HAVE BEEN AGREED TO
VOLUNTARILY, AFTER NEGOTIATION, WITHOUT DURESS OR
COERCION BY ANY PARTY UPON THE OTHER PARTY, AND
WITH EACH PARTY HAVING BEEN (OR HAVING HAD FULL AND
ADEQUATE OPPORTUNITY TO BE) REPRESENTED BY
COUNSEL, ACCOUNTANTS, BROKERS, APPRAISERS AND
OTHER EXPERTS AND ADVISORS OF ITS OWN CHOOSING.

661.    Nowhere in the Purchase Agreement is there any provision limiting the amount

that the Sponsor may retain on the purchaser's default to 15% of the purchase

price of the Unit or actual damages, if greater, or requiring the Sponsor to refund

anything in excess of that amount upon default.

662.    Because the Purchase Agreements do not have any provision limiting the amount

that the Sponsor may retain on purchaser's default to 15% of the purchase price,

or actual damages if greater, but rather contain a 20% liquidated damages clause,

under 15 U.S.C. § 1703(d)(3), the Purchasing Plaintiffs had the option to revoke

their Purchase Agreements within two years of their being signed.

663.    Further, under 15 U.S.C. § 1703(d)(1), a purchaser has the option to revoke its

Purchase Agreement if it does not provide: "a description of the lot which makes

such lot clearly identifiable and which is in a form acceptable for recording by the

appropriate public official responsible for maintaining land records."

664.    The New York Condominium Act, Article 9-B of the New York Real Property

Law ("RPL"), sets forth, *inter alia*, the requirements for the legal description of a

condominium unit lot to be acceptable for recording.

665.    New York Real Property Law ("RPL") § 339-o provides, in relevant part:

Deeds and leases of units shall include the following particulars:

1. Description of the land as provided in subsection two of section three hundred thirty-nine-n and the liber, page and date of recording of the declaration or solely by naming the city, village or town and the county in which the unit is located and referring to the liber, page and date of recording of the declaration.

2. The unit designation of the unit in the declaration and any other data necessary for its proper identification.

666. Thus, for a New York condominium unit, "a description of the lot . . . which is in a form acceptable for recording" must contain, in addition to other requirements, "the liber, page [or equivalent used by the local recording officer] and date of recording of the declaration," which is information unavailable prior to the recording of the condominium's declaration.

667. Likewise, "[t]he unit designation of the unit in the declaration" is unavailable until the declaration is recorded.

668. Here, each Purchase Agreement failed to contain "the liber, page [or equivalent used by the local recording officer] and date of recording of the declaration" of the Condominium.

669. Similarly, no other document provided to the Purchasing Plaintiffs at or prior to the time the Purchase Agreement was entered into contained "the liber, page [or equivalent used by the local recording officer] and date of recording of the declaration" of the Condominium.

670. Indeed, providing such information was impossible at the time the Purchase Agreements were signed because the Condominium Declaration was not recorded

with the City Register until May 6, 2010, well after each Purchase Agreement was signed.

671.    The Sponsor expressly recognized that the unit description is inadequate for recording in its ILSA Property Report which specifies (at page 9) that the floor plans and the draft Condominium Declaration are subject to review and approval by the New York City Real Property Assessment Bureau ("RPAB") and that: "UNTIL THE FLOOR PLANS ARE FILED AND THE DECLARATION IS RECORDED THE DESCRIPTION OF THE UNIT IS NOT LEGALLY ADEQUATE FOR THE CONVEYANCE OF THE UNITS." (capitalization in original)

672.    Accordingly, because the Purchase Agreements did not (and could not) contain "a description of the lot . . . which is in a form acceptable for recording," the Purchasing Plaintiffs had the option to revoke their Purchase Agreements within two years of their being signed under 15 U.S.C. § 1703(d)(1).

673.    Because the Purchase Agreements did not meet the requirements of 15 U.S.C. § 1703(d)(1) or (3), each Purchasing Plaintiff had the right to revoke its Purchase Agreement within two years of its being signed.

**The ILSA Property Report's Failure To Disclose The Revocation Option**

674.    Under 15 U.S.C. §§ 1704 & 1707, the ILSA Property Report must include information specified in the ILSA statute and the regulations promulgated under the authority of those sections.

675.    The regulation specifying what must be on the cover page of the ILSA Property Report, 24 CFR 1710.105, provides, in relevant part:

The cover page of the Property Report shall be prepared in accordance with the following directions: . . .

(d) . . . (2)(i) . . . unless certain provisions are included in the contract or agreement, the purchaser is entitled to cancel the contract within two years from the date of signing the contract or agreement. . . .

(iii) The contract provisions are:

(A) A legally sufficient and recordable lot description; and . . .

(C) A provision that, if the purchaser loses rights and interest in the lot because of the purchaser's default or breach of contract after 15% of the purchase price, exclusive of interest, has been paid, the seller shall refund to the purchaser any amount which remains from the payments made after subtracting 15% of the purchase price, exclusive of interest, or the amount of the seller's actual damages, whichever is the greater.

(iv) If a deed is not delivered within 180 days of the signing of the contract or if the necessary provisions are not included in the contract, the following statement shall be used in place of any other recession language:

Under Federal law you may cancel your contract or agreement of sale any time within two years from the date of signing.

676. Although the Sponsor was required under 24 CFR § 1710.105(d)(2) to specify unconditionally on the ILSA Property Report's cover page that: "you may cancel your contract or agreement of sale any time within two years from the date of signing," the Sponsor failed to do so.

677. Instead, the ILSA Property Report contained improper and inaccurate language stating:

If you received this Report prior to signing a contract or agreement, you may cancel your contract or agreement by giving notice to the seller any time before midnight of the seventh day following the signing of the contract or agreement.

If you did not receive this Report before you signed a contract or agreement, you may cancel the contract or agreement any time within two years from the date of signing.

