UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PALMER GARDENS, LLC, RACHEL GERSTEIN, JOYCE GERSTEIN, HERBERT GERSTEIN, ALAN MALTZ, JANET MALTZ, HUBERT TSAI, CHRISTINE SINGH, XUE FENG, RANDALL A. MECKEL, HENRY GROSS, BEAVER METAL, LLC, ACACIO RODRIGUEZ, CREDIBOX UNIVERSAL, SL, FELISA HERNANDEZ, MICHAEL HADJEDJ, and OLIVER DACOURT, <br><br> *Plaintiffs* <br><br> -against- <br><br> BAYROCK/SAPIR ORGANIZATION LLC, DONALD J. TRUMP, ALEX SAPIR, TEVFIK ARIF, 246 SPRING STREET HOLDINGS II, LLC, BAYROCK/SAPIR REALTY LLC, BAYROCK SPRING STREET, LLC, BAYROCK GROUP, LLC, JULIUS SCHWARZ, TRUMP INTERNATIONAL HOTELS MANAGEMENT LLC, TRUMP MARKS SOHO LLC, DONALD TRUMP JR., IVANKA TRUMP, ERIC TRUMP, PRODIGY INTERNATIONAL NYC, LLC, RODRIGO NINO, CORE GROUP MARKETING LLC, SHAUN OSHER, THOMAS POSTILIO and AKERMAN SENTERFITT LLP, as ESCROW AGENT, <br><br> *Defendants.* | Case No. <br> 10-Civ.-5830 (KMW) <br><br><br><br><br><br><br><br><br> **FIRST AMENDED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs, through their attorneys, Adam Leitman Bailey, P.C., for their First

Amended Complaint against the Defendants allege as follows:

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................6

THE PLAINTIFFS ..............................................................................10

     The Palmer Garden Plaintiffs ...............................................12

     The Maltz Plaintiffs ..............................................................14

     The Tsai-Singh Plaintiffs .......................................................15

     The Feng-Meckel-Gross Plaintiffs .........................................16

     The Beaver Metal Plaintiffs ..................................................18

     The Credibox Plaintiffs.........................................................19

     The Sultan-Represented Plaintiffs ........................................21

     Purchasing and Investing Plaintiffs ......................................23

THE DEFENDANTS ...........................................................................23

     The Sponsor Defendants.......................................................23

     The Trump Defendants .........................................................27

     The Prodigy Defendants .......................................................29

     The Core Defendants ...........................................................30

     The Escrow Agent ................................................................32

     Misrepresenting and Control Defendants ..............................32

     Other Non-Party Trump Soho Representatives .......................36

JURISDICTION AND VENUE ..............................................................40

THE TRUMP SOHO DEVELOPMENT ...................................................41

     The Marketing of the Trump Soho ........................................41

     The Offering Plan and Documents ........................................42

The Restrictive Declaration ...........................................................................44

The Condominium Declaration .....................................................................47

The Condominium By-Laws .........................................................................48

The Unit Management Agreement ................................................................49

FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS .....................50

Actual Unit Sales by Date Reported in the May 5, 2010 Amendment .....................50

Actual Unit Sales by Date Reported to HUD ...........................................................52

False Statements Made to the Palmer Gardens Plaintiffs .........................................55

False Statements Made to the Maltz Plaintiffs .........................................................60

False Statements Made to the Tsai-Singh Plaintiffs .................................................62

False Statements Made to the Feng-Meckel-Gross Plaintiffs ...................................64

False Statements Made to the Beaver Metal Plaintiffs .............................................68

False Statements Made to the Credibox Plaintiffs....................................................72

False Statements Made to the Sultan-Represented Plaintiffs ...................................76

Additional False Statements Made to the Press and Reliance by Plaintiffs .............77

Reliance on Defendants' False Statements by Additional Purchasers .....................84

THE MAY 5, 2010 FILING REVEALING THE FRAUD...................................................86

The Minimum Sales Percentage Required Under the Martin Act Regulations and

the Plan ..................................................................................................86

The Effectiveness Amendment and the Sapir Affidavit ...........................................91

The Drastic Staff Cuts Revealed by the Tenth Amendment .....................................92

THE DEFENDANTS' FRAUD AND THE MOTIVATION BEHIND IT........................96

The Need to Project Success Through False Statements ...........................................96

False Statements of the Prodigy Defendants ............................................ 100

False Statements of the Core Defendants ............................................... 109

False Statements of the Trump Defendants ............................................ 113

False Statements of the Sponsor Defendants and their Agents ................. 120

The Control Defendants' Responsibility for the False Statements ........................... 132

The Defendants' Regular Monitoring and Correction of News Reports ................ 133

THE TRUMP SOHO OFFERING AS A SECURITY ......................................... 136

NON-EXEMPTION AND NON-COMPLIANCE WITH ILSA ......................................... 143

No Full Exemption from ILSA under 15 U.S.C. §1702(a) Applies ......................... 143

No Other Statutory or Regulatory ILSA Exemption Applies .................................. 145

The ILSA Property Report ................................................................... 148

The Right to Revoke Under 15 U.S.C. §1503(d) ...................................... 149

The ILSA Property Report's Failure to Disclose the Revocation Option ................ 154

The Sponsor Distributed Materials Inconsistent with the ILSA Property Report ..... 157

CLAIM I – ILSA DECEPTIVE SALES PRACTICES, 15 U.S.C. § 1703(a)(2) ................ 158

CLAIM II – COMMON LAW FRAUD ................................................................ 165

CLAIM III – SECURITIES FRAUD – 1934 ACT § 10(b) & RULE 10b-5 ...................... 167

CLAIM IV – SECURITIES CONTROL PERSONS – 1934 ACT § 20(a) ......................... 172

CLAIM V – SECURITIES FRAUD – 1933 ACT § 12(a)(2) ................................... 173

CLAIM VI – SECURITIES CONTROL PERSONS – 1933 ACT § 15 ............................. 177

CLAIM VII – DECEPTIVE BUSINESS PRACTICES, GBL §§ 349 *et seq.* ...................... 179

CLAIM VIII – BREACH OF CONTRACT ......................................................... 182

CLAIM IX – ILSA PROPERTY REPORT OMISSION,

15 U.S.C. § 1702(a)(1)(B) & (C)...............................................................186

CLAIM X – MISLEADING AND INCONSISTENT ILSA PROPERTY REPORT,

15 U.S.C. § 1702(a)(1)(B), (C) & (D) ....................................................189

CLAIM XI – DECEPTIVE ILSA PROPERTY REPORT, 15 U.S.C. § 1702(a)(2) ............192

CLAIM XII – ILSA REVOCATION, 15 U.S.C. § 1703(d).................................195

CLAIM XIII– INJUNCTION TO HOLD AND REFUND ESCROW ...............................196

REQUEST FOR RELIEF .........................................................................198

DEMAND FOR JURY TRIAL .....................................................................211

## PRELIMINARY STATEMENT

1.      This action seeks to redress the substantial and ongoing pattern of fraudulent

misrepresentations and deceptive sales practices that the Defendants undertook

against the Plaintiffs, inducing them to enter into agreements to buy hotel-

condominium Units at the Trump Soho Hotel Condominium New York (the

"Condominium"), then under construction at 246 Spring Street, New York, New

York 10013.

2.      The hotel-condominium development  (the "Trump Soho") was announced with

great fanfare by celebrity real estate mogul Donald J. Trump on the 2006 finale of

the fifth season of his television show *The Apprentice*, and has been a signature

project of Trump's three children, Donald Trump Jr., Ivanka Trump and Eric

Trump, who have both an equity interest in the project and have publicly used the

project to try to establish some independent credibility in the real estate business

beyond their mere status as Trump's children.

3.      The Condominium sponsor, Bayrock/Sapir Organization LLP (the "Sponsor") is

jointly owned by Donald Trump, Alex Sapir and Tevfik Aviv, each of whom had

and has a significant personal, financial, and reputational interest in having the

project succeed by selling condominium Units.

4.      The Sponsor and its affiliates and sales agents – the Defendants – stood to make

substantial profits if large numbers of the Condominium Units could be sold, but

could face disaster if they went unsold.

5.      As a result, from the very beginning of their marketing of the Units in September

2007, the Defendants (other than Akerman Senterfitt LLP (the "Escrow Agent"),

sued only in its role as escrow agent holding the Plaintiffs' contract deposits) engaged in a coordinated pattern of falsely overstating the number and percentage of Trump Soho Units sold, and other indicators of market interest, to encourage the Plaintiffs and other potential purchasers to buy Units in what they claimed to be a highly successful sales effort.

6.    Over the first year and a half of marketing the Units (the period that the Plaintiffs signed contracts to buy their Units and then made additional deposits to preserve their contract rights), and despite badly lagging sales, the Defendants made increasing representations about the percentages of Units sold – stating that the Trump Soho was 30, 40, 50, 60 percent or more sold – both to worldwide media sources and to individual purchasers and potential purchasers, including the Plaintiffs.

7.    The Defendants' claims of high percentages of Units sales were very important to the Plaintiffs and other purchasers hearing them because robust sales are a strong indication of the development's value and that the Units are well priced in the marketplace.

8.    More significantly, since a substantial part of the Unit's value was in the ability to resell it at some later time in the secondary market, and if the Sponsor did not sell out the Units, the buyer would be competing with the Sponsor on resale, a high sales percentage reported by the Sponsor was vital to the buyer's belief in his or her ability to eventually resell his or her investment.

9.    Indeed the federally-required property disclosure report distributed to Trump Soho purchasers expressly cautions: "Resale of your Hotel Suite Unit may be

difficult or impossible until our projected sell-out of the condominium, since you may face the competition of our own sales program and local real estate brokers may not be interested in listing your Hotel Suite Unit."

10. Further, the higher the percentage of Sponsor ownership in a condominium development, the riskier the investment because of the greater chance and consequences of Sponsor default.

11. Indeed, many banks will not lend on condominium Units where the Sponsor ownership is more than 30 or 50 percent.

12. Despite the extravagant claims of the percentage of Units sold made by Trump Soho representatives, when construction was complete the Sponsor was forced to reveal in a filing with the office of the New York Attorney General (the "Attorney General") required under New York's Martin Act, New York General Business Law ("GBL") §§ 352 *et seq.*, that it had only entered into bona-fide, non-defaulted contracts to sell 62 out of the 413 Units originally offered (later reduced to 391 Units), or just over 15%.

13. The 15% number is highly significant because under the Martin Act's regulations, the Sponsor would have been unable to declare the condominium offering effective and close on the sales of the Units unless it had secured contracts to sell 15% of the Units.  Similarly, in the Trump Soho's offering plan, the Sponsor represented that it would not declare the offering effective if fewer than 60 Units were under contract.

14. What this means is that if the Sponsor had induced just three fewer bona fide purchasers to sign contracts and pay their required deposits (and possibly just one

fewer), the project would have foundered, and all purchasers could have rescinded their contracts and obtained full refunds under New York law.

15.    Further, because the Sponsor elected not to put certain protective clauses into its purchase agreements, under the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. §§ 1701 *et seq.* , the Sponsor was required to disclose in the purchase agreement and the federal property disclosure report that the buyer had two years to rescind their purchase agreements from the dates of their signing, an option that the Plaintiffs and many other purchasers would have exercised.

16.    Thus, not only were the Plaintiffs individually misled into signing their contracts and submitting their additional deposits, the Defendants collective efforts to pump up sales through false and misleading statements caused all buyers to miss options to revoke their contract that they would have exercised in the absence of fraud.

17.    According to documents filed with the U.S. Department of Housing and Urban Development ("HUD") but never publicly distributed, the Sponsor had entered into a much larger number of contracts, 122 by the end of 2008 (approximately 30% of the total units), almost half of which were not reported to the Attorney General, presumably because they did not meet the Attorney General's requirements due to their not being bona fide sales to unrelated parties or to their buyers being in default in the payment of required deposit installments.

18.    Not only was it misleading to publicly report sales to non-bona fide, related party or defaulted buyers as actual sales, whether one uses the figure of 62 Units in contract reported to the Attorney General or the figure of 122 units in contract

reported to HUD, but the actual sales figures were substantially below the more

than 50 and 60 percent unit sales being trumpeted by Trump Soho representatives.

19.    Moreover, although the Plaintiffs were promised a hotel fully staffed to provide

high quality services, severe budget cutbacks by Trump Soho management mean

that the services the Plaintiffs would receive do not match what was promised.

20.    A key aspect of the Trump Soho's sales pitch was that, because zoning

restrictions prohibited buyers from staying in their Units for more than limited

periods, each buyer's Unit would be rented to the public as a hotel room during

the time they were not in occupancy, with the buyers receiving the rental revenue

(less charges and expenses) as an investment return on their Unit purchases.

21.    As a result of these actions by the Defendants, the Plaintiffs are seeking rescission

of their purchase agreements refund of all deposits they have made (a total of

$2,487,115.25) compensatory and punitive damages, interest, costs and attorney's

fees, and other relief under the Interstate Land Sales Full Disclosure Act

("ILSA"), 15 U.S.C. §§ 1701 *et seq.*, common law fraud, breach of contract, the

Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78a *et seq.*, the

Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77a *et seq.*, and the New

York Deceptive Business Practices Act, GBL §§ 349 *et seq.*

## THE PLAINTIFFS

22.    Each of the Plaintiffs, either directly or indirectly through a business entity, is a

contract vendee to purchase a Hotel Suite Unit (a "Unit") of the Condominium

under a purchase agreement (a "Purchase Agreement") with the Sponsor.

23.     Each of the Units was offered and sold pursuant to a Commercial Condominium

Offering Plan for Trump Soho Condominium New York (the "Offering Plan" or

"Plan"), as amended from time to time, issued by the Sponsor.

24.     Each Purchase Agreement is on an identical form as provided in the Offering

Plan, with provisions identical in substance other than business terms such as Unit

number, purchase price, deposit amount, date and the like.

25.     Each Purchase Agreement requires the purchaser to submit an initial deposit (an

"Initial Deposit") of 10% of the purchase price of the Unit to be held in escrow by

the Escrow Agent simultaneously with the submission of the Purchase Agreement

to the Sponsor, except that in one instance detailed below, a purchaser was

permitted to make an Initial Deposit of 5% of the purchase price, a First

Additional Deposit of an additional 5% and then a Second Initial Deposit of 10%.

26.     Each Purchase Agreement also requires the purchaser to submit an additional

deposit (an "Additional Deposit") of 10% of the purchase price of the Unit to be

held in escrow by the Escrow Agent on or before a date six months after the date

of the Purchase Agreement (except as noted above and detailed below).

27.     The Initial Deposit and the Additional Deposit (or First and Second Additional

Deposit, as applicable) (collectively, the "Deposit"), totaling 20% of the purchase

price, are to be held under an escrow agreement dated June 26, 2007 between the

Escrow Agent and the Sponsor (the "Escrow Agreement") until released with all

accrued interest under the terms of the Escrow Agreement.

**The Palmer Garden Plaintiffs**

28.  Plaintiff Palmer Gardens LLC ("Palmer Gardens") is a California limited liability company with an address of 660 Sunset Blvd, #201, Los Angeles, California 90028.

29.  Under a Purchase Agreement dated January 28, 2008, Palmer Gardens contracted to purchase Hotel Suite Unit 2509 of the Condominium from the Sponsor for a purchase price of $2,136,000.00 under the terms and conditions thereof.

30.  Palmer Gardens submitted an Initial Deposit of $213,600.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

31.  Palmer Gardens submitted an Additional Deposit of $213,600.00 payable to the Escrow Agent on or about the day it was due, July 28, 2008.

32.  On information and belief, the Escrow Agent holds a total Deposit of $427,200.00, plus accrued interest, in escrow for the benefit of Palmer Gardens under the Escrow Agreement.

33.  Plaintiff Rachel Gerstein is a California resident with an address of 660 Sunset Blvd, #201, Los Angeles, California 90028.

34.  Plaintiff Rachel Gerstein is the managing member of Palmer Gardens and owns 50% of its equity membership interests.

35.  Plaintiff Joyce Gerstein is a Florida resident with an address of 660 Sunset Blvd, #201, Los Angeles, California 90028.

36.  Plaintiff Joyce Gerstein is a member of Palmer Gardens and owner of 49% of its equity membership interests.

37.     Plaintiff Herbert Gerstein is a Florida resident with an address of 660 Sunset Blvd, #201, Los Angeles, California 90028.

38.     Plaintiff Herbert Gerstein is a member of Palmer Gardens and owner of 1% of its equity membership interests.

39.     Rachel Gerstein conducted the investigation of the purchase of the Trump Soho Unit on behalf of Palmer Gardens, Joyce Gerstein and Herbert Gerstein.

40.     Rachel Gerstein communicated statements and representations made to her and reviewed by her regarding the Trump Soho, and her analyses and summaries thereof, to Palmer Gardens, Joyce Gerstein and Herbert Gerstein.

41.     In reliance on the representations made to Rachel Gerstein, Rachel Gerstein, Joyce Gerstein and Herbert Gerstein agreed to purchase a Unit of the Trump Soho through Palmer Gardens.

42.     In reliance on the representations made to Rachel Gerstein, Rachel Gerstein, Joyce Gerstein and Herbert Gerstein contributed the funds used to make the Initial Deposit and the Additional Deposit to Palmer Gardens in proportion to their membership interests in Palmer Gardens.

43.     In reliance on the representations made to Rachel Gerstein, Palmer Gardens agreed to purchase a Unit of the Trump Soho

44.     In reliance on the representations made to Rachel Gerstein, Palmer Gardens deposited the funds used to make the Initial Deposit and the Additional Deposit.

45.     In reliance on the representations made to Rachel Gerstein, Palmer Gardens entered into its Purchase Agreement.

**The Maltz Plaintiffs**

46.   Plaintiffs Alan Maltz and Janet Maltz are Florida residents with an address of 220 Grand Pointe Drive, Palm Beach Gardens, Florida 33418.

47.   Under a Purchase Agreement dated October 27, 2007, Alan Maltz and Janet Maltz contracted to Purchase Hotel Suite Unit 2006 of the Condominium from the Sponsor for a purchase price of $1,244,000.00 under the terms and conditions thereof.

48.   Alan Maltz and Janet Maltz submitted an Initial Deposit of $124,400.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

49.   Alan Maltz and Janet Maltz submitted an Additional Deposit of $124,400.00 payable to the Escrow Agent on or about the day it was due, April 25, 2008.

50.   On information and belief, the Escrow Agent holds a total Deposit of $248,800.00, plus accrued interest, in escrow for the benefit of Alan Maltz and Janet Maltz under the Escrow Agreement.

51.   In reliance on the representations made to them, Alan Maltz and Janet Maltz agreed to purchase a Unit of the Trump Soho.

52.   In reliance on the representations made to them, Alan Maltz and Janet Maltz deposited the funds used to make the Initial Deposit and the Additional Deposit.

53.   In reliance on the representations made to them, Alan Maltz and Janet Maltz entered into their Purchase Agreement.

**The Tsai-Singh Plaintiffs**

54.     Plaintiff Hubert Tsai is a California resident with an address of 3141 Michelson Drive, #1202, Irvine, California 96212.

55.     Plaintiff Christine Singh is a New York resident with an address of 3274 Harbor Court, Baldwin Harbor, New York 11510.

56.     Under a Purchase Agreement dated September 7, 2007, Hubert Tsai and non-party Anthony Tsai contracted to purchase Hotel Suite Unit 902 of the Condominium from the Sponsor for a purchase price of $1,062,000.00 under the terms and conditions thereof.

57.     Hubert Tsai and Anthony Tsai submitted an Initial Deposit of $106,200.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

58.     Hubert Tsai and Anthony Tsai submitted an Additional Deposit of $106,200.00 payable to the Escrow Agent on or about the day it was due, March 7, 2008.

59.     Anthony Tsai assigned his rights and obligations under the Purchase Agreement to Plaintiff Christine Singh under an Assignment and Assumption of Agreement which was dated as of May 15, 2008, but which was signed by the parties in or about September 2008.

60.     In connection with her assumption of Anthony Tsai's interest in the Purchase Agreement, Christine Singh paid Anthony Tsai $106,200.00 representing Anthony Tsai's interest in and contribution to the Initial Deposit and Additional Deposit, and thereby assumed Anthony Tsai's interest in the Initial Deposit and Additional Deposit.

61.     On information and belief, the Escrow Agent holds a total Deposit of $248,800.00, plus accrued interest, in escrow for the benefit of Hubert Tsai and Christine Singh under the Escrow Agreement.

62.     In reliance on the representations made to them, Hubert Tsai and Anthony Tsai agreed to purchase a Unit of the Trump Soho.

63.     In reliance on the representations made to them, Hubert Tsai and Anthony Tsai deposited the funds used to make the Initial Deposit and the Additional Deposit.

64.     In reliance on the representations made to them, Hubert Tsai and Anthony Tsai entered into their Purchase Agreement.

65.     In reliance on the representations made to Hubert Tsai, Anthony Tsai and her, Christine Singh agreed to purchase Anthony Tsai's interest in his Purchase Agreement.

66.     In reliance on the representations made to Hubert Tsai, Anthony Tsai and her, Christine Singh agreed to enter into Assignment and Assumption of Agreement and to assume Anthony Tsai's interest in his Purchase Agreement.

67.     In reliance on the representations made to Hubert Tsai, Anthony Tsai and her, Christine Singh paid to Anthony Tsai the funds representing her share of the Initial Deposit and Additional Deposit under the Purchase Agreement she assumed.

### The Feng-Meckel-Gross Plaintiffs

68.     Plaintiff Henry Gross is a New York resident with a business address of 444 Madison Avenue, 18th Floor, New York, New York 10022.

69.     Plaintiff Randall A. Meckel is a New York resident with an address of 310 East 46th Street, #24A, New York, New York 10017.

70.     Plaintiff Xue Feng is a New York resident with an address of 310 East 46th Street, #24A, New York, New York 10017.

71.     Under a Purchase Agreement dated December 14, 2007, Xue Feng, Randall A. Meckel and Henry Gross contracted to Purchase Hotel Suite Unit 2202 of the Condominium from the Sponsor for a purchase price of $1,257,000.00 under the terms and conditions thereof.

72.     Xue Feng, Randall A. Meckel and Henry Gross submitted an Initial Deposit of $125,700.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

73.     Xue Feng, Randall A. Meckel and Henry Gross submitted an Additional Deposit of $125,700.00 payable to the Escrow Agent on or about the day it was due, June 14, 2008.

74.     On information and belief, the Escrow Agent holds a total Deposit of $251,400.00, plus accrued interest, in escrow for the benefit of Xue Feng, Randall A. Meckel and Henry Gross under the Escrow Agreement.

75.     In reliance on the representations made to them, Xue Feng, Randall A. Meckel and Henry Gross agreed to purchase a Unit of the Trump Soho.

76.     In reliance on the representations made to them, Xue Feng, Randall A. Meckel and Henry Gross deposited the funds used to make the Initial Deposit and the Additional Deposit.

77.     In reliance on the representations made to them, Xue Feng, Randall A. Meckel and Henry Gross entered into the Purchase Agreement.

**The Beaver Metals Plaintiffs**

78.     Plaintiff Beaver Metal, LLC ("Beaver Metal") is a Delaware limited liability company with an address of C/ Velazquez 60, 4°, 28001 Madrid, Spain.

79.     Under a Purchase Agreement dated July 2, 2008, Beaver Metal contracted to purchase Hotel Suite Unit 3203 from the Sponsor for a purchase price of $1,560,000.00 under the terms and conditions thereof.

80.      Beaver Metal submitted an Initial Deposit of $156,000.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

81.     Beaver Metal submitted an Additional Deposit of $156,000.00 payable to the Escrow Agent on or about the day it was due, January 2, 2009.

82.     On information and belief, the Escrow Agent holds a total Deposit of $312,000.00 in escrow for the benefit of Beaver Metal under the Escrow Agreement.

83.     Plaintiff Acacio Rodriguez is a resident of Spain with an address of C/ Velazquez 60, 4°, 28001 Madrid, Spain.

84.     Acacio Rodriguez is the principal of Beaver Metal and owns all of its equity membership interests.

85.     Non-party Javier Rodriguez is an authorized representative of Beaver Metal.

86.     Javier Rodriguez conducted the investigation of the purchase of the Trump Soho Unit on behalf of Beaver Metal and Acacio Rodriguez.

87.     Javier Rodriguez communicated statements and representations made to him and reviewed by him regarding the Trump Soho, and his analyses and summaries thereof, to Beaver Metal and Acacio Rodriguez.

88.     In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Acacio Rodriguez agreed to purchase a Unit of the Trump Soho through Beaver Metal

89.     In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Acacio Rodriguez contributed the funds used to make the Initial Deposit and the Additional Deposit to Beaver Metal.

90.     In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Beaver Metal agreed to purchase a Unit of the Trump Soho.

91.     In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Beaver Metal deposited the funds used to make the Initial Deposit and the Additional Deposit.

92.     In reliance on the representations made to Javier Rodriguez and Acacio Rodriguez, Beaver Metal entered into its Purchase Agreement.

**The Credibox Plaintiffs**

93.     Plaintiff Credibox Universal, SL ("Credibox") is a Spanish company with an address of Calle Aurea Diaz Flores número 5 piso primero oficina número 8 Tenerife.código postal 38003, Spain.

94.     Under a Purchase Agreement dated August 2, 2008, Credibox contracted to purchase Hotel Suite Unit 3311 from the Sponsor for a purchase price of $1,490,305.00 under the terms and conditions thereof.

95.     Credibox submitted an Initial Deposit of $74,515.25 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

96.     On information and belief, the Escrow Agent holds a total Deposit of $74,515.25.00 in escrow for the benefit of Credibox under the Escrow Agreement.

97.     Plaintiff Felisa Hernandez is a resident of Spain with an address of Calle La Pirra14, Resid, Eisenhower, BQ C, 5°C, Madrid, 28022 Spain.

98.     Felisa Hernandez is the sole owner and principal of Credibox.

99.     Felisa Hernandez conducted the investigation of the purchase of the Trump Soho Unit on behalf of Credibox.

100.    Felisa Hernandez communicated statements and representations made to her and reviewed by her regarding the Trump Soho, and her analyses and summaries thereof, to Credibox.

101.    In reliance on the representations made to her, Felisa Hernandez agreed to purchase a Unit of the Trump Soho through Credibox.

102.    In reliance on the representations made to her, Felisa Hernandez contributed the funds used to make the Initial Deposit to Credibox.

103.    In reliance on the representations made to Felisa Hernandez, Credibox deposited the funds used to make the Initial Deposit.

104.    In reliance on the representations made to Felisa Hernandez, Credibox entered into its Purchase Agreement.

## The Sultan-Represented Plaintiffs

105.   Non-party Michael Sultan is a New York licensed real estate salesperson who represented several buyers of Units at the Trump Soho, including Plaintiffs Michael Hadjedj, Oliver Dacourt, and Zlatan Ibrahimovic (the "Sultan-Represented Plaintiffs").

106.   Michael Sultan conducted the investigation of the purchase of their Trump Soho Units on behalf of the Sultan-Represented Plaintiffs.

107.   Michael Sultan communicated statements and representations made to him and reviewed by him regarding the Trump Soho, and his analyses and summaries thereof, to the Sultan-Represented Plaintiffs.

108.   In reliance on the representations made to Michael Sultan, the Sultan-Represented Plaintiffs each agreed to purchase a Unit of the Trump Soho.

### *Plaintiff Michael Hadjedj*

109.   Plaintiff Michael Hadjedj is a resident of London, England with an address of 10-12 Hanscrescent Flat 10, London, SWX0LJ, England.

110.   Under a Purchase Agreement dated October 4, 2007, Michael Hadjedj contracted to Purchase Hotel Suite Unit 3910 of the Condominium from the Sponsor for a purchase price of $2,503,000.00 under the terms and conditions thereof.

111.   Michael Hadjedj submitted an Initial Deposit of $500,600.00 payable to the Escrow Agent with its submission of the Purchase Agreement to the Sponsor.

112.   On information and belief, the Escrow Agent holds a total Deposit of $500,600.00, plus accrued interest, in escrow for the benefit of Michael Hadjedj under the Escrow Agreement.

113.    In reliance on the representations made to Michael Sultan, Michael Hadjedj
        agreed to purchase a Unit of the Trump Soho.

114.    In reliance on the representations made to Michael Sultan, Michael Hadjedj
        deposited the funds used to make the Initial Deposit and the Additional Deposit.

115.    In reliance on the representations made to Michael Sultan, Michael Hadjedj
        entered into their Purchase Agreement.

*Plaintiff Oliver Dacourt*

116.    Plaintiff Oliver Dacourt is resident of Milan, Italy with an address of Via
        Ippodromo 105 Milano, 20151 Italy.

117.    Under a Purchase Agreement dated September 20, 2007, Oliver Dacourt
        contracted to Purchase Hotel Suite Unit 3410 of the Condominium from the
        Sponsor for a purchase price of $2,302,000.00 under the terms and conditions
        thereof.

118.    Oliver Dacourt submitted an Initial Deposit of $230,200.00 payable to the Escrow
        Agent with its submission of the Purchase Agreement to the Sponsor.

119.    Oliver Dacourt submitted an Additional Deposit of $230,200.00 payable to the
        Escrow Agent on or about the day it was due, March 20, 2008.

120.    On information and belief, the Escrow Agent holds a total Deposit of
        $460,400.00, plus accrued interest, in escrow for the benefit of Oliver Dacourt
        under the Escrow Agreement.

121.    In reliance on the representations made to Michael Sultan, Oliver Dacourt agreed
        to purchase a Unit of the Trump Soho.

122.   In reliance on the representations made to Michael Sultan, Oliver Dacourt deposited the funds used to make the Initial Deposit and the Additional Deposit.

123.   In reliance on the representations made to Michael Sultan, Oliver Dacourt entered into the Purchase Agreement.

### Purchasing and Investing Plaintiffs

124.   As used herein, the term "Purchasing Plaintiffs" refers to all Plaintiffs who have entered into Purchase Agreements (i.e. all Plaintiffs except Rachel Gerstein, Joyce Gerstein, Herbert Gerstein, Acacio Rodriguez and Felisa Hernandez).

125.   As used herein, the term "Investing Plaintiffs" refers to all Plaintiffs who have contributed funds to business entities for those entities to use to make deposits required under those entities' Purchase Agreements (i.e. Rachel Gerstein, Joyce Gerstein, Herbert Gerstein, Acacio Rodriguez and Felisa Hernandez).

### <u>THE DEFENDANTS</u>

### The Sponsor Defendants

126.   Defendant Bayrock/Sapir Organization LLC (the "Sponsor") is a Delaware limited liability company having an address of 160 Varick Street, 2nd Floor, New York, New York 10013.

127.   The Sponsor is the sponsor of the Trump Soho Hotel Condominium New York (the "Condominium").

128.   On September 21, 2005, the Sponsor acquired an approximately 24,727 square foot parcel of land located at 246 Spring Street, New York, New York (the "Land") upon which the Condominium was later constructed by the Sponsor.

129. Defendant Donald J. Trump ("Donald Trump") is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

130. Defendant Alex Sapir is, on information and belief, an individual and resident of New York with an address of c/o The Sapir Organization, LLC, 384 Fifth Avenue, New York, New York 10018.

131. Defendant Tevfik Arif is, on information and belief, an individual and resident of New York with an address of c/o Bayrock Group LLC, 160 Varick Street, 2nd Floor, New York, New York 10013.

132. Donald Trump, Alex Sapir and Tevfik Arif are, on information and belief, the indirect owners of the Sponsor.   The basis for this allegation is a statement on page 170 of the Offering Plan.

