UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

PALMER GARDENS, LLC, RACHEL GERSTEIN,
JOYCE GERSTEIN, HERBERT GERSTEIN, ALAN
MALTZ, JANET MALTZ, HUBERT TSAI,
CHRISTINE SINGH, XUE FENG, RANDALL A.
MECKEL, HENRY GROSS, BEAVER METAL, LLC,
ACACIO RODRIGUEZ, CREDIBOX UNIVERSAL,
SL, FELISA HERNANDEZ, MICHAEL HADJEDJ,
OLIVER DACOURT, ANH NGOC TRUONG and
SEAN TRAN,

               Plaintiffs,

    - against -

BAYROCK/SAPIR ORGANIZATION LLC, DONALD
J. TRUMP, ALEX SAPIR, TEVFIK ARIF, 246
SPRING STREET HOLDINGS II, LLC,
BAYROCK/SAPIR REALTY LLC, BAYROCK
SPRING STREET, LLC, BAYROCK GROUP, LLC,
JULIUS SCHWARZ, TRUMP INTERNATIONAL
HOTELS MANAGEMENT LLC, TRUMP MARKS
SOHO LLC, DONALD TRUMP JR., IVANKA
TRUMP, ERIC TRUMP, PRODIGY
INTERNATIONAL NYC, LLC, RODRIGO NINO,
CORE GROUP MARKETING LLC, SHAUN OSHER,
THOMAS POSTILIO and AKERMAN SENTERFITT
LLP, as ESCROW AGENT,

               Defendants.

———————————————————————— x

Case No.:  10 Civ. 5830 (KMW)


**AFFIRMATION IN SUPPORT
OF MOTION TO DISMISS
COMPLAINT**


       I, Fred, D. Weinstein, an attorney admitted to practice before this Court, affirms under

penalty of perjury that:

       1.    I am a member of Kurzman Eisenberg Corbin and Lever, LLP, the attorneys for

Defendants, Bayrock/Sapir Organization LLC, Donald J. Trump, Alex Sapir, Tevfik Arif, 246

Spring Street Holdings II, LLC, Bayrock/Sapir Realty LLC, Bayrock Spring Street, LLC,

Bayrock Group, LLC, Julius Schwarz, Trump International Hotels Management LLC, Trump

Marks Soho LLC, Donald Trump, Jr., Ivanka Trump, Eric Trump, Prodigy International NYC,

LLC and Rodrigo Nino, and co-counsel for CORE Group Marketing LLC, Shaun Osher and Thomas Postilio (collectively, the "Moving Defendants").

2.      I make this affirmation in support of the foregoing Defendants' Motion to Dismiss the Second Amended Complaint herein.

3.      Annexed hereto as Exhibit "A" are true copies of the Plaintiffs' Purchase Agreements.

4.      Annexed hereto as Exhibit "B-1" through "B-8" are true copies of excerpts of the Offering Plan for Trump Soho Hotel Condominium, and certain of the Amendments to the Offering Plan and Exhibits to the Offering Plan more fully identified below:

B-1      Excerpts of the Offering Plan;

B-2      The Hotel Condominium Declaration, which is Exhibit 6 to the Offering Plan;

B-3      The Hotel Condominium By-Laws, which is Exhibit 7 to the Offering Plan;

B-4      The Restrictive Declaration, which is Exhibit 15 to the Offering Plan;

B-5      The Unit Management Agreement, which is Exhibit C to the Fifth Amendment to the Offering Plan;

B-6      Tenth Amendment to the Offering Plan, with Exhibits, including the Affidavit of Alex Sapir in Support of Declaring the Offering Plan Effective;

B-7      Seventh Amendment to the Offering Plan, with Exhibits;

B-8      Third Amendment to the Offering Plan, with Exhibit F.

5.    Annexed hereto as Exhibit "C" is a true copy of the form of the Property Report for Trump Soho Hotel Condominium.

6.    It is respectfully submitted that it is proper for the Court to consider the foregoing exhibits in deciding the Defendants' motion to dismiss because they are referenced in and integral to the Plaintiffs' Second Amended Complaint.

WHEREFORE, the Moving Defendants respectfully request that the Court grant their Motion to Dismiss in its entirety and such other and further relief as the Court may deem just and proper.

Dated:  White Plains, New York
        January 7, 2011

                        KURZMAN EISENBERG CORBIN & LEVER,
                        LLP

                        By: _____
                            Fred D. Weinstein, Esq.
                        One North Broadway
                        White Plains,  NY 10601
                        Tel. No. (914) 285-9800
                        Fax No. (914) 285-9855

                        *Attorneys for Defendants*
                        Bayrock/Sapir Organization LLC, Donald J.
                        Trump, Alex Sapir, Tevfik Arif, 246 Spring Street
                        Holdings II, LLC, Bayrock/Sapir Realty LLC,
                        Bayrock Spring Street, LLC, Bayrock Group, LLC,
                        Julius Schwarz, Trump International Hotels
                        Management LLC, Trump Marks SoHo LLC,
                        Donald Trump Jr., Ivanka Trump, Eric Trump,
                        Prodigy International NYC, LLC, and Rodrigo
                        Nino, and co-counsel for CORE Group
                        Marketing LLC, Shaun Osher and Thomas
                        Postilio

# EXHIBIT "A"
## PART I

# PALMER GARDENS, LLC
# PLAINTIFF'S
# PURCHASE AGREEMENT

# AGREEMENT

Palmer Gardens LLC

Purchaser

with

## BAYROCK/SAPIR ORGANIZATION LLC

Sponsor/Seller

---

**Hotel Suite Unit 2509**
**Trump Soho Hotel Condominium New York**
**246 Spring Street**
**New York, New York 10013**

# AGREEMENT

## HOTEL SUITE UNIT 2509

## TRUMP SOHO HOTEL CONDOMINIUM NEW YORK
### 246 Spring Street
### New York, New York 10013

(to be executed in quadruplicate)

AGREEMENT (this "Agreement"), made as of the 28 day of January 200ℓ, between BAYROCK/SAPIR ORGANIZATION LLC, a Delaware limited liability company, having an office at c/o Bayrock Group, LLC, 725 Fifth Avenue, New York, New York 10022 (hereinafter, "Sponsor"), and Palmer Gardens LLC having an address at 6600 Sunset Blvd #201 Los Angeles, CA 90028 USA (hereinafter, "Purchaser").

## W I T N E S S E T H:

1. **Definitions.** Terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in the Offering Plan for Trump Soho Hotel Condominium New York, (such plan, together with any amendments thereto filed prior to the date hereof, is hereinafter referred to as the "Plan").

2. **Hotel Suite Unit.** Sponsor hereby grants to Purchaser, and Purchaser hereby acquires from Seller, an option to purchase Hotel Suite Unit 2509 at the Condominium (as designated in the Declaration), together with the undivided 0.2457 % interest in the Common Elements appurtenant to such Hotel Suite Unit (the "Unit") and certain fixtures, furnishing and equipment (the "FF&E") more particularly described on Schedule A-1 attached hereto and made part hereof, upon and subject to the terms and conditions set forth herein.

3. **Purchase Price.**

   3.1    The purchase price for the Unit and the FF&E (the "Purchase Price") is $2,136,000.00 payable as follows:

   (a)    $213,600.00 (the "Initial Deposit"), due upon the signing and submitting of this Agreement, receipt of which (subject to collection) is hereby acknowledged;

   (b)    $213,600.00 (the "Additional Deposit"; the term "Deposit", as used herein, refers to both the Initial Deposit and, if the same has been paid at the time in question, the Additional Deposit), due upon the earlier to occur of: (i) July 28, 2008 (the date which is six (6) months after the date of this Agreement); or (ii) fifteen (15) days after Sponsor serves Purchaser with written notice of an amendment declaring the Plan effective, but in no event later than the closing of title, subject to collection; and

   (c)    $1,708,800.00 (the "Balance"), constituting the balance of the Purchase Price, at the closing as hereinafter provided.

- 2 -

3.2    All checks shall represent United States currency, be drawn on or issued by a New York bank which is a member of the New York Clearing House Association and shall be unendorsed. Checks for the Deposit shall be Purchaser's good check(s) or, at Sponsor's option, Purchaser's certified check(s) or an official bank check(s), made payable to the direct order of "Akerman Senterfitt LLP, as Escrow Agent". The check or checks for the Balance and all other sums due Sponsor pursuant to this Agreement shall be good certified check of Purchaser or official bank or cashier's check, made payable to the direct order of "BAYROCK/SAPIR ORGANIZATION LLC" (or such other party as Sponsor directs to Purchaser, in writing, prior to the date of closing of title). If any check is returned, dishonored or fails collection for insufficient funds or for any other reason, the Escrow Agent is authorized to deliver such check to Sponsor and Sponsor will have the choice of remedies set forth in the Plan and in this Agreement with respect to an Event of Default (which shall include suing on such dishonored check or (at Sponsor's option) canceling this Agreement and returning the instrument to Purchaser without affording Purchaser a grace period to cure such default).

4.    **Deposit.**

4.1    The Initial Deposit shall be deposited within five (5) business days after this Agreement is countersigned by or on behalf of Sponsor and returned to Purchaser, and the Additional Deposit shall be deposited within five (5) business days after its receipt by Sponsor or Sponsor's agents, employees or the Escrow Agent, in each case into a segregated special interest-bearing escrow account (the "Escrow Account") at either (i) HSBC Private Bank, 425 Fifth Avenue, Tower 26, New York, N.Y. 10018; or (ii) North Fork Bank, 424 Madison Avenue, 2nd Floor, New York, N.Y. 10017 (the "Depository") entitled "Akerman Senterfitt Trump SoHo Hotel Condominium New York Escrow Account" subject to the provisions of the Plan with respect to the designation of a substitute bank and/or account type or title. The Deposit shall be held in trust in such account in conformity with Sections 352-e(2)(b) and 352-h of the New York General Business Law and the Attorney General's regulations promulgated pursuant thereto until such funds may be withdrawn in accordance with such laws and regulations and the terms of this Agreement and the Plan. While the same are being so held, such funds shall not be commingled with any other funds of Sponsor (except, at Sponsor's sole election, funds deposited by other purchasers under the Plan). The Escrow Account will be interest-bearing and, unless Purchaser defaults, interest will be credited to Purchaser at the closing. The interest rate to be earned will be the prevailing rate for these accounts. (No representation or guarantee is made as to the actual rate of interest that will be earned on such funds.) Interest, if any, will begin to accrue within five (5) business days after this Agreement is fully executed and tender for payment of the check representing the Deposit. Notwithstanding anything to the contrary contained herein, unless and until Purchaser has delivered to the Escrow Agent a completed and signed Form W-9 (Request for Taxpayer Identification Number and Certification) or Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding), whichever may be applicable, the Deposit will be deposited in a non-interest-bearing escrow account at the Depository.

4.2    The Deposit shall be held in the escrow account identified in Section 4.1 above until Akerman Senterfitt LLP (the "Escrow Agent") is otherwise directed in: (a) a writing signed by both Sponsor and Purchaser; or (b) a determination of the Attorney General pursuant to the dispute resolution procedures contained in the Attorney General's regulations; or (c) a judgment or order of a court of competent jurisdiction.

4.3    If there is no written agreement between the parties to release the escrowed funds, the Escrow Agent will not pay the funds to Sponsor until the Escrow Agent has given Purchaser written notice of not fewer than ten (10) business days. Thereafter, the funds may be paid to Sponsor unless Purchaser has already made application to the Department of Law pursuant to the dispute resolution provisions of the Attorney General regulations and has so notified the Escrow Agent in accordance with such provisions.

4.4     Sponsor will not object to the release of the escrowed funds to: (a) a purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan; or (b) all purchasers after an amendment abandoning the Plan is accepted for filing by the Department of Law.

4.5     Purchaser or the Escrow Agent may apply to the Attorney General in the event of a dispute for a determination on the disposition of the escrowed funds and any interest thereon. Sponsor must avail itself of this procedure if there is a dispute which needs to be resolved. A form for this purpose is attached as Exhibit 8 of Part II of the Plan. The party applying for a determination must send all other parties a copy of the application. Pending the determination of the Attorney General to grant or deny the application, Sponsor, Purchaser and the Escrow Agent shall abide by any interim directive issued by the Attorney General.

4.6     Sponsor and Purchaser hereby jointly direct the Escrow Agent as follows:

(a)     if title to the Unit is transferred to Purchaser, the Deposit shall be paid to Sponsor, and any interest earned on the Deposit shall be paid to Purchaser; or

(b)     if Purchaser becomes entitled to cancel this Agreement in accordance with the terms of this Agreement or the Plan, and actually cancels this Agreement as so provided, the Deposit and any interest earned on the Deposit shall be refunded in full.

4.7     Notwithstanding anything set forth in this Article 4 to the contrary, the Escrow Agent may release a portion of the Deposit to Sponsor, provided that prior to such release, such released funds shall be secured by a bond ("Bond") obtained by Sponsor from an insurance company to be named in an amendment to the Plan (the "Insurance Company") in favor of Purchaser in an amount equal to the amount released, together with interest, if any, which shall accrue thereon as hereinafter provided. Sponsor will secure the Bond in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and Section 71-a of the New York Lien Law. Simultaneously with the delivery of the released funds to Sponsor, Purchaser will receive the Bond, the form of which Bond will be set forth as an exhibit in an amendment to the Plan. The Bond shall apply to a loss by Purchaser of the released portion of the Deposit in the event Sponsor fails to complete the Unit and deliver a deed or convey title to the Unit pursuant to this Agreement or if for any reason Purchaser is entitled to receive the return of the Deposit. The extent of Purchaser's recovery under the Bond is the amount of the released portion of the Deposit actually received by Sponsor, together with any interest which has accrued thereon in accordance with this Agreement, and the liability of the Insurance Company under the Bond does not exceed the amount of the Bond. In order to recover such funds pursuant to the Bond, Purchaser must file a claim with the Insurance Company. In the event of a dispute Sponsor must apply and Purchaser or the Insurance Company may apply to the Attorney General for a determination on the disposition of the portion of the Deposit secured by the Bond. All funds received by Sponsor will be handled in accordance with the provisions of Sections 352-e(2)(b) and 352-h of the New York General Business Law and shall be employed by Sponsor only in connection with the consummation of the Plan.

4.8     Sponsor is required by law to submit a Form 1099 to the Internal Revenue Service reporting any interest earned on the Deposit, if any. Purchaser will be taxed accordingly on such interest, whether or not Purchaser ultimately receives the interest in accordance with the terms of this Article or Article 8.

## 5.     Closing Date and Place.

5.1     The closing of title shall be held at the offices of Akerman Senterfitt LLP, 335 Madison Avenue, New York, New York 10017 (or such other place in the City and State of New York as

Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than thirty (30) days' prior notice. Sponsor may, from time to time, adjourn such date and hour upon reasonable prior notice to Purchaser, which notice shall fix a new date (and hour and place, if appropriate) for the closing of title (but in no event may Sponsor adjourn the date originally set for a closing for more than twelve months in the aggregate without the consent of Purchaser).

    5.2  Whenever used herein, the terms "Closing Date" or "closing of title" or words of similar import shall mean the date on which the deed to the Unit is delivered to Purchaser.

### 6.  Delivery of Deed and Power of Attorney.

    6.1  At the closing of title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying fee simple title to the Unit to Purchaser, subject only to the liens, encumbrances and title conditions set forth on Schedule B annexed hereto and made a part hereof. Sponsor shall prepare the deed, which shall be substantially in the form set forth in Exhibit 3 in Part II of the Plan, and Sponsor and Purchaser shall execute the deed and have the same acknowledged, in form for recording.

    6.2  At the closing of title, Sponsor and Purchaser shall execute and deliver a bill of sale with respect to the FF&E, prepared by Sponsor and substantially in the form set forth as Exhibit 12 in Part II of the Plan.

