# EXHIBIT "B"
## PART I

# EXHIBIT "B-1"

THIS PLAN HAS BEEN AMENDED. SEE INSIDE COVER.

COMMERCIAL CONDOMINIUM OFFERING PLAN FOR

# TRUMP SOHO

## HOTEL CONDOMINIUM NEW YORK

246 Spring Street • New York, New York 10013

TOTAL INITIAL PURCHASE PRICE OF THE 413 HOTEL SUITE UNITS
OFFERED FOR SALE HEREBY IS $764,206,000
(The Condominium has 413 Hotel Suite Units and 7 Commercial Units.
The Commercial Units are not being offered for sale hereunder at this time.)

| SPONSOR | SELLING AGENT |
|---|---|
| Bayrock/Sapir Organization LLC c/o Bayrock Group L.L.C. 160 Varick Street - Floor 2 New York, New York 10013 | Prodigy International NYC, LLC 72 Greene Street - Floor 2 New York, New York 10012 |
| | SALES OFFICE |
| | 102 Wooster Street New York, New York 10012 212.375.6470 |

Date of Acceptance for Filing: August 3, 2007

The term of the initial offering of the Plan commenced on August 3, 2007 and expires on August 2, 2008, unless said date is extended in a duly filed amendment.

SEE PAGE 1 FOR SPECIAL RISKS TO PURCHASERS.

OCCUPANCY OF THE HOTEL SUITE UNITS IS SUBJECT TO THE OCCUPANCY RESTRICTIONS DESCRIBED HEREIN AND IN THE RESTRICTIVE DECLARATION. HOTEL SUITE UNITS MAY ONLY BE OCCUPIED FOR TRANSIENT OCCUPANCY AND FOR NO OTHER PURPOSE.

THIS OFFERING PLAN IS NOT AN OFFER TO SELL NOR A SOLICITATION OF OFFERS TO PURCHASE THE HOTEL SUITE UNITS FOR INVESTMENT PURPOSES.

BECAUSE SPONSOR IS RETAINING THE UNCONDITIONAL RIGHT TO RENT RATHER THAN SELL THE HOTEL SUITE UNITS, THIS PLAN MAY NOT RESULT IN THE CREATION OF A CONDOMINIUM IN WHICH A MAJORITY OF THE HOTEL SUITE UNITS ARE OWNED BY OWNER-OCCUPANTS OR INVESTORS UNRELATED TO SPONSOR. (SEE SPECIAL RISKS SECTION OF THE PLAN.)

PURCHASERS FOR THEIR OWN OCCUPANCY MAY NEVER GAIN CONTROL OF THE BOARD UNDER THE TERMS OF THIS PLAN. (SEE SPECIAL RISKS SECTION OF THE PLAN.)

THIS OFFERING PLAN IS THE ENTIRE OFFER TO SELL THESE CONDOMINIUM UNITS. NEW YORK LAW REQUIRES SPONSOR TO DISCLOSE ALL MATERIAL INFORMATION IN THIS PLAN AND TO FILE THIS PLAN WITH THE NEW YORK STATE DEPARTMENT OF LAW PRIOR TO SELLING OR OFFERING TO SELL ANY CONDOMINIUM UNIT. FILING WITH THE DEPARTMENT OF LAW DOES NOT MEAN THAT THE DEPARTMENT OR ANY OTHER GOVERNMENT AGENCY HAS APPROVED THIS OFFERING.

## SPECIAL RISKS TO BE CONSIDERED BY PURCHASERS

All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

1.     **Use Provisions; Occupancy Restrictions; Restrictive Declaration**

Trump SoHo Hotel Condominium New York will initially consist of (i) 413 Hotel Suite Units; (ii) 7 Commercial Units; and (iii) the Common Elements. Only the Hotel Suite Units (and their appurtenant interests in the Common Elements) are offered pursuant to this offering plan.

The Building is located in an area zoned M1-6 under the New York City Zoning Resolution. A copy of the zoning regulations with respect to the Project is on file at Sponsor's office. On account of the zoning classification of the area in which the Building is located, each Hotel Suite Unit may be used only for transient occupancy and for no other purpose, and in all events subject to all Laws, the Occupancy Restrictions (as hereinafter defined) and to the further provisions of the Declaration, the Restrictive Declaration (as hereinafter defined) and the By-Laws. Sponsor makes no representation or warranty with respect to any future requirements or interpretations of the Zoning Resolution with respect to the permitted use of the Hotel Suite Units.

At the request of the New York City Department of Buildings ("DOB"), Sponsor executed a Restrictive Declaration dated as of April 26, 2007 (the "Restrictive Declaration"), and recorded the Restrictive Declaration in the Office of the New York City Register, New York County on May 4, 2007 as CRFN 2007050100385001. The Restrictive Declaration establishes the Occupancy Restrictions and sets forth certain mechanisms for their enforcement. Title to the Hotel Suite Units will be conveyed subject to, among things, the terms and conditions of the Restrictive Declaration. The Restrictive Declaration will encumber the Hotel Suite Units and will run with the land until terminated pursuant to its terms. (See Exhibit 15 to Part II of the Offering Plan for a copy of the Restrictive Declaration.)

In accordance with the Restrictive Declaration, usage of the Hotel Suite Units by Hotel Suite Unit Owners or Non-Owner Occupants (as hereinafter defined) will be limited to twenty-nine (29) consecutive days per thirty-six (36) day period and to no more than one hundred twenty (120) days (in the aggregate) per calendar year. The foregoing limitations on the occupancy of the Hotel Suite Units are referred to as the "Occupancy Restrictions." Any one of the Occupancy Restrictions is referred to as an "Occupancy Restriction." "Non-Owner Occupant" is any Person who is not a Hotel Suite Unit Owner and includes the employees, members, agents and invitees of a corporation, partnership, limited liability company or association which is a Hotel Suite Unit Owner.

In addition to the foregoing, pursuant to the Restrictive Declaration, Hotel Suite Units when not occupied, will be required, to be made available for occupancy on a daily or weekly basis through either (i) the Hotel Management Company; or (ii) a Qualified Broker (as hereinafter defined) and at occupancy rates comparable to those at hotels similar to the Condominium in New York City. The Board will maintain a list of five (5) real estate brokers

licensed in the State of New York that the Board determines satisfy certain minimum objective qualifications reasonably established and modified by the Board from time to time. Each real estate broker approved by the Board from time to time will be referred to as a "Qualified Broker." The Board may remove a Qualified Broker with or without cause at any time and will, in such event, promptly designate a replacement Qualified Broker. No party other than the Hotel Management Company or a Qualified Broker will be permitted to rent a Hotel Suite Unit on behalf of Hotel Suite Unit Owner, and no Hotel Suite Unit Owner will be permitted to advertise the availability of his or her Hotel Suite Unit for rental except through the Hotel Management Company or a Qualified Broker.

The Restrictive Declaration sets forth certain additional requirements with respect to the use and operation of the Hotel Suite Units and mechanisms for enforcement of the Occupancy Restrictions.

In order to occupy a Hotel Suite Unit for his or her own use, a Hotel Suite Unit Owner will be required to provide to the Hotel Management Company at least five (5) days' prior written notice of his or her intended use. No Hotel Suite Unit Owner or Non-Owner Occupant will be permitted to occupy a Hotel Suite Unit without a prior notice to the Hotel Management Company. Hotel Suite Unit Owners and Non-Owner Occupants will also be required to check-in and check-out at the front desk of the Condominium. Consistent with the operation of an integrated hotel, all Hotel Suite Units will be furnished and decorated with the FF&E (as hereinafter defined), and no Hotel Suite Unit Owner will be allowed to decorate a Hotel Suite Unit with any personal decoration and/or furnishing. All decisions regarding future decoration and/or furnishing of the Hotel Suite Units will be made by the Board or the Hotel Management Company, as its delegee. A description of the initial FF&E for each type of Hotel Suite Unit as well as the initial configuration of such FF&E within each unit type (the "Configuration Plan") is available for inspection at the Sales Office. Pursuant to the Unit Management Agreement, the Hotel Management Company will be responsible, at the sole cost and expense of each Hotel Suite Unit Owner, for maintaining, repairing and refurbishing each Hotel Suite Unit to ensure that at all times the appearance of the Hotel Suite Unit complies with the requirements of the Condominium License Agreement (as hereinafter defined) as well as all applicable Legal Requirements.

To enforce compliance with the Occupancy Restrictions, the Hotel Management Company will deliver to any Hotel Suite Unit Owner or Non-Owner Occupant occupying a Hotel Suite Unit more than twenty-seven (27) consecutive days a notice prior to the twenty-ninth (29th) consecutive day of occupancy that he or she must vacate the Hotel Suite Unit in question by said twenty-ninth (29th) day, and that penalties will be imposed if there is occupancy in excess of twenty-nine (29) consecutive days. The Hotel Management Company will also provide notice to any Hotel Suite Unit Owner or Non-Owner Occupant occupying a Hotel Suite Unit for more than one hundred fifteen (115) days in any calendar year a notice prior to the one hundred twentieth (120th) day of occupancy in such calendar year that he or she must vacate the Hotel Suite Unit by said one hundred twentieth (120th) day, and that penalties will be imposed if there is occupancy in excess of one hundred twenty (120) days. Upon the occurrence of an exceedence in occupancy, the Hotel Management Company will, using commercially reasonable methods, provide notice thereof on the first day of such exceedence but no later than three (3) days after the commencement of the exceedence with a copy, and, in the case of an exceedence

by a Non-Owner Occupant, to the Hotel Suite Unit Owner of the Hotel Suite Unit in question no later than three (3) business days after the commencement of the exceedence.

Pursuant to the Restriction Declaration, the Board will be required to impose penalties in case of a violation of any Occupancy Restriction. Any Hotel Suite Unit Owner or Non-Owner Occupant who violates an Occupancy Restriction will be charged by the Board a penalty (the "Exceedence Penalty") equal to two (2) times the Rack Rate for each night that constitutes an exceedence of an Occupancy Restriction. "Rack Rate" means the average undiscounted daily rate maintained by the Hotel Management Company for all Hotel Suite Units of comparable size that are being offered for occupancy by the Hotel Management Company. All sums due from a Hotel Suite Unit Owner or Non-Owner Occupant will be payable, upon demand, to the Board, and if not paid, will, in the case of a Hotel Suite Unit Owner, be a lien against the Hotel Suite Unit in question and subject to collection in the same manner as Common Charges. A Hotel Suite Unit Owner that is not a natural person will be responsible for payment of the Exceedence Penalty for a Non-Owner Occupant if such Non-Owner Occupant is an employee, member, agent and invitee of such Hotel Suite Unit Owner.

The Board will be required to remit one-half of any Exceedence Penalty collected to the City of New York (the "City"), together with a letter setting forth the Rack Rate in effect on the date(s) on which there was an exceedence(s) for the Hotel Suite Unit in question.

Any exceedence of an Occupancy Restriction by a Hotel Suite Unit Owner or a Non-Owner Occupant will be a violation of Section 27-217 of the New York City Administrative Code (or any successor provision of law).

To monitor compliance with the Occupancy Restrictions, the Hotel Management Company, on behalf of the Board, will deliver to the DOB no later than March 31 of each calendar year a report known as the "Unit Occupancy Report." The form of the report is attached as Exhibit A to the Restrictive Declaration. If the Unit Occupancy Report shows an exceedence of an Occupancy Restriction by a Hotel Suite Unit Owner, such owner's name will be provided in such report.

The basis for the Unit Occupancy Report will be a sworn statement by each Hotel Suite Unit Owner with respect to his or her compliance with the Occupancy Restrictions and that of any Non-Owner Occupant. The form of sworn statement is attached as Exhibit B to the Restrictive Declaration. The Hotel Management Company will deliver to each Hotel Suite Unit Owner prior to January 31 of each calendar year, a report showing the listing of his or her occupancy and that of any Non-Owner Occupant as well as whether either occupancy exceeds the Occupancy Restrictions. The Hotel Management Company will also provide a similar report to the Board prior to January 31 of each calendar year.

In the DOB or the City determines on the basis of information furnished by the Board and the Hotel Management Company that in a given calendar year there were of (i) (A) 60 days of exceedences consisting of five (5) or more consecutive days in one or any combination of Hotel Suite Units; or (B) 120 days of exceedences in one or any combination of Hotel Suite Units; or (ii) the DOB or the City has a reasonable basis to believe the information provided to the DOB or the City by the Board or the Hotel Management Company was false or fraudulent,

the DOB or the City may direct the Board, at its sole expense, to retain an Independent Private Sector Inspector General a.k.a. Compliance Monitor.

No smoking will be permitted in the Hotel Suite Units.

The Commercial Units (not offered hereby) may be used for any lawful purpose, including, without limitation, for hotel, retail, spa, conference, catering, restaurant, banking, commercial, office, storage and utility purposes (in each case, subject to any applicable Legal Requirements), provided, however, the Commercial Units will not be used for any purpose that is materially inconsistent with the operation of a hotel. The Board will have no right to restrict or limit any of the uses of, or alterations in or to, the Commercial Units (including the storefronts thereof) which are permitted by applicable Legal Requirements, except as otherwise set forth in the By-Laws and the Declaration. It is currently anticipated that the Commercial Units will initially be used as an antenna room, a restaurant, a retail store, a spa, a lobby bar, a pool bar and conference and catering facilities (and uses ancillary to each of the foregoing). However, no representation or warranty is made with respect to such initial or any subsequent uses of the Commercial Units or with respect to whom the owner(s), tenant(s) or other user(s) of the Commercial Units may be at any time. No income derived from any use of the Commercial Units will constitute income to the Board or the Hotel Suite Unit Owners. (See Sections B and R in Part I of the Plan for further discussion.)

