# EXHIBIT "B"
## PART III

# EXHIBIT "B-3"

# BY-LAWS

## OF

## TRUMP SOHO HOTEL CONDOMINIUM NEW YORK

6.5.2     If three-fourths or more of the Building is destroyed or substantially damaged and if 75% or more in Common Interest of all Unit Owners do not duly and promptly resolve to proceed with the repair or restoration thereof, the Building (or so much thereof as remains) will not be repaired and the Property shall be subject to an action for partition instituted by any Unit Owner or lienor, as if owned in common, in which case the net proceeds of sale, together with the net proceeds of insurance policies, shall be divided among all Unit Owners : (i) first, by apportioning such proceeds in the aggregate among each class of Unit (i.e., Hotel Suite and Commercial) pursuant to an appraisal of fair market values to be performed by a panel of three independent appraisers (one of whom shall be selected by the Board, one of whom shall be chosen by the Commercial Unit Owners, and the third chosen by the other two appraisers); and (ii) then among the Unit Owners of each class of Unit in proportion to the respective Common Interests of such Units; provided, however, that no payment shall be made to a Unit Owner until there has first be paid out of his or her share of such funds, such amounts as may be necessary to discharge all unpaid liens on his or her Unit (other than mortgages that are not Permitted Mortgages) in the order of the priority of such liens.

6.5.3     As used in this Section 6.5, the words "promptly resolve" shall mean not more than sixty (60) days after the date of the damage of destruction in question occurs.

6.5.4     Any dispute between the Board and a Unit Owner under this Section 6.5 shall be settled by Arbitration (as provided in Article 11).

6.6     <u>Maintenance and Repairs</u>.

6.6.1     Except as otherwise provided in the Declaration or these By-Laws or in the applicable Unit Management Agreement: (a) all painting, decorating, maintenance, repairs and replacements, whether structural or non-structural, ordinary or extraordinary, and all maintenance, repairs and replacements of all plumbing, heating and lighting fixtures, heating and air-conditioning units and appliances (i) in or to any Unit (excluding Common Elements included therein except as otherwise provided in these By-Laws or in the applicable Unit Management Agreement) and the interior side of entrance doors thereto, shall be made by the owner of such Unit at its sole cost and expense; provided that, except in the case of work to be done in Unsold Units or in the Commercial Units, the Unit Owner thereof will utilize only such contractors, workers or suppliers as are on the Hotel Management Company's then approved list, which list may change from time to time in the Hotel Management Company's or the Board's sole discretion; (ii) in or to the General Common Elements (unless caused by or attributable to a Unit Owner, in which case such Unit Owner shall be responsible for the entire cost), shall be made by the Board and the cost and expense thereof shall be charged as a Common Expense to all Unit Owners, or (iii) in or to the Hotel Suite Limited Common Elements (unless caused by or attributable to a Unit Owner, in which case such Unit Owner shall be responsible for the entire cost) shall be made by the Board, and the cost and expense thereof shall be charged to all Hotel Suite Unit Owners in proportion to their respective Common Interests; provided, however, that a Hotel Suite Unit Owner having use of a Terrace shall be responsible for ordinary maintenance and cleaning thereof; (b) a Unit Owner shall not be responsible for the cost of painting, decorating, maintenance, repairs or replacements on or to any Unit other than to its own Unit (and any Limited Common Elements included in or appurtenant to any such Unit), except to the extent otherwise provided herein; and (c) each Unit and all portions of the Common Elements

shall be kept in a clean and sanitary condition, and in good working order (and all portions thereof exposed to public view shall be kept in a neat appearance and in first-class condition in accordance with the high quality, character and dignity of the Building), in each case, by the Unit Owner or the Board, whichever is responsible, under the By-Laws, for the maintenance thereof. In the event that any Unit Owner fails to keep his or her Unit in such condition, the Board, at the expense of such Unit Owner, may enter such Unit and perform such acts as are necessary to cure such default. Without limiting the foregoing, Unit Owners shall be responsible for all maintenance, repairs and replacements of all plumbing, appliances and lighting fixtures, and heating, ventilation and air conditioning units in their respective Units. Notwithstanding the forgoing, (i) each Hotel Suite Unit Owner shall be responsible for all ordinary maintenance, repairs, replacements and cleaning of each Terrace appurtenant to its Hotel Suite Unit (including, without limitation, replacement of tiles); however, the costs and expenses of any extraordinary or structural repairs or replacements, (including, without limitation, work necessary to repair any leaks) with respect to each such Terrace (unless caused by or attributable to a given Unit Owner, in which case such Unit Owner shall be responsible for the entire cost), shall be charged to all Hotel Suite Unit Owners as a Common Expense, and (ii) the Hotel Suite Unit Owners shall bear the entire cost all ordinary maintenance, repairs, replacements and cleaning of the Terrace as a Common Expense of the Hotel Suite Unit Owners.

6.6.2    Notwithstanding the provisions of subsection 6.6.1:

(a)    In the event that any painting, decorating, maintenance, repairs or replacements to the Property or any part thereof (including, without limitation, any Unit) is necessitated by or attributable to the negligence, misuse, neglect or abuse of: (i) any one or more Unit Owner(s) or its or their tenants, agents, invitees, licensees or guests, the entire cost thereof shall be borne entirely by such Unit Owner, or (ii) the Board or its tenants, agents, invitees, licensees or guests, the entire cost thereof shall be charged to all Unit Owners as a Common Expense, except to the extent in any case that such cost is covered by the proceeds of any insurance maintained pursuant to the provisions hereof and only if, in each case, such negligence, misuse, neglect or abuse and is within the control of such Unit Owner or the Board, as applicable.

(b)    Except as may otherwise be expressly provided herein, no Unit Owner may install, inscribe or expose any signage on or at any window or any other part of the Common Elements. Notwithstanding the foregoing, (i) there are no restrictions on the ability of the Commercial Unit Owners to place any signs inside the Commercial Units, provided such signs comply with all applicable Legal Requirements and do not significantly and adversely affect all or any portion of the Building outside the Commercial Units, and (ii) the Commercial Unit Owners will be permitted to place signs and awnings on the exterior of the Commercial Units, provided that (w) no flashing, blinking or neon sign shall be placed in the windows or in any display or other area visible to public view from the outside of the Commercial Units, (x) no canopy or marquee shall be placed or installed outside the Commercial Units, (y) the affected Commercial Unit Owners obtains the written consent of the Board, which consent shall not be unreasonably withheld; provided that the standard sign of an occupant of the Commercial Units which is a national retailer shall not require the consent of the Board and (z) such signs and awnings comply with applicable Legal Requirements and do not otherwise violate the provisions of these By-laws (other than the first sentence of this subparagraph (b)) or the Declaration.

Additionally, notwithstanding the foregoing, Sponsor, any holder of Unsold Units and the Board shall have an easement to erect, maintain, repair and replace signs, notices, advertisements and illuminations on reasonable portions of the Property, including, without limitation, on the portions of the Building, on or at windows and in interior public spaces of the Building (but in no event within the interior of or on the exterior of the Unit owned by any other party), for the purposes of advertising the availability of Units for sale or lease by Sponsor or its designee and/or, in the case of the Board, for any other valid business purpose.

(c)     The interior and exterior glass surfaces of all windows located in any Unit (other than the Commercial Units, with respect to which the provisions of Section 6.7 hereof shall apply) shall not be altered, colored or painted. The washing and cleaning of interior glass surfaces of windows in the Hotel Suite Units shall be the responsibility of the Unit Owners. All exterior windows shall be cleaned a minimum of three times per calendar year. The Board may from time to time enforce the responsibility of Unit Owners to wash and clean the interior surfaces of windows located in their respective Units. The exterior glass surfaces of windows will be washed, cleaned and replaced at the direction of the Board and the cost thereof shall be charged to the Unit Owners as a Common Expense, on an allocated basis, except for exterior glass surfaces of doors and windows opening onto or directly accessible from any Terrace that is appurtenant to a Hotel Suite Unit as to which the Owner of such Hotel Suite Unit shall have the responsibility for washing and cleaning. Any replacement of glass windows in any Hotel Suite Unit, because of breakage or otherwise, shall be made by the Board, and charged to the Hotel Suite Unit Owners, as a Common Expense on an allocated basis (unless such breakage is caused or attributable to negligence, misuse, neglect or abuse of one or more Unit Owner(s) or its or their tenants, agents, invitees, licensees or guests, in which event such replacement of glass windows shall be made by the Board, at the expense of such Unit Owner(s)) to the extent that the Board's insurance does not cover the same. Any replacement of glass windows in the Commercial Units, because of breakage or otherwise, shall be promptly performed by the affected Commercial Unit Owners at its sole cost and expense (except to the extent the need to replace same results from the negligence, misuse or abuse of another Unit Owner or the Board.)

(d)     All normal maintenance, repairs and replacements of any Common Element appurtenant to a Unit shall be made by the Unit Owner having exclusive access thereto, at its own cost and expense; any structural or extraordinary repairs or replacements thereto (including, without limitation, leaks) shall be made by the Board and the cost and expense thereof shall be charged to all Hotel Suite Unit Owners as a Common Expense, unless due to the negligence, misuse, neglect or abuse of such Unit Owner or its tenant, agent, invitee, licensee or guest under the control of such Hotel Suite Unit Owner, in which event such Unit Owner shall bear the entire cost thereof, and the same shall, for all purposes hereunder, constitute part of the Common Charges payable by such Unit Owner. Unit Owners are prohibited from cleaning or allowing to be cleaned any window from the outside in violation of Section 202 of the New York State Labor Law, any other applicable Legal Requirements, any insurance policy or requirement or otherwise.

