UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____ x

PALMER GARDENS, LLC, RACHEL GERSTEIN,
JOYCE GERSTEIN, HERBERT GERSTEIN, ALAN
MALTZ, JANET MALTZ, HUBERT TSAI,
CHRISTINE SINGH, XUE FENG, RANDALL A.
MECKEL, HENRY GROSS, BEAVER METAL, LLC,
ACACIO RODRIGUEZ, CREDIBOX UNIVERSAL,
SL, FELISA HERNANDEZ, MICHAEL HADJEDJ,
OLIVER DACOURT, ANH NGOC TRUONG and
SEAN TRAN,

Case No.:   10 Civ. 5830 (KMW)

Plaintiffs,

- against -

BAYROCK/SAPIR ORGANIZATION LLC, DONALD
J. TRUMP, ALEX SAPIR, TEVFIK ARIF, 246
SPRING STREET HOLDINGS II, LLC,
BAYROCK/SAPIR REALTY LLC, BAYROCK
SPRING STREET, LLC, BAYROCK GROUP, LLC,
JULIUS SCHWARZ, TRUMP INTERNATIONAL
HOTELS MANAGEMENT LLC, TRUMP MARKS
SOHO LLC, DONALD TRUMP JR., IVANKA
TRUMP, ERIC TRUMP, PRODIGY
INTERNATIONAL NYC, LLC, RODRIGO NINO,
CORE GROUP MARKETING LLC, SHAUN OSHER,
THOMAS POSTILIO and AKERMAN SENTERFITT
LLP, as ESCROW AGENT,

Defendants.
_____ x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

KURZMAN EISENBERG CORBIN & LEVER, LLP
One North Broadway, Suite 1004
White Plains, NY 10601
Tel No.:  (914) 285-9800

*Attorneys for Defendants*,
Bayrock/Sapir Organization LLC, Donald J. Trump,
Alex Sapir, Tevfik Arif, 246 Spring Street Holdings II,
LLC, Bayrock/Sapir Realty LLC, Bayrock Spring
Street, LLC, Bayrock Group, LLC, Julius Schwarz,
Trump International Hotels Management LLC, Trump
Marks SoHo LLC, Donald Trump Jr., Ivanka Trump,
Eric Trump, Prodigy International NYC, LLC, and
Rodrigo Nino, and co-counsel for CORE Group
Marketing LLC, Shaun Osher and Thomas Postilio

## Table of Contents

Table of Authorities ................................................................................................................. iii

Preliminary Statement .............................................................................................................1

The Allegations of the Complaint ..........................................................................................1

POINT I

    THE COMPLAINT FAILS TO ALLEGE ANY CLAIMS UNDER THE FEDERAL
    SECURITIES LAWS ...........................................................................................................3

        A.  The Agreements Are Not Securities................................................................................4

        B.  The Contractual Disclaimer Provisions Preclude a Finding of Either Reliance or
        Materiality.........................................................................................................................7

        C.  The Complaint Fails to Allege Loss Causation .........................................................13

        D.  The Complaint Fails to Adequately Allege Scienter.................................................15

POINT II

    DISMISSAL OF THE ILSA CLAIMS IS WARRANTED SINCE ILSA DOES NOT APPLY TO
    THE SALE OF THE TRUMP SOHO HOTEL CONDOMINIUM UNITS ....................................16

POINT III

    PLAINTIFFS FAIL TO STATE CLAIMS FOR VIOLATIONS OF ILSA DISCLOSURE AND
    ANTI-FRAUD PROVISIONS...............................................................................................20

        A.  Claim IX Fails to State Claims Under Sections 15 U.S.C. §§1703(a)(1) (B) and (C)............21

        B.  Claim X Fails to State Claims Under 15 U.S.C. §§1703(a)(1) (B),(C) and (D) ......................25

        C.  Claim I Fails to State Claims Under Sections 1703(a)(2)(A),(B) and(C) ..............................27

        D.  Claim XI Fails to State Claims Under Sections 1703(a)(2)(A), (B) and(C) ...........................29

POINT IV

    THE COMPLAINT FAILS TO STATE ILSA CLAIMS AGAINST THE NON-DEVELOPER
    OR NON-AGENT DEFENDANTS .........................................................................................29

POINT V

    THE COMPLAINT FAILS TO STATE CLAIMS FOR COMMON LAW FRAUD, DECEPTIVE
    BUSINESS PRACTICES AND BREACH OF CONTRACT .........................................................31

        A.  Common Law Fraud ....................................................................................................31

**B. Deceptive Business Practices** ..................................................................................32

**C. Breach of Contract** ..................................................................................................33

**CONCLUSION** ..............................................................................................................35

## Table of Authorities

### Federal Cases

Abbey v. 3F Therapeutics, Inc.,

    2009 U.S. Dist. LEXIS 111917 (S.D.N.Y. Dec. 2, 2009) (Wood, K.)....................................11

Bartholomew v. Northampton Nat'l Bank of Easton,

    584 F.2d 1288, 1292 (3rd Cir. 1978); 15 U.S.C. §1703(a)(1); 15 U.S.C. §1701(5)(6)............................30

Becherer v. Merrill Lynch Pierce Fenner & Smith, Inc.,

    127 F.3d 478 (6th Cir. 1997) ............................................................ 16-17, 19

Bennett v. U. S. Trust Co. of N.Y.,

    770 F.2d 308, 316 (2d Cir. 1985) ..................................................... 32-33

Bildstein v. Mastercard Int'l Inc.,

    329 F. Supp.2d 410 (S.D.N.Y. 2004) ....................................................33

Caiafa v. Sea Containers, Ltd.,

    331 Fed. Appex. 14, Fed. Sec. L. Rep. (CC) ¶95,235 (2d Cir. May 19, 2009)............................12

Chavin v. Chalam Adver.,

    1999 U.S. App. LEXIS 15497 (2d Cir. 1999) ........................................9, 10

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,

    467 U.S. 837, 842-43 (1984)..........................................................16

Chill v. Gen. Elec. Co.,

    101 F.3d 263, 268 (2d Cir. 1996).....................................................15

Degirmenci v. Sapphire-Fort Lauderdale, LLP,

    693 F. Supp. 2d 1325, 1341-43 (S.D. Fla. 2010) ......................................28

Dura Pharm., Inc. v. Broudo,

    544 U.S. 336 (2005) ..........................................................3, 4, 13, 15

Faulkner v. Verizon Commc'n In.c,

    156 F. Supp.2d at 392...............................................................2, 4

Flint Ridge Dev. Co. v. Scenic Rivers Ass'n.,

    426 U.S. 776, 778 (1976) ...........................................................................27

Garber v. Legg Mason, Inc.,

    347 Fed. Appx. 665, 668, Fed. Sec. L. Rep.(CCH) ¶95,360 (2d Cir. 2009) ......................................4, 11

Garcia v. Santa Maria Resort, Inc.,

    528 F. Supp. 2d 1283, 1293 (S.D. Fla. 2007)...........................................................10, 28

Grupo Sistemas Integrales de Telecomuncacacion S.A. de C.V. v. A T & T Commc'n, Inc.,

    1990 U.S. Dist. LEXIS 2927 (S.D.N.Y. Mar. 12, 1996).........................................................31

Harvey v. Lake Buena Vista Resort, LLC,

    568 F. Supp. 2d 1354, 1358 (M.D. Fla. 2008) ...................................................................22

Infinity Global, LLC v. Resort at Singer Island, Inc.,

    2008 WL 1711535 (S.D. Fla. Apr. 10, 2008)...........................................................29

Ivar v. Elk River Partners,

    705 F. Supp. 2.d 1220 (D. Col. 2010)…………………………………………………………….28

Lentell v. Merrill Lynch & Co, Inc.,

    396 F.3d 161, 172 (2d Cir. 2005)...........................................................9, 13, 14

Leykin v. AT & T Corp.,

    423 F. Supp. 2d 229 (S.D.N.Y. 2006)...........................................................14

Llewellyn v. North Am. Trading,

    1997 U.S. Dist. LEXIS 22142 at *30 (S.D.N.Y. Dec. 29, 1997) .............................................7

Moy v. Adelphi Inst. Inc.,

    866 F. Supp. 696 (E.D.N.Y. 1994)...........................................................32

Nahigian v. Juno-Loudon, LLC,

    2010 WL 3418179 at *33, n.8 (E.D. Va. Aug. 23, 2010) .............................................25, 30

Novak v. Kasaks,

    216 F.3d 300, 307 (2d Cir. 2000)...........................................................15

Pani v. Empire Blue Cross Blue Shield,

    152 F.3d 67, 74 (2d Cir. 1998)..................................................................................13

Plant v. Merrifield Town Ctr. L.P.,

    711 F. Supp. 2d 576, 590-91 (E.D. Va. 2010)...........................................................24

Price v. Owens-Illinois Dev. Corp.,

    646 F. Supp. 314, 317 (M.D. Ga. 1986)...................................................................26

Revak v. SEC Realty Corp.,

    18 F.3d 81 (2d Cir. 1994).......................................................................................5, 6

Rissman v. Rissman,

    213 F. 3d 381, 383 (7th Cir. 2000)........................................................................10

Rombach v. Chang,

    355 F.3d 164 (2d Cir. 2004)..................................................................................4, 15

Rothman v. Gregor,

    220 F.3d 81, 90 (2d Cir. 2000)............................................................................15, 17

S.E.C. v. W.J. Howey, Co.,

    328 U.S. 293 (1946)...............................................................................................5, 6

Santidrian v. Landmark Custom Ranches, Inc.,

    2008 WL 4571820 at *3, n.1 (S.D. Fla, Oct. 14, 2008) ...........................................30

Scott v. Bell Atlantic Corp.,

    282 A.D.2d 180, 183-84, 726 N.Y.S.2d 60, 63-64 (1st Dept. 2001)........................33

Shirley v. Mann,

    1993 U.S. Dist. LEXIS 13843 at *22-23 (N.D. Ill. Sept. 22, 1993).........................24

Taplett v. TRG Oasis Ltd., L.P.,

    2009 WL 7231455 at *5-6 (M.D. Fla. Apr. 30, 2009) ............................................28

U. S. v. Connolly,

    552 F.3d 86, 89 (2d Cir. 2008)...............................................................................16

U.S. v. Mead Corp.,

    533 U.S. 218, 229 (2001) ................................................................................16

Venezia v. 12th & Div. Prop, LLC,

    685 F. Supp. 2d 752, 756 (M.D. Tenn. 2010) .....................................22, 25, 26, 29

Ventura v. Merrill, Lynch & Co.,

    568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) .............................................14, 31

