UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No.
10-Civ.-5830 (KMW)

PALMER GARDENS, LLC, RACHEL GERSTEIN,
JOYCE GERSTEIN, HERBERT GERSTEIN, ALAN
MALTZ, JANET MALTZ, HUBERT TSAI,
CHRISTINE SINGH, XUE FENG, RANDALL A.
MECKEL, HENRY GROSS, BEAVER METAL, LLC,
ACACIO RODRIGUEZ, CREDIBOX UNIVERSAL,
SL, FELISA HERNANDEZ, MICHAEL HADJEDJ,
OLIVER DACOURT, ANH NGOC TRUONG and
SEAN TRAN,

*Plaintiffs*

-against-

BAYROCK/SAPIR ORGANIZATION LLC, DONALD
J. TRUMP, ALEX SAPIR, TEVFIK ARIF, 246
SPRING STREET HOLDINGS II, LLC,
BAYROCK/SAPIR REALTY LLC, BAYROCK
SPRING STREET, LLC, BAYROCK GROUP, LLC,
JULIUS SCHWARZ, TRUMP INTERNATIONAL
HOTELS MANAGEMENT LLC, TRUMP MARKS
SOHO LLC, DONALD TRUMP JR., IVANKA
TRUMP, ERIC TRUMP, PRODIGY
INTERNATIONAL NYC, LLC, RODRIGO NINO,
CORE GROUP MARKETING LLC, SHAUN OSHER,
THOMAS POSTILIO and AKERMAN SENTERFITT
LLP, as ESCROW AGENT,

*Defendants.*

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

**Adam Leitman Bailey, P.C.**
**120 Broadway, 17th Floor**
**New York, New York 10271**

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF CONTENTS........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS .......................................................................................2

ARGUMENT ...........................................................................................................7

I      THE DEFENDANTS EMPHASIZED THE INVESTMENT RETURNS
FROM TRUMP SOHO UNITS UNDER THEIR RESTRICTIVE USE
AND RENTAL REQUIREMENTS, RENDERING THEM
"INVESTMENT CONTRACTS" SUBJECT TO THE SECURITIES
LAWS .............................................................................................................7

II     BECAUSE TRUMP SOHO OWNERS HAVE GUARANTEED,
EXCLUSIVE OCCUPANCY OF THEIR UNITS FOR A
SUBSTANTIAL PORTION OF THE YEAR, AND PERMANENT
OCCUPANCY OF THEIR "OWNER'S SECURE CLOSETS", THE
UNITS ARE LOTS SUBJECT TO ILSA ...........................................................13

III    THE FRAUD CLAIMS ALLEGE THAT THE DEFENDANTS
KNOWINGLY OR RECKLESSLY MADE MATERIAL FALSE
REPRESENTATIONS THAT WERE JUSTIFIABLY RELIED UPON
AND CAUSED LOSS TO DEFENDANTS.......................................................16

      A.    Scienter Is Alleged By Showing Both the Defendants Motive and
Opportunity to Defraud, and Their Conscious Misbehavior and
Recklesness ...........................................................................................17

      B.    The Defendants Generalized Disclaimers Do Not Preclude
Justifiable Reliance, Particularly For Information Peculiarly
Within Their Knowledge .........................................................................19

           1.    *The Disclaimer Provisions are Not Sufficiently Specific to
Preclude Plaintiffs' Reasonable Reliance on Defendants'
Misrepresentations*........................................................................20

2. *The Facts Underlying Defendants' Misrepresentations Were Peculiarly Within Defendants' Knowledge and Thus Cannot Be Disclaimed* ...............................................................21

3. *The Disclaimers Do Not Apply to The Plaintiffs' Additional Deposit Investment Decisions* ........................................................24

C. The Complaint Sets Forth The Many Reasons The Misrepresentations Were Material to the Plaintiffs ...................................24

D. The Deliberately False Overstatements of Sales Levels Foreseeably and Directly Caused Plaintiffs' Losses.................................26

IV DEFENDANTS DO NOT DISPUTE THAT UNDER ILSA THEY WERE REQUIRED TO DISCLOSE THAT THE PLAINTIFFS HAD TWO YEARS TO REVOKE THEIR PURCHASE AGREEMENTS DUE TO THEIR FAILURE TO INCLUDE THE PROVISIONS SPECIFIED IN 15 U.S.C. § 1703(d) ...................................................................................28

V THE COMPLAINT ALLEGES BREACH OF CONTRACT ..............................31

CONCLUSION.............................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

*Abbey v. 3F Therapeutics, Inc.*, 2009 WL 4333819
    (S.D.N.Y 2009) (Wood, J.) .......................................................................19, 20

*Bacolitsas v. 86th & 3rd Owner, LLC*, 2010 WL 3734088 (S.D.N.Y. 2010) .....................29

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ......................................................24

*Betcherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 127 F.3d 478
    (6th Cir. 1997) ....................................................................................15, 16

*Betcherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 799 F. Supp. 755
    (E.D.Mich.1992), *modified* 809 F. Supp. 1259 (E.D.Mich. 1992),
    *aff'd & rev'd in part* 43 F.3d 1054 (6th Cir. 1995) ...................................15

*Burns v. Duplin Land Development, Inc.* 621 F. Supp. 2d 292
    (E.D.N.C. 2009) ...................................................................................30

*Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187 (5th Cir. 1979),
    *mod on other grounds* 611 F.2d 105 (5th Cir. 1980) ..............................12

*Charles H. Greenthal & Co. v. Lefkowitz*, 32 N.Y.2d 457
    346 N.Y.S.2d 234, 236 (1973) ...............................................................32

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317
    184 N.Y.S.2d 599, 602 (1959) ..........................................................20, 22

*DiFolco v. MSNBC Cable, LLC*, 622 F.3d 104 (2d Cir. 2010) ..............................2

*Dimon, Inc. v. Folium, Inc.*, 48 F.Supp.2d 359 (S.D.N.Y 1999) ........................23

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
    Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ..............................................24

*Emergent Capital Investment Management, LLC v. Stonepath Group,
    Inc.*, 343 F.3d 189 (2d Cir. 2003) .......................................................26

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) ...........................................25

*Green v. Beer*, 2009 WL 911015 (S.D.N.Y 2009) ...........................................21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) ......................27

*In re J.P. Jeanneret Associates, Inc.*, 2011 WL 335594 (S.D.N.Y. 2011) ......................12

*In re Paramount Lake Eola, L.P. Litigation*, 2009 WL 2525558
    (M.D. Fla. 2009) ..................................................................13

*Koch v. Greenberg*, 2008 WL 4778813 (S.D.N.Y 2008) ..................................23

*Kwon v. Yun*, 606 F.Supp.2d 344 (S.D.N.Y 2009) .........................................21

*Llewellyn v. North American Trading*, 1997 US Dist. Lexis 22142
    (S.D.N.Y 1997) (Wood, J.)..............................................................23

*Manufacturers Hanover Trust Company v. Yanakas,*
    7 F.3d 310 (2d Cir. 1993)..............................................................20, 21

*Morris v. Bischoff*, 1997 WL 128114 (M.D. Fla 1997) ....................................12

*Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731 (E.D. Va. 2010)..........................31

*Nash v. The New School*, 2009 WL 1159166 (S.D.N.Y 2009) (Wood, J.) ................21, 22

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..................................................17

*Nu-Chan, LLC v. 20 Pine Street LLC*, 2010 WL 3825734 (S.D.N.Y. 2010) ...................31

*Pigott v. Sanibel Development, LLC*, 576 F. Supp. 2d 1258 (S.D. Ala. 2008)................13

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ................................11, 12

*S.E.C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943)................................8

*S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946). ..........................................7

*South Cherry Street, LLC v. Hennessee Group, LLC,*
    573 F.3d 98 (2d Cir. 2009)..............................................................17, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)....................18

*Tippens v. Round Island Plantation L.L.C.*, 2009 WL 2365347
    (S.D. Fla. 2009)..............................................................12, 13

*U.S. v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977)........................................12

*Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444
    (11th Cir. 1985)..............................................................13

**Statutes, Regulations and Other Authorities**

13 NYCRR § 20.5(e)(2) ................................................................................17

15 U.S.C. § 1701(5) .....................................................................................31

15 U.S.C. § 1701(6) .....................................................................................31

15 U.S.C. §1703(a)(1) ..................................................................................30

15 U.S.C. §1703(a)(2) ..................................................................................30

15 U.S.C. § 1703(d) ..............................................................................28 - 31

15 U.S.C. § 78u-4(b)(2) ...............................................................................17

24 CFR § 1710.1 ..........................................................................................13

24 CFR § 1710.105(d)(2) .........................................................................29, 30

24 CFR § 1710.107(a)(3) ..............................................................................25

24 CFR § 1710.209(f)(3) ..............................................................................29

24 CFR § 1715.4(b) ..................................................................................28, 29

Department of Housing and Urban Development, *ILSA Guidelines*,
       61 FR 13596, 13602 (March 27, 1996)...................................................17

Fed. R. Civ. P. 9(b) ......................................................................................17

Fed. R. Civ. P. 12(d) .....................................................................................3

General Business Law § 352-e(1)(b) ..............................................................32

*In re Central Park West PT Associates*, 1995 WL 648105
       (S.E.C. No Action Letter Nov. 2, 1995) ................................................9

Interstate Land Sales Full Disclosure Act, 15 U.S.C. 1701 *et seq.* ("ILSA")............ *passim*

New York Deceptive Business Practices Law,
       General Business Law §§ 349 *et seq* ...................................................17

Real Property Law § 294(1)............................................................................29