678. Accordingly, the ILSA Property Report distributed to the Purchasing Plaintiffs did not meet ILSA's requirements.

679. Further, the ILSA Property Report, on its very cover, contained an untrue statement of a material fact and omitted a material fact required to be stated under ILSA and its regulations.

## CLAIM I – ILSA DECEPTIVE SALES PRACTICES, 15 U.S.C. § 1703(a)(2)

(by Purchasing Plaintiffs against all Defendants)

680. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

681. Under 15 U.S.C. § 1703(a)(2):

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails-- . . .

(2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title--

(A) to employ any device, scheme, or artifice to defraud;

(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser; . . .

682.   Under 15 U.S.C. § 1709:

> (a) Violations; relief recoverable

> A purchaser or lessee may bring an action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title. In a suit authorized by this subsection, the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable. In determining such relief the court may take into account, but not be limited to, the following factors: the contract price of the lot or leasehold; the amount the purchaser or lessee actually paid; the cost of any improvements to the lot; the fair market value of the lot or leasehold at the time relief is determined; and the fair market value of the lot or leasehold at the time such lot was purchased or leased. . . .

> (c) Amounts recoverable

> The amount recoverable in a suit authorized by this section may include, in addition to matters specified in subsections (a) and (b) of this section, interest, court costs, and reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot.

683.   The Purchasing Plaintiffs are "purchasers" under 15 U.S.C. § 1701(10) in that they are each "an actual or prospective purchaser or lessee of any lot in a subdivision."

684.   The Trump Soho is a "subdivision" under 15 U.S.C. § 1701(3) in that it is land located in New York that "is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan."

685.   The Sponsor is the "developer" of the Trump Soho under 15 U.S.C. § 1701(5) in that it "directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision," the Trump Soho.

686. Each Defendant other than the Sponsor is an "agent" of the Sponsor under 15 U.S.C. § 1701(6) in that each of them "represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision."

687. The Escrow Agent is not covered by the exclusion from the definition of "agent" for attorneys "whose representation solely consists of rendering legal services" under 15 U.S.C. § 1701(6) in that the Escrow Agent is being sued solely in its capacity as escrow agent of the Sponsor, and not as attorney for the Sponsor.

688. As laid out in detail above, the Defendants made numerous false, deceptive and misleading statements to induce the Purchasing Plaintiffs to enter Purchase Agreements at the Trump Soho.

689. In making such false, deceptive and misleading statements, the Defendants acted "to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision," in violation of 15 U.S.C. § 1703(a)(2)(B).

690. In addition, all of the acts and practices of the Defendants set forth above constitute a "device, scheme, or artifice to defraud," in violation of 15 U.S.C. § 1703(a)(2)(A).

691. Further, all of the acts and practices of the Defendants set forth above constitute a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser" in violation of 15 U.S.C. § 1703(a)(2)(C).

692. In particular, the Defendants engaged in a continuing plan, scheme and course of business under which they consistently overstated Trump Soho sales levels and falsely created the perception of Unit shortages in order to deceitfully and fraudulently induce purchasers to sign Purchase Agreements for Trump Soho Units and thereafter to make the Additional Deposits called for in such Purchase Agreements.

693. The Defendant conducted the foregoing acts using the means and instruments of interstate and international commerce and communication and the mails.

694. For the reasons discussed above, each of the Defendants had strong motives and substantial opportunities to engage in these fraudulent and deceptive practices and did so knowingly and consciously, or at the very least, with substantial recklessness.

695. For the reasons discussed above, the Defendants acted for their own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect their reputations, which were intimately bound up in the success of the Trump Soho project.

696. The fraudulent and deceptive practices of the Defendants were material in the Purchasing Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

697. Had the Defendants not engaged in these fraudulent and deceptive practices, the Purchasing Plaintiffs would not have entered into their Purchase Agreements, would not have made their Initial Deposits, and would not have made their Additional Deposits.

698. Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the fair market value of the Trump Soho Units (to the extent they were marketable at all) would have been substantially below the purchase prices agreed to by the Purchasing Plaintiffs at the time they were entered into.

699. Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the current fair market value of the Trump Soho Units (to the extent they are marketable at all) is substantially below the purchase prices agreed to by the Purchasing Plaintiffs.

700. Indeed, as the nature and extent of the Defendants fraudulent and deceptive practices, and the low level of actual Unit sales, become widely known, on information and belief, the actual prices ~~under~~ at which the Sponsor can sell Units and close the sales of Units under Purchase Agreements are substantially below the sales and closing prices previously realized by the Sponsor. The basis for this information and belief is that recorded purchase prices at closing listed on documents filed with the City Register are more than 20% lower than the offering prices listed in the Offering Plan, as amended to the date of the Purchase Agreement.

701. On information and belief, the current sales and closing prices for Trump Soho Units for purchasers that are aware of the low level of actual sales are well more than 20% below the purchase prices the Sponsor originally offered and which the Purchasing Plaintiffs agreed to in their Purchase Agreements.

702. Further, the fraudulent and deceptive practices of the Defendants not only induced the Purchasing Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

703. Had the Defendants not engaged in their fraudulent and deceptive practices, a sufficiently lower number of purchasers of Trump Soho Units (including both the Purchasing Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

704. If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and the Martin Act and its regulations from closing on the sale of any Units by that date.

705. If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho, including each of the Purchasing Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

706. Had each Purchasing Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

707. As a result of Defendants' violations of 15 U.S.C. § 1703(a)(2), the Purchasing Plaintiffs are entitled to relief against the Defendants under 15 U.S.C. § 1709, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) reasonable attorney's fees; (f) any independent appraisers' fees; (g) any costs incurred by a Purchasing Plaintiff or a person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office; (h) interest; and (g) such other relief as the Court deems fair, just and equitable.

## CLAIM II – COMMON LAW FRAUD

(by all Plaintiffs against all Defendants)

708. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

709. As set forth in detail above, the Defendants made (or were legally responsible for the making of) numerous false statements regarding the levels of sales at the Trump Soho.