133. Defendant 246 Spring Street Holdings II, LLC ("246 Spring Holdings") is, on information and belief, a Delaware limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

134. 246 Spring Holdings is, on information and belief, the sole member of Sponsor.

135. Defendant Bayrock/Sapir Realty LLC ("Bayrock/Sapir Realty") is, on information and belief, a Delaware limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

136. Bayrock/Sapir Realty is, on information and belief, the managing member of 246 Spring Holdings.

137. Defendant Bayrock Spring Street LLC ("Bayrock Spring") is, on information and belief, a Delaware limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

138. Bayrock Spring is on information and belief, the managing member of Bayrock/Sapir Realty.

139. Defendant Bayrock Group LLC ("Bayrock Group") is, on information and belief, a New York limited liability company with an address of 160 Varick Street, #2, New York, New York 10013.

140. Bayrock Group, on information and belief, is the sole member of Bayrock Spring.

141. The basis for the allegations regarding the statuses of 246 Spring Holdings, Bayrock/Sapir Realty, Bayrock Spring and Bayrock Group as sole member or managing member of another company are statements in the Offering Plan and documents signed on behalf of those companies in those respective capacities, including a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan.

142. Julius Schwarz is, on information and belief, an individual and resident of New York with an address of c/o Bayrock Group LLC, 160 Varick Street, 2nd Floor, New York, New York 10013.

143. Julius Schwarz is, on information and belief, an Executive Vice President and Principal of Bayrock Group, and an authorized signatory of the Sponsor. The basis for this allegation is documents executed by Mr. Schwarz, including a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan.

144.    Tevfik Arif is, on information and belief, the founder and Chairman of the Bayrock Group.  The basis for this information is press reports regarding his title.

145.    Donald Trump, Alex Sapir, Tevfik Arif and Julius Schwarz are, on information and belief, "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan."  The basis for this allegation is the statement to this effect on page 170 of the Plan and a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan.

146.    Donald Trump, Alex Sapir, Tevfik Arif and Julius Schwarz have, in a sworn certification to the New York Department of Law attached as Exhibit 10A of the Offering Plan, certified that they have read and investigated the facts in the Offering Plan, and that the Offering Plan (including any amendments to be submitted) is "complete, current and accurate," does not "omit any material fact," does not "contain any untrue statement of a material fact," and does "not contain any fraud, deception, concealment, suppression, [or] false pretence."

147.    The By-Laws to the Condominium designate Donald Trump, Alex Sapir and Julius Schwarz as the initial board of directors of the Condominium, in full control and management of the Condominium, to serve as such until the Condominium's first annual meeting, which may be held as late as one year and 30 days after the first closing of a sale of a Unit.

148.    The By-Laws of the Condominium provide that the Sponsor will have the absolute right to designate a majority of the members of the board of directors of the Condominium for a period ending the later of five years from the date of the

first closing of a sale of a Unit or when the Sponsor has sold an aggregate of 90%
of common interests in Condominium Units.

149.    Even after the expiration of the period when the Sponsor has the absolute right to
designate a majority of the members of the board of directors of the
Condominium, the Sponsor may still continue to control the board of directors of
the Condominium through voting its interests in any Units it owns.

### The Trump Defendants

150.    Defendant Trump International Hotels Management LLC ("Trump Hotels") is, on
information and belief, a Delaware limited liability company with an address of
725 Fifth Avenue, New York, New York 10022.

151.    Trump Hotels is designated in the Offering Plan (at 35) as the "Hotel
Management Company" which will "act as the operator and manager of the hotel
in the Condominium on behalf of the Board pursuant to a Hotel Management
Agreement," with extensive responsibilities detailed in the Plan.

152.    Trump Hotels is also the "Hotel Manager" under a Unit Management Agreement
(Exhibit 13 to the Plan) that each Unit buyer is required to sign upon purchase of
the Unit, with extensive responsibilities detailed in the Plan.

153.    Defendant Trump Marks Soho LLC ("Trump Marks") is, on information and
belief, a New York limited liability company with an address of 725 Fifth
Avenue, New York, New York 10022.

154.    Trump Marks is the owner of certain trademarks, including "Trump Soho Hotel
Condominium New York," "Trump Soho Hotel Condominium," "Trump Soho
Hotel" and any other combination of "Trump" with "Soho", and the Licensor of

such trademarks to the Sponsor pursuant to a Sponsor License Agreement described on page 19 of the Plan, and to the Condominium under a Condominium License Agreement (Exhibit 16 to the Plan).

155.   Defendant Donald Trump Jr. is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

156.   Defendant Ivanka Trump is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

157.   Defendant Eric Trump is, on information and belief, an individual and resident of New York with an address of c/o The Trump Organization, LLC, 725 Fifth Avenue, New York, New York 10022.

158.   On information and belief, Donald Trump, Donald Trump Jr., Ivanka Trump and Eric Trump have an 18% interest in the Trump Soho.  The basis for this allegation is a *Wall Street Journal* article dated March 29, 2010 and a *Wall Street Journal* article dated July 30, 2010 that state that each have an 18% interest in the Trump Soho, and are each individual signatories to the exclusivity provisions of a license agreement for the use of Trump Trademarks, attached as Exhibit 16 to the Offering Plan.

159.   On information and belief, Donald Trump, Donald Trump Jr., Ivanka Trump and Eric Trump are officers, directors, shareholders, members, managers and/or principals of Trump Hotels, Trump Marks and the Sponsor.  The basis for this

information and belief are press reports regarding their extensive involvement and control over multiple aspects of the Trump Soho project.

160.   On information and belief, Trump Hotels has significant influence and control over the management and operations of the Sponsor and the Trump Soho.  The basis of such information and belief is the common ownership, management and control between Trump Hotels and the Sponsor, because of its designation as Hotel Management Company and Hotel Manager in the Plan and the agreements referenced therein, and because of its extensive responsibilities for management and operation of the Trump Soho detailed in the Plan.

161.   On information and belief, Trump Marks has significant influence and control over the management and operations of the Sponsor and the Trump Soho.  The basis of such information and belief is the common ownership, management and control between Trump Marks and the Sponsor; and  because of its ownership and licensing of trademarks critical to the operation and marketing of the Trump Soho under the Plan and in agreements referenced therein.

**The Prodigy Defendants**

162.   Defendant Prodigy International NYC, LLC ("Prodigy") is a Delaware limited liability company with an address of 72 Greene Street, 2nd Floor, New York, New York 10012.

163.   Until approximately July 2008, Prodigy was designated by the Sponsor as the co-exclusive selling agent for the Trump Soho.

164.   After approximately July 2008, Prodigy was the exclusive selling agent for the Trump Soho.

165.   At all relevant times, Prodigy was, on information and belief, responsible on an exclusive or co-exclusive basis for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels.  The basis for this allegation is statements in the Offering Plan, including on page 172 thereof.

166.   By reason of its status as exclusive and co-exclusive sales agent for the Trump Soho, Prodigy has, on information and belief, a substantial financial stake in each Unit of the Trump Soho sold.

167.   Defendant Rodrigo Nino is an individual and resident of New York with an address of 1 Morton Square, #6FW, New York, New York 10014.

168.   Rodrigo Nino is, on information and belief, the founder and President of Prodigy, as well as the principal officer of Prodigy responsible for the sales and marketing of the Trump Soho.  The basis for this allegation in multiple statements reported in the press and on the Trump Soho website.

169.   By reason of his status as founder, President and principal officer responsible for the Trump Soho for Prodigy, Rodrigo Nino has, on information and belief, a substantial personal financial stake in each Unit of the Trump Soho sold.

**The Core Defendants**

170.   Defendant Core Group Marketing, LLC ("Core") is a New York limited liability company with an address of 417 Fifth Avenue, 9th Floor, New York, New York 10016.

171.   Until approximately July 2008, Core was designated by the Sponsor as the co-exclusive selling agent for the Trump Soho.

172.   At all relevant times, Core was, on information and belief, responsible on a co-exclusive basis for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels.  The basis for this allegation is statements in the Offering Plan, including on page 172 thereof.

173.   By reason of its status as co-exclusive sales agent for the Trump Soho until approximately July 2008, Core had, on information and belief, a substantial financial stake in each Unit of the Trump Soho sold.

174.   On information and belief, Defendant Shaun Osher is an individual and resident of New York with an address at 417 Fifth Avenue, 9th Floor, New York, New York 10016.

175.   Shaun Osher is, on information and belief, the founder and Chief Executive Officer of Core, as well as a principal officer of Core responsible for the sales and marketing of the Trump Soho.  The basis for this allegation in multiple statements reported in the press and on the Trump Soho website.

176.   By reason of his status as founder, Chief Executive Officer and principal officer responsible for the Trump Soho for Core, Shaun Osher has, on information and belief, a substantial personal financial stake in each Unit of the Trump Soho sold.

177.   On information and belief, Defendant Thomas Postilio is an individual and a resident of New York with an address of 417 Fifth Avenue, 9th Floor, New York, New York 10016.

178.   Thomas Postilio is, on information and belief, a founding member and Managing Director of Core, as well as a principal officer of Core responsible for the sales

and marketing of the Trump Soho.  The basis for this allegation is Thomas
Postilio's position at Core.

179.    By reason of his status as a founding member, Managing Director and principal
officer responsible for the Trump Soho for Core, Thomas Postilio has, on
information and belief, a substantial personal financial stake in each Unit of the
Trump Soho sold.

### The Escrow Agent

180.    Defendant Akerman Senterfitt, LLP (the "Escrow Agent") is a New York limited
liability partnership with an address of 335 Madison Avenue, New York, New
York 10017.

181.    The Escrow Agent is the escrow agent for purchasers of Units at the Trump Soho
under a Escrow Agreement attached as Exhibit 9 to the Offering Plan.

182.    The Escrow Agent is being sued only in its capacity as Escrow Agent.

### Misrepresenting and Control Defendants

183.    As used herein, the term "Misrepresenting Defendants" refers to the Sponsor,
Donald Trump, Julius Schwarz, Alex Sapir, Trump Hotels, Trump Marks, Donald
Trump Jr., Ivanka Trump, Prodigy, Rodrigo Nino, Core, Shaun Osher and
Thomas Postilio.

184.    As used herein, the term "Control Defendants" refers to all Defendants other than
the Sponsor and the Escrow Agent.

185.    Each of the Control Defendants directly or indirectly had the power and influence,
to control the decision-making of Sponsor, and did influence and control the
decision-making of Sponsor, with respect to the acts and omissions and course of

conduct alleged herein, including the dissemination of all false and misleading statements described herein, and culpably participated in such acts and omissions and course of conduct, and had the opportunity to prevent, but failed to prevent, such acts and omissions and course of conduct by reason of the following:

a. 246 Spring Holdings, by reason of its being the sole member of Sponsor.

b. Bayrock/Sapir Realty, by reason of its being the managing member of 246 Spring Holdings, the sole member of Sponsor.

c. Bayrock Spring, by reason of its being the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

d. Bayrock Group, by reason of its being the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

e. Donald Trump, by reason of his being one of the three indirect owners of the Sponsor; his being one of the "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his having been designated a member of the initial Board of Directors of the Condominium; and his being an officer, director, shareholder, and/or principal of Trump Hotels, Trump Marks and the Sponsor.

f.   Alex Sapir, by reason of his being one of the three indirect owners of the Sponsor; his being one of the "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his having been designated a member of the initial Board of Directors of the Condominium.

g.   Tevfik Arif, by reason of his being one of the three indirect owners of the Sponsor; his being one of the "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his being founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

h.   Julius Schwarz, by reason of his being one of the "officers, directors, shareholders and principals of Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan"; his being an authorized signatory of the Sponsor; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his being Executive Vice

President and Principal of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, the managing member of 246 Spring Holdings, the sole member of Sponsor.

i.  Trump Hotels, by reason of the common ownership, management and control between Trump Hotels and the Sponsor; its designation as Hotel Management Company and Hotel Manager in the Plan and the agreements referenced therein; and its extensive responsibilities for management and operation of the Trump Soho detailed in the Plan.

j.  Trump Marks, by reason of the common ownership, management and control between Trump Marks and the Sponsor; and its ownership and licensing of trademarks critical to the operation and marketing of the Trump Soho under the Plan and in agreements referenced therein.

k.  Donald Trump Jr., Ivanka Trump and Eric Trump, by reason of their ownership interest in the Trump Soho; and their being officers, directors, shareholders, members, managers and/or principals of Trump Hotels, Trump Marks and the Sponsor.

l.  Prodigy, by reason of its being responsible on an exclusive or co-exclusive basis for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels.

m.  Rodrigo Nino, by reason of his being the founder and President of Prodigy; and the principal officer of Prodigy responsible for the sales and marketing of the Trump Soho.

n.   Core, by reason of its being responsible on a co-exclusive basis for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels.

o.   Shaun Osher, by reason of his being the founder and Chief Executive Officer of Core, and a principal officer of Core responsible for the sales and marketing of the Trump Soho.

p.   Thomas Postilio, by reason of his being a founding member and Managing Director of Core, and a principal officer of Core responsible for the sales and marketing of the Trump Soho.

**Other Non-Party Trump Soho Representatives**

186.   In addition to the Defendants named above, the following individuals and entities (the "Non-Party Trump Soho Representatives") have acted as representatives and agents of the Trump Soho in the capacities indicated.

187.   Sara Clephane was formerly Director of Sales for the Trump Soho.  On information and belief, she is a licensed real estate broker or salesperson and was an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

188.   Sandra Dominguez was formerly a sales associate for the Trump Soho.  On information and belief, she is a licensed real estate salesperson and was an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

189.   Amy Williamson is the Director of Rental Programs for the Trump Soho.  On information and belief, she is a licensed real estate salesperson and was an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

190.   Marcella Carrillo is or was a sales associate for the Trump Soho.  On information and belief, she is a licensed real estate broker or salesperson and is currently an employee or sales agent of Prodigy who is or was detailed to work on behalf of the Trump Soho.

191.   Marcella Reyes formerly was a sales associate for the Trump Soho.  On information and belief, she is a licensed real estate broker or salesperson and an employee or sales agent of Prodigy detailed to work on behalf of the Trump Soho.

192.   Ruedi Sieber is or was a sales associate for the Trump Soho.  On information and belief, he is a licensed real estate broker or salesperson and is currently an employee or sales agent of Prodigy who is or was detailed to work on behalf of Trump Soho.

193.   Baobab 3i ("Baobab") is a Spanish company with an address of C/Agustin De Foxa N°25 12°A, 28036 Madrid, Spain.

194.   At all relevant times, Baobab was, on information and belief, an authorized selling agent of the Sponsor in Spain and responsible for selling Units of the Trump Soho on behalf of the Sponsor and for marketing the Trump Soho's rental management program on behalf of Trump Hotels in Spain.  The basis for this allegation is that Baobab acted as a selling agent and was issued a Trump Soho business card and provided with a Trump Soho sales office address in New York.

195.   Ferran Fontal is, on information and belief, Chairman and Chief Executive Officer of Baobab, as well as the principal officer of Baobab responsible for the sales and marketing of the Trump Soho. Defendant Ferran Fontal acted as a selling agent of the Trump Soho and was issued a Trump Soho business card by

the Sponsor and was provided with a Trump Soho sales office address in New York.

196. Javier Cerro Diaz is or was the International Sales Manager for Baobab. On information and belief, he is or was an employee or sales agent of Baobab detailed to work on behalf of the Trump Soho.

197. Upon information and belief, each of the above-named Non-Party Trump Soho Representatives was privy to "inside" information of the Sponsor, provided to them either by the Sponsor and/or other Defendants, concerning (a) the number of actual potential buyers on the Trump Soho waiting list at any given time, (b) the number and percentage of Trump Soho Units that were actually sold or under a purchase agreement to purchasers at any given time, and (c) the overall progress of the marketing and sales of Trump Soho Units for purposes of the Sponsor being able declare the Plan effective and/or for purposes of the Sponsor being able to hold closings within the time specified in the Plan.

198. Upon information and belief, each of the above-named Non-Party Trump Soho Representatives were authorized by the Sponsor and/or other Defendants to market Trump Soho Units to potential buyers by use of statements that referred to the number of buyers on the Trump Soho waiting list and/or to the number or percentage of sales already made overall or in specific hotel unit "lines."

199. Upon information and belief, the statements made by each of the Non-Party Trump Soho Representatives to potential buyers, concerning the number of buyers on the Trump Soho waiting list and/or the number and percentage of sales already made overall or in specific hotel unit "lines," were made either (a) at the

express direction or agreement of, or (b) with the knowledge, approval, or acquiescence of the Sponsor and/or one or more of the other Defendants.

200.    Upon information and belief, neither the Sponsor nor any of the other Defendants ever advised any of the Non-Party Trump Soho Representatives that any statement made to a potential buyer, concerning the number of buyers on the Trump Soho waiting list and/or the number or percentage of sales already made overall or in specific hotel unit "lines," was either inaccurate or false; nor was any one of the Non-Party Trump Soho representatives ever directed to cease and desist from making inaccurate or false statements concerning the waiting list or the number of sales;  nor was any one of them ever reprimanded or his or her services terminated for doing so.

201.    Upon information and belief, each of the Non-Party Trump Soho Representatives had sufficient knowledge of the waiting list and/or the number of sales already made at any given time, through his or her own efforts, to know or determine the true facts concerning (a) the waiting list and sales numbers provided to them by either the Sponsor and/or by any of the other Defendants, (b) or the waiting list and sales numbers each of them represented in statements made to potential buyers.

202.    Upon information and belief, the compensation to be received by each of the Non-Party Trump Soho Representatives was directly related to the number of actual sales determined to be attributable to their individual services, and, therefore, each Non-Party Trump Soho Representative had a personal financial interest in marketing and promoting the sale of Trump Soho hotel Units to potential buyers

by making statements that inflated the numbers on the waiting list and the number of sales already made.

## JURISDICTION AND VENUE

203. Jurisdiction is proper in this Court under both 28 U.S.C. § 1331, the general federal question jurisdiction statute, and 15 U.S.C. § 1719, the provision of ILSA granting U.S. District Courts jurisdiction over actions to enforce ILSA's provisions.

204. Jurisdiction is proper in this Court as to the Claims not arising under federal law pursuant to this Court's supplemental jurisdiction under 28 U.SC. § 1367.

205. Venue is proper in this District under both 28 U.S.C. § 1391, the general venue statute, and 15 U.S.C. § 1719, ILSA's venue provision, in that many of the Defendants reside and may be found in this District, and the Condominium and the Units at issue are located in this District, the Units were offered for sale in this District, the Purchase Agreements at issue were entered into in this District, and a substantial part of the events, misrepresentations and omissions at issue here occurred in this District.

206. The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate and international commerce, the means and instruments of transportation and communication in interstate and international commerce, including the mails, the internet, electronic mails, interstate and international couriers and the telephones, in connection with the acts and practices, and courses of business set forth in this Complaint.

## THE TRUMP SOHO DEVELOPMENT

### The Marketing of the Trump Soho

207.    The Trump Soho was announced during the fifth season of Donald Trump's reality TV show, "The Apprentice" in 2006.

208.    The Trump Soho was initially marketed as a 46-story glass tower, $3,000-a-square-foot condo-hotel that was scheduled to open in the Spring of 2009.

209.    The Trump Soho was going to be the first new five-star hotel downtown since the Ritz Carlton and the first one ever in Soho.

210.    The interior of the Trump Soho was designed by David Rockwell, and it features Fendi Casa furniture and custom-made bedding by Bellino.

211.    The advertisements for the Trump Soho have been described as featuring "Ivanka [Trump] elegantly falling out of a cocktail dress," and have the tagline "Possess Your Own Soho."

212.    While the Trump Soho was under construction, the Defendants conducted their marketing out of a sales office located at 102 Wooster Street, New York, New York, 10020.

213.    In conducting their marketing of the Trump Soho, the Defendants established a website, http://www.trumpsoho.com/, which was available to potential buyers worldwide.

214.    On information and belief, the Defendants marketed and promoted their http://www.trumpsoho.com website through paid, sponsored advertising links on Gmail and other Google websites.  The basis for this information and belief is a February 6, 2008 article in *Curbed NY*.

215.    In conducting their marketing of the Trump Soho, the Defendants published advertisements in magazines, newspapers and other publications of interstate and international distribution.

216.    In conducting their marketing of the Trump Soho, the Defendants sent sales agents on international trips to market the Trump Soho, including but not limited to trips to Spain and Korea.

217.    In conducting their marketing of the Trump Soho, the Defendants used the mails, the telephone, the internet, e-mails, interstate air courier service, and international air courier services, among other means of interstate and international communication.

218.    The Defendants marketed the Units to the general public in a public offering.

219.    The Plan states (at page 30) that: "There are no limitations on who may purchase the offered Units."

### The Offering Plan and Documents

220.    On August 3, 2007, the office of the New York Attorney General (the "Attorney General") accepted for filing an offering plan for the Trump Soho promulgated by the Sponsor.

221.    Under the Martin Act, the Attorney General's acceptance of the Plan for filing is a legal prerequisite to the offering of the Units for sale.

222.    The Offering Plan set forth the terms and conditions under which the Sponsor was to sell the Units.

223.    The Plan stated on its cover that 413 Hotel Suite Units of the Trump Soho were offered for sale.

224.   The cover of the Plan also noted that "The Condominium has 413 Hotel Suite Units and 7 Commercial Units.  The Commercial Units are not being offered for sale hereunder at this time."

225.   In the section of the Plan's Introduction entitled "Offering of Units for Sale", the Plan (at page 30) states:  "Sponsor hereby offers the 413 Hotel Suite Units for sale under the Plan."

226.   The "Offering of Units for Sale" section of the Plan goes on to state (at page 31): "Sponsor will endeavor in good faith to sell . . . the Hotel Suite Units offered hereunder."

227.   Nowhere in the Plan, or any of the other offering documents, does the Sponsor state – or even suggest – that any of the Units are excluded from or held back from the offering.

228.   Nowhere in the Plan, or any of the other offering documents, does the Sponsor state – or even suggest – that the offering of the Units is to be conducted in separate phases.

229.   Although amendments to the Offering Plan subsequently reduced the number of Units offered to 391, none of the amendments or any other offering documents state – or even suggest – that:  (i) the Sponsor has retreated from its pledge to "sell in good faith" all of the Units; (ii) the Sponsor has excluded from or held back from the offering any of the reduced number of Hotel Suite Units; (iii) the offering of the reduced number of Units is is to be conducted in separate phases.

230.   Under the Offering Plan, each purchaser is required to sign a Purchase Agreement in the form attached as Exhibit 1 to the Plan.

231.   Each of the Purchasing Plaintiffs has signed a Purchase Agreement that is identical in substance to the form attached as Exhibit 1 to the Plan, other than business terms such as Unit number, purchase price, deposit amount, date and the like.

232.   Under paragraph 11.2 of the Purchase Agreement:  "The Plan is incorporated herein [into the Purchase Agreement] by reference and made a part hereof with the same force and effect as if set forth herein at length."

233.   Under the Offering Plan, any purchaser of a Unit is required to be bound by at least four agreements that were then recorded or were to be recorded as binding encumbrances on the Unit with the Office of the New York City Register (the "City Register"):

   a.   a Restrictive Declaration governing the use and occupancy of the Unit;

   b.   the Condominium Declaration;

   c.   the Condominium's By-Laws; and

   d.   a Unit Management Agreement.

234.   Copies of each of these four documents were included as exhibits to the Plan.

**The Restrictive Declaration**

235.   In response to the Defendants' announcement of the Trump Soho, several community groups and governmental officials raised strong opposition to several aspects of the project.

236.   One of the key grounds of opposition was a perceived risk that Trump Soho buyers would use their Units for their personal residences, rather than as transient hotel rooms.

237.   The Trump Soho is located in an area zoned M1-6 under the New York City Zoning Resolution.

238.   In an area zoned M1-6, use of property as a transient hotel is permitted, but use for residential purposes is prohibited.

239.   In order to prevent residential use of the Trump Soho and as a condition of issuing a building permit for its construction, the New York City Department of Buildings ("DOB") required the Sponsor to file a restrictive declaration placing limitations on the occupancy of Trump Soho Units.

240.   On May 4, 2007, the Sponsor recorded a restrictive declaration dated April 26, 2007 (the "Restrictive Declaration") with the City Register under City Register File Number ("CRFN") 20077050100385001.

241.   The key feature of the Restrictive Declaration is that it prohibits each Unit from being occupied by its owner (or any other individual) for more than 120 days in a calendar year (and no more than 29 days in any 36 day period), and that when the Unit is not occupied by its owner, it must be offered for rental to the public by the Trump Hotels or another qualified broker as rental agent.

242.   Specifically, Sections 2.02(a), (b) & (c) of the Restrictive Declaration provide:

   (a)     No Unit may be occupied by its Unit Owner or by any other individual: (i) for a continuous period of more than 29 days in any 36 day period; or (ii) for a total of more than 120 days in any calendar year.

   (b)     At all times during which a Unit is not occupied by its Unit Owner, it shall be made available on a daily or weekly basis to non-Unit Owners pursuant to a rental program operated either (i) by or on behalf of the Management Company or (ii) through no more than five (5) (or such greater number as shall be mandated by applicable determination of the Securities and Exchange Commission) rental agents approved (which

approval shall not be unreasonably withheld) by the Board, at occupancy rates comparable to those at similar hotels in New York City.

(c)      All units shall be similarly furnished and decorated.  The Condominium Documents shall prohibit each Unit Owner from decorating its Unit with any personal furnishings and/or decorations.  All decisions as to the furnishing and decorations of individual Units shall be made by the declarant prior to the date on which the Condominium is established for the Subject Premises and by the Condominium thereafter, and no Unit Owner shall have any discretion as to the furnishings of the individual Unit(s) it owns.

243.   Under this restriction, the Unit owner is compelled to use the Unit as an investment property for a large majority of the time.

244.   Indeed, as detailed below, a significant portion of the marketing of the Units centered around the investment returns the Units could provide when not being used by their owners.

245.   The Restrictive Declaration provides for the enforcement of the occupancy restrictions in its section 2.02(a) through a requirement that, among other things, the Condominium report any violations to the DOB and charge any violating Unit owner a financial penalty.

246.   The first "Special Risk" in the Offering Plan, starting on page 1 of the Plan, summarizes the provisions of the Restrictive Declaration and what the Trump Soho will do to comply with its terms.

247.   This "Special Risk" specifies (at pages 1-2) that:

pursuant to the Restrictive Declaration, Hotel Suite Units when not occupied, will be required, to be made available for occupancy on a daily or weekly basis through either (i) the Hotel Management Company [Trump Hotels]; or (ii) a Qualified Broker (a hereinafter defined) and at occupancy rates comparable to those at hotels similar to the Condominium in New York City.  The [Condominium] Board *will maintain a list of five*

First Amended Complaint Page 46

*(5) real estate brokers* licensed in the state of New York that the Board determines satisfy certain minimum objective qualifications . . . [emphasis added].

248. Although the Plan specifies that the Trump Soho will provide Unit owners with a list of five "Qualified Brokers" to act as rental agents in addition to Trump Hotels, in fact the Sponsor and Condominium Board have only been able to find a single company to serve as a Qualified Broker.

249. Further, as detailed below, the marketing of the Trump Soho was exclusively focused on using Trump Hotels as the rental agent.

250. More significantly, as discussed below, the Unit Management Agreement with Trump Hotels (which the By-Laws require all Unit purchasers to enter) provides significant financial disincentives to selecting a Qualified Broker other than Trump Hotels to act as rental agent.

**The Condominium Declaration**

251. The Condominium Declaration is the document that, when filed, establishes the Condominium and which, together with the By-Laws sets forth the mutual rights and responsibilities between the Condominium and its Unit owners.

252. The Offering Plan contained a copy of the Condominium Declaration, which was filed with the City Register on May 6, 2010 under CRFN 2010000153443

253. Under Section 8.1.1 of the Condominium Declaration, repeats the occupancy restrictions of the Restrictive Declaration, though the Condominium Declaration does not repeat the requirement that the Unit be in a rental program of the Management Company or a Qualified Broker.

### The Condominium By-Laws

254.   The Offering Plan also contained a copy of the Condominium's By-Laws, which were filed with the City Register on May 6, 2010 as annexed to the Condominium Declaration.

255.   In contrast to typical condominium By-Laws which provide for the prompt turn-over of control of the condominium's board of directors from the Sponsor to the Unit owners when 50% of the condominium is sold, Article 2 of the Trump Soho's By-Laws provide that Donald Trump, Alex Sapir and Julius Schwarz are designated as the initial board of directors of the Condominium until Condominium's first annual meeting, which may be held as late as one year and 30 days after the first closing of a sale of a Unit, and then the Sponsor has the absolute right to designate a majority of the board of directors of the Condominium until the Sponsor has sold *90%* of its interest in the Condominium Units, for up to a maximum of five years.

256.   Even after the expiration of the period when the Sponsor has the absolute right to designate a majority of the members of the board of directors of the Condominium, the Sponsor may still continue to control the board of directors of the Condominium through voting its interests in any Units it owns.

257.   Further, the Sponsor retains the absolute right to appoint one member of the board for so long as it owns at least two Units.

258.   The By-Laws also set forth many of the numerous fees, charges, and expenses that Unit owners at the Trump Soho are required to pay while they own and occupy their Units.

259. Article 15 of the By-Laws sets forth that the use and occupancy of the Trump Soho is subject to the restrictions contained in the Restrictive Declaration.

260. Article 16 of the By-Laws requires that, at the closing of title to each Unit, the purchaser execute a Unit Management Agreement with the Hotel Management Company, Trump Hotels, in a specified form.

### The Unit Management Agreement

261. The original Offering Plan contained a form of the Unit Management Agreement that each purchaser would be required to execute upon the closing of title to the purchaser's Unit.

262. The Fifth Amendment to the Offering Plan dated July 23, 2008 contained an amended form Unit Management Agreement.

263. The amended form Unit Management Agreement was filed with the City Register on May 6, 2010, as an exhibit to the By-Laws under the same filing as the Condominium Declaration.

264. Under Section 3(a) of the Unit Management Agreement, Trump Hotels is responsible for certain "Mandatory Services", including "establishing room rental rates."

265. The Unit Management Agreement sets forth many more of the numerous fees, charges, and expenses that Unit owners at the Trump Soho are required to pay while they own and occupy their Units.

266. Among the fees payable to Trump Hotels in the Unit Management Agreement is a "Unit Management Fee" under Section 7(a) in the amount of the greater of

$1,000.00 per year or $15.00 per night the Unit is occupied (either by the Unit owner or a hotel guest), each of which is increased by 3% annually.

267.    One significant aspect of this Unit Management Fee is that if Trump Hotels is designated by the Unit owner as the Unit's rental agent, this fee is rebated to the Unit owner, but if the Unit owner employs another "Qualified Broker" as rental agent, the Unit owner becomes fully subject to this fee.

## FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS

### Actual Unit Sales By Date Reported in the May 5, 2010 Amendment

268.    Almost immediately after the Defendants began to offer Trump Soho Units, they began making false and misleading statements regarding the development, and in particular the number and percentage of Units sold.

269.    As discussed below, many of the statements made by the Defendants are shown to be false by reason of an "Affidavit in Support of Declaring the Plan Effective" sworn to by Alex Sapir on March 30, 2010 (the "Sapir Affidavit") filed in connection with the Tenth Amendment to the Offering Plan (accepted for filing and publicly available May 5, 2010), which disclosed the actual number of bona fide Purchase Agreements that the Sponsor had entered into and listed the Unit number and date of each such Purchase Agreement.