    6.3  At the closing of title, Purchaser shall execute and acknowledge a power of attorney to the Board, prepared by Sponsor and substantially in the form set forth as Exhibit 2 in Part II of the Plan.

    6.4  Purchaser acknowledges and confirms the matters set forth in Purchaser's Express Acknowledgement Regarding Certain Matters and Disclaimers attached hereto as Exhibit A and made part hereof. At the closing of title, Purchaser shall execute and deliver such acknowledgment to Sponsor.

    6.5  The executed deed and power of attorney shall be delivered to the representative of the title company insuring Purchaser's title (or if no such representative is present, then to Sponsor's attorney) for recording in the City Register's Office, which recording shall be at Purchaser's expense. After being recorded: (i) the deed shall be returned to Purchaser; and (ii) the power of attorney in favor of the Board shall be returned to the Board (or as the Board shall direct).

    6.6  Purchaser's payment of the Balance and acceptance of the deed to the Unit shall constitute Purchaser's recognition that Sponsor has fully satisfactorily performed those obligations stated in the Plan and/or this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of purchasers under Article 23-A of the General Business Law, the Plan or Part 20 of the Regulations issued by the Department of Law.

### 7.  State of Title.

    7.1  The title conveyed by Sponsor to Purchaser shall be subject only to the liens, encumbrances and title conditions set forth in Schedule B annexed hereto and made a part hereof. Any lien, encumbrance or condition to which title is not to be subject shall not be an objection to title if: (a) the instrument required to remove it of record is delivered at or prior to the closing of title to the proper party or to the Title Company (as such term is defined the Plan), together with the recording or

filing fee; or (b) Purchaser's title insurance company will insure Purchaser, at the company's regular rates and without additional premium, that it will not be collected out of, or enforced against, the Unit; or (c) Purchaser's title insurance company is unwilling to issue the affirmative insurance described in subsection (b) at its regular rates and without additional premium, and the Title Company would be willing to do so at its regular rates and without additional premium (as evidenced by the issuance of the same by the Title Company in connection with the closing of any other Units in the Condominium).

7.2     Sponsor shall be entitled to adjourn the closing to remove or correct any defect in title which is not set forth in Schedule B. However, if such defect existed at least 10 days prior to the closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least 10 days prior to the closing, then, for purposes of Article 12 below, Purchaser shall be deemed at fault for not having sent timely notice, and the closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

7.3     The covenants in the deed will be solely for the personal benefit of Purchaser and will not inure to the benefit of Purchaser's successors or subrogees. In the event of a claimed breach of any covenant of the grantor contained in the deed, Purchaser must first seek recovery against Purchaser's title insurance company before proceeding against Sponsor, it being agreed that the liability of Sponsor will be limited to any loss or damage not covered by such title insurance. In the event that Purchaser elects not to purchase title insurance, then the liability of Sponsor shall be limited to any loss or damage which would not have been covered by the title insurance that was available to Purchaser at the closing. The terms of any marked-up title binder of any title insurance company authorized to do business in New York State issued in connection with any Unit shall be conclusive evidence of the title insurance coverage that was available to Purchaser. The provisions of this Section 7.3 shall survive the closing of title or the termination of this Agreement.

8.     **Closing Adjustments.**

8.1     The following costs with respect to the Unit shall be apportioned between Sponsor and Purchaser as of the Closing Date:

(a)     real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed;

(b)     Common Charges for the month in which title closes; and

(c)     if Purchaser is allowed to occupy the Unit prior to the closing, accrued rent and any other charges pursuant to an interim lease or occupancy or other agreement, if any, covering the Unit.

8.2     If the Unit has been separately assessed but the closing of title occurs before the tax rate is fixed, adjustment of taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation. Installments for tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser; however, the installment for the then current period shall be apportioned appropriately. If the Unit has not been separately assessed as of the Closing Date for the then current tax period, the adjustment under subsection 8.1(a) hereof shall be based upon the Property's actual taxes and assessment for such period prorated to the Unit in the manner set forth in Section 6.16 of the By-Laws and in Part I of the Plan.

8.3     Sponsor shall remit or cause to be remitted to Purchaser an amount equal to interest, if any, earned on the Deposit, on or promptly after the Closing Date.

8.4     In the event that Purchaser fails to close title to the Unit on the date originally scheduled for the closing of title, postpones the closing for any reason, or is deemed at fault for not timely sending notice of a title defect as provided in Article 7 above, and title thereafter closes, then:

(a)     the closing apportionments shall be made as of the originally scheduled closing date regardless of when the actual closing of title occurs; and

(b)     Purchaser shall pay Sponsor interest at the rate of 0.04% per day (or such lower rate per day which is the legal limit, if 0.04% per day exceeds the legal limit) on the Purchase Price, computed from the original Closing Date until this transaction is actually closed. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, the foregoing provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date.

8.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as aforesaid and as otherwise provided herein or in the Plan.

8.6     Any errors or omissions in calculating apportionments at closing shall be corrected, and payment shall be made to the proper party, promptly after discovery. This provision shall survive the closing.

## 9.     Closing Costs

Purchaser shall be required to pay certain costs in connection with the purchase of the Unit, in addition to any net credit in favor of Sponsor that may result from the closing adjustments and any interest or late closing charge described in Article 8. Other than any such net credit in favor of Sponsor that may result from the closing adjustments (or certain other fees which may be payable prior to the closing, as described below), all such closing costs shall be paid by Purchaser, at closing, by Purchaser's unendorsed, personal certified check or by official bank check, in either event drawn only upon a bank that is a member of the New York Clearing House Association. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date hereof and are subject to change without prior notice:

9.1     If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which will vary depending upon the amount of insurance purchased.

9.2     Purchaser will pay a fee to the City Register for recording the deed and the power of attorney and will pay the filing fee for the RP-5217 form, in each case, at the rate and/or in the amount applicable at the time of the closing. In addition, Purchaser's title insurance company may charge various fees and service charges in connection with such recordings and filings, all of which shall be payable by Purchaser.

9.3     If Purchaser obtains a mortgage loan, Purchaser shall pay all closing costs associated with such loan, which may include, but need not be limited to, the following:

(a)     a fee and service charge for recording the mortgage at the same rates given above for recording the deed and power of attorney;

- 7 -

(b)     a mortgage recording tax in the amount provided for by law, taking into account however any deduction for the amount payable to Sponsor under subparagraph (c) below;

(c)     to Sponsor, a sum equal to the full amount (but not in excess thereof) of the partial mortgage recording tax credit provided by Section 339-ee(2) of the New York Condominium Act, to the extent the same is or becomes available, as a reimbursement for the mortgage recording taxes previously paid (such credit is based, in general, on the Common Interest of the Units being purchased multiplied by a portion of the mortgage tax previously paid on account of pre-existing mortgages on the Property);

(d)     the premium for mortgage title insurance, if required by Purchaser's lender;

(e)     deposits for Common Charges, real estate taxes, any assessments, water charges and sewer rents (if separately assessed), if required by Purchaser's lender; and

(f)     such other costs and expenses in connection with such loan as determined by Purchaser's lender.

9.4     Purchaser will be required to pay the amount of $1,750.00 to Akerman Senterfitt LLP, Sponsor's closing counsel, for each Unit purchased hereunder, in order to defray Sponsor's legal fees for services in connection with preparing the deed and power of attorney and for coordinating and attending the closing and the sum of $250 for the preparation of ACRIS transfer documents required by the City of New York. If Purchaser obtains financing and the lender is unwilling to close at the offices of Sponsor's closing counsel or if Purchaser otherwise requests that the Closing occur other than at the office of Sponsor's closing counsel (or such other place as Sponsor may designate in its closing notice) and Sponsor in its sole discretion consents to such request, the closing may be held elsewhere in New York City, provided that Purchaser shall pay Sponsor's closing counsel a travel fee of $500 if the closing is held elsewhere in Manhattan and $750 if the closing is held in another borough other than Manhattan. If, through no fault of Sponsor, Purchaser fails to close on the date scheduled by Sponsor (including, without limitation, the failure of Purchaser or Purchaser's attorney to give at least ten (10) days' prior written notice of a title defect as required in Article 7 above and the failure of Purchaser to have payment in proper form available at closing), then Purchaser shall pay to Sponsor's closing counsel an additional fee of $600 for each Unit purchased hereunder for each rescheduled closing to help defray the cost of preparing for and coordinating the new closing and recalculating the closing apportionments. If Purchaser shall obtain mortgage financing, then Purchaser shall pay an additional fee of $600 to Sponsor's closing counsel to defray the additional costs associated therewith. In addition, if Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement, or for the addition, deletion or substitution of names on this Agreement (or Purchaser otherwise exercises its limited right with respect to an assignment as provided in Section 23.4 hereof), a fee of $850, shall be payable by Purchaser to Sponsor's closing counsel, for preparation of an assignment agreement. If Purchaser is undertaking a Section 1031 like-kind exchange, then Purchaser shall pay an additional fee of $850 to defray the additional costs associated therewith. Purchaser may be required to pay more than one fee pursuant to the preceding sentence and forgoing provisions with respect to a single Unit. At Sponsor's option in its sole discretion, any one or more of the foregoing fees to be paid to Sponsor's closing counsel shall be paid by Purchaser in advance, prior to closing, upon notice to Purchaser.

9.5     Purchaser shall make a contribution to the Working Capital Fund of the Condominium, payable to the Board, in an amount equal to two (2) months' of the Common Charges then in effect for each Unit pursuant to the Condominium budget and in accordance with Schedule A in the Plan, as the same may be amended from time to time.

9.6     Purchaser shall pay to the Board the Common Charges for the Unit for the first full month following the month in which title closes. In addition, if Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity) shall pay to the Board an amount equal to the Common Charges for such Unit for a period of two (2) years as security for the faithful observance by Purchaser of the terms, provisions and conditions of the By-Laws. In the event that Purchaser defaults in respect of the terms, provisions and conditions of the By-Laws, the Board may use, apply, or retain the whole or any part of the security so paid in advance to the extent required for the payment of any Common Charges or any other sum as to which Purchaser is in default; and such Unit Owner shall, within thirty (30) days after notice from the Board, deposit with such Board the amount so applied or retained so that at the option of the Board, such Board shall have the full amount of said security on hand at all times. The provisions of the preceding sentence shall survive the closing of title.

9.7     Purchaser shall be required to pay the combined state and local sales tax applied in respect of that portion of the Purchase Price attributable to the FF&E which, for such purposes, shall be the rate of $43.00 per square foot.

9.8     Purchaser shall pay the Real Estate Transfer Tax due to the State of New York (the so-called "deed stamps" and, if applicable, the so-called "mansion tax"), the Real Property Transfer Tax due to the City of New York and any other real property transfer tax due to the City or State of New York. Purchaser agrees to indemnify and hold Sponsor harmless from and against any and all liabilities and expenses (including, without limitation, reasonable legal fees and disbursements) incurred by Sponsor by reason of the non-payment by Purchaser of any of the taxes Purchaser is obligated to pay hereunder in connection with the purchase of the Unit. Purchaser's obligations to pay the taxes described in this Section 9.7 and to indemnify Sponsor as herein provided shall survive the closing of title or the termination of this Agreement.

**10.     Transfer Tax Returns.** At the closing, Purchaser shall duly complete and sign before a notary public the real property transfer tax return required to be filed with The City of New York ("RPT Form") and Purchaser shall duly complete and sign the Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate ("Combined Tax Form") required to be filed with the Department of Taxation and Finance of the State of New York (the "Tax Department"), or such other forms as may then be required by law. The RPT Form and Combined Tax Form shall be delivered at closing to the representative of Purchaser's title insurance company (or, if none, to Sponsor's attorney) for filing with the proper governmental officer. Sponsor will similarly execute all of such forms and other documents required in connection with recording of the deed including, without limitation, smoke detector and multiple-dwelling affidavits.

**11.     The Plan.**

11.1     Purchaser acknowledges having received and read a copy of the Plan, including all amendments thereto, if any, filed prior to the date hereof with the Department of Law of the State of New York, at least three (3) business days before submitting this Agreement. If, however, Purchaser did not receive a copy of the Plan at least three (3) business days before submitting this Agreement, Purchaser may rescind this Agreement, by sending written notice of same to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within seven (7) days of Purchaser's submission of this Agreement.

11.2     The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth herein at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern, except with respect to express

modifications to the terms of the Plan included in this Agreement and agreed to by Sponsor and Purchaser, in which case such modifications will govern.

11.3     Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, Restrictive Declaration, By-Laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor.

**12.**     **Default by Purchaser**. (a) Any of the following shall constitute an "Event of Default" hereunder:

(i)  Purchaser's failure to pay the Additional Deposit on the date set forth in Article 3 hereof, Purchaser's failure to pay the Balance or any closing apportionment or closing cost required to be paid by Purchaser in Article 8 or 9 hereof on the Closing Date designated by Sponsor pursuant to Article 5 hereof, or the dishonor of any check given by Purchaser to Sponsor; or

(ii)  the failure to pay, perform or observe any of Purchaser's other obligations hereunder; or

(iii)  the occurrence of any Events of Default under any other Agreement between Sponsor and Purchaser, or between Sponsor and any member or members of Purchaser's immediate family or between Sponsor and any parent, affiliate or subsidiary of Purchaser; or

(iv)  if Purchaser is permitted to become the tenant or other occupant of the Unit, Purchaser's failure to pay rent or to perform some other lease or occupancy obligation within the period after notice, if any, set forth in the lease or occupancy or other agreement and either (x) Sponsor has obtained an order of eviction against Purchaser from a court of competent jurisdiction or (y) Purchaser has vacated the Unit; or

(v)  Purchaser's assignment of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(vi)  if a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vii) if a judgment or tax lien is filed against Purchaser and Purchaser does not pay or bond the same within thirty (30) days.

(b)  **TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Balance and to pay, perform or observe Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such thirty (30) days, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, the Deposit and any interest earned on the Deposit. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for any of the proceeds of such sale.

(c)     Sponsor and Purchaser each hereby agree and acknowledge that it would be impractical and/or extremely difficult to fix or establish the actual damage sustained by Sponsor as a result of a default by a Purchaser hereunder, and that the Deposit (including all interest) shall constitute and be deemed to be the reasonable and agreed upon liquidated damages of Sponsor in respect of the possible loss of a timely closing, the possible fluctuation of values, additional carrying costs of the Unit and other expenses that may be incurred, including, without limitation, attorneys' fees, and shall be paid by Purchaser to Sponsor as Sponsor's sole and exclusive remedy. The payment of the deposit (including all interest) as liquidated damages is not intended to be a forfeiture or penalty, but is intended to constitute liquidated damages to Sponsor.

(d)     NEITHER SELLER NOR PURCHASER SHALL CHALLENGE THE VALIDITY OF THE PROVISIONS OF THIS AGREEMENT OR THE PLAN WITH RESPECT TO LIQUIDATED DAMAGES OR ANY RIGHT OF SPONSOR SET FORTH HEREIN OR THEREIN TO RETAIN THE DEPOSIT IN THE EVENT OF A PURCHASER DEFAULT. SUCH PROVISIONS HAVE BEEN AGREED TO VOLUNTARILY, AFTER NEGOTIATION, WITHOUT DURESS OR COERCION BY ANY PARTY UPON ANY OTHER PARTY, AND WITH EACH PARTY HAVING BEEN (OR HAVING HAD FULL AND ADEQUATE OPPORTUNITY TO BE) REPRESENTED AND ADVISED BY COUNSEL, ACCOUNTANTS, BROKERS, APPRAISERS AND OTHER EXPERTS AND ADVISORS OF ITS OWN CHOOSING.

**13.     Agreement Subject to Lien of Mortgage.** No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any money deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall continue to be subject and subordinate to the lien of any mortgage heretofore or hereafter made and any payments or expenses already made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the fullest extent thereof, without the execution of any further legal documents by Purchaser. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date, unless, if Purchaser is obtaining financing on the Unit, Purchaser assumes such mortgages (at Sponsor's discretion). The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage is subordinated to the Declaration, or the Unit is released from, or not subject to, the lien of such mortgage at closing (unless Purchaser has assumed the continuation of a mortgage lien encumbering such Unit as hereinabove described).