2.  **Urban Plaza**

A legal requirement for the construction of the Building is the construction of an urban plaza (the "Plaza") as shown on the Floor Plans of the Building. The Plaza will initially be open to the general public 24 hours a day, 7 days a week and will feature benches, planters and other amenities, to the extent required by Legal Requirements. The Plaza will constitute a portion of the General Common Elements of the Building. An application may be filed with the New York City Planning Commission (the "CPC") to alter the hours of operation of the Plaza. Except as otherwise set forth in the Plan, the Declaration and the By-Laws, the cleaning and maintenance of the Plaza will be the responsibility of the Board. An application may be filed with the CPC for a certification designating a portion of the Plaza for use by the Restaurant Unit Owner. If the application is approved, the initial term of the certification will be three (3) years, and the Declaration will be amended to provide that such portion of the Plaza so designated is a Restaurant Limited Common Element. Subsequent to such amendment to the Declaration, the Restaurant Unit Owner will be responsible for the cleaning and maintenance with respect to the portion of the Plaza so designated until the expiration of the term of the certification then in effect, unless the same is renewed or replaced. The term may be renewed once after which a new application will be required to be submitted. In addition to being open to the general public, as heretofore described, the Plaza, subject to Legal Requirements, may be made available by the Board or the Restaurant Unit Owner for public gatherings, events and functions. On account of the foregoing, it should be noted that use of the Plaza is likely to create noise, disturbances and other inconveniences to Unit Owners.

and the rate for the New York City hotel room occupancy tax is $2.00 per day per room (not including any bathroom) plus 5% of the daily occupancy charge. In addition, New York State imposes a hotel unit fee in the amount of $1.50 per unit per day. (Sponsor makes no representation or warranty that such tax rates will remain in effect for any period of time.) Generally, these taxes will be paid by guests occupying the Hotel Suite Units. Pursuant to the Unit Management Agreement, the Hotel Management Company, along with collecting rentals payments and fees, will be responsible for collecting and remitting the above referenced taxes to the appropriate taxing authorities with respect to usage by Hotel Suite Unit Owners and other occupants of the Hotel Suite Units.

13. **Unit Management Agreement**

At the closing of title, each Hotel Suite Unit Owner will be required to execute and deliver an agreement in the form of the Unit Management Agreement reproduced as Exhibit 13 in Part II of the Plan whereby such Hotel Suite Unit Owner will retain the Hotel Management Company as its agent with respect to the maintenance, repair, refurbishment and operation of its Hotel Suite Unit. Together with the execution, acknowledgement and delivery of the Unit Management Agreement upon taking title to a Hotel Suite Unit, each Hotel Suite Unit Owner will also execute, acknowledge and deliver to the Hotel Management Company a Memorandum of Unit Management Agreement in the initial recordable form reproduced as Exhibit 14 in Part II of the Plan. If any Hotel Suite Unit Owner fails or refuses to execute, acknowledge or deliver the Unit Management Agreement and the Memorandum of Unit Management Agreement within ten (10) days after receipt of a written request therefor, then at the request of the Hotel Management Company, an officer of the Board (or its designee) will be authorized as attorney-in-fact for such Hotel Suite Unit Owner, coupled with an interest, to execute, acknowledge and deliver the Unit Management Agreement and the Memorandum of Unit Management Agreement with respect to such Hotel Suite Unit Owner in the name of such Hotel Suite Unit Owner and such document will be binding on such Hotel Suite Unit Owner.

In accordance with the Unit Management Agreement, the Hotel Management Company will, from time to time, require each Hotel Suite Unit Owner, at his or her sole cost and expense, to repair or replace the FF&E in his or her Hotel Suite Unit in order to maintain same in a "first class" condition and otherwise in compliance with the requirements of the Condominium License Agreement. In addition, the Hotel Management Company will be responsible for managing the collection and payment of rental revenues, occupancy sales taxes and hotel occupancy taxes. In order to ensure that the Condominium is operated as an integrated hotel, Hotel Suite Unit Owners will not be permitted to rent their Units at rates that are lower than the best available rates offered by the Hotel Management Company for the same or similar type of Units.

Pursuant to the Unit Management Agreement, Hotel Suite Unit Owners will be required to pay a fee (the "Unit Management Fee") for the services rendered by the Hotel Management Company with respect to each Hotel Suite Unit. The Unit Management Fee will be equal to greater of: (x) $1,000 annually (escalated at a rate of 3% per annum commencing in 2010) for each fiscal year (prorated for partial fiscal years) (the "Minimum Fee"); and (y) $15.00 for each night (escalated at a rate of 3% per annum commencing in 2010) a Hotel Suite Unit is occupied by a Hotel Suite Unit Owner or a Non-Owner Occupant (the "Nightly Fee"). The

Minimum Fee will be paid in a single installment on the first (1st) day of each fiscal year and will be credited against the accrual of Nightly Fees during such fiscal year. For those Hotel Suite Unit Owners who retain the Hotel Management Company as their rental agent pursuant to separate agreement, the Unit Management Fee will be credited toward any fees assessed by the Hotel Management Company under such separate agreement.

Hotel Suite Unit Owners will be required to provide up to seven (7) complimentary rooms to the Hotel Management Company for use in connection with the operation of the Condominium. (See Exhibit 13 in the Part II of the Plan for the form of Unit Management Agreement and Schedule B (and the notes thereto) for further information.)

### 14.  **Operating Expenses and Overhead Expenses**

As described in the Plan, the Hotel Suite Units (together with the Common Elements) will be operated together as a hotel. In connection therewith, as described more fully within the notes to the projected budget for the Condominium for the anticipated First Year of Condominium Operation (Section E of the Plan), the services to be provided to each Hotel Suite Unit will include items not routinely associated with the operation of a typical residential condominium (such as overhead expenses related to the operation of Condominium as a hotel as opposed simply to the maintenance of the Building), and accordingly the costs and expenses relating thereto, which will be included within the Common Charges payable by each Hotel Suite Unit Owner, will result, in the aggregate, in annual charges which are greater than those which might otherwise be found in a typical residential condominium. (See Part I, Section A and Schedules A-1 and B (and the notes thereto) in Part I of the Plan for further discussion.)

### 15.  **Convenience Fee**

Common Charges do not include a fee for the availability (at an additional cost) of food and beverage facilities and services (e.g., room service staff) to the Hotel Suite Units. Pursuant to the Unit Management Agreement, Hotel Suite Unit Owners will therefore be required to pay a fee (the "Convenience Fee") to the Restaurant Unit Owner to defray the cost of maintaining the availability of such facilities and services. The Convenience Fee will be payable by all Hotel Suite Unit Owners. The Convenience Fee will be calculated at the rate of twelve and one-half (12.5%) percent of the Net Unit Income collected with respect to the Hotel Suite Unit in question. The Hotel Management Company will calculate and assess the Convenience Fee following the end of each fiscal quarter on the basis of the Net Unit Income collected during such quarter. The Convenience Fee will be deducted from the proceeds distributable to each Hotel Suite Unit Owner under the Unit Management Agreement and will be remitted directly to the Restaurant Unit Owner. (See Schedule A-1 for a summary and explanation of the projected Hotel Suite Unit costs and expenses for the first fiscal year of the Condominium.)

### 16.  **Per Use Fee**

Common Charges do not include "Per Use" expenses. Per Use expenses are costs incurred by the Condominium in connection with the provision of housekeeping services, including furnishing guest supplies and amenities, to the Hotel Suite Units. Per Use expenses will be paid by a Hotel Suite Unit Owner for each night of occupancy (whether by the Hotel

the Hotel Suite Units will be completed at differing times over a period that may begin prior to and/or extend significantly beyond such date. Sponsor will have no liability to any Purchaser, nor will a Purchaser be entitled to any credit, offset or reduction in the purchase price for his or her Hotel Suite Unit or otherwise be relieved from any obligations under the Agreement, in the event that the First Closing occurs earlier or later than the targeted date or the time to complete or to close title to such Purchaser's Hotel Suite Unit is accelerated, delayed or postponed by Sponsor, provided, however, that in the event (x) the actual or anticipated commencement date of the projected First Year of Condominium Operation is to be delayed by six months or more, Sponsor will amend the Plan to include a revised budget with current projections and if the amended budget exceeds the projected budget set forth herein by 25% or more; or (y) the First Closing does not occur within 12 months after June 2009, the date set forth in Schedule B as the commencement date for the projected First Year of Condominium Operation, then in either case Sponsor will offer all Purchasers (other than Purchasers who are then in default beyond any applicable grace period under their Agreements, if the Plan has been declared effective) the right to rescind their Agreements within not less than fifteen (15) days after the presentation date of the amendment containing such revised budget or after such 12-month period, as the case may be, and any Purchasers electing rescission pursuant to such offer will have their Deposits and any interest accrued thereon returned. Purchasers' rights as described in the preceding sentence are in lieu of any other rights or remedies which may be available pursuant to any applicable law, regulation, statute or otherwise, all of which will be deemed to have been waived by all Purchasers. As set forth in the Section L of the Plan entitled "Effective Date," no closing of title to any Unit will take place prior to the Plan being declared effective.

### 21. **Sponsor's Right to Lease and Use Unsold Units**

Sponsor will endeavor in good faith to sell, but nevertheless reserves the unconditional right to rent or lease, rather than sell, the Units offered hereunder on a transient basis prior to the conveyance of such Hotel Suite Unit. Sponsor will have the further right to use the Unsold Units as sales offices and/or model units in connection with the marketing of the Hotel Suite Units. As a result, a Purchaser may be acquiring a Unit that has been previously occupied, but unless otherwise specifically agreed to in writing by Sponsor and such Purchaser, such Unit will be delivered at closing free and clear of all leases and tenancies, subject, however, to any reservations existing at that time the proceeds of which shall inure to the benefit of Purchaser. In addition, there is no commitment to sell more Hotel Suite Units than the fifteen (15%) percent of Hotel Suite Units necessary to declare the Plan effective and owner-occupants may never gain effective control and management of the Condominium. (See Sections A, I and Q in Part I of the Plan for further discussion.)

### 22. **No Bond or Other Security**

No bond or other security has been posted by Sponsor to secure its obligation to pay Common Charges, special assessments or real estate taxes with respect to the Unsold Units. Sponsor represents that it has the financial resources to pay such amounts with respect to the Unsold Units and agrees to pay such amounts. (See Section O in Part I of the Plan for further discussion.)

# PART I

## A. INTRODUCTION

Bayrock/Sapir Organization LLC ("<u>Sponsor</u>"), a limited liability company organized and existing under the Laws of the State of Delaware, hereby presents this Offering Plan (the "<u>Plan</u>") for the establishment of condominium ownership of the land, building and appurtenances thereto, situated on the south side of Spring Street and the east side of Varick Street and known by the street address 246 Spring Street, New York, New York. The condominium will be known as the "Trump SoHo Hotel Condominium New York" and is herein called the "<u>Condominium</u>".

The purpose of the Plan is to set forth in detail all material terms of the offering by Sponsor of the Hotel Suite Units located in the Condominium and offered hereby.* Sponsor may amend the Plan from time to time by filing an amendment with the New York State Department of Law ("<u>Department of Law</u>"), a copy of which amendment will be served on all purchasers of Hotel Suite Units pursuant to executed Agreements who are not in default, and to all Hotel Suite Unit Owners and any Offerees, as may be required by applicable law or regulation.

The Plan is presented in two parts (in one volume), which together, constitute the entire Plan. Part I of the Plan sets forth a general description of the offering and the rights and obligations of Sponsor and the Unit Owners. Part II contains the basic documents necessary to create the Condominium and to otherwise effectuate the provisions of the Plan. Also included in Part II is a detailed physical description of the Property and certifications by Sponsor, Sponsor's architect and Sponsor's budget expert. In addition to the Plan, Sponsor has filed separately with the Department of Law certain exhibits to the Plan which are presented as Parts A (Certifications), B (General), C (Engineering) and D (Other Information).

The Plan, including all Schedules set forth herein, and Parts A, B, C and D of the exhibits, together constitute the entire offer of Sponsor to sell the Hotel Suite Units at the Condominium which are the subject of the Plan. Sponsor will not make, and has not authorized any other party to make, any oral representations or statements concerning the Plan, and no such representations or statements will be considered part of the Plan. No information, data or representations other than those contained herein or in the documents annexed hereto as exhibits in Part II of the Plan may be relied upon. Copies of the Plan and the exhibits will be available for inspection by prospective Purchasers without charge, and for copying at a reasonable charge, at the Condominium's Sales Office by appointment.

The Condominium will be organized pursuant to Article 9-B of the Real Property Law of the State of New York, as amended, commonly known as and hereinafter referred to as

---

\* Each capitalized term used in Part I of the Plan will have the meaning ascribed thereto in the section of the Plan entitled "Certain Definitions", unless otherwise clearly indicated or defined elsewhere.

the "Condominium Act". The Condominium is subject to and will comply with all statutes and regulations applicable to condominiums in the State of New York.

THE PURCHASE OF A CONDOMINIUM UNIT HAS MANY SIGNIFICANT LEGAL AND FINANCIAL CONSEQUENCES. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK STRONGLY URGES YOU TO READ THIS OFFERING PLAN CAREFULLY AND TO CONSULT WITH AN ATTORNEY BEFORE SIGNING AN AGREEMENT TO PURCHASE A CONDOMINIUM UNIT.

## 1.  The Property

Sponsor acquired the Land, an approximately 24,727 square foot parcel, and the existing improvements located at 246 Spring Street, New York, New York, on September 21, 2005. Sponsor will demolish the improvements, if any, in order to allow for the construction of a new building (the "Building") which, as more specifically described herein, upon completion of construction, will constitute the Condominium and include:

(a) (i)  413 hotel suites (the "Hotel Suite Units") located on portions of Floors 8 through 45, which, together with certain Common Elements, will be operated as a hotel;

(ii)  a Commercial Unit (the "Antenna Unit") located on a portion of the cellar floor of the Building, which Sponsor currently anticipates will be operated as an antenna room (and ancillary uses with respect to the foregoing);

(iii)  a Commercial Unit (the "Restaurant Unit") located on portions of the ground floor and Floor 2 of the Building, which Sponsor currently anticipates will be operated as a restaurant (and ancillary uses with respect to the foregoing);

(iv)  a Commercial Unit (the "Lobby Bar") located on a portion of the ground floor of the Building, which Sponsor currently anticipates will be operated as a bar (and ancillary uses with respect to the foregoing);

(v)  a Commercial Unit (the "Retail Unit") located on a portion of the ground floor of the Building, which Sponsor currently anticipates will be operated for a retail store (and ancillary uses with respect to the foregoing);

(vi)  a Commercial Unit (the "Accessory Unit") located on a portion of Floor 3 of the Building, which Sponsor currently anticipates will be operated as conference and catering facilities (and ancillary uses with respect to the foregoing);

(vii)  a Commercial Unit (the "Pool Bar Unit") located on a portion of Floor 5 of the Building, which Sponsor currently anticipates will be operated as a bar (and ancillary uses with respect to the foregoing); and

(viii) a Commercial Unit (the "Spa Unit") located principally on a portion of Floor 5 of the Building, which Sponsor currently anticipates will be operated as a spa (and ancillary uses with respect to the foregoing);

     (b)     a lobby area located on the ground floor;

     (c)     a library located on Floor 2;

     (d)     a fitness center and a pool located on Floor 5; and

     (e)     various utility and service areas located throughout the Building.