6.6.3     Each Unit and all portions of the Common Elements shall be kept in accordance with the Operating Standard (and with respect to any roof or other part of the Property exposed to the elements, free of snow, ice and accumulation of water) by the Unit Owner or the Board, whichever is responsible for the maintenance thereof under the Declaration

or these By-Laws, and such Unit Owner or the Board shall promptly make or perform, or cause to be made or performed, all maintenance work, repairs and replacements necessary in connection therewith. In addition, the public areas of the Building and those areas which are exposed to public view shall be kept in good appearance, in conformity with the dignity and character of the Building, by: (a) the Board, with respect to such parts of the Building it is required to maintain under the Declaration or these By-Laws; and (b) each Unit Owner, with respect to the windows and window shades, venetian or other blinds, drapes, curtains or other window decorations in or appurtenant to its Unit, as well as those other areas of such Unit and its appurtenant Hotel Suite Limited Common Elements (if any) which are exposed to public view.

6.6.4　　Without limiting the generality of the other provisions of these Bylaws (including, without limitation, Section 6.6.3 hereof and the Rules and Regulations), The Commercial Unit Owners, at their sole cost and expense, shall:

(a)　　clean the interior and exterior of the windows and doors (including, in each case, the frames thereof) in their Commercial Units and in the perimeter walls thereof whenever necessary, and clean and polish the inside and outside of the store fronts of their Commercial Units whenever reasonably necessary;

(b)　　keep their Commercial Units clean, and in a sanitary condition, keep all plumbing and sanitary systems and installations serving their Commercial Units in a good state of repair and operating condition to the points they connect with the main vertical risers and stacks of the Building;

(c)　　comply with all sanitary codes, bag and remove all rubbish and other debris from the Commercial Units daily between the hours of 6:00 P.M. and 8:00 A.M., keep the sidewalks in front of their Commercial Units clean and free from any garbage, debris, or obstruction and place all garbage away from the lobby;

(d)　　use reasonable efforts to eliminate all noxious fumes, odors or gases originating from their Commercial Units and vent the foregoing;

(e)　　utilize, all reasonable measures to keep their Commercial Units free from rats, mice, insects, and other vermin;

(f)　　on a daily basis, keep the sidewalks in front of their Commercial Units clean and free of dirt, ice, snow, mud and rubbish, but the cost of all necessary repairs or replacements to the sidewalks for which the Condominium is responsible shall be a Common Charge (unless the need to make such repair or replacement is caused by or attributable to a Unit Owner, in which case such Unit Owner shall be responsible for the entire cost);

(g)　　as soon as reasonably practicable after any glass (including mirrors) in their Commercial Units and the perimeter and the demising walls thereof is broken or cracked, including a so-called "bulls eye" break in the glass, replace such glass with glass of substantially the same kind and quality as may be necessary or desirable in connection with such replacement, repair or replace the frames for such glass and in the event such Commercial Unit Owners shall fail to so replace such glass and if necessary repair or replace such frames as aforesaid, then the Board may replace the glass, if necessary, and repair or replace such frames on such Commercial

Unit's behalf and the affected Commercial Unit Owners shall, within ten (10) days after the Board's demand therefor, pay to the Board the costs incurred by the Board in so doing; and

(h) install, over and adjacent to the areas used for cooking or baking the proper exhaust hoods and equipment which will be equipped in an "ansul" or equal self-extinguishing fire control system, which shall be approved by the Board of Fire Underwriters for such use.

6.6.5 In the event that any Unit Owner, after receipt of written notice from the Board, fails or neglects in any way to perform any of its obligations with respect to the maintenance, repair or replacement in or to its Unit as provided in this Article 6 or of any Common Element for which such Unit Owner is responsible under the Declaration or these By-Laws, the Board may perform or cause to be performed such maintenance, repair or replacement unless such Unit Owner, within 10 days after receiving notice of such default by the Board, (except in the event of an "emergency", i.e., a condition requiring repairs, replacements or installations immediately necessary for the preservation or safety of all or any portion of the Property or for the safety of occupants of the Building or other persons, or required to avoid the suspension of any necessary service in the Building or with respect to all or any portion of the Property), cures such default, or in the case of a default not reasonably susceptible to cure within such period, commences (within such 10 day period) and thereafter prosecutes to completion, with due diligence, the curing of such default. All sums expended and all costs and expenses incurred by the Board in connection with the making of any such maintenance, repair or replacement in or to such Unit Owner's Unit or to any such Common Element for which such Unit Owner is responsible as aforesaid, together with interest thereon at the rate of 1.5% per month (but in no event in excess of the maximum rate permitted by law), shall be immediately payable by such Unit Owner to the Board and shall, for all purposes hereunder, constitute Common Charges payable by such Unit Owner.

6.7 Alterations of Units.

6.7.1 Except as otherwise provided in the Declaration or these By-Laws:

(a) No Hotel Suite Unit Owner (other than Sponsor or its designee as the owner of Unsold Units) shall make any alterations, additions, installations, improvements, replacements or repairs (all of the foregoing being, collectively, "Alterations") in or to its Unit, without obtaining the prior written consent of the Board thereto. Prior to, and as a condition of, the granting of its consent to the making of any such Alteration in or to a Unit, the Board, at its option, may require any Hotel Suite Unit Owner to execute an agreement, in form and substance satisfactory to the Board, setting forth the terms and conditions under which such Alteration (as defined below) may be made. Any Hotel Suite Unit Owner seeking to perform such work requiring the consent of the Board shall be liable for all costs and expenses incurred by the Board in obtaining such consent.

(b) All repairs which would affect the structure or systems of the Building (including, without limitation, the mechanical, electrical, plumbing, heating, ventilating and/or air-conditioning system thereof, but excepting any system which exclusively serves the Unit in question) and all Alterations to any Hotel Suite Unit shall be made in accordance with plans and

specifications, which plans and specifications shall be subject to review and approval by the Board.

(c)     The Board may impose fees upon any Hotel Suite Unit Owner to reimburse the Condominium for costs incurred by the Board in connection with the review and supervision of such Hotel Suite Unit Owner's work.

6.7.2     All Alterations by a Unit Owner shall be performed:

(a)     at the Unit Owner's sole cost and expense (which shall include, without limitation, the reasonable costs of the Board incurred in reviewing and approving such Unit Owner's submission for approval (if such approval is required under these By-laws) and in monitoring such Unit Owner's compliance with the provisions of this Section 6.7);

(b)     in a manner which will not interfere with, or cause any labor disturbances or stoppages in, the work of Condominium employees or other contractors or subcontractors employed in the Units or the Building;

(c)     only during only such days and hours as may be specified by the Board in its reasonable judgment;

(d)     only after obtaining such insurance, naming the Board, the Hotel Management Company and Sponsor as additional insureds, as the Board or the Hotel Management Company may require and indemnifying the Board, all other Unit Owners and the Hotel Management Company against any liability arising from the work;

(e)     in the case of a Hotel Suite Unit, employing such architects, engineers, contractors, subcontractors, workers, suppliers and other laborers who are on the Hotel Management Company's then approved list, as such list may change from time to time, in the sole discretion of the Board or the Hotel Management Company; and

(f)     in compliance with the Declaration, these By-Laws, the Rules and Regulations, the overall Building standards and all applicable laws, ordinances, orders, rules, regulations and requirements of all governmental and quasi-governmental authorities, including, without limitation, the requirements of the New York City Department of Buildings and the boards of fire underwriters having jurisdiction thereof (all such laws, ordinances, orders, rules, regulations and requirements being sometimes hereinafter collectively referred to as "Legal Requirements"), including, without limitation, Legal Requirements relating to licensing of contractors, obtaining of all necessary governmental permits, authorization, certificate and licenses for the commencement and completion of any Alterations and obtaining of any amendment to the Certificate of Occupancy for such Unit, if necessary.

6.7.3     The Unit Owner performing, causing, permitting or suffering such Alterations to be performed shall, if required by the Board, pay the cost of: (i) any amendment of the Declaration and the floor plans of the Condominium, if required by the Board or by any applicable Legal Requirements, to reflect any such Alterations, (ii) obtaining all necessary governmental permits, authorizations, certificates and licenses for the commencement and completion of any Alterations (copies of which shall be delivered to the Board promptly after the

issuance thereof and prior to the commencement of any Alterations), and obtaining any amendment to the Certificate of Occupancy for such Unit, if necessary; provided that no work or change by or on behalf of a Hotel Suite Unit Owner will be permitted without the consent of the Board (which consent may be withheld on conditioned in the sole discretion of such Board) if such work or change would result in a delay in obtaining a temporary or permanent Certificate of Occupancy for the Building, or any amendment to, or extension of, the same if theretofore issued; and (iii) any reasonable architectural, engineering and legal fees incurred by the Board in connection with such work. Neither the Board nor any Unit Owner (other than the Unit Owner making, permitting or suffering any Alterations to be made in or to its Unit) shall incur any liability, cost or expense either: (A) in connection with the preparation, execution or submission of the applications referred to above; (B) to any contractor, subcontractor, supplier, architect, engineer or laborer on account of any Alterations made or permitted or caused to be made by any Unit Owner; (C) to any person or entity asserting any claim for personal injury or property damage arising therefrom; or (D) arising out of a Unit Owner's failure to obtain any permit, authorization, certificate or license, or to comply with the Declaration, these By-Laws, the Rules and Regulations and the provisions of any Legal Requirements insofar as the same relates to Alterations. A Unit Owner making or causing, permitting or suffering any tenant or occupant to make, any Alteration shall be deemed to have agreed to indemnify, defend and hold the Board, the Hotel Management Company and all other Unit Owners harmless from and against any liability, loss, cost, or expense arising therefrom, and from and against any and all loss, cost, expense (including, but not limited to, attorneys' fees and disbursements), damage, injury or liability, whether direct, indirect or consequential, resulting from, arising out of, or in any way connected with, any of the foregoing.