Winter v. Hollingsworth Prop,

    777 F.2d 1444, 1447 (11th Cir. 1985) ....................................................16

**State Cases**

Bd of Managers of Chelsea 19 Condo. v. Chelsea 19 Assoc.,

    73 A.D.3d 581, 905 N.Y.S.2d 8, 10 (1st Dept. 2010) ...................................34

Danann Realty Corp. v. Harris,

    5 N.Y. 2d 317 (1959) ...............................................................................32

Kerusa Co. LLC, v. W10Z/515 Real Estate L.P.,

    12 N.Y.3d 236 (2009) ..............................................................................34

**Statutes and Regulations**

Federal Securities Regulations Act, 1933, §12(a)(2) (the "1933 Act").................3, 4, 5, 11, 12, 13

Federal Securities Regulations Act, 1933 §10(b) (the "1934 Act") ..........................3, 4, 5, 11, 13

15 U.S.C. §§1703(a)(1) .................................................................................16

15 U.S.C. §1703(a)(1)(B)...............................................................................21, 26

15 U.S.C. §1703(a)(1)(C)...............................................................................21, 24

15 U.S.C. §§1703(a)(1)(B),(C) and (D) ...........................................................25

15 U.S.C. § 1703(a)(2)(A) .............................................................................27, 28, 29

15 U.S.C. §1703(a)(2)(B)...............................................................................27, 28, 29

15 U.S.C. §1703(a)(2)(C)...............................................................................27, 28, 29

15 U.S.C. §1702(a)........................................................................................16

15 U.S.C. §§1704-1707 ........................................................................................................21

15 U.S.C. §§1705, 1707 ......................................................................................................22

15 U.S.C. §1701(a)(1)(D) ...................................................................................................27

15 U.S.C. §1703(a)(1)(B) ..............................................................................................23, 26

15 U.S.C. §1706(d) .............................................................................................................23

15 U.S.C. §78u-4(b) ..............................................................................................................4

15 U.S.C.§1703(a)(1)(C) .....................................................................................................26

15 U.S.C.§1703(b) ..............................................................................................................25

15 U.S.C.§1706(c) ...............................................................................................................23

24 C.F.R §1710.105(c) .........................................................................................................21

24 C.F.R. §1710.1 ................................................................................................................16

24 C.F.R. §1710.23(a) .........................................................................................................23

24 C.F.R. §1710.45 ..............................................................................................................23

24 C.F.R. §1710.100 ............................................................................................................22

24 C.F.R. §1710.102 (i) .......................................................................................................27

24 C.F.R.§1710.105(d)(2)(iii)(C) .......................................................................................25

24 C.F.R.§1710.105(d)(2)(iv) .............................................................................................21

24 C.F.R. §1710.208 ............................................................................................................27

24 C.F.R. Ch. X ...................................................................................................................20

24 CFR § 1710.100 ..............................................................................................................27

24 CFR §1710.208(d) ..........................................................................................................27

**Miscellaneous**

Central Park West PT Assoc., SEC No-Action Letter, 1995 SEC No. Act. LEXIS 786 (Nov. 2, 1995)......7

## Preliminary Statement

This is a simple case of buyers' remorse.  Plaintiffs are contract vendees to purchase hotel condominium units (the "Hotel Units") at the Trump Soho Hotel Condominium, a now completed, critically acclaimed and successful project in New York City ("Trump Soho").  Each of the Plaintiffs signed a purchase agreement (the "Agreement") and made their down payments between September 2007 and August 2008 (i.e., before the historic downturn in the stock market and the New York City real estate market).  By the time their Hotel Units were ready for closings in 2010, rather than fulfill their contractual obligations to close on their Hotel Units at prices they believed were too high, Plaintiffs collectively filed this lawsuit seeking to rescind their Agreements and recover their deposits based on a variety of legal theories.  The instant motion is filed on behalf of all Defendants, other than the escrow agent who has appeared pro se (the "Moving Defendants").  As discussed below, all of the claims are legally insufficient and should now be dismissed.

## The Allegations of the Complaint

The allegations of the Second Amended Complaint (the "Complaint" or "SAC"), which for purposes of this motion to dismiss are deemed to be true, are as follows.  Trump Soho is a high-rise luxury hotel/condominium located in downtown Manhattan.  As required by the applicable New York City zoning regulations, which allow only transient occupancy, the Hotel Units are available for an Owner's personal use for not more than 120 days per year and not more than 29 days in any 36 day period. When not occupied by the Owner, the Hotel Units are required to be made available for rental to the public as hotel rooms.  Each Owner is entitled to receive rental income attributable to his or her own Hotel Unit and there is no "pooling" of rental income.  Plaintiffs were given extensive written disclosures, including a detailed 558-page

Offering Plan and numerous amendments thereto (collectively, the "Plan"), as well as a property report (the "Property Report") in the form set forth by the U.S. Department of Housing and Urban Development ("HUD") pursuant to the federal Interstate Land Sales Full Disclosure Act ("ILSA" or the "Act").

Each of the Agreements signed by Plaintiffs is identical in form, other than terms such as the Hotel Unit number, purchase price, and the like.  The Agreements and the Plan[1] contain several provisions in which Plaintiffs acknowledge that <u>no oral or written representations were made to them</u> other than as set forth in the Plan and Agreements themselves, and that they did not rely on any extra-contractual representations in deciding to purchase their Hotel Units.  The Plan also further cautions that there is <u>no commitment to sell more than the 15% of the Hotel Units, which was the minimum required to render the Plan effective</u>.  Nevertheless, Plaintiffs now allege that they were induced to enter into the Agreements by the very types of oral representations that they specifically disclaimed.

The gist of the claimed misstatements is that Trump Soho representatives (both Defendants and non-parties) made statements outside the contract documents that the demand for Hotel Units at the Trump Soho was greater than it actually was, and that more Hotel Units had been sold than had actually been sold.  Plaintiffs claim to have relied upon such representations in deciding to enter into the Agreements.  The representations were allegedly made in several ways: (1) orally, by a representative of the hotel-condominium sponsor, Bayrock/Sapir Organization LLC (the "Sponsor"), directly to one or more of the Plaintiffs; (2) orally, by a Sponsor representative to an agent for one or more of the Plaintiffs, who conducted an

---

[1] The Agreements, relevant portions of the Offering Plan and Property Report are annexed as exhibits to the accompanying Affirmation of Fred D. Weinstein.  It is proper for the Court to consider these exhibits in connection with this motion since they are referenced in and integral to the Complaint.  <u>See, e.g.</u>, <u>Faulkner v. Verizon Comme'n, Inc.</u>, 156 F. Supp. 2d 384, 391 (S.D.N.Y. 2001).

investigation on such Plaintiff's behalf; (3) through newspaper or magazine articles purporting to quote a Sponsor representative, which were read by certain Plaintiffs or their agents.  Some of the alleged statements were made prior to execution of the Agreements, but many were made after their execution.

Plaintiffs' Complaint alleges thirteen separate causes of action, each of which (except for the claim against the escrow agent) seeks rescission of their Agreements and/or compensatory damages equal to the amount of their deposits.  Plaintiffs did not merely sue the Sponsor with which they are in contractual privity, but have sued 20 entities and individuals – including various affiliates of the Sponsor, its sales agents, the escrow agent, and various individuals and principals associated with them (collectively the "Defendants"). There is simply no basis for granting Plaintiffs any of the relief they seek.  For the reasons set forth below, each of the Claims fail to state a claim and should therefore be dismissed.

## POINT I

### THE COMPLAINT FAILS TO ALLEGE ANY CLAIMS UNDER THE FEDERAL SECURITIES LAWS

The Complaint alleges four claims under the federal securities laws – two based on the 1934 Act (the Section 10(b) Claim and its derivative Section 20(a) Claim) (Claims III and IV) and two based on the 1933 Act (the Section 12(a)(2) Claim and its derivative Section 15 Claim)(Claims V and VI).

It is well settled that to state a Section 10(b) Claim under the '34 Act, a plaintiff must allege that (1) in connection with the purchase or sale of securities, the defendant (2) acting with scienter (3) made a material misrepresentation (4) that plaintiff relied on the representation in purchasing the security (5) that plaintiff suffered an economic loss and (6) that the misrepresentation was the cause of its loss.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005).

To state a claim under Section 12(a)(2) of the 1933 Act, a plaintiff must allege that the defendant offered or sold a security, by the use of some means of interstate commerce, by means of a prospectus or oral communication which contained a material misrepresentation. Garber v. Legg Mason, Inc., 347 Fed. Appx. 665, 668, Fed. Sec. L. Rep.(CCH) ¶95,360 (2d Cir. 2009).   In addition, for a Section 12(a)(2) Claim to be viable there must be loss causation, i.e., a causal link between the misrepresentation and plaintiff's loss.