Real Property Law § 339-o .............................................................................29

Securities Act of 1933 §2(a)(1), 15 U.S.C. § 77b(a)(1).......................................................7

Securities Exchange Act of 1934 § 3(a)(10), 15 U.S.C. § 78c(a)(10) ...............................7

Securities Exchange Commission, *Guidelines as to the Applicability of the Federal Securities Laws to Offersand Sales of Condominiums or Units in a Real Estate Development,* S.E.C. Release No. 33-5347, 38 FR 1735, 1973 WL 158443 (Jan. 18, 1973) ............................................. 7-8, 11

## PRELIMINARY STATEMENT

Defendants' motion to dismiss virtually ignores the most salient allegations in the Second Amended Complaint (the "Complaint" or "SAC").  In the Complaint the Plaintiffs have exhaustively detailed a consistent and concerted pattern of outright lies told by the Defendants and their agents in order to induce the Plaintiffs and other purchasers to buy units in the Trump Soho.  While official governmental filings show that no more than about 30% of the Trump Soho condominium units have *ever* been sold, the Defendants and their agents repeatedly – and falsely – represented to the individual Plaintiffs and to the worldwide news media that 40%, 50%, 60% and even 70% of the units had been sold.  Because the Defendants cannot escape that the fact that they defrauded the Plaintiffs into signing purchase contracts at their failed development – and that without the fraud, they would have been required refund the deposits of *all* purchasers – they raise a series of picayune technical objections in the vain hope that a strained and distorted reading of some of the project documents can absolve them from liability for their lies and other breaches of their contracts and state and federal law.

The Trump Soho is a unique and untested development concept where a unit owner is guaranteed to be able to occupy his or her unit on an exclusive basis for up to 120 days per year, but whenever he or she is not occupying the unit, it is required to be offered for rental to the general public as a hotel room.  As such, it was marketed both as a part-time hotel residence in the fashionable Soho area of Manhattan and a profitable investment during the times it was not owner-occupied, and the sale of units were governed by both the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* ("ILSA") and the federal securities laws.  Having marketed Trump Soho units as both part-time residences and as investments, the Defendants now argue that legally they are neither, leaving unanswered the question of why the Plaintiffs would

each have contracted to pay more than $1 million for a unit if they could neither live there nor make money off the investment.

Defendants seek to avoid liability for their knowing and deliberate scheme of falsifying their sales figures because of one-sided, generalized disclaimers they included in the voluminous sales documents they drafted.  Such disclaimers cannot, as a matter of law, negate Plaintiff's reasonable reliance on Defendants' false statements about their ongoing unit sales and sales levels, which were peculiarly within the Defendants' knowledge, and not addressed within the sales documents.

As such, Plaintiffs have properly alleged reliance and all of the other elements of their ILSA, securities, and common law fraud claims.  Similarly, the exhaustively detailed Complaint properly alleges the Plaintiffs' claims arising from the revocation option contained in 15 U.S.C. § 1703(d) and for breach of contract.  Accordingly, this Court must deny Defendants' motion to dismiss in all respects.

**STATEMENT OF FACTS**

In considering this motion to dismiss, the Court must accept as true the allegations set forth in the Complaint, though it may as well consider the terms of undisputed contracts and similar documents referenced in the Complaint.  *DiFolco v. MSNBC Cable, LLC,* 622 F.3d 104, 111 (2d Cir. 2010). Though the Purchase Agreements and Offering Plan and Amendments attached to the Affirmation of Fred D. Weinstein dated January 7, 2011 ("Weinstein Aff.") may properly be considered, the purported Form of Property Report the Defendants propound is not the document referenced in the Complaint and does not relate to any transaction at issue herein, so it should not be considered by this Court in deciding this motion.[1]

---

[1]   The Plaintiffs concede, for the purposes of this motion only, the accuracy of the copies of the Purchase Agreements and Offering Plan and Amendment Excerpts attached as Exhibits A and B to the Weinstein Aff. and do

2

The Trump Soho, developed by Defendant Bayrock/Sapir Organization LLC (the

"Sponsor"), is a unique and controversial development located at 246 Spring Street, New York,

New York 10013.  The key issue that the Sponsor had to contend with in creating the Trump

Soho was that it is located in an M1-6 zoning classification which permits its use as a transient

hotel, but not as permanent residences.  To maximize profitability, the Sponsor devised a scheme

– amid substantial community opposition to the project – which allowed it to market and sell

individual units as condominiums while not running afoul of zoning restrictions.

This scheme is embodied in the April 26, 2007 Restrictive Declaration filed by the

Sponsor (the "Restrictive Declaration") (Weinstein Aff., Ex. B-4), to which all other

condominium documents are subject and subordinate.  Under this compromise, a unit owner

may, on the one hand, "guaranty its usage of the Unit it owns" by giving "no less than five (5)

days notice of its intent to occupy its Unit."  (*Id*., ¶ 2.02(d)). [2]  On the other hand, however, each

unit owner's use of its unit is limited to a maximum of 120 days in any calendar year, with no

more than 29 days in any 36 day period.  (*Id*., ¶ 2.02(a))  During the times that the unit is not

owner-occupied, the owner is *required* to make it available for rental as a hotel room under a

rental program of either Defendant Trump International Hotels Management LLC ("Trump

Hotels"), an affiliate of Sponsor, or another rental agent chosen by the Sponsor-controlled

---

not object to their use in connection with this motion, provided that this Court likewise consider the additional
Offering Plan excerpts attached as Exhibits 1 & 2 to the Declaration of William J. Geller dated February 18, 2011
("Geller Decl.").  However, the Plaintiffs object to consideration of Exhibit C to the Weinstein Aff. as it is dated a
different date from the Property Report date alleged in the Complaint (SAC ¶ 733), it relates to a unit not purchased
by any of the Plaintiffs, it was acknowledged by the sales agent well after all of the transactions at issue herein, and
it contains information unrelated to any of the transactions at issue herein.  (*See* Geller Decl., ¶¶ 7-15)  As such, the
Plaintiffs respectfully request that this Court not consider this it connection with this motion.

    The Plaintiffs are drafting this Memorandum of Law assuming that the Court will not consider Exhibit C to
the Weinstein Aff.  Should the Court elect to consider Exhibit C or any similar document propounded by the
Defendants, the Plaintiffs respectfully request the opportunity for further briefing on the authenticity and effect of
such document.  *See* Fed. R. Civ. P. 12(d) (where non-pleading material used "parties must be given a reasonable
opportunity to all present all the material that is pertinent").

[2]    The Hotel Management Agreement requires that, upon proper notice, the "Hotel Manager shall not deny
access to the Subject Unit to Owner."  (Weinstein Aff., Ex. B-5, § 5(a)).

Condominium Board.  (*Id.*, ¶ 2.02(b)) Though up to five other rental agents are permitted, the Sponsor has only been able to locate a single qualified rental agent other than Trump Hotels, and has set up strong financial disincentives for choosing the alternate agent, rendering the purported choice of rental agent illusory and virtually ensuring that all unit owners will use Trump Hotels to rent and manage their units.  (SAC ¶¶ 684-94)  Through this scheme, the Sponsor could offer buyers a guaranteed (though limited-time) residence in New York when they wanted it, and a financial return on their investment when they did not.

Following the recording of the Restrictive Declaration, the Sponsor's Offering Plan (the "Offering Plan" or "Plan") was accepted for filing by the New York Attorney General (the "Attorney General") on August 3, 2007.  (SAC ¶ 236)  Under the Offering Plan, all Trump Soho unit owners are bound by several recorded documents, including the Restrictive Declaration and a Unit Management Agreement between the unit owner and Trump Hotels.  (SAC ¶ 249)  Under the Unit Management Agreement, Trump Hotels is responsible for certain "Mandatory Services", including "establishing room rental rates," and the unit owner is responsible for paying numerous fees, charges and expenses to Trump Hotels and other affiliated entities.  The Unit Management Agreement further sets out the requirements for the Unit Owner's use of the "locked owner's closet located therein and designated for the Owner's exclusive use."  (SAC ¶ 277-284; Weinstein Aff., Ex. B-5).

With the operative documents filed, the Sponsor commenced the marketing and sales of Trump Soho units in September 2007.  As detailed in the Complaint, almost immediately upon the sales launch, the Defendants and their agents began misrepresenting the levels of unit sales and interest, grossly overstating the numbers of units in contract and the size of the purported waiting list to buy a unit.  (SAC ¶¶304-382).  Throughout the sales period, the sales levels

claimed by the Defendants and their agents grew and grew, eventually reaching a plateau in the spring of 2008 where multiple project personnel repeatedly stated to both unit purchasers and the press that around 60% to 70% of the Trump Soho units had been sold.  (SAC ¶¶304-382).[3]

Ultimately, later-revealed filings that the Sponsor made to government agencies demonstrated that the Defendants' statements regarding sales levels were grotesquely overstated. The May 5, 2010 Tenth Amendment to the Offering Plan disclosed that only 62 units, just over 15% of the total, were under bona fide Purchase Agreements, and that sales were very slow to grow to that level.  (SAC ¶¶ 285-88; Weinstein Aff., Ex. B-6)  The fact that just over 15% of the units were in contract is particularly significant, because if the Sponsor had not entered into bona fide sales contracts for at least 15% of the units by May 31, 2010, the Sponsor would have been required to offer rescission and a full deposit refund to all purchasers, including the Plaintiffs. (SAC ¶¶ 392-409)