710. As set forth in detail above, each such statement made by a Defendant (or for which a Defendant was legally responsible) was a statement of a material existing fact and was false at the time it was made.

711. As set forth in detail above, each Defendant that made such a false statement or was legally responsible for the making of such statement knew or should have known at the time of the making of such statement that it was false, or at the very least, was substantially reckless in making such statement.

712. For the reasons discussed above, each of the Defendants had strong motives and substantial opportunities to make these false statements and did so knowingly and consciously, or at the very least, with substantial recklessness.

713. For the reasons discussed above, in making these false statements, the Defendants acted for their own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect their reputations, which were intimately bound up in the success of the Trump Soho project.

714. The Defendants made (or were legally responsible for making) these statements with the intention that they be relied upon by the Plaintiffs.

715. None of the Plaintiffs knew that such statements were false.

716. Each of the Plaintiffs relied upon the false statements of the Defendants in deciding to enter into a Purchase Agreement for a Unit of the Trump Soho, to authorize an entity they owned and controlled to enter into such a Purchase

Agreement, to make Deposits under such Purchase Agreements and/or to contribute the funds to make such Deposits.

717. Such reliance by each Plaintiff was justifiable.

718. Based upon such justifiable reliance by the Plaintiffs, they were each fraudulently induced to enter into a Purchase Agreement for a Unit of the Trump Soho, to authorize an entity they owned and controlled to enter into such a Purchase Agreement, to make Deposits under such Purchase Agreements and/or to contribute the funds to make such Deposits.

719. By reason of such fraud, each Plaintiff was suffered injury and harm for which the Defendants are liable.

720. As a result of Defendants' fraud, the Plaintiffs are entitled relief against the Defendants including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) compensatory damages in the amount of the Deposits made plus all interest accrued thereon and any other costs and expenses incurred by the Plaintiffs in entering into the Purchase Agreements; (d) punitive damages; (e) costs; (f) reasonable attorney's fees; (g) any independent appraisers' fees; (h) interest; and (i) such other relief as the Court deems fair, just and equitable.

## CLAIM III – SECURITIES FRAUD – 1934 ACT § 10(b) & RULE 10b-5

(by Purchasing Plaintiffs against Misrepresenting Defendants)

721. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

722. Under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j, it is unlawful for any person directly or indirectly to use or employ, in connection with the purchase or sale of any security… any *manipulative* or *deceptive* device or contrivance in contravention of such rules and regulations as may be prescribed by the Securities and Exchange Commission.

723. Rule 10b-5, promulgated under the 1934 Act, 17 C.F.R. 240.10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceipt upon any person
>
> in connection with the purchase or sale of any security.

724. As shown above, the Units at the Trump Soho constituted a securities under Section 3(a)(10) of the 1934 Act, 15U.S.C. §78(a)(10).

725. As laid out in detail above, the Defendants made numerous false, deceptive and misleading statements to induce the Purchasing Plaintiffs to enter Purchase Agreements at the Trump Soho.

726. In making such false, deceptive and misleading statements, the Defendants used "manipulative [and] deceptive device[s]," in violation of 15 U.S.C. § 78j.

727. All of the statements made by the Defendants constitute untrue statements of a material fact and/or omissions of material fact necessary in order to make the

statements made, in light of the circumstances under which they are made, not misleading, in violation of Rule 10b-5(b).

728. In addition, all of the acts and practices of the Defendants set forth above constitute a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a).

729. Further, all of the acts and practices of the Defendants set forth above constitute acts, practices, or courses of business which operated as a fraud or deceipt upon the Plaintiffs, in violation of Rule 10(b)(5)(b).

730. In particular, the Defendants engaged in a continuing plan, scheme and course of business under which they consistently overstated Trump Soho sales levels and falsely created the perception of Unit shortages in order to deceitfully and fraudulently induce purchasers to sign Purchase Agreements for Trump Soho Units and thereafter to make the Additional Deposits called for in such Purchase Agreements.

731. The Defendant conducted the foregoing acts using the means and instruments of interstate and international commerce and communication and the mails.

732. For the reasons discussed above, each of the Defendants had strong motives and substantial opportunities to engage in these fraudulent and deceptive practices and did so knowingly and consciously, or at the very least, with substantial recklessness.

733. For the reasons discussed above, the Defendants acted for their own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect their reputations, which were intimately bound up in the success of the Trump Soho project.

734.  The fraudulent and deceptive practices of the Defendants were material in the Purchasing Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

735.  Had the Defendants not engaged in these fraudulent and deceptive practices, the Purchasing Plaintiffs would not have entered into their Purchase Agreements, would not have made their Initial Deposits, and would not have made their Additional Deposits.

736.  Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the fair market value of the Trump Soho Units (to the extent they were marketable at all) would have been substantially below the purchase prices agreed to by the Purchasing Plaintiffs at the time they were entered into.

737.  Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the current fair market value of the Trump Soho Units (to the extent they are marketable at all) is substantially below the purchase prices agreed to by the Purchasing Plaintiffs.

738.  Indeed, as the nature and extent of the Defendants fraudulent and deceptive practices, and the low level of actual Unit sales, become widely known, on information and belief, the actual prices under which the Sponsor can sell Units and close the sales of Units under Purchase Agreements are substantially below the sales and closing prices available to the Sponsor. The basis for this information and belief is that recorded purchase prices at closing listed on documents filed with the City Register are more than 20% lower than the offering

prices listed in the Offering Plan, as amended to the date of the Purchase Agreement.

739. On information and belief, the current sales and closing prices for Trump Soho Units for purchasers that are aware of the low level of actual sales are well more than 20% below the purchase prices the Sponsor originally offered and which the Purchasing Plaintiffs agreed to in their Purchase Agreements.

740. Further, the fraudulent and deceptive practices of the Defendants not only induced the Purchasing Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

741. Had the Defendants not engaged in their fraudulent and deceptive practices, a sufficiently lower number of purchasers of Trump Soho Units (including both the Purchasing Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

742. If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and

the Martin Act and its regulations from closing on the sale of any Units by that date.