270.    The Sapir Affidavit certified that: "As of March 30, 2010, [Purchase] Agreements had been accepted for sixty-two (62) Hotel Suite Units . . . representing 15% of the three hundred ninety-one (391) Hotel Suite Units presently offered under the Plan."

271.   Exhibit A-1 to the Sapir Affidavit identified each of the 62 Unit Purchase

Agreements by Unit number and by the date the Agreement was signed.  Sorting

this information by Agreement Date, the following table shows the number of

Units sold by date, as well as the percentage of Units sold of the total number

then-offered.

| Agreement Date | Unit No. | Units Sold | Total Offered | % Sold | Agreement Date | Unit No. | Units Sold | Total Offered | % Sold |
|---|---|---|---|---|---|---|---|---|---|
| 9/7/2007 | 902 | 1 | | | 10/28/2007 | 2611 | 31 | 413 | 7.51% |
| 9/7/2007 | 1703 | 2 | | | 11/9/2007 | 1004 | 32 | 413 | 7.75% |
| 9/7/2007 | 1803 | 3 | | | 11/13/2007 | 2508 | 33 | | |
| 9/7/2007 | 1805 | 4 | | | 11/13/2007 | 2610 | 34 | 413 | 8.23% |
| 9/7/2007 | 2303 | 5 | | | 11/16/2007 | 2108 | 35 | | |
| 9/7/2007 | 3009 | 6 | 413 | 1.45% | 11/16/2007 | 2805 | 36 | 413 | 8.72% |
| 9/14/2007 | 1402 | 7 | | | 11/28/2007 | 2111 | 37 | | |
| 9/14/2007 | 2003 | 8 | | | 11/28/2007 | 2905 | 38 | 413 | 9.20% |
| 9/14/2007 | 2606 | 9 | | | 12/10/2007 | 3406 | 39 | 413 | 9.44% |
| 9/14/2007 | 3208 | 10 | 413 | 2.42% | 12/14/2007 | 2202 | 40 | | |
| 9/20/2007 | 1102 | 11 | | | 12/14/2007 | 2304 | 41 | | |
| 9/20/2007 | 1903 | 12 | | | 12/14/2007 | 2511 | 42 | 413 | 10.17% |
| 9/20/2007 | 3010 | 13 | | | 12/20/2007 | 1002 | 43 | 413 | 10.41% |
| 9/20/2007 | 3410 | 14 | 413 | 3.39% | 12/27/2007 | 3109 | 44 | 413 | 10.65% |
| 10/4/2007 | 1202 | 15 | | | 1/8/2008 | 3108 | 45 | 413 | 10.90% |
| 10/4/2007 | 1802 | 16 | | | 1/11/2008 | 2411 | 46 | 413 | 11.14% |
| 10/4/2007 | 1811 | 17 | | | 1/28/2008 | 2509 | 47 | 400 | 11.75% |
| 10/4/2007 | 2902 | 18 | | | 2/13/2008 | 2811 | 48 | | |
| 10/4/2007 | 3810 | 19 | | | 2/13/2008 | 3005 | 49 | 400 | 12.25% |
| 10/4/2007 | 3910 | 20 | 413 | 4.84% | 3/22/2008 | 2106 | 50 | 400 | 12.50% |
| 10/9/2007 | 1502 | 21 | | | 4/16/2008 | 2506 | 51 | 400 | 12.75% |
| 10/9/2007 | 2603 | 22 | | | 5/1/2008 | 2505 | 52 | 400 | 13.00% |
| 10/9/2007 | 2702 | 23 | 413 | 5.57% | 5/9/2008 | 2711 | 53 | | |
| 10/16/2007 | 2704 | 24 | 413 | 5.81% | 5/9/2008 | 2705 & 4009* | 54 | 400 | 13.50% |
| 10/23/2007 | 1905 | 25 | | | 5/12/2008 | 3509 | 55 | 400 | 13.75% |
| 10/23/2007 | 2205 | 26 | | | 6/5/2008 | 2405 | 56 | | |
| 10/23/2007 | 2403 | 27 | | | 6/5/2008 | 2806 | 57 | | |
| 10/23/2007 | 3104 | 28 | 413 | 6.78% | 6/5/2008 | 3709 | 58 | 400 | 14.50% |
| 10/25/2007 | 2006 | 29 | | | 7/2/2008 | 3203 | 59 | | |
| 10/25/2007 | 2408 | 30 | 413 | 7.26% | 7/2/2008 | 3309 | 60 | 400 | 15.00% |

| Agreement Date | Unit No. | Units Sold | Total Offered | % Sold |
|---|---|---|---|---|
| 7/23/2008 | 3803 | 61 | 400 | 15.25% |
| 12/4/2008 | 2404 | 62 | 400 | 15.50% |
| 8/19/2009 | ** | 62 | 391 | 15.86% |

\* A note to the Sapir Affidavit explains: "These two units are subject to separate purchase agreements to the same purchaser; however, only one of them is included in the count of 62 units for effectiveness purposes."

\*\* In an August 19, 2009 Amendment to the Offering Plan, the number of units was reduced from 400 to 391. The number of units had been previously reduced from 413 to 400 in an January 25, 2008 Amendment to the Offering Plan.

### Actual Unit Sales By Date Reported to HUD

272.    In addition to the Unit sales reported in the Sapir Affidavit, the Sponsor filed a

series of reports with HUD that stated the Units sold and/or under contract at

various times.

273.    Like the Sapir Affidavit, these HUD reports demonstrate that the Unit Sales

representations made by the Defendants were grossly overstated.

274.    Unlike the Sapir Affidavit, however, these HUD reports were not publicly

disclosed or distributed to purchasers or potential purchasers.

275.    Although they were technically available to an interested persons through the

filing of a Freedom of Information Act with HUD soon after their being filed,

making such a request would be far beyond any reasonable, customary or usual

due diligence conducted by any condominium unit purchaser or the purchaser's

attorneys – indeed such a request would be virtually unprecedented – and the

Defendants never gave any purchaser or potential purchaser any reason to doubt

their statements regarding unit sales levels, nor any reason to make any inquiry of

HUD regarding the Sponsor's filings, causing these HUD filings to be effectively

concealed from Trump Soho purchasers.

276. The Sponsor filed an Annual Report of Activity sworn to before a notary by Julius Schwarz on June 30, 2008 (the "2008 HUD Annual Report") with HUD under a cover letter from Sponsor's counsel dated July 10, 2008.

277. At the time the 2008 HUD Annual Report was filed, the Sponsor was offering 400 units for sale, as indicated by both the then-current Statement of Record filed with HUD and the then-current amended Offering Plan filed with the Attorney General.

278. In the sworn 2008 HUD Annual Report, the Sponsor stated:  "The number of registered units unsold as of June 18, 2008:  292."

279. As the sworn 2008 HUD Annual Report stated that 292 of the then-current 400 units being offered were unsold as of June 18, 2008, the 2008 HUD Annual Report indicated that 108 of those units must have been reported by the Sponsor as sold as of that date.

280. The Sponsor filed the audited Consolidated Financial Statements for the years ended December 31, 2007 and 2006 of the Sponsor and certain affiliated companies (the "2007 Audited Financial Statements") with HUD under a cover letter from Sponsor's counsel dated September 12, 2008.

281. Note 8 to the 2007 Audited Financials Statements states:  "As of December 31, 2007, there were 74 signed contracts to purchase Units."

282. The Sponsor filed the audited Consolidated Financial Statements for the years ended December 31, 2008 and 2007 of the Sponsor and certain affiliated companies (the "2008 Audited Financial Statements") with HUD under a cover letter from Sponsor's counsel dated September 18, 2009.

283. Note 7(e) to the 2008 Audited Financials Statements states: "As of December 31, 2008, there were 122 signed contracts to purchase Units."

284. Accordingly, if the sales representations made to HUD were accurate, the number of contracts signed and sales percentages for the reported dates would be as follows:

| Sales Through: | Contracts Signed | Units Offered | Percentage Sold |
|---|---|---|---|
| December 31, 2007 | 74 | 413 | 17.9% |
| June 18, 2008 | 108 | 400 | 27.0% |
| December 31, 2008 | 122 | 400 | 30.5% |

285. The Defendants have not explained the discrepancy between the sales reported to HUD and those reported to the Attorney General in the Sapir Affidavit, though presumably the signed contracts that were not reported in the Sapir Affidavit did not meet the Attorney General's requirements due to their not being bona fide sales to unrelated parties or to their buyers being in default in the payment of required deposit installments.

286. Although it would be misleading and improper to report sales that were not bona fide sales to unrelated parties or sales in default in the payment of required deposit installments as valid sales, as disclosed in detail below, even if all of the sales reported to HUD were counted, the sales representations made by the Defendants were false and misleading.

**False Statements Made to the Palmer Gardens Plaintiffs**

287.    On January 9, 2008, Rachel Gerstein visited the Trump Soho sales office and Sara

Clephane told her that 30-40% of the Units had been sold.

    a.    Rachel Gerstein justifiably relied on this statement in deciding to enter

into the Purchase Agreement on behalf of Palmer Gardens.

    b.    This statement was false when it was made because, as sworn to in the

Sapir Affidavit, on January 9, 2008 only 10.9% of the Units had been sold.

    c.    This statement is further shown to be false when it was made because, as

shown in the 2007 Audited Financial Statements, as of December 31, 2007

only 74 Units (representing 17.9% of the 413 Units then being offered)

had sold and as sworn to in the 2008 HUD Annual report, as of June 18,

2008, only 108 Units (representing 27% of the 300 Units then being

offered) had been sold.

288.    In her January 9, 2008 visit to the Trump Soho sales office, Rachel Gerstein was

told by Sara Clephane that buyers were purchasing as many as three to five Units.

    a.    Rachel Gerstein justifiably relied on this statement in deciding to enter

into the Purchase Agreement on behalf of Palmer Gardens.

    b.    This statement was false when it was made because, as sworn to in the

Sapir Affidavit, only one out of the 62 buyers purchased multiple Units

and that one buyer purchased just two Units.

289.    On January 15, 2008, an Associated Press wire service report, which described

the neighborhood opposition to the project, the death of a construction worker and

the violations the project received, stated that the developers boasted there were 3,200 purchase applications for the 400 Units**.**

    a.   The January 15, 2008 article was read and justifiably relied upon by Rachel Gerstein in deciding to enter into the Purchase Agreement on behalf of Palmer Gardens.

    b.   On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the number of purchase applications.

    c.   On information and belief, the information that there were 3,200 purchase applications for the 400 Units was provided to the Associated Press by the Sponsor or a representative or agent of the Sponsor.

    d.   On information and belief, the information regarding the number of purchase applications was false and misleading when it was made.  The basis for this belief is that on January 15, 2008, only 11.14% of the Units had been sold according to the Sapir Affidavit and, if there were such a waiting list, it is reasonable to believe that a much higher percentage of Units would have been sold at that time or shortly thereafter.

    e.   This statement is further shown to be false when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units (representing 17.9% of the 413 Units then being offered) had sold and as sworn to in the 2008 HUD Annual report, as of June 18, 2008, only 108 Units (representing 27% of the 300 Units then being offered) had been sold.

290.   On January 25, 2008, Sara Clephane told Rachel Gerstein that certain lines were almost sold out.

    a.   Rachel Gerstein justifiably relied on this statement in deciding to enter into the Purchase Agreement on behalf of Palmer Gardens.

    b.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, none of the lines of Units was even close to being sold out.

291.   On or shortly before January 28, 2008, Rachel Gerstein signed the Purchase Agreement on behalf of Palmer Gardens, and she, Joyce Gerstein and Herbert Gerstein paid the Initial Deposit funds in reliance on the false statements that had been made to Rachel Gerstein.

292.   Had the false statements identified herein not been made to and justifiably relied upon by Rachel Gerstein, she, Joyce Gerstein and Herbert Gerstein would not have agreed to purchase the Unit and Palmer Gardens would not have entered into the Purchase Agreement.

293.   A March 30, 2008 *New York Magazine* article related to the history and problems with the Trump Soho development, described the Trump Soho sales process in detail, and stated that the author was told by a Trump Soho representative that the building was 60% sold.

    a.   This article was read and justifiably relied upon by Rachel Gerstein in deciding to pay the Additional Deposit on behalf of Palmer Gardens.

b. On information and belief, the Trump Soho sales agents, or other agents of the Sponsor, discussed in the article provided the author with the information that the building was 60% sold.

c. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on March 30, 2008 only 12.5% of the Units had been sold.

d. This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

294. A June 2, 2008 article in *The Real Deal* about international buyers at Trump Soho and William Beaver House, stated that Rodrigo Nino said 58% of the Trump Soho Units were under contract**.**

a. This article was read and justifiably relied upon by Rachel Gerstein in deciding to pay the Additional Deposit on behalf of Palmer Gardens.

b. On information and belief, Rodrigo Nino told the author of the article that 58% of the Trump Soho Units were under contract.

c. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on June 2, 2008 only 13.75% of the Units were under contract.

d. This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

295.    A June 26, 2008 a Reuters wire service article, which described how the weak
dollar has attracted foreign buyers to Trump Soho, stated that Ivanka Trump said
60% of the Units were sold.

    a.    This article was read and justifiably relied upon by Rachel Gerstein in
deciding to pay the Additional Deposit on behalf of Palmer Gardens.

    b.    On information and belief, Ivanka Trump told the author of the article the
statement that 60% of the Units were sold.

    c.    This statement was false when it was made because, as sworn to in the
Sapir Affidavit, by June 27, 2008 only 14.5% of the Units had been sold.

    d.    This statement is further shown to be false when it was made because, as
sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108
Units (representing 27% of the 400 Units then being offered) had been
sold and as shown in the 2008 Audited Financial Statements, as of
December 31, 2008, only 122 Units (representing 30.5% of the 400 Units
then being offered) had been sold.

    e.    This article has remained posted on the Trump Soho website through the
date of this First Amended Complaint.

296.    On July 17, 2008, Sara Clephane e-mailed Rachel Gerstein and told her that her
Unit's line was "pretty much sold out."

    a.    Rachel Gerstein justifiably relied on this statement in deciding to pay her
Additional Deposit.

    b.    This statement was false when it was made because, as sworn in the Sapir
Affidavit, on this date, only 7 of the 34 Units in the "09" line were sold.

297.   On or about July 28, 2008, Palmer Gardens paid its Additional Deposit in reliance on the false statements made to Rachel Gerstein.

298.   Had the false statements identified herein not been made and justifiably relied upon by Rachel Gerstein, she, Joyce Gerstein, Herbert Gerstein and Palmer Gardens would not have paid Palmer Gardens' Additional Deposit.

### False Statements Made to the Maltz Plaintiffs

299.   On September 20, 2007, Sara Clephane, Director of Sales, e-mailed Alan Maltz stating that "We open to the public today. The demand is overwhelming. We have 1,400 people on a wait list."

   a.   Alan Maltz justifiably relied on this statement in deciding to enter into his Purchase Agreement.

   b.   On information and belief, Sara Clephane's statement regarding the waiting list was false and misleading when it was made. The basis for this belief is that on September 20, 2007, as sworn to in the Sapir Affidavit, only 3.39% of the Units had actually been sold and if there was such a waiting list, it is reasonable to believe that a much higher percentage of Units would have been sold at that time or shortly thereafter.

   c.   Further, on information and belief, the information regarding the number of purchase applications was false and misleading when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units had sold, and if there were such a waiting list, it is reasonable to believe that a much higher number of Units would have been sold at that time or shortly thereafter.

300. In September of 2007, Sara Clephane orally told Alan Maltz that approximately 70% of the Units had been sold.

    a. Alan Maltz justifiably relied on this statement in deciding to enter into his Purchase Agreement.

    b. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on September 20, 2007, contracts for only 3.39% of the Units had been signed.

    c. This statement is further shown to be false when it was made because, as shown by the 2007 Audited Financial Statements, as of December 31, 2007, only 74 Units (representing 17.9% of the 400 Units then being offered) had been sold

301. On or shortly before October 25, 2007, Alan Maltz and Janet Maltz signed the Purchase Agreement in reliance on the false statements that had been made to Alan Maltz.

302. Had the false statements identified herein not been made to and justifiably relied upon by Alan Maltz, he and Janet Maltz would not have entered into the Purchase Agreement.

303. On or about April 25, 2008, Alan Maltz and Janet Maltz paid their Additional Deposit in reliance on the false statements made to Alan Maltz.

304. Had the false statements identified herein not been made to and justifiably relied upon by Alan Maltz, he and Janet Maltz would not have paid their Additional Deposit.

**False Statements Made to the Tsai -Singh Plaintiffs**

305.   On or shortly before September 7, 2007, Hubert Tsai and Anthony Tsai signed the Purchase Agreement.

306.   In early March of 2008, a Trump Soho sales representative told Hubert Tsai that the building was selling faster than expected and that approximately 50% of the Units have already been sold.

   a.   Hubert Tsai justifiably relied on this statement in deciding to pay his Additional Deposit.

   b.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on March 22, 2008 only 12.5% of the Units had been sold.

   c.   This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

307.   On or about March 7, 2008, Hubert Tsai and his brother, Anthony Tsai, paid their Additional Deposit in reliance on the false statements made to Hubert Tsai.

308.   Had the false statements identified herein not been made to and justifiably relied upon by Hubert Tsai, he would not have paid his additional deposit.

309.   On April 7, 2008, Prodigy emailed Hubert Tsai an excerpt from an article entitled "Trump Soho Condominium Outpacing Sales Predictions" in which Rodrigo Nino was quoted as saying that since sales commenced in September of 2007, global buyers had purchased nearly 53% of the building.

    a.   On information and belief, Rodrigo Nino told the author of the article excerpted that, since sales commenced in September of 2007, global buyers had purchased nearly 53% of the building.

    b.   Christine Singh justifiably relied upon this statement in deciding to purchase Anthony Tsai's rights and obligations under the Purchase Agreement.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on April 7, 2008 only 12.5% of the Units had been sold.

    d.   This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

310.   A June 26, 2008 a Reuters wire service article, which described how the weak dollar has attracted foreign buyers to Trump Soho, stated that Ivanka Trump said 60% of the Units were sold.

    a.   This article was read and justifiably relied upon by Christine Singh in deciding to purchase Anthony Tsai's rights and obligations under the Purchase Agreement.

    b.   On information and belief, Ivanka Trump told the author of the article the statement that 60% of the Units were sold.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, by June 27, 2008 only 14.5% of the Units had been sold.

d.  This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold and as shown in the 2008 Audited Financial Statements, as of December 31, 2008, only 122 Units (representing 30.5% of the 400 Units then being offered) had been sold.

e.  This article has remained posted on the Trump Soho website through the date of this First Amended Complaint.

311.  Effective as of May 15, 2008 (by documents signed in September 2008), Anthony Tsai assigned his rights and obligations under the Purchase Agreement to Christine Singh, who agreed to assume those rights and obligations and to pay Anthony Tsai his share of the Deposit in reliance on the false statements made to Hubert Tsai.

312.  Had the false statements identified herein not been made, and not justifiably relied upon by Christine Singh, she would not have assumed the rights and obligations under the Purchase Agreement of Anthony Tsai and would not have paid Anthony Tsai for his share of the Deposit.

**False Statements Made to the Feng-Meckel-Gross Plaintiffs**

313.  In October and November 2007, prior to agreeing to purchase Unit 2202, Randall A. Meckel orally and by e-mail inquired of Thomas Postilio about the availability of at least 10 separate Units (Units 806, 808, 811, 1004, 1111, 1611, 1802, 2011, 2211 and 2611), and was advised by Thomas Postilio that each of these Units had already been sold.

    a.   However, as sworn to in the Sapir Affidavit, all but one of these Units (Unit 1004) were in fact unsold at the time Thomas Postilio told Randall A. Meckell that the Units were already sold.

    b.   Randall A. Meckel justifiably relied on these statements of Thomas Postilio's regarding Units that had been sold and agreed to purchase Unit 2202 at a price higher than those listed for other Units.

314.   In early November of 2007, Thomas Postilio told Randall A. Meckel, who was visiting the Trump Soho Sales Office, that over 30% of the Units had been sold.

    a.   Randall A. Meckel justifiably relied on this statement in deciding to enter into a Purchase Agreement.

    b.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on November 9, 2007, only 7.75% of the Units had been sold.

    c.   This statement is further shown to be false when it was made because, as shown by the 2007 Audited Financial Statements, as of December 31, 2007, only 74 Units (representing 17.9% of the 400 Units then being offered) had been sold.

315.   Prior to signing their Purchase Agreement on or before December 14, 2007, a Trump Soho representative stated to Randall A. Meckel that over 50% of the Units had been sold.

    a.   Randall A. Meckel justifiably relied on this statement in deciding to enter into a Purchase Agreement.

b. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on December 14, 2007, only 10.17% of the Units had been sold.

c. This statement is further shown to be false when it was made because, as shown by the 2007 Audited Financial Statements, as of December 31, 2007, only 74 Units (representing 17.9% of the 400 Units then being offered) had been sold.

316. On or shortly before December 14, 2007, Xue Feng, Randall A. Meckel and Henry Gross signed their Purchase Agreement in reliance on the false statements made to Randall A. Meckel.

317. Had the false statements identified herein not been made to and justifiably relied upon by Randall A. Meckel, he, Xue Feng and Henry Gross would not have entered into the Purchase Agreement.

318. A February 13, 2008 *Curbed NY* article about international and domestic purchasers stated that, according to Sales Director Rodrigo Nino, 53% of the Units had been sold

a. This article was read and justifiably relied upon by Randall A. Meckel in deciding to pay the Additional Deposit for the Unit he purchased with Xue Feng and Henry Gross.

b. The *Curbed NY* article referenced a February 12, 2008 *New York Observer* article (discussed below) as the source of the information provided by Rodrigo Nino.

    c.   On information and belief, Rodrigo Nino told the author of the *New York Observer* article that 53% of the Units had been sold.

    d.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on February 12, 2008, only 12.25% of the Units had been sold.

    e.   This statement is further shown to be false when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units (representing 17.9% of the 413 Units then being offered) had sold and as sworn to in the 2008 HUD Annual report, as of June 18, 2008, only 108 Units (representing 27% of the 300 Units then being offered) had been sold.

319.   A March 5, 2008 article in *The Villager* about the hearing before the New York City Board of Standards and Appeals on the New York City Department of Building's decision to grant the project a building permit, stated that 53% of the 400 Units were sold.

    a.   This article was read and justifiably relied upon by Randall A. Meckel in deciding to submit the Additional Deposit for the Unit he purchased with Xue Feng and Henry Gross.

    b.   On information and belief, the Defendants (either directly or through statements to other publications) provided *The Villager* with the information that 53% of the 400 Units were sold.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on March 5, 2008 only 12.25% of the Units had been sold.

d. This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

320. On or about June 14, 2008, Xue Feng, Randall A. Meckel and Henry Gross paid their Additional Deposit in reliance on the false statements made to Randall A. Meckel.

321. Had the false statements identified herein not been made to and justifiably relied upon by Randall A. Meckel, he, Xue Feng and Henry Gross would not have paid their Additional Deposit.

## False Statements Made To The Beaver Metal Plaintiffs

322. On or about April 8, 2008, Acacio Rodriguez and Javier Rodriguez attended the SIMA (Madrid Real Estate Exhibition International) where they met with Ferran Fontal of Baobab 3i.

323. At the SIMA, Ferran Fontal provided Acacio Rodriguez and Javier Rodriguez with a brochure that contained, among other things, certain financial projections.

a. The financial projections stated that the project would have a Return on Investment of 76.83%, an Internal Return Rate of 19.3%, and other detailed financial information.

b. These statements were false when they were made because they were unrealistic, not based on reasonable and/or supportable assumptions, and were made without justification.

First Amended Complaint Page 68

c. These statements were made without any disclaimers about relying on forward-looking information.

d. These statements were justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

324. On April 15, 2008, Javier Cerro Diaz, International Sales Manager at Baobab 3i, emailed, among other things, financial projections to Acacio Rodriguez and Javier Rodriguez.

a. The financial projections stated that the project would have a Return on Investment of 153%, an Internal Return Rate of 80%, and other detailed financial information.

b. These statements were false and/or misleading when they were made because they were unrealistic, not based on reasonable and/or supportable assumptions, and were made without justification.

c. These statements were made without any disclaimers about relying on forward-looking information.

d. These statements were justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

325. In April of 2008, Acacio Rodriguez contacted Marcela Carrillo, who informed him that more than 70% of the Units had been sold.

    a.   This statement was justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

    b.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on April 16, 2008 only 12.75% of the Units had been sold.

    c.   This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

326.   The April 2008 issue of *In the World Magazine*, a Spanish real estate promotion magazine, published an article that quoted Donald Trump as stating that Spanish purchasers had invested $250 million of the $800 million total offering, which implied that at least 31% of the Units had already been sold.

    a.   This statement was read and justifiably relied upon by Acacio Rodriguez and Javier Rodriguez in deciding to enter into the Purchase Agreement on behalf of Beaver Metal, LLC.

    b.   On information and belief, Donald Trump told the author of the article that Spanish purchasers had invested $250 million of the $800 million total offering.

    c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on April 16, 2008 only 12.75% of the Units had been sold.

    d.   This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108

Units (representing 27% of the 400 Units then being offered) had been
sold.

e.   This statement is also false in that, on information and belief, the total
amount of money actually invested in the Trump Soho through the date of
the Sapir Affidavit was less than $30 million.

327.   A June 29, 2008 article in *The London Times*, which described the Trump Soho
project and the Trump children's involvement in the project, stated that Ivanka
Trump said 60% of the Units were sold.

a.   This article was read and justifiably relied upon by Acacio Rodriguez and
Javier Rodriguez in deciding to enter into the Purchase Agreement on
behalf of Beaver Metal, LLC.

b.   On information and belief, Ivanka Trump told the author of the article that
60% of the Units were sold.

c.   This statement was false when it was made because, as sworn to in the
Sapir Affidavit, on June 29, 2008 only 14.5% of the Units had been sold.

d.   This statement is further shown to be false when it was made because, as
sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108
Units (representing 27% of the 400 Units then being offered) had been
sold.

328.   On or shortly before July 2, 2008, Javier Rodriguez signed the Purchase
Agreement on behalf of Beaver Metal, LLC in reliance on the false statements
made to Javier Rodriguez and Acacio Rodriguez.

First Amended Complaint Page 71

329.  Had the false statements identified herein not been made to and justifiably relied upon by Acacio Rodriguez, he would not have agreed to purchase the Unit and Beaver Metal would not have entered into the Purchase Agreement.

330.  On or about December 2, 2008, Beaver Metal, LLC submitted its Additional Deposit in reliance on the false statements made to non-party Javier Rodriguez and Acacio Rodriguez.

331.  Had the false statements identified herein not been made to and justifiably relied upon by Acacio Rodriguez, he and Beaver Metal would not have paid the Second Deposit.

**False Statements Made to the Credibox Plaintiffs**

332.  In November of 2007, an article in *Magnate Inmobiliario*, a Spanish publication discussing Spanish investment in Trump Soho, stated that 15% of the Units at Trump Soho had been purchased by Spanish individuals and companies, and that a total of 53% of the Units had been sold.

 a.  Felisa Hernandez read and justifiably relied on this statement in deciding to enter into the Purchase Agreement on behalf of Credibox.

 a.  On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the percentage of Units purchased by Spanish individuals and companies and overall sales percentage.

 b.  On information and belief, the Sponsor or the Sponsor's representatives or agents directly or indirectly provided *Magnate Inmobilario* with the information that 15% of the Units at Trump Soho had been purchased by

Spanish individuals and companies, and that a total of 53% of the Units had been sold.

c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, through November, 2007, only 9.2% of the Units had been sold.

d.   This statement is further shown to be false when it was made because, as shown by the 2007 Audited Financial Statements, as of December 31, 2007, only 74 Units (representing 17.9% of the 413 Units then being offered) had been sold.

333.   A March 18, 2008 article in *Calculadora de Hipotecas*, a Spanish publication, stated that Trump Soho had already attracted 98 million Euros from Spain and that 15% of the Units had been purchased by Spanish individuals and companies.

a.   This article was read and justifiably relied upon by Felisa Hernandez in deciding to sign the Purchase Agreement on behalf of Credibox.

a.   On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the amount of investment from Spain and the percentage of Units purchased by Spanish individuals and companies.

b.   On information and belief, the Sponsor or the Sponsor's representatives or agents directly or indirectly provided *Calculadora de Hipotecas* with the information that 15% of the Units at Trump Soho had been purchased by Spanish individuals and companies.

First Amended Complaint Page 73

c.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on March 18, 2008, only 12.25% of the Units had been sold.

d.   This statement was also false when it was made in that, on information and belief, the total amount of money actually invested in the Trump Soho through the date of the Sapir Affidavit was less than $30 million.

334.   On July 3, 2008, an article in *Periodista Digital*, a Spanish publication, stated Spanish investors had invested about 98.5 million Euros in Trump Soho, and that 15% of the Units had been purchased by Spanish buyers.

a.   This article was read and justifiably relied upon by Felisa Hernandex in deciding to enter into the Purchase Agreement on behalf of Credibox.

b.   On information and belief, the Sponsor and representatives and agents of the Sponsor would be the only persons who could provide information regarding the amount of investment from Spain and the percentage of Units purchased by Spanish individuals and companies.

c.   On information and belief, the Sponsor or the Sponsor's representatives or agents directly or indirectly provided *Periodista Digital* with the information that Spanish investors had invested about 98.5 million Euros in Trump Soho and that 15% of the Units at Trump Soho had been purchased by Spanish buyers.

d.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on July 3, 2008, only 15% of all the Units had been sold.

    e.   This statement was also false when it was made in that, on information and belief, the total amount of money invested actually invested in the Trump Soho through the date of the Sapir Affidavit was less than $30 million.

335.   Prior to entering into the Purchase Agreement on or shortly before August 2, 2008 on behalf of Credibox, Felisa Hernandez was told by Sandra Dominguez that 50% of the Units had been sold.

    a.   This statement was justifiably relied upon by Felisa Hernandez in deciding to enter into the Purchase Agreement on behalf of Credibox.

    b.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, prior to August 2, 2008, only 15.25% of the Units had been sold.

    c.   This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

336.   On or shortly before August 2, 2008, Felisa Hernandez signed the Purchase Agreement on behalf of Credibox in reliance on the false statements made to her.

337.   Had the false statements identified herein not been made to and justifiably relied upon by Felisa Hernandez, she would not have agreed to purchase the Unit and Credibox would not have entered into the Purchase Agreement.

**False Statements Made to the Sultan-Represented Plaintiffs**

338.   Prior to when his clients signed the Purchase Agreements on or shortly before September 20, 2007 and October 4, 2007, Michael Sultan was told by Sandra Dominguez that at least 2,500 letters of intention had been signed.

   a.   Michael Sultan justifiably relied upon this statement in advising Michael Hadjedj and Oliver Dacourt to enter into their Purchase Agreements, and , Michael Hadjedj and Oliver Dacourt justifiably relied on Michael Sultan in entering into such Purchase Agreements.

   b.   On information and belief, Sandra Dominguez's statement regarding the letters of intention was false and misleading when it was made.  The basis for this belief is that on September 20, 2007, as sworn to in the Sapir Affidavit, only 3.39% of the Units had actually been sold and if there was such a waiting list, it is reasonable to believe that a much higher percentage of Units would have been sold at that time or shortly thereafter.

   c.   Further, on information and belief, the information regarding the number of purchase applications was false and misleading when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units had sold, and if there were such a waiting list, it is reasonable to believe that a much higher number of Units would have been sold at that time or shortly thereafter.