**14.     Agreement Subject to Plan Being Effective.** The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan (as the same may be amended from time to time). The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if, after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this Agreement shall be deemed cancelled and the Deposit, together with interest, if any, earned thereon, shall be returned to Purchaser. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

**15.     Sponsor's Inability to Convey the Unit.** If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan by reason of a defect in

title, substantial damage or destruction of the Building by fire or other casualty, or the taking of any material portion of the Property by condemnation or eminent domain, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election not to cure such inability, and Purchaser is not in default hereunder, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such inability (without any abatement in or credit against the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser so elects to terminate this Agreement, Sponsor shall, within 30 days after receipt of notice of termination from Purchaser, return the Deposit to Purchaser, together with interest, if any, earned thereon. Upon making such payment, this Agreement shall be terminated and neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan. The foregoing remedy must be exercised by written notice sent by Purchaser to Sponsor within ten days after the giving of Sponsor's notice of election not to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the first remedy above to acquire title subject to such inability.

16. **Fixtures, Appliances and Personal Property**. Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in the sale of the Unit pursuant to this Agreement. Except as otherwise set forth herein or in the plan, no portion of the Purchase Price shall be attributable to such items.

17. **Construction**.

17.1 The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications (as defined in the Plan), subject to the right of Sponsor to amend the Plan and the Plans and Specifications in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required). The issuance of a temporary or permanent Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications. However, nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Plan in the Section entitled "Rights and Obligations of Sponsor."

17.2 The construction of the Building and the Unit and the correction of any defects in the construction thereof to the extent required under the Plan are the sole responsibility of Sponsor. Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

17.3 The closing of title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Prerequisites to Closing of Title" in Part I of the Plan. As a result, if all other prerequisites not involving the construction of the Unit are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price (without any credit against or abatement in the Purchase Price and without any provision for escrow) once a temporary or permanent Certificate of Occupancy is issued for the Unit (notwithstanding any construction items noted on Purchaser's Inspection Report (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligations under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building not preventing Purchaser's occupancy of the Unit).

17.4    Sponsor has projected that, based upon currently anticipated schedules, construction of the Building will be sufficiently completed to permit closings of Units to begin in or about June 1, 2009. The actual date for the First Closing is only an estimate and is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites described in the Plan.  Purchaser acknowledges that construction may be delayed by weather, casualty, labor difficulties (including work stoppages and strikes), late delivery or inability to obtain on a timely basis or otherwise materials or equipment, governmental restrictions, or other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these units will be completed is in the discretion of Sponsor. Purchaser acknowledges that except as otherwise expressly provided in the Plan, Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, in the event that the First Closing occurs substantially earlier or later than the projected date or the time to complete or to close title to the Unit is accelerated, delayed or is postponed by Sponsor, Purchaser's rights as set forth in Plan in respect thereof being in lieu of any other rights or remedies which may be available pursuant to any applicable law, regulation, statute or otherwise, all of are hereby expressly waived by Purchaser.

18.    **Inspection of Unit**.  At least one week (but not more than one month) prior to the Closing Date, at Sponsor's direction, Sponsor's representative shall notify Purchaser that the Unit is ready for inspection.  Upon receipt of the notice, Purchaser shall promptly arrange an appointment with Sponsor's representative to inspect the Unit within the week prior to the Closing Date. Purchaser or his or her duly authorized agent shall attend such inspection, shall carefully inspect the Unit, and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule C to this Agreement) and deliver same to Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within the week prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Balance when due and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in "Rights and Obligations of Sponsor" in the Plan. The FF&E will be delivered to the Unit in accordance with the configuration plan (the "Configuration Plan") attached hereto as Schedule A-2, although the absence of any item(s) of FF&E within the Unit and/or a deviation from the Configuration Plan will not excuse Purchaser from closing title to the Unit. Purchaser may not choose to purchase the Unit without the FF&E.

19.    **Damage to the Unit**.  If between the date of this Agreement and the closing of title, the Unit is damaged by fire or other casualty, the following shall apply:

19.1    The risk of loss to the Unit by fire or other casualty, until the earlier of closing of title or possession of the Unit by Purchaser, is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the Unit.  In the event of damage or destruction of the Unit due to fire or other casualty prior to the closing of title and the election by Sponsor to repair or restore the Unit, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the closing of title or the termination of the Agreement.

19.2    In the event of damage to or destruction of the Unit by fire or other casualty prior to the closing of title and the election by Sponsor, with notice thereof to Purchaser, that it does not elect to

repair or restore the Unit, or, if the Declaration has been recorded prior thereto, then if the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-Laws, this Agreement shall be deemed cancelled and of no further force or effect and Sponsor shall return to Purchaser all sums deposited by Purchaser hereunder, together with interest, if any, earned thereon, and neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that if Purchaser is then in default hereunder (beyond the applicable grace period, if any), Sponsor shall retain all such sums deposited by Purchaser hereunder and any interest earned thereon, as and for liquidated damages.

      **20.**   **No Representations**. Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocable to the Unit, the estimated real estate taxes of the Unit, the ability to rent the Unit and/or the rental income therefor, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as herein or in the Plan specifically represented; Purchaser has relied solely on his or her own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the Floor Plans on file in Sponsor's office and to be filed in the City Register's Office, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any immaterial or insubstantial inaccuracy or error. The provisions of this Article 20 shall survive the closing of title or the termination of this Agreement.

      **21.**   **Prohibition Against Advertising**. Purchaser hereby covenants and agrees that it shall not, prior to the closing of title hereunder, list the Unit for sale or resale with any broker or otherwise advertise, promote, or publicize the availability of the Unit for sale. Any such listing of the Unit or form of advertising, promotion or publicizing of the Unit by Purchaser or its agents or representatives prior to the closing of title shall be an Event of Default hereunder, entitling Sponsor to the remedies set forth in Article 12 hereof. The provisions of this Article 21 shall survive the closing of title or the termination of this Agreement.

      **22.**   **Broker.** Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction other than Selling Agent and RLG Properties. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt, other than Selling Agent and the aforementioned broker. Purchaser agrees that, should any claim be made against Sponsor for commissions by any broker other than Selling Agent on account of any acts or dealings of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including, but not limited to, reasonable legal fees and disbursements. The provisions of this Article 22 shall survive the closing of title or the termination of this Agreement.

      **23.**   **Agreement May Not Be Assigned.**

      23.1   This Agreement, or any interest of Purchaser herein, shall not inure to the benefit of any successors or assigns of Purchaser and may not be assigned by Purchaser, without the prior written consent of Sponsor, which consent may be given or denied by Sponsor in its sole discretion. Any purported assignment by Purchaser in violation of this Agreement shall be an event of default by

Purchaser entitling Sponsor to all remedies available at law, in equity or otherwise, including, without limitation, the remedies set forth in Article 12 hereof, and shall be voidable at the option of Sponsor.

23.2    If Purchaser is a corporation, any sale, assignment, transfer, pledge, encumbrance or other disposition of any of the stock of Purchaser, or if Purchaser is a partnership, limited liability company or other entity, any sale, assignment, transfer, pledge, encumbrance or other disposition of any interest in such partnership, limited liability company or other entity shall, for purposes of this Agreement, be considered an assignment and shall be subject to the provisions, prohibitions and terms of this Article concerning assignment of this Agreement, except that a sale of twenty five (25%) or less of the stock, or in the case of a partnership, limited liability company or other entity, twenty five percent or less (25%) of the ownership interests, of Purchaser which does not result in a change in control of Purchaser shall not be considered an assignment. For purposes of the preceding sentence only, "control" shall mean the ownership of seventy five percent (75%) or more of the interests in such entity or possession of the power to direct the management and policies of such entity and the distribution of its profits.

23.3    If a Purchaser desires to assign its rights under this Agreement or to take title in the name of an affiliate of, or entity related to, or controlled by Purchaser that differs from that reflected in this Agreement, or to add, delete or substitute the name of a member of the Purchaser's family, then, if such assignment, alteration, addition, deletion or substitution is permitted by Sponsor (in Sponsor's sole discretion), Purchaser shall deliver to Selling Agent or Sponsor's closing counsel, four (4) signed forms of assignment of this Agreement (to be prepared by Sponsor's closing counsel at Purchaser's expense and in form and content acceptable to Sponsor, in its sole discretion), as well as three (3) completed and signed copies of either Form W-9 (Request for Taxpayer Identification Number and Certification) or Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding), as applicable, in the form required by law. Upon each assignment or other change permitted by Sponsor (it its sole discretion), the assignments and Form W-8 or Form W-9, as applicable, must be delivered to Selling Agent or Sponsor's closing counsel, together with a personal certified check, or an official bank or cashier's check, in the amount of $850 made payable to Akerman Senterfitt LLP (for services rendered in connection with the assignment), not less than twenty (20) days prior to the date scheduled for the Purchaser's closing. In no event shall Purchaser or its assignee (or any added or substituted party) have any right to adjourn or postpone the closing as a result of any such change or assignment. Sponsor is not obligated to consent to any such change or assignment and, Sponsor's refusal to consent to an assignment or change in name will not entitle Purchaser to cancel this Agreement or excuse Purchaser from any of its obligations hereunder or give rise to any claim for damages against Sponsor; and the prohibition against advertising or publicizing the availability of Purchaser's Unit as set forth in Article 21 above and in the Plan will remain in effect.

23.4    Notwithstanding the provisions of Section 23.1 above, Sponsor will not unreasonably withhold its consent to the assignment by Purchaser, on one (1) occasion only, of all of Purchaser's rights under this Agreement to a Purchaser Affiliate or to member(s) of Purchaser's Immediate Family, provided that any such assignment is made without consideration and otherwise in accordance with the provisions and procedures set forth in Section 23.3 above. For purposes of this Section 23.4 only: (i) "Purchaser Affiliate" means an entity, as of the date of the assignment and at all times thereafter through and including the Closing, controlled by or under common control with Purchaser; (ii) "Immediate Family Members" means Purchaser's spouse, domestic partner, children, grandchildren, parents, grandparents, brothers or sisters, stepchildren and stepparents; and (iii) "control" means the ownership of seventy five percent (75%) or more of the interests in such entity and possession of the power to direct the management and policies of such entity and the distribution of its profits.

23.5    Notwithstanding any consent by Sponsor pursuant to the terms of this Article to any such change of name or assignment, in no event shall Purchaser, as assignor, be released or relieved from any obligations, promises, covenants and liabilities under or in respect of this Agreement.

**24.    Binding Effect.**  The submission of this Agreement to Purchaser does not create a binding obligation on the part of Sponsor. This Agreement shall not be binding on Purchaser or Sponsor until Purchaser has signed this Agreement and delivered the signed Agreement and the Initial Deposit to Sponsor, and a counterpart hereof executed by Sponsor has been delivered to Purchaser. If this Agreement is not signed by Sponsor and a fully executed counterpart delivered to Purchaser or its attorneys within thirty (30) days after the date hereof, this Agreement shall be deemed to have been rejected and the Initial Deposit shall be promptly returned to Purchaser. Upon such refund being made, neither party shall have any further rights, obligations or liabilities hereunder with respect to the other. Prior to Sponsor's countersigning and returning this Agreement to Purchaser, and at any time thereafter, Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history. Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor. Sponsor has the right, without incurring any liability, to reject this Agreement without cause or explanation to Purchaser. This Agreement may not be rejected due to Purchaser's sex, sexual orientation, race, creed, color, national origin, ancestry, disability, marital status, or other ground proscribed by law.

**25.    Notices.**

25.1    Any notice, election, demand, consent, request or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail, return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed: to Purchaser at the address given at the beginning of this Agreement; and to Sponsor, addressed to Selling Agent at: 725 Fifth Avenue, New York, New York 10022, with a copy sent simultaneously and in like manner to Akerman Senterfitt LLP, One S.E. Third Avenue, 25th Floor, Miami, Florida 33131, Attention: Ronald A. Kriss, Esq. Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent. Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected or, in the case of mailing, three (3) days after the date of mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address.

25.2    Sponsor hereby designates and empowers both Selling Agent and Sponsor's closing counsel (Akerman Senterfitt LLP) as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

**26.    Joint Purchasers.**  The term "Purchaser" shall be read as "Purchasers" if the Unit is being purchased by more than one person, in which case their obligations shall be joint and several.

**27.    Liability of Sponsor.**  Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligation or undertaking shall be tolled for the length of the period during which such performance was excused.

**28.** **Further Assurances.** Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

**29.** **Severability.** If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

**30.** **Strict Compliance.** Any failure by either party hereto to insist upon the strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such other party.

**31.** **No Lien.** Neither this Agreement nor any monies deposited hereunder or expended by Purchaser in connection herewith shall constitute a lien against the Unit, any other Units, or any other portion of the Building or the Land upon which it is situated, and Purchaser may not record this Agreement or a memorandum thereof.

**32.** **Governing Law.** The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York applicable to contracts made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

### 33. Purchaser's Representations.

33.1    Purchaser represents that Purchaser has full right and authority to execute this Agreement and perform Purchaser's obligations hereunder. If Purchaser is not a natural person, Purchaser agrees to deliver at Closing, such documents evidencing Purchaser's authority as may be required by Purchaser's title company. Purchaser further represents that the Deposit represents Purchaser's own funds and that no other party (other than Purchaser or Seller, as provided herein) has any right or claim to all or any portion of the Deposit.

33.2    Purchaser is not now, nor shall it be at any time prior to or at the closing of title, an individual, corporation, partnership, joint venture, trust, trustee, limited liability company, unincorporated organization, real estate investment trust or any other form of entity (collectively, a "Person") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC or otherwise). Neither Purchaser nor any Person who owns an interest in Purchaser is now nor shall be at any time prior to or at the closing of title a Person with whom a U.S. Person, including a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC or otherwise.

33.3    Purchaser has taken, and shall continue to take until the closing of title, such measures as are required by applicable law to assure that the funds used to pay to Seller the Purchase Price are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated. Purchaser is, and will at closing be, in compliance with any and all applicable provisions of the USA PATRIOT Act of 2001, Pub. L. No. 107-56, the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

33.4    The provisions of this Article shall survive the closing of title to the Unit or termination of this Agreement.

**34.    Agreement Not Contingent Upon Financing.**    The terms and provisions of this Agreement and Purchaser's obligations hereunder are not contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof) stated in Article 3 of this Agreement, and Purchaser understands and agrees that Purchaser's failure to obtain such financing will not relieve Purchaser of Purchaser's obligations hereunder. Purchaser further understands and agrees that if Purchaser chooses to finance the purchase of the Unit through a lending institution and obtain a commitment therefrom, neither a subsequent change in the terms of such commitment, the expiration or other termination of such commitment, any change in Purchaser's financial status or condition, nor any delay in or adjournment of the Closing, shall release or relieve Purchaser of Purchaser's obligations pursuant to this Agreement.

**35.    Costs of Enforcing and Defending Agreement.**    Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder. The provisions of this Article shall survive closing of title or the termination of this Agreement.

**36.    Waiver of Jury Trial.**   Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived. The provisions of this Article shall survive closing of title or the termination of this Agreement.

**37.    Waiver of Diplomatic or Sovereign Immunity.**

37.1    Purchaser hereby waives any and all immunity from suit or other actions or proceedings and agrees that, should Sponsor or any of its successors or assigns bring any suit, action or proceeding in New York or any other jurisdiction to enforce any obligation or liability of Purchaser arising, directly or indirectly, out of or relating to this Agreement, no immunity from such suit, action or proceeding will be claimed by or on behalf of Purchaser.

37.2    As of the execution of this Agreement, Purchaser acknowledges and agrees that all disputes arising, directly or indirectly, out of or relating to this Agreement may be dealt with and adjudicated in the state courts of New York or the federal courts sitting in New York, and hereby expressly and irrevocably submits the person of Purchaser to the jurisdiction of such courts in any suit,

action or proceeding arising, directly or indirectly, out of or relating to this Agreement. So far as is permitted under the applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action shall be necessary in order to confer jurisdiction upon the person of Purchaser in any such court.