Based upon the current construction schedule, Sponsor presently contemplates that, unless delayed by weather, casualty, labor difficulties (including work stoppages and strikes), late delivery and/or the inability to obtain on a timely basis or otherwise, materials or equipment, governmental restrictions, acts of god or other events beyond its reasonable control, construction of the Building will be sufficiently completed to permit closings of title to Hotel Suite Units to begin in or about June 2009. Prospective Purchasers should note, however, that the Hotel Suite Units will be completed at differing times over a period that may begin prior to and/or extend significantly beyond such date. Sponsor will have no liability to any Purchaser, nor will a Purchaser be entitled to any credit, offset or reduction in the purchase price for his or her Hotel Suite Unit or otherwise be relieved from any obligations under the Agreement, in the event that the First Closing occurs earlier or later than the targeted date or the time to complete or to close title to such Purchaser's Hotel Suite Unit is accelerated, delayed or postponed by Sponsor, provided, however, that in the event (i) the actual or anticipated commencement date of the projected First Year of Condominium Operation is to be delayed by six months or more, Sponsor will amend the Plan to include a revised budget with current projections and if the amended budget exceeds the projected budget set forth herein by 25% or more; or (ii) the First Closing does not occur within 12 months after June 2009, the date set forth in Schedule B as the commencement date for the projected First Year of Condominium Operation, then in either case Sponsor will offer all Purchasers (other than Purchasers who are then in default beyond any applicable grace period under their Agreements, if the Plan has been declared effective) the right to rescind their Agreements within not less than fifteen (15) days after the presentation date of the amendment containing such revised budget or after such 12-month period, as the case may be, and any Purchasers electing rescission pursuant to such offer will have their Deposit and any interest accrued thereon returned. Purchasers' rights as described in the preceding sentence are in lieu of any other rights or remedies which may be available pursuant to any applicable law, regulation, statute or otherwise, all of which will be deemed to have been waived by all Purchasers. As set forth in Section L of the Plan entitled "Effective Date," no closing of title to any Unit will take place prior to the Plan being declared effective.

As set forth in more detail in Section H entitled "Changes in Prices and Units" in Part I of the Plan, Sponsor reserves the right to change the number of Units from time to time by subdividing and/or combining Units, even after the Condominium is created, except with respect to a Unit as to which a binding Agreement has been entered into and remains in effect unless the Purchaser thereof consents in writing to such change.

A detailed description of the Property is contained in the Section entitled "Description of the Property and Proposed Building" in Part I, Section B of the Plan.

The statute concerning condominiums in effect in the State of New York pursuant to which the Condominium will be organized is Article 9-B of the Real Property Law of the State of New York, as amended, commonly known as and hereinafter referred to as the "New York Condominium Act." The Property will be submitted to the provisions of said statute by recording of the Declaration in the City Register's Office. From and after the date of recording the Declaration, Sponsor will be the owner of each of the Units until each is sold and conveyed. The Condominium will comply with all statutes and regulations applicable to condominiums in the State of New York.

## 2. Features of Condominium Ownership

Each Hotel Suite Unit Owner is the fee owner of his or her Unit. Each such Hotel Suite Unit Owner also owns, in common with the owners of all other Units, an undivided interest in the Common Elements, which, as more particularly set forth herein and in the Declaration, include all parts of the Property other than the Units themselves, including, without limitation, the Land and the roofs, foundations and supports of the Building, and all areas, equipment or facilities for the common use of two or more Units or two or more Unit Owners. The ownership of a Hotel Suite Unit is different than the ownership of a private home.

Use and occupancy of all Units is governed by the Declaration and the By-Laws, applicable Legal Requirements; and, with respect to the Hotel Suite Units, the provisions of the Plan and any Rules and Regulations. The use of the Hotel Suite Units is also subject to the Restrictive Declaration described herein.

The Building is located in an area zoned M1-6 under the New York City Zoning Resolution. The intended use of the Building (i.e., a hotel) is in compliance with the requirements of the Zoning Resolution as of the date of filing of this Plan. A copy of the zoning regulations with respect to the Project is on file at Sponsor's office. Each Hotel Suite Unit may only be used as for transient occupancy and for no other purpose, and in all events subject to all Laws and to the further provisions of the Declaration and the By-Laws, and when not occupied by the Hotel Suite Unit Owner, used as a Transient Hotel Room. Sponsor makes no representation or warranty with respect to any future requirements or interpretations of the Zoning Resolution with respect to the permitted use of the Building or Hotel Suite Units.

In accordance with the requirements of the Zoning Resolution as of the date of filing, the Hotel Suite Units may be occupied on a transient basis, and the construction and fit-out of the Hotel Suite Units and the operation of the Building will be consistent with such use and not with the use of the Hotel Suite Units as permanent residences. Hotel Suite Unit Owners will be required to make their Hotel Suite Units available for rental on a transient basis as part of the hotel being operated within the Building. Each Hotel Suite Unit Owner will have the option of renting his or her Hotel Suite Unit pursuant to a hotel rental program offered by the Hotel Management Company or through a third party rental agent designated by such Hotel Suite Unit Owner. Each Hotel Suite Unit Owner shall only use a licensed rental agent who appears on the list of agents recognized by the Board as meeting the objective quality standards reasonably set by the Board, which standards may be amended from time to time, or alternatively, such Hotel Suite Owner may submit his or her choice of rental agent to the Board for consideration based on the minimum quality standards.

Prior to the First Closing, Sponsor will record in the Office of the New York City Register, New York County, the Restrictive Declaration appearing as Exhibit 15 in Part II of the Plan. The Restrictive Declaration memorializes the Occupancy Restrictions as well as provides, among other things, policies and procedures for reporting, monitoring and enforcing compliance with the Occupancy Restrictions. It also requires each Hotel Suite Unit Owner to provide at least five (5) days' prior notice of his or her intended use of a Hotel Suite Unit and, when in not use, to make the same available for transient occupancy. The Restrictive Declaration will encumber the Hotel Suite Units from and after the date of recording and will run with the land until terminated pursuant to its terms. The Restrictive Declaration provides that among other things, the Board, acting through the Hotel Management Company, will be responsible for monitoring and enforcing compliance by the Hotel Suite Unit Owners with the Occupancy Restrictions, including, without limitation, delivering on an annual basis to the DOB a report as to any exceedences by a Hotel Suite Unit Owner of any Occupancy Restriction. Furthermore, the Restrictive Declaration requires that each Hotel Suite Unit Owner report his or her compliance and that of any occupant with the Occupancy Restrictions by filing with the Board on an annual basis a sworn statement, the form of which is attached to the Restrictive Declaration, stating the number of days that the Hotel Suite Unit was occupied by the Hotel Suite Unit Owner or by any other individual in excess of that permitted under any of the Occupancy Restrictions. The Hotel Management Company will deliver to any Hotel Suite Unit Owner or Non-Owner Occupant occupying a Hotel Suite Unit more than twenty-seven (27) consecutive days a notice prior to the twenty-ninth (29th) consecutive day of occupancy that he or she must vacate the Hotel Suite Unit in question by said twenty-ninth (29th) day, and that penalties will be imposed if there is occupancy in excess of twenty-nine (29) consecutive days. In addition, the Hotel Management Company shall give the Hotel Suite Unit Owner who has occupied his or her Hotel Suite Unit for more than one hundred fifteen (115) days in any calendar year notice prior to the one hundred twentieth (120th) day of occupancy in such calendar year confirming that the occupant must vacate the Hotel Suite Unit on said one hundred twentieth (120th) day and penalties will be imposed if there is occupancy in excess of one hundred twenty (120) days in any calendar year. If there is an exceedence of an Occupancy Restriction by a Hotel Suite Unit Owner: (i) such Hotel Suite Unit Owner will be given notice of each exceedence by the Hotel Management Company no more than three (3) business days prior the start of such exceedence; (ii) such Hotel Suite Unit Owner shall be charged by the Board an amount equal to two (2) times the standard, undiscounted daily rate for occupancy of its Hotel Suite Unit for each night that constitutes an exceedence; (iii) such Hotel Suite Unit Owner shall be solely responsible for the payment of all costs and expenses in any administrative or judicial proceeding as a result of such exceedence(s); and (iv) such Hotel Suite Unit Owner shall indemnify and hold the Board, the Hotel Management Company and Sponsor harmless from and against all costs, expenses, damages, claim or liabilities, including reasonable professional fees, incurred in connection with or arising out of such exceedence(s). All sums due from a Hotel Suite Unit Owner on account of an exceedence of any Occupancy Restriction shall be treated by the Board as if the same were Common Charges and shall be payable upon demand therefor by the Board, and, if these sums are not paid when due, the Board shall have the right to collect them using any and all remedies available against a Hotel Suite Unit Owner for the collection of unpaid Common Charges, including filing a lien against the Hotel Suite Unit in question in the amount due. The Board shall further have the right to cause the Hotel Management Company to deduct such sums from the proceeds of any rental of the Hotel Suite Unit regardless of whether the Hotel Suite Unit

Owner is enrolled in the Hotel Management Company's rental program. (See Exhibit 15 in Part II of the Plan for a copy of the Restrictive Declaration.)

The Commercial Units (not offered hereby) may be used for any lawful purpose, including, without limitation, for hotel, retail, public event, restaurant, conference, banking, commercial, office, storage, and utility purposes (in each case, subject to any applicable Legal Requirements), provided, however, the Commercial Units will not be used for any purpose that is materially inconsistent with a hotel. Purchasers are advised that the use of the Commercial Units may result in noise, disturbances and other inconvenience to Unit Owners in and about the Building. The Board will have no right to restrict or limit any of the uses of, or alterations in or to, the Commercial Units (including the storefronts thereof) which are permitted by applicable Legal Requirements and applicable zoning ordinances, except as otherwise set forth in the By-Laws and Declaration. It is currently anticipated that the Commercial Units will initially be used as an antenna room, conference and catering facilities, bars, retail stores, restaurants and a spa (and ancillary uses with respect to the foregoing), although no representation or warranty is made with respect to any such initial or any subsequent uses of the Commercial Units or with respect to who the owner(s), tenant(s) or other user(s) of the Commercial Units may be at any time. No income derived from any use of the Commercial Units will constitute income to the Board or the Hotel Suite Unit Owners. (See Part I, Section G for further discussion.)

Without limiting the foregoing, in an amendment to the Declaration effecting the same, Sponsor may subdivide the Commercial Units and designate any newly created Unit as a Hotel Suite Unit and/or designate up to 20% of the Hotel Suite Units as a new class of Unit (e.g., fractional/timeshare ownership) and to amend the Declaration, and the By-Laws, and/or create and record a fractional/timeshare ownership declaration with respect to such new classification of Units (including, among other things, by-laws and other related documents to address issues affecting only the administration and management of such Units and a plan of fractional/timeshare ownership with respect thereto).

With certain exceptions, any sale of a Hotel Suite Unit will be subject to a right by the Board to acquire such Hotel Suite Unit on the same terms as were offered by the Hotel Suite Unit Owner to the potential purchaser thereof. This right of first refusal in favor of the Board is not applicable to a sale of the Unsold Units, resale of a Hotel Suite Unit to Sponsor or its designee or any subsequent sale of such Hotel Suite Unit by Sponsor or its designee. It is also not applicable to the sale of the Commercial Units. For a more complete discussion of the foregoing, see the Section R "Rights and Obligations of Unit Owners and the Board of Managers" Part I of the Plan.

There is no limit on the number of Unit Owners who may purchase a Unit for investment, rather than personal occupancy, purposes. As such there may always be a substantial percentage of Unit Owners who are non-occupants of the Condominium.

Each Unit Owner must pay Common Charges to cover the costs of operation and maintenance of the Condominium in accordance with Sections 339-i(1)(iv) and 339(m) of the New York Condominium Act. The costs of operation and maintenance of the Condominium, including both those directly attributable to the Units and an allocated share of expenses attributable to the Condominium as a whole (such as expenses for insurance, repairs and

maintenance of the Common Elements and various service contracts), will generally be borne by the Unit Owners in proportion to their respective Common Interests. The Commercial Unit Owner, who will receive in certain instances greater, and in other instances fewer, services from the Condominium, will bear a properly allocated share of the expenses of the Condominium, all as described in Schedules A and B of the Plan and Article 6 of the By-Laws. The estimated Common Charges for each Unit for the projected First Year of Condominium Operation are set forth in Schedule A.

Operation of the Condominium will be vested in the Board which will be elected by the Unit Owners and/or designated by Sponsor as described in the Plan and the By-Laws. As more particularly set forth in the By-Laws, the Board will determine the amounts of Common Expenses, the allocation of Common Expenses among the Units (or classes of Units), and will assess the Unit Owners for Common Charges accordingly.

The Hotel Suite Unit Owners may not decorate the interiors of their Hotel Suite Units in any way other than pursuant to the Unit Management Agreement. The Hotel Management Company will be responsible for maintaining and repairing the Hotel Suite Units pursuant to the Unit Management Agreement. The Hotel Management Company will be responsible for complying with Legal Requirements applicable to each Hotel Suite Unit at such Hotel Suite Unit Owner's sole cost and expense.

Each Unit Owner may mortgage his or her Unit with such lender and in such amount as he or she chooses, provided only that the Unit Owner satisfies all unpaid liens (other than any other permitted mortgages) against his or her Unit prior to making such mortgage. Each Unit is separate and is not subject to the lien of any mortgage placed by other Unit Owners on their respective Units.

After the City of New York assesses as a separate tax lot, each Unit and bills each Unit Owner, the Unit Owner will be responsible for paying the real estate taxes and assessments imposed against such Unit, and no Unit Owner will be responsible for the payment of, nor will his or her Unit be subjected to any lien arising from the non-payment of, taxes and assessments imposed on other Units.

In the opinion of Kramer Levin Naftalis & Frankel LLP, Sponsor's Counsel, an individual Hotel Suite Unit Owner who itemizes deductions generally may, under the income tax laws and regulations in effect as of the date of the Plan, subject to certain limitations, deduct from his or her income for Federal, New York State and New York City income tax purposes:

(a) the annual real estate taxes assessed against his or her Hotel Suite Unit and paid or incurred by such Hotel Suite Unit Owner; and

(b) the annual interest paid or incurred by such Hotel Suite Unit Owner on mortgage indebtedness incurred to acquire or substantially improve his or her Hotel Suite Unit, provided that such Hotel Suite Unit is a "qualified residence" of such Hotel Suite Unit Owner. A "qualified residence" generally is a person's principal residence and one other residence selected by the taxpayer provided that if such residence is rented during the taxable year, the taxpayer must use such

residence for personal purposes for a number of days which exceeds the greater of (i) 14 days or (ii) 10% of the number of days during such year for which such residence is rented at a fair value.