6.7.4    Any application to any department of the City of New York or to any other governmental authority having jurisdiction thereof for a permit to make an Alteration in or to any Unit shall, if and to the extent required by law or such department or authority, be executed by the Board, in the case of any Alteration which such party has approved (or for which its approval is not required), provided that the Board shall not incur any liability, cost or expense in connection with or by reason of executing such application.

6.7.5    Notwithstanding anything to the contrary contained in this Section 6.7 (but subject to all Legal Requirements), however, Sponsor and its designees shall each have the right pursuant (and subject) to the terms of the Declaration, without the approval of the Board: (i) to make any Alterations in or to any Unsold Units, whether structural or non-structural, interior or exterior, ordinary or extraordinary (including, without limitation, those required under the Offering Plan, any Purchase Agreement or otherwise); and (ii) to subdivide, combine and change the boundary walls of Unsold Units. Additionally, any initial purchaser of any Unsold Unit shall have the right, without approval of the Board, to make any Alterations in or to its Unit, provided that Sponsor or its designee has consented to the same in writing at or prior to the closing of title to such Unit (which consent may be withheld or conditioned in Sponsor's sole discretion), that such purchaser obtains all necessary approvals required by law, and that such purchaser complies with all of the other requirements of this Section 6.7.

6.7.6    In addition to the requirements set forth above in this Section 6.7, until a permanent Certificate of Occupancy is obtained for the Building, no Hotel Suite Unit Owner shall make any Alterations in or to its Unit without first notifying Sponsor of the same in writing

work by such Unit Owner to be halted, including, without limitation, causing the Hotel Management Company to deny access to the Building to the Unit Owner's workers and suppliers, until such Unit Owner so complies. During the period until such Unit Owner is permitted hereunder to resume its work, Sponsor shall have the right to cause to be performed (whether by Sponsor, its designee or otherwise) any and all work in and to such Unit Owner's Unit as shall be necessary, in Sponsor's or its designee's sole judgment, in order to avoid any delay in obtaining a temporary or permanent Certificate of Occupancy for the Building (or any amendment to, or extension of, the same if theretofore issued), whether or not such work shall be in compliance with the plans and specifications for the work theretofore performed by, or on behalf of, such Unit Owner. The cost and expense of any such work so performed shall be borne by such Unit Owner and shall be paid to Sponsor within 15 days of Sponsor's written demand therefor.

6.8     Use of Hotel Suite Units. Except to the extent otherwise permitted by law and approved by the Board, each Hotel Suite Unit may only be used in accordance with the Restrictive Declaration. Without limiting any other provision of the Condominium Documents, Hotel Suite Units may not be used in fact or in effect, as part of or in furtherance of any Occupancy Plan; provided, however, if, as and when, and only for so long as, the Hotel Suite Units are being used by the Hotel Management Company in connection with an Occupancy Plan, the Hotel Management Company may be so used on the same basis.

6.9     Alterations to Commercial Units. Each Commercial Unit Owners may make Alterations in or to its Commercial Unit (including any decorations that are compatible with the first class character and location of the Building and installing equipment on any rooftop area (as described below)) which, in each such case, comply with applicable Legal Requirements, without obtaining the approval of the Board, except that Alterations which would materially affect the structural, mechanical, electrical or plumbing elements of the Building, or the exterior appearance of the Building, shall be subject to the approval of the Board, which shall not be unreasonably withheld. In the event that a dispute arises between any Commercial Unit Owner and the Board regarding any Alteration subject to the Board's approval (or which the Board asserts is subject to its approval), such dispute shall be submitted to arbitration in accordance with the terms of Article 11 of these By-Laws, provided that the parties shall cause such arbitration to proceed in an expedited manner. Commercial Unit Owners will be granted reasonable access to all parts of the Building (other than the interior of Hotel Suite Units) to which such Commercial Unit Owners reasonably requires access in order to perform any work or alterations desired by the Commercial Unit Owners thereof and permitted or required to be made by such Commercial Unit Owners hereunder. The Commercial Unit Owners shall have the right to use any portion of the roof located over its Commerical Unit to install, operate, maintain, repair and replace, in accordance with applicable Legal Requirements, equipment serving their Commercial Units. Also, the Commercial Unit Owners shall have reasonable access to the rooftop space to operate, repair, maintain, or replace such equipment. The Commercial Unit Owners shall be solely responsible for the operation, repair, maintenance, and replacement such equipment, and the Commecial Unit Owners shall maintain and the cost of such liability insurance with respect to the rooftop space and all such equipment as the Board shall reasonably require.

Hotel Flag Intellectual Property, as the same may be amended from time to time (the "Operating Standard"). Under no circumstances shall the Hotel Flag Intellectual Property be deemed part of the Property or an appurtenance of any Unit. Neither the Unit Owners nor the Board shall have any right, title, or interest in any name under which the Condominium is operated or in any other of the Hotel Flag Intellectual Property, or in any licensing arrangement between the Hotel Flag and any other party. The Hotel Flag Intellectual Property shall at all times remain the sole and exclusive property of the Hotel Flag.

14.2    Standard for Hotel Suite Units. At all times, all Hotel Suite Units and the Hotel Limited Common Elements shall be kept in the condition and otherwise in accordance with a standard of facilities, equipment, quality, service and appearance consistent with the standard of the hotel being operated in the Condominium, as the same may change from time to time, which shall in all events be no less than the Operating Standard.

14.3    Use of Name. So long as the Condominium is being operated as a hotel, each Hotel Suite Unit Owner covenants that it shall not permit its Unit (or interest in a Unit) to be advertised or promoted through, or otherwise affiliated with, any reservation system or network by whatever means (e.g., Internet, electronic or otherwise), that identifies or otherwise represents the Unit (or interest) as being a part of an integrated hotel operation (as distinct from a transient rental of a privately owned Hotel Suite Unit (or interest)), unless such advertisement, promotion or reservation system or network is operated by the Hotel Management Company or its designee; and no Hotel Suite Unit Owner may use any of the Hotel Flag Intellectual Property in connection with any advertisement or other promotion or rental of any such Unit (or interest) without the express permission of the owner of the Hotel Flag Intellectual Property. Without limiting any other right or remedy available at law or in equity, the foregoing may be enforced by an action for specific performance and/or injunctive relief.

## ARTICLE 15

## RESTRICTIVE DECLARATION

15.1    Restrictive Declaration. Use and occupancy of the Hotel Suite Units shall be subject to that certain Restrictive Declaration (the "Restrictive Declaration") dated as of April 26, 2007 made by Sponsor and recorded in the Office of the New York City Register, New York County on May 4, 2007 in CFRN 2007050100385001. The Restrictive Declaration shall encumber the Hotel Suite Units and run with the land until terminated pursuant to its terms.

## ARTICLE 16

## UNIT MANAGEMENT AGREEMENT

16.1    Execution Required. Each Hotel Suite Unit Owner shall, upon taking title to its Unit, execute, acknowledge and deliver to the Hotel Management Company, a Unit Management Agreement (and a memorandum of Unit Management Agreement) applicable to the Hotel Suite Units, the initial form of which is annexed to these By-Laws as Exhibit B and made a part hereof (such agreement, as the same may be amended from time to time in accordance with

the terms hereof, the "Unit Management Agreement"). If any Hotel Suite Unit Owner fails or refuses to execute, acknowledge or deliver the Unit Management Agreement (or memorandum of Unit Management Agreement referenced in Section 15.3 below), upon taking title to its Unit, or within ten (10) days after receipt of a written request therefor, at the request of the Hotel Management Company, then any officer of the Board (or its designee) is hereby authorized as attorney-in-fact for such Hotel Suite Unit Owner, coupled with an interest, to execute, acknowledge and deliver the Unit Management Agreement (and memorandum of Unit Management Agreement) with respect to such Hotel Suite Unit in the name of such Unit Owner and such documents shall be binding on such Hotel Suite Unit Owner. Furthermore, each successor Hotel Suite Unit Owner shall be bound by the terms of the Unit Management Agreement in respect of such Hotel Suite Unit Owner's Unit automatically as a successor in title; provided, however, that the Hotel Management Company, at its option, may require the successor Hotel Suite Unit Owner to execute a replacement Unit Management Agreement (and memorandum of Unit Management Agreement) or an acknowledgment and assumption of the existing Unit Management Agreement with respect to the Hotel Suite Unit in question.

16.2    Changes to Form.  Changes to the then applicable form of Unit Management Agreement may be made, from time to time, only upon the request of the Hotel Management Company after a proposal with respect thereto having been made by the Hotel Management Company, and such proposed changes shall then require the approval of the Board, such approval not to be unreasonably withheld, conditioned or delayed. Any disputes arising out of any proposed change to the form Unit Management Agreement shall be resolved in Arbitration in accordance with Article 11 hereof. Any amendment to the Unit Management Agreement approved by the Board shall be effective automatically; provided, however, that the Hotel Management Company, at its option, may require Hotel Suite Unit Owners to execute such amendment to the Unit Management Agreement or an acknowledgment of such amendment.

16.3    Memorandum of Unit Management Agreement.  Together with the execution, acknowledgement and delivery of the Unit Management Agreement upon taking title to a Hotel Suite Unit, each Hotel Suite Unit Owner shall also execute, acknowledge and deliver to the Hotel Management Company a memorandum of Unit Management Agreement in recordable form as set forth in an exhibit to the Unit Management Agreement.