Furthermore, a complaint alleging securities fraud is subject to two heightened standards. First, it must satisfy Rule 9(b), which requires that it "state with particularity the circumstances constituting the fraud." Faulkner, 156 F. Supp.2d at 392.  Second, it must meet the requirement of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b), which places "stringent procedural requirements" on plaintiffs who pursue private securities fraud claims. Id. The PSLRA requires that the "complaint specify each misleading statement ... set forth the facts on which a belief that the statement is misleading was formed, and...state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Dura Pharm., 544 U.S. at 345.  These heightened pleading requirements apply to both Section 10(b) and Section 12(a)(2) Claims.  Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004).

The Complaint fails to allege the requisite elements of a securities fraud claim, and falls far short of the threshold for stating a legally sufficient claim.  Thus, the Section 10(b) and Section 12(a)(2) Claims must be dismissed.  Since the Section 15 and Section 20 Claims are purely derivative, they must also be dismissed. Id. at 177.

### A.      The Agreements Are Not Securities

All of the Securities Claims should be dismissed because Plaintiffs have failed to meet even the threshold requirement of adequately alleging the purchase or sale of a "security." The

definition of "security" is the same under Section 2(a) of the 1933 Act and Section 3(a) of the 1934 Act.   As a matter of law, Plaintiffs incorrectly allege that their Agreements were "investment contracts" and thus "securities" subject to the securities laws. (SAC ¶ 695).

The seminal case with regard to what constitutes an "investment contract" for the purpose of securities laws is the decision in S.E.C. v. W.J. Howey, Co., 328 U.S. 293 (1946). Under the Howey test, a land sale contract constitutes a security only if three elements are established: (1) an investment of money (2) in a common enterprise (3) with profits to be derived solely from the efforts of others. In Howey, parcels of land in a citrus grove were offered together with a service contract under which the seller would jointly cultivate and market the produce and remit profits from the enterprise to the investors pro rata, depending on how much land they owned. In that circumstance, the Supreme Court found that an investment contract did exist because the land owners were sharing in the profits of the agricultural enterprise.

However, where, as in the instant case, the purchasers admittedly do not pool rent and do not share equally in the income, the Second Circuit has found that an investment contract does not exist because of the absence of the requisite common enterprise. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). In Revak, purchasers of resort condominiums could enter into an on-site management contract for rental services related to the rental of their units but "the rents attributable to each unit were not shared or pooled in any manner." Id. at 88. Instead, the plaintiffs in Revak "owned individual units and could make profits or sustain losses independent of the fortunes of other purchasers." Id. Under those circumstances, the Court held that the plaintiffs failed to establish the "common enterprise" element of Howey, which requires a showing of "horizontal commonality," i.e., the "tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro rata

distribution of profits." Id. at 87.

The same is true here. The Complaint does not allege any pooling of rents – in fact it alleges the exact opposite. Paragraph 665 of the Complaint alleges that "when a Unit is rented to the public, the Unit's owner receives the rental income attributable to that Unit." That is the very antithesis of pooling. Thus, the Complaint fails to allege the existence of a common enterprise, and therefore fails to meet the Howey test for an "investment contract."

Plaintiffs' further allegations that they were required to use the same rental agent and that the Hotel Units must be made available for rental when not occupied by the respective owners (SAC ¶¶697-99) similarly fail to convert the sale of a condominium into a security offering. In Revak, the plaintiffs also argued that having the same management company to oversee the rentals satisfied the "common enterprise" element of Howey. But the Second Circuit rejected that argument, holding that, at most, this established "a common agency, not a common enterprise." Revak, 18 F.3d at 88. The Second Circuit noted that other jurisdictions may follow a "broad vertical commonality", which requires that the fortunes of the purchasers be "linked to the efforts" of the promoter. Id. at 87-88. However, the Second Circuit expressly rejected the "broad vertical commonality" test, holding that "we do not interpret the Howey test to be so easily satisfied." Id. at 88. The Court commented that even if the common rental agent satisfied the broad vertical commonality test used in some other Circuits, the use of a common rental agent did not satisfy the stricter horizontal commonality test that controls in the Second Circuit, which requires a pooling of rents. Id. at 89.

The Second Circuit declined to rule in Revak (and has still not ruled) on whether a more narrow "strict vertical commonality" test, requiring that the fortunes of the purchaser "be tied to the fortunes" of the promoter, would satisfy the Howey "common enterprise" element. Id. In any

event, the test is simply not met in this case. The Complaint does not, and cannot, allege that the fortunes of the plaintiffs are inextricably tied to the fortunes of the promoter, for better or worse. See Llewellyn v. North Am. Trading, 1997 U.S. Dist. LEXIS 22142 at *30 (S.D.N.Y. Dec. 29, 1997) (finding lack of strict vertical commonality because "although defendants' fortunes rose when plaintiff purchased the rare coins, the defendants would maintain their financial position even if plaintiff's investment decreased in value"). Since Plaintiffs have an interest in only his or her own Hotel Unit, and the Sponsor deals with the building as a whole, the Plaintiffs could make a profit on their single Hotel Unit while Sponsor incurs losses on the project as a whole, and vice versa. Hence, Plaintiffs' fortunes are neither tied to the other purchasers nor to the Sponsor, and the Complaint therefore fails to allege a "common enterprise" under either a horizontal or strict vertical commonality test.

Also without merit is Plaintiffs' assertion that the provisions limiting their use of the Hotel Units to a maximum of 120 days creates an investment contract. The Complaint acknowledges that those restrictions are mandated by New York City zoning regulations (SAC ¶¶253-57). Occupancy restrictions which are mandated by zoning restrictions have not been viewed by the SEC as the type of restriction that would convert an offering of condominium units into a sale of securities. See Central Park West PT Assoc., SEC No-Action Letter, 1995 SEC No. Act. LEXIS 786 (Nov. 2, 1995). The exception for zoning regulations makes sense because it is not a restriction imposed by the Sponsor and does not tie the Plaintiffs' fortunes to those of the Sponsor.

**B.**   **The Contractual Disclaimer Provisions Preclude a Finding of Either Reliance or Materiality**

The essence of Plaintiffs' misrepresentation claims is that the Sponsor's representatives made oral statements that demand for Hotel Units at Trump Soho was greater than it actually

was, and that more Hotel Units had been sold than were actually sold.  Plaintiffs fail to adequately allege that they reasonably relied upon any such statements, or that such statements were "material" to a reasonable investor.  In fact, the opposite is true.  The express provisions of the Agreements and Plan make it <u>unreasonable</u> to infer that such statements were material or reasonably relied upon.

Plaintiffs expressly disclaimed the materiality of, and reliance upon, any oral or written representations allegedly made in connection with their decision to purchase the Hotel Units, unless set forth in the Agreement or Plan itself.  For example, Section 20 of each Agreement (Ex. A) provides in relevant part:

> **No Representations.**  Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise...**except as herein or in the Plan specifically represented**; Purchaser has relied solely on his or her own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement.  (emphasis added)

Similarly, Exhibit A to the Agreement, entitled "Purchaser's Express Acknowledgement Regarding Certain Matters and Disclaimers", provides that:

> The Agreement is being (and was) entered into by Purchaser without reliance upon any representations by Seller or any of its agents, employees or representatives **concerning potential economic or tax benefits to be derived from purchasing the Hotel Suite Unit, including appreciation in value, rental income and depreciation**.  (emphasis added)

Notably, none of the alleged misstatements are alleged to have been set forth in the Agreement or Plan.  Further, the Plan contains provisions that demonstrate that Plaintiffs could not have reasonably relied upon the alleged oral misstatements and that the statements were not material to the decision to purchase the Hotel Units.  For example, the Plan provides:

> **Sponsor will not make, and has not authorized any other party to make, any oral representations or statements concerning the Plan, and no such representations or statements will be considered part of the Plan. No information, data or**

**representations other than those contained herein or in the documents annexed hereto as exhibits in Part II of the Plan may be relied upon.** (Ex. B-1 at 23) (emphasis added)

In addition, **there is no commitment to sell more Units than the 15% of Hotel Suite Units necessary to declare the Plan effective** and owner-occupants and investors may never gain effective control and management of the Condominium.   (Ex. B-1 at 31) (emphasis added)

Given the above provisions, it is not plausible to infer that the alleged oral statements regarding the number of Hotel Units sold could give rise to a claim for securities fraud.  Accordingly, Plaintiffs have failed to allege either reasonable reliance or materiality.

      (1)      Failure to Allege Transaction Causation (Reliance)

A plaintiff pleading a private securities fraud claim under Section 10(b) of the 1934 Act must demonstrate both transaction causation and loss causation.  Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005).  Transaction causation requires an allegation that "but for" the claimed misrepresentations, the plaintiff would not have entered into the transaction. Loss causation, discussed below, requires a causal link between the defendant's alleged fraudulent conduct and the economic loss suffered. Id. at 173-75.

Plaintiffs' assertions that they relied on oral representations regarding the number of Hotel Units were sold fails to demonstrate transaction causation because the Agreements and Plan expressly disclaim that such representations were made or relied upon by Plaintiffs.  Where, as here, the written agreement expressly disavows reliance on statements not contained in the agreement itself, the failure to allege transaction causation must result in dismissal.  Chavin v. Chalam Adver., 1999 U.S. App. LEXIS 15497 (2d Cir. 1999) (securities fraud claim dismissed because plaintiffs could not prove justifiable reliance in light of contract provision stating that parties were not relying on any representation not set forth in the contract).