After the Tenth Amendment was distributed to the Plaintiffs, they uncovered other filings with the Department of Housing and Urban Development ("HUD"), including sworn reports and audited financial statements showing that 17.9% of the units had been sold by the end of 2007 and 30.5% of the units had been sold by the end of 2008 – a time when the Defendants were claiming 60% to 70% unit sales. (SAC ¶¶289-303)[4]  As such, both the Attorney General and

---

[3]      In addition to the numerous oral representations to Plaintiffs and statements stated in the media, Defendants and their agents have made and adopted a number of written representations regarding unit sales, including a Reuters wire service article quoting Defendant Ivanka Trump as saying that 60% of the units were sold, which was posted on the Trump Soho sales website; an e-mail to Plaintiff Alan Maltz from the Trump Soho's Director of Sales that there were 1,400 people on a wait list; an e- mail to Hubert Tsai from Defendant Prodigy International NYC, LLC of a press release quoting Defendant Rodrigo Nino as stating that the building was 53% sold; and  a *Daily News* article quoting Defendant Alex Sapir as stating that the Trump Soho was 53% sold, which was also posted on the Trump Soho sales website.   (SAC ¶¶ 316, 326, 312, 369, & 641-643)

[4]      The first of these filings was submitted to HUD on July 10, 2008 (SAC ¶ 293) – a date well after most of the misrepresentations had been made to and relied upon by the Plaintiffs.  Although this filing was technically subject to discovery by a Freedom of Information Act request thereafter, such a request "would be far beyond any reasonable, customary or usual due diligence." (SAC § 292)

HUD filing demonstrate that the sales level representations made by Defendants and their agents were simply fabrications.

Relying on these false representations, the Plaintiffs entered into agreements with the Sponsor (the "Purchase Agreements") (Weinstein Aff., Ex. A) to buy Hotel Suite Units of the Trump Soho, and upon signing submitted contract deposits of 10% of the purchase price into escrow.  Six months later, the Purchase Agreements provided that the Plaintiffs were to make an additional escrow deposit of 10% of the purchase price, and the Plaintiffs did so in further reliance on the false representations of the Defendants and their agents.

With the disclosure of the Defendants' misrepresentations (prior to the closing of any Unit sales at the Trump Soho), two forms of damages to the Plaintiffs became apparent.  Most significant, because the Plaintiffs and numerous other unit purchasers had been defrauded into signing their contracts and submitting their additional deposits, the minimum of 15% of the units under bona fide sales contracts was procured through fraud, and had there been no such fraud, the Sponsor would not have achieved sales of 15% of the units and thus would have been required to offer refunds of the Plaintiffs' deposits.  (SAC §§ 409-415 & 797-801)  The other consequence of the fraud is that the value of the units at the time the contracts were entered into – and at the present – is substantially below that reflected in the Purchase Agreement prices because the value of a unit in a building with weak and stagnant sales is much less than one where sales are robust and approaching a full sell-out.  Although the amount of diminution of value due to fraud is not liquidated at this time, it appears that it is in excess of 20% of the purchase price, meaning that the fraud exceeds the balance of the purchase deposit, entitling the Plaintiffs to a full refund.  (SAC ¶¶ 454-472 & 793-796).

**ARGUMENT**

**POINT I**

**THE DEFENDANTS EMPHASIZED THE INVESTMENT RETURNS FROM TRUMP SOHO UNITS UNDER THEIR RESTRICTIVE USE AND RENTAL REQUIREMENTS, RENDERING THEM "INVESTMENT CONTRACTS" SUBJECT TO THE SECURITIES LAWS**

In adopting the securities laws of the 1930's, Congress recognized that a broad range of investment vehicles should be considered "securities" subject to regulations.  Securities Act of 1933 §2(a)(1), 15 U.S.C. § 77b(a)(1); Securities Exchange Act of 1934 § 3(a)(10), 15 U.S.C. § 78c(a)(10).  In *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946), the Supreme Court determined that a real estate contract may be considered an "investment contract" and therefore a "security" when it is combined with collateral arrangements binding the buyer.  In a widely-followed 1973 release, the S.E.C. interpreted *Howey* to set forth its *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, S.E.C. Release No. 33-5347, 38 FR 1735, 1973 WL 158443 (Jan. 18, 1973) (the "*S.E.C. Condo Guidelines*"), which conclude that condominium units will be considered "securities" when "any one of the following" applies (emphasis added):

1. The condominiums, with any rental arrangement or other similar service, *are offered and sold with emphasis on the economic benefits* to the purchaser to be *derived from the managerial efforts of the promoter,* or a third party designated or arranged for by the promoter, from rental of the units.

2. The offering of participation in a rental pool arrangement; and

3.  The offering of a rental or similar arrangement whereby *the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.* 38 FR at 1736.

Under the *S.E.C. Condo Guidelines*, and the case law which follows them, Trump Soho units are "securities" due to the Defendants' emphasis on economic returns and the numerous collateral arrangements restricting the buyer's use and rental of the units.

In assessing how the Trump Soho's marketing effort emphasized investment returns, this Court must not only look to the relevant documents, but also the Defendants' actual actions in marketing the Trump Soho. The *S.E.C. Condo Guidelines* explain that:

> the manner of offering and economic inducements held out to the prospective purchaser play an important role in determining whether the offerings involve securities. . . . In other words, condominiums, coupled with a rental arrangement, will be deemed to be securities if they are offered and sold through advertising, sales literature, promotional schemes or oral representations which emphasize the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, in renting the units." 38 FR at 1736 (citing *S.E.C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) ("In enforcement of [the Securities Act], it is not inappropriate that promoters' offerings be judged as being what they were represented to be")

The Complaint details the efforts undertaken by Trump Soho sales staff to market the units through the substantial investment return that they would generate during the times that they were not owner-occupied. SAC ¶¶ 662-683. As the Complaint explains:

> the Trump Soho sales process was presented as selling a cohesive package under which a buyer could have a guaranteed place to stay when he or she was in New York, but would be getting rental income from the property the remainder of the time, under which one organization would manage the hotel, rent out the Units, and distribute the net rental income to the Unit owners." SAC ¶ 672.

In particular, the sales agents provided a detailed investment return computer spreadsheet that would show the net annual rental income the unit would generate based on certain comparable hotel statistics that the sales agents either hinted or directly told buyers. SAC ¶¶ 673-680. Indeed, by couching their investment projections in terms of computer spreadsheets

and comparable hotel variables, they lent the projections an air of precision and authenticity that they might not have had if the sales agents had given the buyers return projections directly.[5]

As to the importance of the emphasis on economic benefits, the S.E.C. no action letter covering another Trump hotel-condominium in New York cited by Defendants is particularly instructive. *In re Central Park West PT Associates*, 1995 WL 648105 (Nov. 2, 1995).[6]  Into the normally-boilerplate cover letter stating that the S.E.C. will take no action under the facts represented, the S.E.C. added an unusual caution:

> In connection with your representations and the position expressed above, the [S.E.C. Enforcement] Division wishes to emphasize that the offer and sale of condominium units and similar properties often involves oral representations made to potential purchasers by sales persons. The Guest Units should be offered and sold without an emphasis on the economic benefits to purchasers to be derived either from the managerial efforts of others or from the rental of such units. In this regard, the Division wishes to make clear that the position expressed in this letter will no longer be applicable if any realtors or salesmen make oral representations concerning the Guest Units which differs from the representations contained in your letter.

Here, the Complaint alleges that the Trump Soho Defendants did exactly what the S.E.C. cautioned the sales agents of the other Trump development not to do, make oral representations regarding the economic benefits of investing in the condominium units.  Indeed, the mere fact that Defendants here actually sold the Trump Soho units based on their economic benefits, is sufficient to render them securities.

The condominium documents further bear out that the economic benefits to Trump Soho purchasers are derived from the efforts of the Sponsor and its affiliated designees.  Under the

---

[5]     In addition, at least one set of Trump Soho sales agents published a brochure and otherwise distributed financial projections that expressly represented the internal rate of return and return on investment that would be generated by the purchase of a Trump Soho unit.  SAC ¶¶ 681-683.

[6]     Because the offering at issue in *Central Park West PT* differs materially from the Trump Soho, principally in that owners there sales of units there are not subject to collateral agreements and are owners are not required to use the hotel manager as rental agent, or even use any rental agent at all, *id.* § III.C, the S.E.C. determined that the offering described would not warrant securities law enforcement.

Restrictive Declaration and Unit Management Agreement, unit owners are required to use Defendant Trump Hotels as Hotel Manager to perform a wide range of "Mandatory Services", including, most significantly "establishing room rental rates." (Weinstein Aff., Ex. B-5, ¶ 3(a))[7] Although unit owners are technically permitted to select from a limited list of companies other than the Trump Hotels as their rental agent, the Sponsor made that choice illusory.

The Restrictive Declaration provides that a unit owner may select as rental manager either Trump Hotels or one of "no more than five (5) (or such greater number as shall be mandated by applicable determination of the Securities Exchange Commission)[8] rental agents approved . . . by the [Sponsor-controlled Condominium] Board." [9] (Weinstein Aff., Ex. B-4, § 2.02(b)). In fact the Sponsor was only able to locate a single company to act as a rental agent other than Trump Hotels, and the Sponsor has set up substantial financial incentives for unit owners to select Trump Hotels over the single other option the Sponsor provides,[10] ensuring that virtually all units will be managed and rented through Trump Hotels, particularly when the alternate rental agents are required to price unit rentals at the rates set by Trump Hotels. (SAC ¶¶ 684-694) Consistent with this, the units were marketed as though their rentals would be handled by one integrated Trump Soho organization. (SAC ¶ 672).