743.     If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho, including each of the Purchasing Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

744.     Had each Purchasing Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

745.     As a result of Defendants' violations of Section 10(b) of the 1934 Act and Rule 10(b)(5), the Purchasing Plaintiffs are entitled to relief against the Defendants under Section 10(b) of the 1934 Act and Rule 10(b)(5), including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

## CLAIM IV – SECURITIES CONTROL PERSONS – 1934 ACT § 20(a)

(by Purchasing Plaintiffs against Control Defendants)

746.     Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

747.     Under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this title [the 1934 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

748. As set forth above, the Sponsor and the other Misrepresenting Defendants are persons liable under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

749. For the reasons set forth above, each of the Control Defendants is, by reason of its position, ownership and actions, a person who "person who, directly or indirectly, controls" the Sponsor and the other Misrepresenting Defendants.

750. None of the Control Defendants acted in good faith in connection with the acts and omissions constituting a violation of under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

751. Each of the Control Defendants directly or indirectly induced the acts and omissions constituting a violation of under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

752. As such, the Control Defendants are jointly and severally liable to the Plaintiff for the acts and omissions of the Sponsor and the other Misrepresenting Defendants for the acts and omissions constituting a violation of under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

753. As a result the Purchasing Plaintiffs are entitled to relief under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) against the Control Defendants under 15 U.S.C.

§ 1709, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

## CLAIM V – SECURITIES FRAUD – 1933 ACT § 12(a)(2)

### (by Purchasing Plaintiffs against the Sponsor)

754.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

755.   Under Section 12(a)(2) of the 1933 Act, 15 U.S.C. 77l:

> Any person who—
>
> (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they are made, not misleading (the purchaswer not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
>
> shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereonm, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

756. As shown above, the Units at the Trump Soho constituted securities under Section 2(a)(1) of the 1933 Act, 15U.S.C. 77b(a)(1).

757. As discussed in detail above, each of the false statements made by the Sponsor constitutes either a prospectus or an oral communication.

758. As laid out in detail above, the Sponsor made numerous false, deceptive and misleading statements to induce the Purchasing Plaintiffs to enter Purchase Agreements at the Trump Soho.

759. All of the statements made by the Sponsor constitute untrue statements of a material fact and/or omissions of material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, in violation of Section 12(a)(2) of the 1933 Act.

760. The Sponsor made the foregoing false statements using the means and instruments of interstate and international commerce and communication and the mails.

761. For the reasons discussed above, the Sponsor had strong motives and substantial opportunities to engage in these fraudulent and deceptive practices and did so knowingly and consciously, or at the very least, with substantial recklessness.

762. For the reasons discussed above, the Sponsor acted for its own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect its reputation, which was intimately bound up in the success of the Trump Soho project.

763. The false statements of the Sponsor were material in the Purchasing Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

764. Had the Sponsor not made the false statements, the Purchasing Plaintiffs would not have entered into their Purchase Agreements, would not have made their Initial Deposits, and would not have made their Additional Deposits.

765. Had the sales and marketing of the Trump Soho been free of the Sponsor's false statements, the fair market value of the Trump Soho Units (to the extent they were marketable at all) would have been substantially below the purchase prices agreed to by the Purchasing Plaintiffs at the time they were entered into.

766. Had the sales and marketing of the Trump Soho been free of the Sponsor's false statements, the current fair market value of the Trump Soho Units (to the extent they are marketable at all) is substantially below the purchase prices agreed to by the Purchasing Plaintiffs.

767. Indeed, as the nature and extent of the Sponsor's false statements, and the low level of actual Unit sales, become widely known, on information and belief, the actual prices under which the Sponsor can sell Units and close the sales of Units under Purchase Agreements are substantially below the sales and closing prices available to the Sponsor. The basis for this information and belief is that recorded purchase prices at closing listed on documents filed with the City Register are more than 20% lower than the offering prices listed in the Offering Plan, as amended to the date of the Purchase Agreement.

768. On information and belief, the current sales and closing prices for Trump Soho Units for purchasers that are aware of the low level of actual sales are well more than 20% below the purchase prices the Sponsor originally offered and which the Purchasing Plaintiffs agreed to in their Purchase Agreements.

769. Further, the false statements of the Sponsor not only induced the Purchasing Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

770. Had the Sponsor not made the false statements, a sufficiently lower number of purchasers of Trump Soho Units (including both the Purchasing Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

771. If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and the Martin Act and its regulations from closing on the sale of any Units by that date.

772. If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho,

including each of the Purchasing Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

773. Had each Purchasing Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

774. As a result of the Sponsor's violations of Section 12(a) of the 1933 Act, the Purchasing Plaintiffs are entitled to relief against the Sponsor under Section 12(a) of the 1933 Act, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

775.

## CLAIM VI – SECURITIES CONTROL PERSONS – 1933 ACT § 15

(by Purchasing Plaintiffs against the Control Defendants)

776. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

777. Under Section 15 of the 1933 Act, 15 U.S.C. § 77o:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more persons by or through stock ownership, agency, or otherwise, controls any personal liable under sections 77k or 77l of this title [sections 11 or 12 of the 1933 Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any

person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

778. As set forth above, the Sponsor is a person liable under Section 12 of the 1933 Act, 15 U.S.C. 77l.

779. For the reasons set forth above, each of the Control Defendants is, by reason of its position, ownership and actions, a person who "controls" the Sponsor.

780. All of the Control Defendants had knowledge of and/or reasonable grounds to know of the acts and omissions constituting a violation of Section 12 of the 1933 Act, 15 U.S.C. 77l.

781. As such, the Control Defendants are jointly and severally liable to the Plaintiff for the acts and omissions of the Sponsor for the acts and omissions constituting a violation of under Section 12 of the 1933 Act, 15 U.S.C. 77l.