339.   In January of 2008, Sandra Dominguez told Michael Sultan that 55% of the Units had been sold.

   a.  Michael Sultan justifiably relied upon this statement in advising Michael Hadjedj and Oliver Dacourt to submit Additional Deposits, and , Michael Hadjedj and Oliver Dacourt justifiably relied on Michael Sultan in submitting such Additional Deposits

   a.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on January 28, 2008, only 11.75% of the Units had been sold.

   b.  This statement is further shown to be false when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units (representing 17.9% of the 413 Units then being offered) had sold and as sworn to in the 2008 HUD Annual report, as of June 18, 2008, only 108 Units (representing 27% of the 300 Units then being offered) had been sold.

**Additional False Statements to the Press and Reliance by Plaintiffs**

340.  On September 19, 2007, the Trump Soho held its sales kickoff gala, about which a September 27, 2007, a *Daily News* article reporting on the event quoted Donald Trump as stating: "We already have a 3,200 person waiting list to see the Units."

   a.  On information and belief, Donald Trump told the author of the article that there was a 3,200 person waiting list to see the Units.

   b.  On information and belief, the allegations regarding the waiting list were false and misleading when they were made.  The basis for this belief is that on that date, only 2.42% of the Units had been sold according to the

Sapir Affidavit and if there was such a waiting list, a much higher

percentage of Units would have been sold at that time or shortly thereafter.

c.    Further, on information and belief, the information regarding the waiting

list was false and misleading when it was made because, as shown in the

2007 Audited Financial Statements, as of December 31, 2007 only 74

Units had sold, and if there were such a waiting list, it is reasonable to

believe that a much higher number of Units would have been sold at that

time or shortly thereafter.

341.    The same September 27, 2007 *Daily News* article covering the September 19,

2007 kickoff gala quoted Shaun Osher as stating that fifty contracts had been

signed so far.

a.    On information and belief, Shaun Osher told the author of the article that

fifty contracts had been signed so far.

b.    This statement was false when it was made because, as sworn to in the

Sapir Affidavit, on September 19, 2007, only 10 Unit contracts had been

signed.

c.    This statement is further shown to be false when it was made because, the

Sapir Affidavit identifies 34 contracts that were signed between

September 20, 2007 and December 31, 2007, and the 2007 Audited

Financial Statements show that, as of December 31, 2007, only 74 total

Units (representing 17.9% of the 413 Units then being offered) had been

sold, meaning that no more than 40 contracts could possibly have been

signed on September 19, 2007.

342. An October 14, 2007 *New York Times* article describing the Trump Soho project reported Donald Trump had stated there were 3,200 purchase applications for the 400 Units.

    a. On information and belief, Donald Trump told the author of the article that there were 3,200 purchase applications for the 400 Units to the author of the article.

    b. On information and belief, the allegations regarding the number of purchase applications were false and misleading when they were made. The basis for this belief is that on October 14, 2007, only 5.57% of the Units had been sold according to the Sapir Affidavit and if there was such a waiting list, a much higher percentage of Units would have been sold at that time or shortly thereafter.

    c. Further, on information and belief, the information regarding the number of purchase applications was false and misleading when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units had sold, and if there were such a waiting list, it is reasonable to believe that a much higher number of Units would have been sold at that time or shortly thereafter.

343. A February 12, 2008 article in *The New York Observer* about foreign purchasers and the purchase of a Unit by an internationally famous soccer player stated that Rodrigo Nino said 53% of the Units were sold.

    a. This article was excerpted and Rodrigo Nino's statement was reprinted in a February 13, 2008 *Huffington Post* article.

b. This article was excerpted and Rodrigo Nino's statement was reprinted in a February 13, 2008 *Curbed NY* article.

c. On information and belief, Rodrigo Nino told the author of the article that 53% of the Units were sold.

d. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on February 12, 2008, only 12.25% of the Units had been sold.

e. This statement is further shown to be false when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units (representing 17.9% of the 413 Units then being offered) had sold and as sworn to in the 2008 HUD Annual report, as of June 18, 2008, only 108 Units (representing 27% of the 300 Units then being offered) had been sold.

344. A February 22, 2008 *Daily News* article about Alex Sapir quoted Alex Sapir as stating that the Trump Soho was 53% sold.

a. On information and belief, Alex Sapir told the author of the article that the Trump Soho was 53% sold.

b. This statement was false when it was made because, as sworn to in the Sapir Affidavit, on February 22, 2008, only 12.25% of the Units had been sold.

c. This statement is further shown to be false when it was made because, as shown in the 2007 Audited Financial Statements, as of December 31, 2007 only 74 Units (representing 17.9% of the 413 Units then being offered)

had sold and as sworn to in the 2008 HUD Annual report, as of June 18, 2008, only 108 Units (representing 27% of the 300 Units then being offered) had been sold.

    d.  This article has remained posted on the Trump Soho website through the date of this First Amended Complaint.

345.  An April 11, 2008 *Daily News* article about Rodrigo Nino and Prodigy International's sales of New York condominiums units to foreign buyers, stated that, according to Rodrigo Nino, 50% of the Trump Soho Units had been sold.

    a.  On information and belief, Rodrigo Nino told the author of the article that 50% of the Units were sold.

    b.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on April 11, 2008 only 12.50% of the Units had been sold.

    c.  This statement is further shown to be false when it was made because, as sworn to in the 2008 HUD Annual Report, as of June 18, 2008, only 108 Units (representing 27% of the 400 Units then being offered) had been sold.

346.  A September 5, 2008 *Downtown Express* article reporting that construction had resumed at Trump Soho after a partial stop-work order was lifted, stated that Julius Schwarz, of the Bayrock Group, said the Condominium was more than half sold.

    a.  On information and belief, Julius Schwarz provided the information in the article that the Condominium was more than half sold.

    b.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, on September 5, 2008 only 15.25% of the Units had been sold.

    c.   This statement is further shown to be false when it was made, as shown by the 2008 Audited Financial Statements, as of December 31, 2008 only 122 Units (representing 30.5% of the 400 units then being offered) had been sold.

347.   A January 29, 2009 *New York Post* article quoted Rodrigo Nino as stating that 270 Units, or about 67% of the 400 total Units have been sold.

    a.   On information and belief, Rodrigo Nino told the author of the article that 270 Units, or about 67% of the 400 total Units have been sold.

    b.   This statement was false when it was made because, as sworn to in the Sapir Affidavit, by January 29, 2009, only 62 Units, 15.5% of the total Units, had been sold.

    c.   This statement is further shown to be false when it was made because, as shown in the 2008 Audited Financial Statements, as of December 31, 2008, only 122 Units (representing 30.5% of the 400 Units then being offered) had been sold.

348.   An April 30, 2009 *The Real Deal* article about condominium hotels quoted Donald Trump Jr. as stating that the building was more than 55% sold as of the middle of the prior month.

    a.   This article was excerpted and Donald Trump Jr.'s statement was reprinted in a May 5, 2009 *Curbed NY* article.

b.  On information and belief, Donald Trump, Jr. told the author of *The Real Deal* article that the building was more than 55%.

c.  This statement was false when it was made because, as sworn to in the Sapir Affidavit, on May 5, 2009, only 15.5% of the Units had been sold.

d.  This statement is further shown to be false when it was made because, as shown in the 2008 Audited Financial Statements, as of December 31, 2008, only 122 Units (representing 30.5% of the 400 Units then being offered) had been sold.

349.  In deciding to purchase their Units and submit their Additional Deposits, the Plaintiffs read and justifiably relied upon news stories and publications other than those they specifically recall having read and relied upon at this time.

350.  On information and belief, in deciding to purchase their Units and submit their Additional Deposits, the Plaintiffs read and justifiably relied upon news stories and publications identified above other than the news stories and publications they specifically identify herein as having been read and relied upon by them.

351.  On information and belief, in deciding to purchase their Units and submit their Additional Deposits, the Plaintiffs read and justifiably relied upon news stories and publications which are not identified in this First Amended Complaint but which contain false representations made by the Defendants regarding Unit sales levels, which are similar in substance to the news stories and publications identified above.

352.  None of the Plaintiffs had any reason to believe that any of the statements told to them by any Trump Soho representatives were false, misleading or inaccurate.

353.   Each of the Plaintiffs was fully justified in relying on all statements made to them by Trump Soho representatives in deciding to enter into their respective Purchase Agreements and make their respective Additional Deposits.

354.   None of the Plaintiffs had any reason to believe that any of the statements in news stories and publications attributed to any of the Defendants or any other Trump Soho representatives were false, misleading or inaccurate.

355.   None of the Plaintiffs had any reason to believe that any of the statements in news stories and publications regarding the sales levels or percentages were false, misleading or inaccurate.

356.   As described in detail below, on information and belief, the Sponsor and other Defendants regularly monitored reports on the Trump Soho in news stories and publications, and demanded corrections of certain inaccurate information, but never sought any correction of any false statements regarding sales levels or percentages.

357.   Each of the Plaintiffs was fully justified in relying on all statements made in news stories and publications regarding sales levels or percentages made by or attributed to Defendants or Trump Soho representatives in deciding to enter into their respective Purchase Agreements and make their respective Additional Deposits.

### Reliance On Defendants False Statements by Additional Purchasers

358.   The Plaintiffs herein have identified a consistent pattern of false representations regarding Unit sales levels made by the Defendants and other Trump Soho sales

representatives, both in personal statements and in reports in the press, to induce them to enter into Purchase Agreements and submit their Additional Deposits.

359.    Trump Soho Unit purchasers other than Plaintiffs have reported similar false representations regarding Unit sales made to induce them to enter into Purchase Agreements and submit Additional Deposits.

360.    As such, on information and belief, Trump Soho sales representatives made false representations to purchasers of Units at the Trump Soho other than the Plaintiffs regarding Unit sales levels and unit availability similar in substance to the false sales representative statements identified above, and such purchasers justifiably relied upon such false statements.

361.    On information and belief, in deciding to purchase Units and submit Additional Deposits, purchasers of Units at the Trump Soho other than the Plaintiffs read and justifiably relied upon news stories and publications identified above.

362.    On information and belief, in deciding to purchase Units and submit Additional Deposits, purchasers of Units at the Trump Soho other than the Plaintiffs read and justifiably relied upon news stories and publications, which are not identified in this Complaint, but which contain false representations made by the Defendants regarding Unit sales levels which are similar in substance to the news stories and publications identified above.

363.    On information and belief, had the false statements identified herein and similar false statements of the Defendants not been made to and justifiably relied upon by numerous purchasers of Units at the Trump Soho other than the Plaintiffs, such purchasers would not have entered into Purchase Agreements.

364.  On information and belief, had the false statements identified herein and similar false statements of the Defendants not been made to and justifiably relied upon by numerous purchasers of Units at the Trump Soho other than the Plaintiffs, such purchasers would not have paid Additional Deposits.

365.  Had any of the purchasers of Units in the Trump Soho (whether Plaintiffs or non-Plaintiffs) not entered into their Purchase Agreements, such Purchase Agreements would not have been eligible to be counted among the 62 Units under contract that were identified in the Sapir Affidavit

366.  Had any of the purchasers of Units in the Trump Soho (whether Plaintiffs or non-Plaintiffs) not paid their Additional Deposits, such purchasers' Purchase Agreements would not have been eligible to be counted among the 62 Units under contract that were identified in the Sapir Affidavit

<u>**THE MAY 5, 2010 FILING REVEALING THE FRAUD**</u>

**The Minimum Sales Percentage Under the Martin Act Regulations and the Plan**

367.  Under the authority of the Martin Act, the Attorney General has promulgated binding regulations ("AG Regs.") for the offering of commercial condominium units such as those offered at the Trump Soho.  13 NYCRR Part 20.

368.  Under the AG Regs., "the offer to sell is contingent upon the [Offering] plan's being declared effective and upon compliance with the relevant conditions and time periods described in the offering plan."  13 NYCRR § 20.3(q).

369.  Thus, under the AG Regs., no Trump Soho Unit sale could close until its Offering Plan was declared effective pursuant to the AG Regs.

370.    Under the AG Regs., "the plan may not be declared effective unless bona fide

purchasers, including investors, have signed purchase agreements for at least

fifteen percent (15%) of the units offered under the plan." 13 NYCRR §

20.3(q)(3).

371.    Under the AG Regs., where a purchaser has signed a Purchase Agreement but

defaulted in making a required payment of an Additional Deposit, such Purchase

Agreement may not be counted toward the minimum 15% of units offered

required for plan effectiveness.  13 NYCRR § 20.5(e)(5)(ii)(*c*).

372.    Under the AG Regs.:  "For the purpose of computing the percentage of bona fide

purchasers of units for which purchase agreements have been executed, a

fractional percentage shall be rounded off to the next lower whole number."  13

NYCRR § 20.5(e)(4).

373.    Thus, under the AG Regs., no Trump Soho Unit sale could close until the Sponsor

had signed purchase agreements (not then in default) for at least 15% of the Units

offered under the Plan.

374.    Under the AG Regs., for a Plan to be declared effective, with exceptions

inapplicable here, in addition to meeting the minimum 15% sales percentage, an

Amendment to the Offering Plan must be submitted to and approved by the

Attorney General, which Amendment shall "state the percentage of units being

offered for which sponsor has accepted purchase agreements from bona fide

purchasers", and include an affidavit from the Sponsor which has a "list of the

units which are being counted to meet the minimum percentage that are needed

under the terms of the plan to declare the plan effective."  13 NYCRR § 20.5(e).

375.  Thus, under the AG Regs., no Trump Soho Unit sale could close until an Offering Plan Amendment containing an affidavit disclosing the number and percentage of units with bona fide purchase agreements had been submitted to and approved by the Attorney General.

376.  Where the number of units has been reduced during the course of an offering, the AG Regs. do not specify whether 15% of the original number of units offered or 15% of the reduced number of units offered must have signed purchase agreements for the plan to be declared effective.

377.  The Trump Soho Plan originally offered 413 Units; if 15% of that number is required for the Plan to become effective, a minimum of 62 signed Purchase Agreements would be required to declare the Plan effective.

378.  Further, the Offering Plan states, on page 102 that:

> The Plan will be declared effective, at Sponsor's option, when bona fide Agreements (including those executed by investors) have been executed and are in effect with respect to not less than 60 Hotel Suite Units.

379.  Although the Plan was amended on August 19, 2009 to reduce the number of Units offered to 391 (15% of which is 59 units), no Offering Plan amendment changed the minimum 60 units required to declare the Plan effective contained at page 102 of the original Plan.

380.  Thus, under the AG Regs. and the Plan, no Trump Soho Unit sale could close until the Sponsor had obtained signed Purchase Agreements (not then in default) from bona fide purchasers for at least 60 (and possibly 62) of the Units.

381.  Under the AG Regs. an offering plan is required to:  "State when sponsor expects the first closing of a unit to occur which should correspond to the first year of

operation projected in Schedule B. State that if such date is delayed twelve (12) months or more, purchasers will be offered rescission."  13 NYCRR § 20.3(o)(12).

382.   The Trump Soho Offering Plan specifies (on page 97) that:

> if . . . the First Closing does not occur within 12 months after June [1,] 2009, the date set forth in Schedule B as the commencement date for the projected First Year of Condominium Operations, then . . . the Sponsor will offer all Purchasers (other than Purchasers who are then in default under their Agreements, if the Plan has been declared effective) the right to rescind their Agreements . . . . Purchasers electing rescission pursuant to such offer will have their Deposits and any interest accrued thereon returned."

383.   Thus, under the AG Regs. and the Offering Plan, if the Sponsor had not obtained signed Purchase Agreements from bona fide purchasers (not then in default) for at least 60 (and possibly 62) of the Units on or before May 31, 2010, the Sponsor would have been required to offer rescission and a full refund of all Deposits to each of the purchasers at the Trump Soho.

384.   Accordingly, under the AG Regs. and the Offering Plan, if just three (and possibly just one) of the 62 actual purchasers of Trump Soho Units had either not signed their Purchase Agreements or defaulted in the payment of their Additional Deposits on or before May 31, 2010, the Sponsor would have been required to offer rescission and a full refund of all Deposits to each of the purchasers at the Trump Soho.

385.   As discussed in detail throughout this Complaint, the Purchasing Plaintiffs were induced by fraud and deceptive sales practices to enter into their Purchase Agreements and to submit their Additional Deposits.

386.    As also discussed throughout this Complaint, on information and belief additional purchasers in the Trump Soho (other than the Purchasing Plaintiffs) were induced by fraud and deceptive sales practices to enter into Purchase Agreements for Trump Soho Units and to make Additional Deposits required in such Purchase Agreements.

387.    Had the Purchasing Plaintiffs had not been fraudulently and deceptively induced to enter their Purchase Agreements and make their Additional Deposits, they would not have done so.

388.    On information and belief, had additional purchasers in the Trump Soho (other than the Purchasing Plaintiffs) not been fraudulently and deceptively induced to enter their Purchase Agreements and make their Additional Deposits, many or most of them would not have done so.

389.    Had the Defendants not engaged in their fraudulent and deceptive sales practices, by May 31, 2010, the Sponsor would have had fewer Units under Purchase Agreements (not then in default) than the minimum 15% of total units required by the AG Regs. and the 60 Units required under the Plan, and therefore would have been required to offer each purchaser of a Unit the opportunity to rescind their Purchase Agreement and obtain a full refund of their Deposits.

390.    Had the Purchasing Plaintiffs been offered the opportunity to rescind their Purchase Agreements, they each would have exercised such opportunity and obtained a full refund of their Deposits.

**The Effectiveness Amendment and the Sapir Affidavit**

391.   On or about April 2, 2010, the Sponsor submitted the Tenth Amendment to the Offering Plan for the Trump Soho to the Attorney General.

392.   The Tenth Amendment stated that its purpose was "to declare the Plan to be effective and to extent the term of the offering under the Plan."

393.   The Attorney General accepted this Tenth Amendment for filing on May 5, 2010.

394.   On information and belief, on or shortly after May 5, 2010, the Sponsor distributed the Tenth Amendment to all Unit purchasers, as required under the AG Regs.

395.   As required by the AG Regs., the Tenth Amendment included an affidavit stating the number of bona fide Purchase Agreements that were in effect and listing the unit numbers and date of each such Purchase Agreement.

396.   Specifically, the Tenth Amendment included a copy of the Sapir Affidavit, which is described above and which disclosed that only 62 of the Trump Soho Units had been sold.

397.   Prior to the public release of the Sapir Affidavit on or about May 5, 2010, neither the Sponsor nor any other Defendant had publicly disclosed the actual number of units sold.

398.   Prior to the public release of the Sapir Affidavit on or about May 5, 2010, no Trump Soho purchaser exercising reasonable diligence would have been able to determine the actual number of units sold.

399.   Prior to the public release of the Sapir Affidavit on or about May 5, 2010, no Trump Soho purchaser exercising reasonable diligence would have been able to

discover the falsity of the Defendants' representations regarding the number and percentage of Trump Soho Units sold described above.

400.     Although the 2007 Audited Financial Statements, the 2008 HUD Annual Report and the 2008 Audited Financial Statements were filed with HUD prior to May 5, 2010, they were never publicly released and the information therein was not publicly disclosed or distributed (and there was no any law or regulation requiring public disclosure or distribution).

401.     Although the 2007 Audited Financial Statements, the 2008 HUD Annual Report and the 2008 Audited Financial Statements could have been discovered after their filing had an interested person made a Freedom of Information Act request to HUD, the Sponsor and its representatives never gave any purchaser or potential purchaser any reason to doubt their statements regarding Unit sales levels, nor any reason to make any inquiry of HUD regarding the Sponsor's filings.

402.     Further, a Freedom of Information Act request of HUD regarding the Sponsor's filings would go far beyond any reasonable, customary or usual due diligence conducted by any condominium unit purchaser or the purchaser's attorneys – indeed such a request would be virtually unprecedented.

403.     As such, no Trump Soho purchaser using reasonable diligence would have discovered the 2007 Audited Financial Statements, the 2008 HUD Annual Report and the 2008 Audited Financial Statements.

### The Drastic Staff Cuts Revealed in the Tenth Amendment

404.     Each Purchase Agreement expressly provides that the Plan (defined in ¶ 1 to include all amendments filed prior to the date of the Purchase Agreement) "is

incorporated herein by reference and made a part hereof with the same force and

effect as if set forth herein at length.  In the event of any inconsistency between

the provisions of this Agreement and the Plan, the Plan shall govern." (¶ 11.2)

405.   Included in the Plan is a detailed budget for the Condominium, which specifies

not only the payroll budgets by department, but also, for each department, the

exact number of employees for each job title to be hired.  (Plan, pages 73-81)

406.   For example, the Plan showed that the Property Operation and Maintenance

department would have 29 employees as follows:   1 Manager, 1 Assistant

Manager, 1 Coordinator, 8 Lead Mechanics and 18 House Mechanics. (Page 74)

407.   In total, the Plan stated that the Condominium would employ a staff of 213

employees.

408.   The Plan explained the Condominium's staffing needs and costs as follows:

The costs listed here are not anticipated to vary considerably due to
changes from time to time in the levels of hotel occupancy as these costs
are considered to be the core management and service staff necessary to
operate a quality hotel of the size of the Condominium. (Page 72)

409.   Further, the Plan specified that:  "The fitness center will initially be operated by

the Spa Unit Owner."  (Page 78)

410.   Although a slightly revised budget was published in the Third Amendment dated

January 25, 2008, it contained identical staffing levels and allocations as the

staffing specified in the original Plan.

411.   The Third Amendment also repeated the statement that:  "The fitness center will

initially be operated by the Spa Unit Owner."

412.   Each of the Purchase Agreements at issue herein (and indeed all of the 62

Purchase Agreements listed in the Sapir Affidavit) were signed when the budgets

in the original Plan or the Third Amendment were current, and therefore the (identical) staffing levels set out in the original Plan and the Third Amendment were incorporated into the Purchase Agreements and became terms and covenants agreed to by the parties.

413. In the May 5, 2010 Tenth Amendment, issued well after each Purchase Agreement had been signed, there was a budget that showed that the Condominium drastically slashed staffing levels.

414. The staff according to the Plan and the Third Amendment of 213 was cut down by the Tenth Amendment to a total of 159 employees, a reduction of 25.4%.

415. The Tenth Amendment radically reduced many departments.

416. For instance, instead of having 29 employees in the Property Operation and Maintenance department, the Condominium would now hire only 12, 1 Manager, 1 Assistant Manager, and 10 House Mechanics, eliminating the positions of Coordinator and Lead Mechanic entirely.  (Tenth Amendment, Budget, Page 4)

417. Similarly, the Rooms department staff dropped from 70 to 48, and the Security staff dropped from 25 to 18.  (Tenth Amendment, Budget, Pages 3 &9)

418. The three persons Florist staff was eliminated entirely, leaving no internal floral services at the Trump Soho.  (Tenth Amendment, page 1)

419. The Tenth Amendment also specifies that, rather than being operated by the Spa Unit Owner:  "The Fitness Center will be operated by the Condominium and the expenses for such are incorporated into the overall Condominium personnel and maintenance expense budget items."  (Tenth Amendment, Budget, page 7-8)

420.   Despite this change in responsibility for the operation of the Fitness Center, there are no jobs for Fitness Center staff listed in the Tenth Amendment budget.

421.   The change in staffing reflected in the Tenth Amendment, undertaking more responsibilities with less than three-quarters of the staff, reflects a material decrease in the level of services from what the Sponsor agreed to provide to the Plaintiffs in their Purchase Agreements.

422.   Such a reduction in staffing and services constitutes a material breach of each of the Plaintiffs' Purchase Agreements.

423.   The AG Regs. specify with regard to amendments to Offering Plans that:

> If there is a material amendment to the offering plan that adversely affects the purchasers, sponsor must grant purchasers a right of rescission and a reasonable period of time that is not less than fifteen (l5) days after the date of presentation to exercise the right. Sponsor must return any deposit or down payment to purchasers who rescind. 13 NYCRR § 20.5(a)(5).

424.   The Plan provides (at page 177) with respect to amendments to the Plan that:

> All substantive or material revisions will be contained in a duly filed amendment to the Plan.  If there is a material change that adversely affects any Purchasers, Sponsor will grant such Purchasers a right to rescind their respective Agreements by written notice to Sponsor given within fifteen (15) days after the date of presentation of such amendment.  In such event, Sponsor will direct the Escrow Agent to return the Deposit of any Purchasers who duly rescind their Agreement.

425.   The Plan's provision requiring the Sponsor to grant purchasers a right to rescind their Purchase Agreements on a material adverse change was incorporated by reference into each Purchase Agreement.

426.   The decrease in Condominium staffing set forth  in the Tenth Amendment is "a material change that adversely affects . . . Purchasers."

427.    Neither in the Tenth Amendment nor in any document provided to Plaintiffs at or

after the time the Tenth Amendment was distributed did the Sponsor grant the

Plaintiffs or other purchasers a right to rescind their Purchase Agreements.

428.    The Sponsor's failure to grant a right to rescind the Plaintiffs' Purchase

Agreements based on the material adverse change set forth in the Tenth

Amendment constitutes a material breach of each Plaintiff's Purchase Agreement.

## THE DEFENDANTS' FRAUD AND THE MOTIVATION BEHIND IT

### The Need to Project Success through False Statements

429.    To effectively market units in a condominium development like the Trump Soho,

it is necessary to generate initial enthusiasm for the project and create a

continuing perception that the project is a success.

430.    This was particularly true in the case of the Trump Soho, which was burdened by

community opposition and its unique Restrictive Declaration limiting how Units

could be occupied.

431.    Donald Trump is well known in the real estate industry and throughout the world

for marketing his projects with extensive hype and glitz.

432.    The marketing of Trump Soho fit squarely in the Trump mode of marketing,

having been introduced on the 2006 finale of Donald Trump's television show,

*The Apprentice*, and with its sales having been kicked off with an opulent gala

celebration, as described in the September 27, 2007 *Daily News* article and other

press reports.

433.    At the gala, as the *Daily News* reported, Donald Trump made the extravagant claim that there was a 3,200 person waiting list, and Shaun Osher boasted that 50 contracts had already been signed.

434.    Although the Defendants may have expected that Units would sell briskly, it must have quickly become apparent to them that sales would instead be sluggish in the extreme.

435.    In fact, though Shaun Osher claimed 50 contracts had been signed by the time of the September 19, 2007 gala, the Sapir Affidavit shows the Trump Soho did not achieve that number of signed contracts until more than six months later, on March 22, 2008.

436.    In a buyer's decision on whether to buy a condominium unit, the number or percentage of units already sold by the developer is an important consideration.

437.    This is particularly true in a hotel condominium where use as a personal residence is prohibited, and the unit is required to be held as an investment property for the bulk of every year.

438.    As an initial matter, buyers consider robust sales to be strong indication of the development's value and that the units are well priced in the marketplace.

439.    With an untested concept like the Trump Soho and its unique Restrictive Covenant, the fact that a substantial number of previous purchasers had evaluated and approved the development's particulars provides substantial comfort to later purchasers.

440.  More significantly, a substantial portion of the value of  hotel condominium units like the ones at the Trump Soho is bound up in the ability of the purchaser to later resell the unit in the secondary market.

441.  Where the developer cannot sell a high number and percentage of units in its initial offering, it becomes unlikely that a viable secondary sales market will develop.

442.  On the other hand, a high number and percentage of initial unit sales is a good indication that demand for unit resales will develop.

443.  In fact, until the developer completes its initial offering and sells out all of its units, the developer remains in competition with unit purchasers for unit sales.

444.  Indeed the Property Report required by ILSA to be distributed to Trump Soho purchasers expressly cautions: "Resale of your Hotel Suite Unit may be difficult or impossible until our projected sell-out of the condominium, since you may face the competition of our own sales program and local real estate brokers may not be interested in listing your Hotel Suite Unit."

445.  In addition, the higher the percentage of developer ownership in a condominium development, the riskier the investment because of the greater chance and consequences of Sponsor default.

446.  Further, many banks will not lend on condominium units where the ownership is more than 30 or 50 percent.

447.  As a result, had the truth gotten out that the Trump Soho's sales were in fact anemic, selling any further units would have become nearly impossible.

448.   As detailed below, each of the Misrepresenting Defendants had a substantial personal, financial and reputational interest in generating sales of Units for the Trump Soho.

449.   Each of the individual and company sales agents, including Defendants Prodigy, Rodrigo Nino, Core, Shaun Osher, and Thomas Postilio, and non-parties Sara Clephane, Sandra Dominguez, Marcella Carrillo, Baobab 3i, Ferran Fontal and Javier Cerro Diaz, are compensated, on information and belief, wholly or in substantial part by commissions based on Unit sales.  The basis for this information and belief is industry practice in the compensation of real estate sales persons.

450.   Each of the other Defendants has, upon information and belief, a personal financial or equity interest in the Trump Soho and will receive compensation or return on that interest based substantially on the level of Unit sales.  The basis for this information and belief is information regarding each such Defendant set forth above and in the Offering Plan.

451.   By reason of their knowledge and experience in the real estate industry, each Defendant knew, on information and belief, that if the true levels of Unit sales had been revealed, that it would become difficult or impossible to make further Unit sales.

452.   Each Defendant also knew, on information and belief, that because the sales levels had been publicly overstated at the very beginning of the sales process, any statement showing a lower level of sales would reveal the prior falsehood.

453.   Indeed, it became necessary to rapidly increase the level of claimed sales told to the public and to prospective purchasers to give the impression that sales were progressing rapidly.

454.   Further, each Defendant was aware that if Trump Soho failed to sell 15% of the Units by May 31, 2010, the Plan would be declared ineffective under New York law, and if Trump Soho failed to sell 60 Units by that same date, the Plan would be declared ineffective under the terms of the Offering Plan.  The Sponsor would then be required to refund the Deposits of each purchaser, thereby suffering substantial economic loss.

As a result, though the Defendants knew or should have known that they were stating falsehoods, on information and belief, they continued on their path of grossly overstating sales levels and numbers, and giving false impressions of limited Unit availability.

**False Statements of the Prodigy Defendants**

455.   Rodrigo Nino made the following false statements described above:

  a.   The statement in the March 12, 2008 *New York Observer* article that 53% of the Units had been sold, which statement was republished in February 13, 2008 articles in *Curbed NY* and *The Huffington Post* (whereas, according the Sapir Affidavit, on March 12, 2008, only 12.25% of the Units had been sold, according to the 2007 Audited Financial Statements, as of December 31, 2007, only 17.9% of the Units had been sold, and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

b. The statement e-mailed to Hubert Tsai on April 7, 2009 by Prodigy stating that Trump Soho is outpacing sales predictions and that approximately 53% of the building had been purchased by global buyers as a result of the weak dollar (whereas, according to the Sapir Affidavit, on April 7, 2008, only 12.50% of the Units had been sold, and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

c. The statement in the April 11, 2008 *Daily News* article that 50% of the Units have been sold (according to the Sapir Affidavit, on April 11, 2008, only 12.50% of the Units had been sold,and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

d. The statement in the June 2, 2008 *The Real Deal* article 58% of the Units were under contract (whereas, according to the Sapir Affidavit, on June 2, 2008, only 13.75% of the Units had been sold, and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

e. The statements in the January 29, 2009 *New York Post* article that 270 Units, or about 67% of the 400 total Units, have been sold (according to the Sapir Affidavit, on January 29, 2009, only 62 Units, or 15.5% of the Units, had been sold, and according to the 2008 Audited Financial Statements, as of December 31, 2008, only 30.5% of the Units had been sold).