37.3     Purchaser irrevocably waives, to the fullest extent permitted by law, and agrees not to assert, by way of motion, as a defense or otherwise in any suit, action or proceeding arising, directly or indirectly, out of relating to this Agreement, brought in the state courts in New York or the federal courts sitting in New York: (i) any objection which it may have or may hereafter have to the laying of the venue of any such suit, action or proceeding in any such court; (ii) any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; or (iii) any claim that it is not personally subject to the jurisdiction of such courts. Purchaser agrees that final judgment from which Purchaser has not or may not appeal or further appeal in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon Purchaser and, may so far as is permitted under the applicable law, be enforced in the courts of any state or any federal court and in any other courts to the jurisdiction of which Purchaser is subject, by a suit upon such judgment and that Purchaser will not assert any defense, counterclaim, or set off in any such suit upon such judgment.

37.4     Purchaser agrees to execute, deliver and file all such further instruments as may be necessary under the laws of the State of New York, in order to make effective the consent of Purchaser to jurisdiction of the state courts of New York and the federal courts sitting in New York and any other provisions of this Article 37.

37.5     Nothing in this Article 37 shall affect the right of Sponsor to bring proceedings against Purchaser in the courts of any jurisdiction or jurisdictions.

37.6     The provisions of this Article 37 shall survive the closing of title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement.

37.7     In the event Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity), such Purchaser shall hereby be deemed to have designated and hereby designates C.T. Corporation System, having its offices, at the date hereof, at 111 Eighth Avenue, New York, New York 10011 as its duly authorized and lawful agent to receive process for and on behalf of Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement.

37.8     If Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. 4305, Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor. Sponsor shall not be bound under this Agreement unless and until the earlier to occur of: (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after Purchaser's notice is received by the Department of State.

38.     **Entire Agreement**. This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

39.     **Certain References**. A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires. The term "herein," "hereof" or "hereunder," or similar terms used in this

Agreement, refer to this entire Agreement and not to the particular provision in which the term is used. Unless otherwise stated, all references herein to Articles, Sections or other provisions are references to Articles, Sections or other provisions of this Agreement.

**40. Captions.** The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**41. Successors and Assigns.** Subject to the provisions of Article 23 hereof, the provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

**42. No Oral Changes.** This Agreement, or any provision hereof, cannot be orally changed, terminated or waived. ANY CHANGES OR ADDITIONAL PROVISIONS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES AND WHICH REFERS TO THIS AGREEMENT.

**43. Counterparts.** This Agreement and any Rider(s) which may be annexed hereto may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same document. A facsimile signature on this Agreement (or any such Rider(s)) shall be acceptable and be deemed binding. The party tendering such facsimile signature shall provide the other party with original counterparts of the signature page promptly after delivery of the facsimile signature page, although the failure to do so shall not invalidate the effectiveness of the facsimile signature.

**44. Rule of Construction.** There shall be no presumption against the drafter of this Agreement or the Plan.

**45. Section 1031 Exchange.** Sponsor hereby acknowledges that the acquisition of the Unit hereunder may be in connection with a tax deferred exchange under §1031 of the Internal Revenue Code and that Purchaser (except as prohibited by paragraph 24 of this Agreement) may be assigning all of its rights and obligations hereunder to a qualified intermediary as part of, and in furtherance of, such tax deferred exchange. Sponsor hereby agrees to reasonably assist and cooperate in such tax deferred exchange, provided, however, that: (i) any action taken in connection with such tax deferred exchange or requested of Sponsor shall not result in any cost, expense or liability on the part of Sponsor or increased risk to Sponsor relating to the transaction contemplated by this Agreement (and, among other things, Purchaser acknowledges that a fee may be payable to Sponsor's closing counsel in connection with the review of any documentation related to such tax-deferred exchange); (ii) no action or failure on the part of Purchaser (or any other party to such tax deferred exchange) or cooperation on the part of Sponsor in connection with or related to said tax deferred exchange will frustrate the purpose of this Agreement or otherwise result in a reduction of Sponsor's rights, remedies and privileges under this Agreement or increase any of Sponsor's obligations or duties under this Agreement or otherwise; and (iii) Sponsor shall not be obligated, as part of any tax deferred exchange, to convey any property (other than the Unit), acquire any property, or accept any form of payment in respect of the amounts due hereunder other than as set forth herein. Purchaser shall indemnify and shall hold Sponsor harmless from and against any and all costs, expenses, fees (including, without limitation, reasonable attorneys' fees) or liabilities incurred by Sponsor in connection with or resulting from the said tax deferred exchange, and such indemnity shall survive the closing of title or the termination of this Agreement. Notwithstanding the foregoing, Sponsor makes no representation and expresses no opinion with respect to the applicability of §1031 of the Internal Revenue Code to the purchase or acquisition of a Unit.

**46.    Disclaimer of Implied Warranties**.  All manufacturers' warranties will be passed through to Purchaser at closing of title.  To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, any and all express or implied warranties as to design, construction, sound transmission, furnishing and equipping of the Building, all warranties imposed by statute and all other implied or express warranties of any kind or character are specifically disclaimed.  Seller has not given and Purchaser has not relied on or bargained for any such warranties, either with respect to any portions of the Building or otherwise.  As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).  Without limiting the generality of the foregoing, if, but only if, Seller is prohibited from disclaiming entirely certain implied warranties by reason of the provisions of the "Magnuson-Moss Warranty Act" (15 U.S.C. § 2301 et seq. (1981) (the "Warranty Act"), if applicable, Seller hereby limits those implied warranties (if any) (a) in scope to those (if any) given on "consumer products" (if any) (as defined in the Warranty Act if applicable) which are actually covered by the limited warranty, and (b) in duration to the one year period of Seller's limited warranty, and all those implied warranties (if any) are hereby disclaimed absolutely thereafter.  This paragraph will survive (continue to be effective after) closing.

**48.    Return of Condominium Documents**.  If this Agreement is canceled for any reason, Purchaser will, along with the written notification of cancellation to Seller, return to Seller all of the Plan and other documents delivered to Purchaser in the same condition received, reasonable wear and tear excepted.  If Purchaser fails to return such documents, Purchaser agrees to pay Seller $150.00 to defray the costs of preparation, printing and delivery of same.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

49.    **INTERSTATE LAND SALES**.  THE FOLLOWING PROVISION IS DEEMED INCORPORATED ONLY SO LONG AS THE PROPERTY IS NOT EXEMPT FROM THE PROVISIONS OF THE INTERSTATE LAND SALES FULL DISCLOSURE ACT 15 USC §§ 1701 ET SEQ.

YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO SPONSOR UNTIL MIDNIGHT OF THE SEVENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT.

IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT OF SALE MAY BE CANCELLED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth hereinabove.

SPONSOR:

BAYROCK/SAPIR ORGANIZATION LLC
By: 246 Spring Street Holdings II, LLC, its sole member
   By: Bayrock/Sapir Realty LLC, its managing member
      By: Bayrock Spring Street, LLC, its managing member
         By: Bayrock Group, LLC, its sole member

      By: _____
         Name:
         Title:

PURCHASER:

By: _____
Name: ZACREC L. GORGTGIN
Title: MANAGING MEMBER, PALMER GARDENS, LLC
Social Sec. Number
or Federal Tax ID: 30 - 0012335

Date of Birth (if individual) : _____

Purchaser acknowledges receipt
of Offering Plan [and amendments]
on ___ 1 | 2 1 _____, 20 08

Initials of Purchaser:

_____

## SCHEDULE A-1

### FF&E DESCRIPTION

See FF&E specifications available at the sales office.

## SCHEDULE A-2

### FF&E CONFIGURATION PLAN

See FF&E configuration plan available at the sales office.

## SCHEDULE B

## PERMITTED ENCUMBRANCES

1.     Building and zoning laws and other regulations, resolutions and ordinances (including, but not limited to, any variances or use regulations) and any amendments thereto now or hereafter adopted.

2.     The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Declaration, the Condominium By-Laws (and the Rules and Regulations made thereunder), the By-Laws (and the Rules and Regulations made thereunder), the Power of Attorney from Purchaser to the Board and the Floor Plans, all as may be amended from time to time.

3.     Any declaration or other instrument affecting the Property which Sponsor deems necessary or appropriate to comply with any Law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building or any portion or element thereof.

4.     Consents by Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5.     Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Property.

6.     Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

7.     Any encumbrance as to which the Title Company (or the title insurance company that insures Purchaser's title to the Unit) would be willing to insure, at its regular rates and without additional premium, in a fee policy issued by it to Purchaser, that such encumbrance will not be collected out of or enforced against the Unit if it is a lien, or that such encumbrance is not a blanket lien encumbering the Common Elements.

8.     Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for its permitted purposes.

9.     Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax.

10.     Encroachments of trim, copings, retaining walls, stoops, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and standpipes, and similar projections, if any, on, over or under the Property or the streets, sidewalks or premises abutting the Property, and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls and the like, if any.

11.     Leases and service, maintenance, employment, concessionaire and license agreements, if any, of other Units or portions of the Common Elements.

12.     The lien of any unpaid Common Charges, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

13.     The lien of any unpaid assessment payable in installments (other than assessments levied by the Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at the closing of title).

14.     Franchise taxes and New York City Business Corporation taxes of any corporation in the chain of title, provided that the Title Company would be willing in a fee policy issued by it to Purchaser, to insure that such taxes will not be collected out of the Unit.

15.     Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company (or the title insurance company insuring Purchaser's title to the Unit).

16.     Any Certificate of Occupancy for the Building, so long as the same permits, or does not prohibit, use of the Unit for its stated purposes.

17.     Any lease or other occupancy agreement for the Unit made by Sponsor and Purchaser.

18.     Any violations against the Property (other than the Unit) that are the obligation of the Board or another Unit Owner to correct.

19.     Survey (the "Existing Survey") made by Vollmer Associates LLP dated April 23, 2004 and last updated March 6, 2007.

21.     Any state of facts which an update of the Existing Survey or any other accurate survey or a personal inspection of the Property and the Unit would show; provided such state of facts would not prevent the use of the Unit for its stated purposes; although any encroachment of a portion of the Unit structure upon another Unit or Units or upon the Common Elements may remain undisturbed as long as the same shall stand.

22.     All other covenants, restrictions and matters of record, including the Restrictive Declaration.

23.     Covenants and Restrictions contained in deed recorded July 9, 1853 in Liber 636 Cp. 418.

24.     Declaration of Zoning Lot Restrictions made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, the Board of Managers of 145 Americas Condominium and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246975.

25.     Zoning Lot Development and Easement Agreement made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, 145 Americas Condominium, acting through its Board of Managers, and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246976.

26.     Zoning Lot Description and Ownership Statement made by 246 Spring Street LLC dated December 2, 2004 and recorded December 14, 2004 as CRFN 2004000770645.

27.     Zoning Lot Certification dated October 8, 2004 and recorded December 14, 2004 as CRFN 2004000770644.

28.     Zoning Lot Certification dated February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246974.

29.     Waiver of Execution of Declaration of Zoning Lot Restrictions made by Fortress Credit Opportunities I LP, dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246977.

30.     Notice of Certification (re: Urban Plaza) made by 246 Spring Street, LLC dated as of May 18, 2005 and recorded June 13, 2006 as CRFN 2006000332139.

31.     Notice of Certification made by Bayrock/Sapir Organization, LLC and Peter Moore, as authorized representative of the Board of Managers of the 145 Americas Condominium, dated as of August 7, 2006 and recorded August 23, 2006 as CRFN 2006000476797.

32.     Covenants and Restrictions contained in deed recorded July 9, 1853 in Liber 636 Cp. 418.

33.     Declaration of Zoning Lot Restrictions made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, the Board of Managers of 145 Americas Condominium and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246975.

34.     Zoning Lot Development and Easement Agreement made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, 145 Americas Condominium, acting through its Board of Managers, and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246976.

35.     Zoning Lot Description and Ownership Statement made by 246 Spring Street LLC dated December 2, 2004 and recorded December 14, 2004 as CRFN 2004000770645.

36.     Zoning Lot Certification dated October 8, 2004 and recorded December 14, 2004 as CRFN 2004000770644.

37.     Zoning Lot Certification dated February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246974.

38.     Waiver of Execution of Declaration of Zoning Lot Restrictions made by Fortress Credit Opportunities I LP, dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246977.

39.     Zoning Lot Description and Ownership Statement made by Bayrock/Sapir Organization LLC dated April 27, 2007 and recorded May 3, 2007 as CRFN 2007000230105.

40.     Notice of Certification (re: Urban Plaza) made by 246 Spring Street, LLC dated as of May 18, 2005 and recorded June 13, 2006 as CRFN 2006000332139.

41.     Notice of Certification made by Bayrock/Sapir Organization, LLC and Peter Moore, as authorized representative of the Board of Managers of the 145 Americas Condominium, dated as of August 7, 2006 and recorded August 23, 2006 as CRFN 2006000476797.

42.     Restrictive Declaration made by Bayrock/Sapir Organization, LLC dated as of April 26, 2007 and recorded May 4, 2007 as CRFN 2007000233248.

**INSPECTION STATEMENT**

BAYROCK/SAPIR ORGANIZATION LLC
c/o Bayrock Group, LLC
725 Fifth Avenue
New York, New York 10022

        Re:    Hotel Suite Unit <u>2509</u>
               Trump Soho Condominium New York

Gentlemen:

      As a result of my/our final inspection, please be advised that except as otherwise noted, I/we found the following items in good condition, free of chips, mars, breaks or other defects:

| **Items** | **Initials** | **Exceptions if any** |
|---|---|---|
| Windows, window frames | | |
| Electric fixtures & globes | | |
| Interior painted surfaces | | |
| Sinks, tubs, bowls & shower | | |
|   doors & trim | | |
| Cabinets & counter tops | | |
| Vanity tops & base | | |
| Medicine cabinets, doors & mirror | | |
| Hardware | | |
| Flooring | | |
| Appliances | | |
| FF&E | | |

      I/we understand that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, cabinets, vanity knobs and mechanical chimes will be installed just prior to my/our date of moving. I/we agree and I/we will sign off each item requiring adjustment or repairs as it is completed.

                        _____
                        Purchaser's Signature

                        _____
                        Purchaser's Signature

_____
Sponsor's Representative

- 29 -

## EXHIBIT A

### PURCHASER'S EXPRESS ACKNOWLEDGEMENT
### REGARDING CERTAIN MATTERS AND DISCLAIMERS

Purchaser: Palmer Gardens LLC

Hotel Suite Unit: 2509

Date: ᴶᴬᴺ 24ᵗ , 20 08

In connection with the execution of an Agreement to purchase the above-referenced Hotel Suite Unit in the Trump SoHo Hotel Condominium New York, I/we ("Purchaser") hereby acknowledge, for the benefit of Bayrock/Sapir Organization LLC ("Sponsor") and all parent, subsidiary and affiliate entities thereof, and at the closing of title, I/we hereby undertake to further confirm my/our acknowledgement that:

1.    The Agreement is being (and was) entered into by Purchaser without reliance upon any representations by Seller or any of its agents, employees or representatives concerning potential economic or tax benefits to be derived from purchasing the Hotel Suite Unit, including appreciation in value, rental income and depreciation.

2.    No statements or representations have been made by Seller, or any of its agents, employees or representatives with respect to the ability or willingness of Seller or its affiliates to assist Purchaser in financing, renting or selling the Hotel Suite Unit, any economic or tax benefits to be derived from any managerial efforts of a third party as a result of renting the Hotel Suite Unit or other units, or any economic or tax benefits to be derived from ownership of the Hotel Suite Unit.

3.    Purchaser shall neither have nor acquire, by virtue of the purchase of a Hotel Suite Unit or otherwise, any rights to the Trump Mark (as defined in the Plan) or any other intellectual property pertaining to the Condominium.