If a Hotel Suite Unit Owner rents his or her Hotel Suite Unit, the deductibility of real estate taxes and interest could be limited. Prospective Purchasers should refer to Section T entitled "Income Tax Deductions to Hotel Suite Unit Owners and Tax Status of Condominium" in T below, as well as to Sponsor's Counsel's Income Tax Opinion reproduced in Section U below for a more complete discussion.

The Board will be responsible for maintaining property (excluding terrorism and mold coverage) and casualty insurance with respect to the entire Building (including each Unit but excluding the fixtures, furniture, furnishings (including the FF&E), decorations, appliances and other personal property not constituting part of the Unit), together with all service machinery contained therein, in accordance with the provisions of the By-Laws. (See Section R entitled "Rights and Obligations Unit Owners and the Board of Managers" for a more complete discussion.) The Board will not be required to obtain or maintain any insurance with respect to any liability for occurrences in or about each Unit or the Limited Common Elements appurtenant thereto including, but not limited to, liability insurance against claims for personal injury, death or property damage occurring in, on or about such Hotel Suite Unit Owner's Unit and the Limited Common Elements, if any, appurtenant to his or her Unit. Purchasers are also advised that the insurance policies to be maintained by or on behalf of the Board will be on a "replacement cost" and will not cover losses to the extent that "market value" of a Unit may exceed its insured replacement cost. Further, as a result of current fluctuations in the insurance market, the Board will not be required to obtain or maintain terrorism or mold coverage but may do so, and in such event, the cost thereof will be a Common Expense as described in the By-Laws.

3.     **Offering of Units for Sale**

Sponsor hereby offers the 413 Hotel Suite Units for sale under the Plan. The Commercial Units are not being offered for sale hereunder at this time. No representation or warranty is made as to who the owner(s), tenant(s) or user(s) of the Commercial Units may be at any time or the uses to which such Unit may be put at any time; and no income derived from any use of the Commercial Units will constitute income to the Board or the Hotel Suite Unit Owners.

There are no limitations on who may purchase the offered Units. However, Sponsor hereby reserves the right at any time and from time to time for any reason whatsoever, without the consent of the Board, any Unit Owner or mortgagee, to refuse to approve and execute an Agreement for any Unit; provided, however, that Sponsor will not discriminate against any person because of race, creed, color, gender, sexual orientation, disability, age, marital status or national origin, or as otherwise prohibited by applicable Legal Requirements.

The prices for the Units offered under the Plan are listed on Schedule A, entitled "Schedule of Purchase Prices and Other Financial Details for June 1, 2009 to May 31, 2010, the projected First Year of Condominium Operation." THESE PRICES HAVE BEEN SET BY

SPONSOR AND ARE NOT SUBJECT TO REVIEW OR APPROVAL BY THE
DEPARTMENT OF LAW OR ANY OTHER GOVERNMENTAL AGENCY.

All Hotel Suite Units offered for sale under the Plan are being offered for sale
furnished with the FF&E. The FF&E will be conveyed to a Purchaser at the closing of title
pursuant to a Bill of Sale, the form of which can be found in Exhibit 12 in Part II of the Plan.
Accordingly, the purchaser of a Hotel Suite Unit will be purchasing personal property in addition
to real property, and a portion of the purchase price for each Hotel Suite Unit is allocable to the
FF&E. Purchasers will be obligated to pay any sales or other federal, state or county tax or fee
applicable to the sale of the FF&E at the closing of title to the Hotel Suite Unit. A description of
the FF&E and the Configuration Plan are available for inspection at the Sales Office (and also
will be available for inspection at the Department of Law). Sponsor reserves the right to change
or substitute the FF&E, provided that the FF&E is comparable in kind, quality and quantity.
Prior to the closing of title to a Hotel Suite Unit, the FF&E will be delivered to the Hotel Suite
Unit in accordance with the Configuration Plan, although neither the absence of the FF&E within
the Hotel Suite Unit nor a deviation from the Configuration Plan will excuse a Purchaser from
closing title to the Unit. A Purchaser may not choose to purchase a Hotel Suite Unit without the
FF&E, nor may it amend or change the FF&E or the Configuration Plan.

Sponsor will endeavor in good faith to sell, but nevertheless reserves the
unconditional right, to rent, rather than sell, the Hotel Suite Units offered hereunder. As a result,
Purchaser may be acquiring a Unit that has been previously occupied, but, unless otherwise
specifically agreed to in writing by Sponsor and such Purchaser, such Unit will be delivered at
closing free and clear of all leases and tenancies except existing reservations. In addition, there
is no commitment to sell more Units than the 15% of Hotel Suite Units necessary to declare the
Plan effective and owner-occupants and investors may never gain effective control and
management of the Condominium.

In the event Sponsor makes a bulk sale of the Units, the transferee is entitled to
and bound by those additional rights and obligations (including the aforementioned
representation regarding good faith efforts to sell the Units) applicable to a "sponsor" as more
fully described in the Plan.

As of the filing of this Plan, Sponsor has closed on a construction loan with iStar
Financial, Inc. (or any successor lender(s), "Construction Lender"), advances under which are
subject to Sponsor complying with certain standard covenants and conditions for loans of this
type. In addition, the loan documentation requires that the Units must be marketed for sale
(unless consent for rental is obtained from Construction Lender). Minimum payments to
Construction Lender in connection with the sale of each Unit must be made to Construction
Lender in order for Construction Lender to release its lien from the Unit being sold.

Since the existing and future mortgages covering the Property will not be
satisfied at or prior to the First Closing, each mortgagee will either: (i) consent to the formation
of the Condominium and acknowledge that its lien will be limited to Unsold Units; or (ii) at the
closing of title to any particular Unit, release its lien on the Unit being conveyed and its interest
in the Common Elements.

The estimated Common Charges for each Unit for the projected First Year of Condominium Operation are set forth on Schedule A. In addition to the payment of Common Charges, each Unit Owner will be responsible for the payment of the Overhead Common Charges as well as real estate taxes which will be separately assessed against such Unit (although the By-Laws provide for a limited period of time following the recording of the Declaration when the Units may not be separately assessed), and interest and amortization payments on the mortgage, if any, which such Purchaser may obtain. Further, Unit Owners may be responsible for additional charges for services which they choose to use at their option. (See the Section entitled "Available Services and Facilities" in Part I, Section B.)

Schedule A sets forth the estimate for the amount of real estate taxes which will be payable with respect to each Unit during the fiscal tax year from June 1, 2009 to May 31, 2010. (See Note 6 to Schedule A hereof with respect to the basis of such estimate.)

### 4.    FF&E

All Hotel Suite Units offered for sale under the Plan are being offered for sale with the FF&E. The FF&E will be conveyed to a Purchaser at the closing of title pursuant to a Bill of Sale, the form of which can be found in Exhibit 12 in Part II of the Plan. Accordingly, the purchaser of a Hotel Suite Unit will be purchasing personal property in addition to real property, and a portion of the purchase price, (calculated as $43.00 per square foot (exclusive of any terrace appurtenant thereto) for non-penthouse Hotel Suite Units and $28.00 per square foot (exclusive of any terrace appurtenant thereto) for penthouse Hotel Suite Units), for each Hotel Suite Unit is allocable to the FF&E. Purchasers will be obligated to pay any sales or other federal, state or county tax or fee applicable to the sale of the FF&E at the closing of title to the Hotel Suite Unit. A description of the FF&E and the Configuration Plan are available for inspection at the Sales Office (and also will be available for inspection at the Department of Law). Sponsor reserves the right to change or substitute the FF&E, provided that the FF&E is comparable in kind, quality and quantity. Prior to the closing of title to a Hotel Suite Unit, the FF&E will be delivered to the Hotel Suite Unit in accordance with the Configuration Plan, although the absence of any item(s) of FF&E and/or a deviation from the Configuration Plan will not excuse a Purchaser from closing title to the Unit. A Purchaser may not choose to purchase a Hotel Suite Unit without the FF&E.

### 5.    Units Not Offered For Sale Hereunder

The Commercial Units are not offered for sale hereunder.

### 6.    Certain Definitions

For convenience, general definitions of certain of the terms used in Part I of the Plan are set forth below, which definitions are subject, in many cases, to the more particular definitions of such terms set forth in the Declaration and By-Laws included in Part II of the Plan.

Agreement: The agreement to purchase a Unit pursuant to the Plan, the form of which is set forth as Exhibit 1 in Part II of the Plan.

and other service, mechanical and utility rooms serving or benefiting only the Hotel Suite Units; (e) all security monitors and equipment and other security facilities serving or benefiting only the Hotel Suite Units; and (f) all other systems, installations and facilities of the Building (including shafts, pipes, wires, ducts, vents, cables, conduits and lines) which exclusively serve or benefit or are necessary or convenient for the existence, maintenance, operation or safety of the Hotel Suite Units.

The Hotel Management Company will have the right to make alterations and repairs to the Hotel Suite Limited Common Elements, including preventing access to any floor(s) so long as may be necessary during the course of renovations or other work with respect to the Hotel Suite Limited Common Elements. As a result of such work, there may be periods of time during which Hotel Suite Unit Owners will not be permitted to have access to their Hotel Suite Units.

c.    **Commercial Limited Common Elements**

The Commercial Limited Common Elements consist of the following: (a) all passages, corridors, storage rooms, mechanical and other rooms, areas and spaces (including their respective floors, ceilings and enclosing walls) located in the Building which exclusively serve or benefit the Commercial Units and are not part of any Unit; (b) smoke detection alarm system, telephone system and cable television system exclusively serving or benefiting the Commercial Units; (c) all Building storage rooms, locker rooms, telephone rooms and other service, mechanical and utility rooms serving or benefiting only the Commercial Units; (d) all security monitors and equipment and other security facilities serving or benefiting only the Commercial Units; (e) all other systems, installations and facilities of the Building (including shafts, pipes, wires, ducts, vents, cables, conduits and lines) which exclusively serve or benefit or are necessary or convenient for the existence, maintenance, operation or safety of the Commercial Units; (f) the portion of the Terrace located on Floor 5 of the Building and appurtenant to the Pool Bar Unit (to the extent shown as such on Floor Plans); and (g) the portion of the Terrace located on Floor 5 of the Building and appurtenant to the Spa Unit (to the extent shown as such on Floor Plans). To the extent that any portion of the Plaza may legally be used as part of the operations of the Restaurant Unit, the Unit Owner thereof may elect to amend the Declaration and Floor Plans to reclassify such area as a Limited Common Element exclusively appurtenant to such Unit, in which case, the Restaurant Unit Owner will thereafter have such rights and bear such responsibilities therefor to the same extent as is provided in the By-Laws with respect to any Unit Owner's appurtenant Limited Common Element. Purchasers are advised that the use of the Commercial Units and the Plaza may result in noise, disturbances and other inconvenience to Unit Owners in and about the Building.

6.    **Available Services and Facilities**

Generally, all services normally associated with the operation and maintenance of a hotel condominium will be provided to Hotel Suite Unit Owners at no cost other than Common Charges (except as otherwise indicated below or in the Plan). These are described below in the Section entitled "Building Standard Services and Facilities". Notwithstanding the foregoing, however, the Board will at all times maintain, operate and staff the Building in compliance with, and subject to, all applicable Legal Requirements.

a.     Building Standard Services and Facilities (provided to all Hotel Suite Unit Owners at no cost other than the Common Charges payable by Hotel Suite Unit Owners (except as otherwise indicated below)):

(i)     **Concierge**. There will be a concierge area adjacent to the lobby, staffed by a concierge who, it is anticipated, subject to hotel occupancy, industry practices and other similar factors, will be available 8 a.m. to 10 p.m. daily, seven days per week. The concierge will provide general information, make restaurant and entertainment recommendations and arrange reservations, reserve theater, sporting and entertainment tickets, arrange housekeeping, valet, limousine and transportation services, and arrange various other services. (The cost of any goods or services provided will be the expense of the requesting party.) Such stated hours are subject to change, and no warranty or representation is made with respect thereto.

(ii)     **Doorman**. Subject to hotel occupancy, industry practices and other similar factors, a doorman will be on duty at the street entrance to the lobby, from 6 a.m. to midnight daily, seven days per week, in order to open doors, hail taxicabs and assist with packages and luggage. Such stated hours are subject to change, and no warranty or representation is made with respect thereto.

(iii)     **Elevator Service**. The passenger elevators will be automatically operated and therefore will be in service, as necessary, 24 hours per day, seven days per week. The service elevator will be available to Hotel Suite Unit Owners by prior arrangement with the Hotel Management Company and otherwise in accordance with established policies.

(iv)     **Housekeeping**. Building standard housekeeping service will be provided, including cleaning bathrooms, removing trash, dusting furniture, vacuuming and changing building standard sheets, pillow cases, towels, washcloths and bathmats and evening turn-down service. All housekeeping services will be charged as part of the Per Use Fee. (See Note 13 to Schedule B in Part I of the Plan for further information.)

(v)     **Communications Facilities, Intercom Service, and Internet Connection**. Each Hotel Suite Unit will be equipped with an internal telephone system. This system will enable the occupants of each Hotel Suite Unit to communicate directly with the reception desk regarding the admission of guests, visitors and, in the case of Building personnel, prior notice of their imminent arrival as well as with other Units in the Condominium. Each Hotel Suite Unit will have wireless and wired internet access.

(vi)     **Package Room**. There will be a package room located in the lobby. The reception desk will accept deliveries of packages and store them temporarily in the package room until picked up by the Unit Owner, guest or occupant.

(vii)     **Mail**. All incoming mail will be delivered by the United States Postal Service to the reception desk.

(viii)     **Maintenance Personnel**. Building personnel employed by the Condominium will include engineers and housekeeping staff as may be necessary for the proper maintenance and cleaning of the Common Elements.

(ix)   **Refuse Disposal**. Building personnel employed by the Condominium will be responsible for collection of recycling items and refuse which will be collected by the City of New York Department of Sanitation.

(x)   **Other Service Contracts**. Certain additional services covered by third-party contracts, such as elevator maintenance, are included in Building Standard Services.

(xi)   **Building Security Procedures**. Entrances to the Building will generally be staffed by employees of the Condominium. Purchasers are advised that certain portions of the Condominium will be regularly used for parties and functions and/or as a restaurant or other similar facilities that are open to the public and that a significant number of non-hotel guests will likely be in the Building at any time. Therefore no representation or warranty is made and no assurance is given that the security systems, procedures and staff of the Building will prevent personal injury or damage to or loss of personal property. Purchasers are advised that the use of "deadbolt" door locks and double door locks is prohibited.