16.4    No Changes.  The provisions of this Article 15 may not be amended without the consent of the Hotel Management Company (which consent may withheld or granted in such Unit Owner's sole discretion).

16.5    Termination of Hotel Management Company.  Notwithstanding anything herein or in the Declaration or By-Laws to the contrary, the Hotel Management Company may only be terminated by the Board upon a vote of the members thereof and only to the extent the Board has a right to vote to terminate pursuant to the Hotel Management Agreement between the Board and the Hotel Management Company; and any replacement Hotel Management Company shall be retained only after being approved by a vote of the Board. Upon any termination of the Hotel Management Company, the Unit Management Agreement will inure to the benefit of the replacement Hotel Management Company.

16.6     <u>Unit Management Fee and Convenience Fee</u>.  Hotel Suite Unit Owners will be required to pay the Convenience Fee and Unit Management Fee (each defined in the Unit Management Agreement) in accordance with the terms and conditions of the Unit Management Agreement.

## EXHIBIT A

## RULES AND REGULATIONS OF UNIT OWNERS
## TRUMP SOHO HOTEL CONDOMINIUM NEW YORK

1.      The entrances, passages, public halls, elevators, vestibules, corridors and stairways of or appurtenant to the Building shall not be obstructed or used for any purpose by Unit Owners and their invitees other than the respective purposes for which they were intended.

2.      No article (including, but not limited to, garbage cans, bottles or mats) shall be placed in any of the passages, public halls, vestibules, corridors, stairways or fire landings of the Building nor shall any fire exit thereof be obstructed in any manner. Nothing shall be hung or shaken from any doors, windows or roofs or placed upon the window sills of any Units of the Building.

3.      Neither occupants nor their guests shall play in the entrances, passages, public halls, lobbies, elevators, vestibules, corridors, fire landings of or serving the Building.

4.      No public hall or public elevator vestibule of the Building shall be decorated or furnished by any Hotel Suite Unit Owner in any manner, except as otherwise expressly provided in the By-Laws.

5.      Each Hotel Suite Unit Owner shall keep his or her Unit (and any Hotel Suite Limited Common Element appurtenant thereto) in a good state of preservation and cleanliness, and shall not sweep or throw or permit to be swept or thrown therefrom, or from the doors or windows thereof, any dirt or other substance.

6.      No radio, television or other aerial, satellite dish, disk or similar device shall be attached to or hung from the exterior of the Building and no sign, notice, advertisement or illumination shall be inscribed or exposed on or at any window or other part of any Unit or anywhere in or on the Building (except such as are permitted pursuant to the Declaration or the By-Laws), or shall have been approved in writing by the Board or the Hotel Management Company; nor shall anything be projected from any window of any Unit.

7.      No heat, ventilator or air conditioning device shall be installed in any Hotel Suite Unit without the prior written approval of the Board; and no "window" air-conditioners of any kind shall be permitted.

8.      All radio, television or other electrical or electronic equipment of any kind installed or used in any Unit shall comply with all rules, regulations, requirements and recommendations of the New York Board of Fire Underwriters and governmental or public authorities having jurisdiction, and the Hotel Suite Unit Owner alone shall be liable for any damage or injury caused by any radio, television or other electrical or electronic equipment in such Hotel Suite Unit Owner's Unit.

9.      No mopeds, motorcycles, bicycles, scooters or similar vehicles shall be taken into or from the Building through the main Building entrance or be allowed in the lobby or in the passenger elevator, and no baby carriages or any of the above-mentioned vehicles shall be

allowed to stand in the public halls, vestibules, corridors or other public areas of the Building. The service entrance is the only means by which bicycles should be transported in and out of the Building. Hotel Suite Unit Owners or occupants of a Unit (including children) will be subject to a fine of $50 per person each time that they or their guests are found in the lobby with a bicycle, scooter or tricycle or wearing rollerblades.

10.     No Hotel Suite Unit Owner shall make or permit any disturbing or objectionable noises, odors or activity in the Building, or do or permit anything to be done therein, which will interfere with the rights, comforts or conveniences of other Hotel Suite Unit Owners or their tenants or occupants. No Hotel Suite Unit Owner shall play upon or suffer to be played upon any musical instrument, or operate or permit to be operated a phonograph, stereo system, or radio or television set or other loudspeaker in such Hotel Suite Unit Owner's Unit between midnight and the following 7:00 A.M., if the same shall disturb or annoy other occupants of the Building, and in no event shall practice or suffer to be practiced either vocal or instrumental music between the hours of 10:00 P.M. and the following 9:00 A.M. No construction or repair work or other installation involving noise shall be conducted in any Unit except on weekdays (not including legal holidays) and only between the hours of 8:00 A.M. and 4:00 P.M., unless such construction or repair work is necessitated by an emergency or is being performed by or on behalf of the owner of any Unsold Units, by Sponsor or its designee, or by the Commercial Unit Owners (after obtaining the consent of Sponsor or the Board as applicable.

11.     Service personnel, messengers and tradespeople visiting or residing in the Building may be required to use the service elevator for ingress and egress, and shall not use the main passenger elevator for any purpose, except that nurses in the employ of Hotel Suite Unit Owners or their guests may use the main passengers elevators when accompanying the Hotel Suite Unit Owner or guest.

12.     All service and delivery persons in respect of the Hotel Suite Units will be required to use the service entrances to the Building. All packages, including, without limitation, those containing perishable items, delivered to Units by outside personnel must be delivered to the area therefor designated by the Board or the Hotel Management Company. Deliveries will be made from such area to individual Units only by Building personnel as otherwise directed by Building personnel. Such deliveries will be made only at such times as a Unit is occupied by the resident thereof or an authorized person and said resident or authorized person is willing to accept delivery. If the Unit is not occupied or delivery is declined, the package will be held in the designated area until the resident or authorized person returns or requests delivery, except in the case of perishable items which will be held in the designated area for no longer than 24 hours. After said 24-hour period, the perishable item shall be disposed of by Building personnel. Building personnel will not be responsible for packages held in the package room for more than 72 hours. No large deliveries will be accepted for a Hotel Suite Unit Owner (or occupant of a Unit) unless such Hotel Suite Unit Owner (or occupant) has made prior arrangements with the Building staff.

13.     No refuse shall be removed from the Units except at such times and in such manner as the Board or the Hotel Management Company may direct.

14.     Water-closets and other water apparatus in the Building shall not be used for any purpose other than those for which they were designed, nor shall any sweepings, rubbish, rags or any other article be thrown into the same. Any damage resulting from misuse of any water-closets or other apparatus in a Unit shall be repaired and paid for by the Owner of such Unit.

15.     No occupant of the Building shall send any employee of the Building or of the Hotel Management Company out of the Building on any private business.

16.     The agents of the Board or the Hotel Management Company, and any contractor or worker authorized by the Board or the Hotel Management Company and accompanied by an agent of the Board or the Hotel Management Company, may enter any room or Unit at any reasonable hour of the day, on at least one day's prior notice to the Hotel Suite Unit Owner, for the purpose of inspecting such Unit for the presence of any vermin, insects or other pests and for the purpose of taking such measures as may be necessary to control or exterminate any such vermin, insects or other pests; however, such entry, inspection and extermination shall be done in a reasonable manner so as not to unreasonably interfere with the use of such Unit for its permitted purposes.

17.     Complaints regarding Building services shall be made in writing to the Board or to the Hotel Management Company.

18.     No Hotel Suite Unit Owner or any of his or her agents, servants, employees, licensees or visitors shall at any time bring into or keep in such Hotel Suite Unit Owner's Unit any inflammable, combustible or explosive fluid, material, chemical or substance.

19.     Nothing shall be done or kept in any Unit which would increase the rate of insurance of the Building or contents thereof, without the prior written consent of the Board. No Hotel Suite Unit Owner shall permit anything to be done or kept in his or her Unit which will result in the cancellation of insurance on the Building or which would be in violation of any law. No waste shall be committed in the Common Elements.

20.     Except as otherwise expressly provided in the Bylaws and the Declaration, Hotel Suite Unit Owners, their families, guests, service personnel, employees, agents, visitors or licensees shall not at any time or for any reason whatsoever enter upon or attempt to enter upon the roof of the Building.

21.     The Board shall have the right from time to time to relocate any portion of the Common Elements used by the Building for storage or service purposes.

22.     No Hotel Suite Unit Owner, tenant or occupant of a Unit shall conduct any group tour, exhibition or open house of any Unit or its contents or any auction sale in any Unit, without the prior consent of the Board or the Hotel Management Company.

23.     Any consent or approval given under these Rules and Regulations may be granted, refused, added to, amended or repealed, in the sole discretion of the Board, at any time by resolution of the Board. Further, any such consent or approval may, in the discretion of the Board or the Hotel Management Company, be conditional in nature.

24. The Board reserves the right to rescind, alter, waive or add, as to one or more or all occupants, any rule or regulation at any time prescribed for the Building when, in the judgment of the Board, the Board deems it necessary or desirable for the reputation, safety, character, security, care, appearance or interests of the Condominium, the Building or the preservation of good order therein, or the operation or maintenance of the Condominium, the Building or the equipment thereof, or the comfort of Hotel Suite Unit Owners, occupants or others in the Building. No rescission, alteration, waiver or addition of any rule or regulation in respect of one Hotel Suite Unit Owner or other occupant shall operate as a rescission, alteration, waiver or addition in respect of any other Hotel Suite Unit Owner or other occupant.

25. Notwithstanding any references to "Hotel Suite Unit Owner" in these Rules and Regulations, the Rules and Regulations of the Condominium shall be binding upon all tenants, guests and other occupants of the Condominium. Hotel Suite Unit Owners shall be responsible for enforcing compliance with, and liable for any violation of, the Rules and Regulations by members of their families, guests, invitees, tenants, employees, agents, visitors and any other occupants of their Units.