The rule is based on fairness and certainty.  As explained by the Seventh Circuit in

Rissman v. Rissman, 213 F. 3d 381, 383 (7th Cir. 2000): "Securities law does not permit a party to a stock transaction to disavow such [disclaimers] – to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." A "non-reliance clause" ensures that "both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." Id.; see also Garcia v. Santa Maria Resort, Inc., 528 F. Supp. 2d 1283, 1293 (S.D. Fla. 2007) ("given the disclaimers of reliance on oral representations by Plaintiffs in the Agreements, not only is the inference that Plaintiffs are suffering from buyers' remorse and seeking to use the federal securities laws to escape their obligations under those contracts more compelling than an inference of intent to defraud, it is the only plausible inference") (emphasis in original). In this case, the disclaimer clause is similar to that in Chavin, in that Plaintiffs agreed that they were not relying on any oral or written representations not contained in the Agreements or Plan, including, specifically, any representations regarding the economic benefits of owning the Hotel Units.

Likewise, Plaintiffs expressly agreed in their Agreements that they were not relying upon any oral or written "representations, warranties, statements or estimates of any nature whatsoever" concerning "the ability to rent the Unit and/or the rental income therefor… " (Ex. A, §20). Thus, the allegations of the recently added Truong-Tran Plaintiffs regarding the Sponsor's representatives' statements about the rental income they might receive from their Hotel Unit (SAC ¶¶359-60) squarely contradicts the terms of their Agreement and could not have been reasonably upon by them.

(2)   Failure to Allege Materiality

Similarly, the contractual provisions preclude a finding of materiality.   The test for

"materiality" under Section 10(b) of the 1934 Act and Section 12(a)(2) of the 1933 Act is identical. <u>Garber</u>, 347 Fed. Appx. at 668. The test is an objective one. A statement is "material" only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Id</u>.

Given the express provisions in the Agreements and Plan, the Complaint fails to adequately allege that an alleged misstatement about the number of Hotel Units sold significantly altered the mix of information available to prospective purchasers. As discussed above, not only were no statements made in the Plan relating to the anticipated number of purchasers, but the Plan makes clear that there was no guarantee to sell more than 15% of the Hotel Units.

The issue of materiality is appropriately determined on a motion to dismiss where the alleged misrepresentations "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." <u>Abbey v. 3F Therapeutics, Inc.</u>, 2009 U.S. Dist. LEXIS 111917 (S.D.N.Y. Dec. 2, 2009) (Wood, K.). It is respectfully submitted that such is the case here. There are no facts alleged from which to infer that if Plaintiffs had been provided with lower sales figures, this would have been viewed by a "reasonable investor" as having "significantly altered the 'total mix' of information made available." <u>Garber</u>, 347 Fed. Appx. at 668. The express disclaimers in the Agreements and the Plan require the opposite conclusion – that the alleged statements were not material at all.

(3)   <u>Representations Made After the Agreement Was Signed</u>

The timing of many of the alleged statements further belies any plausible inference that they were material to a reasonable purchaser's decision to purchase a Hotel Unit, or that Plaintiffs reasonably relied upon such belated statements. For example, with respect to the

"Tsai-Singh Plaintiffs" <u>all</u> of the alleged statements were made <u>after</u> those plaintiffs signed their Agreements (SAC ¶¶322-27).[2]   With respect to the other Plaintiffs, many of the alleged statements were made well after the Agreements were signed (SAC ¶¶ 310-13, 335-36, 355-56, 365-73).  It defies logic that statements made <u>after</u> the Agreements were signed were material to the decision to purchase.  Similarly, Plaintiffs' further allegations (SAC ¶¶310-13, 323, 335-36) of reliance on representations made after the Agreements were signed in making the "Additional Deposits" is not plausible as they were contractually obligated to pay the Additional Deposits and their failure to do so would have constituted a default under the Agreements.  (Ex. A at ¶12).

    (4)    <u>The Complaint Fails to Draw a Plausible Inference of Falsity</u>

Plaintiffs' attempt to imply falsity with respect to the number of Units sold based upon the Affidavit of Alex Sapir, sworn to on March 30, 2010, (the "Sapir Aff.") (Ex. B-6) (SAC ¶286) in connection with the Sponsor's declaring the Plan effective, is equally without merit.

As the Complaint acknowledges and the Plan sets forth, the Sponsor had to show that "the required minimum of fifteen (15%) percent" of qualified Hotel Units had been sold in order for the Plan to be effective (SAC ¶¶393-95).  As the Complaint further acknowledges, the Sapir Affidavit was filed "in Support of Declaring the Plan Effective" (SAC ¶286).  Thus, by its very terms, the Sapir Affidavit does no more than certify that the <u>minimum</u> 62 Hotel Units (or 15%) had been sold.  It does not state that those were the <u>only</u> Hotel Units sold.  Indeed, the Sapir Affidavit (Ex. B-1 at ¶f) purports only to "list the Units which are being counted toward meeting the minimum percentage that is needed under the terms of the Plan to declare the Plan effective."

---

[2] There are additional reasons to dismiss the claims of the Tsai-Singh Plaintiffs.  Plaintiff Christine Singh was not the original purchaser, but rather took an assignment of Anthony Tsai's interest (SAC ¶328).  The Agreement (¶23) expressly prohibits assignment without the written agreement of the Sponsor and the Complaint fails to allege such agreement..  Also, a secondary buyer such as Singh, lacks standing to bring a Section 12(a)(2) Claim. <u>Caiafa v. Sea Containers, Ltd.</u>, 331 Fed. Appx. 14, Fed. Sec. L. Rep. (CCH) ¶95,235 (2d Cir. May 19, 2009).

(See SAC ¶¶393-400, citing Attorney General Regulations).

Similarly, Plaintiffs' allegations that the sales reports filed with HUD were "effectively concealed" from them (SAC ¶292) is entirely implausible.  The Complaint fails to allege that Plaintiffs requested this information from the Sponsor.  In addition, making a Freedom of Information Act ("FOIA") request for HUD documents is hardly "unprecedented" (SAC ¶292). The Court can take judicial notice that HUD's website[3] shows the procedure for making FOIA requests, if the information requested is not already available.

### C.    The Complaint Fails to Allege Loss Causation

Loss causation, which is akin to proximate cause, requires a causal link between the defendant's alleged fraudulent conduct and the economic loss plaintiff suffered. Lentell, 396 F.3d at 172. With respect to Section 12(a)(2) of the 1933 Act, lack of loss causation is an express affirmative defense and dismissal of a Section 12(a)(2) Claim at the pleading stage is appropriate when it is apparent as a matter of law that the lack of loss causation is apparent from the face of the complaint. Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998).

In Dura Pharm., supra, the seminal case on loss causation, the Supreme Court held that a plaintiff does not allege loss causation merely by alleging that the price of the security on the date of purchase was inflated because of defendant's misrepresentation.  The Court explained:

> When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price . . . . Other things being equal, the longer the time between the purchase and sale, the more likely that this is so, i.e. the more likely that other factors cause the loss. Id. at 342-343.

The Second Circuit has held that loss causation requires that the loss be foreseeable and

---

[3] http://portal.hud.gov/portal/page/portal/HUD/program_offices/administration/foia

caused by the materialization of the concealed risk. <u>Lentell</u>, 396 F.3d at 173. A plaintiff must allege that the subject of the fraudulent statement was the cause of the actual loss. <u>Id</u>. at 175.

In <u>Leykin v. AT & T Corp.</u>, 423 F. Supp. 2d 229 (S.D.N.Y. 2006), the Court set forth two steps in analyzing whether a complaint adequately pleads loss causation. The "first step" is to "identify the subject of the misrepresentations or omission that allegedly caused plaintiff's loss, <u>i.e.</u>, the risk concealed by defendant's fraud." The "second step" is to "determine whether the complaint alleges that the concealed risk led to plaintiff's loss." <u>Id</u>. at 240. Applying this two-step analysis, Plaintiffs have failed to allege loss causation. The "subject" of the representations was the demand for the Hotel Units and the number of Units sold when Plaintiffs purchased their Hotel Units. The "concealed risk" would be that sales were less than represented. **It is a fatal flaw of the Complaint that it does not demonstrate any causal link between the number of Hotel Units sold and any economic loss suffered by Plaintiffs.** Indeed, Plaintiffs have not alleged that they incurred any loss at all. <u>See</u> <u>Dura Pharm.</u>, 544 U.S. at 338. ("A private plaintiff who clams securities fraud must prove that the defendant's fraud caused an economic loss").

Significantly, as none of the Plaintiffs have yet closed on their purchases, it is mere speculation that Plaintiffs would suffer any loss upon closing. A far more plausible inference to be drawn from the Complaint is that this is simply a case of buyers' remorse – that the economic downturn and slumping real estate market have caused Plaintiffs to seek ways to avoid their contractual obligations to purchase the Hotel Units. Since the economic recession, several securities actions have been dismissed for failure to demonstrate loss causation. <u>See, e.g.</u>, <u>Ventura v. Merrill, Lynch & Co.</u>, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (complaint did not explain how the decline in the stock price was attributable to the alleged fraud, rather than the loss in value incurred due to Internet sector's collapse).

**D.**     **The Complaint Fails to Adequately Allege Scienter**

A Section 10(b) Claim must also allege facts that establish a "strong inference" of fraudulent intent. Rombach, 355 F.3d at 176. The "strong inference" standard is satisfied either by allegations of defendants' motive and opportunity to commit fraud or "strong circumstantial evidence of conscious misbehavior or recklessness." Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000). An inference of motive may arise from allegations of "concrete benefits that could be realized by one or more of the false statements." Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000). Recklessness is conduct which is "highly unreasonable" and which represents an "extreme departure from the standards of ordinary care." Rothman, 220 F.3d at 90.

The Complaint fails to adequately allege scienter under either the "motive and opportunity" or "recklessness" standards. Plaintiffs' allegations of "recklessness", which do not set forth any supporting facts, are merely conclusory. In addition, the Complaint does not allege any motive for personal gain by any Defendant other than the desire to make the Trump Soho project a success. Such allegations of generalized motive, shared universally by all real estate developers, are insufficient to raise a strong inference of fraudulent intent. Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) (desire to advance the appearance of corporate profitability or success of the investment is insufficient to allege motive).