---

[7]     The Offering Plan further explains that: "In order to ensure that the Condominium is operated as an integrated hotel, Hotel Suite Unit Owners will not be permitted to rent their Units at rates that are lower that the best available rates offered by the Hotel Management Company for the same or similar types of Units." (Weinstein Aff., Ex. B-1 at 9)

[8]     This clause of the Restrictive Declaration expressly acknowledges that the Trump Soho units are securities under the jurisdiction of the S.E.C., particularly if rental is offered through a tightly restricted number of agents. The Sponsor has not applied for any determination from the S.E.C. regarding the number of rental agents that should be offered.

[9]     The initial condominium board consists of Defendants and Sponsor-principals Donald Trump, Alex Sapir and Julius Schwarz, and the Sponsor has the absolute right to designate a majority of the board for the project's first five years (except in the highly unlikely event that the condominium is 90% sold before then). SAC §271.

[10]     Trump Hotels charges a rental agent fee of 3.75% of gross room rental, plus other charges up to a maximum of 15% of gross room rental. On the other hand, the alternate rental agent charges 35% of gross room rental, and use of the alternate agent subjects the owner to an additional Unit Management Fee that is rebated if Trump Hotels is rental agent. (SAC ¶¶ 688-692).

Additional indicia that the Trump Soho offering is a security under the *S.E.C. Condo Guidelines* are that the Restrictive Covenant and other condominium documents: (i) prohibit owners from occupying their units for more than 120 days per year, (ii) require that whenever the unit is not owner-occupied it must be held available for rental, and (iii) specify that the owners' occupancy is subject to numerous other restrictions.  38 FR at 1736 (security indicated where "the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit").

The Plaintiff contends that *Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) shows that Trump Soho units are not securities, but *Revak* is readily distinguishable in a critical respect, there was no requirement to use a specified rental agent – or even any rental agent at all.  In *Revak*, the court considered the *S.E.C. Condo Guidelines*, and determined that the guidelines were not met because there were no collateral agreements under which (1) there was any rental agent designated or required to be used by the owners, (2) there was rental pooling, and (3) there were other limitations on the use or rental of their units.  *Id.* at 88-89.  In contrast, the Trump Soho offering is replete with substantial limitations on the use of the units, including that owners are limited to 120 days of use per year and that for all other times they are required to offer their units for rental through one of two rental agents, either the sponsor-affiliated Trump Hotels or, at a heavy financial penalty, the sole authorized independent agent.  Although rents are not technically pooled, owners are required to offer their units for rental at the rates established by Trump Hotels, whether or not they use Trump Hotels as their rental agents, giving virtually all control over rentals to Trump Hotels.  (SAC ¶¶ 684-694) As such, the Complaint properly alleges that "the Trump Soho is set up so that all or virtually all Units will be managed for profit

through the common efforts of Trump Hotels" (SAC ¶¶ 694), satisfying the "horizontal commonality" test of *Revak*. *See also Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 192-93 (5ᵗʰ Cir. 1979), *mod on other grounds* 611 F.2d 105 (5ᵗʰ Cir. 1980) (finding condominium was security with common rental agent despite lack of pooling of rental profits).

Further, although the Second Circuit has not ruled on the issue, courts in this District hold that strict vertical commonality, where "the fortunes of plaintiff and defendants are linked so that they rise and fall together", is sufficient to establish a common enterprise under *Howey.*" *In re J.P. Jeanneret Associates, Inc.*, 2011 WL 335594, *14 (S.D.N.Y. 2011). The Complaint alleges under the Unit Management Agreement charges the unit owner is responsible for paying numerous fees, charges and expenses to Trump Hotels and other affiliated entities based on the usage and rental of the Units (SAC ¶¶ 282-284; Weinstein Aff., Ex. B-5, e.g. §§ 3(b), 4, 7, 13(c), 16 & 18), and that the unit owner is responsible for paying Trump Hotels an additional rental agent fee of at least 3.75% to 15% of gross room rentals if Trump Hotels is selected as rental agent (SAC ¶¶ 690). Because the Complaint alleges that Trump Hotels and other affiliated entities directly participate in the rental revenue collected on behalf of the unit owners, their fortunes rise and fall together, meeting the test of strict vertical commonality. *Id.*; *see also Tippens v. Round Island Plantation L.L.C.*, 2009 WL 2365347, *6-*10 (S.D. Fla. 2009) (finding condominium investment was properly alleged to be both a security and subject to ILSA); *Morris v. Bischoff*, 1997 WL 128114, *5 (M.D. Fla 1997) (security alleged when "condominium units that were intended not only to be used by the purchaser, but also to be rented out as hotel rooms, with the revenue to be shared between the purchaser and the Defendants, and with the Defendants to manage the rental and other arrangements"); *U.S. v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977) (affirming conviction for fraud under both ILSA and the securities laws).

Accordingly, the Trump Soho units are properly alleged to be securities.

## POINT II

**BECAUSE TRUMP SOHO OWNERS HAVE GUARANTEED, EXCLUSIVE OCCUPANCY OF THEIR UNITS FOR A SUBSTANTIAL PORTION OF THE YEAR, AND PERMANENT OCCUPANCY OF THEIR "OWNER'S SECURE CLOSETS", THE UNITS ARE LOTS SUBJECT TO ILSA**

The parties agree that the appropriate starting point in the analysis of whether a Trump Soho unit is a "lot" subject to ILSA is HUD's definition:  "Lot means any portion, piece, division, unit, or undivided interest in land located in any State or foreign country, if the interest includes the right to the exclusive use of a specific portion of the land."  24 CFR § 1710.1 The parties also agree that this Court should consider HUD's interpretive ILSA Guidelines, 61 FR 13596, 13602 (March 27, 1996)[11] which specify that:

> If the purchaser of an undivided interest or a membership has exclusive repeated use or possession of a specific designated lot even for a portion of the year, a lot, as defined by the regulations, exists.  For purposes of definition, if the purchaser has been assigned a specific lot on a recurring basis for a defined period of time and could eject another person during the time he has the right to use that lot, then the purchaser has an exclusive use.

As such, under the ILSA regulations and Guidelines, Trump Soho units are "lots" subject to ILSA if unit owners have exclusive use of any portion of the real property and/or exclusive repeated use of a lot for a portion of the year.

The Sponsor provided most Trump Soho units with an "Owner's Secure Closet" for their owner's safe and permanent storage of possessions within the unit during the periods when they

---

[11]    Courts routinely apply these ILSA Guidelines (or their predecessors, which were identical in relevant part) when deciding ILSA coverage issues.  *Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444, 1450 n.16 (11th Cir. 1985) (applying Guidelines to reject conclusion that realty partnership was in land sales business); *In re Paramount Lake Eola, L.P. Litigation*, 2009 WL 2525558, *13-14 (M.D. Fla. 2009) (detailing applicability of Guidelines); *Tippens v. Round Island Plantation, L.L.C.*, 2009 WL 2365347, *6 (S.D. Fla. 2009) (upholding ILSA claim under Guidelines); *Pigott v. Sanibel Development, LLC*, 576 F. Supp. 2d 1258, 1270-73 (S.D. Ala. 2008) (applying Guidelines to grant summary judgment awarding rescission to buyers).

were renting units as hotel rooms.  The floor plans attached as Exhibit A-1 to each Purchase

Agreement (except the agreement with Dr. & Mrs. Maltz, whose unit omits this feature) contain

an area marked "Owner's Secure Closet" or "O.C." (Weinstein Aff., Ex. A)  The Unit

Management Agreement specifies that the "locked owner's closet" is "designated for Owner's

exclusive use." (Weinstein Aff., Ex. B-5), and the Sponsor's Architect's Report describes the

features of a "typical Owner's Closet" including a drawer, shelves, hanging rod and personal

safe.  (Geller Decl., Ex. 1 at 268).  These Owner's Secure Closets are under the exclusive, full-

time possession and control of the unit owners, for their use while they are actually occupying

their units and to be kept locked and secure while the units are rented out to non-owner guests.

(SAC § 231-235)[12]  Because the Trump Soho offering includes "the right to the exclusive use of

a specific portion of the land", the Owner's Secure Closets, the units offered must be considered

"lots" subject to the full anti-fraud, disclosure and rescission provisions of ILSA.

More broadly, Trump Soho units are "lots" under ILSA because the Restrictive

Declaration and other controlling documents state that, for up to 120 days per year, a unit owner

may "guaranty its usage of the Unit it owns" on five days written notice.  (Weinstein Aff., Ex. B-

4, § 2.02(d); *see also id.*, Ex. B-1 at 2)  Consistent with this, the Unit Management Agreement

provides:  "Hotel Manager shall not deny access to the Subject Unit to Owner for an Owner

Occupancy Period." (Weinstein Aff., Ex. B-5, § 5(a)).[13]  Because Trump Soho unit owners have

---

[12]     Defendants correctly point out that under the Unit Management Agreement an owner may not have *access*
to his or her Owner's Secure Closet while the unit is rented out to a non-owner guest.  (Weinstein Aff., Ex. B-5, ¶
9).  However the fact that the owner's access to the Closet may be restricted at times, does not contradict the fact
that the owner has the permanent, full-time possession and use of the Closet as a place to store his or her toothbrush
and teddy bear between stays at his or her unit.