782. As a result the Purchasing Plaintiffs are entitled to relief under Section 15 of the 1933 Act, 15 U.S.C. 77o. against the Control Defendants, jointly and severally, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

### CLAIM VII – DECEPTIVE BUSINESS PRACTICES, GBL §§ 349 *et seq.*

(by all Plaintiffs against all Defendants)

783. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

784. Under the General Business Law of New York, NY GBL 349(a), it is unlawful to engage in "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state..."

785. As laid out in detail above, the Defendants made numerous false, deceptive and misleading statements with regard to the percentage and/or number of Units sold and the potential for return on investment.

786. As detailed above the false, deceptive and misleading statements made by the Defendants were widely disseminated in the media, made in periodicals with large circulation, and to consumers who expressed interest in purchasing a Unit at the Trump Soho.

787. The Defendants' false, deceptive and misleading statements were aimed at inducing consumers to enter into purchase agreements.

788. The Defendants' false, deceptive and misleading statements did in fact induce the Purchasing Plaintiffs to enter into their Purchase Agreements and thereafter to make the Additional Deposits called for in such Purchase Agreements.

789. The fraudulent and deceptive practices of the Defendants were material in the Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

790. Had the Defendants not engaged in these fraudulent and deceptive practices, the Plaintiffs would not have entered into their Purchase Agreements, would not have made their Initial Deposits, and would not have made their Additional Deposits.

791. Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the fair market value of the Trump Soho Units

(to the extent they were marketable at all) would have been substantially below the purchase prices agreed to by the Plaintiffs at the time they were entered into.

792. Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the current fair market value of the Trump Soho Units (to the extent they are marketable at all) is substantially below the purchase prices agreed to by the Plaintiffs.

793. Indeed, as the nature and extent of the Defendants fraudulent and deceptive practices, and the low level of actual Unit sales, become widely known, on information and belief, the actual prices under which the Sponsor can sell Units and close the sales of Units under Purchase Agreements are substantially below the sales and closing prices available to the Sponsor. The basis for this information and belief is that recorded purchase prices at closing listed on documents filed with the City Register are more than 20% lower than the offering prices listed in the Offering Plan, as amended to the date of the Purchase Agreement.

794. On information and belief, the current sales and closing prices for Trump Soho Units for purchasers that are aware of the low level of actual sales are well more than 20% below the purchase prices the Sponsor originally offered and which the Plaintiffs agreed to in their Purchase Agreements.

795. Further, the fraudulent and deceptive practices of the Defendants not only induced the Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

796. Had the Defendants not engaged in their fraudulent and deceptive practices, a sufficiently lower number of purchasers of Trump Soho Units (including both the Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

797. If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and the Martin Act and its regulations from closing on the sale of any Units by that date.

798. If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho, including each of the Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

799. Had each Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

800. As a result of Defendants' violations of Section 349 (a) of the New York General Business Law, the Plaintiffs are entitled to relief against the Defendants under Section 349 (a) of the New York General Business Law, including: (a) damages in the amount of the Deposits made plus all interest accrued thereon; (b) statutory damages in the amount of $1,000.00 per Plaintiff; costs; (c) interest; (d) reasonable attorney's fees; and (f) such other relief as the Court deems fair, just and equitable.

## CLAIM VIII – BREACH OF CONTRACT

(by Purchasing Plaintiffs against the Sponsor)

801. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

802. Each Purchase Agreement is a contract, duly entered into by the Purchasing Plaintiffs and the Sponsor.

803. Each Purchase Agreement expressly provides that the Plan (defined in ¶ 1 to include all amendments filed prior to the date of the Purchase Agreement) "is incorporated herein by reference and made a part hereof with the same force and effect as if set forth herein at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern." (¶ 11.2)

804. Included in the Plan is a detailed budget for the Condominium, which specifies not only the payroll budgets by department, but also for each department the exact number of employees for each job title to be hired. (Plan, pages 73-81)

805. In total, the Plan stated that the Condominium would employ a staff of 213 employees.

806. The Plan explained the Condominium's staffing needs and costs as follows:

> The costs listed here are not anticipated to vary considerably due to changes from time to time in the levels of hotel occupancy as these costs are considered to be the core management and service staff necessary to operate a quality hotel of the size of the Condominium. (Page 72)

807. Each of the Purchase Agreements at issue herein (and indeed all of the 62 Purchase Agreements listed in the Sapir Affidavit) were signed when the budgets in the original Plan or the Third Amendment, which slightly revised the budget, were current, and therefore the (identical) staffing levels set out in the original Plan and the Third Amendment were incorporated into the Purchase Agreements and became terms and covenants agreed to by the parties.

808. In the May 5, 2010 Tenth Amendment, issued well after each Purchase Agreement had been signed, there was a budget that showed that the Condominium would have drastically slashed staffing levels.

809. The prior staff of 213 was cut down to a total of 159 employees, a reduction of 25.4% and many departments were radically reduced.

810. The change in staffing reflected in the Tenth Amendment, undertaking more responsibilities with less than three-quarters of the staff, reflects a material decrease in the level of services from what the Sponsor agreed to provide to the Purchasing Plaintiffs in their Purchase Agreements.

811. Such a reduction in staffing and services constitutes a material breach of each of the Purchasing Plaintiffs' Purchase Agreements.

812. The AG Regs. specify with regard to amendments to Offering Plans that:

> If there is a material amendment to the offering plan that adversely affects the purchasers, sponsor must grant purchasers a right of rescission and a

reasonable period of time that is not less than fifteen (15) days after the
date of presentation to exercise the right. Sponsor must return any deposit
or down payment to purchasers who rescind. 13 NYCRR § 20.5(a)(5).

813.    The Plan provides (at page 177) with respect to amendments to the Plan that:

All substantive or material revisions will be contained in a duly filed
amendment to the Plan. If there is a material change that adversely affects
any Purchasers, Sponsor will grant such Purchasers a right to rescind their
respective Agreements by written notice to Sponsor given within fifteen
(15) days after the date of presentation of such amendment. In such event,
Sponsor will direct the Escrow Agent to return the Deposit of any
Purchasers who duly rescind their Agreement.