456.   Each of these statements by Rodrigo Nino was false when made.

457. By reason of his being the founder and President of Prodigy, the exclusive or co-exclusive sales agent for the Trump Soho, and the principal officer of Prodigy responsible for the sales and marketing of the Trump Soho, Rodrigo Nino knew or should have known the true sales levels at the Trump Soho at the times he made these statements.

458. By reason of his being the founder and President of Prodigy, the exclusive or co-exclusive sales agent for the Trump Soho, and the principal officer of Prodigy responsible for the sales and marketing of the Trump Soho, Rodrigo Nino knew or should have known these statements were false.

459. Had he made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Rodrigo Nino would have been severely reckless in making these statements.

460. On information and belief, as President of Prodigy (and possibly an owner), Rodrigo Nino would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Prodigy. On information and belief, Rodrigo Nino made these false statements in order to induce sales of Trump Soho Units.

461. On information and belief, Rodrigo Nino made these false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Prodigy.

462. On information and belief, as one of the public faces of the Trump Soho project, it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

463.    On information and belief, Rodrigo Nino made these false statements to protect his personal reputation and the reputation of his company, Prodigy, as successful sales agents.

464.    Sara Clephane made the following false statements described above:

    a.    The statement emailed to Alan Maltz on September 20, 2007 that the demand for Units was overwhelming and that there was a 1,400 person waiting list (whereas, according to the Sapir Affidavit, on this date, only 2.42% of the Units had been sold, and according to the 2007 Audited Financial Statements, as of December 31, 2007, only 17.9% of the Units had been sold, and if there was such a waiting list, a much higher percentage of Units would have been sold at that time or shortly thereafter).

    b.    The statement made to Alan Maltz in September of 2007 that 70% of the Units had been sold (whereas, according to the Sapir Affidavit, on September 20, 2007, only 3.39% of the Units had been sold, and according to the 2007 Audited Financial Statements, as of December 31, 2007, only 17.9% of the Units had been sold).

    c.    The statement made to Rachel Gerstein on January 9, 2008 that 30-40% of the Units had been sold (whereas, according to the Sapir Affidavit, on January 8, 2008, only 10.9% of the Units had been sold, and according to the 2007 Audited Financial Statements, as of December 31, 2007, only 17.9% of the Units had been sold).

   d.   The statement made to Rachel Gerstein on January 9, 2008 that buyers were purchasing as many as three to five units (whereas, according to the Sapir Affidavit only one out of the 62 buyers purchased multiple units and that one buyer purchased just two units).

   e.   The statement made to Rachel Gerstein on January 25, 2008 that certain lines were almost sold out (whereas, according to the Sapir Affidavit, on January 8, 2008, none of the lines were nearly sold out.)

   f.   The statement made to Rachel Gerstein on July 17, 2008 that her Unit's line was "pretty much sold out" (whereas, according to the Sapir Affidavit, on this date, only 7 of the 34 units in the "09" line were sold).

465.   Each of these statements by Sara Clephane was false when made.

466.   By reason of her position as Director of Sales at the Trump Soho for Prodigy, Sara Clephane knew or should have known the true sales levels at the Trump Soho at the times she made these statements.

467.   By reason of her position as Director of Sales at the Trump Soho for Prodigy, Sara Clephane knew or should have known these statements were false.

468.   Had she made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Sara Clephane would have been severely reckless in making these statements.

469.   On information and belief, as Director of Sales at the Trump Soho for Prodigy, Sara Clephane would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by her.

470.  On information and belief, Sara Clephane made these false statements in order to induce sales of Trump Soho Units.

471.  On information and belief, Sara Clephane made these false statements because of the direct, personal, financial benefit she would receive by generating or increasing sales at the Trump Soho as a sales agent of Prodigy.

472.  Sandra Dominguez made the following false statement described above:

   a.  The statement made to Felisa Hernandez prior to August 2, 2008 that 50% of the Units had been sold (whereas, according to the Sapir Affidavit, on August 2, 2008, only 15.25% of the Units had been sold, and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

   b.  The statement made to Michael Sultan prior to September 20, 2007 that at least 2,500 letters of intention had been signed for Trump Soho Units (whereas, according to the Sapir Affidavit, by September 20, 2007, only 3.39% of the Units had been sold and according to the 2007 Audited Financial Statements, as of December 31, 2007, only 17.9% of the Units had been sold, and if there had been as many letters of intention signed, a much higher percentage of Units would have been sold at that time or shortly thereafter).

   c.  The statement made to Michael Sultan in January of 2008 that 55% of the Units had been sold (whereas, according to the Sapir Affidavit, by January 28, 2008, only 11.75% of the Units had been sold, according to the 2007 Audited Financial Statements, as of December 31, 2007, only 17.9% of

the Units had been sold, and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

473. These statements made by Sandra Dominguez were false when made.

474. By reason of her position as Sales Associate for the Trump Soho with Prodigy, Sandra Dominguez knew or should have known the true sales levels at the Trump Soho at the time she made the statements.

475. By reason of her position as Sales Associate for the Trump Soho with Prodigy, Sandra Dominguez knew or should have known the statements were false.

476. Had she made the statements without knowing or ascertaining the true sales levels at the Trump Soho, Sandra Dominguez would have been severely reckless in making the statements.

477. On information and belief, as Sales Associate for the Trump Soho with Prodigy, Sandra Dominguez would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by her.

478. On information and belief, Sandra Dominguez made the false statements in order to induce sales of Trump Soho Units.

479. On information and belief, Sandra Dominguez made the false statements because of the direct, personal, financial benefit she would receive by generating or increasing sales at the Trump Soho as a sales agent for the Trump Soho with Prodigy.

480. Marcella Carillo made the following false statement described above:

   a. The statement made to Acacio Rodriguez in April of 2008 that 70% of the Units had been sold (whereas, according to the Sapir Affidavit, in April of

2008, only 12.75% of the Units had been sold and according to the 2008

HUD Annual Report, as of June 18, 2008, only 27% of the Units had been

sold).

481.    This statement made by Marcella Carrillo was false when made.

482.    By reason of her position as International Director of Sales – New York at

Prodigy and sales agent for the Trump Soho with Prodigy, Marcella Carrillo knew

or should have known the true sales levels at the Trump Soho at the time she

made the statement.

483.    By reason of her position as International Director of Sales – New York at

Prodigy and sales agent for the Trump Soho with Prodigy, Marcella Carrillo knew

or should have known the statement was false.

484.    Had she made the statement without knowing or ascertaining the true sales levels

at the Trump Soho, Marcella Carrillo would have been severely reckless in

making the statement.

485.    On information and belief, as International Director of Sales – New York at

Prodigy and and sales agent for the Trump Soho with Prodigy, Marcella Carrillo

would directly or indirectly receive a sales commission or similar compensation

for each Trump Soho Unit sold by her.

486.    On information and belief, Marcella Carrillo made the false statement in order to

induce sales of Trump Soho Units.

487.    On information and belief, Marcella Carrillo made the false statement because of

the direct, personal, financial benefit she would receive by generating or

increasing sales at the Trump Soho as a sales agent for the Trump Soho with Prodigy.

488. At the time that Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Prodigy.

489. Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo made the false statements described herein in the course of their duties as employees, officers, directors, principals and/or sales agents for Prodigy and for the benefit of Prodigy.

490. As such, the false statements made by Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo described herein may be attributed to Prodigy.

491. Accordingly, Prodigy is legally responsible for the false statements made by Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo described herein.

492. At the time that the false statements made by Rodrigo Nino, Sara Clephane, Sandra Dominguez, and Marcella Carrillo and attributed to Prodigy herein were made, Prodigy was acting as exclusive or co-exclusive sales agent for the Sponsor.

493. Prodigy made the false statements attributed to it herein in the course of its duties as exclusive or co-exclusive sales agent for the Sponsor and for the benefit of the Sponsor.

494. As such, the false statements attributed to Prodigy herein may be attributed to the Sponsor.

495.    Accordingly, the Sponsor is legally responsible for the false statements attributed to Prodigy herein.

**False Statements of the Core Defendants**

496.    Shaun Osher made the following false statement described above:

a.    The statement in the September 27, 2007 *Daily News* article that reporting on his statement at the the September 19, 2007 sales kickoff gala that fifty contracts had been signed so far (whereas, according the Sapir Affidavit, on September 19, 2007, only 10 Units were under contract, and according to the 2007 Audited Financial Statements, as of December 31, 2007, only 74 Units had been sold, which, when considered with the 34 contracts shown in the Sapir Affidavit to have been sold between those dates, means that no more than 40 contracts could possibly have been signed by September 19, 2007).

497.    This statement by Shaun Osher was false when made.

498.    By reason of his being the founder and Chief Executive Officer of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Shaun Osher knew or should have known the true sales levels at the Trump Soho at the times he made the statement.

499.    By reason of his being the founder and Chief Executive Officer of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Shaun Osher knew or should have known the statement was false.

500.   Had he made the statement without knowing or ascertaining the true sales levels at the Trump Soho, Shaun Osher would have been severely reckless in making the statement.

501.   On information and belief, as founder and Chief Executive Officer of Core, Shaun Osher would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Core.

502.   On information and belief, Shaun Osher made the false statement in order to induce sales of Trump Soho Units.

503.   On information and belief, Shaun Osher made the false statement because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Core.

504.   On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

505.   On information and belief, Shaun Osher made the false statement to protect his personal reputation and the reputation of his company, Core, as successful sales agents.

506.   Thomas Postilio made the following false statements described above:

a.   The statements made to Randall A. Meckel in October and November of 2007 that Units 806, 808, 811, 1004, 1111, 1611, 1802, 2011, 2211, and 2611 (whereas, according the Sapir Affidavit, none of these Units were sold in October and November of 2007).

b.   The statement made to Randall A. Meckel in early November of 2007 that over 30% of the Units had been sold (whereas, according to the Sapir Affidavit, in early November of 2007, only 7.75% of the Units had been sold, and according to the 2007 Audited Financial Statements, as of December 31, 2007, only 17.9% of the Units had been sold).

507.   These statements by Thomas Postilio were false when made.

508.   By reason of his being a founding member and Managing Director of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Thomas Postilio knew or should have known the true sales levels at the Trump Soho at the times he made the statements.

509.   By reason of his being a founding member and Managing Director of Core, the co-exclusive sales agent for the Trump Soho, and a principal officer of Core responsible for the sales and marketing of the Trump Soho, Thomas Postilio knew or should have known the statements were false.

510.   Had he made the statements without knowing or ascertaining the true sales levels at the Trump Soho, Thomas Postilio would have been severely reckless in making these statements.

511.   On information and belief, as founder and Chief Executive Officer of Core, Thomas Postilio would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Core.

512.   On information and belief, Thomas Postilio made the false statements in order to induce sales of Trump Soho Units.

513. On information and belief, Thomas Postilio made the false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Core.

514. On information and belief, Thomas Postilio made these false statements to protect his personal reputation and the reputation of his company, Core, as successful sales agents.

515. At the time that Shaun Osher and Thomas Postilio made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Core.

516. Shaun Osher and Thomas Postilio made the false statements described herein in the course of their duties as employees, officers, directors, principals and/or sales agents for Core and for the benefit of Core.

517. As such, the false statements made by Shaun Osher and Thomas Postilio described herein may be attributed to Core.

518. Accordingly, Core is legally responsible for the false statements made by Shaun Osher and Thomas Postilio described herein.

519. At the time that the false statements made by Shaun Osher and Thomas Postilio and attributed to Core herein were made, Core was acting as co-exclusive sales agent for the Sponsor.

520. Core made the false statements attributed to it herein in the course of its duties as co-exclusive sales agent for the Sponsor and for the benefit of the Sponsor.

521. As such, the false statements attributed to Core herein may be attributed to the Sponsor.

522. Accordingly, the Sponsor is legally responsible for the false statements attributed to Core herein.

### False Statements of the Trump Defendants

523. Donald Trump made the following false statements described above:

    a. The statement in the September 27, 2007 *Daily News* article that there was already a 3,200 person waiting list to see the Units (whereas, according to the Sapir Affidavit, on this date, only 2.42% of the Units had been sold, and according to the 2007 Audited Financial Statements, only 17.9% of the Units had been sold, and, if there was such a waiting list, a much higher percentage of Units would have been sold at that time or shortly thereafter).

    b. The statement in the October 14, 2007 *New York Times* article that there were 3,200 purchase applications for the 400 Units (whereas, according to the Sapir Affidavit, on this date, only 5.57% of the Units had been sold and according to the 2007 Audited Financial Statements, only 17.9% of the Units had been sold, and, if there were that many applications, a much higher percentage of Units would have been sold at that time or shortly thereafter).

    c. The statement in the April 2008 issue of *In the World Magazine* that Spanish purchasers had invested $250 million of the $800 million total offering, which implied that at least 31% of the Units had been sold (whereas, according to the Sapir Affidavit, in April of 2008, only 12.5% of

the Units had been sold, and according to the 2008 HUD Annual Report,

as of June 18, 2008, only 27% of the total Units had been sold).

524.   Each of these statements by Donald Trump was false when made.

525.   By reason of his being one of three indirect owners of the Sponsor, his being one
of the "officers, directors, shareholders and principals of the Sponsor who are
actively involved in the planning or consummation of the offering contemplated
by the Plan, his having submitted a sworn certification to the New York
Department of Law regarding the accuracy of the Sponsor's representations, his
having been designated a member of the initial Board of Directors of the
Condominium, and his being an officer, director, shareholder, and/or principal of
Trump Hotels, Trump Marks and the Sponsor, Donald Trump knew or should
have known the true sales levels at the Trump Soho at the times he made these
statements.

526.   By reason of his being one of three indirect owners of the Sponsor, his being one
of the "officers, directors, shareholders and principals of the Sponsor who are
actively involved in the planning or consummation of the offering contemplated
by the Plan, his having submitted a sworn certification to the New York
Department of Law regarding the accuracy of the Sponsor's representations, his
having been designated a member of the initial Board of Directors of the
Condominium, and his being an officer, director, shareholder, and/or principal of
Trump Hotels, Trump Marks and the Sponsor, Donald Trump knew or should
have known these statements were false.

527.   Had he made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Donald Trump would have been severely reckless in making these statements.

528.   On information and belief, as one of three indirect owners of the Sponsor, his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or consummation of the offering contemplated by the Plan, his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, his having been designated a member of the initial Board of Directors of the Condominium, and as an officer, director, shareholder, and/or principal of Trump Hotels, Trump Marks and the Sponsor, Donald Trump would receive compensation for each Trump Soho Unit sold.

529.   On information and belief, Donald Trump made these false statements in order to induce sales of Trump Soho Units.

530.   On information and belief, Donald Trump made these false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho.

531.   On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

532.   On information and belief, Donald Trump made these false statements to protect his personal reputation and the reputation of his companies as successful developers.

533. Donald Trump Jr. made the following false statements described above:

    a. The statement in the April 30, 2009 *The Real Deal* article that more than 55% of the Units had been sold (whereas, according to the Sapir Affidavit, on April 30, 2009, only 15.5% of the Units had been sold and and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

    b. The statement in the May 5, 2009 Curbed.com article that the building was more than 55% sold (whereas, according to the Sapir Affidavit, on May 5, 2009, only 15.5% of the Units had been sold and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

534. These statements made by Donald Trump Jr. were false when made.

535. By reason of his ownership interest in the Trump Soho and of his being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Donald Trump, Jr. knew or should have known the true sales levels at the Trump Soho at the times he made the statements.

536. By reason of his ownership interest in the Trump Soho and of his being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Donald Trump Jr. knew or should have known the statements were false.

537. Had he made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Donald Trump Jr. would have been severely reckless in making these statements.

538.    On information and belief, by reason of his ownership interest in the Trump Soho and of his being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Donald Trump Jr. would receive compensation for each Trump Soho Unit sold.

539.    On information and belief, Donald Trump Jr. made the false statements in order to induce sales of Trump Soho Units.

540.    On information and belief, Donald Trump Jr. made the false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho.

541.    On information and belief, as one of the public faces of the Trump Soho project, it was important for his business and personal reputation that the project be seen as successful and as having robust sales, and in particular, because Donald Trump had given Donald Trump Jr. and his other children very public responsibility for the development and operation of the Trump Soho project, and Donald Trump Jr. and the other Trump children were using the project in an attempt to establish some independent credibility in the real estate business beyond their mere status as Trump's children, it would have been particularly devastating to Donald Trump Jr. to have the project seen as unsuccessful.

542.    Ivanka Trump made the following false statements described above:

    a.    The statement in the June 26, 2008 Reuters wire service article that 60% of the Units were sold (whereas, according to the Sapir Affidavit, on June 27, 2008, only 14.5% of the Units had been sold, according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been

sold and according to the 2008 Audited Financial Statements, as of December 31, 2008, only 30.5% of the Units had been sold).

b. The statement in the June 29, 2008 *London Times* article that 60% of the Units were sold (whereas according to the Sapir Affidavit, on June 27, 2008, only 14.5% of the Units had been sold, according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold, and according to the 2008 Audited Financial Statements, as of December 31, 2008, only 30.5% of the Units had been sold).

543.    These statements made by Ivanka Trump were false when made.

544.    By reason of her ownership interest in the Trump Soho and her being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Ivanka Trump knew or should have known the true sales levels at the Trump Soho at the times she made these statements.

545.    By reason of her ownership interest in the Trump Soho and her being an officer, director, shareholder, member, manager and/or principal of Trump Hotels, Trump Marks, and the Sponsor, Ivanka Trump knew or should have known these statements was false.

546.    Had she made these statements without knowing or ascertaining the true sales levels at the Trump Soho, Ivanka Trump would have been severely reckless in making these statements.

547.    On information and belief, by reason of her ownership interest in the Trump Soho and her being an officer, director, shareholder, member, manager and/or principal

of Trump Hotels, Trump Marks, and the Sponsor, Ivanka Trump would receive compensation for each Trump Soho Unit sold.

548.     On information and belief, Ivanka Trump made these false statements in order to induce sales of Trump Soho Units.

549.     On information and belief, Ivanka Trump made these false statements because of the direct, personal, financial benefit she would receive by generating or increasing sales at the Trump Soho.

550.     On information and belief, as one of the public faces of the Trump Soho project, it was important for her business and personal reputation that the project be seen as successful and as having robust sales, and in particular, because Donald Trump had given Ivanka Trump and his other children very public responsibility for the development and operation of the Trump Soho project, and Ivanka Trump and the other Trump children were using the project in an attempt to establish some independent credibility in the real estate business beyond their mere status as Trump's children, it would have been particularly devastating to Ivanka Trump to have the project seen as unsuccessful.

551.      At the time that Donald Trump, Donald Trump, Jr. and Ivanka Trump made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Trump Hotels, Trump Marks, and the Sponsor.

552.     Donald Trump, Donald Trump, Jr. and Ivanka Trump made the false statements described herein in the course of their duties as employees, officers, directors,

principals and/or sales agents for Trump Hotels, Trump Marks, and the Sponsor and for the benefit of Trump Hotels, Trump Marks, and the Sponsor.

553.   As such, the false statements made by Donald Trump, Donald Trump, Jr. and Ivanka Trump described herein may be attributed to Trump Hotels, Trump Marks, and the Sponsor.

554.   Accordingly, Trump Hotels, Trump Marks, and the Sponsor are legally responsible for the false statements made by Donald Trump, Donald Trump, Jr. and Ivanka Trump described herein.

### False Statements of the Sponsor Defendants and their Agents

555.   Julius Schwarz made the following false statement described above:

   a.   The statement in the September 5, 2008 *Downtown Express* article that the condominium was more than half sold  (whereas according to the Sapir Affidavit, on September 5, 2008, only 15.25% of the Units had been sold and according to the 2008 Audited Financial Statements, as of December 31, 2008, only 30.5% of the Units had been sold).

556.   This statement made by Julius Schwarz was false when made.

557.   By reason of his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or the consummation of the offering contemplated by the Plan,", his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, and his being the founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, and the managing member of 246 Spring Holdings, the

sole member of the Sponsor, Julius Schwarz knew or should have known the true sales levels at the Trump Soho at the times he made this statement.

558.    By reason of his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or the consummation of the offering contemplated by the Plan," his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, and his being the founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, and the managing member of 246 Spring Holdings, the sole member of the Sponsor, Julius Schwarz knew or should have known this statement was false.

559.    Had he made the statement without knowing or ascertaining the true sales levels at the Trump Soho, Julius Schwarz would have been severely reckless in making this statement.

560.    On information and belief, by reason of his being one of the "officers, directors, shareholders and principals of the Sponsor who are actively involved in the planning or the consummation of the offering contemplated by the Plan," his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations, and his being the founder and Chairman of the Bayrock Group, the sole member of Bayrock Spring, the managing member of Bayrock/Sapir Realty, and the managing member of 246 Spring Holdings, the sole member of the Sponsor, Julius Schwarz would receive compensation for each Trump Soho Unit sold.

561.   On information and belief, Julius Schwarz made the false statement in order to induce sales of Trump Soho Units.

562.   On information and belief, Julius Schwarz made the false statement because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho.

563.   On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

564.   On information and belief, Julius Schwarz made the false statement to protect his personal reputation and the reputation of his company as successful developers.

565.   At the time that Julius Schwarz made the false statement described herein, he was acting an employee, officer, director, principal and/or sales agent for the Sponsor.

566.   Julius Schwarz made the false statement described herein in the course of his duties as an employee, officer, director, principal and/or sales agent for the Sponsor.

567.   As such, the false statement made by Julius Schwarz described herein may be attributed to the Sponsor.

568.   Accordingly, the Sponsor is legally responsible for the false statement made by Julius Schwarz described herein.

569.   Alex Sapir made the following false statement described above:

   a.   The statement in the February 22, 2008 *Daily News* article that the Trump Soho was 53% sold (whereas according to the Sapir Affidavit, on February 22, 2008, only 12.25% of the Units had been sold, and according

to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the

Units had been sold).

570.  This statement made by Alex Sapir was false when made.

571.  By reason of his being one of the three indirect owners of the Sponsor; his being

one of the "officers, directors, shareholders and principals of Sponsor who are

actively involved in the planning or consummation of the offering contemplated

by the Plan"; his having submitted a sworn certification to the New York

Department of Law regarding the accuracy of the Sponsor's representations; and

his having been designated a member of the initial Board of Directors of the

Condominium,  Alex Sapir knew or should have known the true sales levels at the

Trump Soho at the times he made this statement.

572.  By reason of his being one of the three indirect owners of the Sponsor; his being

one of the "officers, directors, shareholders and principals of Sponsor who are

actively involved in the planning or consummation of the offering contemplated

by the Plan"; his having submitted a sworn certification to the New York

Department of Law regarding the accuracy of the Sponsor's representations; and

his having been designated a member of the initial Board of Directors of the

Condominium,  Alex Sapir knew or should have known this statement was false.

573.  Had he made the statement without knowing or ascertaining the true sales levels

at the Trump Soho, Alex Sapir would have been severely reckless in making this

statement.

574.  By reason of his being one of the three indirect owners of the Sponsor; his being

one of the "officers, directors, shareholders and principals of Sponsor who are

actively involved in the planning or consummation of the offering contemplated by the Plan"; his having submitted a sworn certification to the New York Department of Law regarding the accuracy of the Sponsor's representations; and his having been designated a member of the initial Board of Directors of the Condominium,  Alex Sapir would receive compensation for each Trump Soho Unit sold.

575.  On information and belief, Alex Sapir made the false statement in order to induce sales of Trump Soho Units.

576.  On information and belief, Alex Sapir made the false statement because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho.

577.  On information and belief, as one of the public faces of the Trump Soho project it was important for his business and personal reputation that the project be seen as successful and as having robust sales.

578.  On information and belief, Alex Sapir made the false statement to protect his personal reputation and the reputation of his company as successful developers.

579.  At the time that Alex Sapir made the false statement described herein, he was acting an employee, officer, director, principal and/or sales agent for the Sponsor.

580.  Alex Sapir made the false statement described herein in the course of his duties as an employee, officer, director, principal and/or sales agent for the Sponsor.

581.  As such, the false statement made by Alex Sapir described herein may be attributed to the Sponsor.

582.   Accordingly, the Sponsor is legally responsible for the false statement made by Alex Sapir described herein.

583.   Ferran Fontal made the following false or misleading statements described above:

      a.   Ferran Fontal provided a brochure to Acacio Rodriguez and Javier Rodriguez that contained, among other things, certain financial projections that stated the Return on Investment as 76.83% and the Internal Return Rate as 19.3% (these projections were false because they were unrealistic and unsupportable).

584.   These statements contained in the brochure provided to Acacio Rodriguez and Javier Rodriguz by Ferran Fontal were false when made.

585.   By reason of his being Chairman and Chief Executive Officer of Baobab, a sales agent for the Trump Soho in Spain, and a principal officer of Baobab responsible for the sales and marketing of the Trump Soho, Ferran Fontal knew or should have known that his statements regarding investment return at the Trump Soho were either false or unsupportable.

586.   Had he made the statements without knowing that it was false or unsupportable, Ferran Fontal would have been severely reckless in making the statements.

587.   On information and belief, as Chairman and Chief Executive Officer of Baobab, Ferran Fontal would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Baobab.

588.   On information and belief, Ferran Fontal made the false statements in order to induce sales of Trump Soho Units.

589.   On information and belief, Ferran Fontal made the false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Baobab.

590.   Javier Cerro Diaz made the following false or unsupportable statements described above:

      a.   The email to Acacio Rodriguez on April 15, 2008 that contained, among other things, certain financial projections that stated the Return on Investment as 153% and the Internal Return Rate as 80% (these projections were false because they were unrealistic and unsupportable).

591.   These statements by Javier Cerro Diaz was false when made.

592.   By reason of his being International Sales Manager of Baobab, the sales agent for the Trump Soho in Spain, and a principal officer of Baobab responsible for the sales and marketing of the Trump Soho, Javier Cerro Diaz knew or should have known that his statements regarding investment return at the Trump Soho were either false or unsupportable.

593.   Had he made the statements without knowing it was false or unsupportable, Javier Cerro Diaz would have been severely reckless in making the statements.

594.   On information and belief, as International Sales Manager of Baobab, Javier Cerro Diaz would directly or indirectly receive a sales commission or similar compensation for each Trump Soho Unit sold by him or by Baobab.

595.   On information and belief, Javier Cerro Diaz made the false statements in order to induce sales of Trump Soho Units.

596.    On information and belief, Javier Cerro Diaz made the false statements because of the direct, personal, financial benefit he would receive by generating or increasing sales at the Trump Soho as a sales agent and officer of Baobab.

597.    At the time that Ferran Fontal and Javier Cerro Diaz made the false statements described herein, they were acting as employees, officers, directors, principals and/or sales agents for Baobab.

598.    Ferran Fontal and Javier Cerro Diaz made the false statements described herein in the course of their duties as employees, officers, directors, principals and/or sales agents for Baobab and for the benefit of Baobab.

599.    As such, the false statements made by Ferran Fontal and Javier Cerro Diaz described herein may be attributed to Baobab.

600.    Accordingly, Baobab is legally responsible for the false statements made by Ferran Fontal and Javier Cerro Diaz described herein

601.    At the time that the false statements made by Ferran Fontal and Javier Cerro Diaz and attributed to Baobab herein were made, Baobab was acting as sales agent for the Sponsor in Spain.

602.    Baobab made the false statements attributed to it herein in the course of its duties as sales agent for the Sponsor in Spain and for the benefit of the Sponsor.

603.    As such, the false statements attributed to Baobab herein may be attributed to the Sponsor.

604.    Accordingly, the Sponsor is legally responsible for the false statements attributed to Baobab herein.

605.   The following false statements described above ("Unattributed False Statements")
were, on information and belief made, directly or indirectly, by the Sponsor or a
representative or agent of the Sponsor:

    a.   In November of 2007, an article in *Magnate Inmobiliario*, a Spanish
publication discussing Spanish investment in Trump Soho, stated that 15%
of the Units at Trump Soho had been purchased by Spanish individuals
and companies, and that a total of 53% of the Units had been sold
(whereas, according to the Sapir Affidavit, by the end of November of
2007, only 9.2% of the Units had been sold and according to the 2007
Audited Financial Statements, as of December 31, 2007, only 17.9% of
the Units had been sold).

    b.   Prior to  signing the Purchase Agreement on or before December 14, 2007,
Randall A. Meckel was told by a Trump Soho representative that over
50% of the Units had been sold (whereas, according to the Sapir Affidavit,
on December 14, 2007, only 9.93% of the Units had been sold and
according to the 2007 Audited Financial Statements, as of December 31,
2007, only 17.9% of the Units had been sold).

    c.   On January 15, 2008, an Associated Press wire service article stated that
the developers boasted there were 3,200 purchase applications for the 400
Units (whereas, according to the Sapir Affidavit, on January 15, 2008,
only 11.14% of the Units had been sold, according to the 2007 Audited
Financial Statements, as of December 31, 2007, only 17.9% of the Units
had been sold and according to the 2008 HUD Annual Report, as of June

18, 2008, only 27% of the Units had been sold, and if that many purchase applications had been received, a much higher percentage of Units would have been sold at that time or shortly thereafter).

d.   In early March of 2008, a Trump Soho sales representative told Hubert Tsai that the building is selling faster than expected and that approximately 50% of the Units have already been sold (whereas, according to the Sapir Affidavit, in early March of 2008, only 12.25% of the Units had been sold and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

e.   On March 5, 2008 an article in *The Villager* stated that 53% of the 400 Units were sold (whereas, according to the Sapir Affidavit, on March 5, 2008, only 12.25% of the Units had been sold and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

f.   On March 18, 2008, an article in *Calculadora de Hipotecas*, a Spanish publication, stated that Trump Soho had already attacted 98 million Euros from Spain and that 15% of the Units have been purchased by Spanish individuals and companies (whereas, according to the Sapir Affidavit, on March 5, 2008, only 12.25% of the Units had been sold).

g.   A March 30, 2008 *New York Magazine* article stated that the author was told by a Trump representative that the building was 60% sold (whereas, according to the Sapir Affidavit, on March 30, 2008, only 12.5% of the

Units had been sold and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

h.   On July 3, 2008, an article in *Periodista Digital*, a Spanish publication, stated that Spanish investors had invested about 98.5 million Euros in Trump Soho, and 15% of the Units had been purchased by Spanish buyers (whereas, according to the Sapir Affidavit, on March 5, 2008, only 15% of the total Units had been sold and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the total number of Units had been sold).

606.   Each of the Unattributed False Statements were made, on information and belief, directly or indirectly, by the Sponsor or a representative or agent of the Sponsor, were false.

607.   By reason of being the Sponsor or a representative or agent of the Sponsor, each speaker of an Unattributed False Statement knew or should have known the true sales levels at the Trump Soho at the times the speaker made such statements.

608.   By reason of being the Sponsor or a representative or agent of the Sponsor, each speaker of an Unattributed False Statement knew or should have known that such statements were false.

609.   Had any speaker of an Unattributed False Statement made such  statements without knowing or ascertaining the true sales levels at the Trump Soho, the speaker would have been severely reckless in making the statements.

610. On information and belief, as the Sponsor or a representative or agent of the Sponsor, each speaker of an Unattributed False Statement would receive compensation for each Trump Soho Unit sold.

611. On information and belief, each speaker of an Unattributed False Statement made the false statement in order to induce sales of Trump Soho Units.

612. On information and belief, each speaker of an Unattributed False Statement made such false statement because of the direct, personal, financial benefit the speaker would receive by generating or increasing sales at the Trump Soho.