4.    Sponsor has made no representation or warranty that the Hotel Suite Unit will be or will continue to be owned or operated as a hotel (as described in the Plan) or as Trump SoHo Hotel Condominium New York or otherwise under the Trump hotel brand or any other hotel brand, or that the current Hotel Management Company, if any, will continue to be the manager.

5.    Use of the Hotel Suite Unit shall be subject to the Occupancy Restrictions (as defined in the Plan) and the terms and conditions of the Restrictive Declaration (as defined in the Plan).

6.    The right to submit the Hotel Suite Unit to any Occupancy Plan (as defined in the Plan) shall extend only to Sponsor and shall specifically not be available to Purchaser, other owners of Hotel Suite Units, the Board, any Commercial Unit Owner, including their successors, or assigns, except with the prior written consent of Sponsor.

7.    Sponsor intends to submit (or has submitted for review) to the Department of Law, an amendment to the Plan providing for a reduction in the number of Hotel Suite Units in the Condominium to 400 Hotel Suite Units, changes in the floor plans and the addition of a new commercial unit as well as certain non-material revisions. Such amendment will cause the square footage and the Common Interest (and

- 30 -

therefore the Common Charges) of certain Hotel Suite Units in the Condominium to increase (or decrease). We/I acknowledge that a copy of the new floor plan, if any, for the Hotel Suite Unit is attached hereto as Exhibit A-1, and that the amendment will reflect the change in square footage and the Common Interest of the Hotel Suite Unit to approximately 741 square feet and 0.2489%, respectively. We/I further acknowledge that such amendment shall not give rise to any claim of rescission or constitute a material change to the terms of the offering. Sponsor shall, in accordance with applicable regulations, provide you with a copy of such amendment as and when the same is accepted for filing by the Department of Law.

**PURCHASER:**

By: _____
Name: RACHEL L. GERSTEIN
Title: MANAGING MEMBER, PALMEGH
                              GARDENS, LLC

-31-

## EXHIBIT A-1

## HOTEL SUITE UNIT FLOOR PLAN

KL3 2468682 17





## DELUXE SUITE 9

floors: 8-20, 23-42 (741 Sq Ft / 68.84 Sq Meters)
floors: 8, 14, 19, 24, 29, 34 & 39 will comply
with the Americans with Disabilities Act.

# TRUMP SOHO

HOTEL CONDOMINIUM NEW YORK

212.965.0000 - trumpsoho.com

COPYRIGHT TRUMP SOHO

# MALTZ
# PLAINTIFFS'
# PURCHASE AGREEMENT

# AGREEMENT

Alan Maltz AND JANET Maltz

Purchaser

with

## BAYROCK/SAPIR ORGANIZATION LLC

Sponsor/Seller

---

**Hotel Suite Unit 2006**
**Trump Soho Hotel Condominium New York**
**246 Spring Street**
**New York, New York 10013**

# AGREEMENT

## HOTEL SUITE UNIT 2006

## TRUMP SOHO HOTEL CONDOMINIUM NEW YORK
### 246 Spring Street
### New York, New York 10013

(to be executed in quadruplicate)

AGREEMENT (this "Agreement"), made as of the 25 day of October 2007 between BAYROCK/SAPIR ORGANIZATION LLC, a Delaware limited liability company, having an office at c/o Bayrock Group, LLC, 725 Fifth Avenue, New York, New York 10022 (hereinafter, "Sponsor"), and JANET MALTZ AND Alan Maltz having an address at 220 GRAND POINTE DRIVE, PALM BEACH GARDENS (hereinafter, "Purchaser"). FLA 33418

## WITNESSETH:

**1.** **Definitions.** Terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in the Offering Plan for Trump Soho Hotel Condominium New York, (such plan, together with any amendments thereto filed prior to the date hereof, is hereinafter referred to as the "Plan").

**2.** **Hotel Suite Unit.** Sponsor hereby grants to Purchaser, and Purchaser hereby acquires from Seller, an option to purchase Hotel Suite Unit 2006 at the Condominium (as designated in the Declaration), together with the undivided 0.1475 % interest in the Common Elements appurtenant to such Hotel Suite Unit (the "Unit") and certain fixtures, furnishing and equipment (the "FF&E") more particularly described on Schedule A-1 attached hereto and made part hereof, upon and subject to the terms and conditions set forth herein.

**3.** **Purchase Price.**

3.1 The purchase price for the Unit and the FF&E (the "Purchase Price") is $1,244,000.00 payable as follows:

    (a) $124,400.00 (the "Initial Deposit"), due upon the signing and submitting of this Agreement, receipt of which (subject to collection) is hereby acknowledged;

    (b) $124,400.00 (the "Additional Deposit"; the term "Deposit", as used herein, refers to both the Initial Deposit and, if the same has been paid at the time in question, the Additional Deposit), due upon the earlier to occur of: (i) Apr 125 08 (the date which is six (6) months after the date of this Agreement); or (ii) fifteen (15) days after Sponsor serves Purchaser with written notice of an amendment declaring the Plan effective, but in no event later than the closing of title, subject to collection; and

    (c) $995,200.00 (the "Balance"), constituting the balance of the Purchase Price, at the closing as hereinafter provided.

- 2 -

3.2     All checks shall represent United States currency, be drawn on or issued by a New York bank which is a member of the New York Clearing House Association and shall be unendorsed.    Checks for the Deposit shall be Purchaser's good check(s) or, at Sponsor's option, Purchaser's certified check(s) or an official bank check(s), made payable to the direct order of "Akerman Senterfitt LLP, as Escrow Agent".  The check or checks for the Balance and all other sums due Sponsor pursuant to this Agreement shall be good certified check of Purchaser or official bank or cashier's check, made payable to the direct order of "BAYROCK/SAPIR ORGANIZATION LLC" (or such other party as Sponsor directs to Purchaser, in writing, prior to the date of closing of title).  If any check is returned, dishonored or fails collection for insufficient funds or for any other reason, the Escrow Agent is authorized to deliver such check to Sponsor and Sponsor will have the choice of remedies set forth in the Plan and in this Agreement with respect to an Event of Default (which shall include suing on such dishonored check or (at Sponsor's option) canceling this Agreement and returning the instrument to Purchaser without affording Purchaser a grace period to cure such default).

## 4.     Deposit.

4.1     The Initial Deposit shall be deposited within five (5) business days after this Agreement is countersigned by or on behalf of Sponsor and returned to Purchaser, and the Additional Deposit shall be deposited within five (5) business days after its receipt by Sponsor or Sponsor's agents, employees or the Escrow Agent, in each case into a segregated special interest-bearing escrow account (the "Escrow Account") at either (i) HSBC Private Bank, 425 Fifth Avenue, Tower 26, New York, N.Y. 10018; or (ii) North Fork Bank, 424 Madison Avenue, 2nd Floor, New York, N.Y. 10017 (the "Depository") entitled "Akerman Senterfitt Trump SoHo Hotel Condominium New York Escrow Account" subject to the provisions of the Plan with respect to the designation of a substitute bank and/or account type or title.  The Deposit shall be held in trust in such account in conformity with Sections 352-e(2)(b) and 352-h of the New York General Business Law and the Attorney General's regulations promulgated pursuant thereto until such funds may be withdrawn in accordance with such laws and regulations and the terms of this Agreement and the Plan.  While the same are being so held, such funds shall not be commingled with any other funds of Sponsor (except, at Sponsor's sole election, funds deposited by other purchasers under the Plan).  The Escrow Account will be interest-bearing and, unless Purchaser defaults, interest will be credited to Purchaser at the closing.  The interest rate to be earned will be the prevailing rate for these accounts.  (No representation or guarantee is made as to the actual rate of interest that will be earned on such funds.)  Interest, if any, will begin to accrue within five (5) business days after this Agreement is fully executed and tender for payment of the check representing the Deposit. Notwithstanding anything to the contrary contained herein, unless and until Purchaser has delivered to the Escrow Agent a completed and signed Form W-9 (Request for Taxpayer Identification Number and Certification) or Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding), whichever may be applicable, the Deposit will be deposited in a non-interest-bearing escrow account at the Depository.

4.2     The Deposit shall be held in the escrow account identified in Section 4.1 above until Akerman Senterfitt LLP (the "Escrow Agent") is otherwise directed in: (a) a writing signed by both Sponsor and Purchaser; or (b) a determination of the Attorney General pursuant to the dispute resolution procedures contained in the Attorney General's regulations; or (c) a judgment or order of a court of competent jurisdiction.

4.3     If there is no written agreement between the parties to release the escrowed funds, the Escrow Agent will not pay the funds to Sponsor until the Escrow Agent has given Purchaser written notice of not fewer than ten (10) business days.  Thereafter, the funds may be paid to Sponsor unless Purchaser has already made application to the Department of Law pursuant to the dispute resolution provisions of the Attorney General regulations and has so notified the Escrow Agent in accordance with such provisions.

4.4    Sponsor will not object to the release of the escrowed funds to: (a) a purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan; or (b) all purchasers after an amendment abandoning the Plan is accepted for filing by the Department of Law.

4.5    Purchaser or the Escrow Agent may apply to the Attorney General in the event of a dispute for a determination on the disposition of the escrowed funds and any interest thereon. Sponsor must avail itself of this procedure if there is a dispute which needs to be resolved. A form for this purpose is attached as Exhibit 8 of Part II of the Plan. The party applying for a determination must send all other parties a copy of the application. Pending the determination of the Attorney General to grant or deny the application, Sponsor, Purchaser and the Escrow Agent shall abide by any interim directive issued by the Attorney General.

4.6    Sponsor and Purchaser hereby jointly direct the Escrow Agent as follows:

(a)    if title to the Unit is transferred to Purchaser, the Deposit shall be paid to Sponsor, and any interest earned on the Deposit shall be paid to Purchaser; or

(b)    if Purchaser becomes entitled to cancel this Agreement in accordance with the terms of this Agreement or the Plan, and actually cancels this Agreement as so provided, the Deposit and any interest earned on the Deposit shall be refunded in full.

4.7    Notwithstanding anything set forth in this Article 4 to the contrary, the Escrow Agent may release a portion of the Deposit to Sponsor, provided that prior to such release, such released funds shall be secured by a bond ("Bond") obtained by Sponsor from an insurance company to be named in an amendment to the Plan (the "Insurance Company") in favor of Purchaser in an amount equal to the amount released, together with interest, if any, which shall accrue thereon as hereinafter provided. Sponsor will secure the Bond in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and Section 71-a of the New York Lien Law. Simultaneously with the delivery of the released funds to Sponsor, Purchaser will receive the Bond, the form of which Bond will be set forth as an exhibit in an amendment to the Plan. The Bond shall apply to a loss by Purchaser of the released portion of the Deposit in the event Sponsor fails to complete the Unit and deliver a deed or convey title to the Unit pursuant to this Agreement or if for any reason Purchaser is entitled to receive the return of the Deposit. The extent of Purchaser's recovery under the Bond is the amount of the released portion of the Deposit actually received by Sponsor, together with any interest which has accrued thereon in accordance with this Agreement, and the liability of the Insurance Company under the Bond does not exceed the amount of the Bond. In order to recover such funds pursuant to the Bond, Purchaser must file a claim with the Insurance Company. In the event of a dispute Sponsor must apply and Purchaser or the Insurance Company may apply to the Attorney General for a determination on the disposition of the portion of the Deposit secured by the Bond. All funds received by Sponsor will be handled in accordance with the provisions of Sections 352-e(2)(b) and 352-h of the New York General Business Law and shall be employed by Sponsor only in connection with the consummation of the Plan.

4.8    Sponsor is required by law to submit a Form 1099 to the Internal Revenue Service reporting any interest earned on the Deposit, if any. Purchaser will be taxed accordingly on such interest, whether or not Purchaser ultimately receives the interest in accordance with the terms of this Article or Article 8.

## 5.    Closing Date and Place.

5.1    The closing of title shall be held at the offices of Akerman Senterfitt LLP, 335 Madison Avenue, New York, New York 10017 (or such other place in the City and State of New York as

Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than thirty (30) days' prior notice. Sponsor may, from time to time, adjourn such date and hour upon reasonable prior notice to Purchaser, which notice shall fix a new date (and hour and place, if appropriate) for the closing of title (but in no event may Sponsor adjourn the date originally set for a closing for more than twelve months in the aggregate without the consent of Purchaser).

5.2    Whenever used herein, the terms "Closing Date" or "closing of title" or words of similar import shall mean the date on which the deed to the Unit is delivered to Purchaser.

## 6.    Delivery of Deed and Power of Attorney.

6.1    At the closing of title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying fee simple title to the Unit to Purchaser, subject only to the liens, encumbrances and title conditions set forth on Schedule B annexed hereto and made a part hereof. Sponsor shall prepare the deed, which shall be substantially in the form set forth in Exhibit 3 in Part II of the Plan, and Sponsor and Purchaser shall execute the deed and have the same acknowledged, in form for recording.

6.2    At the closing of title, Sponsor and Purchaser shall execute and deliver a bill of sale with respect to the FF&E, prepared by Sponsor and substantially in the form set forth as Exhibit 12 in Part II of the Plan.

6.3    At the closing of title, Purchaser shall execute and acknowledge a power of attorney to the Board, prepared by Sponsor and substantially in the form set forth as Exhibit 2 in Part II of the Plan.

6.4    Purchaser acknowledges and confirms the matters set forth in Purchaser's Express Acknowledgement Regarding Certain Matters and Disclaimers attached hereto as Exhibit A and made part hereof. At the closing of title, Purchaser shall execute and deliver such acknowledgment to Sponsor.

6.5    The executed deed and power of attorney shall be delivered to the representative of the title company insuring Purchaser's title (or if no such representative is present, then to Sponsor's attorney) for recording in the City Register's Office, which recording shall be at Purchaser's expense. After being recorded: (i) the deed shall be returned to Purchaser; and (ii) the power of attorney in favor of the Board shall be returned to the Board (or as the Board shall direct).

6.6    Purchaser's payment of the Balance and acceptance of the deed to the Unit shall constitute Purchaser's recognition that Sponsor has fully satisfactorily performed those obligations stated in the Plan and/or this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of purchasers under Article 23-A of the General Business Law, the Plan or Part 20 of the Regulations issued by the Department of Law.

## 7.    State of Title.

7.1    The title conveyed by Sponsor to Purchaser shall be subject only to the liens, encumbrances and title conditions set forth in Schedule B annexed hereto and made a part hereof. Any lien, encumbrance or condition to which title is not to be subject shall not be an objection to title if: (a) the instrument required to remove it of record is delivered at or prior to the closing of title to the proper party or to the Title Company (as such term is defined the Plan), together with the recording or

filing fee; or (b) Purchaser's title insurance company will insure Purchaser, at the company's regular rates and without additional premium, that it will not be collected out of, or enforced against, the Unit; or (c) Purchaser's title insurance company is unwilling to issue the affirmative insurance described in subsection (b) at its regular rates and without additional premium, and the Title Company would be willing to do so at its regular rates and without additional premium (as evidenced by the issuance of the same by the Title Company in connection with the closing of any other Units in the Condominium).

7.2    Sponsor shall be entitled to adjourn the closing to remove or correct any defect in title which is not set forth in Schedule B. However, if such defect existed at least 10 days prior to the closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least 10 days prior to the closing, then, for purposes of Article 12 below, Purchaser shall be deemed at fault for not having sent timely notice, and the closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

7.3    The covenants in the deed will be solely for the personal benefit of Purchaser and will not inure to the benefit of Purchaser's successors or subrogees. In the event of a claimed breach of any covenant of the grantor contained in the deed, Purchaser must first seek recovery against Purchaser's title insurance company before proceeding against Sponsor, it being agreed that the liability of Sponsor will be limited to any loss or damage not covered by such title insurance. In the event that Purchaser elects not to purchase title insurance, then the liability of Sponsor shall be limited to any loss or damage which would not have been covered by the title insurance that was available to Purchaser at the closing. The terms of any marked-up title binder of any title insurance company authorized to do business in New York State issued in connection with any Unit shall be conclusive evidence of the title insurance coverage that was available to Purchaser. The provisions of this Section 7.3 shall survive the closing of title or the termination of this Agreement.