(xii)   **Reception Desk**. Subject to hotel occupancy, industry practices and other similar factors, the Board will provide staff who will be on duty at the reception desk in the lobby 24 hours a day, 7 days per week to handle registration, issue room keys and deliver messages. The reception desk will, among other things, handle check-in and check-out procedures, accept and deliver mail and packages and respond to general inquiries. For security purposes and to monitor occupancy in connection with the New York State and New York City hotel occupancy and sales taxes, each occupant must register with the reception desk and leave a valid credit card upon commencing any occupancy. The occupant will be issued a specially-encoded room key at that time. The maintenance of the reception desk is included in the Common Charges payable by the Unit Owners.

(xiii)   **Lobby Staff**. Lobby attendants will be available 24 hours a day, 7 days per week, to hail taxis, transport baggage and packages to and from the Hotel Suite Units.

(xiv)   **Licensing**. The Board will procure and maintain in effect all licenses and permits consistent with its operation of a hotel at the Property.

(xv)   **Sales Tax and Hotel Occupancy Tax**. Occupancy by the Hotel Suite Unit Owners (or their guests) and rentals of Hotel Suite Units will be subject to sales taxes and hotel occupancy tax. As of the filing of the Plan, New York State sales tax is at the rate of 4% and New York City sales tax is at the rate of 4.375%, for a combined rate of 8.375%; and the rate for the New York City hotel room occupancy tax is $2.00 per day per room (not including any bathroom) plus 5% of the daily occupancy charge. In addition, New York State imposes a hotel unit fee in the amount of $1.50 per unit per day. (Sponsor makes no representation or warranty that such tax rates will remain in effect for any period of time.) The Hotel Management Company will, pursuant to the Unit Management Agreement, be responsible for collecting and remitting to the appropriate taxing authorities the applicable sales and hotel room occupancy taxes and for filing with the appropriate taxing authorities all applicable sales and hotel room occupancy tax returns and applications for refunds on behalf of the Hotel Suite Unit Owners.

(xvi) **Telephone Service**. Telephone operator service is provided 24 hours a day, 7 days per week, for assistance with incoming call routing, message service, wake-up call service and outside operator connections. Hotel Suite Unit Owners will also be able to make outgoing calls by (DID) direct dial service, at their own expense. Telephone company charges for local and long-distance calls from each Unit will be charged at the hotel's posted rates separately from Common Charges and will be based on usage. All Hotel Suite Occupants will be required to leave a valid credit charge authorization and execute the Hotel Management Company's associated hotel services agreement for each stay to secure timely payment of charges, including but not limited to, telephone and other per-use or discretionary charges incurred during any occupancy period.

(xvii) **Cable Television Service**. Each Hotel Suite Unit will be connected to cable service which will offer a variety of stations. Premium movie channels and a pay-per-view service offering movies, specials and sporting events will be available at an additional charge. No Hotel Suite Unit Owner may install on the exterior of any Hotel Suite Unit any antenna or over-the-air receiving device.

(xviii) **Pool**. All Hotel Suite Unit Owners will have use of an outdoor pool located on Floor 5 of the Building. It is contemplated that the hours of operation of the Pool will be during daylight hours. Such stated hours are subject to change, and no warranty or representation is made with respect thereto.

(xix) **Fitness Center**. All Hotel Suite Unit Owners will have use of access to the fitness center facilities located on Floor 5 of the Building. Accordingly, all Hotel Suite Unit Owners when in occupancy will have daily access to the exercise equipment of the fitness center, without payment of any membership or initiation fee. It is contemplated that the hours of operation of the fitness center will be 6:30 a.m. to 9:30 p.m. (Monday through Friday) and 8:00 a.m. to 8:00 p.m. (Saturday, Sunday and holidays). Such stated hours are subject to change, and no warranty or representation is made with respect thereto. A list of the equipment to be included in the fitness center will be set forth in an amendment to the Plan and will be available at the Sales Office.

Purchasers are advised that certain of the services to be provided in the Building will performed and/or provided by the Hotel Management Company on behalf of the Board. All decisions regarding providing or facilitating such services, will be made and controlled by the Hotel Management Company and the cost thereof billed to the Board (and included in Common Expenses and collected as Common Charges) in the manner provided in the By-Laws.

b. **Optional Services.**

These services will be the responsibility of the Hotel Management Company to administer for those Hotel Suite Unit Owners who will be receiving the same at their option upon payment of an additional fee:

(1) **Room Service**. Room service is expected to be offered by the Hotel Management Company, 24 hours per day, 7 days per week, subject to availability and

advance notice, with fees and delivery charges to be determined in the discretion of the Hotel Management Company.

(2) **Cleaning**. Additional cleaning, beyond basic housekeeping, may also be obtained at an additional cost. Cleaning services will be coordinated through the Hotel Management Company. Charges will be payable directly to the Hotel Management Company by the Hotel Suite Unit Owners using such service.

(3) **Spa Treatments**. The Spa Unit within the Condominium is expected to offer a variety of relaxation and beauty treatments. These services will be available to Hotel Suite Unit Owners subject to advance booking on a restricted/availability basis at charges determined by the Spa Unit Owner, or the lessee, of that portion of the Spa Unit (Sponsor currently anticipates that such services will initially be available within approximately twelve (12) months after the First Closing.)

c. **Unit Management Agreement Services.**

All Hotel Suite Unit Owners must execute and deliver the Unit Management Agreement substantially in the form set forth in Exhibit 13 in Part II of the Plan to the Hotel Management Company. The execution of the Unit Management Agreement is mandatory. Together with the execution, acknowledgement and delivery of the Unit Management Agreement upon taking title to a Hotel Suite Unit, each Hotel Suite Unit Owner will also execute, acknowledge and deliver to the Board a Memorandum of Unit Management Agreement in recordable form as set forth in Exhibit 14 in Part II of the Plan.

Each Hotel Suite Unit Owner, pursuant to the Unit Management Agreement, will agree that the Hotel Suite Unit, including Terraces, if any, and all furniture and furnishings, will be kept and maintained in compliance with the Operating Standard and otherwise in compliance with the requirements of the Condominium License Agreement. The Hotel Management Company will, from time to time, require each Hotel Suite Unit Owner, at the Hotel Suite Unit Owner's expense, to replace furniture, fixtures, equipment, carpeting, case goods, soft goods and/or decorations in the Hotel Suite Unit in order to maintain same in a manner and condition suitable and as required by the Condominium License Agreement and which comply in kind, quantity and quality with the Operating Standard. The Hotel Management Company will have the option, exercisable at its sole discretion upon notice to the Hotel Suite Unit Owner, to take such steps to maintain the interior of the Hotel Suite Unit in accordance with the Operating Standard, and to undertake Hotel Suite Unit Owner's obligations under the Unit Management Agreement, but at the sole cost of Hotel Suite Unit Owner. Each Hotel Suite Unit Owner will be required to contribute towards the FF&E Reserve Fund and the amount of such contribution to the FF&E Reserve Fund will be determined by the Hotel Management Company from time to time in its reasonable discretion.

The Unit Management Agreement to be executed in conjunction with the closing of title to each Hotel Suite Unit outlines the services to be provided by the Hotel Management Company. Such services include, but are not limited to: (i) maid and linen services; (ii) accepting and managing reservations; (iii) enforcing check-in and check-out procedures; and (iv) collecting payments and service charges.

Hotel Suite Unit Owners when not in occupancy are required to rent their Units to the general public on a transient basis. Hotel Suite Unit Owners may elect to rent their Units on their own, through the Hotel Management Company or through a Qualified Broker.

As a condition of the Unit Management Agreement, each Hotel Suite Unit Owner will be required to furnish and equip the applicable Unit with the FF&E to be described in Schedule A annexed to the form of Unit Management Agreement which is reproduced as Exhibit 13 in Part II of the Plan. The FF&E, which is included with the purchase of all Hotel Suite Units will, as of the initial conveyance of a Hotel Suite Unit from Sponsor to a Purchaser, conform with the initial requirements of the Unit Management Agreement; however, the requirements with respect thereto may be changed at the discretion of the Hotel Management Company from time to time.

The services covered by the Unit Management Agreement will include among other services, housekeeping service. As more fully described in the Unit Management Agreement, a staff of housekeepers employed by the Condominium will be available on a part-time or full-time basis for Hotel Suite Unit Owners in connection with cleaning and linen service, including cleaning bathrooms, removing trash, dusting furniture, vacuuming and changing sheets, pillow cases, towels, washcloths and bathmats. Such service will be coordinated directly with the Hotel Management Company. An estimate of such charges is more particularly set forth on Schedule B. Hotel Suite Unit Owners may not arrange housekeeping services for their Hotel Suite Units with other third-party service providers. Additionally, certain ordinary maintenance and repair services will be included as a part of the Unit Management Agreement and will be arranged and coordinated directly with the Hotel Management Company. There will be additional charges for such services pursuant to the Unit Management Agreement.

The Board must approve any revisions or amendments proposed by the Hotel Management Company to the then approved form of Unit Management Agreement which approval may not be unreasonably withheld, conditioned or delayed.

d.    **General Provisions Concerning Services and Facilities**

No representation or warranty is made as to the continued operation or existence of any of the foregoing services or facilities and neither Sponsor nor the Board will have any liability with respect to or arising from any Unit Owner's, tenant's or occupant's use of any of the foregoing or the amount of the fees charged therefor.

In all likelihood, the nature of the services listed above, the hours during which they are provided and the rates charged for same will change from time to time, in the discretion of the Board, the Hotel Management Company or other party providing the service. However, all services required by law will be provided at all times. Neither Sponsor, the Hotel Management Company, the Selling Agent nor the Board will in any event be liable for the availability, interruption, discontinuance or quality of any of such services, including, but not limited to, any services provided by any outside company or person, other than Building personnel, or for any injury to person or damage to property resulting from any act or omission of such company or persons or their employees or agents, except to the extent that any such

injury or damage occurs as a result of the gross negligence or willful misconduct of Sponsor, the Hotel Management Company, the Selling Agent or the Board, as the case may be.

The party operating these facilities has complete discretion in determining how these facilities will be operated, maintained or modified, whether facilities should be added or discontinued, and the rates to be charged for their use. No representation or warranty is made as to the continued operation or existence of any of the foregoing facilities, or the amount of the fees charged therefor.

Although Sponsor anticipates that many of the services described above will be available at the time of the First Closing, prospective's Purchasers should note that some of these services (such as a full staff of personnel) may not be available until the later of: (i) twelve months after the First Closing; or (ii) the closing of title to and occupancy of at least 50% of the Hotel Suite Units. In addition, certain of the amenities described in the Plan may not be arranged or available until after such interim period. However, it is anticipated that at all times after the First Closing, subject to hotel occupancy, industry practices and other similar factors, the lobby will be attended 24 hours per day, seven days per week, and there will be at least one elevator servicing every floor on which there are occupied Hotel Suite Units. The interim level of staffing will at all times during this period be commensurate with the levels of occupancy from time to time and adequate to properly maintain the Building. Purchasers are also advised that during such period and beyond, various systems, including, but not limited to, water supply, air conditioning, heating, cooling, ventilating and elevators, may be incomplete and may be disrupted temporarily and from time to time. (See the Special Risks entitled "Interim Service Period" and "Additional Building Work" above.)

Purchasers are further advised to note that construction in general is a complicated process which requires the coordination of numerous concurrent tasks, contractors and suppliers and the balancing of complex mechanical and architectural systems, all of which is subject to unanticipated delays and difficulties and necessarily involves noise, disruption and inconvenience. Thus, for a period of time following the First Closing (through, including and beyond the closing of title to any particular purchaser's Hotel Suite Unit), work should be expected to be undertaken and continue by or on behalf of: (i) Sponsor to complete the balance of the Building and individual Hotel Suite Units; and (ii) the Commercial Unit Owners to complete construction, build-out, furnishing and equipping their Units. During at least the First Year of Operation, construction workers and related personnel of Sponsor and others will be at the Property from time to time performing construction work, making adjustments and performing various other tasks related to the completion of construction, fitting out of, and moving into, the Hotel Suite Units and other portions of the Building. Hotel elevators and personnel may be taken out of service and diverted to facilitate construction and exterior hoists may be in place during at least the year following the First Closing, and from time to time thereafter, as needed, in connection with construction being performed in Hotel Suite Units by the Unit Owners thereof. Sponsor may not fully complete the decoration or finishing of the lobby, corridors, elevator finishes and other portions of the Building, including, but not limited to, installing light fixtures, painting, hanging wall coverings or laying carpeting, until that particular floor is fully occupied by Unit Owners or, if additional construction within a Unit is anticipated, for some period thereafter. All of the foregoing work and conditions will create a noisy and otherwise disruptive condition in the Building during the period such work is being

performed. Certain portions of the Common Elements may be completed before or after completion of any particular Purchaser's Hotel Suite Unit. As a result, certain amenities and benefits anticipated to be available to Hotel Suite Unit Owners may not be available until such other portions of the Building are completed and fully operational. Sponsor will have no liability whatsoever in the event these services are delayed, not made available, or discontinued or disrupted. No assurance can be given with regard to the accuracy of any projected schedules or completion dates set forth herein or with respect to the duration of any interim service period or periods of potential disruption to the Hotel Suite Unit Owners and their occupants, all such dates and timetables, to the extent provided, being only good faith estimates.

Sponsor and its designee(s) will have the right, until the tenth anniversary of the First Closing, to use, without charge, portions of the Building, including the Common Elements, for exhibitions, events, promotional functions (e.g., with respect to any sales programs for Unsold Units) or otherwise.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## C. LOCATION AND AREA INFORMATION

### 1. Location and Services

The Condominium is situated at 246 Spring Street, in the SoHo district of New York City, on the south side of Spring Street on a portion of the block between Varick Street and Dominick Street. The Condominium lies within the SoHo district which is generally defined as the area south of Houston Street, north of Canal Street, east of Varick Street and west of Lafayette Street. In the immediate vicinity of the Condominium, there are several planned condominium developments, restaurants and other commercial establishments.

New York City is one of the leading cultural centers of the world, with many of the finest universities, museums, libraries, theaters and cultural institutions, attracting millions of national and international tourists. New York City is the nation's center for communications, publishing, advertising, the stock market and other financial services, visual and performing arts and the fashion industry.

New York City is served by three major airports -- LaGuardia Airport, John F. Kennedy International Airport and Newark International Airport. Passenger railroad service is provided from Pennsylvania Station, located at Seventh Avenue and 33rd Street, and from Grand Central Terminal, located at Lexington Avenue and 42nd Street.