26. With respect to any Unit to which there is a Terrace appurtenant, the following additional rules and regulations shall apply: All furniture must be "patio/terrace" furniture which is rust-proof; any planting/landscaping must comply with all Legal Requirements. Plants may not exceed the total weight allowance of 100 pounds and must be planted in water-proof containers so as not to cause water leakage. Any damage caused by the Hotel Suite Unit Owner's negligence shall be at such Hotel Suite Unit Owner's sole cost and expense. All Terraces must be kept clean and free from snow, ice, leaves and debris and all screens and drains must be kept in good repair. The Hotel Suite Unit Owner shall not remove any of the above items by putting them over the Terrace walls, but shall remove said items either through the apartment or through drainage where appropriate. No hanging of any items, including but not limited to banners, laundry, decorations, etc., from any Terrace wall, structure, railing or other temporary or permanent structure is permitted. No items, including but not limited to climbing equipment, bikes, pools, children's toys, etc., may be stored on any Terrace; any appropriate furniture including table, chair cushions and umbrellas may be left on the Terraces only if properly secured. No items can be placed on the Terrace parapet wall and/or railing. In no event shall any Hotel Suite Unit Owner be permitted to enclose any Terrace (except to the extent that such Terrace was enclosed by Sponsor) or erect any structure on any Terrace. No portion of any Terrace may be painted, cemented or changed in any fashion from its original appearance. No carpeting may be placed on any Terrace. Lighting fixtures may only be plugged into regulation sockets. No satellite dishes may be placed on any Terrace. No animals, which include but are not limited to dogs, cats, birds, are allowed on any Terrace.

27. There will be no barbecuing in the Units or in the Common Elements (including, without limitation, the Hotel Suite Limited Common Elements).

# EXHIBIT "B-4"

# RESTRICTIVE DECLARATION

DECLARATION, made as of the 26th day of April, 2007, by BAYROCK/SAPIR ORGANIZATION, LLC, a limited liability company organized under the laws of the State of Delaware with offices at 725 Fifth Avenue, New York, New York 10022 (the "Declarant").

WHEREAS, the Declarant is the fee owner of certain land located in the City and State of New York, Borough of Manhattan, designated as Block 491, [Tentative] Lot 36 on the Tax Map of the City of New York, hereinafter referred to as Parcel A, more particularly described by a metes and bounds description set forth in Schedule A annexed hereto and by this reference made a part hereof;

WHEREAS, the Declarant has requested the New York City Department of Buildings (the "DOB") to act upon Application No. 104403334 ("Application") to authorize construction of a new transient hotel ("New Building") on Parcel A; and

WHEREAS, the Declarant intends to file an application for a tax lot subdivision in respect of Tax Lot 36 in connection with the establishment of the Condominium (as hereinafter defined); and

WHEREAS, DOB and Declarant have agreed (a) that Declarant will execute, acknowledge and record this Declaration prior to approving the Application and issuing a permit pursuant thereto for the construction of the entire New Building and (b) that the cross-reference number and title of this Declaration as so recorded shall be noted on each temporary and permanent certificate of occupancy thereafter issued to the New Building.

NOW, THEREFORE, in connection with the approval by DOB of the Application and the issuance of a permit pursuant thereto, Declarant does hereby declare, create, impose and establish the following:

1.  Definitions

    1.01    "Board" shall mean the Board of Managers of the Condominium.

    1.02    "City" shall mean the City of New York.

    1.03    "Condominium" shall mean the condominium regime for Parcel A to be established pursuant to the Declaration of Condominium to be recorded in the Office of the New York City Register, New York County. The Condominium shall be deemed to act through the Board.

    1.04    "Management Company" shall mean the company retained to manage the operation of the New Building as a transient hotel with responsibility for, among other things, marketing, making available for occupancy, and maintenance and repair of the transient hotel units in the New Building.

1.05    "Occupancy Restrictions" shall be the limitations on the occupancy of a unit in the New Building set forth in paragraph (a) of Section 2.02 of this Declaration. Any one of the Occupancy Restrictions may be referred to as an "Occupancy Restriction".

1.06    "Rack Rate" shall mean the average undiscounted daily rate established and maintained by the Management Company for all Units of comparable size that are being offered for occupancy by the Management Company.

1.07    "Unit" shall mean a condominium unit to be located in the Condominium.

1.08    "Unit Owner" means the record owner of a Unit from time to time and shall include, if the record owner is a natural individual, such individual and such individual's parent(s), spouse and unemancipated children.

2.    Construction and Operation of the New Building

2.01    The New Building shall be constructed in accordance with drawings and specifications therefor approved by DOB as a part of its approval of the Application, as such drawings may, following such approval, be amended in a manner not prohibited by this Declaration and approved by DOB, and thereafter used, maintained, altered or reconstructed in a manner not prohibited by this Declaration. Without limiting the generality of the foregoing:

(a)    The New Building shall be constructed in compliance with, and it shall be used only in conformity with, all laws, rules and regulations governing, as applicable, the construction and/or use of a transient hotel, as such term is defined in the Zoning Resolution of the City of New York ("Zoning Resolution"), a Class B Multiple Dwelling, as such term is defined in the New York State Multiple Dwelling Law ("MDL"), and a building classified within Occupancy Group J-1 under the New York City Building Code ("Code"), as such use shall be further defined, delineated and restricted in this Declaration.

(b)    The plans and specifications for the New Building (i) shall include, and the New Building shall contain upon completion and thereafter, (A) no less than 40,000 square feet of space that is used for one or more uses (other than guest rooms or suites) that are accessory to a transient hotel use, including food and beverage, conference, spa, gym, retail, back of house or other function facilities and (B) a Class J Fire Safety System and (ii) shall not include, and the New Building shall not contain upon completion or thereafter, a central chute for rubbish or individual mailboxes for each Unit, and no standard guestroom shall have a stove, oven or fixed rangetop, a dishwasher or a washer/dryer. The New Building may contain no more than six (6) non-standard guestrooms or suites, which guestrooms or suites may contain a stove or fixed rangetop and a dishwasher.

2.02.    (a)    No Unit may be occupied by its Unit Owner or by any other individual: (i) for a continuous period of more than 29 days in any 36 day period; or (ii) for a total of more than 120 days in any calendar year.

(b)    At all times during which a Unit is not occupied by its Unit Owner, it shall be made available on a daily or weekly basis to non-Unit Owners pursuant to a rental program operated either (i) by or on behalf of the Management Company or (ii) through no more than five

KL3 2558628.20

(5) (or such greater number as shall be mandated by applicable determination of the Securities and Exchange Commission) rental agents approved (which approval shall not be unreasonably withheld) by the Board, at occupancy rates comparable to those at similar hotels in New York City.

(c)     All Units shall be similarly furnished and decorated. The Condominium Documents shall prohibit each Unit Owner from decorating its Unit with any personal furnishings and/or decorations. All decisions as to the furnishing and decoration of individual Units shall be made by the Declarant prior to the date on which the Condominium is established for the Subject Premises and by the Condominium thereafter, and no Unit Owner shall have any discretion as to the furnishing of the individual Unit(s) it owns.

(d)     Each Unit Owner shall be required to give the Management Company no less than five (5) days notice of its intent to occupy its Unit in such form as is acceptable to the Management Company in order to guaranty its usage of the Unit it owns. Each Unit Owner, and any other individual who occupies a Unit, shall be required to check in at the front desk at the start of each stay in the Unit and check out at the front desk at the end of each such stay.

(e)     Each day that occupancy in a Unit exceeds the restrictions set forth in paragraph (a) of this Secton 2.02 shall be a separate exceedence which constitutes a violation of the provisions of this Declaration.

2.03    (a)     The lobby shall have a front desk staffed for 24-hours each day, which front desk shall be operated such that an occupant of a Unit is checked in at the front desk upon the commencement of his or her occupancy and is checked out at the front desk upon the termination of such occupancy. The Management Company shall manage the front desk so as to ensure that no non-Unit Owner may occupy a Unit other than through a rental program pursuant to paragraph (b) of Section 2.02 and shall establish a record-keeping procedure for such purpose.

(b)     Daily maid and linen service shall be provided to each Unit when the Unit is occupied.

(c)     From and after issuance of the first temporary or permanent certificate of occupancy that permits actual occupancy of the New Building, the Declarant or Condominium, as the case may be, shall retain a Management Company to manage the operation of the New Building. Declarant or the Condominium, as the case may be, shall at the time of application for such certificate of occupancy give notice to DOB of the name and address of the Management Company, and it shall thereafter give notice to DOB of any replacement Management Company, together with the name and address thereof. Notwithstanding the foregoing, for the purposes of any enforcement proceedings and liability under Section 5.02 of this Declaration, the Condominium may not delegate responsibility and liability for, and shall remain responsible and liable to the City for, the performance of all of the contractual obligations of the Management Company listed in Section 4 of this Declaration.

(d)     The Management Company shall utilize a software program to control, monitor and track each Unit's occupancy every day and provide information as to the occupancy of each Unit. Such software shall have the capacity to identify automatically the imminent and

actual occurrence of any exceedence of an Occupancy Restriction, including any imminent or actual exceedence resulting from successive periods of occupancy by any combination of a natural person who is a Unit Owner and such person's parents, spouse and unemancipated children.