It is respectfully submitted that all of the Securities Claims must be dismissed because first, as a threshold matter, this case does not involve the purchase or sale of a "security." In addition, the Complaint fails to adequately allege a material misstatement of fact, loss or transaction causation (or any loss at all) or scienter.

**POINT II**

**DISMISSAL OF THE ILSA CLAIMS IS WARRANTED SINCE ILSA DOES NOT
APPLY TO THE SALE OF THE TRUMP SOHO HOTEL CONDOMINIUM UNITS**

The Complaint contains five counts alleging violations of ILSA (collectively the "ILSA Claims"). However, ILSA applies only to the sale of non-exempt "lots" [15 U.S.C. §§1703(a)(1), 1702(a)]. Since, as discussed below, the instant Hotel Units do not constitute "lots" under ILSA, Plaintiffs' ILSA Claims must be dismissed.

The term "lot" is not defined under ILSA and the legislative history is not instructive in this regard. However, the regulations promulgated by HUD have defined "lot as: "any portion, piece, division, unit, or undivided interest in land located in any State or foreign country **if the interest includes the right to the exclusive use of a specific portion of the land**." 24 C.F.R. §1710.1 (emphasis added).

As the agency responsible for the enforcement of ILSA, HUD's regulations are entitled to deference as an authoritative interpretation of the statute, unless it appears from the statute or its legislative history that the agency interpretation would not be sanctioned. See U. S. v. Connolly, 552 F.3d 86, 89 (2d Cir. 2008), citing, Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Chevron deference is to be afforded to HUD's interpretation of the definition of "lot" where, as here, the circumstances indicate that "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills space in the enacted law." U.S. v. Mead Corp., 533 U.S. 218, 229 (2001). Accordingly, courts construing ILSA have uniformly viewed the "exclusive use" requirement as integral to the definition of "lot". See e.g., Winter v. Hollingsworth Prop, 777 F.2d 1444, 1447 (11th Cir. 1985).

In Becherer v. Merrill Lynch Pierce Fenner & Smith, Inc., 127 F.3d 478 (6th Cir. 1997),

the only reported Circuit Court decision which has addressed ILSA's application to hotel condominium units, the Sixth Circuit affirmed the district court's dismissal of all of the plaintiffs' ILSA claims, concluding that, "[g]iven the numerous use restrictions and the non-residential business purpose of the hotel units", the interests in the non-residential condominium hotel were not "lots" and thus, were not subject to ILSA's requirements. Id. at 481.

The Becherer Court reasoned that "substantively the hotel interests are quite different from traditional condominium units" and agreed with the district court's finding that the interests were not "lots" because the "exclusive use' requirement" in the definition of "lot" was not met Id. The Becherer Court considered, as ample indicia of the non-exclusive use of the hotel interests, the fact that the "investors did not purchase property rights that were free of restrictions and only thereafter chose to use their units for rental purposes." Id. at 482. Instead, when purchased, the units were already restricted for use as a hotel and were never available for use at the discretion of the individual unit owners. Id. Among the key indications of non-exclusive use cited by the Sixth Circuit in Becherer in affirming the dismissal of the ILSA claims were:

- The units were purchased subject to restrictions that did not permit the purchasers to use them as residences and required them to rent the units for the great majority of the year;
- The right to convey the units was made subject to the use restrictions of the condominium documents; and
- The owners had no right to eject guests from their units, since such authority resided in the hotel manager

Id.

The same reasoning underlying the dismissal of the ILSA claims in Becherer warrants dismissal here. Plaintiffs' ILSA Claims are predicated on the content of their respective Agreements and the Plan, which was incorporated by reference into the Agreements (Ex. A at §11.2). As set forth in the Plan and the Agreements, the use and occupancy of the Hotel Units was expressly made subject to a restrictive declaration, dated April 26, 2007 and recorded in the

Office of the New York City Register on May 4, 2007 (the "Restrictive Declaration"). <u>See</u> Ex. B-4; B-1 at 1-3, 26-27, 209, 212, 330, 418).

The Restrictive Declaration unequivocally establishes "Occupancy Restrictions", mandated by New York City zoning regulations, which limit the number of days that an owner or its designee can occupy the Hotel Unit to a continuous period of a maximum of 29 days in any 36 day period, for a total not to exceed 120 days in any calendar year. (Ex. B-4 at §2.02(a); Ex. B-1 at 1, 4, 52-53, 129).[4] In addition to the Occupancy Restrictions, the Restrictive Declaration contains further mandatory restrictions on the use of the Hotel Units, set forth in Sections 2.02(b) through 2.02(e). Notably, when not occupied by owners, Hotel Units are required to be made available for transient occupancy to non-owner guests on a daily or weekly basis through either the Hotel Management Company or a Qualified Broker at occupancy rates comparable to those at hotels similar to the Trump Soho. (Ex. B-4 at §2.02(b); Ex. B-2 at Art. 8.1.1). Additionally, each owner is prohibited from decorating his or her Hotel Unit with any personal furnishings or decorations and all Hotel Units must be similarly decorated. [Ex. B-4 at §2.02(c)]. Furthermore, a Hotel Unit owner is required to provide a minimum of five days notice of his or her intent to occupy the Unit to reserve its use, and must check in and out at the front desk at the start and end of each stay. <u>Id</u>. at §2.02(d); <u>see also</u> Ex. B-5 §6(a)(iv).

Consistent with the provisions of the Restrictive Declaration, the Unit Management Agreement (the "UMA") contains further restrictions, which preclude an owner's entitlement to the exclusive use of his or her Hotel Unit, or any portion thereof, at any given time. (Ex. B-5 and

---

[4] As set forth in the April 14, 2007 letter from Mona Sehgal, General Counsel to New York City Department of Buildings ("DOB"), the hotel site is located in an "M1-6 zoning district in which Use Group 5 transient hotels are allowed as of right and residential uses are prohibited....The proposed condominium form of ownership that is contemplated for the Use Group 5 hotel does not alter the prohibition against long-term residential occupancy. The proposed hotel remains fully subject to transient use limitations in accordance with zoning." (<u>See</u> Exs. B-8 and B-7).

definition of "Owner Occupancy Period", set forth at Schedule "A", thereto).[5] The UMA delegates to hotel management exclusive control over acceptance and management of reservations, enforcement of registration procedures and management of access to the Units. [Ex. B-1 at §13, p.9; Ex. B-5 at §§3(a)(i)-(xii), 3(c),[6] 5(a)]. Notably, the Hotel Manager has an unqualified right to deny check-in. [Ex. B-5 at §6(b)]. Since the Hotel Unit must be made available for transient use by non-owner guests, when not occupied by the owner [Ex. B-5 at §8(b); B-4 at §2.02(b)], an owner has no right to the use of his Hotel Unit, or any portion thereof, if it was previously rented or is otherwise occupied during the requested period. In fact, during a period that the Hotel Unit is rented or otherwise occupied by a "Non-Owner Guest" in accordance with the requirements for transient rentals, an owner is prohibited from entering his or her Hotel Unit or any portion thereof, including any locked closet contained in such Hotel Unit, ejecting a Non-Owner Guest from the Hotel Unit or otherwise disturbing such guest's occupancy of the Hotel Unit. (Ex. B-5 at §9). Furthermore, the Restrictive Declaration, which encumbers the Hotel Unit and runs with the land (Ex. B-1 at 27), requires that a purchaser of a Hotel Unit on resale enter into a separate UMA and honor any pre-existing reservations and rental agreements.

All of these restrictions on use preclude a conclusion that the subject Hotel Units are available for the exclusive use of its owners. Instead, as was determined by the District Court in Becherer, where, as here, the hotel unit owners' possessory rights are severely circumscribed in both the number of days and manner of use and the owners are not "guaranteed" the right to use

---

[5] As defined by the UMA, the "Owner Occupancy Period" shall mean those times of occupancy **for which Owner has requested, and Hotel Manager has confirmed** Owner's occupancy of the Subject Unit. (emphasis added).

[6] Section (3)(c) of the UMA (Ex. B-5) provides in pertinent part: "Neither Owner nor any other person except the Hotel Manager shall have any right to manage the Subject Unit or to perform any of the Mandatory Services."

their units during any defined period of time, ILSA does not apply.[7]  In holding that ILSA did not

apply to hotel condominium units, the District Court in Becherer stated as follows:

> But the right that is determinative of the inquiry here, the right to the use and enjoyment of the units, is not exclusive as the contractual provisions .... demonstrate, and in fact is not **guaranteed**.  If the unit owner attempts to reserve his or her room and it is already reserved, then he or she may not use it. Alternate dates could be selected by the unit owner, but there is no guarantee that the unit will ever be available to him or her. Returning to the terminology of the definition of "exclusive use" in Appendix A of 24 C.F.R. Ch. X,[8] it is clear that the unit owner does not have exclusive use of his or her unit for even a portion of the year because he or she does not have the right to eject a paying guest of the hotel from his or her unit during any defined period of time.

920 F. Supp. 1345, 1355 (E.D. Mich. 1996) (internal footnotes omitted) (emphasis added).

The use restrictions noted above conclusively demonstrate that the Plaintiffs do not have

the right to the exclusive use of their Hotel Units, and that the same are not "lots" under ILSA.

Accordingly, the Plaintiffs' claims under ILSA should be dismissed.