[13]     "Owner Occupancy Period" is, in turn, defined as "those times of occupancy for which Owner has
requested, and Hotel Manager has confirmed, occupancy by the Owner of the Subject Unit." (Weinstein Aff., Ex. B-
5, § 1(c)(iv)).  Defendants correctly point out that the Unit Management Agreement prohibits unit owners from
entering their units when they are rented to non-owner guests.  (Weinstein Aff., Ex. B-5, § 9)  However, this
provision does not and cannot supersede the requirement of owner's access during an Owner Occupancy Period
requested by the Owner, (*Id.* § 5(a)) nor the Restrictive Declaration's "guaranty [of] usage of the Unit" on five days

a "guaranty" of exclusive use and occupancy of their particular unit on notice, and may

repeatedly use their unit for up to 120 days per year,[14] the Trump Soho units are "lots" subject to

ILSA.

Despite these provisions, the Defendants argue that the Trump Soho is akin to the tax

shelter hotel condominium offering considered in *Betcherer v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 127 F.3d 478 (6th Cir. 1997), the sole reported case holding that ILSA might not

apply to a hotel condominium.  The *Betcherer* court found that the unit buyers, whom it

characterized as "investors", were each "dedicating his or her hotel units for a common business

purpose – use as rental hotel rooms for transient guests.  Investors, largely to comply with tax

regulations, were limited to occupying their hotel units to fourteen days in each calendar year."

*Id.* at 480.[15] Although each investor technically retained the right to evict tenants, the eviction

right was "assigned to the [hotel's] management."  *Id.*  As a result, the investor was not

guaranteed to obtain use of his or her unit on demand, but only could use it if it were not

previously rented.  *Id.* at 482. [16]  Based on this, the Sixth Circuit endorsed the district court's

finding:  "the investors' financing and ownership of the units is in condominium form, but in

reality the units are hotel rooms, designed only for use as hotel rooms, may not be used for

---

notice. (Weinstein Aff., Ex. B-4, § 2.02(d)).  Likewise, the right of hotel manager to control check-ins cannot
supersede the express "guaranty" that a unit owner may use and occupy his or her own unit on notice in the
Restrictive Declaration.  Instead, if a non-owner guest has a reservation covering an owner-requested period, the
hotel manager has at least five days to relocate the guest with the reservation to an alternate unit.

[14]      Indeed, were unit owners not able to guarantee the repeated use of their particular units, the "Owner's
Secure Closet" in which they can store possessions between uses would be rendered useless.

[15]      The first *Betcherer* district court opinion, *Betcherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 799 F.
Supp. 755, 762-63 (E.D.Mich.1992), *modified* 809 F. Supp. 1259 (E.D.Mich. 1992), *aff'd & rev'd in part* 43 F.3d
1054 (6th Cir. 1995) makes clear that the fourteen day usage limitation was necessary to maintain the property's tax
classification as "business investments" and preserve the tax shelter status of the hotel-condominium.  In distinct
contrast, the Sponsor has included a tax opinion in the Offering Plan that states that for tax purposes, a Trump Soho
unit may be considered a "qualified residence."  (Geller Decl. Ex. 2, at 150 & 153-158)

[16]      The Defendants' Memorandum of Law (at 20) quotes a passage in the district court opinion affirmed by the
Sixth Circuit which discussed how the investors' right to use their particular unit was not "guaranteed", and that
indeed there was no "guarantee" that an investor could ever use his or her unit.  In distinct contrast, however, the
Trump Soho's Restrictive Declaration  which was adopted and filed by the Sponsor, expressly provides that a unit
owner may "guaranty its usage of the Unit it owns" on five days written notice. (Weinstein Aff., Ex. B-4, § 2.02(d)).

residential purposes, and were clearly sold as business investments in a hotel," and concluded

that the investments could not be considered "lots" under ILSA.  *Id.*

Unlike an investor in *Betcherer*, a Trump Soho unit owner may "guaranty its usage of the

Unit it owns" for up to 120 days per year, and the "Hotel Manager shall not deny access to the

Subject Unit to Owner."  (Weinstein Aff., Ex. B-4, § 2.02(a) & (d), & Ex. B-5, § 5(a)).  Because

Trump Soho unit owners have guaranteed, part-time, exclusive residential use of the

condominium, which the Sponsor has even promoted as a potential "qualified residence" under

the tax code (Geller Decl. Ex. 2, at 150 & 153-158), it is not a mere business investment like the

units at issue in *Betcherer*.[17]  Instead, the Trump Soho unit owner's "guaranty [of] its usage of

the Unit it owns" confirms that the units are considered "lots" under ILSA, and therefore a

proper subject for ILSA claims.

## POINT III

### THE FRAUD CLAIMS ALLEGE THAT THE DEFENDANTS KNOWINGLY OR RECKLESSLY MADE MATERIAL FALSE REPRESENTATIONS THAT WERE JUSTIFIABLY RELIED UPON AND CAUSED LOSS TO DEFENDANTS

The Defendants do not dispute that in their ILSA, securities and common law fraud

claims, the Plaintiffs have alleged with the requisite particularity the falsehoods uttered by the

Defendants and their agents.  In challenging the other elements of fraud, however, the

Defendants ignore the detailed, factual allegations in the Complaint that establish:  (i) the

Defendants' consistent pattern of stating bald untruths[18] about the project must have occurred

---

[17]     To the extent that the Defendants argue that Trump Soho units are a "business investment", they concede that they are securities subject to the federal securities laws.

[18]     Defendants make the absurd claim that Plaintiffs have failed to adequately allege falsity. In an exhaustively detailed section of the Complaint, the Plaintiffs set forth each specific statement made regarding the then-current sales levels or interest in units, and show the stark discrepancy between such statement and sworn or audited reports of the Sponsor filed with governmental agencies covering the same time period.  (SAC ¶¶ 285-373)  Though Defendants' suggest – impermissibly seeking an inference in their favor – that the affidavit submitted to the Attorney General lists not all units under contract, but only the minimum necessary for effectiveness, that suggestion is contradicted by the Attorney General's regulations, which expressly require disclosure of the full "percentage of

either with knowledge of falsity or reckless disregard of the truth; (ii) the Plaintiffs justifiably relied upon the lies told to them, (iii) the misrepresentations were which were material to the Plaintiffs' decision-making; and (iv) the Defendants' fraud caused substantial losses to the Platintiffs.[19]

## A.  Scienter Is Alleged By Showing Both the Defendants' Motive and Opportunity to Defraud, and Their Conscious Misbehavior and Recklesness

In the Second Circuit, a plaintiff may adequately allege scienter by pleading either that the defendants either had the motive and opportunity to commit the fraud, or by alleging facts to show strong circumstantial evidence of conscious misbehavior or recklessness.  To adequately plead motive and opportunity, the plaintiff must present facts that the defendants would receive concrete, personal financial benefits from the fraud and that they had the means and a likely prospect of achieving those benefits.  To adequately plead conscious misbehavior or recklessness, the plaintiff may set forth facts showing that defendants knew facts or had access to information that the public statements were not accurate, or that defendants failed to check information they had a duty to monitor.  *Novak v. Kasaks*, 216 F.3d 300, 307-311 (2d Cir. 2000); *South Cherry Street, LLC v. Hennessee Group, LLC*, 573 F.3d 98, 108-111, (2d Cir. 2009). Here, Plaintiffs have adequately pled both motive and opportunity and evidence of conscious misbehavior or recklessness.[20]

---

units being offered for which sponsor has accepted purchase agreements from bona fide purchasers."  13 NYCRR § 20.5(e)(2); *see also* SAC § 420 ("affidavit stating the number of bona fide Purchase Agreements that were in effect" in accordance with regulations).  Even if Defendants suggestion that their Attorney General disclosures were incomplete, they cannot escape that their audited financial statements submitted to HUD show their sales representations were simply false.

[19]  The Defendants contend that the Claim VII allegations under the New York Deceptive Business Practices Law, General Business Law §§ 349 *et seq.*, should be dismissed on the same reliance, materiality and injury grounds that they  raise with regard to the fraud claims.  For the same reasons the fraud claims must be sustained, the Deceptive Business Practice Law claim must likewise be sustained.

[20]  Under Fed. R. Civ. P. 9(b), applicable to the ILSA and common law fraud claims, must be plead with particularity, but:  "Malice, intent, knowledge, and other condition's of a person's mind may be alleged generally." For the securities fraud claims, however, plaintiffs must plead particularized facts "giving rise to a strong inference" of the defendants' scienter.  15 U.S.C. § 78u-4(b)(2).  The "strong inference" test is met when "*all of the facts*

To plead scienter through motive and opportunity, a plaintiff point to "concrete benefits that could be realized" from the misstatements and "means used and the likely prospect of achieving concrete benefits by the means alleged."  *South Cherry Street*, 573 F.3d at 108 (internal quotations omitted).  With regard to the Defendants' motive, the Complaint sets forth how each Defendant has a direct financial and personal interest in making and increasing sales of Trump Soho units, both generally with regard to the various classes of Defendants (SAC ¶¶ 473-479), and specifically for each Defendant and other person making a misrepresentation (e.g. SAC ¶¶ 485-487, 494-495, 502-504, etc.).  With regard to the Defendants' opportunity, a detailed section of the Complaint sets forth "The Need to Project Success through False Statements," showing why it was a necessary part of the marketing of the Trump Soho for the defendants to state – and misstate – a high level and continually increasing level of sales to prevent sales from stagnating (SAC ¶¶ 454-72), which would eliminate the direct financial rewards each of the Defendants received based on unit sales.  The Complaint alleges that the Defendants were required to artificially pump up the reported sales levels to keep the sales – and their sales-based compensation – coming, a classic motive and opportunity for fraud.