814.    The Plan's provision requiring the Sponsor to grant purchasers a right to rescind

their Purchase Agreements on a material adverse change was incorporated by

reference into each Purchase Agreement.

815.    The decrease in Condominium staffing set forth in the Tenth Amendment is "a

material change that adversely affects . . . Purchasers."

816.    Neither in the Tenth Amendment nor in any document provided to the Purchasing

Plaintiffs at or after the time the Tenth Amendment was distributed did the

Sponsor grant the Purchasing Plaintiffs or other purchasers a right to rescind their

Purchase Agreements.

817.    The Sponsor's failure to grant a right to rescind the Purchasing Plaintiffs'

Purchase Agreement based on the material adverse change set forth in the Tenth

Amendment constitutes a material breach of each Purchasing Plaintiffs' Purchase

Agreement.

818.    In addition, the failure of the Sponsor and the Condominium Board (consisting of

Donald Trump, Alex Sapir, and Julius Schwarz) to comply with the requirement

on the very first page of the Offering Plan that they wil "maintain a list of five (5)

real estate brokers" to act as "Qualified Brokers" for the Unit, instead only designating a single "Qualified Broker," is also a material breach.

819. As a result of the Sponsor's material breach of each Purchasing Plaintiff's Purchase Agreement, the Sponsor should be permitted to require each Purchasing Plaintiff to close, but rather should be required to refund the full deposit of each Purchasing Plaintiff.

820. As a result of the Sponsor's material breach of each Plaintiff's Purchase Agreement, the Plaintiffs are entitled to relief against the Sponsor, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

821.

## CLAIM IX – ILSA PROPERTY REPORT OMISSION, 15 U.S.C. § 1703(a)(1)

(Purchasing Plaintiffs against All Defendants)

822. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

823. 15 U.S.C. § 1703(a)(1) provides, in relevant part:

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails--

(1) with respect to the sale or lease of any lot not exempt under section 1702 of this title-- . . .

(B) to sell or lease any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the

purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee;

(C) to sell or lease any lot where any part of the statement of record or the property report contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein pursuant to sections 1704 through 1707 of this title or any regulations thereunder; . . .

824.    As discussed above, the Purchase Agreements of the Trump Soho Units to the Purchasing Plaintiffs were not subject to any ILSA Exemption at the time they were entered into.

825.    As discussed above the ILSA Property Report distributed to the Purchasing Plaintiffs did not meet the requirements of 15 U.S.C. § 1707 and its regulations in that it failed to specify unconditionally on its cover the required language that "you may cancel your contract or agreement of sale any time within two years from the date of signing."

826.    Similarly, the ILSA Property Report "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein pursuant to sections 1704 through 1707 of [15 U.S.C.] or any regulations thereunder" in that it failed to specify unconditionally on its cover that the purchaser had a two year period to cancel its Purchase Agreement, but rather falsely stated that the purchaser had only seven days to cancel its Purchase Agreement, unless it had not received the ILSA Property Report, in which case it would have two years.

827.    Such failure to distribute a compliant ILSA Property Report and sale of Units using an ILSA Property Report containing false and misleading statements violated 15 U.S.C. § 1703(a)(1).

828. The Defendants were each either a developer or its agent with respect to such acts.

829. The Defendants conducted the foregoing acts using the means and instruments of interstate and international commerce and communication and the mails.

830. Had the Defendants issued the noncompliant, false and deceptive ILSA Property Report, the Purchasing Plaintiffs would each have been aware that they had the unconditional right to revoke their Purchase Agreements within two years of their signing.

831. Had the Purchasing Plaintiffs been aware that they had the unconditional right to revoke their Purchase Agreements within two years of their signing, they each would have done so within the time required.

832. Had the Purchasing Plaintiffs timely revoked their Purchase Agreements, under 15 U.S.C. § 1703(3) they each would "be entitled to all money paid by him or her under such contract or agreement."

833. As a result of Defendants' violations of 15 U.S.C. § 1703(a)(1), the Purchasing Plaintiffs are entitled to relief against the Defendants under 15 U.S.C. § 1709, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) reasonable attorney's fees; (f) any independent appraisers' fees; (g) any costs incurred by a Purchasing Plaintiff or a person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office; (h) interest; and (g) such other relief as the Court deems fair, just and equitable.

## CLAIM X – ILSA REVOCATION, 15 U.S.C. § 1703(d)

### (Palmer Garden against the Sponsor)

834. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein

835. Because the Purchase Agreement entered into between Palmer Gardens and the Sponsor dated January 28, 2008 failed to contain the terms specified in 15 U.S.C. § 1703(d)(1) & (3), Palmer Gardens was entitled to revoke its Purchase Agreement within two years of its signing under 15 U.S.C. § 1703(d).

836. By letter dated January 18, 2010 sent by Federal Express from Palmer Gardens' counsel to the Sponsor and the Escrow Agent, Palmer Gardens revoked its Purchase Agreement and demanded immediate repayment of all money deposited under the Purchase Agreement.

837. From the time that Palmer Gardens signed its Purchase Agreement through the time it submitted letter revoking its Purchase Agreement, no ILSA Exemption applied to its transaction.

838. No deed to the Trump Soho Unit at issue in Palmer Gardens Purchase Agreement was ever delivered to Palmer Gardens, much less delivered within 180 days of the Purchase Agreement's signing.

839. As such, Palmer Garden properly, validly and timely revoked its Purchase Agreement.

840. Upon such revocation, the Sponsor was required under 15 U.S.C. § 1703(e) to refund all money paid by Palmer Gardens under the Purchase Agreement.

841. The Sponsor failed to acknowledge Palmer Gardens' revocation of the Purchase Agreement and failed to refund any money paid by Palmer Gardens.