613. At the time that each speaker of an Unattributed False Statement made the false statements described herein, such speaker was acting an employee, officer, director, principal and/or sales agent for the Sponsor.

614. Each speaker of an Unattributed False Statement made the false statements described herein in the course of the speaker's duties as an employee, officer, director, principal and/or sales agent for the Sponsor.

615. As such, the false statements made by each speaker of an Unattributed False Statement described herein may be attributed to the Sponsor.

616. Accordingly, the Sponsor is legally responsible for each Unattributed False Statement described herein.

617. The following false articles described above are posted on the website established by or on behalf of the Sponsor to promote Trump Soho Sales, www.trumpsoho.com:

   a. The February 22, 2008 article in the *Daily News* quoting Alex Sapir as stating that the Trump Soho was 53% sold (whereas, according to the

First Amended Complaint Page 131

Sapir Affidavit, on that date only 12.25% of the Units had been sold and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

b. The June 26, 2008 Reuters wire service article quoting Ivanka Trump as stating that 60% of the Units had been sold (whereas, according to the Sapir Affidavit, on that date only 14.5% of the Units had been sold and according to the 2008 HUD Annual Report, as of June 18, 2008, only 27% of the Units had been sold).

618. On information and belief, these articles were posted on the www.trumpsoho.com website on or shortly after the dates they were published.

619. By reason of these articles being posted on www.trumpsoho.com by the Sponsor or its agents, the Sponsor has adopted the statements contained therein and is legally responsible for each of them.

620. All of the false representations described herein as having been made by or attributed to Sponsor were made for the benefit of Sponsor and for the direct financial gain that Sponsor obtains when it sells Units.

**The Control Defendants' Responsibility for the False Statements**

621. Each of the Control Defendants was legally responsible for the making of each false statement described herein.

622. Each of the Control Defendants knew or should have known of the false statements described herein.

623. Each of the Control Defendants was reckless in not learning of the false statements described herein.

624. Each of the Control Defendants adopted the false statements described herein.

625. Each of the Control Defendants could have prevented the false statements described herein from being made.

626. Each of the Control Defendants failed to prevent the false statements described herein from being made.

**The Defendants' Regular Monitoring and Correction of News Reports**

627. On information and belief, the Sponsor and the other Defendants regularly monitored publications and the internet for statements and misstatements made regarding the Trump Soho.

628. On information and belief, the Sponsor and the other Defendants were aware of all or substantially all of the representations regarding Trump Soho occupancy made through newspapers, magazines, wire services and internet websites of general distribution.

629. On information and belief, the Sponsor and the other Defendants would regularly issue demands for correction or cease and desist letters when certain inaccurate information regarding the Trump Soho was published.

630. The basis for this information and belief includes:

a. A letter dated December 19, 2006 from the Sponsor's outside counsel sent to the New York City Commissioner of Buildings, the Director of the New York City Department of City Planning, the Manhattan Borough President, the New York City Counsel Speaker, U.S. Representative Jerold Nadler, State Senator Tom Duane, and State Assembly Member Deborah Glick, which represented that the "Sponsor has been and

continues to monitor the Internet" for improper representations regarding the Trump Soho.

b. A letter dated December 27, 2006 from the Sponsor's outside counsel to the General Counsel of the New York City Department of Buildings stating that the Sponsor is continuing to monitor the Internet for improper representations regarding the Trump Soho.

c. Numerous cease and desist letters attached to the December 19, 2006 and December 27, 2006 letters from the Sponsor's outside counsel described above requesting that inaccurate information regarding the Trump Soho cease being distributed.

d. An e-mail dated February 28, 2007 from Julius Schwarz entitled "CORRECTION URGENTLY NEEDED – Trump Soho Real Estate Feature" sent to *New York* magazine requesting a correction of a feature describing the Trump Soho in the magazine.

e. A correction letter dated February 14, 2008 from a Trump Soho lawyer to *Curbed NY* (published by *Curbed NY* on February 15, 2008) requesting a correction of a January 29, 2008 *Curbed NY* article regarding the scheduling of a hearing on the Trump Soho.

f. A letter dated March 31, 2008 from the Sponsor's outside counsel to the chair of the New York City Board of Standards and Appeals which stated that:  "Where the Sponsor has become aware of websites, brokers and/or publications that could mislead the public . . . the Sponsor has worked to clarify the matter."

First Amended Complaint Page 134

    g.  The well-known propensity of Donald Trump and his organization to monitor, read and reply to press reports regarding him and his projects.

    h.  The fact that many organizations, including developers of major real estate developments, either internally or through contractors, monitor the press and publicity regarding their projects.

    i.  That, where an individual has been interviewed for a publication, the individual will often monitor that publication for any stories resulting from his or her interview, and that reporters will frequently notify interview subjects when such stories are published.

631.  On information and belief, the Sponsor and other Defendants have not requested any correction of any statements in any newspaper, magazine, wire service or internet website article regarding Trump Soho sales percentages or number of Units sold.

632.  The basis for such information and belief is that Plaintiffs' counsel has made a diligent search of publications and websites for corrections of statements regarding Trump Soho sales percentages or number of Units sold, and has been unable to locate any such corrections.

633.  It is particularly noteworthy that on February 14, 2008, Trump Soho counsel requested a correction of a claimed misstatement regarding the scheduling of a hearing in a January 29, 2008 *Curbed NY* article (which correction request was published in *Curbed NY* on February 15, 2008), but apparently did not request any correction of a February 13, 2008 *Curbed NY* article in which Rodrigo Nino was reported to have said that 53% of the Trump Soho Units had been sold.

634.    Accordingly, based on the foregoing, on information and belief, the Sponsor and
the other Defendants had a policy of monitoring and reviewing published reports
regarding the Trump Soho and engaged in the practice of requesting corrections
of matters other than reports of sales, but not requesting any corrections of
inaccurate statements of the percentages or number of Trump Soho Units sold.

635.    As such, on information and belief, the Sponsor and the other Defendants
accepted, adopted and endorsed each of the inaccurate statements regarding
Trump Soho sales percentages and number of Units sold in the newspaper,
magazine, wire service or internet website articles.

636.    As such, on information and belief, the Sponsor and the other Defendants are
legally responsible for all published inaccurate statements regarding Trump Soho
sales percentages and number of Units sold in the newspaper, magazine, wire
service or internet website articles.

637.    At the very minimum, the Sponsor and the other Defendants are legally
responsible for all inaccurate statements regarding Trump Soho sales percentages
and number of Units sold in newspaper, magazine, wire service or internet
website articles which were actually read, received or reviewed by such
Defendants and for which such Defendants failed to request a correction or
clarification.

## THE TRUMP SOHO OFFERING AS A SECURITY

638.    In the marketing of the Trump Soho, purchasers were not only offered a Unit
which they could personally use and occupy, they were also offered the

opportunity to earn investment income during the periods that they were not in occupancy.

639.   Indeed, the Restrictive Declaration requires in § 2.02(b) that:  "At all times during which a Unit is not occupied by its Unit Owner, it shall be made available on a daily or weekly basis to non-Unit Owners pursuant to a rental program."

640.   That section further provides that each Unit is required to be rented "at rates comparable to those at similar hotels in New York City."

641.   Under the Trump Soho documents, including the Condominium Declaration, the By-Laws and the Unit Management Agreement, when a Unit is rented to the public, the Unit's owner receives the rental income attributable to that Unit, subject to numerous fees, charges, expenses and deductions.

642.   A significant portion of the Sponsor's efforts to market the Trump Soho to purchasers and their representatives, including the Plaintiffs, consisted of its sales representatives and agents touting the Trump Soho Rental Program and the investment returns which could be earned when the purchaser did not occupy the Unit.

643.   Although certain Trump Soho sales representatives appeared to focus on promoting the rental program while others focused on promoting Unit sales as a whole, the distinction between the two groups of representatives was not made apparent to purchasers and their representatives, including the Plaintiffs.

644.   Each of the Trump Soho sales representatives was an employee or agent of Prodigy or Core, and each had identical black business cards with the Trump Soho logo.

645.   They each used e-mail addresses at "trumpsoho.com."

646.   Although purchasers and their representatives, including the Plaintiffs, were sometimes referred back and forth between Trump Soho sales representatives to answer different types of questions, the sales organization was presented to them as an integrated whole selling Trump Soho Units, and not as two groups separately selling condominium Units and rental agent services.

647.   Further, some sales agents who appeared to concentrate on Unit sales provided information and answered questions regarding the rental program and economic benefits of the Trump Soho, and vice versa.

648.   Indeed, the Trump Soho sales process was presented as selling a cohesive package under which a buyer could have a guaranteed place to stay when he or she was in New York, but would be getting rental income from the property the remainder of the time, under which one organization would manage the hotel, rent out the Units, and distribute the net rental income to the Unit owners.

649.   In promoting the economic benefits available to Trump Soho purchasers, sales representatives would send prospective purchasers a computer spreadsheet that could calculate the investment return to the purchaser if he or she invested in a particular Unit.

650.   This spreadsheet allowed the user to enter three variables, the average daily Unit rental rate, an occupancy rate representing the the percentage of nights the Unit would be occupied for rent, and the number nights that the purchaser was intending to use the Unit personally in a year.

651. From these variables, the spreadsheet would calculate and display the net annual rental income the Unit would provide, net of fees, charges, costs and expenses.

652. Although the sales representatives would generally not tell purchasers the exact numbers to fill into the spreadsheet (though sometimes they did), they often provided such clear and direct hints about what values to use that it was tantamount to directing them to use particular numbers.

653. For instance, with regard to average daily Unit rental rate to use, Trump Soho sales agents said and did the following:

   a. During a May 22, 2008 visit to the Trump Soho sales office, Javier Rodriguez was taken to the Mercer Hotel by Marcella Reyes, and directed to ask the desk clerk there what the room rental rates for that hotel were, whereupon he was told $500.00 to $700.00 per night from the Mercer desk clerk.

   b. On that same day, Marcella Reyes confirmed to Javier Rodriguez that $500.00 to $700.00 would be an appropriate rate to use.

   c. Similarly, in a January 9, 2007 meeting, Sara Clephane told Rachel Gerstein that that the room rate to be used in calculating the return on investment was similar to that of The Mercer Hotel, and therefore she could charge at least $660.00 to $700.00 per night

   d. In a December 19, 2007 e-mail, Amy Williamson told Rachel Gerstien that the Mandarin Oriental or Four Seasons were comparable hotels whose room rates could be used in the spreadsheet.

    e.   A September 20, 2007 e-mail from Sara Clephane to Alan Maltz advised Alan Maltz that comparable hotels were the Mark, the Plaza, the St. Regis and the Mercer.

    f.   Finally, in an April 18, 2008 e-mail, Reudi Sieber advised Felicia Hernandez that she could get $1000 per night.

654.   With regard to the occupancy rate, Trump Soho sales agents said and did the following:

    a.   In a December 19, 2007 e-mail Amy Williamson told Rachel Gerstien that: "So far as occupancy rates are concerned, statistics for Manhattan hotel occupancy rates and highly credible studies indicating occupancy rate trends are available online."

    b.   Other Plaintiffs were told orally to use New York City occupancy rates.

    c.   Finally, during a May 22, 2008 visit to the Trump Soho sales office, Javier Rodriguez was told by Marcella Reyes that the appropriate occupancy rate to be used in calculating the return on investment was 84%.

655.   Other of the Plaintiffs were given similar advice in filling out their spreadsheets.

656.   Using these detailed hints or express instructions, purchasers, including the Plaintiffs would be able to determine an exact investment return by using the spreadsheet they were given.

657.   As discussed above, Ferran Fontal and Javier Cerro Diaz of Baobab did even more.

658.   At the SIMA real estate conference in Madrid, Ferran Fontal provided Acacio Rodriguez and Javier Rodriguez, along with other conference attendees, with a

brochure that contained, among other things, financial projections that stated that an investment in the Trump Soho would have a Return on Investment of 76.83% and an Internal Return Rate of 19.3%.

659. On April 15, 2008, Javier Cerro Diaz e-mailed a detailed financial projection to Acacio Rodriguez and Javier Rodriguez concluding that the Trump Soho project would have a Return on Investment of 153%, an Internal Return Rate of 80%.

660. Further, the Restrictive Declaration provides that the Unit Owner must hire as a rental agent either Trump Hotels or one of up to five Qualified Brokers.

661. Similarly, the very first page of the Offering Plan state that: "The Board will maintain a list of five (5) real estate brokers" qualified to act as Qualified Brokers.

662. However, the Trump Soho has designate only a single Qualified Broker to act as a rental agent (other than Trump Hotels), Jet Luxury Resorts ("Jet").

663. On information and belief, Jet is the only other company in the country able to act as an independent rental agent for a luxury property like the Trump Soho.  The basis for this information and belief is a discussion between the president of Jet and Plaintiffs' counsel.

664. If a Unit purchaser were to select Jet, the purchaser would be required to pay Jet a full 35% of its gross room revenue for Jet's fee under its rental agency contract.

665. In addition, were a purchaser to select Jet, it would be subject to a Unit Management Fee in the amount of the greater of $1,000.00 per year or $15.00 per night the Unit is occupied (either by the unit owner or a hotel guest), each of which is increased by 3% annually.

666.   In contrast, if a purchaser selects Trump Hotels to act as rental agent, the purchaser will only be subject to a 3.75% rental agent fee, plus deductions for any credit card fees and travel agency and similar commissions, amounts which cannot total more than 14% of the gross room rental, leading to a maximum cost of less than 15% (and often a much lower cost).

667.   Further, if Trump Hotels is selected, the Unit Management Fee will be rebated to the Unit owner.

668.   As such, though a purchaser technically has a choice of rental agent, such a choice is actually illusory in that Trump Hotels provides a significant financial advantage to the Purchaser.

669.   A key part of this advantage is set forth in the Unit Management Agreement that Trump Hotels wrote and all purchasers are required to sign.

670.   As such, the Trump Soho is set up so that all or virtually all Units will be managed for profit through the common efforts of Trump Hotels.

671.   Under § 2(a)(1) of the 1933 Act and §3(a)(10) of the 1934 Act, 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10), the term "security" is defined to include an "investment contract."

672.   Under the securities laws and precedent, a real estate investment providing financial returns to buyers may be considered an "investment contract" based on the facts and circumstances surrounding its terms and sales efforts.

673.   Factors that tend to establish that a real estate investment is a security include a requirement that they owner hold the unit available for rental for part of the year, a joint rental management or similar agreement, sales efforts that emphasize the

First Amended Complaint Page 142

economic benefits of the investment, and joint sales operations for both unit sales and rental management.

674.   Each of these factors is present in the Trump Soho offering.

675.   As such, and in consideration of all of the facts and circumstances of the Trump Soho sales offering, the Trump Soho offering must be considered a "security" under the federal securities laws.

## **NON-EXEMPTION AND NON-COMPLIANCE WITH ILSA**

676.   As ILSA is written, all real estate sales transactions are subject to ILSA unless they are found to be exempt under a particular statutory or regulatory exemption under ILSA (an "ILSA Exemption").

677.   Certain ILSA Exemptions, those listed under 15 U.S.C. § 1702(a), exempt transactions from ILSA in its entirety, including ILSA's provisions prohibiting fraud and deceptive sales practices.

678.   Other ILSA Exemptions, those statutory exemptions listed under 15 U.S.C. § 1702(a) and the regulatory exemptions authorized by 15 U.S.C. § 1702(c), exempt transactions from the registration, reporting and contract revocation provisions of ILSA, but do not exempt transactions from its provisions prohibiting fraud and deceptive sales practices.

### **No Full Exemption From ILSA under 15 U.S.C. § 1702(a) Applies**

679.   Though a transaction is fully exempt from ILSA if one of the eight subsections of 15 U.S.C. § 1702(a) applies, no such subsection is applicable here.

680.   Because the Trump Soho is a subdivision containing more than 25 lots, 15 U.S.C. § 1702(a)(1) does not apply.

681.   Because each of the Purchasing Plaintiffs entered into their Purchase Agreements prior the construction of their Units being completed and such Units being habitable, and because none of the Purchase Agreements required that such Units be constructed and habitable within two years from the date such Purchasing Plaintiff signed its Purchase Agreement, 15 U.S.C. § 1702(a)(2) does not apply.

682.   Because the transactions are not a sale of mortgage or deed of trust indebtedness, 15 U.S.C. § 1702(a)(3) does not apply.

683.   Because the transaction is not a sale of securities of a real estate investment trust, 15 U.S.C. § 1702(a)(4) does not apply.

684.   Because the transactions are not the sale or lease of real estate by a government or governmental agency, 15 U.S.C. § 1702(a)(5) does not apply.

685.   Because the transactions are not the sale or lease of cemetery lots, 15 U.S.C. § 1702(a)(6) does not apply.

686.   Because the transactions are for the sale of fully constructed Hotel Suite Units, and Unit purchasers are prohibited from altering or redecorating such Units, much using such Units for the purpose of constructing buildings thereon, 15 U.S.C. § 1702(a)(7) does not apply.

687.   Because each of the Purchasing Plaintiffs except Palmer Gardens, Beaver Metal and Credibox are individuals and not business entities, 15 U.S.C. § 1702(a)(8) does not apply to such Purchasing Plaintiffs.

688.   Although 15 U.S.C. § 1702(a)(8) may, under certain circumstances, apply to business entities purchasing real estate zoned for or restricted by covenant to commercial or industrial use, such ILSA Exemption does not apply to Palmer

Gardens, Beaver Metal and Credibox because those entities are not (and cannot be under the Restrictive Declaration) purchasing their Units substantially for their own use, and those entities do not have a binding commitment to sell, lease or sublease such Units to another business entity engaging in commercial or industrial business, but rather the Units are to be rented nightly as hotel rooms to individuals.

689. Further, Palmer Gardens, Beaver Metal and Credibox have not submitted to the Sponsor the affirmation in writing required under 15 U.S.C. § 1702(a)(8)(D) as a prerequisite for the 15 U.S.C. § 1702(a)(8) ILSA Exemption to apply.

690. As such, the transactions at issue herein are not fully exempt from ILSA under 15 U.S.C. § 1702(a).

691. Because the transactions are not fully exempt from ILSA, they are subject to ILSA's prohibition against fraudulent and deceptive sales practices contained in 15 U.S.C. § 1703(a)(2).

**No Other Statutory or Regulatory ILSA Exemption Applies**

692. Though a transaction may be partially exempt from ILSA if one of the subsections of 15 U.S.C. § 1702(b) or a regulatory exemption adopted pursuant to 15 U.S.C. § 1702(c) applies, no such exemption applies to exempt the Defendants from the ISLA liability claimed herein.

693. As to the regulatory exemptions set forth in 24 CFR § 1710.14, .15 & .16, they are each clearly inapplicable by their terms, except potentially for the "bona fide land sales business" exemption under 24 CFR § 1710.14(a)(3).

694.    With respect to regulatory exemptions, 24 CFR § 1710.4(d) requires that:  "If a developer elects to take advantage of an exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met."

695.    As such, the Purchasing Plaintiffs cannot be subject to the "bona fide land sales business" exemption under 24 CFR § 1710.14(a)(3) because the Sponsor never obtained records from them regarding whether or not they met the requirements of the Exemption.

696.    Regardless of whether or not the Sponsor has records regarding applicability of the "bona fide land sales business" exemption under 24 CFR § 1710.14(a)(3), such exemption is inapplicable as each Purchasing Plaintiff is not in the "bona fide land sales business" in that (i) they are not persons who plan to subsequently sell their Unit in the ordinary course of their business; (ii) they are not in the business of  land sales as an activity of some continuity, regularity and permanency, or means of livelihood; and (iii) they are buying the Units for their personal use and investment, to be sold at some unforeseeable time in the future. *See* HUD's Guidelines to the Interstate Land Sales Registration Program (the "ILSA Guidelines"), 61 FR 13596, 13609 (1996).

697.    As to the statutory exemptions set forth in 15 U.S.C. § 1702(b), the exemptions in 15 U.S.C. § 1702(b)(2) through (8) are each clearly inapplicable by their terms.

698.    15 U.S.C. § 1702(b)(1) exempts:  "the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section."

699. The regulation interpreting this section, 24 CFR § 1710.6 provides: "The sale of lots in a subdivision is exempt from the registration requirements of the Act if, since April 28, 1969, the subdivision has contained fewer than 100 lots, exclusive of lots which are exempt from jurisdiction under § 1710.5 [regarding 15 U.S.C. § 1702(a) full exemptions from ILSA]."

700. At the time that the Sponsor started marketing Trump Soho Units in August 2007, the Trump Soho had 413 Units, none of which was exempt under 15 U.S.C. § 1702(a).

701. Under the ILSA Guidelines, a Unit may only be considered complete and therefore eligible for the 15 U.S.C. 1702(a)(2) constructed building exemption where it is "physically habitable and usable for the purpose for which it was purchased." 61 FR at 13603.

702. At the Trump Soho, a Unit can be considered habitable and usable for its intended purpose only when the DOB has issued a permanent or temporary certificate of occupancy for that Unit.

703. Until at least March 21, 2010, more than 100 Units of the Trump Soho were not covered by a temporary certificate of occupancy issued by the DOB.

704. Further, the Sponsor submitted to HUD the sworn 2008 HUD Annual Report stating that as of June 18, 2008, 108 Units had been sold and the 2008 Audited Financial Statements stated that: "As of December 31, 2008, there were 122 signed contracts to purchase Units."

705.  As such, until at least March 21, 2010, the Trump Soho was not "a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of [15 U.S.C. § 1702]."

706.  Accordingly, from the beginning of the marketing of the Trump Soho Units in August 2007 through at least March 21, 2010, the Trump Soho was not subject to any ILSA Exemption, and each Purchase Agreement signed before March 21, 2010 was not subject to any ILSA Exemption.

707.  Therefore, from August 2007 through at least March 21, 2010 , the Trump Soho was required to comply with all provisions of ILSA, including ILSA's registration, reporting and revocation provisions.

**The ILSA Property Report**

708.  As the Trump Soho was not subject to any ILSA Exemption from the time its Units began to be offered through at least March 21, 2010, the Sponsor registered the Trump Soho with HUD, effective July 3, 2007.

709.  The Sponsor also prepared a property report purporting to comply with the requirements of ILSA (the "ILSA Property Report") dated July 3, 2007.

710.  On information and belief, the Sponsor distributed the ILSA Property Report to each Unit purchaser prior to that purchaser's signing its Purchase Agreement.

711.  However, the ILSA Property Report was severely deficient in that it neglected to disclose that each purchaser had the right to revoke its Purchase Agreement within two years of the date the purchaser signed it under 15 U.S.C. § 1703(d).The ILSA Property Report was also deficient in that it falsely and misleadingly stated that purchasers would, under certain circumstances be able to

obtain a partial refund of their Deposits after default, while the operative legal

documents, the Purchase Agreements and the Offering Plan provide that the full

amounts of the Deposits are considered liquidated damages to be forfeited in full

on default.

712.    Further, this inconsistency between the materials submitted to prospective

purchasers, including the Offering Plan and the Purchase Agreements and the

ILSA Property Report violates 15 U.S.C. § 1703(a)(1)(D), which requires that all

such materials be consistent with the ILSA Property Report.

**The Right to Revoke Under 15 U.S.C. § 1703(d)**

713.    15 U.S.C. § 1703(d) provides:

> (d) Additional authority for revocation of nonexempt contract or
> agreement at option of purchaser or lessee; time limit; applicability
>
> Any contract or agreement which is for the sale or lease of a lot not
> exempt under section 1702 of this title and which does not provide--
>
>> (1) a description of the lot which makes such lot clearly
>> identifiable and which is in a form acceptable for recording by the
>> appropriate public official responsible for maintaining land records
>> in the jurisdiction in which the lot is located;
>>
>> (2) that, in the event of a default or breach of the contract or
>> agreement by the purchaser or lessee, the seller or lessor (or
>> successor thereof) will provide the purchaser or lessee with written
>> notice of such default or breach and of the opportunity, which shall
>> be given such purchaser or lessee, to remedy such default or breach
>> within twenty days after the date of the receipt of such notice; and
>>
>> (3) that, if the purchaser or lessee loses rights and interest in the lot
>> as a result of a default or breach of the contract or agreement
>> which occurs after the purchaser or lessee has paid 15 per centum
>> of the purchase price of the lot, excluding any interest owed under
>> the contract or agreement, the seller or lessor (or successor thereof)

shall refund to such purchaser or lessee any amount which remains after subtracting (A) 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, or the amount of damages incurred by the seller or lessor (or successor thereof) as a result of such breach, whichever is greater, from (B) the amount paid by the purchaser or lessee with respect to the purchase price of the lot, excluding any interest paid under the contract or agreement,

may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement. This subsection shall not apply to the sale of a lot for which, within one hundred and eighty days after the signing of the sales contract, the purchaser receives a warranty deed (or, where such deed is not commonly used in the jurisdiction where the lot is located, a deed or grant that warrants at least that the grantor has not conveyed the lot to another person and that the lot is free from encumbrances made by the grantor or any other person claiming by, through, or under him or her).

714. A regulation issued by HUD pursuant to ILSA, 24 CFR § 1715.4(b), interprets 15 U.S.C. § 1703(d)(3) and specifies that to avoid a revocation right under that subsection: "no damages may be specified in the contract or agreement, except a liquidated damages clause not exceeding 15% of the purchase price of the lot, excluding any interest owed."

715. Each Purchase Agreement provides that the purchaser will make an aggregate Deposit totaling 20% of the purchase price of the Unit.

716. Paragraph 12(b) of each Purchase Agreement specifies that upon the purchaser's uncured default, "Sponsor shall have the right to retain, as and for liquidated damages, the Deposit and any interest earned on the Deposit."

717. Paragraph 12(c) of each Purchase Agreement reinforces this, stating that:

Sponsor and Purchaser each hereby agree and acknowledge that it would be impractical and/or extremely difficult to fix or establish the actual

First Amended Complaint Page 150

damage sustained by Sponor as a result of a default by a Purchaser hereunder, and that the Deposit (including all interest) shall constitute and be deemed to be the reasonable and agreed upon liquidated damages of Sponor in respect of the possible loss of a timely closing, the possible fluctuation of values, additional carrying costs of the Unit and other expenses that may be incurred, including without limitation, attorney's fees, and shall be paid by Purchaser to Sponor as Sponor's sole and exclusive remedy.  The payment of the deposit (including all interest) as liquidated damages is not intended to be a forfeiture or penalty, but is intended to constitute liquidated damages.

718.    Paragraph 12(d) of each Purchase Agreement further reinforces this in the

strongest possible terms, stating in all capital letters that:

NEITHER SELLER NOR PURCHASER SHALL CHALLENGE THE VALIDITY OF THE PROVISIONS OF THIS AGREEMENT OF THE PLAN WITH RESPECT TO LIQUIDATED DAMAGES OR ANY RIGHT OF SPONSOR SET FORTH HEREIN OR THEREIN TO RETAIN THE DEPOSIT IN THE EVENT OF A PURCHASER DEFAULT.  SUCH PROVISIONS HAVE BEEN AGREED TO VOLUNTARILY, AFTER NEGOTIATION, WITHOUT DURESS OR COERCION BY ANY PARTY UPON THE OTHER PARTY, AND WITH EACH PARTY HAVING BEEN (OR HAVING HAD FULL AND ADEQUATE OPPORTUNITY TO BE) REPRESENTED BY COUNSEL, ACCOUNTANTS, BROKERS, APPRAISERS AND OTHER EXPERTS AND ADVISORS OF ITS OWN CHOOSING.

719.    Nowhere in the Purchase Agreement is there any provision limiting the amount

that the Sponsor may retain on the purchaser's default to 15% of the purchase

price of the Unit or actual damages, if greater, or requiring the Sponsor to refund

anything in excess of that amount upon default.

720.    Similarly, the Offering Plan has no provision limiting the amount that the Sponsor

may retain on default, but rather, consistent with the Purchase Agreement,

provides (at page 98) that the full Deposit will constitute liquidated damages and

that "Purchaser will not have any right whatsoever to return of all or any portion of its Deposit (or any interest thereon)."

721.   Because neither the Purchase Agreements nor the Offering Plan have a provision limiting the amount that the Sponsor may retain on purchaser's default to 15% of the purchase price, or actual damages if greater, but rather contain a 20% liquidated damages clause, 15 U.S.C. § 1703(d)(3) provides the Purchasing Plaintiffs an unconditional option to revoke their Purchase Agreements within two years of their being signed.

722.   Further, under 15 U.S.C. § 1703(d)(1), a purchaser has the option to revoke its Purchase Agreement if it does not provide: "a description of the lot which makes such lot clearly identifiable and which is in a form acceptable for recording by the appropriate public official responsible for maintaining land records."

723.   The New York Condominium Act, Article 9-B of the New York Real Property Law ("RPL"), sets forth, *inter alia*, the requirements for the legal description of a condominium unit lot to be acceptable for recording.

724.   New York Real Property Law ("RPL") § 339-o provides, in relevant part:

> Deeds and leases of units shall include the following particulars:
>
> 1. Description of the land as provided in subsection two of section three hundred thirty-nine-n and the liber, page and date of recording of the declaration or solely by naming the city, village or town and the county in which the unit is located and referring to the liber, page and date of recording of the declaration.
>
> 2. The unit designation of the unit in the declaration and any other data necessary for its proper identification.

725. Thus, for a New York condominium unit, "a description of the lot . . . which is in a form acceptable for recording" must contain, in addition to other requirements, "the liber, page [or equivalent used by the local recording officer] and date of recording of the declaration," which is information unavailable prior to the recording of the condominium's declaration.

726. Likewise, "[t]he unit designation of the unit in the declaration" is unavailable until the declaration is recorded.

727. Here, each Purchase Agreement failed to contain "the liber, page [or equivalent used by the local recording officer] and date of recording of the declaration" of the Condominium.

728. Similarly, no other document provided to the Purchasing Plaintiffs at or prior to the time the Purchase Agreement was entered into contained "the liber, page [or equivalent used by the local recording officer] and date of recording of the declaration" of the Condominium.

729. Indeed, providing such information was impossible at the time the Purchase Agreements were signed because the Condominium Declaration was not recorded with the City Register until May 6, 2010, well after each Purchase Agreement was signed.

730. The Sponsor expressly recognized that the unit description is inadequate for recording in its ILSA Property Report which specifies (at page 9) that the floor plans and the draft Condominium Declaration are subject to review and approval by the New York City Real Property Assessment Bureau ("RPAB") and that:

"UNTIL THE FLOOR PLANS ARE FILED AND THE DECLARATION IS

RECORDED THE DESCRIPTION OF THE UNIT IS NOT LEGALLY

ADEQUATE FOR THE CONVEYANCE OF THE UNITS." (capitalization in

original)

731.   Accordingly, because the Purchase Agreements did not (and could not) contain "a

description of the lot . . . which is in a form acceptable for recording," the

Purchasing Plaintiffs had the option to revoke their Purchase Agreements within

two years of their being signed under 15 U.S.C. § 1703(d)(1).

732.   Because the Purchase Agreements did not meet the requirements of 15 U.S.C. §

1703(d)(1) or (3), each Purchasing Plaintiff had the right to revoke its Purchase

Agreement within two years of its being signed.

**The ILSA Property Report's Failure To Disclose The Revocation Option**

733.   Under 15 U.S.C. §§ 1704 & 1707, the ILSA Property Report must include

information specified in the ILSA statute and the regulations promulgated under

the authority of those sections.

734.   The regulation specifying what must be on the cover page of the ILSA Property

Report, 24 CFR 1710.105, provides, in relevant part:

> The cover page of the Property Report shall be prepared in accordance
> with the following directions: . . .