## 8.    Closing Adjustments.

8.1    The following costs with respect to the Unit shall be apportioned between Sponsor and Purchaser as of the Closing Date:

(a)    real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed;

(b)    Common Charges for the month in which title closes; and

(c)    if Purchaser is allowed to occupy the Unit prior to the closing, accrued rent and any other charges pursuant to an interim lease or occupancy or other agreement, if any, covering the Unit.

8.2    If the Unit has been separately assessed but the closing of title occurs before the tax rate is fixed, adjustment of taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation. Installments for tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser; however, the installment for the then current period shall be apportioned appropriately. If the Unit has not been separately assessed as of the Closing Date for the then current tax period, the adjustment under subsection 8.1(a) hereof shall be based upon the Property's actual taxes and assessment for such period prorated to the Unit in the manner set forth in Section 6.16 of the By-Laws and in Part I of the Plan.

8.3    Sponsor shall remit or cause to be remitted to Purchaser an amount equal to interest, if any, earned on the Deposit, on or promptly after the Closing Date.

8.4     In the event that Purchaser fails to close title to the Unit on the date originally scheduled for the closing of title, postpones the closing for any reason, or is deemed at fault for not timely sending notice of a title defect as provided in Article 7 above, and title thereafter closes, then:

(a)     the closing apportionments shall be made as of the originally scheduled closing date regardless of when the actual closing of title occurs; and

(b)     Purchaser shall pay Sponsor interest at the rate of 0.04% per day (or such lower rate per day which is the legal limit, if 0.04% per day exceeds the legal limit) on the Purchase Price, computed from the original Closing Date until this transaction is actually closed. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, the foregoing provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date.

8.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as aforesaid and as otherwise provided herein or in the Plan.

8.6     Any errors or omissions in calculating apportionments at closing shall be corrected, and payment shall be made to the proper party, promptly after discovery. This provision shall survive the closing.

## 9.     Closing Costs

Purchaser shall be required to pay certain costs in connection with the purchase of the Unit, in addition to any net credit in favor of Sponsor that may result from the closing adjustments and any interest or late closing charge described in Article 8. Other than any such net credit in favor of Sponsor that may result from the closing adjustments (or certain other fees which may be payable prior to the closing, as described below), all such closing costs shall be paid by Purchaser, at closing, by Purchaser's unendorsed, personal certified check or by official bank check, in either event drawn only upon a bank that is a member of the New York Clearing House Association. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date hereof and are subject to change without prior notice:

9.1     If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which will vary depending upon the amount of insurance purchased.

9.2     Purchaser will pay a fee to the City Register for recording the deed and the power of attorney and will pay the filing fee for the RP-5217 form, in each case, at the rate and/or in the amount applicable at the time of the closing. In addition, Purchaser's title insurance company may charge various fees and service charges in connection with such recordings and filings, all of which shall be payable by Purchaser.

9.3     If Purchaser obtains a mortgage loan, Purchaser shall pay all closing costs associated with such loan, which may include, but need not be limited to, the following:

(a)     a fee and service charge for recording the mortgage at the same rates given above for recording the deed and power of attorney;

(b)    a mortgage recording tax in the amount provided for by law, taking into account however any deduction for the amount payable to Sponsor under subparagraph (c) below;

(c)    to Sponsor, a sum equal to the full amount (but not in excess thereof) of the partial mortgage recording tax credit provided by Section 339-ee(2) of the New York Condominium Act, to the extent the same is or becomes available, as a reimbursement for the mortgage recording taxes previously paid (such credit is based, in general, on the Common Interest of the Units being purchased multiplied by a portion of the mortgage tax previously paid on account of pre-existing mortgages on the Property);

(d)    the premium for mortgage title insurance, if required by Purchaser's lender;

(e)    deposits for Common Charges, real estate taxes, any assessments, water charges and sewer rents (if separately assessed), if required by Purchaser's lender; and

(f)    such other costs and expenses in connection with such loan as determined by Purchaser's lender.

9.4    Purchaser will be required to pay the amount of $1,750.00 to Akerman Senterfitt LLP, Sponsor's closing counsel, for each Unit purchased hereunder, in order to defray Sponsor's legal fees for services in connection with preparing the deed and power of attorney and for coordinating and attending the closing and the sum of $250 for the preparation of ACRIS transfer documents required by the City of New York. If Purchaser obtains financing and the lender is unwilling to close at the offices of Sponsor's closing counsel or if Purchaser otherwise requests that the Closing occur other than at the office of Sponsor's closing counsel (or such other place as Sponsor may designate in its closing notice) and Sponsor in its sole discretion consents to such request, the closing may be held elsewhere in New York City, provided that Purchaser shall pay Sponsor's closing counsel a travel fee of $500 if the closing is held elsewhere in Manhattan and $750 if the closing is held in another borough other than Manhattan. If, through no fault of Sponsor, Purchaser fails to close on the date scheduled by Sponsor (including, without limitation, the failure of Purchaser or Purchaser's attorney to give at least ten (10) days' prior written notice of a title defect as required in Article 7 above and the failure of Purchaser to have payment in proper form available at closing), then Purchaser shall pay to Sponsor's closing counsel an additional fee of $600 for each Unit purchased hereunder for each rescheduled closing to help defray the cost of preparing for and coordinating the new closing and recalculating the closing apportionments. If Purchaser shall obtain mortgage financing, then Purchaser shall pay an additional fee of $600 to Sponsor's closing counsel to defray the additional costs associated therewith. In addition, if Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement, or for the addition, deletion or substitution of names on this Agreement (or Purchaser otherwise exercises its limited right with respect to an assignment as provided in Section 23.4 hereof), a fee of $850, shall be payable by Purchaser to Sponsor's closing counsel, for preparation of an assignment agreement. If Purchaser is undertaking a Section 1031 like-kind exchange, then Purchaser shall pay an additional fee of $850 to defray the additional costs associated therewith. Purchaser may be required to pay more than one fee pursuant to the preceding sentence and forgoing provisions with respect to a single Unit. At Sponsor's option in its sole discretion, any one or more of the foregoing fees to be paid to Sponsor's closing counsel shall be paid by Purchaser in advance, prior to closing, upon notice to Purchaser.

9.5    Purchaser shall make a contribution to the Working Capital Fund of the Condominium, payable to the Board, in an amount equal to two (2) months' of the Common Charges then in effect for each Unit pursuant to the Condominium budget and in accordance with Schedule A in the Plan, as the same may be amended from time to time.

9.6  Purchaser shall pay to the Board the Common Charges for the Unit for the first full month following the month in which title closes. In addition, if Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity) shall pay to the Board an amount equal to the Common Charges for such Unit for a period of two (2) years as security for the faithful observance by Purchaser of the terms, provisions and conditions of the By-Laws. In the event that Purchaser defaults in respect of the terms, provisions and conditions of the By-Laws, the Board may use, apply, or retain the whole or any part of the security so paid in advance to the extent required for the payment of any Common Charges or any other sum as to which Purchaser is in default; and such Unit Owner shall, within thirty (30) days after notice from the Board, deposit with such Board the amount so applied or retained so that at the option of the Board, such Board shall have the full amount of said security on hand at all times.  The provisions of the preceding sentence shall survive the closing of title.

9.7  Purchaser shall be required to pay the combined state and local sales tax applied in respect of that portion of the Purchase Price attributable to the FF&E which, for such purposes, shall be the rate of $43.00 per square foot.

9.8  Purchaser shall pay the Real Estate Transfer Tax due to the State of New York (the so-called "deed stamps" and, if applicable, the so-called "mansion tax"), the Real Property Transfer Tax due to the City of New York and any other real property transfer tax due to the City or State of New York. Purchaser agrees to indemnify and hold Sponsor harmless from and against any and all liabilities and expenses (including, without limitation, reasonable legal fees and disbursements) incurred by Sponsor by reason of the non-payment by Purchaser of any of the taxes Purchaser is obligated to pay hereunder in connection with the purchase of the Unit. Purchaser's obligations to pay the taxes described in this Section 9.7 and to indemnify Sponsor as herein provided shall survive the closing of title or the termination of this Agreement.

10.  **Transfer Tax Returns**. At the closing, Purchaser shall duly complete and sign before a notary public the real property transfer tax return required to be filed with The City of New York ("RPT Form") and Purchaser shall duly complete and sign the Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate ("Combined Tax Form") required to be filed with the Department of Taxation and Finance of the State of New York (the "Tax Department"), or such other forms as may then be required by law.  The RPT Form and Combined Tax Form shall be delivered at closing to the representative of Purchaser's title insurance company (or, if none, to Sponsor's attorney) for filing with the proper governmental officer. Sponsor will similarly execute all of such forms and other documents required in connection with recording of the deed including, without limitation, smoke detector and multiple-dwelling affidavits.

11.  **The Plan.**

11.1  Purchaser acknowledges having received and read a copy of the Plan, including all amendments thereto, if any, filed prior to the date hereof with the Department of Law of the State of New York, at least three (3) business days before submitting this Agreement.  If, however, Purchaser did not receive a copy of the Plan at least three (3) business days before submitting this Agreement, Purchaser may rescind this Agreement, by sending written notice of same to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within seven (7) days of Purchaser's submission of this Agreement.

11.2  The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth herein at length.  In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern, except with respect to express

modifications to the terms of the Plan included in this Agreement and agreed to by Sponsor and Purchaser, in which case such modifications will govern.

11.3    Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, Restrictive Declaration, By-Laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor.

**12.    Default by Purchaser.** (a)  Any of the following shall constitute an "Event of Default" hereunder:

(i)  Purchaser's failure to pay the Additional Deposit on the date set forth in Article 3 hereof, Purchaser's failure to pay the Balance or any closing apportionment or closing cost required to be paid by Purchaser in Article 8 or 9 hereof on the Closing Date designated by Sponsor pursuant to Article 5 hereof, or the dishonor of any check given by Purchaser to Sponsor; or

(ii)  the failure to pay, perform or observe any of Purchaser's other obligations hereunder; or

(iii)  the occurrence of any Events of Default under any other Agreement between Sponsor and Purchaser, or between Sponsor and any member or members of Purchaser's immediate family or between Sponsor and any parent, affiliate or subsidiary of Purchaser; or

(iv)  if Purchaser is permitted to become the tenant or other occupant of the Unit, Purchaser's failure to pay rent or to perform some other lease or occupancy obligation within the period after notice, if any, set forth in the lease or occupancy or other agreement and either (x) Sponsor has obtained an order of eviction against Purchaser from a court of competent jurisdiction or (y) Purchaser has vacated the Unit; or

(v)  Purchaser's assignment of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(vi)  if a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vii)  if a judgment or tax lien is filed against Purchaser and Purchaser does not pay or bond the same within thirty (30) days.

(b)  **TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Balance and to pay, perform or observe Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such thirty (30) days, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, the Deposit and any interest earned on the Deposit. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for any of the proceeds of such sale.

(c)    Sponsor and Purchaser each hereby agree and acknowledge that it would be impractical and/or extremely difficult to fix or establish the actual damage sustained by Sponsor as a result of a default by a Purchaser hereunder, and that the Deposit (including all interest) shall constitute and be deemed to be the reasonable and agreed upon liquidated damages of Sponsor in respect of the possible loss of a timely closing, the possible fluctuation of values, additional carrying costs of the Unit and other expenses that may be incurred, including, without limitation, attorneys' fees, and shall be paid by Purchaser to Sponsor as Sponsor's sole and exclusive remedy. The payment of the deposit (including all interest) as liquidated damages is not intended to be a forfeiture or penalty, but is intended to constitute liquidated damages to Sponsor.

(d)    NEITHER SELLER NOR PURCHASER SHALL CHALLENGE THE VALIDITY OF THE PROVISIONS OF THIS AGREEMENT OR THE PLAN WITH RESPECT TO LIQUIDATED DAMAGES OR ANY RIGHT OF SPONSOR SET FORTH HEREIN OR THEREIN TO RETAIN THE DEPOSIT IN THE EVENT OF A PURCHASER DEFAULT. SUCH PROVISIONS HAVE BEEN AGREED TO VOLUNTARILY, AFTER NEGOTIATION, WITHOUT DURESS OR COERCION BY ANY PARTY UPON ANY OTHER PARTY, AND WITH EACH PARTY HAVING BEEN (OR HAVING HAD FULL AND ADEQUATE OPPORTUNITY TO BE) REPRESENTED AND ADVISED BY COUNSEL, ACCOUNTANTS, BROKERS, APPRAISERS AND OTHER EXPERTS AND ADVISORS OF ITS OWN CHOOSING.

13.    **Agreement Subject to Lien of Mortgage.**  No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any money deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall continue to be subject and subordinate to the lien of any mortgage heretofore or hereafter made and any payments or expenses already made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the fullest extent thereof, without the execution of any further legal documents by Purchaser. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date, unless, if Purchaser is obtaining financing on the Unit, Purchaser assumes such mortgages (at Sponsor's discretion). The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage is subordinated to the Declaration, or the Unit is released from, or not subject to, the lien of such mortgage at closing (unless Purchaser has assumed the continuation of a mortgage lien encumbering such Unit as hereinabove described).

14.    **Agreement Subject to Plan Being Effective.**  The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan (as the same may be amended from time to time). The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if, after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this Agreement shall be deemed cancelled and the Deposit, together with interest, if any, earned thereon, shall be returned to Purchaser. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

15.    **Sponsor's Inability to Convey the Unit.** If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan by reason of a defect in

title, substantial damage or destruction of the Building by fire or other casualty, or the taking of any material portion of the Property by condemnation or eminent domain, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election not to cure such inability, and Purchaser is not in default hereunder, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such inability (without any abatement in or credit against the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser so elects to terminate this Agreement, Sponsor shall, within 30 days after receipt of notice of termination from Purchaser, return the Deposit to Purchaser, together with interest, if any, earned thereon. Upon making such payment, this Agreement shall be terminated and neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan. The foregoing remedy must be exercised by written notice sent by Purchaser to Sponsor within ten days after the giving of Sponsor's notice of election not to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the first remedy above to acquire title subject to such inability.

16.     **Fixtures, Appliances and Personal Property**. Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in the sale of the Unit pursuant to this Agreement. Except as otherwise set forth herein or in the plan, no portion of the Purchase Price shall be attributable to such items.

17.     **Construction**.

17.1     The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications (as defined in the Plan), subject to the right of Sponsor to amend the Plan and the Plans and Specifications in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required). The issuance of a temporary or permanent Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications. However, nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Plan in the Section entitled "Rights and Obligations of Sponsor."

17.2     The construction of the Building and the Unit and the correction of any defects in the construction thereof to the extent required under the Plan are the sole responsibility of Sponsor. Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

17.3     The closing of title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Prerequisites to Closing of Title" in Part I of the Plan. As a result, if all other prerequisites not involving the construction of the Unit are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price (without any credit against or abatement in the Purchase Price and without any provision for escrow) once a temporary or permanent Certificate of Occupancy is issued for the Unit (notwithstanding any construction items noted on Purchaser's Inspection Report (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligations under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building not preventing Purchaser's occupancy of the Unit).

17.4    Sponsor has projected that, based upon currently anticipated schedules, construction of the Building will be sufficiently completed to permit closings of Units to begin in or about June 1, 2009. The actual date for the First Closing is only an estimate and is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites described in the Plan. Purchaser acknowledges that construction may be delayed by weather, casualty, labor difficulties (including work stoppages and strikes), late delivery or inability to obtain on a timely basis or otherwise materials or equipment, governmental restrictions, or other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these units will be completed is in the discretion of Sponsor. Purchaser acknowledges that except as otherwise expressly provided in the Plan, Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, in the event that the First Closing occurs substantially earlier or later than the projected date or the time to complete or to close title to the Unit is accelerated, delayed or is postponed by Sponsor, Purchaser's rights as set forth in Plan in respect thereof being in lieu of any other rights or remedies which may be available pursuant to any applicable law, regulation, statute or otherwise, all of are hereby expressly waived by Purchaser.