Transportation to and from the Building, and throughout New York City, is readily available by taxi, limousine, private automobile, subway or bus. A number of commercial parking garages are located nearby.

A number of excellent medical centers, such as St. Vincent's Hospital, New York University Medical Center, Lenox Hill Hospital, Mt. Sinai Medical Center, New York Hospital-Cornell Medical Center, and Columbia Presbyterian Medical Center, are readily accessible.

All public services, including schools, police protection, library, street maintenance, social services and fire protection are provided by The City of New York. The Property is located at 246 Spring Street, between Varick Street and Dominick Street, which are dedicated New York City roads. The nearest police precinct headquarters is the 1st Precinct located at 16 Ericsson Place between Varick Street and Hudson Street. Fire protection is provided from the Engine 24, Ladder 5 firehouse situated at 227 Sixth Avenue between King Street and West Houston Street.

In addition, other attractions near the Property include The New Museum of Contemporary Art as well as world-renowned art galleries such as Pace Wildenstein, Kent Gallery and Louis Meisel Gallery. The area includes premier retailers such as Chanel, Prada and Emporio Armani as well as restaurants such as Balthazar, Blue Ribbon, Fiamma and Lupa.

### 2. Zoning

The Condominium is located in an area zoned M1-6 under the New York City Zoning Resolution. The intended use of the Building as described in accordance with the provisions of the Plan will be in compliance with the requirements of the Zoning Resolution as

of the date of filing. A copy of the zoning regulations with respect to the Project is on file at Sponsor's office. The construction and design of the Hotel Suite Units and the operation of the Building is consistent with transient use of the Hotel Suite Units and not with New York City requirements for use of the Hotel Suite Units as permanent residences. Sponsor makes no representation or warranty with respect to any future interpretation of the Zoning Resolution with respect to the permitted use of the Hotel Suite Units.

Pursuant to that certain Zoning Lot Merger Purchase and Sale Agreement (the "Development Rights Purchase Agreement") dated as of November 8, 2005 between Sponsor (then known as Bayrock/Zar Spring LLC) and Peter Moore ("Moore"), Moore conveyed to Sponsor all of his right, title and interest in and to 27,785 square feet of Floor Area Development Rights (as defined in the Development Rights Purchase Agreement) appurtenant to the parcel of land known as and by the street address of 145-149 Sixth Avenue, a/k/a 1-7 Dominick Street, a/k/a 145 Avenue of the Americas, New York, New York, and designated as Block 491, Lots 1101 through 1131, f/k/a Lot 50 on the Tax Map of the City of New York (the "Tax Map"). The closing for the conveyance of such excess Floor Area Development Rights occurred on February 3, 2006. In connection therewith, Sponsor, Moore and the condominium known as 145 Americas Condominium entered into (i) that certain Declaration of Zoning Lot Restrictions (the "Declaration of Restrictions") dated as of February 3, 2006 and recorded on May 3, 2006 in the New York County records of the Office of the New York City Register (the "City Register's Office") as CRFN 2006000246975, pursuant to which Declaration of Restrictions, Lots 34, 36 and 1101-1131(f/k/a Lot 50) in Block 491 on the Tax Map were merged to create a single zoning lot; (ii) that certain Zoning Lot Development and Easement Agreement dated as of February 3, 2006 and recorded on May 3, 2006 in the City Register's Office as CRFN 2006000246976 (the "ZLDA"), pursuant to which ZLDA, Sponsor is entitled to utilize 27,785 square feet of Floor Area Development Rights attributable to Lots 1101-1131 (f/k/a Lot 50) in Block 491 on the Tax Map on other parcels of land and in furtherance thereof, to merge Lots 1101-1131 (f/k/a Lot 50) with other parcels of land to create a single zoning lot; and (iii) and other related documents.

A legal requirement for the construction of the Building is the construction of the Plaza in the area adjacent to the east side of the Building between Spring Street and Dominick Street. The Plaza will initially be open to the general public 24 hours a day, 7 days a week and will feature benches, planters and other amenities, to the extent required by Legal Requirements. The Plaza will constitute a portion of the General Common Elements of the Building. An application may be filed with the City Planning Commission (a) for a certification to alter the hours of operation of the Plaza; or (b) for a certification permitting the use of a portion of the Plaza lying adjacent to the Restaurant Unit as a Restaurant Unit Limited Common Element for an initial term of three (3) years. Such term may be renewed one time after which time a new application will have to be submitted. In the event that such application is approved, then the Declaration may be amended to designate that portion of the Plaza as a Restaurant Unit Limited Common Element, and subsequent to such amendment to the Declaration, the Restaurant Unit Owner will be responsible for its cleaning and maintenance, etc. until the expiration of the term of the certification then in effect. In addition to being open to the general public as heretofore described, the Plaza, subject to Legal Requirements, may be made available by the Board or the Hotel Management Company, as its delegee, for public gatherings, events and functions. On account of the foregoing, it should be noted that the Plaza creates an increased risk of noise, disturbances and other inconveniences to Unit Owners.

# I. TRANSIENT RENTAL

Sponsor will endeavor in good faith to sell, but nevertheless reserves the unconditional right, prior to the date of closing title to a Hotel Suite Unit, to rent, rather than sell, such Unit to Purchasers and others. Moreover, Sponsor may, from time to time prior to the closing of title to any Hotel Suite Unit, cause such Unit to be available for transient rental. Accordingly, the Hotel Management Company may, by arrangement with Sponsor, continue to utilize the Unsold Units in connection with the operation of the hotel within the Condominium following the recording of the Declaration.

Unless otherwise specifically agreed to in writing by Sponsor and such Purchaser, such Hotel Suite Unit will be delivered at the closing vacant and free and clear of all rights of occupancy. No Purchaser will have the right to occupy any Hotel Suite Unit prior to the closing unless Sponsor agrees to permit such occupancy under an interim rental or other written rental agreement. No portion of the rental paid under any such interim rental will be credited towards the Purchase Price of a Hotel Suite Unit unless the rental agreement therefor expressly so provides.

Interim rentals of Hotel Suite Units will not be subject to the New York City Rent Law (rent control), the Emergency Tenant Protection Act of 1974, the New York City Rent Stabilization Law, the New York City Rent Stabilization Code, any rent regulatory scheme or code, rule or regulation promulgated under any of the foregoing, or any other rental protection laws.

If Sponsor agrees to any such interim rental, the rental will be for a rent and upon such other terms and conditions as may be agreed upon by Sponsor and the tenant; provided, however, that in the case of an interim rental to a Purchaser, such rental will provide that an uncured default by the Purchaser under the Agreement (that is, a default not cured within thirty (30) days after the sending of written notice thereof) will constitute a default under the rental entitling the landlord (i.e., Sponsor), at its sole option, to immediately terminate such rental. The Agreement will contain a similar provision entitling Sponsor to terminate the Agreement and retain the Deposit (and any interest thereon) as liquidated damages, and not as a penalty, in the event the Purchaser fails to cure a default under such Purchaser's lease, if any, within the applicable grace period (if any).

No portion of the rental paid under any lease will be credited towards the purchase price of a Unit unless the lease and the Agreement therefor expressly so provide.

In the event of any amendment to the Plan which discloses a material adverse change to the Plan to which the Purchaser is allowed to rescind an Agreement, if a Purchaser who is an occupant under an interim rental duly elects to rescind, the interim rental made with such Purchaser will be cancelled and possession of the Unit must be surrendered within ten (10) days thereafter free of all occupants. A Purchaser will be liable to Sponsor for any and all damages, costs and expenses incurred by Sponsor by reason of any failure to vacate within said 10-day period. If such failure to timely vacate occurs prior to the First Closing, the Purchaser will be liable for use and occupancy in an amount equal to twice the rent under the interim rental agreement. If such failure to timely vacate occurs after the First Closing, the Purchaser will be liable for twice the costs of carrying the Unit (such as Hotel Common Charges and real estate

taxes allocable to such Unit) as calculated by Sponsor. In addition, irrespective of when such failure to timely vacate occurs, such Purchaser will be liable to Sponsor for loss of profit and all costs and expenses incurred by Sponsor to obtain possession of the Unit, including the cost of litigation and reasonable attorneys' fees and expenses.

In the event the Plan is abandoned, a Purchaser who has entered into an interim rental will have no right to remain in occupancy as a tenant after the abandonment of the Plan.

So long as the Condominium is being operated as a hotel, no Hotel Suite Unit Owner will permit its Hotel Suite Unit to be advertised or promoted through, or otherwise affiliated with, any reservation system or network by whatever means (e.g., internet, electronic or otherwise), that identifies or otherwise represents the Hotel Suite Unit as being a part of an integrated hotel operation (as distinct from a transient rental of a privately owned Hotel Suite Unit), unless such advertisement, promotion or reservation system or network is operated or approved by the Hotel Management Company or Board or their designees; and no Hotel Suite Unit Owner may use any of the intellectual property of the Hotel Management Company in connection with any advertisement or other promotion or rental of any Hotel Suite Unit without the express permission of the holder of the Hotel Management Company.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## J. PROCEDURE TO PURCHASE

### 1. Execution of Documents

Any party desiring to purchase a Unit will be required to execute four original counterparts of an Agreement, in the form set forth as Exhibit 1 in Part II of the Plan, for each such Unit desired. The Agreement sets forth in detail the terms of sale with respect to the Units offered hereunder and should be read carefully by each prospective Purchaser. In the event of any conflict or ambiguity between the Plan and the Agreement, the provisions of the Plan will control.

No signed Agreement will be accepted from a prospective Purchaser for three business days following such Purchaser's receipt of a copy of the Plan, including all amendments thereto. For the convenience of some Purchasers, however, Sponsor will have the right, at its sole option, to accept an Agreement prior to the expiration of such period of three business days; and in such event, and only in such instance, such Purchaser will have the right to rescind such Agreement by written notice sent to Sponsor by certified or registered mail, return receipt requested, or by personal delivery within seven (7) days of such Purchaser's submission of the Agreement, whereupon Sponsor will refund, without interest (notwithstanding any provision of the Plan regarding interest to the contrary), the Deposit received by Sponsor from such Purchaser in connection with such Agreement.

A Purchaser will deliver to Selling Agent, together with the four signed original counterparts of the completed Agreement, the following: three completed and signed copies of either Form W-9 (Request for Taxpayer Identification Number and Certification), Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding), or other applicable W-8 form, as appropriate, in the form required by law (the forms currently required by law are reproduced as Exhibits 1A and 1B in Part II of the Plan); and a deposit as set forth below.

Agreements will not be binding on Sponsor until approved and executed on behalf of Sponsor. All Agreements must be executed by an authorized signatory of Sponsor in order to be binding and effective. Sponsor will have thirty (30) days after delivery by the Purchaser of an executed Agreement, together with the amounts and other items described above within which to accept or reject such Agreement. Sponsor reserves the right to request thorough identification and financial information concerning any prospective Purchaser, subject to any limitations and requirements imposed by applicable Legal Requirements. Each Purchaser will and will in all events be deemed to represent and warrant that the Deposit and all sums deposited by Purchaser pursuant to the Agreement are such Purchaser's own funds and that no other party has any right thereto. If an Agreement is not accepted by Sponsor within such 30-day period, the Agreement will be deemed to have been rejected and cancelled and all sums deposited by such prospective Purchaser in connection therewith will be promptly returned, together with any accrued interest. Sponsor reserves the right to reject any prospective Purchaser without cause or explanation, provided that such rejection is not based on race, creed, color, age, gender, sexual orientation, disability, marital status, national origin, ancestry, or any other ground proscribed by law, and to refuse to execute an Agreement for any Unit, or an Agreement or Agreements, as the case may be, for more than one Unit to any one person or entity.

2. **Deposits/Escrow**

As set forth above, a prospective Purchaser will deliver to Selling Agent, together with the four signed original counterparts of the completed Agreement, a deposit (any of the following amounts, the "Initial Deposit") in an amount equal to: (a) 10% of the Purchase Price; or (b) 50% of the Purchase Price if the Purchaser is a foreign government, a resident representative of a foreign government or other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity). A prospective Purchaser who, in accordance with the previous sentence, was only required to make an Initial Deposit equal to 10% of the Purchase Price will be required to make, in addition to the Initial Deposit, an additional payment equal to 10% of the Purchase Price of such Purchaser's Hotel Suite Unit (the "Additional Deposit") due and payable no later than the earlier to occur of six (6) months after the date of the Agreement or fifteen (15) days after Sponsor serves Purchaser with written notice of an amendment to the Plan declaring the Plan effective, but in no event later than the Closing. No Additional Deposit will be required if the Purchaser is a foreign government or other person or entity referenced in (b) of the first sentence of this paragraph and who or which has made a 50% Initial Deposit as described above. The term "Deposit", as used in the Plan, refers to both the Initial Deposit and, if the same has been paid at the time in question, the Additional Deposit. All such payments will be made by unendorsed check drawn only on a member bank of the New York Clearing House Association made payable to "Akerman Senterfitt LLP, as escrow agent." All such checks will be subject to collection and if any such check is returned for insufficient funds or for any other reason, Sponsor will have the right, among other things, to deem such Agreement to be cancelled and of no further force or effect, and to retain any Deposit and other amounts previously deposited.

With respect to any check or other instrument that is dishonored or fails of collection, the Escrow Agent is authorized to deliver to Sponsor the dishonored or uncollected instrument and Sponsor will have the choice of remedies set forth in the Plan and in the Agreement with respect to an Event of Default (which includes suing on such dishonored or uncollected instrument or (at Sponsor's option) canceling this Agreement and returning the instrument to Purchaser without affording Purchaser a grace period to cure such default).

All deposits, Deposits or advances received by Sponsor will be held in escrow by Akerman Senterfitt LLP (the "Escrow Agent") and placed in the Escrow Account (as hereinafter defined) in conformity with the procedure set forth herein. Sponsor will comply with the escrow and trust fund requirements of General Business Law Sections 352-e(2-b) and 352-h and the Attorney General's regulations promulgated pursuant thereto, and the provisions of Lien Law Section 71-a(3), as applicable.