2.04    No later than March 31 of each calendar year, the Condominium shall file with DOB a report prepared by the Management Company in form and substance substantially similar to the form attached as Exhibit A ("Unit Occupancy Report"), together with a certification by an independent certified public accountant that it has conducted such reviews of the records of the Condominium and the Management Company relating to the occupancy of Units as it deems appropriate and that it has found that the Unit Occupancy Report accurately reflects the records it has reviewed. If a Unit Occupancy Report shows an exceedence of an Occupancy Restriction by a Unit Owner, the Unit Owner's name shall be provided in such report.

2.05    All records maintained by the Condominium and/or the Management Company reflecting the Rack Rate and the occupancy of each Unit, including but not limited to reports by the Condominium and/or the Management Company relating to the occupancy of each Unit, statements of each Unit Owner as to the use of its Unit(s), all records utilized or relied upon in the preparation of such reports, and any other records relating to the occupancy of Units in the New Building (collectively, the "Occupancy Records"), shall be retained for a period of no less than three (3) years. During such period, the Management Company or the Condominium, as the case may be, shall, within ten (10) business days of request therefor by DOB or the City, make the Occupancy Records available to DOB or to another agency of the City designated by DOB at the offices of the Condominium or another location reasonably acceptable to the Condominium and DOB: (i), on no more than one (1) occasion in any calendar year for the purpose of verifying compliance with the provisions of this Declaration by an audit of such records or otherwise; (ii), at any time that there is a complaint filed with DOB or the City alleging an exceedence of an Occupancy Restriction in one or more Units; and (iii), at any time that DOB or the City believes that there may have been an exceedence of the Occupancy Restrictions by one or more Unit(s). The Management Company or the Condominium, as the case may be, shall furnish DOB or the City with copies of such records as DOB or the City shall request in connection with DOB's or the City's review for compliance with this Declaration or prosecution of an administrative or judicial enforcement action against this Board and/or each Unit Owner owning a Unit.

2.06    (a)    Any non-Unit Owner who occupies a particular Unit for more than twenty-seven (27) consecutive days will be given notice by the Management Company prior to the twenty-ninth (29th) consecutive day of its occupancy confirming that such non-Unit Owner must vacate the Unit on said twenty-ninth (29th) day and that penalties are required to be imposed if such non-Unit Owner occupies the Unit in excess of twenty-nine (29) consecutive days. In addition, any non-Unit Owner who occupies a particular Unit for more than one hundred fifteen (115) days in any calendar year will be given notice by the Management Company prior to the one hundred twentieth (120th) day of its occupancy in such calendar year confirming that such non-Unit Owner must vacate the Unit on said one hundred twentieth (120th) day and that penalties are required to be imposed if such non-Unit Owner occupies the Unit in excess of one hundred twenty (120) days in any calendar year.

(b)    If there is an exceedence of an Occupancy Restriction by a non-Unit Owner: (i) the Unit Owner and the then-occupant of the Unit in which such exceedence occurred shall be given written notice of such exceedence by the Management Company; (ii) such non-Unit Owner shall be charged for its occupancy of the Unit an amount equal to two times the Rack Rate for occupancy of the Unit for each day on which such exceedence occurs and shall be responsible for payment of such charge prior to checking out of the hotel; and (iii) such non-Unit Owner shall be solely responsible for the payment of all of its costs and expenses in any administrative or judicial proceeding arising out of such exceedence. The notice referred to in clause (i) of this paragraph (b) shall, if possible using commercially reasonable methods, be delivered to the then occupied Unit on the first day of such exceedence, and it shall in no event be sent to the then-occupant of the Unit no more than three (3) calendar days after the start of an exceedence and to the Unit Owner of the Unit no more than three (3) business days after the start of an exceedence.

(c)    To the extent permitted by applicable law, the Unit Owner of a Unit in which an exceedence by a non-Unit Owner occurred shall not be responsible or liable to the City for any charges, costs or expenses arising out of or by reason of such exceedence. Each particular individual employee, member, agent or invitee of a corporation, a partnership, a limited liability company or partnership, and/or an association (any one of which is referred to as an "Entity") that is a Unit Owner shall be treated as a separate non-Unit Owner for the purposes of paragraph (a) of Section 2.02 and this Section 2.06; provided, that the Entity that owns the Unit shall be solely responsible for all occupancy charges assessed by, and any other costs and expenses incurred by, the Condominium in the same manner and to the same extent as is an individual Unit Owner pursuant to paragraph (b) of Section 2.07 of this Declaration.

2.07    (a)    Any Unit Owner who is in occupancy of its Unit for more than twenty-seven (27) consecutive days will be given notice by the Management Company prior to the twenty-ninth (29th) consecutive day of occupancy confirming that such Unit Owner must vacate the Unit on said twenty-ninth (29th) day, and that penalties will apply if such Unit Owner occupies the Unit in excess of twenty-nine (29) consecutive days. In addition, any Unit Owner who occupies its Unit for more than one hundred fifteen (115) days in any calendar year will be given notice by the Management Company prior to the one hundred twentieth (120th) day of its occupancy in such calendar year confirming that such Unit Owner must vacate the Unit on said one hundred twentieth (120th) day and that penalties will apply if such Unit Owner occupies the Unit in excess of one hundred twenty (120) days in any calendar year.

(b)    If there is an exceedence of an Occupancy Restriction by the Unit Owner: (i) such Unit Owner shall be given notice of such exceedence by the Management Company; (ii) such Unit Owner shall be charged by the Condominium on its statement of common charges rendered during the month immediately following the exceedence an amount equal to two times the Rack Rate for occupancy of the Unit for each day on which such exceedence occurs; (iii) such Unit Owner shall be solely responsible for the payment of all of its costs and expenses in any administrative or judicial proceeding arising out of such exceedence; and (iv) such Unit Owner shall indemnify and hold the Condominium, the Management Company and the Declarant harmless from and against any costs, expenses, damages, claim or liabilities, including reasonable professional fees, incurred by any of them in connection with or arising out of such exceedence. The notice referred to in clause (i) of this paragraph (b) shall, if possible using

commercially reasonable methods, be delivered to the then occupied Unit on the first day of such exceedence, and it shall in no event be sent to the Unit Owner occupying such Unit no more than three (3) calendar days after the start of an exceedence.

(c)     All sums due from a Unit Owner pursuant to this Section 2.07 shall be treated as an additional common charge and shall be payable upon demand therefor, and, if these sums are not paid when due, the Condominium shall have the right to collect them using any and all remedies available against a Unit Owner for the collection of unpaid common charges. The Condominium shall have a lien on the Unit as security for payment of all such sums and will have the right to instruct Management Company to deduct such sums from the proceeds of any rental of the Unit. Any Entity that owns a Unit in which there is an exceedence of an Occupancy Restriction by an individual employee, member, agent or invitee shall be responsible for the payment of all of the charges, costs, expenses and indemnities of an individual Unit Owner pursuant to paragraph (b) of this Section 2.07, and all sums due from such Entity Unit Owner shall be treated as an additional common charge and be collectable in any manner permitted pursuant to said paragraph (b).

2.08.   Any exceedence of an Occupancy Restriction by a Unit Owner or a non-Unit Owner shall be a violation of Section 27-217 of the New York City Administrative Code or its successor provision of law. The charge and collection of an amount equal to two times the Rack Rate for occupancy of the Unit for each day on which such exceedence occur as set forth in paragraph (b) of Section 2.07 (in the case of a non-Unit Owner) and paragraph (b) of Section 2.06 (in the case of a Unit Owner) shall be an admission of such violation for which the Condominium waives any right to a hearing; and one-half of such charge shall constitute a penalty therefor immediately payable to the City by check payable to the City of New York and sent, together with a letter setting forth the Rack Rate in effect on the date(s) on which there was an exceedence of an Occupancy Restriction for each Unit in which the exceedence occurred, to the attention of the General Counsel of DOB at its address set forth in Section 4.07 or as otherwise directed by DOB.

2.09   The Condominium Documents shall:

(a)     Authorize the Condominium, without limitation to take any actions permitted or required to be taken by the Condominium in order to comply with and enforce the provisions of this Declaration against any non-complying Unit Owner or non-Unit Owner.

(b)     Require each Unit Owner to file with the Condominium prior to February 28 of each calendar year a sworn statement on the form substantially similar to the form attached as Exhibit B setting forth the usage of each Unit it owns during the preceding calendar year. The statement shall provide information as to the number of days that the Unit was occupied, the number of days and the dates it was occupied by its Unit Owner, and the number of days it was occupied by its Unit Owner or by any other individual that were in excess of any of the Occupancy Restrictions. If the Unit Owner relies on the records of the Management Company in preparing such statement, it shall attach to such statement a true copy of all records provided by the Management Company upon which it has relied. Exceedences of an Occupancy Restriction by the Unit Owner (but not by any other individual) noted in the statement shall be deemed an admission of a default in the performance of the Unit Owner's obligations under paragraph (a) of

Section 2.02 and, to the extent a common charge has not been previously charged and collected pursuant to Section 2.07 with respect thereto, shall be subject to the procedures of said Section 2.07 and Section 2.08 of this Declaration.

2.10    This Declaration shall be attached to, and its terms, provisions, covenants, obligations, restrictions, and agreements shall be incorporated by reference into, the Condominium Documents.