## POINT III

### PLAINTIFFS FAIL TO STATE CLAIMS FOR VIOLATIONS OF ILSA DISCLOSURE AND ANTI-FRAUD PROVISIONS

Even if ILSA were applicable, which it is not, Claims I, IX, X and XI still fail to state

claims under ILSA. Claims IX and X are predicated upon claimed deficiencies and

---

[7] Although in Becherer, a purchaser could not use his unit for more than 14 days per calendar year or more than seven days during the peak period of December through April, the longer cumulative occupancy period in the instant case does not affect the impact of the restrictions contained in the Offering Plan and related documents, which preclude an owner's right to the exclusive possession of his Unit for any defined period.
[8]  That section, published at 61 Fed. Reg. 13596 (Mar. 27, 1996) as part of the HUD Guidelines for Exemptions provides:

> "Lot" means any portion, piece, division, unit or undivided interest in land if such interest includes the right to the exclusive use of a specific portion of the land or unit. This applies to the sale of a condominium or cooperative unit or a campsite as well as a traditional "lot".
> If the purchaser of an undivided interest or a membership has exclusive use or possession of a specific designated lot even for a portion of the year, a lot as defined by the regulations, exists. For purposes of definition, if the purchaser has been assigned a specific lot on a recurring basis for a defined period of time and could eject another person during the time he has the right to use that lot, then the purchaser has an exclusive use.

Although the above guidelines are "interpretive rules" containing illustrative examples  (Id. at 13-14), it bears noting that HUD does not include the sale of a "hotel unit" among the examples provided in its definition of "lot".

misstatements in the Property Reports, that were provided to each of the Plaintiffs prior to the execution of the Agreements, and in the Agreement, a form of which was attached to the underlying Statement of Record.[9] [Sections 1703(a)(1)(B)-(D)].  Claims I and XI purport to allege deceptive sales practices under ILSA's anti-fraud provisions [Sections 1703(a)(2)(A)-(C)] based, respectively, upon Defendants' alleged overstatement of sales of the Hotel Units and the inclusion of a provision in the Property Report relating to Plaintiffs' right to a partial refund upon default, which allegedly conflicted with the liquidated damages clause contained in the Agreement.  For the reasons set forth below, these allegations fail to state claims under ILSA.

## A.  Claim IX Fails to State Claims Under Sections 15 U.S.C. §§1703(a)(1)(B) and (C)

Plaintiffs allege that the Property Reports were noncompliant with ILSA because they contained notice of a general seven-day right of revocation, but not notice of a right to revoke within two years of the signing of the Agreement[10] (SAC ¶¶918-19).  On this basis, Plaintiffs assert claims for rescission and damages in the amount of their deposits under Section 1701(a)(1)(B)[11]; however, such claims are legally insufficient. ILSA's legislative history and the implementing regulations unequivocally demonstrate that, to be actionable, any alleged deficiency in the Property Report must be material to the decision to **purchase** the subject property -- not to a subsequent decision to revoke it.  As discussed below, Plaintiffs' allegations of "materiality" notwithstanding (SAC ¶921), Plaintiffs do not and cannot allege that the

---

[9] Pursuant to ILSA, a developer is required to file a Statement of Record with the Secretary of HUD containing certain factual information and documentation.  A Property Report, comprised of a portion of the information contained in the Statement of Record, is required to be distributed to a prospective purchaser in advance of the execution of a contract for the purchase or lease of a lot. 15 U.S.C. §§1704-1707.

[10] The general revocation provisions, which are contained in the Property Reports disseminated to the Plaintiffs, provide that the purchaser may cancel the Agreements within seven days of its signing. 24 C.F.R §1710.105(c). 24 C.F.R.§1710.105(d)(2)(iv) provides for notice in the Property Report of a two-year revocation period from the signing of the Agreement, where certain contractual provisions are not contained in the Agreement or a deed is not delivered within six months of the signing of the Agreement.

[11] That Section makes it unlawful for a developer or agent to make use of interstate commerce or the mails to sell or lease any lot unless a printed property report, meeting the requirements of Section 1707, has been furnished to the purchaser in advance of the signing of the contract or agreement.

decision to purchase their respective units was influenced by the <u>absence</u> of notice of a two-year revocation right in the Property Report.

Courts construing ILSA have consistently recognized that the fundamental purpose of the Property Report requirement in ILSA is to provide "information designed to assist potential buyers in making a fully-informed decision whether to purchase." <u>Harvey v. Lake Buena Vista Resort, LLC</u>, 568 F. Supp. 2d 1354, 1358 (M.D. Fla. 2008); <u>Venezia v. 12th & Div. Prop, LLC</u>, 685 F. Supp. 2d 752, 756 (M.D. Tenn. 2010) ("Generally speaking,…courts appear to agree, based on its legislative history, that "[t]he underlying purpose of [ILSA] is to insure that a buyer, prior to purchasing certain kinds of real estate, is informed of facts which will enable him to make an informed decision about purchasing the property").

This purpose is further borne out by what is required by the regulations to be included the Property Report, such as warnings regarding the specific risks of purchasing the land in question, the condition of title to the land, the range of selling prices, access to the subdivision, the existence of unusual conditions relating to noise or safety, the availability of sewage disposal, other public utilities and local services, recreational facilities, subdivision characteristics and climate, the nature and completion schedule for proposed improvements and statements relating to any blanket encumbrances. 15 U.S.C. §§1705, 1707; 24 C.F.R. §1710.100.

The text of ILSA and the regulations also reflect the overriding legislative intention that any purported deficiency in the Property Report must be "material" to the purchase decision to be actionable.  It is only changes in "material facts" or "material" misstatements or omissions, which trigger such events as amendments, suspensions or additional disclosures to the Statement

of Record, which includes the Property Report.[12]   See e.g., 15 U.S.C.§1706(c); 15 U.S.C. §1706(d); see also Venezia, 685 F. Supp. 2d at 761 (in dismissing claim regarding the failure to receive a Property Report, alleged pursuant to 1703(a)(1), the Court rejected Plaintiff's contention that ILSA is a strict civil liability statute pursuant to which Plaintiff could prevail upon allegations of a merely "technical violation" without regard to actual harm).

Here, Plaintiffs' claim of a violation of Section 1703(a)(1)(B) rests solely upon their allegations that they were provided with incorrect notice of their revocation rights in the Property Report (SAC ¶¶918-20).   Thus, even assuming the truth of Plaintiffs' allegations, they fail to allege a material deficiency in the Property Report because they are unrelated to any disclosures concerning the Hotel Units, themselves, and would not affect a reasonable purchaser's decision to enter into the Agreements. (Cf. Nahigian v. Juno-Loudon, LLC, 2010 WL 3418179 at *33, n.8 (E.D. Va. Aug. 23, 2010) (rejecting Plaintiffs' claim for equitable rescission on the ground that the failure to provide notice of a two-year revocation right was not material to the decision to execute the disputed contract "at the time they signed the agreement") (emphasis in original).

In fact, Plaintiffs do not allege that they would have refrained from entering into the Agreements had they been apprised of the more favorable unconditional two-year revocation right.   To the contrary, their allegations in this regard acknowledge that such notice would not have influenced their decisions to execute the Agreements, but instead would have caused them to revoke the Agreements at a later date. Specifically, the Plaintiffs  allege: "Had the Purchasing

---

[12] See, e.g., 24 C.F.R. 1710.23(a), (b) (requiring amendment of the Statement of Record if any change occurs in any representation of material fact"); 24 C.F.R.§1710.29 (providing that there is no authorization or approval for the use of a property report containing any untrue statement of a material fact or omitting to state a material fact required to be stated therein) (emphasis added); 24 C.F.R.§ 1710.45(a) (providing for suspension of a Statement of Record, prior to its effective date, where it or an amendment thereto is, on its face, incomplete or inaccurate in any material respect); 24 C.F.R.§ 1710.45(b) (providing for suspension of an effective Statement of Record upon reasonable grounds to believe that it "includes an untrue statement of a material fact, or omits a material fact required by the Act or rules and regulations, or omits a material fact which is necessary to make the statements therein not misleading").

Plaintiffs been aware that they had the unconditional right to revoke their Agreements within two years of their signing, they each would have done so within the time required." (SAC ¶927).

For the same reason, Plaintiffs fail to state a claim under Section 1703(a)(1)(C), which prohibits the sale of a lot where any part of the Property Report or Statement of Record[13] contains "an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein pursuant to sections 1704 through 1707…or any regulations thereunder." An objective standard of materiality, borrowed from federal securities jurisprudence, is applied under this Section. Thus, materiality is defined as "whether a reasonable investor might have considered the omitted fact or erroneous statement as important in making the [purchase] decision." See Shirley v. Mann, 1993 U.S. Dist. LEXIS 13843 at *22-23 (N.D. Ill. Sept. 22, 1993). As set forth above, that standard cannot be satisfied here.

Finally, Plaintiffs' ILSA claims fail because Plaintiffs have failed to state plausible claims for damages as a result of the alleged ILSA violations. Cf. Venezia, 685 F. Supp. 2d at 761 (rejecting Plaintiff's conclusory assertion of "damages", in the form of the deposits paid, plus interest and legal fees, as nothing more than a "formulaic recitation" of an element of the claim which is not entitled to be assumed to be true). Here, as in Venezia, even assuming that the payment of deposits can be deemed "damages," Plaintiffs have not alleged how such damages are related to the alleged ILSA violations. Plaintiffs have likewise failed to allege any facts which support their claim for the remedy of rescission. In that regard, Plaintiffs have failed to allege sufficient facts to satisfy the "objective materiality" standard required for rescission under ILSA. See Plant v. Merrifield Town Ctr. L.P., 711 F. Supp. 2d 576, 590-91 (E.D. Va. 2010)

---

[13] Plaintiff's allegations of misstatements and omissions in the Statement of Record are premised upon the same provision regarding notice of revocation rights in the Agreement, submitted therewith, as was contained in the Property Report. See note 10, supra.