Plaintiffs properly allege scienter through conscious misbehavior or recklessness "when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  For each Defendant and other person making a misrepresentation, the Complaint

---

alleged, taken collectively" are such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  The Complaint's fraud claims meet both standards because the consistent pattern of lies regarding sales levels alleged to have been made to induce sales by Defendants who, the Complaint alleges, are directly financially compensated on the basis of those sales, sets forth a thoroughly cogent and compelling showing of the inference that those lies were made with fraudulent intent.  Plaintiffs' inference is at least as compelling as any potential opposing inferences, given that there is not another plausible reason for Defendants' to lie about the sales figures and Defendants have not set forth any other motivation.

specifically alleges: (i) why he or she should have know the true sales levels, or other facts alleged to have been falsely stated, (ii) why he or she knew or should have known the statements were false, and (iii) that to have made such statements without knowing or ascertaining the true facts would have been severely reckless.  (e.g. SAC ¶¶ 482-484, 491-493, 499-501, etc.). Because each of the defendants was in a position to know the true facts about the false statements they were alleged to have made, and made those statements either knowing they were false or recklessly failing to ascertain the true state of affairs, the Complaint properly alleges that they made their false statements with scienter.

**B.    The Defendants' Generalized Disclaimers Do Not Preclude Justifiable Reliance, Particularly For Information Peculiarly Within Their Knowledge**

The Complaint specifically alleges that, for each of the "False and Misleading Statements Made by Defendants," each Plaintiff justifiably relied on the false statement in deciding to enter into the Purchase Agreement or submit their additional deposits. (SAC ¶¶ 304-364, 374-382) Without denying the falsity or apparent reliability of the sales and other representations made to the Plaintiffs and their representatives, Defendants argue that certain generalized Purchase Agreement disclaimer provisions prevent Plaintiffs from establishing justified reliance on Defendants' lies.  None of the disclaimer provisions, however, are sufficiently specific to bar a claim of reasonable reliance.  Further, such disclaimers cannot immunize the false statements the Defendants made about facts peculiarly within their knowledge.  Additionally, the disclaimers made on the signing of the Purchase Agreements cannot limit the fraud claimed on the subsequent misrepresentations inducing the Plaintiffs to make additional deposits.

In assessing the reasonableness of a plaintiff's reliance, this Court must consider:  the context of the transaction as a whole, the complexity and magnitude of the transaction, the sophistication of the parties, and the content of any agreements between them.  *Abbey v. 3F*

*Therapeutics, Inc.*, 2009 WL 4333819 at *11 (S.D.N.Y 2009) (Wood, J.) (reasonable reliance

properly alleged).  Whether a plaintiff's reliance on the misrepresentations was reasonable is

"intensely fact-specific and generally considered inappropriate for determination on a motion to

dismiss." *Id.* at *12.

### 1.   *The Disclaimer Provisions are Not Sufficiently Specific to Preclude Plaintiffs' Reasonable Reliance on Defendants' Misrepresentations*

For a disclaimer to defeat the justifiable reliance element of a fraud claim, it must

contradict the specific representations underlying the fraud.  In its leading case on this issue,

*Manufacturers Hanover Trust Company v. Yanakas,* 7 F.3d 310, 312-315 (2d Cir. 1993), Second

Circuit reversed the district court's dismissal of counterclaim for fraudulent inducement, holding

that "a general merger clause is ineffective, however, to preclude parol evidence that a party was

induced to enter the contract by means of fraud.  *Id.* at 315.  Although the Court noted that a

disclaimer of "the existence of or reliance upon *specified representations*" may bar a fraud claim

based on those representations, *id.* (emphasis added),  dismissal is only warranted where "the

disclaimer has been sufficiently specific to match the alleged fraud."  *Id.* at 317.  As such, the

most important factors to consider were the specificity of the disclaimers and how they track the

substance of the alleged misrepresentations.  Ultimately, the Second Circuit found dismissal

improper, holding that:

> [T]here is no indication that the Yanakas Guaranty, which is in preprinted form, is
> anything but a generalized boilerplate exclusion.  The form was one that MHT apparently
> used routinely…[and] [t]here was no evidence that the scope or character of the
> Guaranty was the product of any negotiations between the parties.

*Id.* at 317; *see also Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320, 184 N.Y.S.2d 599, 602

(1959) ("a general merger clause is ineffective to exclude parol evidence to show evidence of

fraud in inducing the contract").  As such, it is only where a contract states that the plaintiff

disclaims reliance on the specific representations made to him or her, that the plaintiff is barred from claiming that he or she was fraudulently induced into entering the contract due to his reliance.  *Yanakas*, 7 F.3d at 315-7; *see also Nash v. The New School*, 2009 WL 1159166 at *4 (S.D.N.Y 2009) (Wood, J.) (denying defendants' Motion to Dismiss plaintiffs' fraud because plaintiff adequately pled all the elements of fraud, including reasonable reliance in spite of a general disclaimer provision); *Green v. Beer*, 2009 WL 911015 at *8  (S.D.N.Y 2009) (holding that plaintiffs sufficiently alleged reasonable reliance and the general disclaimers did not preclude plaintiffs' claims); *Kwon v. Yun*, 606 F.Supp.2d 344, 357-358 (S.D.N.Y 2009) (holding that the disclaimers cited by defendant were not sufficiently specific to preclude plaintiff's fraudulent inducement claim).

The Defendants, in their Memorandum of Law (at 8) quote an abridgement of the disclaimer language in paragraph 20 of the Purchase Agreement which is nothing more than a generalized merger clause with a boilerplate disclaimer of non-reliance on parol representations. However, when the full paragraph 20 is examined, it becomes clear that this disclaimer is actually *focused away from* representations regarding sales, but rather concentrates on items actually addressed in the Purchase Agreement and Offering Plan such as the physical conditions of the development and the unit, the services available to purchasers, and the financial aspects of the transaction.[21]  Nowhere do the Defendants disclaim any representations made with regard to unit sales, the relevant misstatements at issue here.[22]  As representations concerning sales figures

---

[21]     The clause of Paragraph 20 of the Purchase Agreements omitted from the Defendants' Memorandum of Law  focuses the disclaimer on items:  "including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocable to the Unit, the estimated real estate taxes of the Unit, the ability to rent the Unit and/or the rental income therefor, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data."

[22]     Although the Offering Plan has a clause that states there the Sponsor does not commit to selling more than 15% of the units, such a clause does not contradict the Defendants' specific, present time representations of fact that

are not specifically disclaimed in Section 20 of the Purchase Agreement, Defendants cannot rely on this section to disclaim liability for their misstatements.[23]

Similarly, Defendants' argument that Exhibit A to the Purchase Agreements, which provides that the Purchaser has not relied on any representations "concerning potential economic or tax benefits to be derived from purchasing the Hotel Suite Unit, including appreciation in value, rental income and depreciation," fails to defeat justifiable reliance on the Defendants misrepresentations concerning the sales levels of the Condominium, because sales figures are not the type of economic or tax benefit representations specifically disclaimed.[24]

Because a disclaimer must state *affirmatively* that the party disclaims reliance *specifically* on the subject about which the contracting party allegedly made misrepresentations in order to serve as a bar to that party's claim of reasonable reliance, *Nash*, 2009 WL 1159166 at *4, and none of the disclaimers address reliance on sales representations, and thus, Defendants' cannot use these disclaimers to shield themselves from liability for their fraudulent statements concerning unit sales.

### 2. The Facts Underlying Defendants' Misrepresentations Were Peculiarly Within Defendants' Knowledge and Thus Cannot Be Disclaimed

Though the Defendants' disclaimers not specific enough to bar Plaintiffs' fraud claims, even if they were more specific, they would be ineffective to defeat Plaintiffs' fraud claim under the well-established exception for false statements "wherein the facts represented were matters peculiarly within the defendant's knowledge." *Danann*, 5 N.Y.2d at 322, 184 N.Y.S.2d at 603.

---

numbers much greater than 15% of the Units were then sold.  Thus, Defendants cannot invoke this provision to preclude Plaintiffs' reasonable reliance on those misrepresentations.

[23]     Likewise, the disclaimer on page 23 of the Plan (Weinstein Aff., Ex. B-1, at 23) is simply generalized boilerplate insufficient to defeat reliance on specific representations regarding sales.

[24]     To the extent that this disclaimer may be effective to bar reliance on the financial misrepresentations made by Defendants or their agents, those representations are simply not the basis for Plaintiffs' fraud claims.  Instead, the Defendants' statements to Plaintiffs regarding investment returns are used to demonstrate that Trump Soho units were marketed as investment securities.  (SAC ¶¶ 662-699).

Even were there is a specific disclaimer of the representations relied upon by a plaintiff, when the facts related to the representations are peculiarly within the misrepresenting party's knowledge, such disclaimer will not bar a claim of reasonable reliance. *Dimon, Inc. v. Folium, Inc.*, 48 F.Supp.2d 359, 368 (S.D.N.Y 1999) (holding that plaintiff has alleged facts to show that the information underlying the misrepresentations was peculiarly within defendant's knowledge); *Koch v. Greenberg*, 2008 WL 4778813 at *3 (S.D.N.Y 2008) (holding that plaintiff sufficiently alleged that the facts underlying defendant's misrepresentations were peculiarly within defendant's knowledge).

In determining whether the facts supporting the misrepresentations are within the peculiar knowledge of the defendant, the courts look at whether the information was within the exclusive knowledge of the defendant or whether the truth could have been discovered only with extraordinary effort, the level of sophistication of the plaintiff, and the plaintiff's access to the information underlying the misrepresentation. *Dimon, Inc.* 48 F.Supp.2d at 368; *Koch*, 2008 WL 4778813 at *3 (S.D.N.Y 2008). This is a fact specific inquiry that is generally not appropriate for a motion to dismiss. *See Llewellyn v. North American Trading*, 1997 US Dist. Lexis 22142 at *15 (S.D.N.Y 1997) (Wood, J.) (holding that a disclaimer "will not preclude evidence of misrepresentations if, as here, the facts allegedly misrepresented are peculiarly within the seller's knowledge").