842. As a result of the Sponsor's violations of 15 U.S.C. § 1703(d) & (e), Palmer Gardens is entitled to relief against the Sponsor under 15 U.S.C. § 1709, including: (a) a declaration that it has validly revoked its Purchase Agreement; (b) the refund of all Deposits made under its Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of its Deposits made plus all interest accrued thereon; (d) costs; (e) reasonable attorney's fees; (f) any independent appraisers' fees; (g) any costs incurred by Palmer Gardens or a person acting for Palmer Gardens for travel to the Trump Soho site or sales office; (h) interest; and (g) such other relief as the Court deems fair, just and equitable.

## CLAIM XI – INJUNCTION TO HOLD AND REFUND ESCROW

(All Plaintiffs against the Escrow Agent)

843. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

844. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

845. The Escrow Agent and the Sponsor entered into an Escrow Agreement dated June 26, 2007 (the "Escrow Agreement"), a copy of which is included as Exhibit 9 to the Offering Plan, under which the Escrow Agent would hold the Deposits of Trump Soho purchasers in escrow pending closing of the sales of the Units or until otherwise released under the terms of the Escrow Agreement.

846. Section 3.4 of the Escrow Agreement provides:

> If there is no written agreement between the parties to release the escrowed funds, ESCROW AGENT shall not pay the funds to SPONSOR until ESCROW AGENT has given the purchaser written notice of not fewer than ten (10) business days. Thereafter, the funds may be paid to SPONSOR unless the purchaser has made application to the Department of Law pursuant to the dispute resolution provisions contained in the Attorney General's regulations and has so notified ESCROW AGENT in accordance with such provisions.

847.  Under this provision, if the Sponsor demands the Deposits from the Escrow Agent, the Escrow Agent will have to release them after ten business days notice, unless the purchaser makes an application under the Attorney General's dispute resolution procedures.

848.  However, the Escrow Agreement does not provide that the Escrow Agent will retain the Deposits in escrow in the event that a purchaser has instituted litigation against the Escrow Agent concerning the disposition of the Deposits.

849.  The Purchasing Plaintiffs are third party beneficiaries of the Escrow Agreement.

850.  Under the Escrow Agreement, the Escrow Agent is required to hold the Deposits for the benefit of the Sponsor and the Purchasing Plaintiffs until closing or the resolution of any dispute concerning the disposition of the Deposits.

851.  In Claims I through X above, the Plaintiffs have set forth causes of action under which they seek orders and judgments directing the return of their respective Deposits held by the Escrow Agent.

852.  If the Escrow Agent is permitted to release the Deposits from escrow prior to the resolution of the disputes among the parties to this action, the Plaintiffs will suffer irreparable harm.

853.     It would be fair, just and equitable to enter a preliminary injunction preserving the

         *status quo* and a permanent injunction directing the payment of the Deposits to

         the party that is determined by this Court to be entitled to the Deposits.

854.     For this reason, and for the reasons set forth in Claims I through X above, the

         Plaintiffs should be entitled to preliminary and permanent injunctive relief:  (i)

         ordering the Escrow Agent to maintain in escrow all funds held on behalf of each

         Purchasing Plaintiff herein until their payment is directed by an order of this

         Court or an agreement between the Sponsor and such Purchasing Plaintiff; and (ii)

         upon a determination of this Court as to which party is entitled to such funds,

         directing that the such funds be paid to the party entitled thereto.

## **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs herein respectfully request that this Court grant Judgment

         against the Defendants as follows:

I.       On Claim I, Judgment in favor of all Purchasing Plaintiffs against all

         Defendants:

         a.       Awarding each Purchasing Plaintiffs rescission of its Purchase

                  Agreement;

         b.       Directing the repayment to each Purchasing Plaintiff their

                  respective deposits, as follows: (i)Palmer Gardens, in the amount

                  of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of

                  $1,244,000.00; (iii) Hubert Tsai and Christine Singh damages in

                  the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and

                  Henry Gross damages in the amount of $251,400.00; (v) Beaver

Metal damages in the amount of $312,000.00; (vi) Credibox

damages in the amount of $298,061; plus all accrued interest

thereon;

c.    Awarding damages to each Purchasing Plaintiff in the amount of

their respective Deposits as listed above, plus all interest accrued

thereon;

d.    Awarding each Purchasing Plaintiff costs;

e.    Awarding each Purchasing Plaintiff attorney's fees;

f.    Awarding each Purchasing Plaintiff any independent appraisers'

fees

g.    Awarding each Purchasing Plaintiff any costs incurred by said

Plaintiff or person acting for a Purchasing Plaintiff for travel to the

Trump Soho site or sales office;

h.    Awarding each Purchasing Plaintiff interest; and

i.    Awarding each Purchasing Plaintiff such other relief as the Court

deems fair, just, and equitable

II.    On Claim II, Judgment in favor of all Plaintiffs against all Defendants:

a.    Awarding each Plaintiff rescission of its Purchase Agreement;

b.    Directing the repayment to each Plaintiff their respective deposits,

as follows: (i) Palmer Gardens, Rachel Gerstein, Joyce Gerstein,

and Herbert Gerstein, in the amount of $427,200.00; (ii) Alan

Maltz and Janet Maltz in the amount of $1,244,000.00; (iii) Hubert

Tsai and Christine Singh damages in the amount of $212,400.00;

(iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal and Acacio Rodriguez damages in the amount of $312,000.00; (vi) Credibox and Felisa Hernandez damages in the amount of $298,061; plus all accrued interest thereon;

 c. Awarding compensatory damages to each Plaintiff in the amount of their respective deposits as listed above;

 d. Awarding each Plaintiff punitive damages in an amount to be proven at trial;

 e. Awarding each Plaintiff costs;

 f. Awarding each Plaintiff reasonable attorney's fees;

 g. Awarding each Plaintiff any independent appraisers' fees

 h. Awarding each Plaintiff interest; and

 i. Awarding each Plaintiff such other relief as the Court deems fair, just, and equitable.