> (d) . . . (2)(i) . . . unless certain provisions are included in the contract or
> agreement, the purchaser is entitled to cancel the contract within two years
> from the date of signing the contract or agreement. . . .

> (iii) The contract provisions are:

> (A) A legally sufficient and recordable lot description; and . . .

> (C) A provision that, if the purchaser loses rights and interest in the lot
> because of the purchaser's default or breach of contract after 15% of the

purchase price, exclusive of interest, has been paid, the seller shall refund to the purchaser any amount which remains from the payments made after subtracting 15% of the purchase price, exclusive of interest, or the amount of the seller's actual damages, whichever is the greater.

(iv) If a deed is not delivered within 180 days of the signing of the contract or if the necessary provisions are not included in the contract, the following statement shall be used in place of any other recession language:

Under Federal law you may cancel your contract or agreement of sale any time within two years from the date of signing.

735. Although the Sponsor was required under 24 CFR § 1710.105(d)(2) to specify unconditionally on the ILSA Property Report's cover page that: "you may cancel your contract or agreement of sale any time within two years from the date of signing," the Sponsor failed to do so.

736. Instead, the ILSA Property Report contained improper and inaccurate language stating:

If you received this Report prior to signing a contract or agreement, you may cancel your contract or agreement by giving notice to the seller any time before midnight of the seventh day following the signing of the contract or agreement.

If you did not receive this Report before you signed a contract or agreement, you may cancel the contract or agreement any time within two years from the date of signing.

737. In addition to requiring that the ILSA Property Report disclose on its cover page that "you may cancel your contract or agreement of sale any time within two years from the date of signing," the ILSA regulations also require that the Purchase Agreement provide and prominently display a clause permitting the purchaser the same revocation right.

738.    Specifically, 24 CFR § 1710.209(f)(3) requires, in relevant part that:

>   (i) . . . The contracts or agreements, including promissory notes, must contain . . . language in boldface type (which must be distinguished from the type used for the rest of the contract) on the face or signature page above all signatures: . . .

>   (ii) If the purchaser is entitled to a longer revocation period by operation of State law or the [ILSA] Act, that period becomes the Federal revocation period and the contract or agreement must reflect the requirements of the longer period, rather than the seven days. This language shall be consistent with that shown on the Cover Page (see §1710.105).

>   (iii) The revocation provisions may not be limited or qualified in the contract or other document by requiring a specific type of notice or by requiring that notice be given at a specified place.

739.    As such, under 24 CFR § 1710.209(f)(3), because the purchasers were entitled to a two year revocation period under ILSA and the ILSA Property Report cover page was required to state that the purchasers were entitled to such a two year revocation period, the Purchase Agreements were required include a clause (in boldface on the contract face or signature page) that permitted the purchasers a two revocation period.

740.    The Purchase Agreements, however, did not include such a two year revocation period clause, but rather had a clause on the signature page containing the improper and inaccurate statement that the purchaser had a seven day revocation period, unless the purchaser did not receive an ILSA Property Report, which would permit a two year revocation period.

741.   In accordance with ILSA and its regulations, the Sponsor submitted the form of Purchase Agreement containing this improper and inaccurate statement on its signature page to HUD as part of its Statement of Record.

742.   Accordingly, neither the ILSA Property Report distributed to the Purchasing Plaintiffs nor their Purchase Agreements complied with ILSA's requirements.

743.   Further, the ILSA Property Report, on its very cover, contained an untrue statement of a material fact and omitted a material fact required to be stated under ILSA and its regulations.

**The Sponsor Distributed Materials Inconsistent with the ILSA Property Report**

744.   As discussed above, the Purchase Agreements and the Offering Plan unequivocally and emphatically provide that the full 20% Deposit required to be submitted by the Purchasing Plaintiffs is considered liquidated damages to be retained by the Sponsor in the event of an uncured default.

745.   The Purchase Agreements, which incorporate by reference the Offering Plan, set forth the rights and obligations of the Purchasing Plaintiffs and the Sponsor with respect to each other.

746.   Under ILSA, the ILSA Property Report is supposed to accurately disclose the rights and obligations of the parties.

747.   However, the ILSA Property Report here misstates the rights and obligations of the parties.

748.   Instead of accurately reporting that the full 20% Deposit is subject to loss as liquidated damages in the event of default, as the Purchase Agreement and Offering Plan state, the ILSA Property Report states (at page 6):

Notwithstanding our right to retain the earnest money upon your failure to cure a default after expiration of the thirty (30) day notice and opportunity to cure, if you paid fifteen (15%) percent of the purchase price or more at the time of default and you lose the right to purchase the Hotel Suite Unit, you may be entitled to a refund of a portion of your total deposit(s) if and to the extent required under Section 1703(d) of the Interstate Land Sales Full Disclosure Act.  Under 1703(d) of the Interstate Land Sales Full Disclosure Act, we must refund to you the remaining amount of the total deposit(s) after subtracting the greater of (i) fifteen percent (15%) of the purchase price (excluding any interest owed) and (ii) the amount of damages incurred by us due to the default.  For the purposes hereof, "damages" means actual damages resulting from the default under New York Law.

749.    This statement in the ILSA Property Report is false and misleading because it inaccurately states both the rights and obligations of the parties and the requirements of 15 U.S.C. § 1703(d), which does not require any deposit refund, but rather provides developers the option to elect to give a two year revocation option, or if the developer wishes to avoid that, to put into the purchase agreement a clause limiting the amount of deposit retained on default.

750.    In any event, the ILSA Property Report is inconsistent with the other materials distributed to the Purchasing Plaintiffs prior to their purchases, including the Purchase Agreements and Offering Plan.

**<u>CLAIM I – ILSA DECEPTIVE SALES PRACTICES, 15 U.S.C. § 1703(a)(2)</u>**

(by Purchasing Plaintiffs against all Defendants)

751.    Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

752.    Under 15 U.S.C. § 1703(a)(2):

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails-- . . .

(2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title--

(A) to employ any device, scheme, or artifice to defraud;

(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser; . . .

753.   Under 15 U.S.C. § 1709:

(a) Violations; relief recoverable

A purchaser or lessee may bring an action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title. In a suit authorized by this subsection, the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable. In determining such relief the court may take into account, but not be limited to, the following factors: the contract price of the lot or leasehold; the amount the purchaser or lessee actually paid; the cost of any improvements to the lot; the fair market value of the lot or leasehold at the time relief is determined; and the fair market value of the lot or leasehold at the time such lot was purchased or leased. . . .

(c) Amounts recoverable

The amount recoverable in a suit authorized by this section may include, in addition to matters specified in subsections (a) and (b) of this section, interest, court costs, and reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot.

754.   The Purchasing Plaintiffs are "purchasers" under 15 U.S.C. § 1701(10) in that they are each "an actual or prospective purchaser or lessee of any lot in a subdivision."

755.   The Trump Soho is a "subdivision" under 15 U.S.C. § 1701(3) in that it is land located in New York that "is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan."

756.   The Sponsor is the "developer" of the Trump Soho under 15 U.S.C. § 1701(5) in that it "directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision," the Trump Soho.

757.   Each Defendant other than the Sponsor is an "agent" of the Sponsor under 15 U.S.C. § 1701(6) in that each of them "represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision."

758.   The Escrow Agent is not covered by the exclusion from the definition of "agent" for attorneys "whose representation solely consists of rendering legal services" under 15 U.S.C. § 1701(6) in that the Escrow Agent is being sued solely in its capacity as escrow agent of the Sponsor, and not as attorney for the Sponsor.

759.   As laid out in detail above, the Defendants made numerous false, deceptive and misleading statements to induce the Purchasing Plaintiffs to enter Purchase Agreements at the Trump Soho.

760.   In making such false, deceptive and misleading statements, the Defendants acted "to obtain money or property by means of any untrue statement of a material fact,

or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision," in violation of 15 U.S.C. § 1703(a)(2)(B).

761. In addition, all of the acts and practices of the Defendants set forth above constitute a "device, scheme, or artifice to defraud," in violation of 15 U.S.C. § 1703(a)(2)(A).

762. Further, all of the acts and practices of the Defendants set forth above constitute a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser" in violation of 15 U.S.C. § 1703(a)(2)(C).

763. In particular, the Defendants engaged in a continuing plan, scheme and course of business under which they consistently overstated Trump Soho sales levels and falsely created the perception of Unit shortages in order to deceitfully and fraudulently induce purchasers to sign Purchase Agreements for Trump Soho Units and thereafter to make the Additional Deposits called for in such Purchase Agreements.

764. The Defendant conducted the foregoing acts using the means and instruments of interstate and international commerce and communication and the mails.

765. For the reasons discussed above, each of the Defendants had strong motives and substantial opportunities to engage in these fraudulent and deceptive practices and did so knowingly and consciously, or at the very least, with substantial recklessness.

766.   For the reasons discussed above, the Defendants acted for their own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect their reputations, which were intimately bound up in the success of the Trump Soho project.

767.   The fraudulent and deceptive practices of the Defendants were material in the Purchasing Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

768.   Had the Defendants not engaged in these fraudulent and deceptive practices, the Purchasing Plaintiffs would not have entered into their Purchase Agreements, would not have made their Initial Deposits, and would not have made their Additional Deposits.

769.   Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the fair market value of the Trump Soho Units (to the extent they were marketable at all) would have been substantially below the purchase prices agreed to by the Purchasing Plaintiffs at the time they were entered into.

770.   Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the current fair market value of the Trump Soho Units (to the extent they are marketable at all) is substantially below the purchase prices agreed to by the Purchasing Plaintiffs.

771.   Indeed, as the nature and extent of the Defendants fraudulent and deceptive practices, and the low level of actual Unit sales, become widely known, on information and belief, the actual prices at which the Sponsor can sell Units and

close the sales of Units under Purchase Agreements are substantially below the sales and closing prices previously realized by the Sponsor. The basis for this information and belief is that recorded purchase prices at closing listed on documents filed with the City Register are more than 20% lower than the offering prices listed in the Offering Plan, as amended to the date of the Purchase Agreement.

772. On information and belief, the current sales and closing prices for Trump Soho Units for purchasers that are aware of the low level of actual sales are well more than 20% below the purchase prices the Sponsor originally offered and which the Purchasing Plaintiffs agreed to in their Purchase Agreements.

773. Further, the fraudulent and deceptive practices of the Defendants not only induced the Purchasing Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

774. Had the Defendants not engaged in their fraudulent and deceptive practices, a sufficiently lower number of purchasers of Trump Soho Units (including both the Purchasing Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

775.   If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and the Martin Act and its regulations from closing on the sale of any Units by that date.

776.   If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho, including each of the Purchasing Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

777.   Had each Purchasing Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

778.   As a result of Defendants' violations of 15 U.S.C. § 1703(a)(2), the Purchasing Plaintiffs are entitled to relief against the Defendants under 15 U.S.C. § 1709, including:  (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) reasonable attorney's fees; (f) any independent appraisers' fees; (g) any costs incurred by a Purchasing Plaintiff or a person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office; (h) interest; and (g) such other relief as the Court deems fair, just and equitable.

## CLAIM II – COMMON LAW FRAUD

(by all Plaintiffs against all Defendants)

779.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

780.   As set forth in detail above, the Defendants made (or were legally responsible for the making of) numerous false statements regarding the levels of sales at the Trump Soho.

781.   As set forth in detail above, each such statement made by a Defendant (or for which a Defendant was legally responsible) was a statement of a material existing fact and was false at the time it was made.

782.   As set forth in detail above, each Defendant that made such a false statement or was legally responsible for the making of such statement knew or should have known at the time of the making of such statement that it was false, or at the very least, was substantially reckless in making such statement.

783.   For the reasons discussed above, each of the Defendants had strong motives and substantial opportunities to make these false statements and did so knowingly and consciously, or at the very least, with substantial recklessness.

784.   For the reasons discussed above, in making these false statements, the Defendants acted for their own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect their reputations, which were intimately bound up in the success of the Trump Soho project.

785.   The Defendants made (or were legally responsible for making) these statements with the intention that they be relied upon by the Plaintiffs.

786.   None of the Plaintiffs knew that such statements were false.

787.   Each of the Plaintiffs relied upon the false statements of the Defendants in deciding to enter into a Purchase Agreement for a Unit of the Trump Soho, to authorize an entity they owned and controlled to enter into such a Purchase Agreement, to make Deposits under such Purchase Agreements and/or to contribute the funds to make such Deposits.

788.   Such reliance by each Plaintiff was justifiable.

789.   Based upon such justifiable reliance by the Plaintiffs, they were each fraudulently induced to enter into a Purchase Agreement for a Unit of the Trump Soho, to authorize an entity they owned and controlled to enter into such a Purchase Agreement, to make Deposits under such Purchase Agreements and/or to contribute the funds to make such Deposits.

790.   By reason of such fraud, each Plaintiff was suffered injury and harm for which the Defendants are liable.

791.   As a result of Defendants' fraud, the Plaintiffs are entitled relief against the Defendants including:  (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) compensatory damages in the amount of the Deposits made plus all interest accrued thereon and any other costs and expenses incurred by the Plaintiffs in entering into the Purchase Agreements; (d) punitive damages; (e) costs; (f) reasonable attorney's fees; (g) any independent appraisers' fees; (h) interest; and (i) such other relief as the Court deems fair, just and equitable.

## CLAIM III – SECURITIES FRAUD – 1934 ACT § 10(b) & RULE 10b-5

### (by Purchasing Plaintiffs against Misrepresenting Defendants)

792.    Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

793.    Under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j, it is unlawful for any person directly or indirectly to use or employ, in connection with the purchase or sale of any security… any *manipulative* or *deceptive* device or contrivance in contravention of such rules and regulations as may be prescribed by the Securities and Exchange Commission.

794.    Rule 10b-5, promulgated under the 1934 Act, 17 C.F.R. 240.10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person
>
> in connection with the purchase or sale of any security.

795.    As shown above, the Units at the Trump Soho constituted a securities under Section 3(a)(10) of the 1934 Act, 15U.S.C. §78(a)(10).

796.    As laid out in detail above, the Defendants made numerous false, deceptive and misleading statements to induce the Purchasing Plaintiffs to enter Purchase Agreements at the Trump Soho.

797.   In making such false, deceptive and misleading statements, the Defendants used
"manipulative [and] deceptive device[s]," in violation of 15 U.S.C. § 78j.

798.   All of the statements made by the Defendants constitute untrue statements of a
material fact and/or omissions of material fact necessary in order to make the
statements made, in light of the circumstances under which they are made, not
misleading, in violation of Rule 10b-5(b).

799.   In addition, all of the acts and practices of the Defendants set forth above
constitute a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a).

800.   Further, all of the acts and practices of the Defendants set forth above constitute
acts, practices, or courses of business which operated as a fraud or deceipt upon
the Plaintiffs, in violation of Rule 10(b)(5)(b).

801.   In particular, the Defendants engaged in a continuing plan, scheme and course of
business under which they consistently overstated Trump Soho sales levels and
falsely created the perception of Unit shortages in order to deceitfully and
fraudulently induce purchasers to sign Purchase Agreements for Trump Soho
Units and thereafter to make the Additional Deposits called for in such Purchase
Agreements.

802.   The Defendant conducted the foregoing acts using the means and instruments of
interstate and international commerce and communication and the mails.

803.   For the reasons discussed above, each of the Defendants had strong motives and
substantial opportunities to engage in these fraudulent and deceptive practices and
did so knowingly and consciously, or at the very least, with substantial
recklessness.

804.  For the reasons discussed above, the Defendants acted for their own financial
      benefit, to preserve the value and viability of the Trump Soho project, and to
      protect their reputations, which were intimately bound up in the success of the
      Trump Soho project.

805.  The fraudulent and deceptive practices of the Defendants were material in the
      Purchasing Plaintiffs decisions to enter into their Purchase Agreements and to
      make their Additional Deposits.

806.  Had the Defendants not engaged in these fraudulent and deceptive practices, the
      Purchasing Plaintiffs would not have entered into their Purchase Agreements,
      would not have made their Initial Deposits, and would not have made their
      Additional Deposits.

807.  Had the sales and marketing of the Trump Soho been free of the Defendants'
      fraudulent and deceptive practices, the fair market value of the Trump Soho Units
      (to the extent they were marketable at all) would have been substantially below
      the purchase prices agreed to by the Purchasing Plaintiffs at the time they were
      entered into.

808.  Had the sales and marketing of the Trump Soho been free of the Defendants'
      fraudulent and deceptive practices, the current fair market value of the Trump
      Soho Units (to the extent they are marketable at all) is substantially below the
      purchase prices agreed to by the Purchasing Plaintiffs.

809.  Indeed, as the nature and extent of the Defendants fraudulent and deceptive
      practices, and the low level of actual Unit sales, become widely known, on
      information and belief, the actual prices under which the Sponsor can sell Units

and close the sales of Units under Purchase Agreements are substantially below the sales and closing prices available to the Sponsor.  The basis for this information and belief is that recorded purchase prices at closing listed on documents filed with the City Register are more than 20% lower than the offering prices listed in the Offering Plan, as amended to the date of the Purchase Agreement.

810.  On information and belief, the current sales and closing prices for Trump Soho Units for purchasers that are aware of the low level of actual sales are well more than 20% below the purchase prices the Sponsor originally offered and which the Purchasing Plaintiffs agreed to in their Purchase Agreements.

811.  Further, the fraudulent and deceptive practices of the Defendants not only induced the Purchasing Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

812.  Had the Defendants not engaged in their fraudulent and deceptive practices, a sufficiently lower number of purchasers of Trump Soho Units (including both the Purchasing Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

813.   If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and the Martin Act and its regulations from closing on the sale of any Units by that date.

814.   If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho, including each of the Purchasing Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

815.   Had each Purchasing Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

816.   As a result of Defendants' violations of Section 10(b) of the 1934 Act and Rule 10(b)(5), the Purchasing Plaintiffs are entitled to relief against the Defendants under Section 10(b) of the 1934 Act and Rule 10(b)(5), including:  (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

## CLAIM IV – SECURITIES CONTROL PERSONS – 1934 ACT § 20(a)

(by Purchasing Plaintiffs against Control Defendants)

817.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

818.   Under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this title [the 1934 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

819.   As set forth above, the Sponsor and the other Misrepresenting Defendants are persons liable under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

820.   For the reasons set forth above, each of the Control Defendants is, by reason of its position, ownership and actions, a "person who, directly or indirectly, controls" the Sponsor and the other Misrepresenting Defendants.

821.   None of the Control Defendants acted in good faith in connection with the acts and omissions constituting a violation of under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

822.   Each of the Control Defendants directly or indirectly induced the acts and omissions constituting a violation of under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

823.   As such, the Control Defendants are jointly and severally liable to the Plaintiff for the acts and omissions of the Sponsor and the other Misrepresenting Defendants

for the acts and omissions constituting a violation of under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.

824. As a result the Purchasing Plaintiffs are entitled to relief under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) against the Control Defendants under 15 U.S.C. § 1709, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

## CLAIM V – SECURITIES FRAUD – 1933 ACT § 12(a)(2)

(by Purchasing Plaintiffs against the Sponsor)

825. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

826. Under Section 12(a)(2) of the 1933 Act, 15 U.S.C. 77l:

Any person who—

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they are made, not misleading (the purchaswer not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

First Amended Complaint Page 173

> shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

827. As shown above, the Units at the Trump Soho constituted securities under Section 2(a)(1) of the 1933 Act, 15U.S.C. 77b(a)(1).

828. As discussed in detail above, each of the false statements made by the Sponsor constitutes either a prospectus or an oral communication.

829. As laid out in detail above, the Sponsor made numerous false, deceptive and misleading statements to induce the Purchasing Plaintiffs to enter Purchase Agreements at the Trump Soho.

830. All of the statements made by the Sponsor constitute untrue statements of a material fact and/or omissions of material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, in violation of Section 12(a)(2) of the 1933 Act.

831. The Sponsor made the foregoing false statements using the means and instruments of interstate and international commerce and communication and the mails.

832. For the reasons discussed above, the Sponsor had strong motives and substantial opportunities to engage in these fraudulent and deceptive practices and did so knowingly and consciously, or at the very least, with substantial recklessness.

833. For the reasons discussed above, the Sponsor acted for its own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect its

reputation, which was intimately bound up in the success of the Trump Soho project.

834. The false statements of the Sponsor were material in the Purchasing Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

835. Had the Sponsor not made the false statements, the Purchasing Plaintiffs would not have entered into their Purchase Agreements, would not have made their Initial Deposits, and would not have made their Additional Deposits.

836. Had the sales and marketing of the Trump Soho been free of the Sponsor's false statements, the fair market value of the Trump Soho Units (to the extent they were marketable at all) would have been substantially below the purchase prices agreed to by the Purchasing Plaintiffs at the time they were entered into.

837. Had the sales and marketing of the Trump Soho been free of the Sponsor's false statements, the current fair market value of the Trump Soho Units (to the extent they are marketable at all) is substantially below the purchase prices agreed to by the Purchasing Plaintiffs.

838. Indeed, as the nature and extent of the Sponsor's false statements, and the low level of actual Unit sales, become widely known, on information and belief, the actual prices under which the Sponsor can sell Units and close the sales of Units under Purchase Agreements are substantially below the sales and closing prices available to the Sponsor.  The basis for this information and belief is that recorded purchase prices at closing listed on documents filed with the City Register are

more than 20% lower than the offering prices listed in the Offering Plan, as amended to the date of the Purchase Agreement.

839. On information and belief, the current sales and closing prices for Trump Soho Units for purchasers that are aware of the low level of actual sales are well more than 20% below the purchase prices the Sponsor originally offered and which the Purchasing Plaintiffs agreed to in their Purchase Agreements.

840. Further, the false statements of the Sponsor not only induced the Purchasing Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

841. Had the Sponsor not made the false statements, a sufficiently lower number of purchasers of Trump Soho Units (including both the Purchasing Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

842. If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and the Martin Act and its regulations from closing on the sale of any Units by that date.

First Amended Complaint Page 176

843.    If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho, including each of the Purchasing Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

844.    Had each Purchasing Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

845.    As a result of the Sponsor's violations of Section 12(a) of the 1933 Act, the Purchasing Plaintiffs are entitled to relief against the Sponsor under Section 12(a) of the 1933 Act, including:  (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

### CLAIM VI – SECURITIES CONTROL PERSONS – 1933 ACT § 15

(by Purchasing Plaintiffs against the Control Defendants)

846.    Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein. Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

847.    Under Section 15 of the 1933 Act, 15 U.S.C. § 77o:

>       Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding

First Amended Complaint Page 177

with one or more persons by or through stock ownership, agency, or otherwise, controls any personal liable under sections 77k or 77l of this title [sections 11 or 12 of the 1933 Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

848.   As set forth above, the Sponsor is a person liable under Section 12 of the 1933 Act, 15 U.S,C. 77l.

849.   For the reasons set forth above, each of the Control Defendants is, by reason of its position, ownership and actions, a person who "controls" the Sponsor.

850.   All of the Control Defendants had knowledge of and/or reasonable grounds to know of the acts and omissions constituting a violation of Section 12 of the 1933 Act, 15 U.S,C. 77l.

851.   As such, the Control Defendants are jointly and severally liable to the Plaintiff for the acts and omissions of the Sponsor for the acts and omissions constituting a violation of under Section 12 of the 1933 Act, 15 U.S,C. 77l.

852.   As a result the Purchasing Plaintiffs are entitled to relief under Section 15 of the 1933 Act, 15 U.S,C. 77o. against the Control Defendants, jointly and severally, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) interest; and (f) such other relief as the Court deems fair, just and equitable.

## CLAIM VII – DECEPTIVE BUSINESS PRACTICES, GBL §§ 349 *et seq.*

(by all Plaintiffs against all Defendants)

853.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

854.   Under the General Business Law of New York, NY GBL 349(a), it is unlawful to engage in "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state…"

855.   As laid out in detail above, the Defendants made numerous false, deceptive and misleading statements with regard to the percentage and/or number of Units sold and the potential for return on investment.

856.   As detailed above the false, deceptive and misleading statements made by the Defendants were widely disseminated in the media, made in periodicals with large circulation, and to consumers who expressed interest in purchasing a Unit at the Trump Soho.

857.   The Defendants' false, deceptive and misleading statements were aimed at inducing consumers to enter into purchase agreements.

858.   The Defendants' false, deceptive and misleading statements did in fact induce the Purchasing Plaintiffs to enter into their Purchase Agreements and thereafter to make the Additional Deposits called for in such Purchase Agreements.

859.   The fraudulent and deceptive practices of the Defendants were material in the Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

860.    Had the Defendants not engaged in these fraudulent and deceptive practices, the
Plaintiffs would not have entered into their Purchase Agreements, would not have
made their Initial Deposits, and would not have made their Additional Deposits.

861.    Had the sales and marketing of the Trump Soho been free of the Defendants'
fraudulent and deceptive practices, the fair market value of the Trump Soho Units
(to the extent they were marketable at all) would have been substantially below
the purchase prices agreed to by the Plaintiffs at the time they were entered into.

862.    Had the sales and marketing of the Trump Soho been free of the Defendants'
fraudulent and deceptive practices, the current fair market value of the Trump
Soho Units (to the extent they are marketable at all) is substantially below the
purchase prices agreed to by the Plaintiffs.

863.    Indeed, as the nature and extent of the Defendants fraudulent and deceptive
practices, and the low level of actual Unit sales, become widely known, on
information and belief, the actual prices under which the Sponsor can sell Units
and close the sales of Units under Purchase Agreements are substantially below
the sales and closing prices available to the Sponsor.  The basis for this
information and belief is that recorded purchase prices at closing listed on
documents filed with the City Register are more than 20% lower than the offering
prices listed in the Offering Plan, as amended to the date of the Purchase
Agreement.

864.    On information and belief, the current sales and closing prices for Trump Soho
Units for purchasers that are aware of the low level of actual sales are well more

than 20% below the purchase prices the Sponsor originally offered and which the Plaintiffs agreed to in their Purchase Agreements.

865.   Further, the fraudulent and deceptive practices of the Defendants not only induced the Plaintiffs to enter into Purchase Agreements and to make Additional Deposits, these practices fraudulently and deceptively induced other Trump Soho Unit purchasers to enter into Purchase Agreements and to make Additional Deposits.

866.   Had the Defendants not engaged in their fraudulent and deceptive practices, a sufficiently lower number of purchasers of Trump Soho Units (including both the Plaintiffs and non-Plaintiff purchasers) would have entered into Purchase Agreements and made Additional Deposits such that, by May 31, 2010, the Sponsor would not have had at least 15% of the total number of Units offered under non-defaulted Purchase Agreements, as required by the Martin Act and its regulations, or at least 60 Units, as required by the Offering Plan, to declare the Offering Plan effective.

867.   If the Sponsor did not have sufficient non-defaulted Purchase Agreements in effect to declare the Plan effective on or before May 31, 2010, and did not declare the Plan effective by that date, the Sponsor would be prohibited by the Plan and the Martin Act and its regulations from closing on the sale of any Units by that date.

868.   If the Sponsor had not closed on the sale of any Units on or before May 31, 2010, the Sponsor would have been required under the Plan and the Martin Act and its regulations to, on that date, offer each purchaser of a Unit at the Trump Soho,

including each of the Plaintiffs, the option to rescind its Purchase Agreement and obtain a full refund of its Deposit plus all interest accrued thereon.

869.    Had each Plaintiffs been offered the option to rescind its Purchase Agreement on or about May 31, 2010, it would have exercised that option, rescinded its Purchase Agreement and obtained a full refund of its Deposit, plus all interest accrued thereon.

870.    As a result of Defendants' violations of Section 349 (a) of the New York General Business Law, the Plaintiffs are entitled to relief against the Defendants under Section 349 (a) of the New York General Business Law, including:   (a) damages in the amount of the Deposits made plus all interest accrued thereon; (b) statutory damages in the amount of $1,000.00 per Plaintiff; (c)costs; (d) interest; (e) reasonable attorney's fees; and (f) such other relief as the Court deems fair, just and equitable.

## CLAIM VIII – BREACH OF CONTRACT

(by Purchasing Plaintiffs against the Sponsor)

871.    Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

872.    Each Purchase Agreement is a contract, duly entered into by the Purchasing Plaintiffs and the Sponsor.

873.    Each Purchase Agreement expressly provides that the Plan (defined in ¶ 1 to include all amendments filed prior to the date of the Purchase Agreement) "is incorporated herein by reference and made a part hereof with the same force and

effect as if set forth herein at length.  In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern." (¶ 11.2)

874.   Included in the Plan is a detailed budget for the Condominium, which specifies not only the payroll budgets by department, but also for each department the exact number of employees for each job title to be hired.  (Plan, pages 73-81)

875.   In total, the Plan stated that the Condominium would employ a staff of 213 employees.

876.   The Plan explained the Condominium's staffing needs and costs as follows:

> The costs listed here are not anticipated to vary considerably due to changes from time to time in the levels of hotel occupancy as these costs are considered to be the core management and service staff necessary to operate a quality hotel of the size of the Condominium. (Page 72)

877.   Each of the Purchase Agreements at issue herein (and indeed all of the 62 Purchase Agreements listed in the Sapir Affidavit) were signed when the budgets in the original Plan or the Third Amendment, which slightly revised the budget, were current, and therefore the (identical) staffing levels set out in the original Plan and the Third Amendment were incorporated into the Purchase Agreements and became terms and covenants agreed to by the parties.

878.   In the May 5, 2010 Tenth Amendment, issued well after each Purchase Agreement had been signed, there was a budget that showed that the Condominium would have drastically slashed staffing levels.

879.   The prior staff of 213 was cut down to a total of 159 employees, a reduction of 25.4% and many departments were radically reduced.

880.   The change in staffing reflected in the Tenth Amendment, undertaking more responsibilities with less than three-quarters of the staff, reflects a material

decrease in the level of services from what the Sponsor agreed to provide to the Purchasing Plaintiffs in their Purchase Agreements.

881. Such a reduction in staffing and services constitutes a material breach of each of the Purchasing Plaintiffs' Purchase Agreements.

882. The AG Regs. specify with regard to amendments to Offering Plans that:

> If there is a material amendment to the offering plan that adversely affects the purchasers, sponsor must grant purchasers a right of rescission and a reasonable period of time that is not less than fifteen (15) days after the date of presentation to exercise the right. Sponsor must return any deposit or down payment to purchasers who rescind. 13 NYCRR § 20.5(a)(5).

883. The Plan provides (at page 177) with respect to amendments to the Plan that:

> All substantive or material revisions will be contained in a duly filed amendment to the Plan.  If there is a material change that adversely affects any Purchasers, Sponsor will grant such Purchasers a right to rescind their respective Agreements by written notice to Sponsor given within fifteen (15) days after the date of presentation of such amendment.  In such event, Sponsor will direct the Escrow Agent to return the Deposit of any Purchasers who duly rescind their Agreement.

884. The Plan's provision requiring the Sponsor to grant purchasers a right to rescind their Purchase Agreements on a material adverse change was incorporated by reference into each Purchase Agreement.

885. The decrease in Condominium staffing set forth in the Tenth Amendment is "a material change that adversely affects . . . Purchasers."

886. Neither in the Tenth Amendment nor in any document provided to the Purchasing Plaintiffs at or after the time the Tenth Amendment was distributed did the Sponsor grant the Purchasing Plaintiffs or other purchasers a right to rescind their Purchase Agreements.