**18.    Inspection of Unit**. At least one week (but not more than one month) prior to the Closing Date, at Sponsor's direction, Sponsor's representative shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with Sponsor's representative to inspect the Unit within the week prior to the Closing Date. Purchaser or his or her duly authorized agent shall attend such inspection, shall carefully inspect the Unit, and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule C to this Agreement) and deliver same to Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within the week prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Balance when due and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in "Rights and Obligations of Sponsor" in the Plan. The FF&E will be delivered to the Unit in accordance with the configuration plan (the "Configuration Plan") attached hereto as Schedule A-2, although the absence of any item(s) of FF&E within the Unit and/or a deviation from the Configuration Plan will not excuse Purchaser from closing title to the Unit. Purchaser may not choose to purchase the Unit without the FF&E.

**19.    Damage to the Unit**. If between the date of this Agreement and the closing of title, the Unit is damaged by fire or other casualty, the following shall apply:

19.1    The risk of loss to the Unit by fire or other casualty, until the earlier of closing of title or possession of the Unit by Purchaser, is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the Unit. In the event of damage or destruction of the Unit due to fire or other casualty prior to the closing of title and the election by Sponsor to repair or restore the Unit, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the closing of title or the termination of the Agreement.

19.2    In the event of damage to or destruction of the Unit by fire or other casualty prior to the closing of title and the election by Sponsor, with notice thereof to Purchaser, that it does not elect to

repair or restore the Unit, or, if the Declaration has been recorded prior thereto, then if the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-Laws, this Agreement shall be deemed cancelled and of no further force or effect and Sponsor shall return to Purchaser all sums deposited by Purchaser hereunder, together with interest, if any, earned thereon, and neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that if Purchaser is then in default hereunder (beyond the applicable grace period, if any), Sponsor shall retain all such sums deposited by Purchaser hereunder and any interest earned thereon, as and for liquidated damages.

20. **No Representations**. Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocable to the Unit, the estimated real estate taxes of the Unit, the ability to rent the Unit and/or the rental income therefor, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as herein or in the Plan specifically represented; Purchaser has relied solely on his or her own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the Floor Plans on file in Sponsor's office and to be filed in the City Register's Office, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any immaterial or insubstantial inaccuracy or error. The provisions of this Article 20 shall survive the closing of title or the termination of this Agreement.

21. **Prohibition Against Advertising**. Purchaser hereby covenants and agrees that it shall not, prior to the closing of title hereunder, list the Unit for sale or resale with any broker or otherwise advertise, promote, or publicize the availability of the Unit for sale. Any such listing of the Unit or form of advertising, promotion or publicizing of the Unit by Purchaser or its agents or representatives prior to the closing of title shall be an Event of Default hereunder, entitling Sponsor to the remedies set forth in Article 12 hereof. The provisions of this Article 21 shall survive the closing of title or the termination of this Agreement.

22. **Broker**. Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction other than Selling Agent and _Prudential Douglas Elliman_. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt, other than Selling Agent and the aforementioned broker. Purchaser agrees that, should any claim be made against Sponsor for commissions by any broker other than Selling Agent on account of any acts or dealings of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including, but not limited to, reasonable legal fees and disbursements. The provisions of this Article 22 shall survive the closing of title or the termination of this Agreement.

23. **Agreement May Not Be Assigned.**

23.1 This Agreement, or any interest of Purchaser herein, shall not inure to the benefit of any successors or assigns of Purchaser and may not be assigned by Purchaser, without the prior written consent of Sponsor, which consent may be given or denied by Sponsor in its sole discretion. Any purported assignment by Purchaser in violation of this Agreement shall be an event of default by

Purchaser entitling Sponsor to all remedies available at law, in equity or otherwise, including, without limitation, the remedies set forth in Article 12 hereof, and shall be voidable at the option of Sponsor.

23.2    If Purchaser is a corporation, any sale, assignment, transfer, pledge, encumbrance or other disposition of any of the stock of Purchaser, or if Purchaser is a partnership, limited liability company or other entity, any sale, assignment, transfer, pledge, encumbrance or other disposition of any interest in such partnership, limited liability company or other entity shall, for purposes of this Agreement, be considered an assignment and shall be subject to the provisions, prohibitions and terms of this Article concerning assignment of this Agreement, except that a sale of twenty five (25%) or less of the stock, or in the case of a partnership, limited liability company or other entity, twenty five percent or less (25%) of the ownership interests, of Purchaser which does not result in a change in control of Purchaser shall not be considered an assignment. For purposes of the preceding sentence only, "control" shall mean the ownership of seventy five percent (75%) or more of the interests in such entity or possession of the power to direct the management and policies of such entity and the distribution of its profits.

23.3    If a Purchaser desires to assign its rights under this Agreement or to take title in the name of an affiliate of, or entity related to, or controlled by Purchaser that differs from that reflected in this Agreement, or to add, delete or substitute the name of a member of the Purchaser's family, then, if such assignment, alteration, addition, deletion or substitution is permitted by Sponsor (in Sponsor's sole discretion), Purchaser shall deliver to Selling Agent or Sponsor's closing counsel, four (4) signed forms of assignment of this Agreement (to be prepared by Sponsor's closing counsel at Purchaser's expense and in form and content acceptable to Sponsor, in its sole discretion), as well as three (3) completed and signed copies of either Form W-9 (Request for Taxpayer Identification Number and Certification) or Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding), as applicable, in the form required by law. Upon each assignment or other change permitted by Sponsor (it its sole discretion), the assignments and Form W-8 or Form W-9, as applicable, must be delivered to Selling Agent or Sponsor's closing counsel, together with a personal certified check, or an official bank or cashier's check, in the amount of $850 made payable to Akerman Senterfitt LLP (for services rendered in connection with the assignment), not less than twenty (20) days prior to the date scheduled for the Purchaser's closing. In no event shall Purchaser or its assignee (or any added or substituted party) have any right to adjourn or postpone the closing as a result of any such change or assignment. Sponsor is not obligated to consent to any such change or assignment and, Sponsor's refusal to consent to an assignment or change in name will not entitle Purchaser to cancel this Agreement or excuse Purchaser from any of its obligations hereunder or give rise to any claim for damages against Sponsor; and the prohibition against advertising or publicizing the availability of Purchaser's Unit as set forth in Article 21 above and in the Plan will remain in effect.

23.4    Notwithstanding the provisions of Section 23.1 above, Sponsor will not unreasonably withhold its consent to the assignment by Purchaser, on one (1) occasion only, of all of Purchaser's rights under this Agreement to a Purchaser Affiliate or to member(s) of Purchaser's Immediate Family, provided that any such assignment is made without consideration and otherwise in accordance with the provisions and procedures set forth in Section 23.3 above. For purposes of this Section 23.4 only: (i) "Purchaser Affiliate" means an entity, as of the date of the assignment and at all times thereafter through and including the Closing, controlled by or under common control with Purchaser; (ii) "Immediate Family Members" means Purchaser's spouse, domestic partner, children, grandchildren, parents, grandparents, brothers or sisters, stepchildren and stepparents; and (iii) "control" means the ownership of seventy five percent (75%) or more of the interests in such entity and possession of the power to direct the management and policies of such entity and the distribution of its profits.

23.5  Notwithstanding any consent by Sponsor pursuant to the terms of this Article to any such change of name or assignment, in no event shall Purchaser, as assignor, be released or relieved from any obligations, promises, covenants and liabilities under or in respect of this Agreement.

**24.  Binding Effect.**  The submission of this Agreement to Purchaser does not create a binding obligation on the part of Sponsor.  This Agreement shall not be binding on Purchaser or Sponsor until Purchaser has signed this Agreement and delivered the signed Agreement and the Initial Deposit to Sponsor, and a counterpart hereof executed by Sponsor has been delivered to Purchaser.  If this Agreement is not signed by Sponsor and a fully executed counterpart delivered to Purchaser or its attorneys within thirty (30) days after the date hereof, this Agreement shall be deemed to have been rejected and the Initial Deposit shall be promptly returned to Purchaser.  Upon such refund being made, neither party shall have any further rights, obligations or liabilities hereunder with respect to the other.  Prior to Sponsor's countersigning and returning this Agreement to Purchaser, and at any time thereafter, Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history.  Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor.  Sponsor has the right, without incurring any liability, to reject this Agreement without cause or explanation to Purchaser.  This Agreement may not be rejected due to Purchaser's sex, sexual orientation, race, creed, color, national origin, ancestry, disability, marital status, or other ground proscribed by law.

**25.  Notices.**

25.1  Any notice, election, demand, consent, request or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail, return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed: to Purchaser at the address given at the beginning of this Agreement; and to Sponsor, addressed to Selling Agent at: 725 Fifth Avenue, New York, New York 10022, with a copy sent simultaneously and in like manner to Akerman Senterfitt LLP, One S.E. Third Avenue, 25th Floor, Miami, Florida 33131, Attention: Ronald A. Kriss, Esq.  Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent.  Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected or, in the case of mailing, three (3) days after the date of mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address.

25.2  Sponsor hereby designates and empowers both Selling Agent and Sponsor's closing counsel (Akerman Senterfitt LLP) as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

**26.  Joint Purchasers.**  The term "Purchaser" shall be read as "Purchasers" if the Unit is being purchased by more than one person, in which case their obligations shall be joint and several.

**27.  Liability of Sponsor.**  Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor.  Sponsor's time to perform such obligation or undertaking shall be tolled for the length of the period during which such performance was excused.

28.   **Further Assurances**. Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

29.   **Severability**. If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

30.   **Strict Compliance**. Any failure by either party hereto to insist upon the strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such other party.

31.   **No Lien**. Neither this Agreement nor any monies deposited hereunder or expended by Purchaser in connection herewith shall constitute a lien against the Unit, any other Units, or any other portion of the Building or the Land upon which it is situated, and Purchaser may not record this Agreement or a memorandum thereof.

32.   **Governing Law**. The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York applicable to contracts made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

33.   **Purchaser's Representations**.

33.1   Purchaser represents that Purchaser has full right and authority to execute this Agreement and perform Purchaser's obligations hereunder. If Purchaser is not a natural person, Purchaser agrees to deliver at Closing, such documents evidencing Purchaser's authority as may be required by Purchaser's title company. Purchaser further represents that the Deposit represents Purchaser's own funds and that no other party (other than Purchaser or Seller, as provided herein) has any right or claim to all or any portion of the Deposit.

33.2   Purchaser is not now, nor shall it be at any time prior to or at the closing of title, an individual, corporation, partnership, joint venture, trust, trustee, limited liability company, unincorporated organization, real estate investment trust or any other form of entity (collectively, a "Person") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC or otherwise). Neither Purchaser nor any Person who owns an interest in Purchaser is now nor shall be at any time prior to or at the closing of title a Person with whom a U.S. Person, including a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC or otherwise.

33.3   Purchaser has taken, and shall continue to take until the closing of title, such measures as are required by applicable law to assure that the funds used to pay to Seller the Purchase Price are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.   Purchaser is, and will at closing be, in compliance with any and all applicable provisions of the USA PATRIOT Act of 2001, Pub. L. No. 107-56, the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

33.4   The provisions of this Article shall survive the closing of title to the Unit or termination of this Agreement.

34.   **Agreement Not Contingent Upon Financing.**   The terms and provisions of this Agreement and Purchaser's obligations hereunder are not contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof) stated in Article 3 of this Agreement, and Purchaser understands and agrees that Purchaser's failure to obtain such financing will not relieve Purchaser of Purchaser's obligations hereunder.   Purchaser further understands and agrees that if Purchaser chooses to finance the purchase of the Unit through a lending institution and obtain a commitment therefrom, neither a subsequent change in the terms of such commitment, the expiration or other termination of such commitment, any change in Purchaser's financial status or condition, nor any delay in or adjournment of the Closing, shall release or relieve Purchaser of Purchaser's obligations pursuant to this Agreement.

35.   **Costs of Enforcing and Defending Agreement.**   Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.   The provisions of this Article shall survive closing of title or the termination of this Agreement.

36.   **Waiver of Jury Trial**.   Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan.   With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.   The provisions of this Article shall survive closing of title or the termination of this Agreement.

37.   **Waiver of Diplomatic or Sovereign Immunity.**

37.1   Purchaser hereby waives any and all immunity from suit or other actions or proceedings and agrees that, should Sponsor or any of its successors or assigns bring any suit, action or proceeding in New York or any other jurisdiction to enforce any obligation or liability of Purchaser arising, directly or indirectly, out of or relating to this Agreement, no immunity from such suit, action or proceeding will be claimed by or on behalf of Purchaser.

37.2   As of the execution of this Agreement, Purchaser acknowledges and agrees that all disputes arising, directly or indirectly, out of or relating to this Agreement may be dealt with and adjudicated in the state courts of New York or the federal courts sitting in New York, and hereby expressly and irrevocably submits the person of Purchaser to the jurisdiction of such courts in any suit,

action or proceeding arising, directly or indirectly, out of or relating to this Agreement. So far as is permitted under the applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action shall be necessary in order to confer jurisdiction upon the person of Purchaser in any such court.

37.3 Purchaser irrevocably waives, to the fullest extent permitted by law, and agrees not to assert, by way of motion, as a defense or otherwise in any suit, action or proceeding arising, directly or indirectly, out of relating to this Agreement, brought in the state courts in New York or the federal courts sitting in New York: (i) any objection which it may have or may hereafter have to the laying of the venue of any such suit, action or proceeding in any such court; (ii) any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; or (iii) any claim that it is not personally subject to the jurisdiction of such courts. Purchaser agrees that final judgment from which Purchaser has not or may not appeal or further appeal in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon Purchaser and, may so far as is permitted under the applicable law, be enforced in the courts of any state or any federal court and in any other courts to the jurisdiction of which Purchaser is subject, by a suit upon such judgment and that Purchaser will not assert any defense, counterclaim, or set off in any such suit upon such judgment.

37.4 Purchaser agrees to execute, deliver and file all such further instruments as may be necessary under the laws of the State of New York, in order to make effective the consent of Purchaser to jurisdiction of the state courts of New York and the federal courts sitting in New York and any other provisions of this Article 37.

37.5 Nothing in this Article 37 shall affect the right of Sponsor to bring proceedings against Purchaser in the courts of any jurisdiction or jurisdictions.

37.6 The provisions of this Article 37 shall survive the closing of title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement.

37.7 In the event Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity), such Purchaser shall hereby be deemed to have designated and hereby designates C.T. Corporation System, having its offices, at the date hereof, at 111 Eighth Avenue, New York, New York 10011 as its duly authorized and lawful agent to receive process for and on behalf of Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement.

37.8 If Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. 4305, Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor. Sponsor shall not be bound under this Agreement unless and until the earlier to occur of: (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after Purchaser's notice is received by the Department of State.

**38.** **Entire Agreement**. This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

**39.** **Certain References**. A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires. The term "herein," "hereof" or "hereunder," or similar terms used in this

Agreement, refer to this entire Agreement and not to the particular provision in which the term is used. Unless otherwise stated, all references herein to Articles, Sections or other provisions are references to Articles, Sections or other provisions of this Agreement.

**40.** **Captions**. The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**41.** **Successors and Assigns**. Subject to the provisions of Article 23 hereof, the provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

**42.** **No Oral Changes**. This Agreement, or any provision hereof, cannot be orally changed, terminated or waived. ANY CHANGES OR ADDITIONAL PROVISIONS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES AND WHICH REFERS TO THIS AGREEMENT.