All Deposits or advances made by Purchasers prior to closing of each individual transaction will be placed, within five business days after the Agreement is signed by all necessary parties, or within five business days after receipt, in the case of deposits, Deposits or advances made subsequent to the execution of the Agreement, in a segregated special escrow account (the "Escrow Account") of Akerman Senterfitt LLP, the Escrow Agent, whose address is 335 Madison Avenue, New York, New York 10017, and whose telephone number is 212-880-3800. The signatories on the Escrow Account authorized to withdraw funds are any one of Ronald A. Kriss, Andrew Smulian, Karen P. Kondell, Marc L. Druckman and Francis Kleiner. The name of the Escrow Account will be "Akerman Senterfitt Trump SoHo Hotel Condominium

New York Attorney Escrow Account" or similar name, located at either (a) Bank Leumi USA, 579 Fifth Avenue, New York, New York; or (b) HSBC Private Bank, 425 Fifth Avenue, Tower 26, New York, N.Y. 10018; or (ii) North Fork Bank, 424 Madison Avenue, 2nd Floor, New York, N.Y. 10017 (in each case, the "Bank"), or such other substitute bank and/or account type and/or title as may be designated in an amendment to the Plan. The Bank is covered by federal bank deposit insurance up to a maximum of $100,000 per individual depositor. Deposits made by a Purchaser in excess of $100,000 in the aggregate in connection with the purchase of a Unit or Units will not be federally insured.

The Escrow Account will be interest-bearing and, unless the Purchaser defaults, interest will be credited to the Purchaser at closing. The interest rate to be earned will be the prevailing rate paid by the Bank for such accounts from time to time (although no representation or guarantee is made as to the actual rate of interest that will be earned on such funds). Interest, if any, will begin to accrue within five (5) business days after the Agreement is fully executed by Sponsor and Purchaser and delivered to Purchaser and payment in respect of the Deposit is tendered to Escrow Agent, provided that the Purchaser has delivered the required number of completed and signed Forms W-9 (Request for Taxpayer Identification Number) in the form reproduced as Exhibit 1A in Part II of the Plan, Forms W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding) in the form reproduced as Exhibit 1B in Part II of the Plan (or other applicable Form W-8, as appropriate) to Sponsor or Selling Agent at the time Purchaser tenders the Deposit and the Agreement. If a Purchaser does not deliver the Form W-9, Form W-8BEN or other applicable Form W-8, as appropriate, the Deposit will be deposited in a non-interest-bearing escrow account at the aforesaid bank until the Form W-9, Form W-8BEN or other applicable Form W-8, as appropriate, has been delivered, and neither Sponsor, Selling Agent, the Escrow Agent nor the Bank will be liable for interest for the period prior to the delivery of such form.

Sponsor is required by law to submit a Form 1099-INT to the Internal Revenue Service reporting interest earned on the Deposit, if any. Purchaser will be taxed accordingly on such interest, whether or not Purchaser ultimately receives the interest in accordance with the terms of its Agreement or the Plan. Before funds are transferred to a new Escrow Account, or if the Escrow Agent is replaced, the Plan must be amended to provide the same full disclosure with respect to the new account, the Escrow Agent and the escrow agreement as was originally provided. A bond, letter of credit or other security may be substituted for the Escrow Account only after the Attorney General approves in writing the use of such alternate form of security.

Within 10 business days after delivery by Sponsor of the Initial Deposit to Escrow Agent, Escrow Agent will notify the Purchaser that such funds have been deposited into the Escrow Account and will provide the account number and the initial interest rate. If the Purchaser does not receive notice of such deposit within 15 business days after delivery by Sponsor of the Initial Deposit to Escrow Agent, the Purchaser may cancel the purchase and rescind the Agreement so long as the right to rescind is exercised within 90 days after tender of the Initial Deposit. Rescission may not be afforded where proof satisfactory to the Attorney General is submitted establishing that the escrowed funds were timely deposited and requisite notice was timely mailed to the Purchaser in conformity with the Attorney General's regulations.

Except as set forth above in this paragraph, the Escrow Agent will hold funds in escrow until otherwise directed in (i) a writing signed by both Sponsor and the Purchaser, (ii) a

determination of the Attorney General pursuant to the dispute resolution procedures contained in the Attorney General's regulations, or (iii) a judgment or order of a court of competent jurisdiction.

If there is no written agreement between the parties to release the escrowed funds, the Escrow Agent will not pay the funds to Sponsor until the Escrow Agent has given the Purchaser written notice of not fewer than 10 business days. Thereafter, the funds may be paid to Sponsor unless the Purchaser has already made application to the Department of Law pursuant to the dispute resolution provisions of the Attorney General's regulations and has so notified the Escrow Agent in accordance with such provisions.

Sponsor will not object to the release of the escrowed funds to: (i) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan; or (ii) all Purchasers after an amendment abandoning the Plan is accepted for filing by the Department of Law.

Purchasers and the Escrow Agent may apply to the Attorney General in the event of a dispute for a determination on the disposition of the escrowed funds and any interest thereon. Sponsor must avail itself of this procedure if there is a dispute that needs to be resolved. A form for this purpose is set forth in Part II of the Plan. The party applying for a determination must send all other parties a copy of the application. Pending the determination of the Attorney General to grant or deny the application, Sponsor, the Purchaser and the Escrow Agent will abide by any interim directive issued by the Attorney General. If an application permitting release of the escrowed funds is granted, the escrowed funds and any interest thereon will be disposed of in accordance with the determination of the Attorney General, subject to any court action in which preliminary relief is granted. The Attorney General will act upon the application within thirty (30) days after its submission to the Department of Law, by either making a determination or notifying the parties that an extension of time in which to do so is necessary for stated reasons. If the application seeking the release of the escrowed funds is denied, the Escrow Agent will continue to hold the deposit and any interest earned thereon until: (i) both Sponsor and the Purchaser direct payment to a specified party in accordance with a written direction signed by both Sponsor and the Purchaser; (ii) a judgment or order of a court of competent jurisdiction is served on the Escrow Agent; or (iii) the Escrow Agent deposits the disputed amount into Court. In no event will the Escrow Agent release funds in dispute, other than a payment of such funds into court, until such dispute is finally resolved either by determination of the Attorney General or by order or judgment of a court of competent jurisdiction or by written agreement of Sponsor and Purchaser. Under no circumstances will Sponsor apply for release of the escrowed funds of a defaulting Purchaser until after consummation of the Plan, and consummation of the Plan does not relieve Sponsor of its obligations pursuant to General Business Law 352-h. A copy of the escrow agreement which incorporates the terms of the Attorney General's regulations is set forth in Part II of the Plan.

Sponsor has agreed to indemnify and hold the Escrow Agent harmless from any and all losses, damages, claims, liabilities, judgments and other costs and expenses which may be claimed against or incurred by the Escrow Agent by reason of its acceptance of, and/or its performance under, the escrow agreement (other than those ultimately determined to have arisen out of the willful misconduct or gross negligence of the Escrow Agent), including, without

limitation, attorneys' fees either paid to retained attorneys or amounts representing the fair value of legal services rendered to itself.

The Escrow Agent will maintain all records concerning the Escrow for seven years after the release of funds.

The Escrow Agent will be permitted to act as counsel to Sponsor in any dispute as to the disbursement of the Deposit or any other dispute between Sponsor and a Purchaser whether or not the Escrow Agent is in possession of the Deposit and continues to act as the Escrow Agent.

Any provision of any contract or agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding trust funds is absolutely void. The provisions of the Attorney General's regulations concerning escrow and trust funds will prevail over any conflicting or inconsistent provision in the Plan or in an Agreement. Purchasers will not be obligated to pay any legal or other expense of Sponsor in connection with the establishment, maintenance or defense of obligations arising from the handling or disposition of trust funds.

### 3. **Date of the First Closing**

In the event the actual or anticipated commencement date of the projected First Year of Condominium Operation is to be delayed by six months or more, Sponsor will amend the Plan to include a revised budget with current projections therefor, and if: (i) such amended budget exceeds the projected budget set forth herein by 25% or more; or (ii) the First Closing does not occur within 12 months after June 2009, the date set forth in Schedule B as the commencement date for the projected First Year of Condominium Operation, then in either case Sponsor will offer all Purchasers (other than Purchasers who are then in default under their Agreements, if the Plan has been declared effective) the right to rescind their Agreements within not less than fifteen (15) days after the presentation date of the amendment containing such revised budget or such 12 month period, as the case may be, and any Purchasers electing rescission pursuant to such offer will have their Deposits and any interest accrued thereon returned. Purchasers' rights as described in the preceding sentence are in lieu of any other rights or remedies which may be available pursuant to any applicable law, regulation, statute or otherwise, all of which will be deemed to have been waived by all Purchasers.

### 4. **Default**

In the event that a Purchaser fails to close title on the date set for closing or otherwise fails to perform any other obligation under his or her Agreement, and such default is not cured within thirty (30) days after Sponsor gives written notice to such Purchaser of the default, Sponsor, at its option, may cancel such Agreement and retain as liquidated damages the Deposit made by the Purchaser, together with all interest earned thereon, it being acknowledged and agreed by Sponsor and each Purchaser that it would be impractical and/or extremely difficult to fix or establish the actual damage sustained by Sponsor as a result of such a default by a prospective Purchaser, and that the Deposit (including all interest) will constitute and be deemed to be the reasonable and agreed upon liquidated damages of Sponsor in respect of the possible loss of a timely closing, the possible fluctuation of values, additional carrying costs of the Unit

and other expenses that may be incurred, including, without limitation, attorneys' fees, and will be paid by Purchaser to Sponsor as Sponsor's sole and exclusive remedy. In such case, all rights, obligations and liabilities of Sponsor and the Purchaser to each other will cease and terminate and Purchaser will have no further liability to Sponsor in respect of the Agreement (except for those matters expressly specified therein or herein to survive the termination thereof); however, such Purchaser will not have any right whatsoever to the return of all or any portion of its Deposit (or any interest thereon). The payment of the deposit (including all interest) as liquidated damages is not intended to be a forfeiture or penalty, but is intended to constitute liquidated damages to Sponsor.

Purchasers are advised that notwithstanding the foregoing, including, without limitation, Sponsor not having the right of specific performance, nothing herein will be deemed to grant Purchaser any right of rescission and/or right to the return of all or any portion of a Deposit except as expressly set forth in the Plan. In the event Sponsor elects not to cancel the Agreement as a result of the failure of the Purchaser to close on the date specified by Sponsor, or if Sponsor approves a request from the Purchaser to adjourn the closing date, then Sponsor may require that: (a) the Purchaser pay Sponsor interest at a rate of 0.04% per day (or such lower daily rate which is the legal limit, if 0.04% per day exceeds the legal limit) on the total Purchase Price, computed from the original closing date until the transaction is actually closed; and (b) all apportionments between Sponsor and the Purchaser be made as of the original closing date; in addition, the Purchaser will reimburse Sponsor for any additional costs incurred by Sponsor as a result of the Purchaser's delay.

**Time is of the essence** with respect to the Purchaser's obligation to close title on the date set for closing and to pay, perform or observe all of his or her other obligations under the Agreement, and to cure a default within thirty (30) days after Sponsor gives notice to the Purchaser of such default. Therefore, a Purchaser who defaults under his or her Agreement and who does not cure such default within such 30-day period may not be permitted any additional time to cure such default.

As provided in the form of Agreement, which is set forth in Part II of the Plan as Exhibit 1, the following occurrences, without limitation of any other term or provision thereof or of the Plan, will constitute an event of default under a Purchaser's Agreement: (a) Purchaser's assignment of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; (b) the appointment of a non-bankruptcy trustee or receiver over Purchaser or Purchaser's property, or the filing of an involuntary petition in bankruptcy against Purchaser; or (c) the filing of a judgment or tax lien against Purchaser which Purchaser does not pay or bond within thirty (30) days after the filing thereof.

## 5. Risk of Loss

The risk of loss to any Unit by fire or other casualty until the closing of title to such Unit (or an earlier taking of possession by the Purchaser) is assumed by Sponsor, but Sponsor has no obligation or liability to repair or restore any Unit. If a Unit is damaged or destroyed by fire or other casualty prior to the closing of title, but after the signing of an Agreement, and Sponsor gives written notice to the Purchaser of Sponsor's election to repair or restore the Unit, then the Agreement will continue in full force and effect, and the Purchaser will not have the right to reject title or receive a credit against, or abatement in, the Purchase Price.

Sponsor will be entitled to a reasonable period of time within which to complete the repair or restoration, and any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss will, subject to the rights, if any, of the Board, and other Unit Owners, belong entirely to Sponsor.

However, if Sponsor notifies the Purchaser in writing that it does not elect to repair or restore the Unit, or if the Unit Owners entitled to make such determination do not resolve to make such repair or restoration pursuant to the By-Laws (See the Section entitled "Rights and Obligations of the Unit Owners and the Board of Managers" in Part I of the Plan), the Agreement will be deemed terminated, Sponsor will return to the Purchaser the entire Deposit, together with interest earned thereon, and the parties will be released and discharged from all rights, obligations and liability under the Agreement and the Plan, except that if the Purchaser is then in default under the Agreement beyond any applicable grace period, Sponsor may retain such Purchaser's Deposit, together with interest earned thereon.

### 6. Financing

Although a Purchaser may obtain financing from any lending institution or any other source, the Purchaser's obligation pursuant to an Agreement to purchase a Unit will not be contingent on the Purchaser obtaining a commitment for financing or actually obtaining financing for such purchase. In other words, a Purchaser will remain obligated under an Agreement to purchase his or her Unit whether or not he or she is able to obtain financing. Neither Sponsor nor Selling Agent makes any representations as to the terms or availability of any mortgage financing. Prospective Purchasers are, therefore, advised to finalize their financing arrangements before signing an Agreement. However, prospective Purchasers should be aware that even if a loan commitment is obtained, its term may be limited, and it could expire before the closing date, and Sponsor will have no liability as a result of any scheduling or adjournment of closing beyond the expiration of a loan commitment.

### 7. Transfer Taxes

As described more fully in Section N below, Purchasers will be responsible for the payment at closing of all New York City Real Property Transfer Tax and New York State Real Estate Transfer Tax, notwithstanding that these taxes are by law the primary obligation of the seller. For purposes of calculating the taxes payable, the amounts of such taxes will be included in the consideration subject to such tax. Purchasers are advised that the New York State Department of Taxation and Finance may determine that "mansion tax" is due and payable with respect to the purchase of a Hotel Suite Unit.

### 8. Foreign Missions; Required Notification and Waiver of Diplomatic or Sovereign Immunity

Any Purchaser that is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. 4305, must notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor. Sponsor will not be bound under any Agreement with a foreign mission unless and until the earlier to occur of: (i) receipt of a notification of approval from the Department of State; or (ii) 60 days after receipt of such Purchaser's notice by the Department of State.