3.    <u>The Management Company</u>

3.01    The contract between the Condominium and the Management Company shall include provisions to the following effect:

(a)    The Management Company shall give the Unit Owner and then-occupant of any Unit which has been occupied by either the Unit Owner or the same non-Unit Owner, as the case may be, for no less than twenty-seven (27) consecutive days notice prior to the twenty-ninth (29th) consecutive day of occupancy confirming that the occupant must vacate the Unit on said twenty-ninth (29th) day and that penalties are required to be imposed if such occupant occupies the Unit in excess of twenty-nine (29) consecutive days.  In addition, the Management Company shall give the Unit Owner and then-occupant of any Unit which has been occupied by the Unit Owner or the same non-Unit Owner, as the case may be, for more than one hundred fifteen (115) days in any calendar year notice prior to the one hundred twentieth (120th) day of occupancy in such calendar year confirming that the occupant must vacate the Unit on said one hundred twentieth (120th) day and that penalties are required to apply if such occupant occupies the Unit in excess of one hundred twenty (120) days in any calendar year.  The Management Company shall also give the Unit Owner of any Unit in which there is an exceedence of an Occupancy Restriction and any non-Unit Owner then occupying such Unit notice of such exceedence.  Such notice shall, if possible using commercially reasonable methods, be delivered to the then occupied Unit on the first day of such exceedence, and it shall in no event be sent to the then-occupant of the Unit no more than three (3) calendar days after the start of an exceedence and to the Unit Owner of the then-occupied Unit no more than three (3) business days after the start of an exceedence.

(b)    Prior to January 31 of each calendar year, the Management Company shall provide each Unit Owner with a report showing, for each night of the preceding calendar year: (i) whether the Unit was occupied and, (ii) if so, (A) whether the Unit was occupied by the Unit Owner or by a non-Unit Owner and (B) whether any such occupancy exceeded an Occupancy Restriction.

(c)    The Management Company shall prepare and deliver to the Condominium prior to January 31 of each calendar year:  (i) a report showing, for the prior calendar year, each exceedence of an Occupancy Restriction, the Unit in which such exceedence had occurred, and whether the Unit was at the time of the exceedence occupied by the Unit Owner or a non-Unit Owner; and (ii) a report showing the occupancy of each Unit for the prior calendar year.  Neither report shall provide any information (other than the Unit number and the Block and Lot number) that could be used to identify the Unit Owner.

3.02    The terms, provisions, covenants, obligations, restrictions, and agreements incorporated into the agreement with the Management Company pursuant to this Article 3 may not be amended, modified, cancelled or terminated without the consent of DOB

4.    <u>Miscellaneous</u>

4.01    This Declaration shall be governed by the laws of the State of New York.

4.02    (a)    Declarant acknowledges that the City is an interested party to this Declaration and consents to its enforcement solely by the City, administratively or at law or at equity, of the terms, provisions, covenants, obligations, restrictions and agreements set forth herein. Any such enforcement proceeding may be brought, at the election of the City, against the defaulting Unit Owner, the Condominium, the Board and any other responsible party against which such an action or proceeding is authorized by the New York City Administrative Code or other applicable law. Failure to comply with the terms of this Declaration may result in DOB or the City initiating such enforcement proceedings or actions as are permitted by applicable law.

(b)    Subject to the provisions of Section 4.04 of this Declaration, if Declarant or any of its heirs, successors and assigns are found by a court of competent jurisdiction to have been in default in the performance of its obligations under this Declaration, and such finding is upheld on a final appeal by a court of competent jurisdiction or by other proceedings or the time for further review of such finding or appeal has lapsed, Declarant or such heir, successor or assign shall indemnify and hold harmless the City from and against all reasonable legal and administrative expenses arising out of or in connection with the enforcement of Declarant's obligations under this Declaration.

(c)    Declarant acknowledges that, notwithstanding any other provision of this Declaration, nothing in this Declaration precludes DOB or the City from prosecuting an action or proceeding to enforce this Declaration under any law, rule or regulation giving DOB or the City authority to bring such an action or proceeding.

4.03    The terms, provisions, covenants, obligations, restrictions and agreements of this Declaration shall not be modified, amended, cancelled or terminated without the prior written consent of the DOB. However, no other public or private consent or approval shall be required for any such modification, amendment, cancellation or termination.

4.04    (a)    The terms, provisions, covenants, obligations, restrictions and agreements of this Declaration shall inure to the benefit of and be binding upon the heirs, successors and assigns of the Declarant, including without limitation the Condominium and each Unit Owner in the New Building, and references to the Declarant shall be deemed to include such heirs, successors and assigns as well as successors to their respective interests in Parcel A. However, from and after the creation of the Condominium for the ownership of Parcel A, the Declarant, or any of its heirs, successors and assigns shall be bound by and obligated to perform the terms, provisions, covenants, obligations, restrictions and agreements herein only insofar as such the terms, provisions, covenants, obligations, restrictions and agreements are attached to the interest (other than an undivided interest held in common with all Unit Owners and other owners of interests in the condominium) in the Unit(s) it holds and only for the period during which it holds

such an interest. Neither Declarant, nor any heir, successor or assign shall be responsible for the performance of, or shall be liable to any other public or private party for any breach in the performance of, the terms, provisions, covenants, obligations, restrictions and agreements herein that occurs after its disposition of such an interest; provided, however, that the foregoing shall not prevent the City from commencing and prosecuting an action against Declarant, or any of its heirs, successors or assigns, based on a breach in the performance of this Declaration occurring during the time that Declarant, or such heir, successor or assign, held such interest in Parcel A even if the action is commenced after the disposition of such interest. The foregoing shall not act to limit any obligation of a Unit Owner to the Condominium or otherwise under the Condominium Documents. References in this Declaration to agencies or instrumentalities of the City shall be deemed to include agencies or instrumentalities succeeding to the jurisdiction thereof.

(b) The City and any other party relying on this Declaration will look solely to the fee estate interest of the Declarant in Parcel A, including any interest that Declarant may hold as a Unit Owner, for the collection of any money judgment recovered against Declarant, and no other property of the Declarant shall be subject to levy, execution, or other enforcement procedure for the satisfaction of the remedies of the City or any other person or entity with respect to this Declaration. The limitation on Declarant's liability for the collection of any money judgment in this paragraph (b) shall only apply so long as Declarant holds an interest in Parcel A, including any interest it may hold as a Unit Owner in the Condominium.

4.05    Wherever in this Declaration, the consent, approval, notice or other action of Declarant, DOB or the City is required or permitted, such certification, consent, approval, notice or other action shall not be unreasonably withheld or delayed.

4.06    In the event that any provision of this Declaration is deemed, decreed, adjudged or determined to be invalid or unlawful by a court of competent jurisdiction, such provision shall be severable and the remainder of this Declaration shall continue to be in full force and effect.

4.07    All notices, demands, requests, consents, approvals and other communications which may be or are required to be given hereunder shall be in writing and shall be sent: (a) if intended for the Declarant, by mailing or delivery to the Declarant at its address set forth at the beginning of this Declaration, Attention: Bayrock Group Legal Department, with copies to Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attention: Paul D. Selver, Esq., and The Sapir Organization, 384 Fifth Avenue, New York, New York 10018, Attention: Legal Department; (b) if intended for the Condominium, then (i) if prior to the establishment of the Condominium regime for the Subject property, to Trump-SoHo Condominium, c/o Bayrock/Sapir Organization, 725 Fifth Avenue, new York, New York 10022, Attention: Bayrock Group Legal Department and (ii) if after the establishment of such regime, Board of Managers, Trump SoHo Condominium, 246 Spring Street, New York, New York 10013; and (c) if intended for the DOB, by mailing or delivery two notices to the DOB at 280 Broadway, New York, New York 10007 – one to the attention of the General Counsel and the other to the attention of the Manhattan Borough Commissioner. The Declarant, the Condominium and the DOB, by notice given as provided herein, may change any address for the purposes of this Declaration. Each notice, demand, request, consent, approval or other communication shall be either (i) sent by regular or registered or certified mail, postage prepaid,

or (ii) delivered by hand, and shall be deemed sufficiently given for all purposes hereunder five (5) business days after it shall be mailed, or, if delivered by hand, when actually received.

4.08   This Declaration shall be recorded at the Office of the City Register for New York County and indexed against Parcel A and each Unit created thereon, and the cross-reference number and title of this Declaration shall be recorded on each temporary and permanent certificate of occupancy hereafter issued to the New Building.

4.09   Declarant shall include a true copy of this Declaration or a summary of the material terms thereof within any Offering Plan or Prospectus for the sale of Units in the New Building and shall make the terms of such Offering Plan or Prospectus consistent with the terms hereof.

4.10   (a)   In the event that DOB or the City determines, on the basis of information in the reports filed with either of them or the records that the Condominium and/or the Management Company are required to make available to them pursuant to this Declaration, (i) that in a calendar year there are 60 days of exceedences consisting of five (5) or more consecutive days in one or any combination of Units or 120 days of exceedences in one or any combination of Units or (ii) if DOB or the City has a reasonable basis to believe that information provided to DOB or the City by the Board, Management Company, Declarant, or Condominium as required by this Declaration is false or fraudulent, DOB or the City may, in its discretion, give notice to the Condominium directing the Condominium, at its sole expense, to retain an Independent Private Sector Inspector General a.k.a. Compliance Monitor("IPSIG"), to be selected from a list of three to be provided by the City with such notice. Such notice shall state the basis on which the City is requiring the retention of the IPSIG. Within thirty (30) days of the Condominium's receipt of such notice and the list of IPSIGs, the Condominium shall retain an IPSIG from such list. Each day that each Unit exceeds an Occupancy Restriction is an instance of an exceedence. The DOB or the City may issue a violation when an Occupancy Restriction is exceeded.

(b)   The Condominium shall pay directly to the IPSIG all fees and expenses of the IPSIG in connection with the IPSIG's performance of the needed duties, functions and responsibilities; provided that the form of billing shall be subject to the prior approval of DOB and/or the City.