(rescission is available under ILSA only if the misstatement or omission is "objectively material" to the decision to execute the disputed contract).

### B.    Claim X Fails to State Claims Under 15 U.S.C. §§1703(a)(1)(B),(C) and (D)

Plaintiffs' allegations that the Property Report was rendered noncompliant with ILSA by the inclusion of language regarding a purchaser's entitlement to a partial refund upon default likewise fails to state a claim (SAC ¶¶932-37).  Specifically, the Property Report provides that "notwithstanding our right to retain earnest money upon your failure to cure a default after the expiration of the thirty (30) day notice and opportunity to cure"[14], a defaulting purchaser who has paid 15 percent or more of the purchase price (exclusive of interest) "may be entitled" to a refund of a portion of his deposit(s) "if and to the extent required under Section 1703(d) of [ILSA]": "Under 1703(d) of the ILSA, we must refund to you the remaining amount of the total deposit(s) after subtracting the greater of (i) fifteen percent (15%) of the purchase price and (ii) the amount of the damages incurred by us due to the default" (the "Partial Refund Provision"). (See Ex. C at p.6).

The Partial Refund Provision tracks the language of 24 C.F.R.§1710.105(d)(2)(iii)(C), i.e., it is one of three contractual provisions which, if contained in the Agreement, limit the purchaser's notice of revocation rights to the general seven-day period from the signing of the Agreement. See 15 U.S.C.§1703(b).[15] However, contrary to Plaintiffs' allegations, there is no provision under ILSA or the regulations that prohibits the inclusion of the subject language in the

---

[14] In this regard, the Agreements contain a liquidated damages clause which provides that, upon an uncured event of default by the purchaser, the Sponsor may retain the Deposits, including the Initial Deposit of 10% and the Additional Deposit of 10%. See Ex. A at §§12(b),(c).
[15] The absence of a provision analogous to the Partial Refund Provision in the Agreement, may, under certain circumstances, give rise to two-year revocation right under Section 1703(d). However, with the exception of the Palmer Gardens Plaintiffs (Claim XII), the Plaintiffs do not allege that the two year revocation right provided for by that Section was exercised. Rather, Plaintiffs attempt to circumvent their failure to exercise their purported revocation rights by their assertion of legally insufficient claims under Sections 1703(a)(1) and (a)(2).

Property Report.  Accordingly, Plaintiffs fail to state a claim under 15 U.S.C. §1703(a)(1)(B).

The inclusion of the Partial Refund Provision in the Property Report likewise does not constitute an untrue statement of a material fact or omission of a material fact which is required to be stated in the Property Report or Statement of Record, as is required to state a claim under 15 U.S.C.§1703(a)(1)(C).  As a threshold issue, the statement in the Property Report is not "untrue". The Partial Refund Provision is expressly conditioned upon ILSA's applicability to the transaction, as it is applies only "if and to the extent required by Section 1703(d) of the Interstate Land Sales Full Disclosure Act". (See Ex. C at 6).  Under these circumstances, the Partial Refund Provision is not "false and misleading", as Plaintiffs allege (SAC ¶¶935-38), and is not even inconsistent with the liquidated damages clause in the Agreements, since the Partial Refund Provision will apply only if and to the extent it is required by ILSA.

Moreover, it is well settled that to state a violation of Section 1703(a)(1)(C), the untrue statements of fact or omission of fact must be material and must be required to be stated in the Property Report or Statement of Record.  See Price v. Owens-Illinois Dev. Corp., 646 F. Supp. 314, 317 (M.D. Ga. 1986). Thus, even assuming that the allegations sufficiently alleged that the alleged misstatement or omission was objectively material, a claim does not lie since the language of the Partial Refund Provision is not "required to be stated" in either the Property Report or Statement of Record[16], pursuant to Sections 1704 through 1707 of ILSA and the regulations thereunder.

---

[16] In the latter regard, although the inclusion of language in the Agreement tracking the Partial Refund Provision may affect a purchaser's notice of revocation rights [24 C.F.R.§1710.105(d)(iv)], such language is not "required to be stated" in the Agreement.  Moreover, the Agreement, itself, is not "required to be" annexed to the Statement of Record in the instant case, since forms of agreements to be used in selling or leasing lots are required to be submitted with the Statement of Record only if there is a holder of an ownership interest in the land other than the developer, which is not the case here.  24 C.F.R. §1710.209(f)(3)(i).

Plaintiffs' allegations of a violation of Section 1703(a)(1)(D)[17] fare no better since they are based upon the incorrect premises that: (a) the Agreement and Plan are "advertising or promotional materials", and; (b) the failure to include the Partial Refund Provision in such materials was "inconsistent with information required to be disclosed in the property report". (SAC ¶¶941-44).

First, Plaintiffs' contention that the Agreements and Plan are advertising or promotional materials is belied by the regulations, which provide that the Plan be attached to the Statement of Record [24 CFR §§ 1710.100, 1710.208(d)], and further provide that "[n]o advertising, or promotional material or statements which are self-serving on behalf of the developer or owner may be included in the Statement of Record or resulting Property Report". 24 C.F.R. §1710.102 (i). But even assuming the truth of the allegations that the Agreements and Plan constitute advertising or promotional materials, the claim must fail in any event since, as discussed above, there is no requirement in ILSA or the regulations that the Partial Refund Provision be contained in the Property Report, as is required to state a claim under 15 U.S.C. §1701(a)(1)(D).

## C.      Claim I Fails to State Claims Under Sections 1703(a)(2)(A),(B) and(C)

ILSA's anti-fraud provisions aim to prevent deceptive practices in land sales by requiring developers to disclose material information to purchasers. See Flint Ridge Dev. Co. v. Scenic Rivers Ass'n., 426 U.S. 776, 778 (1976). These provisions make it illegal, with respect to the sale of certain lots, to: (A) employ a device, scheme, or artifice to defraud; (B) obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with

---

[17] Section 1703(a)(1)(D) prohibits the display or delivery of advertising or promotional material which is inconsistent with information required to be disclosed in the Property Report.

respect to any information pertinent to the lot or subdivision; or (C) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a purchaser. 15 U.S.C. § 1703(a)(2)(A)-(C).

In Claim I, Plaintiffs allege broadly that the Defendants' alleged overstatement of Hotel Unit sales and false creation of the perception of unit shortages, made through the oral representations and in press reports and articles, violated each of the above anti-fraud provisions. (SAC ¶¶783-94). It is beyond dispute that the materiality of the alleged misrepresentation or omission is a necessary element of ILSA anti-fraud claims. Notably, courts construing allegations of ILSA's anti-fraud provisions have held that the element of materiality and related element of reliance are negated by disclaimers and specific provisions in the purchase agreement or offering documents.[18] See e.g., Degirmenci v. Sapphire-Fort Lauderdale, LLP, 693 F. Supp. 2d 1325, 1341-43 (S.D. Fla. 2010) (dismissing ILSA fraud claims for lack of materiality and reliance where the allegations were contradicted by the plain language of the contract and other documents attached to the complaint); Taplett v. TRG Oasis Ltd., L.P., 2009 WL 7231455 at *5-6 (M.D. Fla. Apr. 30, 2009) (holding that any presumption of reliance relating to deceptive sales practice claim under 1703(a)(2), premised on non-compliance with ILSA regulation, was rebutted by merger clause in the agreement which prohibited reliance on alleged misrepresentations); Garcia v. Santa Maria Resort, Inc., 528 F. Supp. 2d at 1294-95 (dismissing ILSA fraud claims where the alleged misrepresentations contradicted the express terms of the ensuing written agreement").

---

[18] The courts are divided as to the existence of an independent reliance requirement under ILSA's anti-fraud provisions, Cf. Ivar v. Elk River Partners, 705 F.Supp.2d 1220 (D. Col. 2010) (noting split). However, it is clear from the legislative history that, at minimum, reliance issues in connection with ILSA's anti-fraud claims are to be subsumed into the general materiality inquiry. See H. Rep. No. 96-154, at 34-35, 1979 U.S.C.C.A.N. at 2350-51; Taplett, supra at *4-5 (noting legislative history, and holding that reliance is a requirement under Section1703(a)(2), based on construction of that Section in accordance with the 1934 Act).

28

As discussed in Point I, above, and applying these fundamental principles, the specific disclaimers contained in the Agreements and Plan similarly negate any allegations of the materiality of the alleged misrepresentations or omissions.  The Agreements and Plan contain several specific provisions in which Plaintiffs acknowledge that no oral or written representations were made to them other than as set forth therein and that they did not rely on any extra-contractual representations in deciding to purchase their Hotel Units.

**D.**   **Claim XI Fails to State Claims Under Sections 1703(a)(2)(A), (B) and(C)**

In Claim XI, Plaintiffs merely recast the allegations of Claim X, which relate to the inclusion of the Partial Refund Provision in the Property Report, under the anti-fraud provisions of 1703(a)(2).  However, as discussed in Subsection B, above, the Partial Refund Provision was expressly conditioned upon ILSA's applicability to the transaction and simply does not constitute a misstatement or omission of material fact.  It is fundamental that there can be no fraud where there is no untrue statement of present intention.  See e.g., Venezia, 685 F. Supp. at 764-65 (dismissing ILSA fraud claim since allegations relating to estimated closing date did not qualify as misrepresentation of existing fact).  Additionally, to the extent that Plaintiffs purport to allege a violation under 1703(a)(2)(B), the alleged misstatement or omission is not made with respect to "any information pertinent to the lot or subdivision".  See e.g., Infinity Global, LLC v. Resort at Singer Island, Inc., 2008 WL 1711535 (S.D. Fla. Apr. 10, 2008) (noting the distinction between representations relating to the sale of property versus default and termination of the agreement).  Accordingly, Plaintiffs fail to state a claim under Section 1703(a)(2)(A), (B) and (C).