In this case, Plaintiffs had no access to the true sales figures of the Condominium, and the Defendants certainly did not make such information available. Each Plaintiff is a member of the general public to whom the Units were offered, not a sophisticated real estate company with the means or opportunity to verify the validity of the sales claims. As such, the true Trump Soho

sales figures were within the peculiar knowledge of the Defendants, and the Plaintiffs were thus justified in relying on them despite any disclaimer the Defendant might have propounded.

### 3. The Disclaimers Do Not Apply to The Plaintiffs' Additional Deposit Investment Decisions

Even if the disclaimers had some effect of immunizing the Defendants from the false statements they made before the Purchase Agreements were signed[25], they are ineffective to defeat the Plaintiffs justifiable reliance on the subsequent lies told to induce them to submit their additional 10% deposits six months after contract signing. (SAC § 25-26)[26] In deciding to make the additional deposit, each Plaintiff decided on whether to invest an additional 10% or whether that would be "throwing good money after bad". The Complaint clearly alleges that the Plaintiffs relied on the sales level misrepresentations (unencumbered by any disclaimer) in deciding to make their additional deposits. (SAC ¶¶ 310-382)

### C. The Complaint Sets Forth The Many Reasons The Misrepresentations Were Material to the Plaintiffs

The Complaint carefully explains why the sales misrepresentations were material to the Plaintiffs in making their investment decisions. In order to establish the element of materiality, a plaintiff must show that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). This is a fact specific inquiry into whether a reasonable purchaser would consider the misrepresentation in its decision-making. *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). Because materiality is a mixed question of law

---

[25]   As the Defendants well know, the partial assignment of the Tsai-Singh Purchase Agreement was made with the Sponsor's consent (Geller Aff., Ex. 3), so the Defendants lies to induce that assignment properly support a fraud claim.

[26]   Under the Purchase Agreements, the Sponsor has no enforceable right to this deposit. Rather, not making it may merely risks loss of the initial deposit as liquidated damages. (Weinstein Aff., Ex. A, ¶ 12)

and fact "a complaint may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

The Complaint alleges that the number or percentage of units already sold by the developers was an important consideration in their decision to enter into a purchase agreement for several reasons, each of which is specifically alleged in Plaintiffs' Complaint:  (1) given the novel concept of the Trump Soho and its unique Restrictive Covenant, the Plaintiffs were reassured by the fact that a substantial number of previous purchasers had evaluated and approved the project; (2) a substantial portion of the value of the Units comes from a purchaser's ability to re-sell the Unit in the secondary market;[27] (3) a high percentage of sales indicate that the Units were well priced in the marketplace; (4) the higher the percentage of Sponsor ownership in a condominium development, the riskier the investment becomes because of the increased chance or Sponsor default; and (5) many banks will not lend for condominium units where Sponsor ownership is more than 30 or 50 percent.  (SAC ¶¶ 7-11 & 459-471)  All of these reasons are why the Plaintiffs – as any reasonable investor would be – were keenly interested in the levels of unit sales, and indeed, why the Defendants trumpeted their purported sales levels in the media.  Had the Plaintiffs or any other reasonable purchaser been aware of the anemic sales at the Trump Soho, such information would clearly have "altered the total mix of information available" and subsequently affected the decision to purchase the Unit, satisfying the pleading requirement for the materiality of Defendants' misrepresentations.

---

[27]     Indeed the Property Report contained the HUD-required disclosure that:  "Resale of your Hotel Suite Unit may be difficult or impossible until our projected sell-out of the condominium, since you may face the competition of our own sales program and local real estate brokers may not be interested in listing your Hotel Suite Unit." (SAC § 9); *see* 24 CFR § 1710.107(a)(3).

**D.    The Deliberately False Overstatement of Sales Levels Foreseeably and Directly Caused the Plaintiffs' Losses**

In the Second Circuit, loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff . . . meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) (citations and internal quotes omitted) (reversing dismissal because transaction causation was alleged).  As set forth above, the number and percentage of units sold in a new development is highly material to purchasers, and as such is an important consideration as how a condominium unit should be priced.  The Complaint details how, in order to induce to sales, the Defendants knew that they had to artificially inflate the sales numbers they were reporting, and that if they had failed to do so, sales prices would have declined (to the extent that they would have been able to make any sales at all).  (SAC ¶¶ 454-472)  As such, it was not merely foreseeable, but actually foreseen, that the sales misstatements inflated the purchase prices of the Plaintiffs and other purchasers.

Because of this, the Complaint not only alleges that the Plaintiffs would not have entered into the Purchase Agreements (transaction causation) (SAC § 792), but that:  "Had the sales and marketing of the Trump Soho been free of the Defendants' fraudulent and deceptive practices, the fair market value of the Trump Soho Units (to the extent they were marketable at all) would have been substantially below the purchase prices agreed to by the Purchasing Plaintiffs at the time they were entered into."  (SAC § 793)  Indeed, the Complaint alleges that the level of reduced prices caused by the disclosure of the Defendants' misstatements are "well more than

20% below" the Plaintiffs original purchase prices.  (SAC ¶ 796).[28]  Accordingly, the Complaint

expressly alleges loss causation in that the misrepresentations directly and foreseeably caused the

purchase prices of the Trump Soho units to be overstated, and that such overstatement caused

injury to the Plaintiffs.[29]

Loss causation is also alleged because the Defendants' fraud allowed the Sponsor to

avoid a mandatory offer of rescission to the Plaintiff.  Under the Attorney General's regulations

and the Plan, if the Sponsor did not declare the Plan effective and hold its first closing by May

31, 2010, it was required to offer a rescission and a full deposit refund to each purchaser.  In

order to avoid rescission, it was required to have "purchase agreements from bona fide

purchasers" for at least 15% of the units offered, or at least 60 (possibly 62) of the units.  (SAC

¶¶ 392-409)

The Tenth Amendment disclosed that the Sponsor had bona fide purchase agreements for

only 62 units, just over the bare minimum required (Weinstein Aff., Ex. B-6).  Because

Complaint alleges that the Plaintiffs and numerous other unit purchasers were induced to sign

their contracts through fraud, the required minimum number of sales contract was procured

through fraud.  The Complaint alleges that, had there been no such fraud, the Sponsor would not

have achieved sales of 15% of the units and would have been required to offer rescission and full

refunds of the Plaintiffs' deposits.  (SAC §§ 409-415 & 797-801).  As such, the Complaint

properly alleges that the Defendants' fraud caused loss because it directly and foreseeably

---

[28]     Although the Defendants claim, in a conclusory fashion, that the reduced prices were due to general market
forces, disaggregation of the amount of price reduction caused by different factors is a factual issue to be resolved at
trial.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36-37 (2d Cir. 2009).
[29]     Defendants disingenuously claim that because the Plaintiffs have not closed, they have suffered no loss,
despite the fact that the Plaintiffs each have substantial escrow deposits at risk, and the more than 20% reduced
value of their units because of the fraud means that, were the Defendants to actually close, they would be getting an
unit worth less than the remaining 80% of the purchase price that they have yet to invest.  As such, the Plaintiffs
have fully lost the value of their deposits, and requiring them to close would cause them even more losses.

allowed the Sponsor to avoid refunding the Plaintiffs' deposits, which it would have been required to do absent the fraud.

For these reasons, the Plaintiffs have properly alleged all of the elements of their ILSA, securities and common law fraud claims, as well as their state deceptive sales practices claim, in that they have shown that the Defendants made false statements with scienter which were material and justifiably relied upon by the Plaintiffs, directly causing them substantial losses.

**POINT IV**

**DEFENDANTS DO NOT DISPUTE THAT UNDER ILSA THEY WERE REQUIRED TO DISCLOSE THAT THE PLAINTIFFS HAD TWO YEARS TO REVOKE THEIR PURCHASE AGREEMENTS DUE TO THEIR FAILURE TO INCLUDE THE PROVISIONS SPECIFIED IN 15 U.S.C. § 1703(d)**

15 U.S.C. § 1703(d) provides that any sales contract not exempt under ILSA[30] "may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement" where the contract does not include certain particular clauses, including: (a) "a description of the lot . . . which is in a form acceptable for recording by the appropriate public official", and (b) that on "a default or breach of the contract or agreement which occurs after the purchaser or lessee has paid 15 per centum of the purchase price of the lot, . . . the seller or lessor (or successor thereof) shall refund to such purchaser or lessee any amount" paid in excess of 15 percent of the purchase price, or actual damages if greater.  15 U.S.C. § 1703(d)(1) & (3).  A HUD regulation clarifies that to avoid a revocation right under the refund on default clause: "no damages may be specified in the contract or agreement, except a liquidated damages clause not exceeding 15% of the purchase price of the lot, excluding any interest owed." 24 CFR § 1715.4(b).

---

[30] Defendants do not dispute that no ILSA exemption applies to Trump Soho sales, other than their claim that ILSA is generally inapplicable because the units are not "lots."