III. On Claim III, Judgment in favor of all Purchasing Plaintiffs against the Misrepresenting Defendants:

 a. Awarding each Purchasing Plaintiff rescission of its Purchase Agreements;

 b. Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows: (i) Palmer Gardens in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $1,244,000.00; (iii) Hubert Tsai and Christine Singh damages in

the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $298,061; plus all accrued interest thereon;

c. Awarding damages to each Purchasing Plaintiff in the amount of their respective deposits as listed above;

d. Awarding each Purchasing Plaintiff costs;

e. Awarding each PurchasingPlaintiff interest; and

f. Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable.

IV. On Claim IV, Judgment for Purchasing Plaintiffs against Control Defendants:

a. Awarding each Purchasing Plaintiffs rescission of its Purchase Agreements;

b. Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows:

i. Palmer Gardens, in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $1,244,000.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi)

Credibox damages in the amount of $298,061; plus all

accrued interest thereon;

c. Awarding damages to each Purchasing Plaintiff in the amount of

their respective deposits as listed above;

d. Awarding each Purchasing Plaintiff costs;

e. Awarding each Purchasing Plaintiff interest; and

f. Awarding each Purchasing Plaintiff such other relief as the Court

deems fair, just, and equitable.

V. On Claim V, Judgment in favor of each Purchasing Plaintiffs against the

Sponsor:

a. Awarding each Purchasing Plaintiffs rescission of its Purchase

Agreements.

b. Directing the repayment to each Purchasing Plaintiff their

respective deposits, as follows:

ii. Palmer Gardens, in the amount of $427,200.00; (ii) Alan

Maltz and Janet Maltz in the amount of $1,244,000.00; (iii)

Hubert Tsai and Christine Singh damages in the amount of

$212,400.00; (iv) Xue Feng, Randall A. Meckel, and

Henry Gross damages in the amount of $251,400.00; (v)

Beaver Metal damages in the amount of $312,000.00; (vi)

Credibox damages in the amount of $298,061; plus all

accrued interest thereon;

c. Awarding damages to each Purchasing Plaintiff in the amount of their respective deposits as listed above;

d. Awarding each Purchasing Plaintiff costs;

e. Awarding each Purchasing Plaintiff interest; and

f. Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable.

VI. On Claim VI, Judgment in favor of all Purchasing Plaintiffs against the Control Defendants:

a. Awarding each Purchasing Plaintiffs rescission of its Purchase Agreements;

b. Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows:

iii. Palmer Gardens, in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $1,244,000.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $298,061; plus all accrued interest thereon;

c. Awarding damages to each Purchasing Plaintiff in the amount of their respective deposits as listed above;

d. Awarding each Purchasing Plaintiff costs;

e. Awarding each Purchasing Plaintiff interest; and

f. Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable.

VII. On Claim VIII, Judgment in favor of all Plaintiffs against all Defendants:

a. Awarding each Plaintiff rescission of its Purchase Agreement;

b. Directing the repayment to each Plaintiff their respective deposits, as follows:

iv. Palmer Gardens, in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $1,244,000.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $298,061; plus all accrued interest thereon;

c. Awarding statutory damages in the amount of $1,000.00 for each Plaintiff;

d. Awarding each Plaintiff costs;

e. Awarding each Plaintiff interest;

f. Awarding each Plaintiff reasonable attorney's fees; and

g. Awarding each Plaintiff such other relief as the Court deems fair, just, and equitable.

VIII. On Claim IX, Judgment in favor of all Purchasing Plaintiffs against all Defendants:

    a.    Awarding each Purchasing Plaintiffs rescission of its Purchase Agreement;

    b.    Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows: (i)Palmer Gardens, in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $1,244,000.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $298,061; plus all accrued interest thereon;

    c.    Awarding damages to each Purchasing Plaintiff in the amount of their respective Deposits as listed above, plus all interest accrued thereon;

    d.    Awarding each Purchasing Plaintiff costs;

    e.    Awarding each Purchasing Plaintiff attorney's fees;

    f.    Awarding each Purchasing Plaintiff any independent appraisers' fees

    g.    Awarding each Purchasing Plaintiff any costs incurred by said Plaintiff or person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office;

h.     Awarding each Purchasing Plaintiff interest; and

i.     Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable/

IX.     On Claim X, Judgment in favor of Palmer Gardens against the Sponsor:

a.     Declaring that Palmer Gardens has validly revoked its Purchase Agreement;

b.     Directing the repayment to Palmer Gardens in the amount of $427,200.00, plus all accrued interest thereon;

c.     Awarding damages to Palmer Gardens in the amount of its Deposit as listed above, plus all interest accrued thereon;

d.     Awarding Palmer Gardens costs;

e.     Awarding Palmer Gardens attorney's fees;

f.     Awarding Palmer Gardens any independent appraisers' fees;

g.     Awarding Palmer Gardens any costs incurred by said Plaintiff or person acting for Palmer Gardens for travel to the Trump Soho site or sales office;

h.     Awarding Palmer Gardens interest; and

i.     Awarding Palmer Gardens such other relief as the Court deems fair, just, and equitable/

X.     On Claim XI, Judgment in favor of all Purchasing Plaintiffs against the Escrow Agent:

a.     Ordering the Escrow Agent to maintain in escrow all funds held on behalf of each Purchasing Plaintiff herein until their payment is

directed by an order of this Court or an agreement between the Sponsor and such Purchasing Plaintiff;

b. Upon a determination of this Court as to which party is entitled to such funds, directing that such funds be paid to the party entitled thereto; and

c. Granting such other and further relief as may be just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for each of the Claims herein for which such a trial by jury is available.


Dated:   New York, New York
         August 2, 2010

Adam Leitman Bailey, P.C.

By: _____
    Adam Leitman Bailey
    William J. Geller
    John M. Desiderio
    Courtney J. Killelea

*Attorneys for Plaintiffs*
120 Broadway, 17th Floor
New York, New York 10271
212-825-0365