887.   The Sponsor's failure to grant a right to rescind the Purchasing Plaintiffs'
       Purchase Agreement based on the material adverse change set forth in the Tenth
       Amendment constitutes a material breach of each Purchasing Plaintiffs' Purchase
       Agreement.

888.   In addition, the failure of the Sponsor and the Condominium Board (consisting of
       Donald Trump, Alex Sapir, and Julius Schwarz) to comply with the requirement
       on the very first page of the Offering Plan that they will "maintain a list of five (5)
       real estate brokers" to act as "Qualified Brokers" for the Unit, instead only
       designating a single "Qualified Broker," is also a material breach.

889.   As a result of the Sponsor's material breach of each Purchasing Plaintiff's
       Purchase Agreement, the Sponsor should be permitted to require each Purchasing
       Plaintiff to close, but rather should be required to refund the full deposit of each
       Purchasing Plaintiff.

890.   As a result of  the Sponsor's material breach of each Plaintiff's Purchase
       Agreement, the Plaintiffs are entitled to relief against the Sponsor, including:  (a)
       rescission of their Purchase Agreements; (b) the refund of all Deposits made
       under the Purchase Agreements plus all interest accrued thereon; (c) damages in
       the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e)
       interest; and (f) such other relief as the Court deems fair, just and equitable.

<u>**CLAIM IX – ILSA PROPERTY REPORT OMISSION,**</u>

<u>**15 U.S.C. § 1703(a)(1)(B) & (C)**</u>

(Purchasing Plaintiffs against All Defendants)

891.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set

forth herein.

892.   15 U.S.C. § 1703(a)(1) provides, in relevant part:

It shall be unlawful for any developer or agent, directly or indirectly, to
make use of any means or instruments of transportation or communication
in interstate commerce, or of the mails--

(**1**) with respect to the sale or lease of any lot not exempt under section
1702 of this title-- . . .

(**B**) to sell or lease any lot unless a printed property report, meeting the
requirements of section 1707 of this title, has been furnished to the
purchaser or lessee in advance of the signing of any contract or agreement
by such purchaser or lessee;

(**C**) to sell or lease any lot where any part of the statement of record or the
property report contained an untrue statement of a material fact or omitted
to state a material fact required to be stated therein pursuant to sections
1704 through 1707 of this title or any regulations thereunder; or

(**D**) to display or deliver to prospective purchasers or lessees advertising
and promotional material which is inconsistent with the information
required to be disclosed in the property report; . . .

893.   The Purchase Agreements of the Trump Soho Units entered into by the

Purchasing Plaintiffs were not subject to any ILSA Exemption at the time they

were entered into.

894.   As discussed above, the ILSA Property Report distributed to the Purchasing

Plaintiffs did not meet the requirements of 15 U.S.C. § 1707 and its regulations in

that it failed to specify unconditionally on its cover the required language that

"you may cancel your contract or agreement of sale any time within two years

from the date of signing."

895.    Such failure to distribute a compliant ILSA Property Report violated 15 U.S.C. §

1703(a)(1)(B).

896.    Similarly, the ILSA Property Report "contained an untrue statement of a material

fact or omitted to state a material fact required to be stated therein pursuant to

sections 1704 through 1707 of [15 U.S.C.] or any regulations thereunder" in that

it failed to specify unconditionally on its cover that the purchaser had a two year

period to cancel its Purchase Agreement, but rather falsely stated that the

purchaser had only seven days to cancel its Purchase Agreement, unless it had not

received the ILSA Property Report, in which case it would have two years.

897.    The sale of Units to the Purchasing Plaintiffs where the ILSA Property Report

contained material false and misleading statements violated 15 U.S.C. §

1703(a)(1)(C).

898.    Likewise, the Purchase Agreements, the form of which had been submitted to

HUD as part of the Sponsor's Statement of Record, "contained an untrue

statement of a material fact or omitted to state a material fact required to be stated

therein pursuant to sections 1704 through 1707 of [15 U.S.C.] or any regulations

thereunder" in that they failed to specify unconditionally on their signature pages

that the purchaser had a two year period to cancel its Purchase Agreement, but

rather falsely stated that the purchaser had only seven days to cancel its Purchase

Agreement, unless it had not received the ILSA Property Report, in which case it would have two years

899.   The sale of Units to the Purchasing Plaintiffs where the Statement of Record contained material false and misleading statements violated 15 U.S.C. § 1703(a)(1).

900.   The Defendants were each either a developer or its agent with respect to such acts.

901.   The Defendants conducted the foregoing acts using the means and instruments of interstate and international commerce and communication and the mails.

902.   Had the Defendants issued an ILSA Property Report, Purchase Agreements and a Statement of Record that were not false and deceptive, but rather complied with the requirements of ILSA and its regulations, , the Purchasing Plaintiffs would each have been aware that they had the unconditional right to revoke their Purchase Agreements within two years of their signing.

903.   Had the Purchasing Plaintiffs been aware that they had the unconditional right to revoke their Purchase Agreements within two years of their signing, they each would have done so within the time required.

904.   Had the Purchasing Plaintiffs timely revoked their Purchase Agreements, under 15 U.S.C. § 1703(3) they each would "be entitled to all money paid by him or her under such contract or agreement."

905.   As a result of Defendants' violations of 15 U.S.C. § 1703(a)(1), the Purchasing Plaintiffs are entitled to relief against the Defendants under 15 U.S.C. § 1709, including:  (a) rescission of their Purchase Agreements; (b) the refund of all

First Amended Complaint Page 188

Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) reasonable attorney's fees; (f) any independent appraisers' fees; (g) any costs incurred by a Purchasing Plaintiff or a person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office; (h) interest; and (i) such other relief as the Court deems fair, just and equitable.

## CLAIM X – MISLEADING AND INCONSISTENT ILSA PROPERTY REPORT, 15 U.S.C. § 1703(a)(1)(B), (C) & (D)

(Purchasing Plaintiffs against All Defendants)

906.     Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein.

907.     As discussed above, the Purchase Agreements, which incorporate by reference the Offering Plan, set forth the rights and obligations of the Purchasing Plaintiffs and the Sponsor with respect to each other

908.     The Purchase Agreements and the Offering Plan provide that the Deposit constituting 20% of the full purchase price which was required to be submitted by the Purchasing Plaintiffs is to be considered liquidated damages to be retained by the Sponsor in the event of an uncured default.

909.     The Purchase Agreements and the Offering Plan contain no provision that would allow a purchaser, upon default, a partial refund of any Deposit in excess of 15% of the purchase price or actual damages if greater.

910.     Despite this, the ILSA Property Report states that upon an uncured default, the Sponsor "if and to the extent required by" ILSA will give the defaulting purchaser

a partial refund of any Deposit in excess of 15% of the purchase price or actual damages if greater.

911. As the Purchase Agreements and the Offering Plan contained no provision allowing a purchaser a partial Deposit refund upon default, the statement in the ILSA Property Report that a defaulting purchasers would be entitled to a partial refund of any Deposit in excess of 15% of the purchase price or actual damages if greater is materially false and misleading.

912. Further, there is no provision of ILSA that contains any requirement that any developer give any deposit refund on default, so the ILSA Property Report falsely and misleadingly states the requirements of ILSA.

913. As such, the ILSA Property Report "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein pursuant to sections 1704 through 1707 of [15 U.S.C.] or any regulations thereunder."

914. The sale of Units to the Purchasing Plaintiffs where the ILSA Property Report contained material false and misleading statements violated 15 U.S.C. § 1703(a)(1)(C).

915. Further, the ILSA Property Report distributed to the Purchasing Plaintiffs did not meet the requirements of 15 U.S.C. § 1707 and its regulations.

916. Such failure to distribute a compliant ILSA Property Report violated 15 U.S.C. § 1703(a)(1)(B).

917. The Offering Plan and the Purchase Agreements were each distributed to prospective Trump Soho purchasers in advance of the Purchase Agreements being signed in an effort to market, advertise and promote the Trump Soho.

918.    The Offering Plan and the Purchase Agreements were marketing, advertising and
promotional material of the Trump Soho displayed or delivered to prospective
Trump Soho purchasers.

919.    Because the Purchase Agreements and the Offering Plan do not contain any
requirement that the Sponsor give a partial refund on default, they are
"advertising or promotional materials which [are] inconsistent with information"
disclosed in the ILSA Property Report.

920.    The display or delivery of the inconsistent Offering Plan and the Purchase
Agreements to the Purchasing Plaintiffs when they were prospective purchasers
violated 15 U.S.C. § 1703(a)(1)(D).

921.    The Purchase Agreements of the Trump Soho Units entered into by the
Purchasing Plaintiffs were not subject to any ILSA Exemption at the time they
were entered into.

922.    The Defendants were each either a developer or its agent with respect to such
acts.

923.    The Defendants conducted the foregoing acts using the means and instruments of
interstate and international commerce and communication and the mails.

924.    Had the Defendants issued an ILSA Property Report was not false and deceptive,
distributed Purchase Agreements an Offering Plan inconsistent with the ILSA
Property Report, and otherwise complied with the requirements of ILSA and its
regulations, the Purchasing Plaintiffs would each have been aware of their rights
under ILSA.

925.    The Purchasing Plaintiffs were each damaged by the Defendants' issuance of a

false and deceptive ILSA Property Report, distribution of Purchase Agreements

and an Offering Plan inconsistent with the ILSA Property Report and failure to

otherwise comply with the requirements of ILSA.

926.    As a result of Defendants' violations of 15 U.S.C. § 1703(a)(1), the Purchasing

Plaintiffs are entitled to relief against the Defendants under 15 U.S.C. § 1709,

including:  (a) rescission of their Purchase Agreements; (b) the refund of all

Deposits made under the Purchase Agreements plus all interest accrued thereon;

(c) damages in the amount of the Deposits made plus all interest accrued thereon;

(d) costs; (e) reasonable attorney's fees; (f) any independent appraisers' fees; (g)

any costs incurred by a Purchasing Plaintiff or a person acting for a Purchasing

Plaintiff for travel to the Trump Soho site or sales office; (h) interest; and (g) such

other relief as the Court deems fair, just and equitable.

## CLAIM XI – DECEPTIVE ILSA PROPERTY REPORT, 15 U.S.C. § 1703(a)(1)

(Purchasing Plaintiffs against All Defendants)

927.    Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set

forth herein.

928.    As set forth above, statement in the ILSA Property Report states, upon an uncured

default, the Sponsor "if and to the extent required by" ILSA will give the

defaulting purchaser a partial refund of any Deposit in excess of 15% of the

purchase price or actual damages if greater, constitutes a false, deceptive and

misleading statement to induce the Purchasing Plaintiffs to enter Purchase

Agreements at the Trump Soho

929.  In making such a false, deceptive and misleading statement, the Defendants acted "to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision," in violation of 15 U.S.C. § 1703(a)(2)(B).

930.  In addition, such an act and practice of the Defendants constitutes a "device, scheme, or artifice to defraud," in violation of 15 U.S.C. § 1703(a)(2)(A).

931.  Further, such an act and practice of the Defendants constitutes a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser" in violation of 15 U.S.C. § 1703(a)(2)(C).

932.  The Defendant conducted the foregoing act and practice using the means and instruments of interstate and international commerce and communication and the mails.

933.  For the reasons discussed above, each of the Defendants had strong motives and substantial opportunities to engage in these fraudulent and deceptive practices and did so knowingly and consciously, or at the very least, with substantial recklessness.

934.  For the reasons discussed above, the Defendants acted for their own financial benefit, to preserve the value and viability of the Trump Soho project, and to protect their reputations, which were intimately bound up in the success of the Trump Soho project.

935. The fraudulent and deceptive practices of the Defendants were material in the Purchasing Plaintiffs decisions to enter into their Purchase Agreements and to make their Additional Deposits.

936. Had the Defendants not engaged in these fraudulent and deceptive practices, the Purchasing Plaintiffs would not have entered into their Purchase Agreements.

937. The Purchasing Plaintiffs were damaged by these fraudulent and deceptive practices.

938. The Defendants were each either a developer or its agent with respect to such acts and practices.

939. The Defendants conducted the foregoing acts and practices using the means and instruments of interstate and international commerce and communication and the mails.

940. As a result of Defendants' violations of 15 U.S.C. § 1703(a)(1), the Purchasing Plaintiffs are entitled to relief against the Defendants under 15 U.S.C. § 1709, including: (a) rescission of their Purchase Agreements; (b) the refund of all Deposits made under the Purchase Agreements plus all interest accrued thereon; (c) damages in the amount of the Deposits made plus all interest accrued thereon; (d) costs; (e) reasonable attorney's fees; (f) any independent appraisers' fees; (g) any costs incurred by a Purchasing Plaintiff or a person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office; (h) interest; and (g) such other relief as the Court deems fair, just and equitable.

## <u>CLAIM XII – ILSA REVOCATION, 15 U.S.C. § 1703(d)</u>

(Palmer Garden against the Sponsor)

941.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set forth herein

942.   Because the Purchase Agreement entered into between Palmer Gardens and the Sponsor dated January 28, 2008 failed to contain the terms specified in 15 U.S.C. § 1703(d)(1) & (3), Palmer Gardens was entitled to revoke its Purchase Agreement within two years of its signing under 15 U.S.C. § 1703(d).

943.   By letter dated January 18, 2010 sent by Federal Express from Palmer Gardens' counsel to the Sponsor and the Escrow Agent, Palmer Gardens revoked its Purchase Agreement and demanded immediate repayment of all money deposited under the Purchase Agreement.

944.   From the time that Palmer Gardens signed its Purchase Agreement through the time it submitted letter revoking its Purchase Agreement, no ILSA Exemption applied to its transaction.

945.   No deed to the Trump Soho Unit at issue in Palmer Gardens Purchase Agreement was ever delivered to Palmer Gardens, much less delivered within 180 days of the Purchase Agreement's signing.

946.   As such, Palmer Garden properly, validly and timely revoked its Purchase Agreement.

947.   Upon such revocation, the Sponsor was required under 15 U.S.C. § 1703(e) to refund all money paid by Palmer Gardens under the Purchase Agreement.

948.   The Sponsor failed to acknowledge Palmer Gardens' revocation of the Purchase
Agreement and failed to refund any money paid by Palmer Gardens.

949.   As a result of the Sponsor's violations of 15 U.S.C. § 1703(d) & (e), Palmer
Gardens is entitled to relief against the Sponsor under 15 U.S.C. § 1709,
including:  (a) a declaration that it has validly revoked its Purchase Agreement;
(b) the refund of all Deposits made under its Purchase Agreements plus all
interest accrued thereon; (c) damages in the amount of its Deposits made plus all
interest accrued thereon; (d) costs; (e) reasonable attorney's fees; (f) any
independent appraisers' fees; (g) any costs incurred by Palmer Gardens or a
person acting for Palmer Gardens for travel to the Trump Soho site or sales office;
(h) interest; and (g) such other relief as the Court deems fair, just and equitable.

## CLAIM XIII – INJUNCTION TO HOLD AND REFUND ESCROW

(All Plaintiffs against the Escrow Agent)

950.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set
forth herein.

951.   Plaintiffs repeat and reallege all of the foregoing paragraphs as though fully set
forth herein.

952.   The Escrow Agent and the Sponsor entered into an Escrow Agreement dated June
26, 2007 (the "Escrow Agreement"), a copy of which is included as Exhibit 9 to
the Offering Plan, under which the Escrow Agent would hold the Deposits of
Trump Soho purchasers in escrow pending closing of the sales of the Units or
until otherwise released under the terms of the Escrow Agreement.

953.   Section 3.4 of the Escrow Agreement provides:

> If there is no written agreement between the parties to release the escrowed funds, ESCROW AGENT shall not pay the funds to SPONSOR until ESCROW AGENT has given the purchaser written notice of not fewer than ten (10) business days.  Thereafter, the funds may be paid to SPONSOR unless the purchaser has made application to the Department of Law pursuant to the dispute resolution provisions contained in the Attorney General's regulations and has so notified ESCROW AGENT in accordance with such provisions.

954.   Under this provision, if the Sponsor demands the Deposits from the Escrow Agent, the Escrow Agent will have to release them after ten business days notice, unless the purchaser makes an application under the Attorney General's dispute resolution procedures.

955.   However, the Escrow Agreement does not provide that the Escrow Agent will retain the Deposits in escrow in the event that a purchaser has instituted litigation against the Escrow Agent concerning the disposition of the Deposits.

956.   The Purchasing Plaintiffs are third party beneficiaries of the Escrow Agreement.

957.   Under the Escrow Agreement, the Escrow Agent is required to hold the Deposits for the benefit of the Sponsor and the Purchasing Plaintiffs until closing or the resolution of any dispute concerning the disposition of the Deposits.

958.   In Claims I through X above, the Plaintiffs have set forth causes of action under which they seek orders and judgments directing the return of their respective Deposits held by the Escrow Agent.

959.   If the Escrow Agent is permitted to release the Deposits from escrow prior to the resolution of the disputes among the parties to this action, the Plaintiffs will suffer irreparable harm.

960.   It would be fair, just and equitable to enter a preliminary injunction preserving the *status quo* and a permanent injunction directing the payment of the Deposits to the party that is determined by this Court to be entitled to the Deposits.

961.   For this reason, and for the reasons set forth in Claims I through X above, the Plaintiffs should be entitled to preliminary and permanent injunctive relief:  (i) ordering the Escrow Agent to maintain in escrow all funds held on behalf of each Purchasing Plaintiff herein until their payment is directed by an order of this Court or an agreement between the Sponsor and such Purchasing Plaintiff; and (ii) upon a determination of this Court as to which party is entitled to such funds, directing that the such funds be paid to the party entitled thereto.

## **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs herein respectfully request that this Court grant Judgment against the Defendants as follows:

I.   On Claim I, Judgment in favor of all Purchasing Plaintiffs against all Defendants:

a.   Awarding each Purchasing Plaintiffs rescission of its Purchase Agreement;

b.   Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows: (i)Palmer Gardens, in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $248,800.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver

Metal damages in the amount of $312,000.00; (vi) Credibox

damages in the amount of $74,515.25; (vii) Michael Hadjedj

damages in the amount of $500,600.00; (viii) Oliver Dacourt

damages in the amount of $460,400.00; plus all accrued interest

thereon;

c.     Awarding damages to each Purchasing Plaintiff in the amount of

their respective Deposits as listed above, plus all interest accrued

thereon;

d.     Awarding each Purchasing Plaintiff costs;

e.     Awarding each Purchasing Plaintiff attorney's fees;

f.     Awarding each Purchasing Plaintiff any independent appraisers'

fees

g.     Awarding each Purchasing Plaintiff any costs incurred by said

Plaintiff or person acting for a Purchasing Plaintiff for travel to the

Trump Soho site or sales office;

h.     Awarding each Purchasing Plaintiff interest; and

i.     Awarding each Purchasing Plaintiff such other relief as the Court

deems fair, just, and equitable

II.     On Claim II, Judgment in favor of all Plaintiffs against all Defendants:

a.     Awarding each Plaintiff rescission of its Purchase Agreement;

b.     Directing the repayment to each Plaintiff their respective deposits,

as follows: (i) Palmer Gardens, Rachel Gerstein, Joyce Gerstein,

and Herbert Gerstein, in the amount of $427,200.00; (ii) Alan

Maltz and Janet Maltz in the amount of $248,800.00; (iii) Hubert

Tsai and Christine Singh damages in the amount of $212,400.00;

(iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in

the amount of $251,400.00; (v) Beaver Metal and Acacio

Rodriguez damages in the amount of $312,000.00; (vi) Credibox

and Felisa Hernandez damages in the amount of $74,515.25; (vii)

Michael Hadjedj damages in the amount of $500,600.00; (viii)

Oliver Dacourt damages in the amount of $460,400.00; plus all

accrued interest thereon;

c.    Awarding compensatory damages to each Plaintiff in the amount
of their respective deposits as listed above;

d.    Awarding each Plaintiff punitive damages in an amount to be
proven at trial;

e.    Awarding each Plaintiff costs;

f.    Awarding each Plaintiff reasonable attorney's fees;

g.    Awarding each Plaintiff any independent appraisers' fees

h.    Awarding each Plaintiff interest; and

i.    Awarding each Plaintiff such other relief as the Court deems fair,
just, and equitable.

III.    On Claim III, Judgment in favor of all Purchasing Plaintiffs against the
Misrepresenting Defendants:

a.    Awarding each Purchasing Plaintiff rescission of its Purchase
Agreements;

b.      Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows: (i) Palmer Gardens in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $248,800.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $74,515.25; (vii) Michael Hadjedj damages in the amount of $500,600.00; (viii) Oliver Dacourt damages in the amount of $460,400.00; plus all accrued interest thereon;

c.      Awarding damages to each Purchasing Plaintiff in the amount of their respective deposits as listed above;

d.      Awarding each Purchasing Plaintiff costs;

e.      Awarding each Purchasing Plaintiff interest; and

f.      Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable.

IV.     On Claim IV, Judgment for Purchasing Plaintiffs against Control Defendants:

a.      Awarding each Purchasing Plaintiffs rescission of its Purchase Agreements;

b.      Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows:

        i.    Palmer Gardens, in the amount of $427,200.00; (ii) Alan

Maltz and Janet Maltz in the amount of $248,800.00; (iii)

Hubert Tsai and Christine Singh damages in the amount of

$212,400.00; (iv) Xue Feng, Randall A. Meckel, and

Henry Gross damages in the amount of $251,400.00; (v)

Beaver Metal damages in the amount of $312,000.00; (vi)

Credibox damages in the amount of $74,515.25; (vii)

Michael Hadjedj damages in the amount of $500,600.00;

(viii) Oliver Dacourt damages in the amount of

$460,400.00; plus all accrued interest thereon;

c.    Awarding damages to each Purchasing Plaintiff in the amount of

their respective deposits as listed above;

d.    Awarding each Purchasing Plaintiff costs;

e.    Awarding each Purchasing Plaintiff interest; and

f.    Awarding each Purchasing Plaintiff such other relief as the Court

deems fair, just, and equitable.

V.    On Claim V, Judgment in favor of each Purchasing Plaintiffs against the

Sponsor:

a.    Awarding each Purchasing Plaintiffs rescission of its Purchase

Agreements.

b.    Directing the repayment to each Purchasing Plaintiff their

respective deposits, as follows:

      ii.    Palmer Gardens, in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $248,800.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $74,515.25; (vii) Michael Hadjedj damages in the amount of $500,600.00; (viii) Oliver Dacourt damages in the amount of $460,400.00; plus all accrued interest thereon;

    c.    Awarding  damages to each Purchasing Plaintiff in the amount of their respective deposits as listed above;

    d.    Awarding each Purchasing Plaintiff costs;

    e.    Awarding each Purchasing Plaintiff interest; and

    f.    Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable.

VI.    On Claim VI, Judgment in favor of all Purchasing Plaintiffs against the Control Defendants:

    a.    Awarding each Purchasing Plaintiffs rescission of its Purchase Agreements;

    b.    Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows:

iii.     Palmer Gardens, in the amount of $427,200.00; (ii) Alan

Maltz and Janet Maltz in the amount of $248,800.00; (iii)

Hubert Tsai and Christine Singh damages in the amount of

$212,400.00; (iv) Xue Feng, Randall A. Meckel, and

Henry Gross damages in the amount of $251,400.00; (v)

Beaver Metal damages in the amount of $312,000.00; (vi)

Credibox damages in the amount of $74,515.25; (vii)

Michael Hadjedj damages in the amount of $500,600.00;

(viii) Oliver Dacourt damages in the amount of

$460,400.00; plus all accrued interest thereon;

c.     Awarding damages to each Purchasing Plaintiff in the amount of

their respective deposits as listed above;

d.     Awarding each Purchasing Plaintiff costs;

e.     Awarding each Purchasing Plaintiff interest; and

f.     Awarding each Purchasing Plaintiff such other relief as the Court

deems fair, just, and equitable.

VII.     On Claim VII, Judgment in favor of all Plaintiffs against all Defendants:

a.     Directing the repayment to each Plaintiff their respective deposits,

as follows:

iv.     Palmer Gardens, in the amount of $427,200.00; (ii) Alan

Maltz and Janet Maltz in the amount of $248,800.00; (iii)

Hubert Tsai and Christine Singh damages in the amount of

$212,400.00; (iv) Xue Feng, Randall A. Meckel, and

First Amended Complaint Page 204

Henry Gross damages in the amount of $251,400.00; (v)

Beaver Metal damages in the amount of $312,000.00; (vi)

Credibox damages in the amount of $74,515.25; (vii)

Michael Hadjedj damages in the amount of $500,600.00;

(viii) Oliver Dacourt damages in the amount of

$460,400.00; plus all accrued interest thereon;

b. Awarding statutory damages in the amount of $1,000.00 for each

Plaintiff;

c. Awarding each Plaintiff costs;

d. Awarding each Plaintiff interest;

e. Awarding each Plaintiff reasonable attorney's fees; and

f. Awarding each Plaintiff such other relief as the Court deems fair,

just, and equitable.

VIII. On Claim VIII, Judgment in favor of all Purchasing Plaintiffs against

Sponsor:

a. Awarding each Purchasing Plaintiff rescission of its Purchase

Agreement;

b. Directing the repayment to each Purchasing Plaintiff their

respective deposits as follows: (i)Palmer Gardens, in the amount of

$427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of

$248,800.00; (iii) Hubert Tsai and Christine Singh damages in the

amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and

Henry Gross damages in the amount of $251,400.00; (v) Beaver

Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $74,515.25; (vii) Michael Hadjedj damages in the amount of $500,600.00; (viii) Oliver Dacourt damages in the amount of $460,400.00; plus all accrued interest thereon;

    c.    Awarding damages to each Purchasing Plaintiff in the amount of their respective Deposits as listed above, plus all interest accrued thereon;

    d.    Awarding each Purchasing Plaintiff costs;

    e.    Awarding each Purchasing Plaintiff interest; and

    f.    Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just and equitable.

IX.    On Claim IX, Judgment in favor of all Purchasing Plaintiffs against all Defendants:

    a.    Awarding each Purchasing Plaintiffs rescission of its Purchase Agreement;

    b.    Directing the repayment to each Purchasing Plaintiff their respective deposits, as follows: (i)Palmer Gardens, in the amount of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $248,800.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox

damages in the amount of $74,515.25; (vii) Michael Hadjedj

damages in the amount of $500,600.00; (viii) Oliver Dacourt

damages in the amount of $460,400.00; plus all accrued interest

thereon;

c.    Awarding damages to each Purchasing Plaintiff in the amount of

their respective Deposits as listed above, plus all interest accrued

thereon;

d.    Awarding each Purchasing Plaintiff costs;

e.    Awarding each Purchasing Plaintiff attorney's fees;

f.    Awarding each Purchasing Plaintiff any independent appraisers'

fees

g.    Awarding each Purchasing Plaintiff any costs incurred by said

Plaintiff or person acting for a Purchasing Plaintiff for travel to the

Trump Soho site or sales office;

h.    Awarding each Purchasing Plaintiff interest; and

i.    Awarding each Purchasing Plaintiff such other relief as the Court

deems fair, just, and equitable.

X.    On Claim X, Judgment in favor of all Purchasing Plaintiffs against all

Defendants;

a.    Awarding each Purchasing Plaintiffs rescission of its Purchase

Agreement;

b.    Directing the repayment to each Purchasing Plaintiff their

respective deposits, as follows: (i)Palmer Gardens, in the amount

First Amended Complaint Page 207

of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of $248,800.00; (iii) Hubert Tsai and Christine Singh damages in the amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and Henry Gross damages in the amount of $251,400.00; (v) Beaver Metal damages in the amount of $312,000.00; (vi) Credibox damages in the amount of $74,515.25; (vii) Michael Hadjedj damages in the amount of $500,600.00; (viii) Oliver Dacourt damages in the amount of $460,400.00; plus all accrued interest thereon;

c.  Awarding damages to each Purchasing Plaintiff in the amount of their respective Deposits as listed above, plus all interest accrued thereon;

d.  Awarding each Purchasing Plaintiff costs;

e.  Awarding each Purchasing Plaintiff attorney's fees;

f.  Awarding each Purchasing Plaintiff any independent appraisers' fees

g.  Awarding each Purchasing Plaintiff any costs incurred by said Plaintiff or person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office;

h.  Awarding each Purchasing Plaintiff interest; and

i.  Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable.

First Amended Complaint Page 208

XI.     On Claim XI, Judgment in favor of all Purchasing Plaintiffs against all

Defendants;

    a.      Awarding each Purchasing Plaintiffs rescission of its Purchase

Agreement;

    b.      Directing the repayment to each Purchasing Plaintiff their

respective deposits, as follows: (i)Palmer Gardens, in the amount

of $427,200.00; (ii) Alan Maltz and Janet Maltz in the amount of

$248,800.00; (iii) Hubert Tsai and Christine Singh damages in the

amount of $212,400.00; (iv) Xue Feng, Randall A. Meckel, and

Henry Gross damages in the amount of $251,400.00; (v) Beaver

Metal damages in the amount of $312,000.00; (vi) Credibox

damages in the amount of $74,515.25; (vii) Michael Hadjedj

damages in the amount of $500,600.00; (viii) Oliver Dacourt

damages in the amount of $460,400.00; plus all accrued interest

thereon;

    c.      Awarding damages to each Purchasing Plaintiff in the amount of

their respective Deposits as listed above, plus all interest accrued

thereon;

    d.      Awarding each Purchasing Plaintiff costs;

    e.      Awarding each Purchasing Plaintiff attorney's fees;

    f.      Awarding each Purchasing Plaintiff any independent appraisers'

fees

g.      Awarding each Purchasing Plaintiff any costs incurred by said Plaintiff or person acting for a Purchasing Plaintiff for travel to the Trump Soho site or sales office;

h.      Awarding each Purchasing Plaintiff interest; and

i.      Awarding each Purchasing Plaintiff such other relief as the Court deems fair, just, and equitable.

XII.    On Claim XII, Judgment in favor of Palmer Gardens against the Sponsor:

a.      Declaring that Palmer Gardens has validly revoked its Purchase Agreement;

b.      Directing the repayment to Palmer Gardens in the amount of $427,200.00, plus all accrued interest thereon;

c.      Awarding damages to Palmer Gardens in the amount of its Deposit as listed above, plus all interest accrued thereon;

d.      Awarding Palmer Gardens costs;

e.      Awarding Palmer Gardens attorney's fees;

f.      Awarding Palmer Gardens any independent appraisers' fees;

g.      Awarding Palmer Gardens any costs incurred by said Plaintiff or person acting for Palmer Gardens for travel to the Trump Soho site or sales office;

h.      Awarding Palmer Gardens interest; and

i.      Awarding Palmer Gardens such other relief as the Court deems fair, just, and equitable.

XIII.   On Claim XIII, Judgment in favor of all Purchasing Plaintiffs against the Escrow Agent:

a.   Ordering the Escrow Agent to maintain in escrow all funds held on behalf of each Purchasing Plaintiff herein until their payment is directed by an order of this Court or an agreement between the Sponsor and such Purchasing Plaintiff;

b.   Upon a determination of this Court as to which party is entitled to such funds, directing that such funds be paid to the party entitled thereto; and

c.   Granting such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for each of the Claims herein for which such a trial by jury is available.

Dated:   New York, New York
          September 13, 2010

                                        Adam Leitman Bailey, P.C.


                                        By: /s/ William J. Geller
                                             Adam Leitman Bailey
                                             William J. Geller
                                             John M. Desiderio
                                             Courtney J. Killelea

                                        *Attorneys for Plaintiffs*
                                        120 Broadway, 17th Floor
                                        New York, New York 10271
                                        212-825-0365


First Amended Complaint Page 211