**43.** **Counterparts**. This Agreement and any Rider(s) which may be annexed hereto may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same document. A facsimile signature on this Agreement (or any such Rider(s)) shall be acceptable and be deemed binding. The party tendering such facsimile signature shall provide the other party with original counterparts of the signature page promptly after delivery of the facsimile signature page, although the failure to do so shall not invalidate the effectiveness of the facsimile signature.

**44.** **Rule of Construction**. There shall be no presumption against the drafter of this Agreement or the Plan.

**45.** **Section 1031 Exchange**. Sponsor hereby acknowledges that the acquisition of the Unit hereunder may be in connection with a tax deferred exchange under §1031 of the Internal Revenue Code and that Purchaser (except as prohibited by paragraph 24 of this Agreement) may be assigning all of its rights and obligations hereunder to a qualified intermediary as part of, and in furtherance of, such tax deferred exchange. Sponsor hereby agrees to reasonably assist and cooperate in such tax deferred exchange, provided, however, that: (i) any action taken in connection with such tax deferred exchange or requested of Sponsor shall not result in any cost, expense or liability on the part of Sponsor or increased risk to Sponsor relating to the transaction contemplated by this Agreement (and, among other things, Purchaser acknowledges that a fee may be payable to Sponsor's closing counsel in connection with the review of any documentation related to such tax-deferred exchange); (ii) no action or failure on the part of Purchaser (or any other party to such tax deferred exchange) or cooperation on the part of Sponsor in connection with or related to said tax deferred exchange will frustrate the purpose of this Agreement or otherwise result in a reduction of Sponsor's rights, remedies and privileges under this Agreement or increase any of Sponsor's obligations or duties under this Agreement or otherwise; and (iii) Sponsor shall not be obligated, as part of any tax deferred exchange, to convey any property (other than the Unit), acquire any property, or accept any form of payment in respect of the amounts due hereunder other than as set forth herein. Purchaser shall indemnify and shall hold Sponsor harmless from and against any and all costs, expenses, fees (including, without limitation, reasonable attorneys' fees) or liabilities incurred by Sponsor in connection with or resulting from the said tax deferred exchange, and such indemnity shall survive the closing of title or the termination of this Agreement. Notwithstanding the foregoing, Sponsor makes no representation and expresses no opinion with respect to the applicability of §1031 of the Internal Revenue Code to the purchase or acquisition of a Unit.

**46.** **Disclaimer of Implied Warranties**. All manufacturers' warranties will be passed through to Purchaser at closing of title. To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, any and all express or implied warranties as to design, construction, sound transmission, furnishing and equipping of the Building, all warranties imposed by statute and all other implied or express warranties of any kind or character are specifically disclaimed. Seller has not given and Purchaser has not relied on or bargained for any such warranties, either with respect to any portions of the Building or otherwise. As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above). Without limiting the generality of the foregoing, if, but only if, Seller is prohibited from disclaiming entirely certain implied warranties by reason of the provisions of the "Magnuson-Moss Warranty Act" (15 U.S.C. § 2301 et seq. (1981) (the "Warranty Act"), if applicable, Seller hereby limits those implied warranties (if any) (a) in scope to those (if any) given on "consumer products" (if any) (as defined in the Warranty Act if applicable) which are actually covered by the limited warranty, and (b) in duration to the one year period of Seller's limited warranty, and all those implied warranties (if any) are hereby disclaimed absolutely thereafter. This paragraph will survive (continue to be effective after) closing.

**48.** **Return of Condominium Documents**. If this Agreement is canceled for any reason, Purchaser will, along with the written notification of cancellation to Seller, return to Seller all of the Plan and other documents delivered to Purchaser in the same condition received, reasonable wear and tear excepted. If Purchaser fails to return such documents, Purchaser agrees to pay Seller $150.00 to defray the costs of preparation, printing and delivery of same.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

49.  INTERSTATE LAND SALES. THE FOLLOWING PROVISION IS DEEMED INCORPORATED ONLY SO LONG AS THE PROPERTY IS NOT EXEMPT FROM THE PROVISIONS OF THE INTERSTATE LAND SALES FULL DISCLOSURE ACT 15 USC §§ 1701 ET SEQ.

YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO SPONSOR UNTIL MIDNIGHT OF THE SEVENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT.

IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT OF SALE MAY BE CANCELLED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth hereinabove.

SPONSOR:

BAYROCK/SAPIR ORGANIZATION LLC
By: 246 Spring Street Holdings II, LLC, its sole member
  By: Bayrock/Sapir Realty LLC, its managing member
    By: Bayrock Spring Street, LLC, its managing member
      By: Bayrock Group, LLC, its sole member

        By: _____
          Name:
          Title:

PURCHASER:
By: _____
Name:  Alen C. Mattz              Janet L. Mattz
Title:
Social Sec. Number
or Federal Tax ID:  075 40 3134      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

Date of Birth (if individual) :  3/14/50      12/23/51

Purchaser acknowledges receipt
of Offering Plan [and amendments]
on  August 31  , 2007

Initials of Purchaser:

- 22 -

## SCHEDULE A-1

### FF&E DESCRIPTION

See FF&E specifications available at the sales office.

## SCHEDULE A-2

## FF&E CONFIGURATION PLAN

See FF&E configuration plan available at the sales office.

## SCHEDULE B

### PERMITTED ENCUMBRANCES

1.      Building and zoning laws and other regulations, resolutions and ordinances (including, but not limited to, any variances or use regulations) and any amendments thereto now or hereafter adopted.

2.      The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Declaration, the Condominium By-Laws (and the Rules and Regulations made thereunder), the By-Laws (and the Rules and Regulations made thereunder), the Power of Attorney from Purchaser to the Board and the Floor Plans, all as may be amended from time to time.

3.      Any declaration or other instrument affecting the Property which Sponsor deems necessary or appropriate to comply with any Law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building or any portion or element thereof.

4.      Consents by Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5.      Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Property.

6.      Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

7.      Any encumbrance as to which the Title Company (or the title insurance company that insures Purchaser's title to the Unit) would be willing to insure, at its regular rates and without additional premium, in a fee policy issued by it to Purchaser, that such encumbrance will not be collected out of or enforced against the Unit if it is a lien, or that such encumbrance is not a blanket lien encumbering the Common Elements.

8.      Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for its permitted purposes.

9.      Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax.

10.      Encroachments of trim, copings, retaining walls, stoops, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and standpipes, and similar projections, if any, on, over or under the Property or the streets, sidewalks or premises abutting the Property, and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls and the like, if any.

11.     Leases and service, maintenance, employment, concessionaire and license agreements, if any, of other Units or portions of the Common Elements.

12.     The lien of any unpaid Common Charges, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

13.     The lien of any unpaid assessment payable in installments (other than assessments levied by the Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at the closing of title).

14.     Franchise taxes and New York City Business Corporation taxes of any corporation in the chain of title, provided that the Title Company would be willing in a fee policy issued by it to Purchaser, to insure that such taxes will not be collected out of the Unit.

15.     Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company (or the title insurance company insuring Purchaser's title to the Unit).

16.     Any Certificate of Occupancy for the Building, so long as the same permits, or does not prohibit, use of the Unit for its stated purposes.

17.     Any lease or other occupancy agreement for the Unit made by Sponsor and Purchaser.

18.     Any violations against the Property (other than the Unit) that are the obligation of the Board or another Unit Owner to correct.

19.     Survey (the "Existing Survey") made by Vollmer Associates LLP dated April 23, 2004 and last updated March 6, 2007.

21.     Any state of facts which an update of the Existing Survey or any other accurate survey or a personal inspection of the Property and the Unit would show; provided such state of facts would not prevent the use of the Unit for its stated purposes; although any encroachment of a portion of the Unit structure upon another Unit or Units or upon the Common Elements may remain undisturbed as long as the same shall stand.

22.     All other covenants, restrictions and matters of record, including the Restrictive Declaration.

23.     Covenants and Restrictions contained in deed recorded July 9, 1853 in Liber 636 Cp. 418.

24.     Declaration of Zoning Lot Restrictions made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, the Board of Managers of 145 Americas Condominium and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246975.

25.     Zoning Lot Development and Easement Agreement made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, 145 Americas Condominium, acting through its Board of Managers, and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246976.

26.     Zoning Lot Description and Ownership Statement made by 246 Spring Street LLC dated December 2, 2004 and recorded December 14, 2004 as CRFN 2004000770645.

27.     Zoning Lot Certification dated October 8, 2004 and recorded December 14, 2004 as CRFN 2004000770644.

28.     Zoning Lot Certification dated February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246974.

29.     Waiver of Execution of Declaration of Zoning Lot Restrictions made by Fortress Credit Opportunities I LP, dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246977.

30.     Notice of Certification (re: Urban Plaza) made by 246 Spring Street, LLC dated as of May 18, 2005 and recorded June 13, 2006 as CRFN 2006000332139.

31.     Notice of Certification made by Bayrock/Sapir Organization, LLC and Peter Moore, as authorized representative of the Board of Managers of the 145 Americas Condominium, dated as of August 7, 2006 and recorded August 23, 2006 as CRFN 2006000476797.

32.     Covenants and Restrictions contained in deed recorded July 9, 1853 in Liber 636 Cp. 418.

33.     Declaration of Zoning Lot Restrictions made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, the Board of Managers of 145 Americas Condominium and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246975.

34.     Zoning Lot Development and Easement Agreement made among Bayrock/Sapir Organization LLC, f/k/a Bayrock/Zar Spring LLC, 145 Americas Condominium, acting through its Board of Managers, and Peter Moore dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246976.

35.     Zoning Lot Description and Ownership Statement made by 246 Spring Street LLC dated December 2, 2004 and recorded December 14, 2004 as CRFN 2004000770645.

36.     Zoning Lot Certification dated October 8, 2004 and recorded December 14, 2004 as CRFN 2004000770644.

37.     Zoning Lot Certification dated February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246974.

38.     Waiver of Execution of Declaration of Zoning Lot Restrictions made by Fortress Credit Opportunities I LP, dated as of February 3, 2006 and recorded May 3, 2006 as CRFN 2006000246977.

39.     Zoning Lot Description and Ownership Statement made by Bayrock/Sapir Organization LLC dated April 27, 2007 and recorded May 3, 2007 as CRFN 2007000230105.

40.     Notice of Certification (re: Urban Plaza) made by 246 Spring Street, LLC dated as of May 18, 2005 and recorded June 13, 2006 as CRFN 2006000332139.

41.     Notice of Certification made by Bayrock/Sapir Organization, LLC and Peter Moore, as authorized representative of the Board of Managers of the 145 Americas Condominium, dated as of August 7, 2006 and recorded August 23, 2006 as CRFN 2006000476797.

42.     Restrictive Declaration made by Bayrock/Sapir Organization, LLC dated as of April 26, 2007 and recorded May 4, 2007 as CRFN 2007000233248.

**INSPECTION STATEMENT**

BAYROCK/SAPIR ORGANIZATION LLC
c/o Bayrock Group, LLC
725 Fifth Avenue
New York, New York 10022

Re:     Hotel Suite Unit 2006
          Trump Soho Condominium New York

Gentlemen:

As a result of my/our final inspection, please be advised that except as otherwise noted, I/we found the following items in good condition, free of chips, mars, breaks or other defects:

| **Items** | **Initials** | **Exceptions if any** |
|---|---|---|
| Windows, window frames | | |
| Electric fixtures & globes | | |
| Interior painted surfaces | | |
| Sinks, tubs, bowls & shower | | |
| doors & trim | | |
| Cabinets & counter tops | | |
| Vanity tops & base | | |
| Medicine cabinets, doors & mirror | | |
| Hardware | | |
| Flooring | | |
| Appliances | | |
| FF&E | | |

I/we understand that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, cabinets, vanity knobs and mechanical chimes will be installed just prior to my/our date of moving. I/we agree and I/we will sign off each item requiring adjustment or repairs as it is completed.

_____
Purchaser's Signature

_____
Purchaser's Signature

_____
Sponsor's Representative

## EXHIBIT A

### PURCHASER'S EXPRESS ACKNOWLEDGEMENT
### REGARDING CERTAIN MATTERS AND DISCLAIMERS

Purchaser: Alan Maltz

Hotel Suite Unit: 2006

Date: _____, 20___

     In connection with the execution of an Agreement to purchase the above-referenced Hotel Suite Unit in the Trump SoHo Hotel Condominium New York, I/we ("Purchaser") hereby acknowledge, for the benefit of Bayrock/Sapir Organization LLC ("Sponsor") and all parent, subsidiary and affiliate entities thereof, and at the closing of title, I/we hereby undertake to further confirm my/our acknowledgement that:

1.    The Agreement is being (and was) entered into by Purchaser without reliance upon any representations by Seller or any of its agents, employees or representatives concerning potential economic or tax benefits to be derived from purchasing the Hotel Suite Unit, including appreciation in value, rental income and depreciation.

2.    No statements or representations have been made by Seller, or any of its agents, employees or representatives with respect to the ability or willingness of Seller or its affiliates to assist Purchaser in financing, renting or selling the Hotel Suite Unit, any economic or tax benefits to be derived from any managerial efforts of a third party as a result of renting the Hotel Suite Unit or other units, or any economic or tax benefits to be derived from ownership of the Hotel Suite Unit.

3.    Purchaser shall neither have nor acquire, by virtue of the purchase of a Hotel Suite Unit or otherwise, any rights to the Trump Mark (as defined in the Plan) or any other intellectual property pertaining to the Condominium.

4.    Sponsor has made no representation or warranty that the Hotel Suite Unit will be or will continue to be owned or operated as a hotel (as described in the Plan) or as Trump SoHo Hotel Condominium New York or otherwise under the Trump hotel brand or any other hotel brand, or that the current Hotel Management Company, if any, will continue to be the manager.

5.    Use of the Hotel Suite Unit shall be subject to the Occupancy Restrictions (as defined in the Plan) and the terms and conditions of the Restrictive Declaration (as defined in the Plan).

6.    The right to submit the Hotel Suite Unit to any Occupancy Plan (as defined in the Plan) shall extend only to Sponsor and shall specifically not be available to Purchaser, other owners of Hotel Suite Units, the Board, any Commercial Unit Owner, including their successors, or assigns, except with the prior written consent of Sponsor.

7.    Sponsor intends to submit (or has submitted for review) to the Department of Law, an amendment to the Plan providing for a reduction in the number of Hotel Suite Units in the Condominium to 400 Hotel Suite Units, changes in the floor plans and the addition of a new commercial unit as well as certain non-material revisions. Such amendment will cause the square footage and the Common Interest (and

therefore the Common Charges) of certain Hotel Suite Units in the Condominium to increase (or decrease). We/I acknowledge that a copy of the new floor plan, if any, for the Hotel Suite Unit is attached hereto as Exhibit A-1, and that the amendment will reflect the change in square footage and the Common Interest of the Hotel Suite Unit to approximately 435 square feet and 0.1494%, respectively. We/I further acknowledge that such amendment shall not give rise to any claim of rescission or constitute a material change to the terms of the offering. Sponsor shall, in accordance with applicable regulations, provide you with a copy of such amendment as and when the same is accepted for filing by the Department of Law.

**PURCHASER:**

By:_____
Name:
Title:

# EXHIBIT A-1

## HOTEL SUITE UNIT FLOOR PLAN



06
LIVING
14'-9" x 13'-7"



BATHING

MAXI-BAR

NOTE: REFER TO CONFIGURATION PLAN
FOR FURNITURE LAYOUT



KEY PLAN

## ROOM #06
14TH-35TH FLOOR
435 SQ.F. (40.4 SQ.M.)
1 SLEEPING ROOM, 1 BATH



0    2    5              10



N

T R U M P   S O H O   H O T E L   C O N D O M I N I U M   N E W   Y O R K

NEW YORK, NEW YORK 10013

23 JULY 2007

ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY CONTAIN MINOR VARIATIONS
FROM FLOOR TO FLOOR. SPONSOR RESERVES THE RIGHT TO MAKE CHANGES DUE TO CONDITIONS IN ACCORDANCE WITH THE OFFERING PLAN.