Any Purchaser that is a foreign government, a resident representative of a foreign government or other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity) will expressly and voluntarily waive such immunity and consent to any suit action or proceeding arising out of or relating to the Agreement being brought in any state or Federal court in the State of New York. Any such purchaser will designate C.T. Corporation System, having its offices, at the date hereof, at 111 Eighth Avenue, New York, New York 10011 as its duly authorized and lawful agent to receive process for and on behalf of Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with the Agreement.

## 9. Notice of Effectiveness

After the Plan has been declared effective, Sponsor will, from time to time, fix dates for closing title to all Units for which Agreements have been executed by serving notice on each Purchaser stating the date of the First Closing and setting such Purchaser's closing date. Such notice will be served in compliance with applicable law no less than thirty (30) days before the date set for the closing of the Units. Purchasers may agree to waive said thirty (30) day notice.

## 10. Unit Power of Attorney and Unit Management Agreement

Each Purchaser must execute (i) a Unit Power of Attorney at or prior to closing in the form set forth as Exhibit 2 in Part II of the Plan and (ii) a Unit Management Agreement and Memorandum of Unit Management Agreement in the form set forth as Exhibits 13 and 14, respectively, in Part II of the Plan. If any Hotel Suite Unit Owner fails or refuses to execute, acknowledge or deliver the Unit Management Agreement and Memorandum of Unit Management Agreement within ten (10) days after receipt of a written request therefor, then at the request of the Hotel Management Company, an officer of the Board (or its designee) will be authorized as attorney-in-fact for such Hotel Suite Unit Owner, coupled with an interest, to execute, acknowledge and deliver the Unit Management Agreement with respect to such Hotel Suite Unit in the name of such Unit Owner and such document will be binding on such Hotel Suite Unit Owner. Together with the execution, acknowledgement and delivery of the Unit Management Agreement, upon taking title to a Hotel Suite Unit, each Hotel Suite Unit Owner will also execute, acknowledge and deliver to the Board a Memorandum of Unit Management Agreement in recordable form as set forth in an exhibit to the Unit Management Agreement.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## K. ASSIGNMENT OF AGREEMENTS

An Agreement may not be assigned by the Purchaser thereunder. If a Purchaser desires to assign its rights under an Agreement or to take title in the name of an affiliate of, or entity related to, or controlled by, the Purchaser that differs from the name on the Agreement, or to add, delete or substitute the name of a member of the Purchaser's family, then, if such assignment, alteration, addition, deletion or substitution is permitted by Sponsor (in Sponsor's sole discretion), the Purchaser will be required to deliver to Selling Agent or Sponsor's Closing Counsel, four signed assignments of the Agreement (to be prepared by Sponsor's Closing Counsel at Purchaser's expense and in form and content acceptable to Sponsor, in its sole discretion), as well as three completed and signed copies of either Form W-9 (Request for Taxpayer Identification Number and Certification), Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding), or other applicable Form W-8, as appropriate, in the form required by law. Upon each assignment or other change permitted by Sponsor (in its sole discretion), the assignments and Forms W-9 or Forms W-8BEN, as applicable, must be delivered to the Selling Agent or Sponsor's Closing Counsel, together with a personal certified check, or an official bank or cashier's check, in the amount of $850 made payable to "Akerman Senterfitt LLP" (for services rendered in connection with the assignment), not less than 20 days prior to the date scheduled for the Purchaser's closing. In no event will the Purchaser (or its assignee or any added or substituted party) have the right to adjourn or postpone the closing as a result of such change or assignment. Sponsor is not obligated to consent to any such change or assignment and, if Sponsor refuses to consent, the Purchaser will not be excused from his or her obligations under the Agreement; and the prohibition against advertising or listing any Unit(s) for sale or resale with any broker or otherwise advertising, promoting or publicizing the availability of such Unit(s) for sale will remain in effect.

In connection with the foregoing, if Purchaser is a corporation, any sale, assignment, transfer, pledge, encumbrance or other disposition of any of the stock of Purchaser, or if Purchaser is a partnership, a limited liability company or other entity, any sale, assignment, transfer, pledge, encumbrance or other disposition of any interest in such partnership, limited liability company or other entity will be considered an assignment and will be subject to the provisions, prohibitions and terms of the Plan concerning assignment, except that a sale of less than 25% of the stock, or in the case of a partnership, limited liability company or other entity, less than 25% of the ownership interests, of Purchaser which does not result in a change in control of Purchaser will not be considered an assignment. For purposes of the preceding sentence only, "control" will mean the ownership of 75% or more of the interests in such entity or possession of the power to direct the management and policies of such entity and the distribution of its profits.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## L. EFFECTIVE DATE

The offering by Sponsor of the Hotel Suite Units under the Plan is contingent upon the Plan being declared effective and upon compliance with the relevant conditions and time periods set forth in the Plan.

The Plan may be declared effective, at Sponsor's option, when bona fide Agreements (including those executed by investors) have been executed and are in effect with respect to not less than 60 Hotel Suite Units, representing 15% of the Hotel Suite Units offered hereby. The Plan must, however, be declared effective when bona fide Agreements have been executed and are in effect with respect to at least 330 Hotel Suite Units representing 80% or more of such Units.

The Plan will not be declared effective based on an Agreement: (i) signed by a Purchaser who has been granted a right of rescission that has not yet expired or been waived; (ii) signed by a Purchaser not afforded the three (3) business day period to review the Plan (prior to executing an Agreement) provided for in Part I, Section L hereof; or (iii) entered into with a Purchaser who is Sponsor, Selling Agent or the Hotel Management Company, or who is a principal of any of the foregoing or who is related to any of the foregoing or any principal thereof by blood, marriage or adoption or as a business associate, employee, shareholder or limited partner, except that such a Purchaser (other than Sponsor or a principal of Sponsor) may be included if Sponsor submits proof satisfactory to the Department of Law establishing that such Purchaser is bona fide. Except as otherwise limited by this Section of the Plan, all Units will be counted toward declaring the Plan effective.

The Plan will be declared effective either by: (i) an amendment to the Plan; or (ii) mailing or delivering personally to each Offeree a written notice to such effect, in which event Sponsor will submit an amendment to the Plan to the Department of Law confirming that the Plan was declared effective on a specified date within five days after such mailing or delivery. The First Closing will not occur until the Plan is declared effective and the effectiveness amendment is accepted for filing by the Department of Law.

The Plan may be withdrawn or abandoned by Sponsor, at its option, for any reason whatsoever at any time prior to its being declared effective. Once the Plan has been declared effective, it may not be abandoned or withdrawn, except that prior to the First Closing, the Plan may be abandoned at the option of Sponsor in the event of: (i) the existence of one or more defects in title (including violations of record or work orders of an insurance carrier) affecting any one or more Units and/or the Common Elements which cannot be cured, removed or complied with except through litigation or the expenditure of more than 0.5% of the total initial offering hereunder in the aggregate (as estimated by Sponsor); (ii) substantial damage to or destruction of the Building (or any portion thereof) by fire or other casualty which cannot be cured or repaired for less than $3,821,030 (as estimated by Sponsor); or (iii) a taking of all or a material portion of the Property by condemnation or eminent domain. In calculating the costs referred to in clauses (i) and (ii) above, any defects in title (including violations or work orders) that existed on the date the Units were initially offered for sale under the Plan, and were either known to Sponsor or were a matter of public record, and attorneys' fees, will be excluded.

In the event of a withdrawal or abandonment of the Plan, Sponsor will promptly submit an amendment to the Department of Law to such effect, together with such forms as may be required by law. Purchasers will be notified in writing of a withdrawal or abandonment of the Plan. All Deposits, together with any interest earned thereon, will be returned to Purchasers within 20 days following such withdrawal or abandonment, except that after the Plan has been declared effective, Sponsor may retain the Deposit, together with interest earned thereon, of any Purchaser who is then in default under his or her Agreement beyond the applicable grace period or whose Agreement has been cancelled due to such Purchaser's default, provided, however, that any requisite notice has been given to the Purchaser and any dispute with respect to the disposition of the Deposit has been determined in favor of Sponsor pursuant to the dispute resolution procedures provided by the regulations promulgated by the Department of Law. Upon the return or retention of the Deposit, together with interest earned thereon, the Agreement pursuant to which such Deposit was given will be null and void and Sponsor will have no further obligation or liability to the Purchaser under the Plan or such Agreement.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## P. CONTROL BY SPONSOR

Until the first annual meeting of the Unit Owners (the "First Annual Meeting"), the Board will consist of three persons designated by Sponsor. Sponsor will amend the Plan prior to the First Closing in the event such three persons will not constitute the initial Board members. The First Annual Meeting will be held not later than thirty (30) days following the later to occur of: (a) the first anniversary of the First Closing; or (b) the closing of title to Units representing at least 50% both in number and aggregate Common Interests of all Units to Purchasers; and at such meeting, the incumbent three-member Board designated by Sponsor will resign and a new Board, consisting of five members, will be elected and/or designated by the Unit Owners and Sponsor, as the case may be, as described below. As a result of the foregoing, there is no provision in the By-Laws that assures a majority of the Board will be Unit Owners, Unit occupants or members of a Unit Owner or Unit occupant's household who are unrelated to Sponsor and its principal within two years after the First Closing. In addition, because Sponsor has the unconditional right to rent or lease the Units, there is no commitment to sell more Units than the 15% of Units necessary to declare the Plan effective and owner-occupants may never gain effective control and management of the condominium.

From and after the First Annual Meeting, the Board shall consist of five members -- four members elected by the Unit Owners (including Sponsor) and one member designated by the Commercial Unit Owners; although it is intended initially that Sponsor will own all such Units. The Commercial Unit Owners shall at all times have the right to designate such Board member as aforesaid. As to Board members elected by the Unit Owners (including Sponsor), Sponsor may cast its votes for any qualified person as it may choose, both during and after the Initial Control Period.

At meetings of the Unit Owners, Sponsor will have the right to vote all of the Common Interests appertaining to the Units owned by Sponsor as it sees fit. However, in addition, at elections of the Board held before the expiration of the Initial Control Period, Sponsor and/or its designee shall have the right to designate not more than three members of the Board, in the aggregate, who are related to or affiliated with Sponsor, such designee or other Unsold Unit Owner(s), and Sponsor, such designee and all other Unit Owners shall have the right to elect (or designate, in the case of the Commercial Unit Owners, if Sponsor is not entitled, as Commercial Unit Owner, to designate the one Commercial Unit Owner designee to the Board) the remaining members of the Board who shall not be related to or affiliated with Sponsor, such designee or other Unsold Unit Owners.

Accordingly, until the expiration of the Initial Control Period, if: (i) Sponsor (or its affiliate) owns the Commercial Units and is entitled to designate the Commercial Unit Owner designee to the Board, Sponsor and/or its designee shall designate the member of the Board designated by the Commercial Unit Owners and two additional members of the Board (all of whom may be persons related to or affiliated with Sponsor and/or its designee or other Unsold Unit Owner) and Sponsor, such designee and all other Unit Owners shall elect the two remaining Board members; and (ii) Sponsor (or its designee) is not entitled to appoint the member of the Board to be designated by the Commercial Unit Owners, Sponsor and/or its designee shall designate three members of the Board (all of whom may be persons related to or affiliated with Sponsor and/or its designee or other Unsold Unit Owner), the Commercial Unit Owners shall designate the one member of the Board to be designated by the Commercial Unit Owners, and

Sponsor and/or its designee and all other Unit Owners shall elect the one remaining Board member.

In addition, at elections of members to the Board held after the expiration of the Initial Control Period but while Sponsor and/or its designee still owns at least two Hotel Suite Units, Sponsor and/or its designee will have the right to elect or designate not more than one member of the Board (in addition to any member(s) designated or elected by Sponsor as the Commercial Unit Owner), who may be a person related to or affiliated with Sponsor, such designee or other Unsold Unit Owner; and Sponsor, such designee and all other Unit Owners will have the right to elect (or in the case of the Commercial Unit Owners, to designate) the remaining members of the Board.

Accordingly, from and after the expiration of the Initial Control Period, at least three of the five members of the Board shall not be designated by Sponsor or its designee. There is no restriction on the right of the right of Sponsor and/or its designee(s) or other Unsold Unit Owner(s) to vote for members of the Board who are not related to or affiliated with Sponsor or such designee or such Unsold Unit Owner(s). The number of members of the Board may not be increased without the consent of the owner(s) of the Unsold Units, for so long as there remains at least one Unsold Hotel Suite Unit.

Until Sponsor no longer designates a majority of the members of the Board, Sponsor will, through its control of the Board, be able to control the maintenance and operation of, and the services to be provided by, the Condominium, and also the determination of Common Charges to be paid by all Unit Owners. Prospective Purchasers should be advised that Unit Owners, Unit occupants and non-resident Unit Owners, including Sponsor, may have inherent conflicts on how the Condominium should be managed because of their different reasons for purchasing (i.e., for personal use as opposed to as an investment).

Moreover, during the Initial Control Period, the Board may not, without the prior written consent of Sponsor: (i) make any addition, alteration or improvement to the Common Elements or any Unit (unless required by any applicable Legal Requirements); (ii) assess any Common Charges for the creation of, addition to or replacement of all or any reserve, contingency or surplus fund; (iii) increase or decrease the number of, or change the kind of, employees initially hired for the Building, as provided for in Schedule B "Projected Budget for First Year of Condominium Operation" set forth in the Plan; (iv) enter into any service or maintenance contract for work not covered by contracts in existence on the date of the First Closing or otherwise provide services in excess of those referred to in the Plan, except as is required to reflect normal annual increases in operating services; (v) borrow money on behalf of the Condominium or unless any such borrowing is approved by the owners of Units representing more than 50% both in number and aggregate Common Interests of all Units); or (vi) exercise any right of first refusal to purchase a Hotel Suite Unit. However, the Board may perform any function or take any action enumerated in subsections (i) through (v) hereinabove without the consent of Sponsor if, and only if, the performance of such function or the carrying out of such action is necessary, and no other alternative is available, either to enable the Board to comply with any Legal Requirements, or to remedy any notice of violation entered against the Condominium, or to comply with any proper work order by an insurer of the Building, or for the health and safety (but not the general comfort or welfare) of the occupants of the Building..

Sponsor may not exercise veto power over expenses described in Schedule B, or over expenses required to comply with any Legal Requirements applicable to the Building, or to remedy any notice of violation entered against the Building or to comply with any proper work order by an insurer of the Building. Sponsor may, however, exercise veto power over expenses other than those described in the preceding sentence, to the extent provided in the Plan, for a period ending not more than five (5) years after the First Closing or whenever the Unsold Units constitute less than 25% of the Common Interest, whichever is sooner.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]