(c)   The Condominium acknowledges that the duties, functions and responsibilities of the IPSIG may, at the discretion of DOB or the City, include a full audit and investigation of the extent to which the Unit Owners, the Condominium and the Management Company have complied with the terms of this Declaration, including the Occupancy Restrictions, during the preceding three (3) years and such other duties and functions related to compliance with the terms of this Declaration as directed by DOB or the City, including but not limited to:

(i)   Review and report on the accuracy and integrity of the software program, internal control practices, and operations used to track, record, and monitor compliance of the Occupancy Restrictions by each Unit;

527

(ii)     Review and report on the accuracy of all records and reports of the Declarant, Condominium, Board, Management Company and Unit Owner prepared or maintained in connection with this Declaration, including those relating to the Occupancy Restrictions; and

(iii)     File a report with the City through DOB that: sets forth its findings and conclusions regarding the extent and nature of the problems with the software program, if any, or internal control practices, or any other aspect of the operation; makes recommendations for corrective action, if appropriate; and, in the event of a finding that the Condominium's practices and operations reflect a systemic disregard for compliance with this Declaration, including without limitation the Occupancy Restrictions, makes recommendations for enforcement action by the City. Corrective action may include but not be limited to commencement by the Condominium of appropriate enforcement action against a Unit Owner which, by reason of its occupancy of a Unit, has caused an exceedence of an Occupancy Restriction and the replacement of one or more employees of the Condominium or the Management Company involved in those aspects of the Condominium's operations that are subject to the provisions of this Declaration.

(d)     The Condominium shall cooperate fully with the IPSIG in the review and audit of records and the preparation of the IPSIG's reports as set forth above.

(e)     The Condominium shall retain the IPSIG for such period of time as is reasonably determined by the City to be needed to complete its reports and recommendations as set forth above.

(f)     The Condominium shall implement all recommendations for corrective action set forth in the IPSIG's report which are concurred in by DOB or the City, unless the Condominium demonstrates to the satisfaction of the DOB or the City in consultation with the IPSIG either that a specific recommendation is not reasonably feasible or that implementation of any specific recommendation would unduly interfere with the operations of the hotel. In such case, the Condominium shall propose and, if reasonably acceptable to DOB or the City, implement an alternative course of action acceptable to the DOB or the City for achieving the same result. Failure to implement corrective action as required by DOB or the City shall constitute a violation of this Declaration which may be enforced under the terms hereof.

(g)     The Condominium shall grant the IPSIG the right to examine all books, records, files, accounts, computer records, documents and correspondence, including electronically-stored information, that relate to compliance with the provisions of this Declaration, including the Occupancy Restrictions, that are in the possession or control of the Condominium, and make available to the IPSIG employees of the Condominium and the Management Company.

(h)     The Condominium shall provide the IPSIG reasonable access to, and use of, appropriate, private and secure work space, and reasonable access to adequate photocopying and communications equipment at its offices and work spaces.

KL3 2558628.20

(i)    The Condominium hereby authorizes the IPSIG to make periodic verbal and/or written reports to DOB and/or City regarding the IPSIG's activities and/or the Condominium's activities and its compliance with the terms of this Declaration; provided that the IPSIG shall deliver its final report to the Condominium contemporaneously with delivery thereof to DOB or the City.

4.11    Notwithstanding the provisions of Section 4.03 of this Declaration, the terms, provisions, covenants, obligations, restrictions and agreements in this Declaration shall be modified to the extent permitted by the Zoning Resolution on the effective date of any amendment to the Zoning Resolution that permits residential as well as or in place of commercial and manufacturing uses on Parcel A; provided, however, that any actual change in use of the New Building permitted pursuant to this Section 4.10 shall comply with all applicable laws, rules and regulations.

4.12    In the event that no Units (other than the Unit containing retail and banquet areas) are sold by the Declarant, this Declaration shall be of no force or effect.

**BALANCE OF PAGE INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE FOLLOWS**

KLJ 2558628.20

IN WITNESS WHEREOF, Declarant has made and executed the foregoing Declaration as of the date hereinabove written.

BAYROCK/SAPIR ORGANIZATION, LLC

By: Julius Schwarz, Authorized Signatory

ICL3 2598828.17
ICL3 2508794.1

530

STATE OF NEW YORK    )

                     ) ss.:

COUNTY OF NEW YORK  )

On the _30th_ day of _April_ _____, in the year 2007, before me, the undersigned, personally appeared _Helen Edwar_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_Diane Shamayev_

Notary Public

Diane Shamayev
Notary Public, State of New York
No. 01SH6032932
Qualified in Kings County
Commission Expires 04/18/2010

KL3 2550620.17
KL3 2599794.1

## SCHEDULE A

Metes and Bounds of Parcel A (consisting of Parcel 1 and Parcel 2)

## PARCEL 1 (Block 491, Lot 36):

ALL that certain plot, piece or parcel of land, situate, lying and being in the borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Spring Street with the easterly side of Varick Street, as widened and as legally opened;

RUNNING THENCE easterly along the southerly side of Spring Street, 140 feet 5-3/8 inches;

THENCE southerly on a line forming an interior angle of 89 degrees 37 minutes 40 seconds with the last mentioned course, 54 feet 1 inch to a point;

THENCE southerly on a line forming an interior angle of 180 degrees 12 minutes 40 seconds with the last mentioned course 45 feet 11-1/2 inches;

THENCE easterly on a line forming an exterior angle of 89 degree 51 minutes 20 seconds with the last mentioned course, 0 feet 7-1/2 inches;

THENCE southerly on a line forming an interior angle of 89 degrees 54 minutes 00 second with the last mentioned course, 74 feet 11-1/2 inches to the northerly side of Dominick Street;

THENCE westerly along the northerly side of Dominick Street 142 feet 4-1/4 inches to the corner formed by the intersection of the northerly side of Dominick Street with the easterly side of Varick Street as widened and as legally opened;

THENCE northerly along the easterly side of Varick Street as widened and as legally opened 96 feet 0 inches to a point.

THENCE easterly parallel with the southerly side of Spring Street, 15 feet 2-1/4 inches;

THENCE northerly 21 feet 0 inches to a point distant 58 feet 0 inches southerly from the southerly side of Spring Street, which point is 15 feet 3-1/4 inches easterly from the easterly side of Varick Street as widened and a legally opened;

THENCE westerly parallel with the southerly side of spring Street 15 feed 3-1/4 inches to the easterly side of Varick Street as widened and as legally opened;

THENCE northerly along the easterly side of Varick Street as widened and as legally opened 58 feet 0 inches to the corner formed by the intersection of the southerly side of

Spring Street with the easterly side of Varick Street as widened and as legally opened, the point or place of BEGINNING.

## PARCEL 2 (Block 491, Lot 34)

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Varick Street, as legally opened, distant 58 feet southerly from the southeasterly corner of Spring Street and Varick Street;

RUNNING THENCE southerly along the easterly side of Varick Street, as legally opened, 21 feet;

THENCE easterly parallel with the southerly side of Spring Street, 15 feet 2-1/2 inches;

THENCE northerly along a line parallel with the old east side of Varick Street, 21 feet;

THENCE westerly parallel with the southerly side of spring Street, 15 feet 3-1/4 inches to the easterly side of Varick Street, as legally opened, the point or place of BEGINNING.

Form of Annual Condominium Filing

## UNIT OCCUPANCY REPORT FOR CALENDAR YEAR _____

| Unit # And Block & Lot | Total Days Occupied | Total Days Occupied by Unit Owner | Total Number of Days Occupied by Unit Owner in Excess of 29 Consecutive Days | Total Number of Days Occupied by Non-Unit Owner in Excess of 29 Consecutive Days | Total Number of Exceedences Consisting of 5 or More Consecutive Days | Total Number of Days Occupied by a Unit Owner in Excess of 120 Day... | Total Number of Days Occupied by a Non-Unit Owner in Excess of 120 Days |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
| TOTAL | ... | ... |  |  |  |  |  |

A Unit Owner will be identified by name where his or her occupancy of a Unit (or, in the case of an Entity, occupancy of a Unit by any employee, member, agent or invitee) has exceeded an Occupancy Restriction. In all other cases, Unit numbers may be coded so as to reduce the chance that they might be connected to owners.

Permitted Occupancies are in ordinary type
Each exceedence is in bold face type

Where a Unit is owned by an Entity, any particular individual employee, member, agent or invitee of the Entity shall be treated as an individual non-Unit Owner.

KL3 2338628 20

**EXHIBIT B**

Form of Annual Unit Owner Filing

## UNIT OWNER OCCUPANCY REPORT FOR CALENDAR YEAR _____
### UNIT NO. _____ - BLOCK ____, LOT ____ (MANHATTAN)

STATE OF _____ )
                         ) ss.:
COUNTY OF _____ )

_____, hereby states that (a) he is the owner of Unit ___ in the _____ Condominium at 246 Spring Street, New York, New York and (b) that the information set forth below as to the occupancy of said Unit during the ____ calendar year (i) is, based on my personal knowledge, true and correct insofar as it relates to the occupancy of the Unit by the Unit Owner (as defined in the _____) and (ii) correctly reflects the information set forth on the attached report of _____ as to occupancy of the Unit by third parties.

| | Dates Occupied During each Stay by Unit Owner | Number of Consecutive Days in each Stay by Unit Owner | Dates Occupied During each Stay by Non-Unit Owner | Number of Consecutive Days in each Stay by Non-Unit Owner |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| **Number of Days Occupied by Unit Owner** | --- | | --- | -- |

Identify each instance in which an individual non-Unit Owner occupied the Unit for more than 120 days in such calendar year and the number of days in excess of 120 days that such individual was in occupancy in such calendar year.

_____

_____
        [OWNER]

[ACKNOWLEDGEMENT]

Where a Unit is owned by an Entity, any particular individual employee, member, agent or invitee of the Entity shall be treated as an individual non-Unit Owner.