## POINT IV

### THE COMPLAINT FAILS TO STATE ILSA CLAIMS AGAINST THE NON-DEVELOPER OR NON-AGENT DEFENDANTS

Claims I, IX, X, and XI should be dismissed against Bayrock Spring Street, LLC,

Bayrock Group, LLC, Trump International Hotels Management LLC, Trump Marks Soho, LLC, Donald J. Trump, Alex Sapir, Tevfik Arif, Donald Trump Jr., Ivanka Trump, Eric Trump and Julius Schwarz on the additional ground that they are legally insufficient due to the absence of factual allegations to support Plaintiffs' conclusory allegations that they are "developers" or their "agents".

It is well-settled that liability under ILSA is limited to developers and their agents, as defined under the Act. Bartholomew v. Northampton Nat'l Bank of Easton, 584 F.2d 1288, 1292 (3rd Cir. 1978); 15 U.S.C. §1703(a)(1); 15 U.S.C. §1701(5)(6) (defining "developer" and "agent").[19] Here, Plaintiffs assert Claims I, IX, X, and XI against "All Defendants" based upon their conclusory allegations that every Defendant other than the Sponsor was either a developer or an agent of the Sponsor. (SAC ¶¶924, 946, 962). Critically absent, however, are sufficient factual allegations linking these non-sponsor Defendants to the sales of the Hotel Units to support these perfunctory allegations.

Courts have held that a non-owner entity which was not a party to the Purchase Agreement could not be considered a "developer" or "agent" within the meaning of the Act. Nahigian, 2010 WL at *9. Likewise, "[a]n individual does not become personally liable under the ILSA without some personal involvement in the sale or offer to sell". See e.g., Santidrian v. Landmark Custom Ranches, Inc., 2008 WL 4571820 at *3, n.1 (S.D. Fla, Oct. 14, 2008) (dismissing ILSA claims against president, director and owner of corporate defendant on the ground that he was not a developer or agent where he was not alleged to have personal involvement in the sale of the property).

---

[19] 15 U.S.C. §1701(5) and (6) define "developer" as "any person who directly or indirectly sells or leases or offers to sell or lease or advertises for sale or lease any lots in a subdivision". An "agent" is "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lots in a subdivision."

Plaintiffs' allegations that the aforementioned Defendants are developers and or agents merely state unsupported legal conclusions regarding their respective roles in the transactions. Accordingly, since there are insufficient factual allegations of these Defendants' direct or indirect participation in the sale or offer to sell the Hotel Units, the ILSA Claims against them should be dismissed.

**POINT V**

**THE COMPLAINT FAILS TO STATE CLAIMS FOR COMMON LAW
FRAUD, DECEPTIVE BUSINESS PRACTICES AND BREACH OF CONTRACT**

Once the ILSA Claims and the Securities Claims are dismissed, Claim II (common law fraud), Claim VII (deceptive business practices) and Claim VIII (breach of contract) should be dismissed for lack of subject matter jurisdiction. Without any valid federal claims, and lack of complete diversity between the parties, there is no reason for the Court to retain jurisdiction of the remaining state law claims. Should the Court nevertheless consider those claims, they should all be dismissed, for the same reasons that the Securities Claims require dismissal.

**A.    Common Law Fraud**

The pleading requirements for common law fraud are essentially the same as those for claims under Section 10(b) and Rule 10b-5. Ventura, 568 F. Supp. 2d at 366. Under New York law, to state a claim for common law fraud, or for fraudulent inducement, a plaintiff must allege (1) that the defendant made a false representation of material fact, (2) known by the defendant to be untrue or recklessly made, (3) with the intent to deceive the plaintiff, (4) inducing reasonable reliance, and (5) causation. Grupo Sistemas Integrales de Telecomuncacacion S.A. de C.V. v. A T & T Commc'n, Inc., 1990 U.S. Dist. LEXIS 2927 (S.D.N.Y. Mar. 12, 1996) (Wood, K.). The Complaint fails to adequately allege any of those elements.

The Complaint fails to allege any material misstatement of fact. The element of

31

materiality is determined by examining whether a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question.   Moy v. Adelphi Inst. Inc., 866 F. Supp. 696 (E.D.N.Y. 1994).   As already discussed above (pp.7-12), the Complaint fails to allege that Defendants' statements regarding demand for Trump Soho and the number of Hotel Unit sales would be material to a reasonable person in light of the merger and disclaimer provisions set forth in the Agreements.

The Complaint also fails to plead that the Plaintiffs reasonably relied upon Defendants' alleged misrepresentations because the merger clauses and disclaimer provisions in the Plan and Agreements preclude any finding of justifiable reliance.   Danann Realty Corp. v. Harris, 5 N.Y. 2d 317 (1959) (where plaintiff has in the plainest language stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded, such a specific disclaimer destroys the allegations in complaint that the agreement was executed in reliance upon these contrary oral representations).

Further, the Complaint fails to plead that the alleged fraud was the proximate cause of any loss to Plaintiffs for the same reasons that the Complaint fails to allege loss causation in connection with the Securities Claims (pp.13-14).   See Bennett v. U. S. Trust Co. of N.Y., 770 F.2d 308, 316 (2d Cir. 1985) ("the absence of loss causation is fatal to a common law fraud claim under New York law). Similarly, the failure of the Complaint to allege scienter (p.15) mandates dismissal of the common law fraud claim as well as the Securities Claims.

**B.**     **Deceptive Business Practices**

To state a claim under General Business Law §349, a plaintiff must allege (1) a challenged act or practice that was consumer oriented, (2) that was misleading in a material way and (3) that the plaintiff suffered injury as a result of the deceptive act.   Bildstein v. Mastercard

32

Int'l Inc., 329 F. Supp.2d 410 (S.D.N.Y. 2004).   Putting aside the question of whether a transaction involving a condominium hotel complex has the requisite broad consumer impact, where, as here, the Agreement and Plan contain numerous disclaimers of reliance on any representations or statements not set forth therein, the Plaintiffs' Complaint fails to set forth the requisite material misleading statement.   See e.g., Scott v. Bell Atlantic Corp., 282 A.D.2d 180, 183-84, 726 N.Y.S.2d 60, 63-64 (1st Dept. 2001).  Nor, as noted above, does the Complaint even bother to allege the existence of an actual injury caused by the alleged deceptive practices of the Defendants.  Bildstein, 329 F. Supp. at 415-16.

## C.    **Breach of Contract**

In their claim for breach of contract against the Sponsor, the Plaintiffs allege that the Tenth Amendment to the Plan contained a material change in the terms of their Agreements because of its disclosure of a revised budget and a reduction in the number of projected employees for the Trump Soho.  Citing the Attorney General regulations, the Plaintiffs allege that such a material change required that the "sponsor must grant purchasers a right of rescission and a reasonable period of time that is not less than fifteen (15) days after the date of presentation to exercise the right." (SAC ¶906).  On this basis, Plaintiffs further allege that the absence of a right of rescission extended to purchasers in the Tenth Amendment was a material breach.

However, the Plaintiffs' conveniently ignore that the Tenth Amendment was accepted for filing by the Attorney General without requiring the inclusion of a right of rescission.   If Plaintiffs believed that acceptance of the Tenth Amendment was not in accord with the Attorney General's regulations, their remedy was to initiate an Article 78 proceeding.  Having failed to do so, they cannot allege a breach of contract action based on an alleged violation of the Attorney

General regulations setting forth the requirements for compliance with the Martin Act. It is well settled that only the Attorney General that may prosecute such a claim and no private right exists for individuals to maintain such a claim.  Kerusa Co. LLC, v. W10Z/515 Real Estate L.P., 12 N.Y.3d 236 (2009).  Furthermore, Plaintiffs have not and cannot plead the requisite damages since they have not yet closed on their Units and it is mere speculation that they would suffer any loss at all.

Equally unavailing is Plaintiffs' contention that the failure of the Sponsor and Condominium Board to maintain a list of five real estate brokers as "Qualified Brokers" to rent the Hotel Units was a breach of contract by the Sponsor. First, as set forth in the Restrictive Declaration, the Sponsor was not responsible for the selection of qualified brokers but rather such brokers were to be approved by the Condominium Board [Ex. B-4 §2.02(b)].  Second, as further noted in the Restrictive Declaration, there was no requirement that there be a list of five brokers but that there be "no more than five (5)…rental agents approved…by the Board." Id. (emphasis supplied).  Moreover, the ostensible injury arising from the absence of  a list of five rental agents is the implicit notion that rental of Plaintiffs' Hotel Units would be more difficult. However, as set forth in the Agreements, Purchasers had not relied on any statements, whether written or oral, relating to the ability to rent their Hotel Units. Such a specific disclaimer precludes a claim of a material breach based on the contention that a failure to maintain a list of five brokers impeded the ability of Plaintiffs to rent the units. See, e.g., Bd of Managers of Chelsea 19 Condo. v. Chelsea 19 Assoc., 73 A.D.3d 581, 905 N.Y.S.2d 8, 10 (1st Dept. 2010) (breach of contract claim based on contention that was flatly contradicted by a related disclaimer provision was properly dismissed).

34

## **CONCLUSION**

For all the foregoing reasons, it is respectfully submitted that the instant motion to dismiss Plaintiffs' complaint should be granted in its entirety together with such other and further relief as the Court may deem just and proper.

KURZMAN EISENBERG CORBIN & LEVER, LLP

By:_____
       Fred D. Weinstein, Esq.
       Judith C. Zerden, Esq.
       Diane Kaplan, Esq.
Attorneys for Moving Defendants
One North Broadway
White Plains, NY 10601
Tel. No. (914) 285-9800

H:\84126\0000\00049196.DOC