In their papers, the Defendants do not dispute that the Trump Soho Purchase Agreements contain a 20% liquidated damages on default provision and fail to provide a lot description "in a form acceptable for recording."   Each Purchase Agreement provides that the purchaser is to make escrow deposits totaling 20% of the unit's purchase price and that upon the purchaser's default, the Sponsor may retain the full 20% deposit as liquidated damages.  No provision requires the Sponsor to refund anything upon default.  (Weinstein Aff., Ex. A, ¶¶ 3.1 & 12)  As such, the Purchase Agreements may be revoked within two years under 15 U.S.C. § 1703(d)(3) and 24 CFR § 1715.4(b).  (*See* SAC ¶¶737-745)

Further, the Purchase Agreements are neither notarized or otherwise eligible to be recorded under New York Real Property Law ("R.P.L.") § 294(1), nor do they contain a legal description of the condominium unit to be conveyed in compliance with the requirements of R.P.L. § 339-o.  As such, they do not include "a description of the lot . . . which is in a form acceptable for recording by the appropriate public official" as specified in 15 U.S.C. § 1703(d)(1).  Accordingly, they are revocable within two years of signing.  *See Bacolitsas v. 86th & 3rd Owner, LLC*, 2010 WL 3734088 (S.D.N.Y. 2010); *see also* SAC ¶¶ 746-756.[31]

Because the Trump Soho Purchase Agreements were revocable within two years of signing under 15 U.S.C. § 1703(d), the HUD regulations required that the Sponsor disclose this revocation period both on the face of the Property Report and within the Purchase Agreement itself.  24 CFR 1710.105(d)(2) provides that where the Purchase Agreement does not include the clauses specified in 15 U.S.C. § 1703(d), the cover page of the Property Report must state (in place of other rescission language):  "Under Federal law you may cancel your contract or agreement of sale any time within two years from the date of signing."  Further, 24 CFR §

---

[31]      Because the Purchase Agreements are revocable for two years under 15 U.S.C. § 1703(d), and Plaintiff Palmer Garden claims that it timely and validly revoked its contract within two years of its signing, Plaintiffs' Claim XII brought by Palmer Garden to enforce its revocation validly states a claim.  (SAC ¶¶ 965-973).

1710.209(f)(3) provides that the Purchase Agreement must disclose its ILSA revocability "in boldface type (which must be distinguished from the type used for the rest of the contract) on the face or signature page above all signatures" in language "consistent with that shown on the Cover Page (see §1710.105)."  (SAC ¶¶ 757-767)

Because neither the Property Report cover page nor the Purchase Agreement advised Plaintiffs of their right to cancel their Purchase Agreement within two years, the Sponsor has violated ILSA's disclosure requirements.    15 U.S.C. § 1703(a)(1)(B), (C) & (D).  *see also* SAC ¶¶ 757-767.  Where a developer has not complied with ILSA and its regulations in preparing the property report, a purchaser need not only prove the violations of ILSA and its regulations, and need not demonstrate reliance, intent to deceive, or the purchaser's knowledge through other means.  *Burns v. Duplin Land Development, Inc.* 621 F. Supp. 2d 292 (E.D.N.C. 2009).  Because the Property Report here fails to provide the required disclosure of the Plaintiffs' two year revocation option and omits a material fact (the revocation option), and the materials distributed by Defendants are inconsistent with the required disclosures, Plaintiffs properly state a claim under 15 U.S.C. § 1703(a)(1)(B), (C) & (D).[32]

More significantly, the Sponsor's failure to make the required disclose of the Plaintiffs two year revocation right deprived them of the opportunity to exercise that right within the period that it was effective.  As Judge Paul A. Crotty of this Court recently found, where a plaintiff has a two year revocation right under ILSA but fails to exercise it within the time required, the Court may equitably extend the revocation right in cases:

> where the developer did not give notice of the rescission right, the buyer must prove (1) that the developer did not give notice of the buyer's right of rescission; (2) that the buyer did not learn about the rescission right until after the two-year

---

[32]    These omissions are also properly alleged to be deceptive sales practices actionable under 15 U.S.C. § 1703(a)(3).

period had expired; (3) that the buyer would have exercised the rescission option during the two-year period, if the developer had informed them of the right; and (4) that the buyer has incurred damages as a result.

*Nu-Chan, LLC v. 20 Pine Street LLC*, 2010 WL 3825734 (S.D.N.Y. 2010). As the Complaint alleges that the Defendants failed to disclose the two year revocation right; that had the Plaintiffs learned of that right within two years, they would have made a timely revocation; and that they were injured as a result (SAC ¶¶ 926-929), it states a claim for equitable revocation under *Nu-Chan*.[33]

For these reasons, the Plaintiffs claims based on the Plaintiffs' two year revocation right under 15 U.S.C. § 1703(d) and the Defendants failure to disclose that right (Claims IX to XII) must be sustained.

## POINT V

## THE COMPLAINT ALLEGES BREACH OF CONTRACT

Under the terms of the Offering Plan, expressly incorporated by reference into the Purchase Agreements (Weinstein Aff. Ex. A, ¶ 11.2), the Sponsor retains the extraordinary power to "substantially revise the terms and conditions upon which the Units are to be sold, including changes involving the rights, obligations and liabilities of Sponsor and/or prospective Purchasers under the Plan." (Weinstein Aff., Ex. B-1 at 177) Such boundless authority of the Sponsor to modify the terms of the Plan and its own obligations is restricted, however, by

---

[33]    Throughout the Complaint, the Plaintiffs set forth in detail the roles played by each of the Defendants in the development, marketing and sale of the Trump Soho (*see e.g.* SAC ¶ 193). Based on the prior allegations of their personal involvement in the Trump Soho sales process – including the lies they told to induce sales – in the first ILSA claim, the Plaintiffs allege that the Sponsor is the "developer" of the Trump Soho under 15 U.S.C. § 1701(5) and all other Defendants are "agents" of the Sponsor under 15 U.S.C. § 1701(6) based on the fact that each "directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease" Trump Soho units. (SAC ¶¶780-782) In subsequent ILSA claims, the allegation of Defendants status as developer or agent is repeated in a summary fashion. (SAC ¶¶ 924,946, 962). As such, at this pleading stage, the Plaintiffs allegations that Defendants are developers or agents under ILSA must be sustained pending factual determination of each Defendants' actual participation. *See Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 746-47(E.D. Va. 2010) (denying summary judgment for fact questions over whether party's activities were those of "developer" under ILSA).

Sponsor's promise that it will disclose all "substantive or material" changes in a Plan amendment, and that:  "if there is a material change that adversely affects any Purchasers, Sponsor will grant such Purchasers a right to rescind their respective agreements by written notice given within fifteen (15) days within after the date of presentation of such amendment [disclosing the change]."  (*Id.*)  Under this scheme, the Sponsor retains the flexibility to modify the terms of their offering, but Purchasers retain the ability to avoid being subject to adverse changes to which they object. [34]

    The Complaint details that the Sponsor elected to make and disclose a substantial and averse change to the conditions of the Trump Soho offering in the Tenth Amendment to the Plan (Weinstein Aff., Ex. B-6)  The original Plan (and Third Amendment) set forth a detailed plan listing the 213 employees to be hired by the Trump Soho, broken out by job title and number of positions, which was represented to be the "core management and service staff necessary to operate a quality hotel the size of the Condominium."  (SAC ¶¶ 430-437)  This detailed staffing plan was incorporated into, and became a term and covenant of, the Purchase Agreements signed by the Plaintiffs. (SAC ¶¶ 428 & 437)  However, in the Tenth Amendment, the Sponsor radically reduced its staffing, cutting the number of personnel by more than 25% to 159, and eliminating or decimating many staff functions, while simultaneously taking over responsibility for operation of the fitness center from the spa unit owner without allocating staff to this function.  (SAC ¶¶ 438-445).  As the Complaint properly alleges such a significant staff reduction from the prior

---

[34]    Under the Martin Act:  "The filing requirement is simply for the purpose of affording 'potential investors, purchasers and participants an adequate basis upon which to found their judgment and shall not omit any material fact or contain any untrue statement of a material fact.'"  *Charles H. Greenthal & Co. v. Lefkowitz*, 32 N.Y.2d 457, 462, 346 N.Y.S.2d 234, 236 (1973) (quoting General Business Law § 352-e(1)(b)).  As the Martin Act is merely a disclosure statute, nowhere in the Act or its regulations is the Sponsor required to incorporate the Martin Act disclosures into a purchase agreement.  Similarly, nowhere in the Martin Act or its regulations is the Sponsor required to allow itself to modify its "rights, obligations and liabilities." Instead, the Sponsor here voluntarily incorporated the Offering Plan by reference into the Purchase Agreements, and thus made its obligation to grant rescission for adverse amendments an obligation enforceable under contract law.  The fact the Martin Act may not provide a private right of action does not preclude this contract claim.

"core management and service staff necessary" constitutes material, adverse change entitling the Plaintiffs to a 15 day revocation period, a period which was not offered by Sponsor in breach of the Purchase Agreements.  (SAC ¶¶ 446-453).

## CONCLUSION

Accordingly, for the reasons stated herein, the Plaintiffs respectfully request that this Court: (1) deny in its entirety Defendants' motion to dismiss the Second Amended Complaint; (2) to the extent that this Court may grant dismissal in any respect, permit Plaintiffs leave to replead; and (3) award such other relief as may be just and proper.

Dated: New York, New York
　　　　February 18, 2010

**Adam Leitman Bailey, P.C.**

　/s/ William J. Geller　　　　　
By: William J. Geller

*Of Counsel:*　　　　　　　　　*Attorneys for Plaintiffs*
Adam Leitman Bailey　　　　　120 Broadway, 17th Floor
John M. Desiderio　　　　　　　New York, NY 10271
Courtney J. Killelea　　　　　　(212) 825-0365